**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

| | |
|---|---|
| **Nicholas Funk**<br>109 West Hill Street<br>Baltimore, Maryland 21230<br>Baltimore City<br><br>**For himself and for similarly situated individuals,**<br><br>　　　　　　　　　Plaintiff,<br><br>**vs.**<br><br>**COLLECTORS UNIVERSE, INC., d/b/a**<br>**PROFESSIONAL SPORTS AUTHENTICATOR,**<br>1610 East Saint Andrew Place<br>Santa Ana, California 92705<br><br>**COLLECTORS HOLDINGS, INC.,**<br>1610 East Saint Andrew Place<br>Santa Ana, California 92705<br><br>　　　　　　　　　Defendants. | **JURY TRIAL DEMANDED**<br><br><br>**Civil Action No. 1:26-cv-2933** |

**CLASS ACTION COMPLAINT FOR**
**DECLARATORY JUDGMENT, MONETARY DAMAGES,**
**INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL**

**Table of Contents**

NATURE OF THE ACTION.................................................................................................... 1

PARTIES AND NON-PARTIES........................................................................................... 17

JURISDICTION AND VENUE............................................................................................ 36

COMMON FACTUAL ALLEGATIONS ........................................................................... 38

I.    The Origins and Consolidation of the Modern Trading-Card Grading Industry .............. 38

II.   Defendants' Market Control Has Become Central to the Investment-Driven Trading-Card Market ..................................................................................................................................... 43

    A.    Manufacturing and Intellectual Property ....................................................................... 44

    B.    Grading and Authentication - PSA as the Market Credential....................................... 45

    C.    Pricing, Data Aggregation, and Analytics — Card Ladder ........................................... 47

    D.    Financialization Through Custody, Resale and Acquisition - PSA Vault, PSA Partner Offers, and Collectors Financial Services................................................................................ 50

    E.    Marketplace Integration and Secondary-Market Flow .................................................. 52

    F.    Market Communication, Influence, Solicitation, and Intake......................................... 53

III.  Defendants Scaled a PSA-Centered Financial Marketplace Built on PSA Grades .......... 56

IV.   Defendants' Consumer-Facing Grading and Authentication Representations and Practices Promising Impartial, Expert, Objective, and Standardized Review ......................................... 62

    A.    The Grading Workflow PSA Markets to Consumers .................................................... 63

    B.    PSA's Public Promise: Expert, Standardized, and Reliable Review ........................... 65

    C.    Consumers See PSA's Price, Value, and Speed Package.............................................. 67

V.    Defendants' Fraudulent Grading Scheme and Deceptive Fee Practices........................... 71

    A.    PSA's Fraudulent Grading Methodology and False Market Credential....................... 71

    B.    PSA's Deceptive Fee Model Monetizes the False Credential ..................................... 90

    C.    Collectors Scaled PSA's Fraud Through Vertical Integration................................... 102

    D.    Card Grading Intermediaries Were Also Misled and Passed PSA's Misrepresentations to Consumers ....................................................................................................................... 104

VI.   Plaintiff and the Putative Class Relied on Defendants' Misrepresentations, Omissions, and Market Credential............................................................................................................ 105

VII.  Common Factual Allegations Supporting Plaintiff's RICO Counts.............................. 115

    A.    Overview of Defendants' RICO Scheme Based in Fraud .......................................... 115

    B.    Particularities of Mail Fraud — 18 U.S.C. § 1341 .................................................... 118

C.    Particularities of Wire Fraud — 18 U.S.C. § 1343 .................................................... 119

D.    Each Predicate Act Caused, Furthered, or Concealed the Deceptive Practices .......... 121

E.    Defendants Engaged in a Pattern of Racketeering Activity....................................... 122

F.    Defendants Conducted the Affairs of RICO Enterprises............................................ 125

G.    Collectors' Receipt and Use or Investment of Racketeering Income - 18 U.S.C. § 1962(a) ....................................................................................................................... 128

H.    The Enterprises and Predicate Acts Affect Interstate Commerce.............................. 129

I.    Plaintiff Sustained Injury by Reason of Defendants' Conduct.................................. 129

J.    Plaintiff's Claims Are Timely.................................................................................... 133

**CLASS ACTION ALLEGATIONS** ................................................................................... **135**

I.    Proposed Classes and Subclasses................................................................................ 136

II.    Ascertainability and Class Records ............................................................................ 139

III.    Numerosity.................................................................................................................. 140

IV.    Commonality............................................................................................................... 141

V.    Typicality .................................................................................................................... 143

VI.    Adequacy .................................................................................................................... 143

VII.    Predominance Under Rule 23(b)(3)............................................................................ 144

VIII.    Superiority Under Rule 23(b)(3)................................................................................. 146

IX.    Rule 23(b)(2)............................................................................................................... 147

X.    Classwide Damages and Restitution........................................................................... 148

**CAUSES OF ACTION AND CLAIMS FOR RELIEF** ...................................................... **149**

FIRST CLAIM FOR RELIEF ............................................................................................. 149

SECOND CLAIM FOR RELIEF ........................................................................................ 151

THIRD CLAIM FOR RELIEF ............................................................................................ 153

FOURTH CLAIM FOR RELIEF ........................................................................................ 157

FIFTH CLAIM FOR RELIEF ............................................................................................. 161

SIXTH CLAIM FOR RELIEF............................................................................................. 166

SEVENTH CLAIM FOR RELIEF ...................................................................................... 170

EIGHTH CLAIM FOR RELIEF ......................................................................................... 174

NINTH CLAIM FOR RELIEF............................................................................................ 178

TENTH CLAIM FOR RELIEF ........................................................................................... 182

PRAYER FOR RELIEF ................................................................................................. 183

COMES NOW Plaintiff Nicholas Funk, by and through undersigned counsel, who, based on Plaintiff's personal knowledge and his counsel's reasonable investigation,[1] files this putative class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), for himself and for similarly situated consumers, against Defendants Collectors Universe, Inc., doing business as Professional Sports Authenticator ("PSA"), and against Collectors Holdings, Inc. ("Collectors") (collectively, "Defendants"), and, in support thereof, alleges as follows:

**NATURE OF THE ACTION**

1.       Trading cards are collectible cards featuring athletes, fictional characters, or cultural icons. This case concerns PSA's process for grading trading cards, which involves evaluating the cards' authenticity and physical condition before they are encased in a plastic holder, labeled with a score, and returned to the market as a certified credential.

2.       PSA launched the modern card-grading industry in July 1991. From its inception, PSA has represented that strict rules govern grading:

> *"[Cards that] bear evidence of trimming, re-coloring, restoration,*
> *or any other forms of tampering … will not be graded."*
>
> — *PSA Grading Standards*[2]

But the very first card graded by PSA broke that venerable rule.

3.       PSA assigned certificate number 00000001 to the most famous baseball card in the world, a T206 Honus Wagner. That card had been secretly trimmed years earlier to improve its appearance before PSA graded it, a fact the grader later acknowledged that he knew when he

---

[1] The allegations in this Complaint are based on Plaintiff's personal knowledge as to himself and on information and belief as to all other matters. Allegations made on information and belief are based on counsel's reasonable investigation and on facts and circumstances within Defendants' exclusive possession or control. Those allegations are specifically identified because they likely will have evidentiary support after a reasonable opportunity for discovery, consistent with Fed. R. Civ. P. 11(b)(3).

[2] *Grading Standards*, PSA, https://www.psacard.com/gradingstandards (last visited July 22, 2026).

1

graded the card.[3] PSA's own published standards prohibited grading altered cards. But PSA

graded the card anyway, assigning it a Near Mint-Mint 8 (the highest grade a T206 Wagner has

ever received). PSA then sealed it in a tamper-evident holder bearing that grade and released it

into the trading-card market.[4] PSA neither disclosed the trimming on the holder, nor withdrew

the grade when learning about the alteration.[5] That card later sold for $2.8 million and it remains

encapsulated in that same PSA 8 holder with an active certification today.[6]

4.      The number printed on that holder is now worth millions, but that value was born

from a lie. PSA's first grade was not a minor defect in a system later corrected; it became the

blueprint for the modern grading market that Defendants built. A number sealed in plastic and

backed by claimed authority can create extraordinary value only if the market believes that it

reflects a neutral, expert, standardized, and reliable determination. What began with one card has

become a market exceeding $15 billion. Defendants did not escape the fraud of day one; they

scaled it. Since its inception, the market has depended on PSA's grades as an authoritative

credential because Defendants concealed material facts about the true nature of those grades.

5.      This case challenges PSA's fraudulent grading practices and deceptive fee model,

and Collectors' role in making both profitable at scale. PSA sells card grading as an expert-

driven, criteria-based, unbiased, and reliable credential that the market treats as authoritative. It

---

[3] *See* Chris Olds, *Mastro Pleads Guilty to Mail Fraud, Admits Trimming Famed Honus Wagner Card*, Beckett (Oct. 11, 2013), https://www.beckett.com/news/mastro-pleads-guilty-to-mail-fraud-admits-trimming-wagner-card/; Plea Agreement, *United States v. Mastro*, No. 12-CR-781 (N.D. Ill. Oct. 10, 2013).

[4] *See* Junk Wax Hero, *The PSA Trimming Scandal on the Wayne Gretzky T206 Honus Wagner*, YouTube (Dec. 2, 2022), https://www.youtube.com/watch?v=_pzkd0mlKjU (PSA grader Bill Hughes "admitted knowing at the time that he graded it that it was altered").

[5] *See Cert #00000001*, PSA, https://www.psacard.com/cert/00000001/psa (last visited July 22, 2026) (reflecting that the McNall/Gretzky T206 Honus Wagner remains certified at grade NM-MT 8 and has never been downgraded or withdrawn).

[6] *See World Record $2.8 Million Paid for Famed T206 Honus Wagner Baseball Card*, PSA (Sept. 6, 2007), https://www.psacard.com/articles/articleview/5077/world-record-2-8-million-paid-famed-t206-honus-wagner-baseball-card.

delivers something materially different. Its grading involves a subjective, opaque, inconsistent, financially conflicted system backed by an obscured online "contract" that purportedly disclaims reliability, caps remedies, and forces arbitration. Consumers paid for expertise and reliability, but PSA sold them manufactured uncertainty and then charged them for it. PSA extracted those charges through deceptive dark-pattern pricing, manipulating consumers to spend even more. Collectors compounded the harm by consolidating grading alternatives, connecting PSA grades to downstream monetization, and profiting from the reliance PSA created. Under this scheme, PSA processed millions of cards each month and generated more than a billion dollars in fees over the relevant limitations period. This action seeks to recover those fraudulently obtained fees for Plaintiff and the putative class under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Maryland Consumer Protection Act, and applicable common law.

***The Trading-Card Market***

6.      Trading cards have existed since the late 1800s. What began as a hobby centered on collecting, trading, and preserving childhood memorabilia has evolved into a multibillion-dollar commercial market. The modern card market no longer turns only on nostalgia; it increasingly involves the conversion of cards into trusted, graded financial assets.

7.      The trading-card market has both a primary and secondary tier. In the primary tier, manufacturers sell boxes containing sealed packs of randomly assorted, machine-generated cards. Once sold, those boxes enter the secondary market, where purchasers may resell them or open them and sell the individual cards inside. These secondary transactions occur through online platforms, local card shops, trade shows, auction houses, retail channels, and private sales.

8.      In the secondary market, a card's value is driven largely by perceived scarcity, authenticity, and condition. Often, a card's condition is not determined independently by buyers

3

or sellers; it is assigned by third-party grading companies, including PSA, who place cards into numerical condition tiers, typically on a scale from 1 to 10. Those grades materially influence market price because cards assigned higher grades often command substantial premiums. In practice, the assigned grade frequently becomes the market-recognized proxy for condition.

9. That single number, assigned by a private grader and affixed to a plastic holder encasing a card, can determine how that card is perceived, priced, insured, marketed, financed, and sold. Small differences in condition can translate into substantial differences in value. The grade has become the market's shorthand for value. It often determines whether a card is treated as a mere keepsake or as an investment-grade asset. As a result, control over the grade represents substantial control over how value is recognized in the trading-card market.

***Defendants Control Key Components of the Card Market While Holding Conflicted Positions***

10. Defendants have substantial control of the trading-card market. Collectors owns Defendant PSA, acquired Sportscard Guaranty ("SGC"), and entered into a transaction to acquire Beckett Grading Services ("BGS" or "Beckett"), formerly independent grading brands. Through that consolidation, Collectors' grading brands account for a dominant share of the third-party card-grading market, with PSA alone reported to account for approximately seventy percent of graded-card volume.[7] Defendants do not dispute this statistic. In their own filings in a separate action, Defendants state that PSA "is the leading card grading service provider," having graded 19.2 million of approximately 26.6 million cards graded by the four major graders in 2025.[8]

11. Collectors' interests extend beyond card grading. Through acquired businesses and commercial integrations, Collectors participates in trading-card pricing or valuation through

---

[7] *See* Ben Burrows, *Led by PSA, Collectors corners even more of grading market by acquiring Beckett*, YAHOO! SPORTS (Dec. 16, 2025), https://sports.yahoo.com/articles/led-psa-collectors-corners-even-230000416.html.

[8] Defs.' Mot. to Dismiss, *Rasmussen v. Collectors Holdings Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 8, 2026), ECF No. 21 [hereinafter Rasmussen MTD] at 10.

Card Ladder; custody and resale through the PSA Vault and related market integrations; liquidity and acquisition through PSA Partner Offers; and even asset-backed lending through Collectors Financial Services. These business lines each derive value from PSA grades, PSA certification, and PSA population data, all of which Defendants control.

12.     Within that integrated system, PSA does not merely assign card grades; it also publishes the market's principal grade-based scarcity signal. Each graded card is entered into PSA's population reports, which track how many copies of a given card exist at each grade level. These population reports are widely relied upon by buyers, sellers, marketplaces, and pricing tools as indicators of rarity. A lower population at a given grade level can materially increase perceived scarcity, which then drives price and demand.

13.     Taken together, this integrated system places Defendants on both sides of the grading-dependent market. On the one hand, PSA authenticates cards, assigns grades, issues certification numbers, and publishes population data. On the other hand, Collectors participates in the pricing, custody, resale, offers, lending, insurance, financing, liquidity, and marketplace pathways tied to those same cards ("Downstream Channels"). Because each grade level and population report affect these Downstream Channels and even consumer demand, Defendants have financial interests not only in individual grading outcomes, but also in how those outcomes are communicated through PSA's scarcity signals. Depending on their downstream position, Defendants can benefit from grading outcomes that expand, restrict, or preserve the number of cards at specific grade levels. Defendants can also benefit from stale or inaccurate population data, a problem PSA admits exists but has done little to resolve.[9] These conflicts are embedded in the same system that PSA markets as reliable, objective, and neutral.

---

[9] *Infra* ¶¶ 180–182.

14.     PSA has stated repeatedly that its grading is the product of an impartial, objective, third-party process, emphasizing that it has no financial stake in the sale of the cards it evaluates.[10] But through their vertically integrated system, Defendants now monetize the values, scarcity signals, and transactions that PSA grades help create through Collectors' Downstream Channels. That structure is incompatible with the disinterested, neutral role that PSA represents to consumers and the card market, as Congressman Pat Ryan even recently noted.[11]

15.     Defendants do not adequately disclose those conflicts. They market PSA grading as impartial and objective while operating a system in which grading decisions and scarcity data are intertwined with Defendants' own downstream monetization. That omission is material. A reasonable consumer would consider it very important to know that the entity assigning grades and publishing scarcity data also monetizes the value, liquidity, and transactions that those very grades help create. By concealing those conflicts, Defendants misled consumers and the market about PSA's neutrality and impartiality. But those conflicts are only one part of the scheme. The deeper fraud is that Defendants have engineered market reliance on PSA's grading credential while concealing the lack of neutrality, expertise, objectivity, and reliability behind it.

16.     PSA engineered and monetized reliance by selling more than a mere abstract opinion. PSA sold a market-facing certification product: the assigned grade, encapsulated holder or slab, the proprietary label, certification number, certification-verification system, population reports, price guides, dealer programs, guarantee messaging, and even PSA brand recognition

---

[10] *See Tips for Collectors*, PSA, https://www.psacard.com/resources/guides (last visited July 22, 2026) ("With impartial, third-party validation, someone other than a seller has offered an opinion about the item that's up for sale. . . . Unlike the seller, we have no financial stake in the item's sale. All perceived conflict of interest is eliminated, and so is the risk."); Joe Orlando, *Top 5 Tips for Internet Buying & Selling*, PSA (July 28, 2010), https://www.psacard.com/articles/articleview/6318/top-5-tips-internet-buying-selling (stating that PSA has "no financial interest in the sale" and therefore "there is no conflict of interest perceived by the buyer anymore").

[11] Rep. Pat Ryan, *Letter to Andrew N. Ferguson, Chairman, Fed. Trade Comm'n* (Dec. 18, 2025), https://patryan.house.gov/sites/evo-subsites/patryan.house.gov/files/evo-media-document/collectors-holdings-letter-12.18.25.pdf.

(collectively "Card Grading Credential"). Defendants knew there was a direct and intended nexus between PSA's grading work and Collectors' Downstream Channels because impacting card values is precisely what PSA grades were designed and marketed to affect. Defendants intended buyers, sellers, collectors, dealers, auction houses, marketplaces, insurers, lenders, pricing tools, Card Grading Intermediaries, and downstream consumers to rely on that product (collectively "Card Market Participants"). PSA engineered these participants' reliance through its Grading Credential, price guides, dealer programs, and even market integrations. Collectors then monetized it through its Downstream Channels. Because the credential's value depends on trust in PSA's authoritative standards and methodologies, the fraud begins with the people that PSA says supply that expertise, namely its graders.

***How Defendants' Fraudulent Card-Grading Scheme Works***

17.    PSA markets its graders as experts, but its own filings and materials reveal a far different system. Before Collectors took PSA private in 2021, PSA admitted qualified grading experts were "in short supply," competition for them was "considerable," and that it relied on training young graders it believed could become experts.[12] PSA's publicly available grader profiles are consistent with that admission, reflecting backgrounds outside professional grading, including restaurant work, sports-stadium roles, and songwriting.[13] PSA does not even require prior professional grading experience, specialized training, or certification for card-grader positions; rather, it merely says it prefers candidates with one to three years' experience and treats card collecting as qualifying experience.[14] PSA describes such candidates as ideal for the

---

[12] *Infra* ¶¶ 72, 144.

[13] *Infra* ¶¶ 147–148.

[14] *Infra* ¶ 145.

position.[15] And when card volume increases, PSA contracts with outside individuals, "usually collectibles dealers . . . to address short-term increases in . . . grading orders,"[16] while concealing who actually grades consumers' cards, what qualifications they have, and whether they are in fact experts. PSA then binds graders with strict nondisclosure agreements to keep the market from learning these material facts. Its recent $200 million investment announcement, including its new "Grader's University," underscores the problem here, namely PSA is only now building training infrastructure consumers were led to believe already existed.[17] The gap between PSA's marketed expertise and its opaque grader system is material, misleading, and central to the fraud.

18.    PSA's own published materials expose another aspect of Defendants' fraud. PSA tells consumers that grading is criteria-based, standardized, and reliable, but its grading process relies heavily on a subjective "eye appeal" override that is neither fixed, measurable, nor properly disclosed. Rather than define "eye appeal" through objective condition criteria, PSA defines it by asking: "What will the market accept for this particular issue?"[18] That question is neither a grading standard, nor a subjective opinion. It is, at best, a guess about market tolerance. The grade should tell the market the card's condition, but PSA's formulation lets the market appetite tell PSA what the card can receive. That inversion is material. Consumers pay PSA grading fees for an expert condition credential, not for a speculative, discretionary guess about undefined market acceptance. By selling objectivity and reliability while relying on rampant

---

[15] *Infra* ¶ 145.

[16] *Infra* ¶¶ 72, 144.

[17] PSA Staff, *PSA Announces $200 Million Infrastructure Investment to Support Global Demand*, PSA (May 14, 2026), https://www.psacard.com/articles/articleview/15715/200-million-investment-grading-experience; Teddy Ricketson, *Card grading giant PSA nets $200 million investment for expansion*, YAHOO! SPORTS (May 14, 2026), https://sports.yahoo.com/collectibles/article/card-grading-giant-psa-nets-200-million-investment-for-expansion-185758534.html.

[18] *Infra* ¶¶ 155–157.

subjectivity, PSA delivers a grading product materially different from the one that it markets to consumers.

19.     Plaintiff further alleges, based on information and belief and as detailed below, that PSA's grading outcomes are adversely affected by production quotas, pressure from short review windows, undisclosed changes to grading criteria, inconsistent application of published standards, and population-level practices that PSA does not disclose to consumers at the point of submission. Each of these issues adversely impacts the reliability and objectivity of card grading. Publicly available data shows that graders spend less than a minute per card and that the rates of a perfect grade have experienced sustained swings that Plaintiff contends cannot be reconciled with PSA's criteria-based marketing.[19] Plaintiff alleges that PSA manages gem-mint populations (PSA's highest score) by training ratio-based grading practices, heightened scrutiny of cards that feature premium players or characters, and other concealed grading practices. And PSA's focus on market appetite for eye appeal creates a slippery slope where PSA can contend that market forces want limits on higher grades for certain cards rather than grading cards objectively. These indicia of population control matter. A limit placed on a card's grade for any reason is not and cannot be an objective determination. It is not even a good-faith subjective opinion. It is a commercially managed output, calculated to preserve scarcity, support pricing, and extract fees from the market that PSA created and from which Defendants themselves benefit downstream.

20.     Perhaps nothing demonstrates grading's unreliability better than resubmissions, crossover submissions, and cracking. Resubmission allows a consumer to pay PSA to reconsider a prior assigned grade from its experts. Crossover submissions allow a consumer to pay PSA to grade a card already graded by another company. Cracking involves the process of removing a

---

[19] *Infra* ¶¶ 153–175, 180–182; *see specifically infra* ¶¶ 167–175 (grader speed, production pressure, ratio-based review, and Gem Mint-rate evidence).

graded card from its plastic holder and then resubmitting it to PSA without disclosure of the prior score. These practices exist because grading outcomes are highly variable. PSA monetizes that variability while continuing to market grading as expert, consistent, and reliable. PSA then buries the true nature of its service in dense, legal contract disclaimers that it knows or should know consumers rarely read or understand.[20] Those hidden disclosures seek to recast PSA's grade as a mere subjective opinion after consumers are committed to their grading process because of Defendants' persistent messaging that their expert, neutral graders, who use objective criteria in a reliable process, add substantial value. That bait-and-switch approach represents fraud.

21.    Consumers do not pay merely to have a card sealed in plastic; rather, they pay for a PSA Grading Credential along with the market acceptance that follows. Defendants obtained consumers' money while delivering a grading product materially different from the one that PSA marketed. Plaintiff alleges these features are not accidental flaws. Shifting criteria, undisclosed subjectivity, and inconsistent grading create repeat demand, which preserves dependence on the PSA's credential, thereby generating additional revenue through resubmissions, crossovers, and cracking. Stable, transparent, and consistently applied grading would reduce that repeat demand. Defendants thus profit from uncertainty, while marketing that grading is reliable and objective.

***Defendants' Deceptive Grading Revenue Model***

22.    PSA's pricing also uses deceptive practices. PSA does not charge a disclosed, fixed, final price for grading. It sells 'Service Levels' built around three consumer-facing signals: a headline per-card price, a "Maximum Insured Value," and an estimated turnaround time. PSA's pricing pairs those signals together, presenting grading as a price-value-speed package. Each

---

[20] *See* Caroline Cakebread, *You're not alone, no one reads terms of service agreements*, BUS. INSIDER (Nov. 15, 2017, 7:30 AM), https://www.businessinsider.com/deloitte-study-91-percent-agree-terms-of-service-without-reading-2017-11 (reporting that a Deloitte survey of 2,000 U.S. consumers found that 91% consent to legal terms and service conditions without reading them).

component contributes to its deceptive pricing practices through dark patterns, which are user interfaces on websites and apps carefully crafted to trick or manipulate users into certain actions.

23.     First, PSA advertises turnaround time in business days, which is a practice that misleadingly shortens consumers' perception of how long grading will actually take. PSA places an asterisk next to the advertised turnaround time but not next to the pricing representation. To learn what the asterisk means, the consumer must scroll down to a separate "Disclaimer" section that is presented in less prominent grey font. That section is collapsed and requires consumers to click it to open before seeing the actual disclosure. In other words, PSA sells the visible promise of speed at a set price while hiding the real rules that make both promises materially different from what consumers reasonably understand from PSA's marketing.

24.     When opened, the hidden disclaimer reveals the truth that the headline conceals. PSA states that turnaround times are "not guaranteed"; the clock begins only when an order is "received and scanned into the PSA facility"; timing may be affected by PSA's "submission volume" and "capacity"; turnaround times may change rapidly without notice; PSA may adjust pricing, services offered, and processing time to align demand with capacity; and all terms and conditions are subject to change.[21] Those qualifications are not minor. They strip the advertised timing and pricing of their practical meaning. The Service Level chart tells consumers and the market that they are buying speed and price certainty. The hidden disclaimer reveals that PSA really promises neither.

25.     PSA's own conduct confirms that the hidden disclaimer is material. When grading volume overwhelmed PSA's capacity, it raised prices, increased advertised turnaround times, limited access to lower-cost service levels, and stopped grading below Regular tier submission

---

[21] *Infra* ¶¶ 188–190.

level. These actions occurred because PSA could not process the volume it had solicited.[22] PSA President Ryan Hoge admits that PSA was receiving 150,000 cards per day but could only ship about 90,000 each day.[23] That's a 40% daily deficit while still advertising turnaround times and accepting money. These facts matter. PSA knew that its submission volume adversely impacted its ability to satisfy the advertised turnaround time, but PSA continued to sell grading through Service Levels organized around advertised speed that PSA knew it could not reliably deliver. At some point, an estimate becomes a lie. Plaintiff alleges that PSA crossed that line when it used turnaround estimates to induce payment while knowing that backlog, capacity constraints, clock-start rules, intake delays, and internal processing practices made the advertised timing unreliable or illusory. At the same time, PSA President Ryan Hoge said, "It's very healthy for us to have a backlog. We like to have that. That's just—it helps us stage work and kind of queue it up."[24] He identifies "two months' worth of backlog" as PSA's ideal. PSA *wants* to hold consumers' cards for months, forcing them to pay more to get their property back faster given PSA's possession-based coercion. That is indicia of fraud.

26.     PSA's upcharge uses the same deceptive architecture. PSA requires consumers to choose a Service Level before submitting cards but does not clearly disclose that that service level choice turns on the card's expected post-grading fair market value. That pricing structure requires consumers to make three guesses before PSA grades the card: (1) what grade PSA will ultimately assign, (2) when PSA eventually grades the card, and (3) what the market value for that unknown grade will be when PSA finally grades it. PSA reaps the benefit of these consumer

---

[22] PSA Staff, *Due to Demand Spike, PSA Pauses Value Tiers, Extends Collectors Club Memberships, and Launches Public Backlog Tracker*, PSA (May 28, 2026), https://www.psacard.com/articles/articleview/15210/service-level-update-may-2026.

[23] NEO Cards & Comics, *PSA Is Raising Prices (Again) — Ryan Hoge Explains Why… and More* at 31:19–31:34, YOUTUBE (Feb. 10, 2026), https://www.youtube.com/watch?v=NageYv7EsXA.

[24] *Id.* at 32:57–33:13.

guesses, but still reserves discretion to decide, after it receives the card, that the selected tier was too low and that an additional grading fee is due. This is known as an upcharge. PSA casts the upcharge as a justified insurance charge ("Maximum Insured Value") when it is truly an unjustified second grading fee. The post-grade value of the card does not require PSA to incur any additional expense to justify charging more. This second fee represents drip pricing.

27. Taken together, PSA's fee architecture employs drip pricing, bait-and-switch pricing, partitioned pricing, illusory speed pricing, and possession-based coercion. These dark pattern practices are the hallmark of consumer fraud. PSA advertises misleading Service Levels; takes possession of the consumer's property; controls the grading process; determines the post-grading value; reserves the right to change grades and values; conditions return of the card on payment; and fragments the total cost into grading fees, Maximum Insured Value or declared-value upcharges, shipping, handling, and insurance charges. By the time the consumer learns the real price, real timing, and real rules, the card is already in PSA's system. Defendants do not simply charge for grading cards. They monetize uncertainty, delay, and possession through fraud. And PSA's own alleged contract tries to legitimize these deceptive practices by providing broad discretion that includes the right to "change [those] fees from time to time."[25]

***Plaintiff and The Class are the Intended Victims who Relied on Defendants' Representations***

28. Plaintiff and members of the putative Class are the consumers Defendants set out to reach. As demonstrated herein, they beneficially owned the cards submitted for grading, paid or reimbursed PSA grading-related charges, and bore the economic consequences of PSA's fees, upcharges, grading outcomes, representations, omissions, and certification outputs. They are the card owners whose money, property, and reliance the grading market was designed to capture.

---

[25] Decl. of Jacqueline Curiel, *Rasmussen v. Collectors Holdings Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 4, 2026), ECF No. 20-2, Ex. A (Collectors User Agreement) §§ 2, 18, 19, 24.

29.     Plaintiff, like many other collectors, submitted his cards through a PSA-facing intermediary, such as a local card shop, PSA dealer, or group submitter. Those intermediaries pass cards into PSA's system, relay PSA's prices and grading-related information, collect PSA-related charges, and return graded cards to beneficial owners for a small, per-card fee on top of what PSA charges. That reach and structure is by design. PSA aims its standards, labels, holders, guarantees, pricing, population reports, service tiers, certification tools, dealer programs, and hobby-media presence at beneficial card owners, whether they submit directly or through an intermediary. The deception originated with Defendants and traveled through Defendants' submission channels to the consumers who paid for and relied on PSA grades.

30.     Plaintiff and members of the putative Class relied on Defendants' fraudulent grading and pricing practices in the manner that Defendants intended. Direct reliance arose from PSA's uniform representations and omissions disseminated through its public materials, pricing schedules, grading standards, guarantees, population reports, certification tools, hobby-media messaging, Card Grading Intermediaries, and other PSA-facing channels. Alternatively, Plaintiff also relied on the integrity of the PSA-centered trading-card market that Defendants created, informed, controlled, and monetized, warranting a rebuttable market-reliance presumption by extension of *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). This is a market case because PSA and Collectors made it one. They made PSA's credential a market-facing certification product that is designed to be relied upon by all consumers and the market who buy, sell, and trade cards.

31.     As a result of Defendants' fraud, Plaintiff and the putative class suffered concrete economic injury. They paid PSA grading-related charges for a service that was not delivered as represented—charges they would not have paid, or would have paid in lesser amounts, had Defendants disclosed the truth. Because Defendants' misrepresentations and omissions were

uniform, market-facing, and common to the PSA-centered market they built, reliance may be established through common proof by direct reliance, market reliance, or both.

***The Alleged Contractual Shield Does Not Reach Plaintiff or the Class***

32.    Defendants built their grading system around an online clickwrap agreement that is intentionally designed to protect their fraudulent conduct. Those online terms attempt to limit Defendants' accountability through arbitration clauses, class-action waivers, forum-selection and choice-of-law provisions, liability caps, warranty disclaimers, and language that tries to recast the market-facing certification product PSA sold as a mere subjective, non-warranted opinion. In Plaintiff's view, PSA's terms and conditions are a critical part of the fraud alleged here and are unconscionable even if Defendants could enforce them here, which they cannot. These terms are unenforceable because Plaintiff, and consumer collectors like him, made submissions through intermediaries, not directly to Defendants.

33.    Neither Plaintiff nor members of the putative class are bound by PSA's purported contract. They never opened a PSA submission account and never clicked to accept PSA's online terms. Nor were they asked to accept any contract for PSA, including any term that waives their constitutional, statutory, and procedural rights as stated in PSA's purported online contract. The threshold contract defect here is the absence of assent. Defendants cannot solicit downstream card owners, aim representations at them, profit from their money, and then bind them to terms they never saw or accepted.

***Relief Sought***

34.    This case is not about an isolated grading error or a dispute over a single fee. Nor is it solely about market concentration. This case arises from a specific grading system in which dominant enterprises used representations of neutrality, objectivity, expertise, and reliability,

coupled with control over market-defining credentials, and reliance on contractual limitations, to fraudulently obtain money and property from consumers through repeated interstate transactions.

35.     This is a civil RICO case because Defendants did not obtain Plaintiff's money through a single misrepresentation or isolated transaction. Rather, they associated with others as an ongoing enterprise that used interstate mail and wires to repeatedly disseminate materially false and misleading representations about grading expertise, objectivity, reliability, pricing, turnaround times, and market neutrality, while concealing the true nature of the grading process and fee structure. Those representations induced consumers nationwide to repeatedly surrender their property, pay grading-related charges, and participate in a market whose value Defendants themselves controlled and monetized. Plaintiff alleges this continuous pattern of racketeering activity enabled Defendants to fraudulently obtain and retain hundreds of millions of dollars each year in grading-related fees that directly injured Plaintiff and the Class.

36.     Plaintiff is an ordinary collector and hobbyist. He entered a market that treated PSA grades as authoritative because PSA told him, its intermediaries, and the market that PSA grading meant impartial expertise that is objective and reliable. Plaintiff had no practical way to discover, before submitting his cards and paying his fees, that the Grading Credential that he purchased actually rested on nonexpert graders, undisclosed subjectivity, shifting standards, production pressure, financial conflicts, and hidden fee leverage. Plaintiff alleges that PSA turned grading into a mere gamble, while marketing it as reliable. This case seeks to enforce a simple principle, namely that a company selling neutrality, objectivity, expertise, and reliability must either deliver that or plainly disclose that it does not.

37.     Over the last four years, Defendants have made more than a billion dollars from consumers in fraudulent, unearned grading fees. Plaintiff brings this action for himself and other

16

consumers nationwide who paid or reimbursed PSA grading-related charges through PSA's third-party submission channels. Plaintiff seeks actual damages, treble damages, restitution, declaratory relief, injunctive relief, attorneys' fees, costs, and all other relief permitted by law to stop Defendants' deceptive and racketeering conduct, remedy the economic harm it caused, and restore transparency and accountability to the trading-card grading market.

## PARTIES AND NON-PARTIES

38.    **Plaintiff Nicholas Funk.** Plaintiff Nicholas Funk is, and at all relevant times has been, a citizen and resident of Maryland, residing in Baltimore. Plaintiff beneficially owned the trading cards he submitted for PSA grading, paid or reimbursed the PSA grading-related charges associated with those submissions, and bore the economic consequences of PSA's grading determinations, pricing practices, delays, upcharges, representations, omissions, and related conduct. Plaintiff has never created, registered, opened, maintained, or used an account, profile, login, membership, dealer status, or registered submitter status with PSA, Collectors, or any Collectors-affiliated submission portal. Instead, Plaintiff submitted his cards for PSA's grading services through a Card Grading Intermediary located in Maryland, which is a process that involved the following:

   a.    **Defendants' Intake Agent.** The Card Grading Intermediary through which Plaintiff Funk submitted his cards was, in fact, Defendants' actual, apparent, ostensible, and limited agent, authorized, cultivated, and held out by Defendants as their consumer-facing intake and submission channel, and acted in that capacity by soliciting, and/or handling Plaintiff Funk's submissions, communicating Defendants' standardized representations and submission instructions, transmitting Plaintiff Funk's cards and submission information into Defendants' grading systems, relaying Defendants' post-

17

submission charges and grading-related communications, and/or facilitating payment of grading-related fees.

b.      **No Plaintiff-Side Authority to Waive Rights.** As to Plaintiff, the Card Grading Intermediary was not Plaintiff's legal agent for contract formation, arbitration, class waiver, jury waiver, forum selection, choice of law, limitation of liability, warranty disclaimer, release, delegation, or surrender of statutory, procedural, or substantive rights. Plaintiff did not authorize the intermediary to enter into contracts with PSA or Collectors on Plaintiff's behalf, assent to PSA or Collectors online terms, accept any arbitration provision, waive class or jury rights, accept any forum-selection or choice-of-law clause, accept any liability limitation or warranty disclaimer, release claims, or surrender any right belonging to Plaintiff.

c.      **March 2025 Submission.** In or around March 2025, Plaintiff delivered approximately seven trading cards, including Cal Ripken Jr. rookie cards, to a Card Grading Intermediary in Maryland for submission to PSA for authentication, grading, encapsulation, and related services. Plaintiff remained the beneficial owner of each submitted card, was the person for whose benefit the grading services were sought, was the source of the funds used to pay or reimburse PSA grading-related charges, and bore the economic consequences of PSA's grading determinations, pricing practices, delays, upcharges, representations, omissions, and related conduct. The precise date of the submission is available in PSA's and the intermediary's records.

d.      **Charges Paid.** Plaintiff paid or reimbursed approximately $300 in connection with this single submission transaction. That payment included PSA-imposed grading-related charges passed through by the Maryland Intermediary, together with a

18

nominal separate fee retained by the Maryland Intermediary. PSA's records identify the charges imposed in the PSA-facing transaction, and the Maryland Intermediary's records identify any separate amount it retained. Before deciding to submit, Plaintiff reviewed PSA's consumer-facing service-level and pricing information and PSA materials describing its grading standards and expert grading process. Those materials, together with PSA's broader public messaging and Plaintiff's preexisting experience with PSA-graded cards, conveyed a materially uniform commercial message: PSA would provide a neutral, expert, standardized, criteria-based, and reliable Grading Credential under the displayed service-level terms. Plaintiff relied on that message in choosing PSA, surrendering his cards, and paying or reimbursing the charges.

e.       **PSA-Facing Portal Conduct.** The Card Grading Intermediary entered Plaintiff's cards into PSA's online submission platform under the intermediary's own PSA account, dealer relationship, group-submission relationship, or submitter status, and did so in its own commercial capacity as Defendants' accepted intake channel. Any portal interaction, clickwrap acceptance, account-based submission, or other contractual assent that occurred in connection with Plaintiff's cards occurred in the intermediary's PSA-facing commercial capacity as Defendants' intake agent or authorized submitter. It was not authorized by Plaintiff, was not communicated to Plaintiff, and did not constitute assent by Plaintiff as the beneficial card owner and economic payor. Plaintiff did not know that any such agreement existed and was unaware of any such terms.

f.       **Interstate Mail and Wire Communications.** Plaintiff's cards were physically transmitted by interstate carrier from Maryland to PSA's grading facility in California and later returned by interstate carrier through the Card Grading Intermediary

and then to Plaintiff in Maryland. In connection with his submission, PSA transmitted, or caused to be transmitted, interstate wire and mail communications into Maryland, which include submission confirmations, intake confirmations, grading-status communications, payment communications, certification-related communications, return-shipment communications, and grade-result communications. The timings of these communications are available in Defendants' records, which can be obtained during discovery.

g.    **Injury.** Had Plaintiff known the true facts alleged in this Complaint, he would not have submitted his cards on the same terms, would not have selected the same service tier, would not have paid or reimbursed the same PSA grading-related charges, would not have accepted the same post-submission charges, and/or would have paid materially less. As a direct and proximate result, Plaintiff suffered economic injury, including overpayment for PSA grading services marketed as expert, standardized, reliable, and market-authoritative; payment or reimbursement of grading fees, shipping, handling, insurance, return-shipment charges, and related transaction costs for a service not delivered as represented; and loss of the benefit of the bargain. Plaintiff's injury is not merely that he disagrees with any individual grade; rather, it is that he paid for a PSA certification product materially different from the one Defendants marketed.

39.    For all submissions, Plaintiff relied on PSA's standardized representations when deciding to submit his cards, select PSA service tiers, pay or reimburse PSA-related fees and costs, and treat PSA grades and population data as authoritative market credentials. Plaintiff submitted through Card Grading Intermediaries, but remained the beneficial owner of the cards, the person for whose benefit the grading services were purchased, the source of the grading-related payments or reimbursements, and the person who bore the economic consequences of

20

PSA's grading determinations, fees, upcharges, delays, and market-facing outputs. Plaintiff relied on PSA's market representation that its Grading Credential represents an authoritative, reliable product. Even apart from market-wide reliance, Plaintiff directly relied on PSA's uniform and standardized representations in deciding to submit his cards, select the service tier, and pay the charges at issue. Plaintiff relied on PSA's representations that its grading was neutral, expert-driven, standardized, criteria-based, consistent, objective, reliable, and market-recognized; that PSA's service tiers, pricing schedules, declared-value thresholds, fees, upcharge practices, and advertised turnaround times accurately described the service being purchased, the time for return of the cards and the price for services; and that PSA's grades, certification tools, guarantees, and population reports could be trusted. Plaintiff understood those representations to mean that he was purchasing a defined grading service at the advertised tier, price, and return window, not a variable, opaque, discretionary process involving undisclosed charges, delayed return, or materially different terms after PSA or PSA-facing intake channels obtained possession of his cards. Plaintiff's reliance was reasonable because the true facts alleged in this Complaint were within Defendants' control and possession and were not practically discoverable before submission. The detailed facts concerning Plaintiff's reliance, Defendants' omissions, the role of Card Grading Intermediaries, market reliance, causation, injury, and Defendants' use of interstate mails and wires are alleged more fully below.

40.     For all submissions, Plaintiff incurred a PSA grading fee and associated charges or costs. For purposes of this Complaint, "PSA grading fees and associated charges and costs" means all amounts paid, reimbursed, charged, withheld, imposed, or borne to obtain, accelerate, process, value, insure, disclose, challenge, repeat, convert, correct, reholder, return, or otherwise complete PSA grading. PSA may label those amounts as Service Level charges; expedited-

service premiums; declared-value charges; Maximum Insured Value charges; adjusted grading fees; upcharges; review fees; crossover fees; resubmission fees; reholdering or relabeling charges, imaging or grader-note charges; and/or shipping, handling, insurance, return-shipment charges, or related submission charges (collectively "grading-related charges"), but they are all grading-related charges. The label does not change the economic reality, namely that each charge exists because PSA sells the same market-recognized Card Grading Credential. Plaintiff incurred PSA grading-related charges, and class members incurred similar economic injuries when they paid, reimbursed, or bore any such charges under PSA's common practices. PSA maintains all grading-related charges information in its databases and systems.

***Defendant Collectors Holdings, Inc.***

41.     Defendant Collectors Holdings, Inc. d/b/a Collectors ("Collectors") is, on information and belief, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at or near 1610 East Saint Andrew Place, Santa Ana, California 92705. Collectors is a citizen of Delaware and California within the meaning of 28 U.S.C. § 1332(c)(1). Collectors is the current Collectors-branded parent, platform, and/or controlling entity through which the Collectors corporate family maintains websites, services, products, applications, and tools relating to the authentication, grading, certification, registration, purchase, sale, storage, pricing, and monetization of collectible items. Collectors' own current user agreement identifies those services as provided through Collectors Holdings Inc.'s divisions and affiliated entities, including Collectors Universe, Inc. through PSA, PSA/DNA, and PCGS; New SGC LLC; Ladder Studios, Inc.; Beckett Collectibles, LLC; and other Collectors entities.

42.     Before its acquisition, Collectors Universe operated PSA as one of its principal authentication and grading brands. Collectors Universe publicly described "PSA" as the brand

22

name for its independent sports and trading-card authentication and grading service and stated that it launched PSA's trading-card authentication and grading service in 1991. On or about February 8, 2021, following a tender offer at $92.00 per share by an investor group led by Nat Turner and D1 Capital Partners L.P., among others, Cards Acquisition Inc. merged with and into Collectors Universe, Inc., with Collectors Universe continuing as the surviving corporation and becoming privately held. After the go-private transaction, the business publicly changed its name and/or rebranded under the Collectors/Collectors Holdings name, while Collectors Universe continued to appear in Collectors' corporate terms as an affiliated entity providing PSA-related services.

43.    Collectors operates as a vertically integrated collectibles enterprise and holds itself out as providing authentication, grading, encapsulation, pricing data, marketplace, storage, resale, and financing services across trading cards, coins, sports memorabilia, and related collectibles. Collectors has also acquired or agreed to acquire multiple competing or adjacent third-party grading and collectibles businesses to consolidate grading operations, market-recognized grading brands, pricing infrastructure, and consumer reliance within a single Collectors-controlled ecosystem. Those transactions include the acquisition of Sportscard Guaranty ("SGC") on or about February 29, 2024, and Collectors' December 15, 2025, announcement that it had entered into a definitive agreement to acquire Beckett. Public Collectors materials further stated that Beckett would remain an independent brand within the Collectors family, and Collectors' current user agreement identifies Beckett Collectibles, LLC as a Collectors entity. Therefore, on information and belief, Plaintiff alleges that the Beckett transaction has closed or, at minimum, that Beckett has been integrated into Collectors'

23

corporate terms and Collectors-controlled ecosystem, and Plaintiff reserves the right to amend these allegations to reflect the precise closing date and any subsequent material transactions.

44.    Collectors transacts business in interstate commerce throughout the United States, including in the State of Maryland and within this District. Collectors solicits Maryland consumers through its websites, including collectors.com and affiliated websites such as psacard.com; accepts or causes the acceptance of card-grading submissions from Maryland residents through online submission portals, PSA-facing intake channels, interstate mail, and interstate carriers; processes or controls the processing of those submissions; transmits or causes the transmission of grading results, upcharge notices, valuation determinations, service communications, and other charges to Maryland consumers through interstate wires, including email and web-based dashboards; ships or causes graded cards to be shipped back to Maryland consumers through interstate carriers; and profits from fees and charges paid by Maryland residents for grading, authentication, pricing, storage, resale, and related services. Through its websites, submission portals, email communications, service platforms, and shipment of graded collectibles via interstate carriers and the U.S. mails, Collectors regularly causes the use of interstate wires and mails in connection with its grading, authentication, valuation, custody, resale, and related services directed to Maryland consumers.

45.    Collectors is a "person" within the meaning of 18 U.S.C. § 1961(3). Except where expressly attributed to PSA or another Defendant, allegations concerning the acquisition and consolidation of competing graders, the capture or control of grading-dependent market infrastructure, Collectors' corporate integrations, and the monetization of grades across a card's lifecycle through Card Ladder, the PSA Vault, PSA Partner Offers, Collectors Financial

Services, marketplace integrations, dealer programs, group-submission programs, retail submission channels, and related Collectors-affiliated services refer to Defendant Collectors.

***Defendant Collectors Universe, Inc. d/b/a Professional Sports Authenticator ('PSA')***

46.      Defendant Collectors Universe, Inc. d/b/a Professional Sports Authenticator ("PSA") is, on information and belief, a Delaware corporation and Collectors-affiliated entity with its principal place of business at or near 1610 East Saint Andrew Place, Santa Ana, California 92705. PSA is the trade name, brand, and/or operating division through which Collectors Universe, Inc. provides third-party authentication, grading, certification, encapsulation, and related services for trading cards, sports memorabilia, autographs, and related collectibles. Current PSA terms state that PSA submission services are provided by Collectors Universe, Inc. and Collectors Universe (Canada) Limited under the PSA, Professional Sports Authenticator, PSA/DNA Authentication Services, and related brands.

47.      PSA holds itself out as an authentication and grading authority for trading cards and memorabilia and represents that its grading process is impartial, expert driven, accurate, reliable, and standardized. PSA authenticates trading cards, assigns numerical grades on a scale from 1 to 10, encapsulates graded cards in tamper-evident holders bearing the PSA label and grade, publishes population reports, issues certification numbers, and charges consumers grading fees and related fees in connection with those services.

48.      PSA transacts business in interstate commerce throughout the United States, including in the State of Maryland and within this District. PSA solicits Maryland consumers through psacard.com, Collectors-affiliated websites, online marketplaces, third-party platforms, dealer programs, group-submission programs, retail submission channels, and other PSA-facing intake channels. PSA accepts or causes the acceptance of card-grading submissions from

25

Maryland residents through online submission portals, email, interstate mail, interstate carriers, dealers, group submitters, and other Card Grading Intermediaries; processes those submissions; transmits grading results, upcharge notices, valuations, additional charges, and service communications to Maryland consumers through interstate wires, including email and web-based dashboards; ships graded cards back to Maryland consumers through interstate carriers; and profits from fees and charges paid by Maryland residents for PSA grading and related services.

49.    PSA is a "person" within the meaning of 18 U.S.C. § 1961(3). Except where expressly attributed to Defendant Collectors, all allegations concerning grading, authentication, certification, encapsulation, intake, consumer-facing representations, service tiers, pricing, fees, upcharges, turnaround times, guarantees, population determinations, labels, holders, and related PSA conduct refer to Defendant Collectors Universe, Inc. d/b/a PSA.

***Agency, Common Control, and Enterprise Allegations***

50.    PSA and Collectors are separate legal entities, and each is responsible for its own acts and omissions. As specifically alleged below, PSA also acted as Collectors' actual agent with respect to the challenged conduct, subject to Collectors' direction and control and within the scope of authority Collectors granted. Collectors directed, authorized, knowingly participated in, or ratified that conduct, as applicable. Accordingly, for claims as to which agency-based attribution is legally available, the specifically alleged conduct of PSA is attributable to Collectors. These allegations do not seek to disregard either Defendant's separate legal existence or impose liability under an alter-ego or veil-piercing theory. For purposes of the RICO claims, each Defendant is alleged to be a separate "person" within the meaning of 18 U.S.C. § 1961(3), and each Defendant's liability is based on its own alleged conduct and participation in the affairs of the distinct RICO enterprises alleged below.

51.     Upon information and belief, Defendant Collectors directs and controls enterprise strategy, the acquisition and consolidation of competing third-party grading businesses, the capture and consolidation of the trading-card grading market, capital allocation, and the monetization of grades across the card's lifecycle through Card Ladder, the PSA Vault, PSA Partner Offers, Collectors Financial Services, and marketplace integrations including the eBay arrangement. Collectors maintains a centralized ownership and management structure through which it sets overall strategic direction for, and derives the downstream economic benefit of, the grading operations conducted under the PSA brand and the acquired SGC and BGS operations.

52.     Upon information and belief, Defendant PSA conducts the day-to-day grading business, including the application of grading standards, the staffing, training, and supervision of graders, the operation of the intake and submission systems, the setting and communication of consumer-facing pricing, service tiers, turnaround representations, and guarantee language, the assignment of grades, the determination and imposition of declared-value and other upcharges, the publication of population reports, and the transmission of grading-related communications to consumers and Card Grading Intermediaries.

53.     Collectors directs and conducts the affairs of the enterprises alleged below within the meaning of *Reves v. Ernst & Young*, 507 U.S. 170 (1993), through its strategic, acquisition, and monetization role, and PSA conducts the affairs of those enterprises through its operation of the grading business. This paragraph alleges direction, control, and participation for purposes of RICO liability and attribution only. It does not allege that PSA is the alter ego of, or is indistinct from, Collectors. To the contrary, Collectors and PSA are separate and distinct legal persons within the meaning of 18 U.S.C. § 1961(3), and each is distinct from the RICO enterprises pleaded herein, consistent with *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001).

27

54. Each Defendant knowingly conducted or participated in the conduct of the affairs of one or more association-in-fact enterprises alleged below, within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), through its respective strategic, managerial, or operational role in those enterprises, as alleged herein. The enterprises pleaded below are pleaded in the alternative.

*Non-Party Enterprises*

55. For purposes of 18 U.S.C. §§ 1962(a) and (c), each Defendant is a distinct legal "person" within the meaning of 18 U.S.C. § 1961(3), while the RICO "enterprises" pleaded in the alternative below are separate and distinct from each Defendant. Each enterprise has an existence, structure, common purpose, and continuity of relationships separate and apart from the predicate acts of racketeering activity, and each Defendant participated in the conduct of one or more such enterprises while remaining a legally distinct person from the enterprise. Plaintiff pleads these enterprises in the alternative to ensure satisfaction of the distinctness requirement under *Cedric Kushner Promotions*, 533 U.S. at 158, and *Boyle v. United States*, 556 U.S. 938 (2009). Plaintiff designates the Grading-Intake Enterprise (defined below) as the primary association-in-fact enterprise for purposes of the § 1962(c) claim and pleads the broader vertical enterprise—including Card Ladder, the PSA Vault, PSA Partner Offers, and Collectors Financial Services—in the alternative.

56. **Non-Party Enterprise Members**. Plaintiff alleges that the RICO enterprises consist of the following non-party members and independent commercial participants.

    a. **Primary Enterprise – The Grading-Intake Enterprise.** Plaintiff pleads as the primary RICO enterprise under 18 U.S.C. § 1962(c) the Grading-Intake Enterprise, which consists of Defendants together with the following non-party participants whose coordinated relationships with Defendants form part of the enterprise: Card Grading

28

Intermediaries that participated in the solicitation, intake, custody, and processing of consumer submissions to Defendants. Card Grading Intermediaries operate under Defendants' standardized authorized-intake programs, branded submission channels, and common submission workflows. The members' roles are economically interdependent: the intermediaries' per-card fees and Defendants' grading and monetization revenues all depend on the sustained flow of consumer cards through the shared submission-grading-resale pipeline.

b.    **Alternative Enterprise – The Trading-Card Grading Enterprise.**

Plaintiff alleges in the alternative a broader association-in-fact enterprise, which consists of the members of the Grading-Intake Enterprise together with: (i) eBay, Inc., as Defendants' designated marketplace partner for graded cards as detailed herein; (ii) Beckett Collectibles, LLC ("BGS"); (iii) New SGC LLC ("SGC"); (iv) Card Ladder, LLC, as Defendants' price-data and valuation platform now wholly owned by Collectors; (v) the PSA Vault and PSA Partner Offers, as Defendants' integrated custody, instant-offer, and resale channels; and (vi) Collectors Financial Services, LLC, which serves as Defendants' lending arm that collateralizes graded cards. eBay's marketplace and pricing integrations depend on and amplify the same graded-card intake channels and workflows and grading output impact. This broader enterprise is not merely Collectors conducting its own internal affairs through subsidiaries or divisions. It includes non-Defendant participants (including Card Grading Intermediaries and eBay) and legally separate grading, intake, pricing, marketplace, custody, offer, and lending entities, each performing distinct, recurring functions in the solicitation, intake, grading, certification, valuation, custody, resale, and financing of consumer-owned trading cards.

29

c. **Independent Existence and Common Purpose.** Each non-party participant identified in subparagraphs (a) and (b) has an independent legal existence apart from Defendants, a common purpose with Defendants in soliciting, processing, grading, transmitting, marketing, and monetizing consumer-owned trading cards, and continuing relationships with Defendants supporting the association-in-fact enterprises pleaded under 18 U.S.C. § 1961(4) and *Boyle*, 556 U.S. at 938. Card Grading Intermediaries are independent businesses that maintain their own premises, staff, business records, accounts, PSA-facing submission relationships, and consumer bases. They earn separate compensation on PSA submissions at their place of business, including fees, handling charges, markups, and submission charges. They pursue their own commercial interests when servicing consumer demand for PSA grading. eBay, Inc. also participates for its own independent commercial interests, sharing the enterprises' common purpose of monetizing graded cards under separate ownership, management, and economic motives. The Grading-Intake Enterprise and the alternative Trading-Card Grading Enterprise are each distinct from each Defendant within the meaning of *Cedric Kushner Promotions*, 533 U.S. at 158. Each enterprise is separate from each Defendant because the enterprises include independent businesses (such as eBay and the Card Grading Intermediaries) that Defendants do not own and that exist apart from them. While Defendants directed the enterprise's activities, the outside participants retained their own legal identities and commercial interests. Plaintiff does not allege that eBay or Card Grading Intermediaries knew of, agreed to, or participated in Defendants' alleged fraud. PSA and Collectors allegedly conducted the affairs of that broader commercial enterprise through their own pattern of mail and wire fraud.

d.    **Direction and Control by Defendants.** Defendants directed and controlled the affairs of each enterprise within the meaning of *Reves*, 507 U.S. at 170, by, among other things: establishing the authorized-intake programs through which Card Grading Intermediaries operate; vetting, branding, and publicly listing Card Grading Intermediaries as approved consumer-facing conduits; providing the standardized representations Card Grading Intermediaries communicated to consumers; dictating the fees, declared-value upcharges, expedited-service premiums, and post-submission charges Card Grading Intermediaries relayed; structuring the eBay marketplace and Card Ladder pricing-feed integrations through which graded cards entered and circulated in secondary commerce; and controlling the timing, pricing, valuation, grading, disclosure, return, and remediation of every consumer card submitted into the enterprise. Through these common programs, representations, fee schedules, pricing integrations, and controls over intake, grading, and market outputs, Defendants caused all enterprise participants to function as a coordinated, continuing unit rather than as isolated, parallel actors, thereby satisfying *Boyle*'s requirement of an association-in-fact enterprise with a common purpose, relationships among associates, and longevity sufficient to permit pursuit of that purpose.

e.    **Limited PSA-Facing Agency and RICO Distinctness.** Card Grading Intermediaries participate in the Grading-Intake Enterprise and in the alternative Trading-Card Grading Enterprise solely as Defendants' actual, apparent, ostensible, and limited PSA-facing intake and submission agents, and not as employees, internal divisions, alter egos, or principal-side legal agents of Plaintiff or Class members. Nothing in these allegations is meant to alter or contradict Plaintiff's allegations elsewhere in this

Complaint that Card Grading Intermediaries (i) were not Plaintiff's or Class members' legal agents for any purpose; (ii) lacked authority to bind Plaintiff or Class members to any contract, online terms, arbitration provision, class-action waiver, jury-trial waiver, forum-selection clause, choice-of-law clause, limitation-of-liability clause, warranty disclaimer, or release with any Defendant; and (iii) served as bailees for the physical transmission of cards into Defendants' PSA-facing intake system and the relaying of Defendants' standardized representations and submission-related communications. For RICO purposes, Card Grading Intermediaries and eBay remain legally separate, independently owned enterprise participants whose distinct corporate identities and independent economic motives make each RICO enterprise broader than, and distinct from, any single Defendant.

***Non-Party "Card Grading Intermediary"***

57.    As used in this Complaint, "Card Grading Intermediary" means any card shop, dealer, authorized dealer, group submitter, retail submission channel, official submission center, or similar person or entity through which consumer-owned trading cards are submitted, transmitted, processed, aggregated, or placed into PSA's grading pipeline and that is not owned directly or indirectly by Defendants and that does not bind its consumers and users to PSA's terms and conditions, for example, like eBay. Card Grading Intermediaries are not Defendants and are not alleged to have originated the deceptive practices alleged herein. Defendants used authorized, cultivated, accepted submissions from; gave portal access or submission privileges to; and verified, listed, allowed, branded, or held out Card Grading Intermediaries as Defendants' consumer-facing intake and submission channels into PSA's grading system. Card Grading Intermediaries place a small fee on top of the fees and costs that Defendants charge with respect

to consumers' PSA submissions through intermediaries' services. With respect to Card Grading Intermediaries, Plaintiff alleges:

a.  **Defendants' Agents.** Card Grading Intermediaries are, and at all relevant times have been, Defendants' actual, apparent, ostensible, and limited agents for the purpose of soliciting or accepting PSA submissions, communicating PSA's standardized representations and submission instructions, transmitting cards and submission information into PSA's systems, relaying PSA's post-submission charges and grading-related communications, facilitating payment of PSA grading-related charges, receiving graded cards from PSA, and returning graded cards to beneficial owners. For purposes of the Grading-Intake Enterprise pleaded above, Card Grading Intermediaries participate as Defendants' authorized or accepted intake agents, submission channels, and consumer-facing conduits under Defendants' direction, control, authorization and/or approval.

b.  **No Authority from Plaintiff or Class Members to Waive Rights.** As to Plaintiff and Class members, Card Grading Intermediaries served only as PSA's limited ministerial conduits and physical-custody bailees for transmitting cards into Defendants' PSA-facing intake system and relaying PSA-related communications and charges. They were not Plaintiff's or Class members' legal agents for contract formation, arbitration, class waiver, jury waiver, forum selection, choice of law, limitation of liability, warranty disclaimer, release, delegation, or waiver of statutory, procedural, or substantive rights. Authority to transmit cards and relay PSA charges is not authority to waive rights.

c.  **How Card Grading Intermediaries Operate.** A Card Grading Intermediary's role follows a sequence Defendants designed, authorized, accepted, or relied upon. A Card Grading Intermediary advertises PSA's marketing and/or that the

intermediary performs trading card submissions for PSA. The consumer brings physical cards to the intermediary and surrenders possession for their PSA submission. The intermediary records the cards, commonly creates an intake sheet, receipt, order form, ticket, photograph, image, or other custody record, and later enters the cards into PSA's submission platform under the intermediary's own PSA-facing account, dealer relationship, group-submission relationship, or submitter status. The intermediary packs and ships the cards to PSA according to PSA's submission instructions, communicates with PSA and the consumer about intake, grading status, charges, upcharges, payment, certification, and return shipment, receives the graded cards back from PSA, collects any additional funds corresponding to PSA's demands, and returns the cards to the consumer. The intermediary relays PSA's communications to the consumer submitter. When the cards return, the consumer receives them from a local shop or submitter.

d. **No Assent to Contract.** At no point does PSA or its Card Grading Intermediaries require the beneficial owner to be identified, shown PSA's online terms, or asked to assent to the terms before the card is accepted into PSA's grading system. At no point did Plaintiff see, receive, click, review, or accept PSA's online terms. Nor was Plaintiff asked to accept any arbitration provision, class-action waiver, jury-trial waiver, forum-selection clause, choice-of-law clause, limitation-of-liability clause, warranty disclaimer, release, delegation clause, or other contractual limitation. Defendants control the intake programs, submission platform, dealer relationships, and group-submission infrastructure. They could have required beneficial-owner assent before accepting cards into PSA's system. But they did not.

34

e.   **Submitter Warranty Is Not Owner Assent.** To the extent PSA's terms require a submitting party to represent or warrant that it has authority to submit items on behalf of a third-party owner, that warranty is a representation by the submitter to PSA. It is not the beneficial owner's assent to PSA's online terms. If PSA contends the submitter was required to obtain beneficial-owner authorization, that contention confirms the owner is a separate non-party whose assent cannot be presumed.

f.   **No Contract-Based Claim.** Plaintiff and class members claim no right or benefit under any submission contract, dealer agreement, group-submission agreement, or online terms between PSA and any Card Grading Intermediary. Plaintiff disclaims only the submission contract and online terms between PSA and the intermediary. He does not disclaim the underlying transaction, his ownership of the submitted cards, his payment or reimbursement of PSA grading-related charges, his surrender of property into PSA-facing intake system, his reliance on PSA's representations and omissions, or his resulting injury. Plaintiff's claims arise from that transaction, reliance, payment, and injury, not from any online PSA contract.

g.   **No Direct-Benefits Estoppel.** Any clickwrap, portal-based, or contractual assent by a Card Grading Intermediary occurred in the intermediary's own commercial capacity as Defendants' agent, authorized submitter, accepted submitter, or PSA-facing intake channel. It did not constitute assent by the beneficial card owner. Plaintiff and Class members are not bound to any arbitration provision, class-action waiver, jury-trial waiver, forum-selection clause, choice-of-law clause, limitation-of-liability clause, warranty disclaimer, release, or delegation clause under any owner-side agency theory, assumption, incorporation by reference, third-party beneficiary theory, equitable estoppel,

or direct-benefits estoppel. Plaintiff seeks relief for fraud, statutory deception, racketeering injury, negligent misrepresentation, unjust enrichment, and money wrongfully obtained, not enforcement of PSA's submission contract or online terms.

## JURISDICTION AND VENUE

58.     This Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including RICO, 18 U.S.C. §§ 1961–1968. Plaintiff also seeks declaratory relief under 28 U.S.C. §§ 2201 and 2202 concerning, among other things, the absence of assent to Defendants' online terms, arbitration provisions, class-action waivers, forum-selection clauses, choice-of-law clauses, liability limitations, warranty disclaimers, releases, and delegation clauses.

59.     This Court has subject-matter jurisdiction over Plaintiff's civil RICO claims under 18 U.S.C. § 1964(c), which authorizes any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962 to recover treble damages, costs, and reasonable attorneys' fees. Plaintiff also seeks equitable and declaratory relief to the extent authorized by 28 U.S.C. §§ 2201 and 2202, and the Court's other lawful powers.

60.     This Court also has subject-matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because: (a) the proposed Class contains more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) minimal diversity exists because at least one member of the proposed Class is a citizen of a State different from at least one Defendant. Plaintiff is a citizen of Maryland. On information and belief, Collectors Holdings, Inc. is incorporated in Delaware and has its principal place of business in Santa Ana, California, and is therefore a citizen of Delaware and California. On information and belief, Collectors Universe, Inc., doing business as PSA, is not a

36

citizen of Maryland and is a citizen of Delaware, California, or both. No exception to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) or § 1332(d)(9) applies.

61.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III. Plaintiff's state-law claims arise from the same common nucleus of operative fact as the federal RICO claims, including Defendants' alleged grading fraud, deceptive fee architecture, misrepresentations and omissions, use of PSA-facing intake channels, and attempted reliance on online terms Plaintiff never saw or accepted.

62.     This Court has personal jurisdiction over each Defendant under Fed. R. Civ. P. 4(k)(1)(A), Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1), (3), and (4), and the Fourteenth Amendment. As alleged above, Defendants purposefully solicited and conducted grading-related business in Maryland by accepting Maryland-originating submissions; providing grading, certification, pricing, and related services for Maryland consumers; transmitting grading-related representations, invoices, payment demands, and results into Maryland; collecting Maryland-originating charges; and shipping cards into and out of Maryland. Collectors is subject to this Court's jurisdiction based on Collectors' own Maryland-directed conduct and the PSA conduct that Collectors directed, authorized, ratified, and monetized. Plaintiff's claims arise out of those contacts, which caused economic injury in Maryland, and the exercise of jurisdiction comports with fair play and substantial justice.

63.     Plaintiff's transaction supplies the required suit-related nexus. Plaintiff submitted cards from Maryland through a Card Grading Intermediary operating as Defendants' authorized or accepted PSA-facing intake conduit; paid or reimbursed grading-related charges from Maryland; received Defendants' grading-related communications and results in Maryland; and

received the return of his cards in Maryland, where he suffered economic injury. The intermediary's role does not render these contacts unilateral and, as alleged above, did not constitute Plaintiff-side authority to form contracts or waive rights.

64.    This Court also has personal jurisdiction over Defendants for Plaintiff's RICO claims under 18 U.S.C. § 1965(d) and Fed. R. Civ. P. 4(k)(1)(C), because RICO authorizes nationwide service of process and each Defendant has sufficient contacts with the United States. The exercise of jurisdiction comports with Fifth Amendment due process, and the Court may exercise pendent personal jurisdiction over the related state-law claims arising from the same core operative facts. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997).

65.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a) because, as set forth above, a substantial part of the events giving rise to Plaintiff's claims occurred in Maryland, and Defendants transact their affairs in this District through the Maryland-directed conduct.

## COMMON FACTUAL ALLEGATIONS

66.    The following allegations set out the factual background concerning the origin of third-party card grading, and how Defendants grew and then exploited their dominant position in the multi-billion-dollar trading-card market through fraudulent and deceptive practices, which caused Plaintiff and similarly situated consumers to suffer substantial economic harm.

## I.    The Origins and Consolidation of the Modern Trading-Card Grading Industry

67.    The business of authenticating, evaluating, and encapsulating collectible cards in tamper-evident holders bearing assigned numerical condition grades began in the mid-1980s. The practice is generally traced to Accugrade Sportscard Authentication ("ASA"), founded by Alan Hager. In 1984, ASA introduced the premise, now common to major grading companies, that a purportedly disinterested third party can evaluate a card's condition on a standardized scale

38

and permanently encapsulate the card with that assigned grade.[26] ASA did not achieve market acceptance; instead, the modern card grading industry emerged with PSA's launch in July 1991.

68.      PSA's first grade illustrates the contradiction between PSA's published grading standards and its actual grading practice. As alleged above, PSA assigned certificate number 00000001 to a physically trimmed T206 Honus Wagner despite PSA's standards prohibiting grading any card bearing evidence of trimming, recoloring, restoration, or other tampering. PSA still graded that card and never withdrew the grade after the alteration became known.

69.      PSA's early growth was modest. On information and belief, PSA graded approximately one million cards during its first seven years of operation, from 1991 through 1998.[27] By the end of the 1990s, competing grading brands had emerged. Sportscard Guaranty Corporation ("SGC") was founded in July 1998 and positioned itself as a grading alternative with strength in vintage cards. Beckett Grading Services ("BGS") began operations in 1999 and differentiated itself through subgrades for centering, corners, edges, and surface.[28] By the early 2000s, PSA, SGC, and BGS had become the dominant third-party card-grading brands.

70.      During the pandemic-era, PSA submissions surged. By April 2021, PSA's grading throughput had reached approximately 20,000 cards per day, or roughly 500,000 to 600,000 cards per month.[29] By August 2023, PSA was publicly reported to be on pace to grade approximately 14 million cards per year, or about 1.2 million cards per month.[30] In February

---

[26] *See* Greg Bates, *Making the grade*, SPORTS COLLECTORS DIGEST (July 9, 2020), https://sportscollectorsdigest. com/collecting-101/history-of-grading-cards-psa-bgs-sgc-dominating.

[27] *See id.*

[28] *See id*.

[29] *See* Greg Bates, *PSA grading 20,000 cards per day, slowly making progress on 'avalanche' of submissions*, SPORTS COLLECTORS DIGEST (Apr. 22, 2021), https://sportscollectorsdigest.com/cards/psa-card-grading-suspension-update-sports-cards-collectibles-hobby.

[30] *See PSA on pace to grade 14 Million cards a year.*, COLLECTORS UNIVERSE, https://forums.collectors.com /discussion/1094679/psa-on-pace-to-grade-14-million-cards-a-year (last visited July 22, 2026).

2021, during that surge, an investor group acquired Collectors Universe, Inc,[31] PSA's then-publicly traded parent company, and took it private in a transaction valued at approximately $853 million.[32]

71.    When Collectors took control of PSA, it did not acquire a vast bench of trading-card grading experts. Collectors Universe's public filings identified 18 trading-card experts as of June 30, 2017; 22 as of June 30, 2018; 27 as of June 30, 2019;[33] and 33 as of June 30, 2020.[34] PSA's 2020 Form 10-K reported 77 total experts across all authentication and grading operations, including coins, trading cards, autographs, and memorabilia, and separately identified forty-four customer-service and support personnel.[35] But PSA identified only 33 trading-card experts in that last public annual report before being taken private in the transaction.

72.    PSA also disclosed that qualified collectibles authentication and grading experts were "in short supply," that competition for their services was "considerable," and that PSA therefore focused on training young authenticators and graders whom it believed had the skills or knowledge base to become collectibles experts one day.[36] PSA also disclosed that it contracted "with outside experts, usually collectibles dealers," to address short-term increases in authentication and grading orders.[37]

---

[31] See Investor Group Led by Nat Turner Completes Acquisition of Collectors Universe, BUS. WIRE (Feb. 22, 2021, 9:00 AM), https://www.businesswire.com/news/home/20210222005284/en/Investor-Group-Led-by-Nat-Turner-Completes-Acquisition-of-Collectors-Universe.

[32] See Collectors Universe and Investor Group Led by Entrepreneur and Collector Nat Turner Amend and Restate Merger Agreement to Increase Offer Price to $92.00 Per Share in Cash, STREETINSIDER.COM (Jan. 20, 2021, 8:49 AM), https://www.streetinsider.com/Globe+Newswire/Collectors+Universe+and+Investor+Group+Led+by+Entrepreneur+and+Collector+Nat+Turner+Amend+and+Restate+Merger+Agreement+to+Increase+Offer+Price+to+%2492.00+Per+Share+in+Cash/17840471.html.

[33] Attached at **Exhibit A**, Collectors Universe Form 10-K for 2017, 2018, 2019.

[34] Attached at **Exhibit B**, Collectors Universe 2020 Form 10-K.

[35] Id.

[36] **Exhibit A**, FY2019 10-K, Item 1A (Risk Factors).

[37] Id. at 10.

73.    PSA's own public disclosures showed that its path to increased output depended on operational expansion. PSA stated in its 2020 Form 10-K that it was increasing capacity to grade "a higher number of primarily collectible cards" by adding operating personnel, reviewing and improving operational processes, introducing multiple daily work shifts, and even making additional operational space available.[38] Immediately after the acquisition, Collectors helped PSA implement that expansion.[39] PSA also suspended four of its most popular lower-cost service tiers in March 2021, leaving only higher-cost options open for new submissions. The suspension was driven by a backlog estimated around 10 million cards when announced, which reportedly grew to about 12 million cards as submissions continued before the suspension took effect.[40] PSA committed to restoring suspended services by July 1, 2021,[41] but the lowest tiers remained closed well beyond that date and were not fully restored until approximately September 2022.

74.    Collectors did not operate PSA as a standalone grading service. It pursued a broader consolidation and integration strategy around the commercial life of graded cards. After taking PSA private in February 2021, Collectors acquired Goldin Auctions in July 2021, adding a major high-end collectibles auction business to its portfolio.[42] Collectors acquired Card Ladder, a trading-card valuation and market-data platform, in December 2021.[43] Collectors acquired

---

[38] **Exhibit B**, FY2020 10-K, Item 1 (Business) – Growth Strategy.

[39] *See* Todd Tobias, *Dream of Being a PSA Grader? This Might Be Your Chance!*, PSA (Mar. 22, 2021), https://www.psacard.com/articles/articleview/10361/dream-being-psa-grader-might-your-chance.

[40] Benjamin Burrows, *PSA partially halting grading submissions amid 10 million card backlog*, THE ATHLETIC (June 1, 2026), https://www.nytimes.com/athletic/7315517/2026/05/28/psa-grading-pause-tiers/.

[41] Steve Sloan, *PSA Customer Update - April 2021*, PSA (Mar. 31, 2021), https://www.psacard.com/articles/articleview/10367/psa-customer-update-april-2021.

[42] *See* SCD Staff, *Goldin Auctions sold to Collectors Holdings amid record sales, red-hot industry*, SPORTS COLLECTORS DIGEST (July 1, 2021), https://sportscollectorsdigest.com/news/goldin-auctions-sold-to-collectors-holdings-sports-card-collectibles-ken-goldin-nat-turner.

[43] *See* *Collectors Universe Acquires Trading Card Valuation Platform Card Ladder*, PSA (Dec. 2, 2021), https://www.psacard.com/articles/articleview/10556/collectors-universe-acquires-trading-card-valuation-platform-ladder.

SGC in February 2024.[44] In April 2024, Collectors entered into a transaction with eBay through which eBay acquired Goldin and PSA acquired eBay's trading-card vault.[45] PSA then launched the PSA Vault in June 2024.[46] In December 2025, Collectors announced an agreement to acquire BGS, one of the remaining major grading brands in the United States.[47] Collectors also operates lending services tied to collectibles held in PSA Vault custody.[48] These transactions placed Defendants on both sides of the grading-dependent market, which creates conflicts.

75.      PSA's volume and backlog pressure continued after Collectors' consolidation strategy accelerated. After doubling throughput from 2021 to 2023, Defendants' aggressive growth strategy contributed to that pressure. PSA's annual card volume exceeded 19 million cards in 2025, and by early 2026 PSA was processing approximately 2.0 million cards per month.[49] By comparison, PSA had authenticated and graded approximately 35 million trading cards from its inception in 1991 through June 2020.[50] At a pace of approximately 2.0 million cards per month, PSA was positioned to grade more than 24 million cards in 2026 alone. In May

---

[44] Jeffrey Dohm-Sanchez, *PSA Owners Acquire SGC*, ICV2 (Mar. 1, 2024, 7:55 AM), https://icv2.com/articles/news/view/56365/psa-owners-acquire-sgc; *Collectors Acquired SGC: What the Deal Meant for the Hobby (Two Years Later)*, CARD CAPSULE, https://cardcapsule.com/blogs/blog/the-strategic-acquisition-of-sgc-by-collectors-universe (last visited July 1, 2026).

[45] Press Release, *eBay, Collectors Enter into Commercial Agreement, Sign Deals for Acquisition of Goldin by eBay and Acquisition of the eBay Vault by PSA*, EBAY (Apr. 10, 2024), https://investors.ebayinc.com/investor-news/press-release-details/2024/eBay-Collectors-Enter-into-Commercial-Agreement-Sign-Deals-for-Acquisition-of-Goldin-and-Sale-of-eBay-Vault.

[46] Dylan Manfre, *PSA Trading Card Vault Opens With Goal of Simpler Transactions*, YAHOO! FIN. (June 24, 2024), https://finance.yahoo.com/news/psa-trading-card-vault-opens-170000794.

[47] *See, generally*, Brooks Peck, *PSA parent company Collectors to acquire Beckett, keeping it an independent brand*, THE ATHLETIC (Dec. 15, 2025), https://www.nytimes.com/athletic/6891882/2025/12/15/ collectors-beckett-psa-card-grading/.

[48] *Lending*, COLLECTORS, https://www.collectors.com/lending (last visited July 6, 2026).

[49] *See* Conor B. McGrath, *Over 26 Million Cards Graded in 2025: How the Market Exploded*, SPORTS ILLUSTRATED (Jan. 3, 2026), https://www.si.com/collectibles/over-26-million-cards-graded-in-2025-how-the-market-exploded.

[50] *See* Collectors Universe, Inc., Annual Report (Form 10-K), (Aug. 28, 2019), https://www.sec.gov/Archives/edgar/data/1089143/000143774919017562/clct20190630_10k.htm (reporting that the Company had authenticated and graded approximately 35 million trading cards since PSA's inception in 1991); *see also* Jesse Haynes, *Sports Card Grading Costs Double*, CARDLINES (Mar. 1, 2021), https://cardlines.com/psa-beckett-rates-increase/.

2026, PSA again announced that it would suspend its four lowest-tier services effective June 2, 2026, citing a backlog that had grown to about 10 million cards and then spiked after the announcement.[51] Around the same period, Collectors announced substantial capacity investments, including plans to expand grading capacity and staffing in response to demand and backlog pressure.[52] These facts show that the same capacity pressures present at the time of Collectors' acquisition remained and intensified as PSA's grading volume increased.

## II.    Defendants' Market Control Has Become Central to the Investment-Driven Trading-Card Market

76.    From the late 2010s and then accelerating during and after the COVID-19 period, the trading-card market evolved from a mostly hobby-centered marketplace into a financialized collectibles asset market. That market stacks six interdependent components: manufacturing and intellectual property; third-party grading and authentication; pricing, data aggregation, and analytics; storage, custody, resale, and financialization; secondary-market sales and marketplace integration; and market communication, influence, and intake. Grading is the connective component because the assigned PSA grade travels through or impacts each other component, affecting price, scarcity, liquidity, sale timing, financing, and consumer demand.

77.    As reflected on the demonstrative illustration on the next page, Collectors does not occupy a single position in this ecosystem. Through PSA, acquired or affiliated businesses, and commercial integrations, Collectors owns, controls, or influences each component besides manufacturing. Collectors' financial interest can therefore attach at multiple stages of a card's commercial life. That integrated structure matters because the same PSA grade can influence

---

[51] PSA Staff, *Demand Spike*, *supra* note 22.

[52] *See* Ricketson, *supra* note 17; Burrows, *PSA partially halting grading submissions*, *supra* note 40("PSA has tripled its staff and opened grading facilities in Florida, New Jersey, Texas and Tokyo since 2021").

43

pricing data, vault decisions, resale pathways, offer eligibility, lending capacity, insurance

decisions, and consumer demand.[53]



**(Demonstrative illustration of Defendants' influence over multiple components of the trading-card ecosystem, including grading, pricing, custody, resale, financing, and market communication)**

### A.    Manufacturing and Intellectual Property

78.    The trading-card ecosystem begins with manufacturing and intellectual property.

Manufacturers and licensors, including Topps, Panini America, Upper Deck, The Pokémon

Company International, and entertainment-property licensors, control the creation of cards and

the initial scarcity signals attached to them, including product line, print run, checklist, licensing

rights, autograph and relic content, serial numbering, refractor structure, and parallel structure.

79.    Fanatics Collectibles, through Topps and related league, player, and brand

relationships, controls important sports-card licensing and distribution channels. The Pokémon

---

[53] Decl. of Jacqueline Curiel, *Rasmussen v. Collectors Holdings Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 4, 2026), ECF No. 20-2, Ex. A (Collectors User Agreement) Preamble; *Collectors to Acquire Beckett*, COLLECTORS (Dec. 15, 2025), https://www.collectors.com/company-announcement.

Company International controls significant Pokémon TCG production infrastructure through its acquisition of Millennium Print Group.[54] These manufacturing and licensing facts matter because initial scarcity begins with production, but downstream value increasingly depends on grading, population reports, pricing tools, custody, resale, and financing.

80.     Once sealed products are sold, manufacturers and licensors largely exit the downstream valuation chain. The card's later commercial life—including grading, pricing, storage, resale, financing, insurance, and marketing—increasingly depends on systems and signals Defendants own, operate, influence, or monetize.

### B.      Grading and Authentication - PSA as the Market Credential

81.     The next component is third-party grading and authentication. PSA's own marketing presents its grade as a universal market standard. PSA states that it "has established [a] recognized and respected universal grading standard for trading-card collectors," that the PSA-graded card price guide "has enhanced stability in the marketplace," and that "[c]ards authenticated and graded by PSA achieve amazing prices at auction."[55] PSA also tells consumers that PSA-certified items "tend to sell for more — sometimes significantly more — than those that are not."[56] These statements market the PSA grade as a value-enhancing market credential.

82.     PSA also turns that Grading Credential into public scarcity data. PSA describes its Population Report as an "online record of all PSA-certified trading cards, tickets, packs, coins

---

[54] Press Release, *Fanatics Acquires Topps Trading Cards and Collectibles Business*, FANATICS (Jan. 4), https://www.fanaticsinc.com/press-releases/fanatics-acquires-topps-trading-cards-and-collectibles-business; Press Release, *The Pokémon Company International Enters Into Agreement to Purchase Millennium Print Group*, THE POKÉMON CO. INT'L (Apr. 18, 2022, 7:00 AM), https://press.pokemon.com/en/THE-POKEMON-COMPANY-INTERNATIONAL-ENTERS-INTO-AGREEMENT-TO-PURCH-44490.

[55] *Grading*, PSA, https://www.psacard.com/services/tradingcardgrading (last visited July 22, 2026).

[56] *PSA Price Guide*, PSA, https://www.psacard.com/priceguide (last visited July 22, 2026) ("The clear benefit of having your items certified by PSA is because, generally speaking, items certified by PSA tend to sell for more — sometimes significantly more — than those that are not.").

and pins in today's marketplace" and states that the tool retrieves "current population figures." PSA separately describes the Population Report as providing "an exact count of each item graded, from PSA 1-10," with category summaries and daily updates.[57] In that role, the Population Report is not a passive database. It functions as a prospectus-like scarcity disclosure for the PSA-centered market—not because trading cards are securities, but because PSA publishes grade-by-grade counts that Card Market Participants use to evaluate rarity and value.

83.     PSA further supplies market-value references tied to that same grade. PSA tells consumers they can "[s]ort through the current market values" of PSA-certified collectibles using the PSA Price Guide, which PSA calls the "official price guide for PSA-certified collectibles." PSA also states that its prices are based on "established price histories," include "[n]o subjective pricing surveys," and "more accurately reflect what you will realize when you sell or buy PSA graded sports cards."[58] PSA's Auction Prices Realized product likewise states that realized prices serve as "crucial references for assessing the market value" of collectibles, provides access to "over 5 million auction results," and allows users to "[s]tay ahead of market fluctuations."[59]

84.     PSA integrates grade, price, population, and auction data at the item level. PSA states that collectors can access auction results "sorted by PSA grade" together with "population numbers and price guide listings." PSA CardFacts pages likewise display grade-level fields including "Most Recent Price," "Average Price," "PSA Price," "Population," and "POP

---

[57] *See Population Report*, PSA, https://www.psacard.com/Pop (last visited July 22, 2026) (describing the Population Report as providing "an exact count of each item graded, from PSA 1-10," with category summaries and daily updates).

[58] *Price Guide*, *supra* note 56.

[59] *Auction Prices Realized*, PSA, https://www.psacard.com/auctionprices (last visited July 22, 2026).

Higher."[60] PSA's Set Registry adds another market-supporting mechanism by encouraging collectors to "track your inventory, costs and populations," while linking Registry participation to PSA's official price guide and population reports.[61] These tools reinforce grade-based scarcity, competition, pricing, and demand for PSA-certified cards.

### C.    Pricing, Data Aggregation, and Analytics — Card Ladder

85.    Pricing and valuation tools function as market infrastructure. They translate grades, population data, transaction data, comparable sales, and market movement into consumer-facing valuation signals. Consumers use those signals to decide whether to grade, which service tier to select, whether to sell or hold, what price to ask, what offer to accept, whether to insure a card, and whether a card should be treated as an investment-like asset.

86.    Collectors participates in this pricing-and-valuation infrastructure through Card Ladder. Collectors publicly described Card Ladder as a trading-card valuation platform built on sales data, pricing information, transaction history, and predictive pricing technology.

87.    Card Ladder states that it provides access to more than 100 million historical trading-card sales, millions of vetted sales, and thousands of indexes.[62] Those representations matter because Card Ladder converts grading and population data, together with sales data, into valuation outputs consumers use when deciding whether to submit cards for grading, pay for

---

[60] *Massive Database of Auction Results Unlocked, Free to Collectors*, PSA (Jan. 4, 2018), https://www.psacard.com/articles/articleview/9416/massive-database-auction-results-unlocked-free-collectors (stating that auction results can be "sorted by PSA grade" and viewed with "population numbers and price guide listings"); *Stanley Ketchel (Checklist Back) 1911 T9 Turkey Reds*, PSA, https://www.psacard.com/cardfacts/boxing-cards/1911-t9-turkey-reds/stanley-ketchel-checklist-back-67/18527 (last visited July 22, 2026) (displaying "Prices By Grade" fields including "Most Recent Price," "Average Price," "PSA Price," "Population," and "POP Higher"); *Checklist 1-132 1984 Topps*, PSA, https://www.psacard.com/cardfacts/football-cards/1984-topps/checklist-1-132-394/12238 (last visited July 22, 2026) (same).

[61] *Set Registry Information*, PSA, https://www.psacard.com/psasetregistry/information (last visited July 22, 2026); *PSA Set Registry*, PSA, https://www.psacard.com/psasetregistry/ (last visited July 22, 2026); *PSA Set Registry Rules*, PSA, https://www.psacard.com/psasetregistry/rules (last visited July 22, 2026) (stating that certain functionality "will add another layer of competition within the Registry").

[62] PSA, *Card Ladder*, *supra* note 43; *Card Ladder*, https://www.cardladder.com (last visited July 22, 2026).

higher service levels, hold cards, sell cards, accept offers, or compare graded-card values. Card

Ladder uses explicit public-market language. Card Ladder states that its "'Indexes' describe the

market performance for a given set of cards similar to the S&P 500," and that its software uses

those indexes to "generate estimated values" and "predict" how a card in a user's collection may

move based on index performance. Card Ladder also tells users to check the CL50 index "to

gauge where the market is moving."[63]



**(Representative Card Ladder dashboard screenshot showing financial-market-style presentation of graded-card pricing charts, collection value, daily change, verified sales volume, shop links, and pricing metrics).**

88.    By owning Card Ladder, Collectors controls or materially influences a platform

that turns PSA grades and population and transaction data into market-facing valuation, index,

and portfolio signals. Card Ladder's valuation method is opaque. Card Ladder excludes large

categories of sales unless reported and verified, including retail-site sales, card-shop sales, card-

---

[63] *What Are Indexes?*, CARD LADDER, https://cardladder.zendesk.com/hc/en-us/articles/11943014102167-What-are-Indexes (last visited July 22, 2026); *CL50*, CARD LADDER, https://www.cardladder.com/indexes/cl50index (last visited July 22, 2026); *Indexes*, CARD LADDER, https://www.cardladder.com/indexes (last visited July 22, 2026).

show sales, and in-person transactions. Card Ladder does not publicly explain who verifies such sales, how verification is performed, or how those exclusions affect Card Ladder values.[64] By excluding these categories of sales transactions, Defendants cause included transactions, including any Defendants-linked transactions, to receive greater relative weight.

89.     On information and belief, and as reflected on the representative screenshot on the following page, the Card Ladder values have sharp, unexplained day-to-day changes followed by reversals. While the algorithmic basis, data inputs, model changes, private-sale inputs, or manual adjustments underlying those movements remain within Collectors' possession, Plaintiff avers that the frequency and size of these adjustments suggest issues with valuation methodologies beyond mere market movement.

 

**May 6, 2026**          **May 7, 2026**

---

[64] *What is the Industry Page?*, CARD LADDER, https://cardladder.zendesk.com/hc/en-us/articles/21053788523671-What-is-the-Industry-Page (last visited July 22, 2026) (stating that sales on retail websites, social-media marketplaces, card shops, card shows, and in-person transactions are not included unless reported and verified by a Card Ladder researcher).

90.    These structural issues create an opaque feedback loop. PSA creates or confirms the core valuation input by assigning the grade, issuing the certification number, and publishing population data. Card Ladder then converts those grading-dependent inputs, together with selected sales data, into market-facing pricing signals. Collectors then uses custody, resale, partner-offer, marketplace, and lending channels to monetize the same graded-card values those signals help shape. Consumers do not know whether Card Ladder values reflect representative market data, undisclosed exclusions, manual adjustments, algorithmic changes, private-sale inputs, or Defendants' commercial incentives.

**D.    Financialization Through Custody, Resale and Acquisition - PSA Vault, PSA Partner Offers, and Collectors Financial Services**

91.    The next component is financialization through custody, resale, and acquisition. In the modern trading-card market, a graded card is routed into a vault, held in custody, listed for sale without physical transfer, offered to buyers, or used as collateral. Collectors participates in this component through the PSA Vault, PSA Partner Offers, and Collectors Financial Services.

92.    PSA markets the PSA Vault as custody and asset-management infrastructure. PSA states that vaulted items are "100%-insured" in a modern, climate-controlled facility with "24/7 security and asset management."[65] The Vault interface also includes portfolio-style metrics such as "ITEMS VAULTED," "TOTAL VALUE," and "VAULTED & SOLD."[66] PSA also tells users they can "[c]reate eBay listings in seconds from your PSA Vault," choose when listings go live, and let PSA handle "[l]isting, imaging, packaging, shipping" on the user's behalf.[67]

---

[65] *PSA Vault*, PSA, https://www.psacard.com/info/psa-vault (last visited July 22, 2026).

[66] *Id.*

[67] *Id.*

93.    PSA expressly describes Vault consignment as sale execution, not passive storage. PSA states that "[c]onsigning your card means entrusting PSA to market, sell, ship, and collect payment on your behalf," and that PSA will host listings on its eBay storefront using item details and photography designed to attract buyers who "value the PSA name."[68] A vaulted card therefore may be marketed, sold, shipped, and paid out through PSA-linked infrastructure without the owner physically handling the card.

94.    PSA Partner Offers add instant liquidity to the same pipeline. PSA tells users they can receive "real-time PSA Partner Offers" from a vetted buyer network, "tap to accept," "lock in a guaranteed sale," and receive payment within days.[69] PSA also states that all PSA-graded cards in the Vault are eligible for Partner Offers and eBay consignment, and that PSA Partner Offers are "built directly into the grading and vaulting experience."[70]

95.    Collectors Financial Services adds the financing layer. Collectors publicly offers capital solutions secured by collectibles deposited in the PSA Vault, including acquisition financing, pre-sale financing, and refinancing.[71] Together, these functions allow a PSA-graded card to move from grading, to custody, to offer, to sale, to financing without leaving the Collectors-controlled ecosystem.

96.    Plaintiff does not allege that every consumer uses the PSA Vault, PSA Partner Offers, or Collectors Financial Services. The point is structural. Collectors built infrastructure in which PSA's grade can affect custody, offer, sale, pricing, and lending decisions after grading. The grade affects market value; market value affects pricing data, vault decisions, sale decisions,

---

[68] *Id.*

[69] *Id.*

[70] *Partner Offers*, PSA, https://www.psacard.com/info/psa-partner-offers (last visited July 22, 2026).

[71] *Lending*, *supra* note 48 (describing capital solutions secured by collectibles deposited in the PSA Vault).

51

offer eligibility, and lending capacity; and those downstream services create additional revenue opportunities for Collectors or its commercial partners.

### E.    Marketplace Integration and Secondary-Market Flow

97.    Secondary-market sales are another core component of the trading-card ecosystem. The secondary market is where cards are bought, sold, auctioned, consigned, flipped, liquidated, and converted into realized value. Because graded cards may command materially different prices depending on the grading company and grade assigned, secondary-market activity depends heavily on grading outputs and market confidence in those outputs.

98.    The eBay integration makes that dependence explicit. Collectors and PSA described the PSA/eBay relationship as an "end-to-end" hobby experience designed to streamline "buying, grading, storing and selling," provide "real-time tracking of any item's value . . . utilizing PSA's pricing data," and integrate "real-time transaction data" with PSA Population Report data so users can make "smarter buying, selling and trading decisions."[72] Collectors CEO Nat Turner described "the idea of being able to grade a card with PSA, then utilize the vault to either store it securely or make it available to other collectors on eBay in an instant" as "a major win for everyone who participates in this hobby."[73] PSA President Ryan Hoge likewise described the Vault as allowing customers to "strategically time the market" and referenced future "liquidity solutions" for customers "focused on investment."[74]

---

[72] *Collectors and eBay Transactions Close, Summer Launch Expected for Integrated, End-to-End Hobby Experience*, PSA (May 16, 2024), https://www.psacard.com/articles/articleview/11059/collectors-and-ebay-transactions-close-summer-launch-expected-for-integrated.

[73] *Id.* (quoting Nat Turner).

[74] *Sports Trading Cards: One Business Helping Collectors Buy & Sell* at 1:37-1:40, YAHOO! FIN. (Jan. 12, 2025), https://finance.yahoo.com/video/sports-trading-cards-one-business-190037851.html (statements by PSA President Ryan Hoge that the Vault allows customers to "strategically time the market" and that PSA expects innovations around "liquidity solutions" for customers "focused on investment").

99.    Collectors also participates in secondary-market flow through Card Ladder. Card Ladder routes users from pricing-data dashboards to marketplace listings through compensated affiliate links, including links to eBay and other marketplaces.[75]

100.    These secondary-market relationships matter because the grade is the credential that travels into resale channels. When Collectors owns PSA, controls or participates in pricing data, operates vault custody and partner-offer channels, maintains eBay-linked consignment pathways, and uses retail submission relationships, Collectors can participate in multiple stages of the same card's economic lifecycle. Plaintiff alleges that this integrated structure reinforces Collectors' influence over grading-dependent valuation, scarcity, liquidity, pricing signals, and consumer reliance throughout the trading-card market.

F.    Market Communication, Influence, Solicitation, and Intake

101.    The final component is market communication, influence, solicitation, and third-party intake channels or submission pathways. Consumer behavior in the modern card market is shaped by social-media platforms, podcasts, video channels, dealer content, hobby-media interviews, grading promotions, live-streamed card openings, card-shop events, and hobby personalities. These new media promote cards and grading, reinforce PSA as the preferred market credential, and route consumers into PSA-facing submission pathways.

102.    PSA disseminates and reinforces a standardized market message through official and amplified social media channels: PSA grading is the preferred market credential, PSA is the leading authenticator and grader, and a PSA grade may materially increase a card's value. PSA communicates that message through PSA-branded content, executive appearances, dealer-facing

---

[75] *Does Card Ladder Have Affiliate Relationships?*, CARD LADDER, https://cardladder.zendesk.com/hc/en-us/articles/20658528964887-Does-Card-Ladder-Have-Affiliate-Relationships (last visited July 22, 2026) (stating that purchases after clicking marketplace links from Card Ladder may result in compensation to Card Ladder and that marketplace links inside Card Ladder are affiliate links).

materials, creator-facing promotions, affiliate disclosures, sponsored or promotional posts, public hobby-media programming, and its own official channels.[76] That ecosystem matters because PSA's representations reach beneficial card owners even when those owners do not submit directly through PSA's portal.

103.    PSA also operates dealer and group-submission programs that serve as consumer-facing intake channels. PSA describes authorized dealers as appointed under PSA Dealer Agreements, permits authorized dealers to submit cards on behalf of individuals, and provides preferred pricing and advertising benefits subject to PSA's qualifications. PSA has also represented that authorized dealers may use PSA marketing materials, point-of-sale displays, brochures, direct-mail pieces, and PSA brand logotypes, and that PSA conducts joint marketing programs with authorized dealers that promote both the dealer's services and PSA's authentication and grading services.[77] PSA also promotes group submissions directly to collectors, telling them they may join group submissions run by PSA dealers and directing them to PSA's Dealer Directory to locate verified group submitters.[78]

104.    The communication ecosystem and intake structure operate together. PSA's official and amplified market messaging promotes PSA grading as the expert, reliable, and market-preferred credential; PSA-facing dealers, group submitters, retail partners, card shops,

---

[76] *The PSA Pod*, APPLE PODCASTS, https://podcasts.apple.com/us/podcast/the-psa-pod/id1609006937 (last visited July 22, 2026) ("PSA's Official Podcast. Authentic hobby talk direct from the leading source for trading card authentication and grading."); The Geoff Wilson Show, *PSA Executive Reveals Mistakes Most Collectors Make With Grading*, YOUTUBE (May 13, 2026), https://www.youtube.com/watch?v=Ya5sq98qP5A; *The Geoff Wilson Show*, YOUTUBE, https://www.youtube.com/@itsgeoffwilson (last visited July 22, 2026).

[77] *PSA Sales*, PSA, https://www.psacard.com/sales (last visited July 22, 2026); *How can I become a PSA Dealer?*, PSA (July 19, 2025), https://support.psacard.com/s/article/how-to-become-a-dealer; *Frequently Asked Questions*, PSA, https://www.psacard.com/support/faq (last visited July 22, 2026); Collectors Universe, *Annual Report* (2019), *supra* note 50, Item 1, Authorized Dealer Network.

[78] *PSA Group Submissions*, PSA, https://www.psacard.com/dealers/groupsubmissions (last visited July 22, 2026); *supra* note 77.

and other Card Grading Intermediaries then convert that messaging into submissions. Those intermediaries are not alleged to have originated Defendants' deception or messaging. They are the submission channels through which Defendants' standardized representations, prices, charges, grading outputs, and market messages reach beneficial card owners.

105.    Collectors' relationship with Fanatics Collect provides another grading-linked market pathway. Fanatics publicly identifies PSA, Beckett, CGC Cards, and SGC as grading partners and states that users can authenticate and grade cards through those partners while accessing partnership pricing, convenience, and resale-related services. Fanatics also describes vaulting services through which cards are stored, tracked with live pricing and comparable sales, and kept ready to list, trade, or ship.[79] Plaintiff does not allege Fanatics is a Defendant or that the relationship is exclusive. The relationship is relevant because it illustrates how cards can move through grading-linked market pathways in which value depends on the assigned grade.

106.    Collectors' secondary-market and intake-channel relationships also include GameStop. Public filings indicate that GameStop became an authorized PSA dealer in November 2024, that PSA agreed to provide authentication and grading services through select GameStop stores, and that GameStop disclosed the dollar value of its PSA collaboration in fiscal 2024. GameStop also disclosed that Nat Turner, Collectors' Chief Executive Officer and Chairman, serves on GameStop's Board of Directors.[80] That overlap is relevant market-structure context for the relationship between PSA and a national retail submission channel.

---

[79] *Authentication*, FANATICS COLLECT, https://support.fanaticscollect.com/en_us/authentication-B1V3m0XTxe (last visited July 22, 2026) ("Fanatics Collect offers a simpler way to get your raw cards graded and authenticated by our partners PSA, Beckett, CGC Cards, and SGC."); *How to Grade & Store Your Cards*, FANATICS COLLECT, https://www.fanaticscollect.com/pages/how-to-grade-and-store-your-graded-trading-cards (last visited July 22, 2026).

[80] GameStop Corp., *Proxy Statement* (Schedule 14A) (Apr. 24, 2025), https://s205.q4cdn.com/272884106/files/doc_downloads/annual-meeting-docs/2025/2025-Proxy-Statement.pdf.

**III.        Defendants Scaled a PSA-Centered Financial Marketplace Built on PSA Grades**

107.    The modern trading-card market is no longer a mere hobby. Cards are bought and sold as alternative assets, tracked through pricing and analytics tools, stored in third-party vaults, used as collateral for asset-backed financing, and transacted through integrated resale and custody channels where sales routinely exceed seven figures and occasionally exceed eight figures. The market's financialization is increasingly acknowledged by policymakers and financial analysts. In a December 2025 letter requesting an FTC investigation into Collectors' consolidation strategy, Representative Pat Ryan described the collectibles industry as a "sophisticated asset class" and third-party grading as "essential market infrastructure" enabling "liquidity and price discovery."[81] In July 2026, an article reporting on a Mizuho analyst's estimate that the trading-card market could reach $20 billion stated that financial firms see substantial potential in the category and that institutional analysts increasingly evaluate sports and gaming cards with methods associated with traditional equities.[82] Days later, a policy group within Japan's ruling Liberal Democratic Party stated that "[t]rading cards are no longer simply consumer products" and cited the market's rapid expansion and the cards' growing asset value in calling attention to problems warranting regulatory consideration.[83] These statements reflect

---

[81] Ryan, *Letter to Ferguson*, *supra* note 11, at 1 (warning Collectors' control of grading "creat[es] severe conflicts of interest" and presents "unique opportunities for market manipulation and unfair self-dealing.").

[82] Rohit Gupta, *Wall Street Says the Trading Card Market Could Be Worth $20 Billion. Here's Why Target and Walmart Are Paying Attention*, YAHOO! FIN. (July 16, 2026, 9:44 PM), https://finance.yahoo.com/markets/stocks/articles/wall-street-says-trading-card-014429305.html (originally published by Athlon Sports and reporting a Mizuho analyst's $10 billion-to-$20 billion estimate of the 2026 trading-card market).

[83] Sarah Hilton & Akemi Terukina, *Japan Weighs Regulating Pokemon Cards Amid Trading Mania*, THE JAPAN TIMES (July 23, 2026), https://www.japantimes.co.jp/business/2026/07/23/japan-weighs-regulating-pokemon-cards/; *see also* **Exhibit C**, setting forth Defendants' market representations and incorporated herein by reference; *Collectors Announces New $100 Million Financing Round*, BUS. WIRE (Mar. 30, 2022, 9:00 AM), https://www.businesswire.com/news/home/20220329006052/en/Collectors-Announces-New-$100-Million-Financing-Round; *Collectors Holdings Acquires Goldin Auctions*, AUCTION REPORT (July 1, 2021), https://www.auctionreport.com/collectors-holdings-acquires-goldin-auctions/ (stating that Collectors develops tools and services for "alternative investors" and that "[t]he collectibles market is now valued at more than $400 billion in annual transactions").

increasing recognition that trading cards function as assets whose value is measured, tracked, traded, financed, and subjected to market-level analysis and oversight. Industry participants, including Defendants, likewise describe collectibles as alternative assets and the collectibles market as a growing alternative-asset market.

108. Plaintiff does not allege that Defendants created the trading-card market from scratch. Plaintiff alleges instead that Defendants created, scaled, and now control much of the grading-centered infrastructure through which graded cards are valued, compared, stored, financed, traded, and monetized. As alleged above, PSA's grade is the connective credential across that infrastructure because it affects price, scarcity, liquidity, custody, resale, lending, insurance, market timing, and consumer demand.

109. PSA's grade functions as the core market credential in Defendants' financialized collectibles marketplace. PSA's grade operates like a private rating. PSA's Population Report functions as a prospectus-like scarcity disclosure for PSA-certified cards. PSA's Price Guide, Auction Prices Realized, and CardFacts function as price-discovery tools. Card Ladder functions as an index, valuation, and portfolio-analytics platform. And the PSA Vault, PSA Partner Offers, eBay integrations, and Collectors Financial Services function as custody, execution, liquidity, and lending rails. Plaintiff does not allege that trading cards are securities. But the structural analogy is compelling based on Defendants' own actions and statements. They built and scaled a financialized collectibles marketplace in which PSA's grade supplies the core value signal for a trading-card asset class (or market cap) with a total value exceeding $15 billion.[84]

---

[84] Leore Avidar and Alexis Ohanian, *Tariffs are driving investors to Pokémon and Mickey Mantle as trading cards gain credibility as domestic assets*, N.Y. POST (Apr. 28, 2025, 6:30 AM), https://nypost.com/2025/04/28/opinion/tariffs-are-driving-investors-to-pokemon-and-mickey-mantle-these-arent-your-grandfathers-trading-cards/ ("Collectibles have emerged as a legitimate asset class: a $600 billion+ global industry, with trading cards alone valued at more than $15 billion . . . . These items are no longer mere nostalgic keepsakes; they have evolved into financial instruments with genuine longevity.").

110.    Defendants' own words confirm that grading functions as market infrastructure, not merely as a hobby service. Before Collectors Holdings took PSA private, Collectors Universe told investors that authentication and grading services "add value" to collectibles by "enhancing their marketability" and providing "increased liquidity" to dealers, collectors, and consumers who own, buy, and sell collectibles. Collectors Universe also stated that PSA grading improved the overall marketability of and facilitated commerce in trading cards and allowed trading cards to be traded sight-unseen.[85]

111.    PSA tells consumers the same thing. PSA states that it "has established [a] recognized and respected universal grading standard for trading card collectors," that its PSA-graded card price guide "has enhanced stability in the marketplace," and that "[c]ards authenticated and graded by PSA achieve amazing prices at auction."[86] PSA also tells consumers that PSA-certified items "tend to sell for more — sometimes significantly more — than those that are not."[87] These are not modest claims about authentication or plastic holders. PSA markets its grade as a value-enhancing standard that changes how the market prices the card.

112.    PSA then converts that grade into public scarcity and price-discovery data. PSA then converts that grade into public scarcity and price-discovery data. PSA markets their Population Report as containing "records for all cards, tickets, packs, coins and pins graded by PSA."[88] PSA separately describes the Population Report as providing "an exact count of each

---

[85] *See* Collectors Universe, *Annual Report* (2019), *supra* note 50, Item 1, Authorized Dealer Network ("We believe that our authentication and grading services add value to these collectibles by enhancing their marketability and thereby providing increased liquidity to the dealers, collectors and consumers that own and buy and sell them.").

[86] *Grading*, *supra* note 55 (stating that PSA "has established [a] recognized and respected universal grading standard for trading card collectors," that the PSA-graded card price guide "has enhanced stability in the marketplace," and that "[c]ards authenticated and graded by PSA achieve amazing prices at auction").

[87] *Price Guide*, *supra* note 56 ("The clear benefit of having your items certified by PSA is because, generally speaking, items certified by PSA tend to sell for more — sometimes significantly more — than those that are not.").

[88] *Population Report*, *supra* note 57.

item graded, from PSA 1-10," with category summaries and daily updates.[89] The Population Report functions as a prospectus-like scarcity disclosure for PSA certified cards—not because trading cards are securities, but because PSA publishes grade-by-grade scarcity data that the market uses to price, trade, finance, insure, and value graded assets.

113.    PSA also supplies the market's valuation references. PSA tells consumers they can "[s]ort through the current market values" of PSA-certified collectibles using the PSA Price Guide, which PSA calls the "only official price guide for PSA-certified collectibles." PSA further represents that its prices are based on "established price histories," include "[n]o subjective pricing surveys," and "more accurately reflect what you will realize when you sell or buy PSA graded sports cards."[90] PSA's Auction Prices Realized product likewise states that realized prices serve as "crucial references for assessing the market value" of collectibles, provides access to "over 5 million auction results," and allows users to "[s]tay ahead of market fluctuations."[91] PSA CardFacts pages integrate these inputs by displaying grade-level fields such as "Most Recent Price," "Average Price," "PSA Price," "Population," and "POP Higher."[92] Thus, PSA does not merely assign a grade; it supplies the grade, scarcity count, and valuation references used to price the graded asset.

114.    Collectors expanded that market architecture through Card Ladder. Card Ladder describes its indexes as measuring market performance for sets of cards "similar to the S&P 500," and states that its software uses those indexes to "generate estimated values" and "predict"

---

[89] *Id.*

[90] *Price Guide*, *supra* note 56.

[91] *Auction Prices Realized*, *supra* note 59.

[92] PSA, *Massive Database of Auction Results*, *supra* note 60 (stating that auction results can be "sorted by PSA grade" and viewed with "population numbers and price guide listings"); PSA, *Stanley Ketchel*, *supra* note 60 (displaying "Prices By Grade" fields including "Most Recent Price," "Average Price," "PSA Price," "Population," and "POP Higher"); PSA, *Checklist 1-132*, *supra* note 60 (same).

how cards in a user's collection may move based on index performance.[93] Card Ladder also invites users to "[r]esearch specific markets [on the CL50 index] within the hobby to gauge where the market is moving."[94] By owning Card Ladder, Collectors controls or materially influences a platform that converts PSA grades, population data, and transaction data into market-facing valuation, index, and portfolio signals.

115.    Defendants then connected grading and valuation to custody, execution, liquidity, and financing. PSA markets the PSA Vault as a custody and asset-management platform where items are "100%-insured" in a climate-controlled facility with "24/7 security and asset management."[95] PSA tells users they can "[c]reate eBay listings in seconds from your PSA Vault" and that PSA handles "[l]isting, imaging, packaging, shipping" on the user's behalf.[96] PSA further states that consignment means "entrusting PSA to market, sell, ship, and collect payment on your behalf," with listings hosted on PSA's eBay storefront for buyers who "value the PSA name."[97]

116.    PSA Partner Offers add instant liquidity to that same pipeline. PSA tells users they can receive "real-time PSA Partner Offers" from a vetted buyer network, "tap to accept," "lock in a guaranteed sale," and receive payment within days.[98] PSA also states that all PSA-

---

[93] *What Are Indexes?*, *supra* note 63.

[94] *Id.*; Card Ladder, *CL50*, *supra* note 63 ("Check out the CL50 index to gauge where the market is moving."); Card Ladder, *Indexes*, *supra* note 63 (inviting users to "[r]esearch specific markets within the hobby to gauge where the market is moving").

[95] *PSA Vault*, *supra* note 65 ("Items are 100%-insured in a modern, climate-controlled facility with 24/7 security and asset management").

[96] *Id.*

[97] *Id.* ("Consigning your card means entrusting PSA to market, sell, ship, and collect payment on your behalf."); id. (stating that "PSA will create and host your listing on its eBay storefront, with marketable item details and photography attracting buyers who value the PSA name").

[98] *Id.* (stating users may "[r]eceive real-time PSA Partner Offers from PSA's vetted network — no listings required," "tap to accept," and "lock in a guaranteed sale," with payment processed instantly and arriving in one to three business days); *Partner Offers*, *supra* note 70 ("Accept with one tap. Funds initiate instantly with no fees.").

graded cards in the Vault are eligible for Partner Offers and eBay consignment, and that PSA Partner Offers are "built directly into the grading and vaulting experience."[99] Collectors Financial Services adds the financing layer by offering capital solutions secured by collectibles deposited in the PSA Vault.[100]

117.    The eBay integration completes the transaction stack. Collectors and PSA described the PSA/eBay relationship as an "end-to-end" hobby experience designed to streamline "buying, grading, storing and selling," provide "real-time tracking of any item's value . . . utilizing PSA's pricing data," and integrate "real-time transaction data" with PSA Population Report data so users can make "smarter buying, selling and trading decisions."[101] Collectors CEO Nat Turner described the ability to grade a card with PSA, then use the Vault to store it or make it available on eBay "in an instant," as "a major win for everyone who participates in this hobby."[102] PSA President Ryan Hoge likewise described the Vault as allowing customers to "strategically time the market" and referenced future "liquidity solutions" for customers "focused on investment."[103]

118.    The result of this vertically integrated system based on Collectors' Downstream Channels is a PSA-centered financial marketplace built around the Grading Credential. Defendants control or materially influence the rating function through PSA grading; the scarcity-disclosure function through PSA population reports; price discovery through PSA Price Guide, Auction Prices Realized, CardFacts, and Card Ladder; benchmarking through Card Ladder

---

[99] *Partner Offers*, *supra* note 70.

[100] *Lending*, *supra* note 48 (describing capital solutions secured by collectibles deposited in the PSA Vault).

[101] PSA, *Collectors and eBay Transactions Close*, *supra* note 72.

[102] *Id.* (quoting Nat Turner, CEO).

[103] Yahoo! Fin., *Helping Collectors Buy & Sell*, *supra* note 74.

indexes; custody through PSA Vault; sale execution through eBay-linked Vault listings and consignment; liquidity through PSA Partner Offers; and financing through Collectors Financial Services. Collectors itself describes its business as providing services that allow hobbyists to "grade, authenticate, research, vault and sell" collectibles.[104] And equally important, Defendants themselves describe grading as central to this established, functional market for this asset class as reflected in **Exhibit C**, which is incorporated herein by reference. These extensive market statements represent trading cards as a financial asset and part of a financial market.

119.    That structure makes Defendants' omissions more material, not less. A consumer deciding whether to grade, sell, hold, insure, finance, vault, accept an offer, or rely on a PSA population count would consider it important that the same corporate family assigning the grade and publishing the scarcity disclosure also participates in pricing, custody, sale execution, instant liquidity, lending, marketplace routing, and submission-channel monetization. If PSA's grade is subjective, opaque, inconsistent, revisable, commercially managed, or contractually disclaimed, the harm does not remain confined to the individual slab. It propagates through the financialized market stack Defendants built, affecting grading demand, pricing, scarcity, liquidity, offers, resale, financing, and the fees Defendants extract from consumers. Defendants are unconstrained to issue or influence grades that benefit their downstream positions at the sake of consumers seeking neutral, expert, objective, and reliable credentials. There are virtually no rules or regulations that constrain their actions.

IV.     **Defendants' Consumer-Facing Grading and Authentication Representations and Practices Promising Impartial, Expert, Objective, and Standardized Review**

120.    Because PSA's Grading Credential functions as the core value signal in the PSA-centered card marketplace, the integrity of the process that produces that grade is material. A

---

[104] Collectors, *Acquire Beckett*, *supra* note 53.

grade that affects Downstream Channels and consumer demand has value only if the market can trust that it was assigned through the impartial, expert, standardized, criteria-based and reliable process that PSA represents. Those representations are apparent in PSA's claimed workflow, its pricing structure, and even its marketing that promotes its grades as authoritative and designed to increase the value of trading cards.

### A.    The Grading Workflow PSA Markets to Consumers

121.    PSA's public-facing workflow reinforces its central promise, namely that grading is neutral, expert, objective, criteria-based, and reliable as reflected by the extensive public representations in Exhibit D, which is incorporated herein by reference. In doing so, PSA presents the grading transaction as a controlled institutional process that starts with an online or app-based submission that involves service-level selection, submission-form generation, shipment labeling, package scanning, order entry, certification-number assignment, account-based tracking, authentication, grading, encapsulation, and return shipment. These operational representations matter because they lead consumers to believe that the final grade results from a standardized, auditable process applying defined grading criteria—not from an opaque, discretionary, or subjective judgment hidden inside PSA's system.[105]

122.    In the direct-submission pathway, PSA requires the submitter to identify the cards, select a service type and service level, generate a submission form, and ship the cards according to PSA's instructions. PSA instructs submitters to place cards in the same order listed on the submission form, secure each card in semi-rigid holders, include the printed submission form, and affix the Submission ID Label to the outside of the package.[106] Consumers who submit

---

[105] *How It Works*, PSA, https://www.psacard.com/info (last visited July 2, 2026); *Online Submission Center*, PSA, https://www.psacard.com/submit (last visited July 2, 2026).

[106] *Online Submission Center*, *supra* note 105; *PSA Update: Journey of a PSA Card*, PSA (Oct. 3, 2020), https://www.psacard.com/articles/articleview/10241/psa-update-journey-card.

through Card Grading Intermediaries enter the same PSA grading pipeline, but through the intermediary's PSA-facing account after the consumer has selected the cards and the service levels. *See* supra ¶¶ 29, 38(a)–(f), 57(a)–(c).

123.    PSA's intake sequence reinforces the appearance of institutional control. PSA states that once a package arrives at its facility, the Submission ID Label is scanned, an arrival email is sent, account and order pages are updated, all cards are accounted for, cards are placed with the submission form into an individual processing box, submissions are organized by service level, and an order number is assigned.[107]

124.    PSA then represents that cards move through research, authentication, grading, encapsulation, grade check, quality assurance, and return shipment. PSA states that its Research Department identifies cards for label accuracy, that the customer submission form is sealed away, and that nothing personally identifiable remains associated with the card. PSA also places order-identification stickers on submitted cards and assigns each card a unique certification number, which becomes the key identifier used to track the card through grading.[108]

125.    After grading, PSA seals the card in a tamper-evident holder bearing PSA's proprietary label, assigned grade, and unique certification number. PSA publicly describes the trading card as sonically sealed in a tamper-evident holder and states that each card's grade and certification number appear on the PSA LightHouse label. PSA's publicly available certification-verification database allows market participants to confirm information associated with the certification number.[109]

---

[107] PSA, *Journey of a PSA Card*, *supra* note 106.

[108] *Id.*

[109] *Grading*, *supra* note 55; *Cert Verification*, PSA, https://www.psacard.com/cert (last visited July 22, 2026).

64

126.    The PSA slab, therefore, is not passive packaging. It is a representational credential that carries PSA's promises into downstream transactions. A purchaser who never visits PSA's website may still rely on the holder, label, grade, and certification number as representations that the card was authenticated, evaluated under PSA's marketed standards, assigned the displayed grade, and maintained in PSA's certification system.

127.    PSA also publishes grades into population reports that purport to show how many copies of a card exist at each numerical grade.[110] Because PSA both assigns the grade and publishes the count, the Population Report implicitly represents that the underlying grades were assigned under sufficiently stable, consistent, and criteria-based standards for the count to be meaningful. In other words, PSA's workflow does not end with the slab. PSA transforms each Grading Credential into a market signal.

### B.    PSA's Public Promise: Expert, Standardized, and Reliable Review

128.    PSA's public-facing materials communicate a common promise: consumers are purchasing a professional grading credential. PSA markets itself as the global leader in trading-card authentication and grading, stating that a high PSA grade adds status, scarcity, and value, and represents that PSA-certified items outsell the field in many sales and auctions.[111] PSA also markets its Authenticity and Grade Guarantee as fundamental to its reputation and assures that it stands behind its authenticity and grade determinations.[112]

129.    PSA's market representations reinforce the same message. PSA represents that grading is applied through basic objective standards. PSA presents grading as a criteria-based

---

[110] *Population Report*, *supra* note 57.

[111] *PSA*, https://www.psacard.com (last visited July 10, 2026); *About PSA*, PSA, https://www.psacard.com/about (last visited July 10, 2026); *Authentication*, PSA, https://www.psacard.com/services/autographauthentication (last visited July 10, 2026).

[112] *Terms and Conditions of the PSA Authenticity and Grade Guarantee*, PSA, https://www.psacard.com/financialguarantee (last visited July 2, 2026).

65

condition assessment focused on centering, corners, edges, and surface.[113] Those representations lead consumers to believe that PSA grades are not arbitrary numbers, but standardized condition determinations grounded in defined criteria.

130. PSA further represents that grading involves institutional review rather than a single unsupported judgment. PSA states that a series of PSA graders review cards for authenticity, and PSA's "Journey of a PSA Card" materials describe a multi-stage process involving identification, authentication, grading, encapsulation, grade check, quality assurance, and shipment.[114] These representations contribute to consumers' understanding that a PSA grade reflects an impartial, expert, controlled, objective and repeatable process.

131. PSA's representations do not remain confined to PSA's website. They travel through slabs, labels, certification tools, population reports, Card Ladder valuation data, eBay and marketplace integrations, auction listings, dealer materials, hobby-media messaging, and Card Grading Intermediaries.[115] PSA's crossover service reinforces the independent market value of the PSA label by allowing a card already graded by another company to be submitted to PSA for review and possible encapsulation in a PSA holder, even though the card itself remains unchanged.[116]

132. The commercial reality is that PSA sells more than authentication, encapsulation, or a number on a label. PSA sells a market credential whose value depends on consumers and the

---

[113] *Grading Standards*, *supra* note 2; *PSA Authenticity and Grade Guarantee*, *supra* note 112.

[114] *Grading*, *supra* note 55; PSA, *Journey of a PSA Card*, *supra* note 106.

[115] PSA Staff, *PSA Grading—Now Built Into eBay Checkout*, PSA (Apr. 1, 2025), https://www.psacard.com/articles/articleview/15161; Press Release, *Collectors and eBay Transactions Close, Summer Launch Expected for Integrated End-to-End Hobby Experience*, EBAY (May 16, 2024), https://www.prnewswire.com/news-releases/collectors-and-ebay-transactions-close-summer-launch-expected-for-integrated-end-to-end-experience-for-trading-cards-302146064.html.

[116] *Crossover*, PSA, https://www.psacard.com/services/tradingcardgrading/crossover (last visited July 2, 2026).

market believing that the grade is impartial, expert-driven, standardized, objective, verifiable, and worthy of reliance. If those attributes are absent, materially qualified, or contradicted by undisclosed practices, consumers receive a materially different service from the one PSA sold.

### C. Consumers See PSA's Price, Value, and Speed Package

133.    PSA's consumer-facing trading-card grading page organizes its grading services into individual service-level cards. Within that presentation, PSA places three terms together: (1) a specific per-card price; (2) a specific Maximum Insured Value ("MIV"); and (3) an estimated turnaround time stated as a range of business days. A "Get Started" button appears immediately below those terms. PSA thereby presents the consumer with a single commercial choice organized around price, value, and speed.



**(Representative PSA trading-card grading pricing-page screenshot showing service levels presented with per-card price, Maximum Insured Value, estimated turnaround time, and turnaround-time asterisk.)**

134.    PSA does not present those components with the same degree of qualification. The asterisk appears only after the estimated turnaround-time range. No asterisk appears after the

67

displayed per-card price, or after the stated MIV. A consumer viewing the service-level card would therefore understand that the asterisk relates to the turnaround-time estimate—not that it also qualifies the displayed price or the stated MIV. Importantly, there are no links to the terms and conditions anywhere near the service level window. Nor does PSA recommend consumers review them.

135.    The price is presented as definite. For each service level shown, PSA provides an unqualified, specific dollar amount per card. The price is not labeled an estimate, is not presented as a range, and is not accompanied by an asterisk or an adjacent statement that the amount may later increase. The service-level card does not tell the consumer that PSA may subsequently determine that the selected service level was insufficient, place the item into a higher-priced service level, or require an adjusted grading fee. On the face of the service-level card, PSA's price is not an estimated or provisional price.

136.    PSA presents turnaround time differently. It expressly uses the phrase "Estimated Turnaround Time" in business days. The word estimate denotes a rough, close or approximate representation—not exact. Unlike the price, turnaround-time representations contain an asterisk signal that indicates additional qualifications may exist. But the service-level card does not explain that asterisk, and that asterisk itself does not function as a hyperlink through which the consumer may obtain information about its meaning. Nor does an explanatory footnote appear immediately beneath the service-level card or pricing grid about the asterisks. Nor does PSA provide a link to the terms and conditions nearby. It is just an unexplained asterisk.

137.    PSA presents MIV with the same apparent definiteness as price. Each of the representative service-level cards states a specific MIV amount associated with that tier. The MIV is not accompanied by an asterisk, hyperlink, definition, or adjacent qualification. The card

does not explain that MIV is the maximum compensation PSA may provide for actual loss or damage while the item is in PSA's possession. Nor do the service tiers tell the consumer that PSA expects the submitter to estimate the item's post-grading fair market value, select a tier whose MIV exceeds that estimate, or potentially pay a higher grading fee if PSA later determines that the selected MIV was insufficient. These qualifications are hidden in PSA's terms.

138. PSA's use of the three pricing components together invites a straightforward consumer comparison. PSA then places the large "Get Started" button within the same visual card, inviting the consumer to proceed based on those displayed terms. Once a consumer clicks the Get Started button, the submission process begins, and consumers prepare their orders for their selected services based on Defendants' market representations about the Grading Credential. Below is a demonstrative that reflects the service level and submission architecture.



**(Demonstrative illustrating PSA's pricing architecture operates sequentially from Service Level selection through payment before grade reveal, completion, or return.)**

69

139. For consumers who submit through Card Grading Intermediaries, the same structure governs that transaction. The intermediary may operate the PSA-facing portal, but the beneficial card owner makes the submission determination, and pays, reimburses, or bears the grading-related charges, including grading fees, shipping, handling, insurance, return-shipment charges, and any passed-through value-based or adjusted charges. The card owners examine PSA's service levels or a service level summary that PSA provides the intermediary to show card owners. Even when the intermediary prepares submissions, they encounter the same deception as consumers. But consumers submitting through Card Grading Intermediaries are further removed from PSA's service qualifications because the beneficial card owner may never operate the PSA-facing portal or never have the chance to encounter PSA's terms. From the consumer's standpoint, the visible package remains straightforward: one stated price, one stated MIV, and one estimated turnaround time.

140. In practical terms, PSA first obtains the card, controls intake and timing, grades or processes the card, determines whether the selected value tier was sufficient, calculates any adjusted amount due, and then conditions grade disclosure, order completion, or return of property on payment regardless of whether the card is ultimately graded. The consumer therefore commits to the transaction before all pricing and timing variables are fixed. PSA's pricing structure is a layered monetization stack. PSA presents the front end as a menu of consumer choices, but retains actual control over each choice except what cards are submitted.

\* \* \*

141. Taken together, PSA's marketed grading transaction rests on two connected promises. First, PSA tells consumers that the grade is produced through an impartial, expert, objective, criteria-based, standardized, and verifiable process, which follows that grade into the

70

market through the slab, label, certification number, guarantee language, and population reporting. Second, PSA monetizes that credential through a price-value-speed structure that allows PSA to control timing, value, payment, grade disclosure, and return after the consumer has committed the card to PSA's system. Those representations matter because consumers are not buying plastic, paperwork, or a number in isolation. They are buying an expert, market-recognized credential whose value depends on PSA's promises.

## V.    Defendants' Fraudulent Grading Scheme and Deceptive Fee Practices

142.    Defendants' scheme has two connected parts: they misrepresent their grading services as impartial, expert, objective, criteria-based, guaranteed, and market-authoritative;[117] and they use that same misrepresented credential to extract grading fees and related charges through deceptive pricing practices. Collectors then scaled both parts of the scheme through its vertically integrated trading-card infrastructure. These scaled frauds adversely impacted Card Grading Intermediaries, consumers, and the market. We discuss each of these issues below.

### A.    PSA's Fraudulent Grading Methodology and False Market Credential

143.    Defendants' grading fraud begins with a critical misnomer: they market the grade as an impartial, expert-driven, and criteria-based product, while delivering an opaque, subjective, variable, conflicted, and managed grading output. The Grading Credential is materially different from Defendants' representations. In this respect, their fraud can be separated into four general categories of market-facing misrepresentations and omissions: (1) expertise fraud, namely that PSA grading involves expert determinations by graders with specialized skill, experience and judgment; (2) professional standards fraud, namely that PSA represented grading as impartial, objective, standardized, criteria-based, consistent, and governed by recognized and respected

---

[117] **Exhibit D**, Defendants' repeated representations about their grading credentials incorporated herein by reference.

71

universal grading standards; (3) process-and-certification fraud, namely that PSA represented its Grading Credential as a durable, verifiable, and market-authoritative; and (4) market-use fraud, namely that Defendants represented the PSA Grading Credential and the Collectors Downstream Channels could be relied on by consumers and the market to price, buy, sell, insure, finance, lend against, vault, and value graded cards. *See* **Exhibit D**. Each category of representation was false, misleading, or materially incomplete.

### 1. The Qualifications of PSA's Graders Do Not Match Defendants' Marketed Expertise

144.    A central pillar of PSA's marketing is that grading is performed by trained experts with specialized knowledge and experience sufficient to evaluate valuable collectibles with precision and consistency. But before Collectors took PSA private, PSA admitted that qualified collectibles authentication and grading experts were "in short supply," that competition for them was "considerable," and that PSA relied on training young graders that it hoped could become experts one day. PSA also admitted that when orders increased, it contracted with outside people, "usually collectibles dealers," to address those short-term increases in grading orders.[118] But those "short-term increases" have persisted since 2021, necessitating two partial shutdowns of PSA's services. Thus, over the last five years, PSA apparently has used contractors possessing unknown background, experience, and training on PSA's standards, to perform PSA grading services. These admissions and circumstances undercut PSA's consumer-facing promise of expert grading. They show a constrained labor pool supplemented by trainees and unknown contractors—contractors who include market participants potentially with their own self-interest in the grading results for cards. Plaintiff alleges, therefore, that Defendants' expansion prioritized

---

[118] **Exhibit A**, Collectors Universe, Inc., Annual Report (Form 10-K) (FY 2019), risk-factor and business disclosures regarding grading experts being "in short supply," competition being "considerable," training young graders, and use of outside experts "usually collectibles dealers."

throughput over the training, calibration, quality control, and reasonable grader-to-card ratios necessary to deliver the expert, consistent, criteria-based grading that PSA marketed.

145.    PSA's current hiring and recruiting materials corroborate these issues. PSA does not even require prior grading experience, specialized training, or certification as a condition of hire as a grader. Instead, PSA merely prefers that applicants have one to three years of grading experience "as a professional, dealer or collector."[119] PSA recruiting materials describe the ideal grading applicant as PSA customers who have been successful with their own submissions or who have hobby experience, trainability, and a "good eye."[120] In other words, anybody who collects cards for a year could be hired as a qualified grader. This experience is inconsistent with the professional expertise that PSA's consumer-facing marketing implies.

146.    PSA's marketing of "expert graders" is therefore misleading. PSA tells consumers that its "expert graders" can detect differences submitters "might not be able to tell" and assess details "not visible to the naked eye."[121] But PSA's job description says that graders will "[s]erve as an expert of PSA's card authentication and grading standards."[122] That phrasing suggests the "expert" status is a mere role played within PSA's internal system, not a preexisting professional qualification verified before hire. And PSA's apparent persistent use of contractors, and lack of required grading experience, shows that PSA's designation of graders as experts is performative.

---

[119] *PSA Grader, NJ*, LINKEDIN, https://www.linkedin.com/jobs/view/psa-grader-nj-at-collectors-4243612935 (last visited July 10, 2026); Tobias, *supra* note 39; *cf. Sports Card Grading Jobs*, INDEED, https://www.indeed. com/q-sports-card-grading-jobs.html (last visited July 22, 2026).

[120] *See* Tobias, *supra* note 39.

[121] *PSA's Grading Guide*, PSA, https://www.psacard.com/info/get-started (last visited July 22, 2026) (PSA tells consumers that its "expert graders" can detect differences submitters "might not be able to tell," and that its graders "assess every detail of every card, including those not visible to the naked eye.").

[122] *PSA Grader, Santa Ana*, COLLECTORS CAREERS, https://collectorsuniverse.wd1.myworkdayjobs.com/en-US/collectors/job/PSA-Grader--SNA_PL415 (last visited July 22, 2026).

147.    Publicly available biographies for PSA card graders confirm these concerns. As reflected below, these biographies contain experience that involve "cleaning bathrooms" and "fryers at local sub shops," writing music jingles and working at stadiums. While noble professions, these experiences are far different from the background and experience that a reasonable consumer would attribute to an expert card grader.



**(PSA grader who worked in restaurant industry and commercial real estate before joining PSA.)**



**(PSA grader who worked in restaurant industry and commercial real estate before joining PSA.)**

148.    The above backgrounds are honorable professions, and Plaintiff does not contend they are disqualifying as a matter of character or intelligence. Rather, Plaintiff contends that they are not the professional grading experience consumers would reasonably associate with an expert-driven service that impacts cards having hundreds, thousands, millions, or tens of millions of dollars in market value.

149.    PSA's secrecy compounds the problem. On information and belief, PSA requires graders and workers to sign confidentiality agreements limiting what they can disclose about PSA's operations, and PSA does not disclose the identities, qualifications, training records, calibration data, performance metrics, consistency records, or quality-control data of individual graders. No apparent trade secrets warrant such secrecy. Plaintiff contends that these restrictions on disclosure may arise from the desire to conceal an extremely infirmed grading process. PSA's recent announcement that it will invest $200 million in grading infrastructure, including a much-needed "Grader's University," underscores that point.[123] PSA is only now building the formal training infrastructure consumers were led to believe already existed.

### 2.    PSA Markets Grading as Impartial, Objective, Criteria-Based, and Reliable, But Delivers a Conflicted, Subjective, and Variable Product

150.    The deception does not stop with who assigns PSA's card grades. PSA also misrepresents how those grades are determined. PSA markets grading as impartial, objective, criteria-based, reliable, and consistent, causing consumers to believe each grade reflects fixed standards applied by trained experts. But again, PSA delivers something far different.

151.    PSA President Ryan Hoge has publicly described PSA's grading operations as "a lightweight manufacturing facility" in which "raw cards come in one end of the building" and "go out slabbed . . . the other end," through "eight or nine discrete steps in the manufacturing

---

[123] PSA Staff, *$200 Million Infrastructure Investment*, supra note 17; Ricketson, *supra* note 17.

process," with grading itself being only "one of those steps."[124] By Defendants' own description, PSA's process is structured as throughput-driven production rather than the careful, objective, individualized expert review marketed to consumers. But the issues are far greater than this telling analogy. PSA provides a conflicted Grading Credential that is governed by malleable criteria, an ambiguous "eye appeal" override, and proven unreliable by cracking, resubmission, certification changes, errors, and production-pressure evidence.

### a. PSA's Claimed Impartiality is Incompatible with Collectors' Downstream Financial Interests

152.    PSA represents that its grades provide "impartial, third-party validation," that it has "no financial stake in the item's sale," and that "[a]ll perceived conflict of interest is eliminated."[125] But, as alleged above, Collectors participates in pricing, custody, offers, resale, marketplace flow, and financing tied to PSA-graded cards.[126] Those downstream positions give Defendants economic interests in the value, liquidity, and disposition of assets whose market credential PSA itself assigns. Plaintiff alleges, therefore, that PSA's categorical claims of no financial stake and eliminated conflict are false or materially misleading. Whether those interests affected any particular grade is a matter for discovery, but the undisclosed existence is material.

### b. PSA's Undisclosed Criteria Changes Make Its Published Standards Malleable

153.    PSA repeatedly markets grading as the application of objective standards, but then it changes those standards from time -to-time without explanation or notice. For example, in or around January 2025, PSA changed the critical front centering criteria published on its website.

---

[124] NEO Cards & Comics, *PSA Is Raising Prices (Again)*, *supra* note 23, at 10:15–10:47.

[125] *Tips for Collectors*, *supra* note 10; *see also* **Exhibit D**; Orlando, *Top 5 Tips for Internet Buying & Selling*, *supra* note 10.

[126] *See supra* ¶¶ 11–15, 85–100.

Under its prior standards, a card could qualify as a PSA 10 with front centering approximately at 60/40; a PSA 9 at 65/35; and a PSA 8 at 70/30. PSA eliminated those tolerances, limiting the key front centering criteria to 55/45 for PSA 10, 60/40 for PSA 9, and 65/35 for PSA 8. The changes represented a reduction in tolerances from 80% to 90% dead center for the crucial PSA 10 grade with similar reductions down the top grading tiers. Digital archives show how PSA's published standards on January 14, 2025, differed from its standards on January 30, 2025. PSA never told consumers that it changed the tolerances represented on its website that PSA publicly marketed.



**(Comparison screenshot showing PSA's published grading-standard language before and after PSA revised centering tolerances for PSA 8, PSA 9, and PSA 10.)**

154.    PSA's explanation about the change confirms the deception. On the March 12, 2025, episode of *The PSA Pod*, PSA President Ryan Hoge downplayed the change as merely a "grading standards language update," stating that PSA "revised the language to remove the 60/40 component," because 55/45 had "always been the standard," meaning that PSA "did not" change

the rules.[127] That explanation is not reassuring. If 55/45 was always the true PSA 10 standard, then PSA's prior published tolerance allowing centering "not to exceed approximately 55/45 to 60/40" was materially misleading. PSA's supposedly objective centering standards are not fixed standards. They are discretionary guidelines that PSA can apply, relax, tighten, or rewrite without notice at any time for any card. That is misleading and detrimental to consumers.

### c.    PSA's Eye-Appeal Standard Makes Grading Subjective

155.    Despite advertising objective standards to build market confidence, PSA's own materials reveal that grading ultimately turns on a subjective override. Scrolling far below the grading standards on its website, PSA added a centering note around the time that it changed the centering criteria in 2025. That statement reads, "**\*Centering Note:** At the grader's sole discretion, a small variance may be permitted on occasion based on the card's overall eye appeal." In an article immediately above that note titled "The Importance of Eye Appeal and Subjectivity in Grading," PSA states "there are a host of grading questions that arise and the one basic question that comes up the most has to do with eye appeal and centering."[128] PSA explains, although "a large part of grading is objective," including locating print defects, staining, surface wrinkles, and measuring centering, "the other component of grading is somewhat subjective."[129] PSA did not state it determines that subjective grading component through fixed, measurable, or independently verifiable criteria like the use of spectrophotometers or densitometers, video spectral comparators or UV-Vis-IR imaging. PSA states, instead, that "the best way to define the subjective element" is by asking: "What will the market accept for this particular issue?"[130]

---

[127] PSA Official, *The PSA Pod- Key early 2025 PSA updates with President Ryan Hoge* at 18:00–21:38, YOUTUBE (Mar. 12, 2025), https://www.youtube.com/watch?v=GjNDFwBWQf0.

[128] *Grading Standards*, *supra* note 2.

[129] *Id.*

[130] *Id.*

156.    That question is not an objective grading criterion or subjective opinion. It is at best a guess that allows PSA to grade cards based on perceived market tolerance rather than on a fixed card condition. The circularity in this definition is material because consumers pay PSA to define for the market a card's condition, but PSA's says market acceptance determines the grade PSA assigns. A reasonable consumer would not understand that the final grade may be adjusted upward or downward based on an unidentified grader's subjective view of market acceptability. Plaintiff alleges, upon information and belief, that while PSA may use imaging equipment to authenticate cards (a process that is likely automated), its graders do not use such equipment given time constraints. Instead, graders rely on a highly subjective eye appeal standard that is inconsistent with the standards upon which Defendants told and sold the market.

157.    PSA President Ryan Hoge confirmed the point when responding to strong public criticism about grading inconsistency. Hoge stated that PSA offers an "opinion-based service," that "the opinion can change," and that one grader may view a flaw as more detrimental and penalize the card more than another grader would.[131] That admission is inconsistent with PSA's marketed image of objective, uniform, criteria-based grading. It turns grading from "somewhat subjective" to entirely subjective.

### d.    Cracking and Resubmission Show Non-Repeatability

158.    PSA's subjective grading framework produces a predictable consequence of cracking and resubmission. In the hobby, "cracking" means removing an already graded card from its plastic holder to resubmit in pursuit of a different grade. Resubmissions occur when a consumer receives a grade that s/he wants PSA to re-review in search of a better result. If PSA grading were criteria-based and reliable, the same unchanged card should receive substantially

---

[131] The Geoff Wilson Show, *EXPLOSIVE INTERVIEW: PSA President Ryan Hoge on Card Cleaning, New Slabs, AI Grading & More!* at 24:10, YOUTUBE (Apr. 24, 2024), https://www.youtube.com/watch?v=8bfuICkhi4s.

the same grade under materially similar conditions. Cracking and resubmission exist because that is not how PSA grading functions. The card remains the same, but what changes is the grader, timing, production pressure, undisclosed internal guidance, and subjective judgment applied during review.

159.    PSA's service architecture is designed to generate repeat grading through review, resubmission, crossover and related services, for additional fees.[132] Those services confirm that PSA does not treat grades as final, fixed determinations. Rather, PSA anticipates that cards will be reconsidered, reprocessed, or converted in ways that may produce a different market result for more money. Public examples illustrate this inconsistency in grading approach.

160.    In a documented hobby-media experiment, Tyler Nethercott, who publishes under the name "T-Pott," submitted the same 1989 Upper Deck Ken Griffey Jr. rookie card to multiple grading companies and reported materially divergent results. Relevant here, PSA first graded the card a 6 and later graded the same card an 8 on resubmission—dramatically different scores.[133] The PSA result is inconsistent with its representation that grading reflects a standardized, objective, reliable expert process.

              e.    **Clerical Errors, Certification Deactivation, and After-the-Fact Grade Changes Show the PSA Credential Is Not Durable**

161.    PSA's grading fraud is not limited to subjective judgment, undisclosed standards shift, or inconsistent application of grading criteria. It also includes execution errors and PSA's unilateral ability to correct, alter, revoke, downgrade, or deactivate certification records even

---

[132] *Frequently Asked Questions*, *supra* note 77; *Trading Card Review*, PSA, https://www.psacard.com/services/tradingcardgrading/review (last visited July 4, 2026); *Crossover*, *supra* note 116.

[133] Market Movers by Sports Card Investor, *SHOCKING RESULTS! I Sent The SAME Card to FIVE Different Grading Companies*, YOUTUBE (Feb. 23, 2026), https://www.youtube.com/watch?v=wD7n8kHvySs&t=1304s.

after a grade has entered the market. But like its operations, graders' identity and performance, PSA keeps its errors and deactivations a secret.

162.    Publicly reported incidents show why that omission is material. Nick Andrews, who publishes hobby-media commentary under the name "Boston Card Hunter," documented an instance in which PSA allegedly assigned an incorrect grade to a consumer's card.[134] PSA does not disclose the frequency, scope, causes, or remediation rate of such clerical grading errors.



(**Screenshot altered to include photo of subject card grade PSA 1 next to PSA email concerning the card**).

163.    EDI Sports Cards documented a different example involving a Ken Griffey Jr. minor-league card. In that case, PSA allegedly deactivated the card's certification number, so PSA's website no longer reflected the card as graded. After the owner contacted PSA and then returned the card at PSA's request, PSA allegedly informed the owner that the original PSA 10 grade was a clerical error, cracked the card from its holder, and re-encapsulated it as a PSA 9.[135]

---

[134] Boston Card Hunter, *This PSA Error Will Make You Rethink Your ENTIRE Collection*, YOUTUBE (Apr. 15, 2026), https://youtu.be/BwUaZP6tWnc.

[135] ediSportscards, *PSA Robs Collector of $2200 of Value - What's the Lesson?* at 1:14–2:19, YOUTUBE (Apr. 22, 2026), https://www.youtube.com/watch?v=H5cP62AE83w.

The incident is significant because PSA erased the existing certification record, took back the slabbed card, reduced the grade, and returned a materially less valuable credential after the original PSA 10 had already entered the stream of commerce.

164.    These incidents expose a fundamental weakness in the PSA credential. PSA presents each grade as a durable output of an expert-driven process and affixes that grade to a tamper-evident holder bearing a unique certification number that consumers and the market treat as permanent and verifiable. Yet, the Grading Credential are prone to error at a rate undisclosed to consumers and the market. PSA's limited public response to error-rate concerns underscores the problem rather than cure it.

165.    In a public interview, PSA President Ryan Hoge addressed grading mistakes, stating that PSA grades approximately two million cards per month and the "vast majority" are done correctly and estimated fewer than 100 errors out of roughly two million monthly grades.[136] If PSA maintained a reliable, tracked, and auditable error rate, PSA would disclose that metric, methodology, and categories of included errors. But PSA only offers an unofficial vague estimate while withholding the data needed to assess the reliability of its estimate and processes.

166.    Like errors, PSA retains and uses the ability to alter or deactivate cards without publicly disclosing how often it does so, why it does so, or how those changes affect consumers who paid for the original grading service or populations reports. A grade that can be altered, deactivated, downgraded, or effectively erased after issuance is not the durable market credential PSA markets. It is a database entry controlled by PSA. Any time a consumer submits a card to PSA for an ancillary service, like reholdering, that consumer risks the grade being changed. Consumers pay PSA believing that the grade, holder, label, and certification number create a

---

[136] Sports Cards Nonsense, *PSA Just Exposed a $200M Fake Card Scandal…* at 52:20-64:00, YOUTUBE (May 8, 2026), https://www.youtube.com/watch?v=fadGbN5M1eQ.

stable, verifiable asset. But PSA's undisclosed ability to revise that credential after the fact shows that the product consumers receive is less durable, final, and reliable than what PSA sells.

### f.    High Demand and Production Pressure Undermine PSA's Claimed Reliability

167.    PSA's own volume and former-grader accounts show a production environment inconsistent with careful, expert, criteria-based review. PSA said that it grades about 90,000 cards per day.[137] In a Boston Card Hunter segment, an alleged former PSA grader described the grading process as taking "seconds" per card, estimated a grader will review 500 to 700 cards per eight-hour shift as a "close," which was possibly a low estimate, and then suggested that speed and production quotas are root causes of inconsistent grading outcomes.[138]

168.    Defendants' public statements about grading capacity also demonstrate a lack of sufficient grading resources to handle grading volume. PSA employed as few as 14 graders for many years, before expanding to 44 graders by the time of Collectors' acquisition, and allegedly grew to "more than 100 graders" by 2022.[139] Collectors' CEO Nat Turner acknowledged that grading is difficult work for which good candidates are hard to find.[140] As of January 2025, hobby-industry reporting based on present and former PSA employee sources stated that PSA reportedly employed about 100 graders.[141] Against PSA's reported daily card grading volume,

---

[137] *An Update on Pricing and Services at PSA (February 2026)*, PSA, https://www.psacard.com/info/submission-updates (last visited July 22, 2026).

[138] Boston Card Hunter, *Confessions of An Ex-PSA Grader* at 6:40–9:35, 13:05–18:45, YOUTUBE (Dec. 30, 2025), https://www.youtube.com/watch?v=YuxbvPhoWhQ.

[139] Collectors Universe, Inc., *Annual Report (Form 10-K)*, Item 1, Business (Aug. 26, 2020), https://www.sec.gov/Archives/edgar/data/1089143/000149315220016754/form10-k.htm; Collectors Universe, *Annual Report* (2019), *supra* note 50, Item 1, Business.

[140] Greg Bates, *Good news for collectors: PSA, Beckett making progress on backlog of grading submissions*, SPORTS COLLECTORS DIGEST (Nov. 2, 2021), https://sportscollectorsdigest.com/news/psa-beckett-card-grading-progress-update-submissions (quoting Nat Turner, then-CEO of Collectors Universe, parent of PSA).

[141] Matt Felumlee, *Behind the Scenes at PSA: the Card Grading Process*, CARDHOUND VINTAGE (Jan. 23, 2025), https://cardhoundvintage.com/behind-the-scenes-at-psa-the-card-grading-process/.

that limited workforce does not afford a careful, expert review for each card. Rather the grading

card volume against the estimated grading workforce supports the daily production figures

represented on the Boston Card Hunter episode with the former grader.

169.    Demand spikes make the problem worse. In 2021, PSA CEO Nat Turner stated

that PSA had doubled capacity and doubled the size of its grading team in response to backlog

pressure.[142] In February 2026, PSA stated that it had expanded capacity through investments in

people, facilities, and technology, increasing from approximately 15,000 cards per day globally

in 2021 to approximately 90,000 cards per day globally in 2026.[143] These facts support Plaintiff's

inference that PSA's quality-control infrastructure lagged behind its volume-driven expansion.

170.    The result is a production-driven grading system materially different from the one

PSA markets. Consumers are not told at the point of submission that their cards may be graded in

seconds, by recently trained or rapidly added staff or contractors, under production quotas. Those

omissions reinforce the false impression that PSA grades are the product of careful objective

review rather than high-volume discretionary judgment exercised under speed-output pressure.

### g.    PSA Controls Gem-Mint Populations Through Hidden Discretion and Ratio-Based Grading

171.    PSA's terms and conditions provide it with unfettered control over card grades,[144]

including the ability to manage the supply of Gem Mint 10 grades—the most valuable credential

that PSA issues. A PSA 10 grade receives market premium values, and the number of PSA 10s

---

[142] Bates, *Good news for collectors*, *supra* note 140.

[143] PSA Staff, *An Update on Pricing and Services at PSA (February 2026)*, PSA (Feb. 10, 2026), https://www.psacard.com/articles/articleview/15663/grading-services-update-february-2026.

[144] *See PSA Submission Services Terms and Conditions* §§ 12(f), 12(k) (last updated Apr. 22, 2026), https://www.psacard.com/termsandconditions (providing that PSA may "change the grade/label as it deems appropriate," will not return an item bearing its original grade after determining that the item was overgraded, and may deactivate a previously issued certification after the item has been encapsulated and returned to its owner); *PSA Authenticity and Grade Guarantee*, *supra* note 112 "Guarantee Remedies" ¶ 2, (providing that PSA may assign an authentic card a lower grade or deem it ineligible for a grade and return the card bearing the revised grade).

for a given card is the result of PSA's decisions to award or withhold that Gem Mint credential. When PSA uses subjective eye appeal, undisclosed criteria changes, certification deactivation, after-the-fact grade alteration, high-speed grading, or internal guidance to decide which cards receive PSA 10s and which are diverted into PSA 9 or lower grades, PSA controls the scarcity premium attached to Gem Mint status. Plaintiff alleges that Defendants intentionally use these mechanisms to control Gem Mint populations.

172.    Defendants' own public statements provide evidence of ratio-based Gem Mint control. When consumers questioned PSA's acquisition of Pokémon cards from a submitter during grading—cards PSA initially graded 9, acquired through an instant offer, and then later regraded 10 for resale—PSA defended the regrades through its business partner or spokesperson Geoff Wilson. He explained that the grade changes occurred after the acquisition because of a secondary review driven by the submitter's "ratio of cards submitted" without receiving a single perfect grade.[145] If each card were graded solely on its own condition, the submitter's Gem Mint ratio would be irrelevant. Based on PSA's marketing, consumers expect the grade to turn on the card's centering, corners, edges, surface, and condition—not on how many cards in the batch received PSA 10s.

173.    In the alternative, Defendants have the ability, incentive, and undisclosed means to manage grade outputs, and the resulting grade distributions are plausibly consistent with that control. Ratio-based grading like in the Pokémon incident converts grading from an individual condition assessment into a managed distribution of Gem Mint outcomes. PSA's high-speed production environment makes Gem Mint control scalable. Internal guidance, batch monitoring,

---

[145] The Geoff Wilson Show, *It's NOT a Conspiracy: PSA's Mysterious Grade Swap EXPLAINED* at 3:16–9:48, YOUTUBE (Dec. 10, 2025), https://www.youtube.com/watch?v=CI5TH_eKNkQ (Geoff Wilson stating that he has an "extensive business relationship with PSA" and that he obtained information from PSA about the incident).

calibration instructions, or eye appeal overrides can affect PSA 10 outcomes across large volumes of graded cards, yet PSA does not disclose whether graders are trained, evaluated, supervised, or corrected based on expected Gem Mint ratios. The non-disclosure agreements prevent sharing any of those details.

174.    But the public Gem Mint patterns are inconsistent with purely condition-based grading. Cards within the same product release are produced through the same printing, cutting, packaging, and distribution processes regardless of the player, character, or subject depicted. A superstar's base card and a lower-demand base card from the same issue are not manufactured under different quality standards merely because one later becomes more valuable. Plaintiff alleges that aggregated PSA population data show recurring Gem Mint-rate disparities in which scarcity concentrates around commercially important cards.[146] Independent Gem Rate-based analysis also reports material changes in PSA Gem Mint rates over time, different Gem Mint-rate patterns for sports cards and TCG cards, and raw grading volume that did not move in lockstep with PSA 10 rates.[147]

175.    Taken together, these facts support a reasonable inference that PSA's Gem Mint populations are controlled outputs, not neutral reflections of card condition. Civil discovery will verify the accuracy of the inference. PSA markets grading as an objective, criteria-based process applied to each card individually. But its high-speed grading environment, ratio-based grading explanation, deactivation of certifications, hidden discretion, and demand-correlated Gem Mint

---

[146] NEO Cards & Comics, *Is PSA Grading Harder? Let's Look at the Data* at 13:20–16:17, 17:45–20:30, YOUTUBE (May 22, 2026), https://www.youtube.com/watch?v=Oi0Mx9_sxeY&t=708s (analyzing GemRate data and discussing increased TCG grading volume, declining and later rising TCG Gem Mint rates, comparatively flat sports-card Gem Mint rates, and possible explanations other than raw submission volume).
[147] *Id.* at 3:09–8:02, 11:41–17:02, 18:04–20:30 (discussing sports-card Gem Mint-rate decline from 2024 into 2025, TCG Gem Mint-rate divergence, GameStop submissions, PSA centering-standard updates, sports-card quality control, market heat, and submitter mix as possible contributors to PSA Gem Mint outcomes).

patterns indicate that PSA shapes how many PSA 10s enter the market. Consumers do not pay PSA for undisclosed constraints on Gem Mint supply.

### 3. PSA's Fraud Lies Not Only in the Grade, but in the Credential

176.    PSA's Guarantee exacerbates the problems alleged above. PSA markets its guarantee as a broad, financially backed assurance that PSA-certified cards are accurately graded and may be relied upon in buying, selling, lending, and valuing cards.[148] But by its own terms, the Guarantee does not protect the original submitter—the consumer who paid PSA to grade the card and for the guarantee that travels with the graded card. Instead, the Guarantee extends only to subsequent downstream purchasers contrary to how PSA markets the guarantee.[149] Thus, when PSA's own grading errors, clerical mistakes, and/or certification-record changes reduce the value of a card, the customer who submits the card and pays for the benefit of the Guarantee is not able to use that Guarantee, contrary to a reasonable expectation for a service marketed as guaranteed.



(**Representative screenshots of how PSA markets its guarantee**)

---

[148] *About PSA*, *supra* note 112; *PSA Authenticity and Grade Guarantee*, *supra* note 111.

[149] *PSA Authenticity and Grade Guarantee*, *supra* note 112 (excluding original submitters and their agents).

177.    This exclusion is material because the original submitter is often the person most likely to discover a problem when the card is returned. Instead of allowing that consumer to invoke the Guarantee, dissatisfied submitters' only recourse is paying for resubmission.[150]

178.    These limitations show that PSA's Guarantee functions primarily as a market-confidence advertisement that induces submissions rather than protect consumers who paid for grading. PSA invokes the Guarantee to support the credibility, liquidity, and market value of PSA-graded cards, but structures it so the original payor often cannot use it, must pay PSA again to challenge its grade, and remains subject to PSA's unilateral control over associated decisions.

### 4.    PSA's Population Reports Convert Controlled or Distorted Grade Outcomes Into False Market Scarcity Signals

179.    PSA's population reports extend the fraud beyond grading decisions and the individual slabs. PSA describes its Population Report as an "online record" or database of PSA-certified items in the marketplace, updated as additional items are added.[151] By publishing grade-by-grade counts, including PSA 10 counts, PSA converts its Grading Credentials into public scarcity signals used by Card Market Participants for trading card transactions. A card reported as having ten PSA 10s may command a materially different price than a similar card reported as having one hundred PSA 10s.

180.    PSA's population reports are misleading. PSA knew, or should have known, that population counts are distorted by crack-and-resubmit activity, attempted crossovers, unreturned labels, stale certifications, duplicate entries, "ghost" entries, and cataloging or database artifacts. Industry discussions have long recognized that cracked-out, crossed-over, or resubmitted cards

---

[150] *Frequently Asked Questions*, *supra* note 77; *Trading Card Review*, *supra* note 132.

[151] *Population Report*, *supra* note 57 (describing the Population Report as providing "an exact count of each item graded, from PSA 1-10," with "category summaries" and daily updates).

may remain counted unless prior labels are returned and removed, and PSA has acknowledged that population data "may not reflect accurate numbers" where PSA's cataloging practices changed after cards had already been graded.[152] But PSA provides no explicit warning about the unreliability of the information in the report near the population report database. The distorted reports act to consumers' detriment.

181.    That signal induces both grading and market transactions. The reported scarcity encourages consumers to submit raw cards in pursuit of scarce high-grade outcomes, encourages buyers to pay premiums for cards appearing scarce, and feeds Collectors' broader pricing, custody, offer, lending, and marketplace infrastructure. Plaintiff alleges that inaccurate or managed population reports exacerbate PSA's fraud by converting subjective, inconsistent, ratio-influenced, duplicate, stale, or otherwise distorted the count of grades into public scarcity signals that influence prices and consumer behavior throughout the hobby.

* * *

182.    Each of the foregoing practices independently renders PSA's representations about its grading process materially false or misleading. Taken together, they reveal deception at every material stage of the process: who grades the cards and with what qualifications; what standards govern the review and whether those standards are fixed; how subjective judgment, production pressure, ratio-based practices, and undisclosed discretion shape grading outcomes; whether grades and certification records are durable; and whether PSA's Guarantee and its

---

[152] *PSA Population Accuracy Question*, COLLECTORS UNIVERSE FORUMS (May 5, 2012), https://forums.collectors .com/discussion/855317/psa-population-accuracy-question (discussing population-report inaccuracies caused by cracked-out cards and resubmissions, including "ghost" population entries when prior labels are not removed); *Cracked Cards on PSA Pop Reports and Registry?*, NET54BASEBALL.COM (Aug. 18, 2011), https://www.net54 baseball.com/showthread.php?t=139081 (discussing how cracked-and-resubmitted cards can be counted more than once and how crossed-over or cracked-out cards may remain in population reports); *PSA Resubmissions*, COLLECTORS UNIVERSE FORUMS (May 3, 2004), https://forums.collectors.com/discussion/ 285575/psa-resubmissions (quoting PSA customer service as stating that collectors may crack PSA holders and that many send the flip back so PSA can delete the card from the Population Report).

population reports accurately communicate reliability and scarcity. PSA is therefore not selling a reliable grading system or credential marred by occasional error. It sells uncertainty as certainty, discretion as standards, and control as independence. The Grading Credential consumers receive is not the neutral, expert, standardized, criteria-based, and reliable assessment PSA promises. It is the product of concealed subjectivity, malleable standards, production-driven judgment, managed outputs, and PSA's unilateral control—packaged in a slab, assigned a certification number, published to the market, and sold as authoritative. The fraud is not incidental to the Grading Credential; it is embedded in, carried by, and monetized through that credential.

### B.    PSA's Deceptive Fee Model Monetizes the False Credential

183.    PSA's deceptive fee model is the financial engine that monetizes Defendants' false Grading Credential described above. PSA presents consumers with a menu of seemingly discrete choices concerning price, value, and speed, but operates one integrated fee architecture in which PSA controls the entire process including cost. As detailed below, PSA makes that fee model profitable through material omissions; hidden or separated turnaround-time qualifications; an illusory Maximum Insured Value framework; post-grading upcharges; drip and partitioned pricing; possession-based lock-in; related repeat-service loops; and adhesion terms designed to preserve revenue and obstruct accountability. The fee model is therefore not collateral to the grading fraud; it is the mechanism through which Defendants repeatedly profit from it.

### 1.    PSA's Grading Fees Are One Integrated Fee Architecture

184.    While PSA labels its charges in different ways, those labels do not change the economic reality that the fees and charges are one and the same. The initial grading fee, service-level charge, speed premium, Maximum Insured Value charge, adjusted grading fee, upcharge, review fee, crossover fee, resubmission fee, reholdering or relabeling charge, imaging or grader-note charge, shipping, handling, insurance, return-shipment charge, and related submission

90

charge all exist because the consumer seeks the same commercial product: a PSA-graded, PSA-labeled, PSA-certified, market-recognized trading card. *See* supra ¶¶ 40, 133–142. PSA separates those fees to smaller amounts to make them more appetizing to consumers, which is a deceptive patterns to induce consumers to spend more. The end results are PSA has greater flexibility in charging more for the same service.

### 2. PSA's Turnaround-Time Pricing Is Illusory Because the Advertised Speed Is Qualified by Hidden Disclosures and Routinely Missed

185.    PSA exploits its price-value-speed fee architecture to charge consumers more. The integrated fee architecture is illusory. PSA presents the consumer with a menu of seemingly discrete choices while retaining control over those same variables and hiding the real cost. The consumer sees a headline price-value-speed package, *see* supra ¶¶ 133–142, but PSA controls intake timing, grading timing, grade assignment, grade reveal, post-grade valuation, adjusted grading fees, final amounts due, and return of the card. Consumers commit their property and money before the final price, timing, value, and limitations are fully disclosed or learned.

### a. PSA marketed turnaround time is disclaimed

186.    PSA omits material fee-related facts at the point of submission when its services are seen and requested. These omissions include that the advertised price may not be final; that the final fee may depend on PSA's post-grading valuation; that speed consumers purchase is routinely not satisfied; that consumers may need to pay PSA again to challenge PSA's first grade; and that each representation consumers see on the website is materially impacted by online terms buried on the website—terms that many beneficial owners never see or understand and that none of the putative class members ever accept.

187.    Because graded cards are time-sensitive assets, consumers may pay more to return a card to market quickly to preserve liquidity, sell into a pricing window, respond to player or

product demand, or reduce market-movement risk while PSA possesses the card. PSA's pricing page tells consumers that they can buy speed but then disclaims those same representations. PSA places an asterisk next to advertised turnaround time (without any asterisk next to pricing). The disclaimer associated with the asterisk appears far below the service-level display, in a separate expandable section that consumers have to scroll to find and open. That placement matters. The consumer clearly sees a visible price-value-speed package, but the material limitations appear later, away from the speed and pricing tiers that induce the transaction.



**(PSA pricing-page screenshot with counsel-added arrows and circles showing the disclaimer's placement below the service-level pricing tiers)**

92

188.    When opened, the disclaimer materially qualifies the timing and pricing representations. PSA states that estimated turnaround times are not guaranteed; that timing begins only when the order is received and scanned into PSA's facility; that timing may be affected by submission volume, capacity, and other circumstances; that turnaround times may change rapidly without notice; that PSA may adjust pricing, services, and processing time; and that all terms and conditions are subject to change.[153]

**Disclaimer** ^

*Estimated Turnaround Times are estimates only and not guaranteed. A service level's Estimated Turnaround Time begins when the order is received and scanned into the PSA facility. These times are based on, and may be impacted by, PSA's submission volume, capacity, and other unforeseen circumstances. Turnaround Times may change rapidly without notice as conditions change.*

*As the collectibles industry continues to expand, and the demand for PSA's services continues to expand along with it, PSA may decide to adjust pricing, services offered, and processing time to better align the demand for PSA services with our capacity to deliver those services.*

*All terms & conditions are subject to change.*

**(Representative screenshot of the opened PSA disclaimer from its website.)**

189.    Those qualifications do not merely clarify timing. They strip the speed premium of the certainty PSA uses to sell it. PSA organizes service levels around estimated turnaround and charges more for tiers associated with faster service. But PSA reserves the right to miss the advertised estimate, to delay starting the clock for grading time, and to change timing, pricing, and services based on volume and capacity.

### b.    PSA knows its turnaround times are misleading

190.    PSA has known since at least 2020 that its advertised turnaround times were unreliable. In October 2020, PSA admitted that "despite doubling capacity, turnaround times are

---

[153] *Grading*, *supra* note 55 (pricing-page disclaimer stating that estimated turnaround times are not guaranteed, timing begins only after receipt and scanning, timing may be affected by submission volume and capacity, turnaround times may change rapidly without notice, PSA may adjust pricing, services offered, and processing time, and terms may change); *PSA Submission Services Terms and Conditions*, *supra* note 144.

growing" and announced that "estimated Turnaround Times will be retired in favor of Complete-Through Dates" so customers could see "true data" on backlog progress.[154] In March 2021, PSA reiterated that "[s]ervices defined by turnaround times are a thing of the past."[155] But PSA never retired the time estimates; it still prices its service levels around estimated turnaround times even today.[156] By March 30, 2021, PSA conceded that continuing to accept submissions it would be "unable to process in the foreseeable future" was "disingenuous"—yet it later resumed soliciting those same submissions under the same turnaround-time pricing it deemed a thing of the past.[157]

191.    When PSA finally revised its turnaround estimates, the changes were nominal and offset by a new clock-start rule that went into effect on November 20, 2025. PSA admitted that turnaround times had "[h]istorically . . . began once an order was unboxed under supervision and itemized" but would now "begin the moment your order arrives at a PSA facility." [158] PSA, thus, conceded that its prior timing estimates excluded weeks during which consumers' property sat unprocessed in PSA's possession. The November 2025 "increases" were largely illusory. PSA lengthened its published numbers primarily because it was finally counting time it had always been consuming but never disclosing. PSA acknowledged consumers would "notice longer estimates as a result, but nothing about our process is slowing down," confirming the prior estimates understated actual custody time.[159] Months later, PSA again raised prices and

---

[154] Steve Sloan, *PSA Customer Update – October 2020*, PSA, https://www.psacard.com/articles/articleview/10232/psa-customer-update-october-2020 (last visited July 22, 2026).

[155] Steve Sloan, *PSA Customer Update – March 2021*, PSA, https://www.psacard.com/articles/articleview/10345/psa-customer-update-march-2021 (last visited July 22, 2026).

[156] *See Grading*, *supra* note 55; *An Update on Prices and Services at PSA*, *supra* note 143.

[157] Sloan, *PSA Customer Update – April 2021*, *supra* note 41.

[158] PSA Staff, *Updates to Estimated Turnaround Times*, PSA (Nov. 20, 2025), https://www.psacard.com/articles/articleview/15625/updates-to-estimated-turnaround-times.

[159] Cole Benz, *PSA clarifies turnaround times as grading stays busy*, SPORTS ILLUSTRATED COLLECTIBLES (Nov. 20, 2025), https://www.si.com/collectibles/psa-clarifies-turnaround-times-as-grading-stays-busy.

lengthened estimates, admitting that submission volume was making turnaround times "harder to estimate."[160] Those omissions are material.

*   *   *

192.    A company does not hide details about its advertised delivery metric in obscure disclosures and then retire that metric unless it knows the metric is misleading. PSA's explicit contrast between its existing "estimates" and its proposed disclosure of "true data" supports the inference that PSA itself understood its turnaround times did not accurately depict the actual processing periods that it sold consumers—and PSA made a deliberate choice to keep selling grading on the basis of a metric it had publicly branded unreliable and obsolete. PSA's own statements establish a continuous course of knowledge, not an isolated operational emergency. By October 2020, PSA knew its turnaround times were inaccurate. It announced it would retire them. It declared them "a thing of the past." It admitted that soliciting submissions under such conditions was "disingenuous." But it continued the very practice it had condemned. And when it finally lengthened its published estimates, PSA simultaneously admitted that its prior estimates excluded weeks of custody time, confirming consumers had been misled about how long PSA would hold their property all along. This is not a series of good-faith estimates gone occasionally awry. It is a documented, multi-year pattern in which PSA knowingly represented a delivery timeline it could not meet, while continuing to collect fees premised on that very timeline.

### 3.    PSA's MIV Framework is Illusory and Makes Final Pricing Unknowable at Submission

193.    PSA also exploits the value component of its price-value-speed fee architecture. At the point of sale, PSA presents each service level as a fixed per-card price paired with a stated

---

[160] *An Update on Prices and Services at PSA*, *supra* note 143 (increasing Value Plus from 40 to 45 business days, Value Max from 30 to 35, and Regular from 20 to 25; applicable only to new submissions beginning February 10, 2026).

"Maximum Insured Value" ("MIV"). But PSA does not clearly disclose alongside those terms that service-level selection turns on the card's estimated post-grading fair-market value—a value the submitter must predict before PSA assigns the grade that will materially determine it. Instead, PSA relegates the operative rule to its hidden terms, which instructs the submitter to select a service level whose MIV exceeds the estimated post-grading fair-market value of each item. PSA then reserves the right, in its sole discretion and at any point in the process, to determine that an item's fair-market value exceeds the selected MIV and to require an "adjusted grading fee."[161] That unilateral post-submission price increase is PSA's "upcharge," which is a service-level adjustments that PSA may impose without further authorization.[162]

194.    The apparent service-level choice is therefore illusory. To select a tier, the consumer or PSA-facing submitter must make three interdependent guesses: what grade PSA will assign, when PSA will assign it, and what the market value of that unknown grade will be at that later time. The consumer must either select a higher-priced tier in advance to guard against PSA's later valuation or risk a post-submission upcharge. And the consumer must group cards within the same submission at the same service level, meaning the consumer must pay more for lower valued cards grouped with a higher card or pay more in sending cards in different batches because of incidental grading charges like mail and insurance.[163] PSA, meanwhile, controls the grade, the timing of the grade, the market-recognized credential, the post-grading valuation, and the determination of whether the consumer selected a sufficient tier. The displayed service-level

---

[161] *PSA Submission Services Terms and Conditions*, *supra* note 144, § 2.

[162] *Frequently Asked Questions: Maximum Insured Value*, PSA, https://www.psacard.com/support/faq#maxinsured value (last visited July 22, 2026); *PSA Submission Services Terms and Conditions*, supra note 144, §§ 15–16.

[163] Maximum Insured Value, *supra* note 162; *see also PSA & PSA/DNA Postage Rates*, PSA (last updated Aug. 29, 2025), https://www.psacard.com/ info/postage (setting domestic return-shipping-and-insurance charges according to the shipment's MIV and number of items); *PSA Submission Services Terms and Conditions*, *supra* note 144, §§5–6 (providing that PSA may charge separately for return-shipment insurance).

price is therefore not a final price. It is an opening price that PSA may revise after the consumer has committed money and surrendered possession of the card.

195.    The upcharge is imposed only after the consumer's practical ability to withdraw has disappeared. PSA states that it makes the relevant value determination after grading.[164] By then, the grading service is no longer cancelable. If the consumer refuses the upcharge, PSA's terms permit PSA to return the card "unprocessed," at the consumer's expense, while retaining the original service-level fee; PSA may also impose aggregate service-level adjustments of up to $500—or a lower cap disclosed during submission—without further notice or authorization.[165] PSA further requires payment of all amounts due before it completes processing, reveals the grade, or returns the card.[166] The upcharge is therefore not a consumer-selected upgrade. It is unilateral repricing after PSA has obtained the property, performed the valuation-triggering grade, and acquired leverage over disclosure and return.

### 4.    PSA's "Maximum Insured Value" Is a Liability Cap, Not Insurance, and Does Not Justify the Upcharge

196.    Despite its name, MIV does not state the amount for which PSA has insured the card. It is not an insurance policy, an agreed valuation, or a guaranteed payout; rather, it is only a contractual ceiling on PSA's potential liability.[167] Thus, even the name is misleading. PSA limits any compensation for a card in its care to the lesser of the MIV or the card's fair-market value and then reserves sole discretion to determine fair-market value "by any means," and may return

---

[164] *PSA Submission Services Terms and Conditions*, *supra* note 144, § 2; *PSA Coverage*, PSA, https://www.psacard.com/info/coverage (last visited July 22, 2026).

[165] *PSA Submission Services Terms and Conditions*, *supra* note 144, §§ 2, 15–16.

[166] *See Frequently Asked Questions*, *supra* note 77 (stating that payment is requested when grading is completed and that grades are revealed once payment is received); *PSA Submission Services Terms and Conditions*, *supra* note 144, §15.

[167] *PSA Submission Services Terms and Conditions*, *supra* note 144, §§ 2, 10 (defining MIV as the maximum compensation available for actual damage or loss while an item is in PSA's possession and limiting PSA's potential liability to the lesser of the item's fair-market value or the applicable MIV).

a damaged card while paying only the diminution in value caused by the damage.[168] Nothing in PSA's terms requires the valuation used to resolve a loss-or-damage claim to match the valuation used to impose an upcharge. The framework thus permits PSA to value the same card one way when collecting an additional fee and another way when determining what PSA must pay.

197.    PSA's own disclosures further confirm that the upcharge does not function as an insurance premium. PSA's Coverage page states that a higher MIV becomes effective only after the submitter pays the additional fee. PSA's FAQ, however, states that when PSA determines that a card's value was understated, the resulting adjustment affects only the service-level charge and "will not change" the card's MIV for claim or shipping-insurance purposes.[169] Under either formulation, the additional charge is not tied to meaningful additional insurance protection. Under the Coverage-page formulation, any increase in MIV occurs only after PSA demands payment near the end of processing; under the FAQ formulation, PSA collects the additional fee without increasing MIV at all. Nor is the upcharge tied to additional grading, encapsulation, or shipping services. PSA's published workflow places "Results Review"—the stage at which a pricing specialist communicates value-based "pricing corrections"—after grading, label creation, sealing, and a second-grade check.[170] PSA's FAQ likewise states that payment is requested only after grading is complete and that PSA withholds the grade until payment is received. Thus, by the time PSA imposes the upcharge, the grading and encapsulation work has already been

---

[168] *PSA Submission Services Terms and Conditions*, *supra* note 144, § 10 (reserving to PSA sole discretion to determine an item's fair-market value by any means PSA selects and permitting PSA to return a damaged item while compensating the submitter only for the resulting reduction in value).

[169] *PSA Coverage*, *supra* note 164 (stating that, if PSA determines after grading that an item exceeds the selected MIV, PSA will upgrade the service level and the item will receive the higher MIV only after the additional fees are paid); *Maximum Insured Value*, *supra* note 162 (stating that PSA's determination that MIV was understated affects only the service-level charge and does not change the MIV used for claim or shipping-insurance purposes).

[170] PSA, *Journey of a PSA Card*, *supra* note 106 (placing "Results Review" during the Quality Assurance stage, after grading, label creation, sealing, and a second grade check, and explaining that a PSA Pricing Specialist communicates pricing corrections based on the card's PSA-graded value).

performed, and the added charge does not correspond to additional work or risk incurred during those completed stages. On information and belief, the upcharge therefore compensates PSA neither for additional grading or encapsulation nor for separately purchased shipping protection. It is an additional grading fee tied to the card's post-grading market value that PSA's own grade helps create and make recognizable to the market. In other words, PSA simply shares in the value of the card that its Grading Credential created.

### 5.    PSA Uses Dark Patterns to Extract Grading-Related Charges

198.    PSA's fee model uses deceptive design practices commonly described as dark patterns. The Federal Trade Commission has identified dark patterns as practices that manipulate or trick consumers into taking actions they would not otherwise take by hiding material information, obscuring true costs, sneaking limitations into the transaction, or making it difficult for consumers to avoid unwanted consequences.[171] PSA's practices fall into those categories.

199.    *PSA uses a bait-and-switch*. PSA markets grading as expert, reliable, objective, and guaranteed, but its terms and actual practices treat the grade as subjective, revisable, discretionary, limited, and difficult to challenge. The inducement is authority; the delivery is a qualified opinion surrounded by disclaimers, limitations, and paid challenge mechanisms.

200.    *PSA uses drip pricing and unilateral repricing*. PSA advertises a service-level price before submission, but the consumer may not learn the final amount until after PSA has possession of the card, grades it, assesses post-grading value, and decides whether to impose an adjusted grading fee.

201.    *PSA uses partitioned pricing*. PSA fragments the true cost of grading into multiple smaller charges: grading fees, speed premiums, MIV charges, upcharges, shipping,

---

[171] Fed. Trade Comm'n, *Bringing Dark Patterns to Light: Staff Report* (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

handling, insurance, review fees, crossover fees, resubmission fees, reholdering fees, relabeling fees, and related charges. Fragmentation makes the total cost appear more palatable and less comparable than a single, fully disclosed price.

202.    *PSA uses forced action and possession-based lock-in.* Once PSA or a PSA-facing intake channel has the card, PSA controls the card, the grade, grade reveal, order completion, valuation, payment demand, and return. A consumer confronted with an upcharge or final-amount-due demand does not face an ordinary invoice; the consumer faces a demand backed by PSA's control over both the property and the market credential attached to it.

203.    *PSA uses sneaking.* PSA's most important limitations are not presented with equal prominence alongside the representations that induce submission. PSA markets expertise, speed, reliability, guarantee protection, population-report authority, and market acceptance in consumer facing materials, while the limitations appear elsewhere in separated disclaimers, hyperlinked terms buried at the bottom of webpages that contain exclusions, liability caps, disclaimers, provisions reserving pricing and timing discretion, and language recasting grading as subjective opinion. For consumers submitting through Card Grading Intermediaries, the problem is sharper because the beneficial owner may never have the chance to see or accept PSA's online terms at all. *See* supra ¶¶ 32–33, 57(d)–(g), 128–139, 155–166, 176–199; *see* infra ¶¶ 206–208.

204.    *PSA uses a variable-reward resubmission loop.* When a consumer receives a disappointing or unexpected grade, PSA's own service architecture allows the consumer to pay again for review, resubmission, crossover, reholdering, relabeling, or related services. PSA benefits from the repeat-purchase loop created by grading variability while continuing to market grading as expert, reliable, and criteria-based.

205.     *PSA depends on opacity and information asymmetry*. PSA controls nearly all information needed to evaluate the transaction: grader identity, grader qualifications, time spent per card, training, internal guidance, error rates, consistency metrics, grade-change rates, upcharge triggers, valuation methodology, population-report accuracy, Guarantee outcomes, and certification-record changes. PSA's concealment makes the fee model work. Consumers pay because PSA's public message conveys expertise and reliability, while the facts that would undermine that message remain inside PSA's system.

### 6.     PSA's Contract Terms Are Unconscionable and Operate as Obstruction

206.     PSA's online terms are not merely background conditions. They are part of the architecture PSA uses to preserve revenue and obstruct accountability. PSA purports to impose arbitration provisions, class-action waivers, jury-trial waivers, forum-selection clauses, choice-of-law clauses, liability caps, warranty disclaimers, releases, delegation provisions, fee-retention terms, sole-discretion valuation provisions, and remedy limitations.[172] Those provisions attempt to convert PSA's marketed promise of expert, reliable grading into a one-sided, limited, discretionary, and hard-to-challenge transaction.

207.     Plaintiff and similarly situated beneficial card owners did not assent to that contractual shield. Plaintiff did not create a PSA account, use PSA's submission portal, click PSA's terms, authorize an intermediary to waive his rights, or agree to arbitration, class waiver, forum selection, choice of law, liability caps, warranty disclaimers, releases, delegation, or any other rights-waiving provision. *See* supra ¶¶ 32–33, 38(a)–(e), 57(b)–(g), 139. Any portal interaction or clickwrap acceptance by a Card Grading Intermediary occurred in the

---

[172] Decl. of Jacqueline Curiel, *Rasmussen v. Collectors Holdings Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 4, 2026), ECF No. 20-2, Ex. A (Collectors User Agreement) §§ 2, 18, 19, 24; *PSA Submission Services Terms and Conditions*, *supra* note 144, §§ 10, 12(f), 12(k), 15, 16.

101

intermediary's own PSA-facing commercial capacity. It did not transform the intermediary into Plaintiff's legal agent for contract formation or rights waiver.

208.    Even if PSA could show assent by some submitters like Plaintiff, the challenged terms remain part of the deception here. PSA markets a valuable, reliable, guaranteed credential to consumers and the market, but then seeks to rely on provisions that limit responsibility for the grade, restrict remedies, cap liability, force private arbitration, bar classwide relief, and reserve PSA's control over valuation, error determination, payment, return, and remedy. A contract architecture that preserves PSA's revenue while preventing meaningful accountability for the representations used to obtain that revenue is substantively unfair and unconscionable.

### C.    Collectors Scaled PSA's Fraud Through Vertical Integration

209.    Collectors' role in the fraud was not limited to passive ownership of PSA. Collectors took PSA's allegedly false grading credential and built the infrastructure necessary to scale, monetize, and entrench it. After acquiring PSA during a period of unprecedented demand, limited expert staffing, and severe backlog pressure, Collectors then directed enterprise strategy, capital allocation, acquisition activity, grading-capacity expansion, and designed downstream monetization across the card's lifecycle. *See* supra ¶¶ 42–45, 50–55, 70–75, 85–119. Upon information and belief, Collectors exercised operation-or-management authority over the enterprise by approving and directing enterprise-level pricing, integration, and capital-allocation decisions, including the expansion of PSA submission capacity, the maintenance of consumer-facing marketing representations designed to induce submission volume, the eBay marketplace integrations, the Card Ladder pricing integrations, and the expansion of downstream monetization channels tied to PSA grades.

210.    Collectors connected PSA's grade to a vertically integrated ecosystem that depends on the grade's market authority. Through Card Ladder, Collectors participates in pricing

102

and valuation; through the PSA Vault and PSA Partner Offers, it participates in custody, acquisition, resale, and liquidity; through Collectors Financial Services, it participates in lending against graded-card value; and through marketplace integrations, retail channels, dealer programs, and Card Grading Intermediaries, it routes consumers and transactions into PSA-facing pathways. *See* supra ¶¶ 76–119. PSA supplies the allegedly misleading grade; Collectors supplies the scale, channels, and monetization structure that make the grade more profitable and market pervasive.

211. That integration created undisclosed conflicts inconsistent with PSA's neutral third-party marketing. PSA has long represented that it provides impartial, third-party validation and has no financial stake in the sale of the item it evaluates. *See* supra ¶¶ 14–15, 83–120. But Collectors' ecosystem gives Defendants economic interests in the very values, scarcity signals, and transactions PSA's grades help create. PSA assigns the grade, publishes the population data, and issues the certification; Collectors then participates in pricing, custody, offers, resale, lending, marketplace flow, and submission-channel monetization tied to that same credential.

212. Collectors' consolidation of grading alternatives further entrenched the scheme. PSA already held a dominant position in the grading market. Collectors then acquired or agreed to acquire formerly independent or competing grading brands, including SGC and BGS, while also expanding PSA's own submission channels and market integrations. *See* supra ¶¶ 10, 43–44, 74–75, 97–106. On information and belief, that consolidation allows Collectors to capture grading demand even when PSA suspends lower-cost tiers, raises prices, suffers backlog pressure, or directs overflow toward other Collectors-controlled grading options. That consolidation also eliminates grading alternatives for consumers like Plaintiff.

**D.    Card Grading Intermediaries Were Also Misled and Passed PSA's Misrepresentations to Consumers**

213.    The same deception operates through Card Grading Intermediaries. Many beneficial card owners, including Plaintiff, submit through card shops, dealers, group submitters, retail intake channels, and similar PSA-facing conduits. Those intermediaries transmit cards into PSA's system, relay PSA's pricing and grading-related information, collect or pass through PSA-related charges, and return graded cards to beneficial owners. *See* supra ¶¶ 29, 38(a)–(f), 57(a)–(c). Those intermediaries did not originate the deception.

214.    Plaintiff alleges the Card Grading Intermediaries themselves were misled or left without material information by PSA's standardized market messaging, concealed grading practices, pricing leverage, guarantee limitations, and hidden contract terms. These material misrepresentations and omissions traveled through PSA's submission channels (intermediaries) to the beneficial owners whose cards, money, and reliance sustain the grading market. The intermediary may collect or relay PSA's charges, but the deception originates with Defendants' concealed practices and standardized market message.

215.    This transmission structure was by design. PSA aims its standards, labels, holders, guarantees, pricing, population reports, service tiers, certification tools, dealer programs, group submissions, hobby-media messaging, and market-facing communications at consumers, like Plaintiff, whose money and reliance sustain the market, whether those consumers submit directly or through an intermediary. The beneficial owner remains the person who pays or reimburses the grading-related charges, relies on PSA's market authority, and bears the economic consequences of PSA's grading output.

* * *

216.    The scheme alleged above is not a series of isolated misgrades, delayed orders, or disputed invoices. It is one integrated fraud with two connected parts detailed above. In short, PSA sold trust and Collectors scaled it. Defendants allegedly turned a false grading credential into a market-wide fee machine by using hidden discretion to create the grade, dark-pattern pricing to monetize it, contractual terms to shield it, intermediaries to transmit it, and vertical integration to profit from it throughout the card's commercial life. Consumers and the market were led to believe that the PSA Grading Credential reflected the card's authenticity and condition. Instead, Plaintiff alleges that the credential reflects Defendants' fraudulent grading system, for which consumers paid without receiving the benefit of the marketed service.

**VI.    Plaintiff and the Putative Class Relied on Defendants' Misrepresentations, Omissions, and Market Credential**

217.    Defendants' scheme depended on obtaining consumer reliance. Defendants made repeated, targeted representations through the channels identified herein and in **Exhibits C and D**. Before the March 2025 submission, Plaintiff reviewed PSA's consumer-facing service tiers, pricing information, and published grading criteria. He also encountered PSA public messaging describing PSA grading as expert, standardized, criteria-based, and reliable. And through his preexisting participation in the trading-card market, Plaintiff had also encountered PSA slabs, labels, certification-verification tools, population reports, and the market use of PSA grades, which reinforced the same core message. Plaintiff does not allege that he encountered every representative statement compiled in **Exhibits C and D**; those Exhibits demonstrate the standardized, repeated, and materially consistent nature of Defendants' market-facing representations.

218.    Plaintiff and members of the putative class were the consumers that Defendants intended to reach and did reach with their marketing and representations. They beneficially

105

owned cards submitted for PSA grading, paid or reimbursed PSA grading-related charges, and bore the economic consequences of Defendants' fees, upcharges, delays, grading outcomes, representations, omissions, and certification outputs. Defendants created the Grading Credential, Downstream Channels, and submission channels to induce beneficial card owners to surrender possession of their cards, purchase PSA grading services, pay PSA-related charges, and rely on PSA's grades and certifications, whether those owners submitted directly to PSA or through Card Grading Intermediaries. *See* supra ¶¶ 28–31, 38–40, 57, 76–119, 214–216. Defendants' coordinated representations and omissions directly induced consumers to act and saturated the trading-card market with the materially false or incomplete understanding that PSA's Grading Credential was impartial, objective, independent, criteria-based, and reliable. Plaintiff and members of the putative Class relied on Defendants' grading, pricing, timing, valuation, Guarantee, and market-authority representations in several mutually reinforcing ways.

219.    First, Plaintiff directly relied on the core commercial message conveyed by Defendants' common consumer-facing representations: that PSA grading was neutral, independent, expert-driven, standardized, criteria-based, consistent, objective, and reliable; that PSA followed its published grading standards and scales; that its graders possessed specialized skill sufficient to identify distinctions consumers could not detect themselves; and that PSA's service-level descriptions and pricing schedules accurately described the grading service being purchased. Plaintiff alleges that Class members were induced by the same core message and Grading Credential through one or more of Defendants' standardized public, intermediary, certification, or market-facing channels, even though the precise route by which the message reached each beneficial owner may differ.

220.    Second, as reflected in **Exhibit C**, Plaintiff and members of the putative Class actually relied on the integrity, legitimacy, liquidity, market acceptance, and value signal attached to the PSA Grading Credential and to the PSA-centered market that Defendants created, cultivated, and controlled, influenced, and/or monetized. Through PSA's dominant share of graded-card volume; Collectors' alleged control over PSA grading, certification, and population reporting; Collectors' vertically integrated participation in pricing data, custody, acquisition offers, resale, financing, marketplace integrations, and submission-channel relationships; and Defendants' pervasive presence across hobby communications and transaction channels, Defendants promoted and reinforced the market understanding that PSA grades materially increase card value and that PSA grades, certification records, and population reports are stable, neutral, and objective measures of authenticity, condition, scarcity, and value. *See* supra ¶¶ 10–16, 76–119, 126–131.

221.    Third, Plaintiff and the putative Class relied on Defendants' omissions of material facts that contradicted or materially qualified Defendants' affirmative representations, including:

a.      the identities, qualifications, prior experience, training, and quality-control results of PSA graders;

b.      PSA's use of contractors or other market participants whose qualifications and potential conflicts were not disclosed;

c.      the extent to which grades depended on subjective eye-appeal judgments, perceived market acceptance, individual grader opinion, and discretion not governed by fixed or independently verifiable criteria;

d.      PSA's undisclosed changes to published grading standards and its ability to tighten, relax, reinterpret, or depart from those standards without meaningful notice;

e.       the time allocated to each card, production quotas, backlog pressures,

grader-to-card ratios, and the effect of each on grading accuracy and consistency;

f.       the frequency of inconsistent outcomes on review; and PSA's ability to

revise, deactivate, revoke, or downgrade certifications after issuance;

g.       batch-level review, ratio-based grading practices, internal calibration

instructions, managerial overrides, or other mechanisms capable of influencing the

number of PSA 10 grades entering the market;

h.       Defendants' alleged efforts, ability, incentives, and undisclosed means to

manage grade populations and the scarcity premiums associated with them;

i.       distortions in PSA population reports caused by cracking, resubmission,

attempted crossovers, unreturned labels, stale certifications, duplicate or "ghost" entries,

changing catalog practices, and other database artifacts;

j.       Defendants' downstream financial interests in the pricing, custody,

acquisition, resale, financing, and liquidity of cards whose grades, certifications, and

scarcity signals PSA itself created;

k.       PSA's post-submission pricing leverage, upcharge methodology, variable

charges, valuation discretion, control over grade disclosure and return, and ability to

demand additional payment after obtaining possession of consumers' cards;

l.       the manner in which PSA calculated turnaround time;

m.       the limits of the Guarantee's eligibility restrictions and exclusions; and

n.       the hidden terms and disclosures in separated or hyperlinked areas that

Defendants later invoked or could invoke to qualify or disclaim the grading standards,

pricing, timing commitments, Guarantee protection, remedies, and accountability PSA marketed to consumers.

Plaintiff and members of the putative Class reasonably understood that no undisclosed practices, conflicts, restrictions, exclusions, or pricing mechanisms materially undermined the advertised service. Their reliance on the omissions was transactional and concrete.

222. Fourth, Plaintiff, like many collectors, submitted cards through a Card Grading Intermediary. That intermediary performed limited intake and transmission functions: forwarding Plaintiff's cards to PSA; communicating submission-related information; relaying PSA's service-tier descriptions, prices, turnaround representations, grading-related charges, payment demands, return information, and submission instructions; and remitting or facilitating payment. Plaintiff remained the beneficial owner of the cards, the person for whose benefit grading was sought, the source of the funds used to pay or reimburse PSA-related charges, and the person who bore the economic consequences of Defendants' grading, fees, delays, certifications, and market-facing outputs. The intermediary did not originate the deception, break the causal chain, or transform Plaintiff into an indirect or derivative victim. It was a PSA-facing conduit through which Defendants' standardized representations, charges, services, and grading outputs reached the beneficial card owners who paid for and relied on them.

223. Card Grading Intermediaries were also exposed to Defendants' misleading market message. They received and relayed PSA's standardized service-tier information, pricing, turnaround representations, submission instructions, upcharge communications, grading results, return information, Guarantee-related assurances, and market-facing claims concerning PSA's expertise, neutrality, standards, and reliability. Plaintiff alleges that those intermediaries were themselves misled or left without material information concerning PSA's misrepresentations and

omissions alleged herein. When an intermediary passed PSA's incomplete or misleading information to a beneficial card owner, the deception originated with Defendants who knew and intended that intermediaries would transmit PSA-originated representations and outputs to the beneficial owners whose cards, money, and reliance sustained the transaction.

224. The representations and omissions were common and material because they concerned the core attributes and total economic terms of the bargain. A reasonable consumer deciding whether to submit a card, select a service tier, pay for expedited service, pay or contest a declared-value upcharge, resubmit a card, pursue crossover or review, rely on a grade, or sell, hold, insure, finance, lend against, or otherwise use a graded card in the secondary market would consider it important to each of the issues set forth above in paragraphs 217 through 223.

225. Defendants knew that the concealed facts were material. Defendants created, controlled, and had superior access to PSA's hiring standards, grader training, internal guidance, production expectations, published criteria, certification database, population reports, service-tier architecture, valuation methodology, upcharge process, Guarantee terms, turnaround disclosures, payment demands, and downstream integrations. The concealed facts were therefore not external conditions unknown to Defendants; rather, they were features of the system that Defendants designed, operated, monitored, revised, and monetized. Defendants also knew that consumers and intermediaries lacked access to the internal information necessary to evaluate whether PSA's market-facing representations were accurate and complete.

226. Defendants concealed those facts because the undisclosed system generated revenue at multiple stages. The promise of expert, neutral, standardized grading induced initial submissions. The opacity of the grading process preserved consumer dependence on PSA's judgment. Subjective and variable outcomes encouraged cracking, reviews, resubmissions,

crossovers, and other repeat services. The declared-value structure permitted post-submission upcharges after PSA had obtained possession and assigned the grade that materially affected market value. The advertised turnaround structure induced consumers to pay premiums for faster service that PSA allegedly did not reliably deliver and simultaneously purported to disclaim or materially qualify through separated terms. Guarantee language preserved market confidence while excluding the original submitter and persons acting on the original submitter's behalf or for the original submitter's benefit, and while conditioning any eligible current owner's claim on a qualifying arm's-length purchase, an active certification at the time of purchase, and other restrictions and exclusions. PSA's population reports, certification tools, Card Ladder pricing data, vaulting services, partner-offer mechanisms, marketplace integrations, resale pathways, and financing channels then allowed Defendants to profit from grades, scarcity signals, grading outcomes, and market values that their own system created, influenced, and controlled.

227. Although unnecessary for certain claims, Plaintiff relied on Defendants' conduct. Plaintiff personally relied on Defendants' representations and omissions when deciding to use PSA, cause cards to be submitted, select PSA service tiers, pay or reimburse PSA grading-related charges, pay or contest post-submission charges, permit PSA or PSA-facing channels to retain possession of his cards, and treat PSA's grades, certifications, and population data as reliable and authoritative. Plaintiff also actually relied on the legitimacy, market acceptance, and value signal that Defendants intentionally attached to the PSA credential through their standardized representations and vertically integrated market infrastructure. Accordingly, Plaintiff pleads actual transaction-specific reliance in two mutually reinforcing forms, together and in the alternative: (1) direct reliance on Defendants' material representations and omissions; and (2)

actual reliance on the PSA Grading Credential and the market value signal Defendants attached to it when Plaintiff submitted his cards for grading.

228.    Plaintiff alleges that members of the putative Class likewise relied on specific statements, PSA-originated submission communications, material omissions, the PSA credential's cultivated market legitimacy, the value signal attached to that credential, or some combination of those sources in making their own transactions and card-use decisions. In each instance, reliance arose from Defendants' same common course of conduct, common omissions, common representations, common pricing architecture, common grading system, and common market-making infrastructure. Even absent proof of actual market-credential or value-signal reliance by every Class member, Plaintiff's direct reliance on PSA's common representations and omissions independently caused his submission, payment, and resulting injury.

229.    That reliance was reasonable because Defendants possessed superior or exclusive knowledge of, and controlled access to, the information material to the grading transaction. Before submitting cards or paying charges, Plaintiff had no meaningful ability to know the identities, qualifications, experience, or training of graders; the time allocated to each card; production quotas or backlog pressures; the role of subjective eye-appeal and perceived market acceptance; the frequency of inconsistent or changed grading outcomes; undisclosed changes to grading criteria; the basis for population-report entries; Defendants' alleged efforts and mechanisms to influence Gem Mint populations; how turnaround times were calculated; what triggered declared-value upcharges; whether favored commercial submitters received priority; the full scope and practical effect of the Guarantee's original-submitter exclusion, arm's-length-purchase requirement, active-certification requirement, clerical-error exclusion, and other limitations; Defendants' downstream financial conflicts; or the rights-limiting terms Defendants

112

would later invoke to qualify or disavow the reliability, standards, timing, Guarantee protection, and accountability they marketed. Defendants had a duty to disclose those facts because they made affirmative and partial representations that were misleading without the omitted information, possessed superior or exclusive knowledge of the true grading process and fee practices, knew consumers and intermediaries lacked access to that information, and controlled the terms and information structure of the transactions.

230.    Neither Plaintiff nor similarly situated members of the putative Class received reasonable notice of, relied on, or assented to Defendants' purported online contract of adhesion embodied in the terms and conditions Defendants may invoke to limit their claims or remedies. Nor did Plaintiff authorize the Card Grading Intermediary to accept such terms or waive his rights, represent to Defendants that the intermediary had apparent authority to do so, or ratify any purported acceptance with knowledge of the material terms. Any interaction by the intermediary with Defendants' website, portal, forms, or submission materials occurred in the intermediary's own PSA-facing commercial capacity. Accordingly, Plaintiff's injuries alleged below arose from the representations and omissions on which he actually relied, not from undisclosed limitations that he never saw or accepted. *See* supra ¶¶ 32–33, 38(a)–(e), 57(b)–(g), 139, 206–208.

231.    Plaintiff's and the putative Class's injuries were direct and economic. They paid or reimbursed grading-related charges for services that were materially different from what Defendants represented and paid more than they otherwise would have paid—or purchased services they otherwise would not have purchased—because of Defendants' misrepresentations and omissions. Those charges included, as applicable, grading fees, regardless of how they are characterized, and associated costs like shipping, handling, and insurance. Plaintiff and members of the putative Class also lost the benefit of their bargain and, where applicable, suffered

113

diminished value, marketability, or liquidity when cards received credentials produced through concealed, inconsistent, subjective, arbitrary, manipulated, variable, conflicted, or otherwise unreliable practices.

232.    Had Plaintiff and members of the putative Class known the truth, they would not have submitted the same cards on the same terms, selected the same service tiers, paid the same grading fees, upcharges, expedited premiums, repeat-service fees, or related costs, allowed PSA or PSA-facing intake channels to retain possession of their cards under materially different pricing or timing conditions, or relied on PSA's grades, certifications, and population reports in the same manner. At minimum, they would have paid less. In substance, Defendants represented that they were selling impartiality, expertise, objectivity, accountability, reliability, and disclosed service-tier pricing, service-level distinctions, represented turnaround periods, Guarantee protection, and market authority. Instead, Plaintiff and the putative Class received undisclosed discretion, monetized uncertainty, variable charges, post-submission repricing, delayed return, limited practical recourse, and a credential whose market value depended on representations Defendants knew were materially incomplete or misleading. That substitution is the alleged fraud, and the difference between what Defendants represented and what Plaintiff and the putative Class received caused their economic loss.

233.    Defendants' own market representations create a common and testable factual alternative. Defendants have represented that PSA established a recognized universal grading standard; that PSA grading enhances marketability, liquidity, stability, and sale value; that PSA's Population Report provides current or exact grade-level scarcity data; and that PSA's pricing, valuation, Vault, Partner Offer, and marketplace integrations enable informed buying, selling, trading, custody, and financing decisions. If those representations are accurate, they support

114

Plaintiff's allegation that PSA grades, certification records, population data, and valuation outputs are material, price-forming inputs incorporated into transactions in the PSA-centered market. To the extent Defendants instead contend that those outputs are not materially relied upon, informationally transmitted, or capable of producing common market effects, that contention supports the alternative inference that Defendants' market-use representations were false or materially misleading when made. Plaintiff pleads these alternatives together and will test them through common discovery and expert evidence.

234. Plaintiff therefore preserves a request, following discovery and at class certification, for a rebuttable credential-market reliance presumption by reasonable extension of *Basic*, without making that presumption the exclusive basis for reliance or RICO causation.

## VII.    Common Factual Allegations Supporting Plaintiff's RICO Counts

235. Plaintiff reasserts, realleges, and incorporates by reference all the preceding allegations. Sections I through VI, including Exhibits A–D, supply the particularized facts supporting the RICO claims, including the PSA-centered card market, the marketed grading transaction, the materially misrepresented Grading Credential, the deceptive fee architecture, the use of Card Grading Intermediaries, Plaintiff's reliance and injury, and Defendants' use of interstate mails and wires.

236. Plaintiff alleges violations of 18 U.S.C. §§ 1962(c) and 1962(a), predicated on repeated acts that are indictable as mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.

### A.    Overview of Defendants' RICO Scheme Based in Fraud

237. This case is not a dispute over a single disappointing grade, delayed shipment, or isolated billing error. It concerns a coordinated commercial scheme in which Defendants used the appearance of impartial, expert, criteria-based, objective grading to obtain consumers' money

115

and property through repeated material misrepresentations, half-truths, omissions, concealment, post-submission charges, and possession-based leverage. Defendants sold trust and market authority but knowingly delivered and monetized a materially different Grading Credential, using the interstate mails and wires to implement their scheme.

238.    The scheme's principal property object was consumers' money, including the PSA Grading-Related Charges defined in ¶40. Defendants also obtained possession and control of consumers' cards and used that control to secure additional payments and, in some cases, to facilitate acquisition of the cards themselves. Beyond direct misrepresentations and omissions, market trust, information, and acceptance of the Grading Credential were the manner and means of how Defendants obtained that property.

239.    The scheme had two integrated components. First, Defendants sold, produced, and circulated the Grading Credential through the expertise, standards, process-and-certification, and market-use deceptions alleged in ¶¶143–182. Second, Defendants monetized that credential through the price-value-speed, MIV, upcharge, turnaround, Guarantee, repeat-service, dark-pattern, and contractual-shield practices alleged in ¶¶183–208. Collectors scaled both components through its Downstream Channels and vertically integrated infrastructure alleged in ¶¶76–119 and 209–216. Together, the consumer-facing representations induced card grading submissions and payments; PSA's grading and certification systems produced the credential; Defendants' population, pricing, custody, offer, marketplace, and lending systems reinforced and monetized it; and their limitations and contractual shields concealed material qualifications and obstructed accountability. Each predicate act alleged below executed, furthered, maintained, completed, or concealed one or more parts of that integrated system.

240. The RICO claims do not rest merely on disagreement with an individual numerical grade or on the premise that every evaluative judgment is objectively true or false. They concern verifiable commercial facts and actionable half-truths about who performed the work and with what qualifications; whether PSA followed the standards it invoked; whether the process was standardized, repeatable, independent, and free from undisclosed production or ratio controls; whether the displayed price was final and what an upcharge purchased; how turnaround time was calculated; who could use the Guarantee; whether certifications and population counts were reliable; and whether Defendants had undisclosed financial interests in grade-dependent transactions. The grade, holder, label, certification number, verification record, population entry, scarcity signal, Guarantee messaging, and PSA-associated market acceptance were related, interdependent components of one paid commercial product: the Grading Credential.

241. The preceding allegations also plead materiality, knowledge, and specific intent. The challenged representations and omissions concerned the personnel, standards, reliability, price, timing, protection, scarcity, conflicts, and market utility for which consumers selected PSA and paid them. Defendants created and controlled the concealed grading, certification, population, pricing, valuation, Guarantee, payment, intermediary, and downstream systems and continued the challenged representations after the public admissions, criteria changes, backlog disclosures, Guarantee limitations, and other events alleged in ¶¶144–208. Those facts, together with their concealment practices alleged above, support the inference that Defendants acted knowingly and with intent to obtain consumers' money by fraud. *See* supra ¶¶217–233; *Neder v. United States*, 527 U.S. 1, 22–25 (1999).

242. Plaintiff's March 2025 transactions are representative examples of millions of similar consumer grading transactions that take place each month in the same way. As alleged in

¶¶38(c)–(g), 39–40, and 217–233, Plaintiff reviewed PSA-originated grading, service-level, pricing, standards, Guarantee, and market-facing materials in Maryland and heard on social media PSA's messaging; he delivered approximately seven cards, including Cal Ripken Jr. rookie cards, to a Maryland Card Grading Intermediary; and he paid or reimbursed about $300 in PSA grading-related charges and associated transaction costs. The intermediary used its PSA account and interstate systems to transmit Plaintiff's cards, submission information, payments, and PSA-originated communications, and later received and returned the PSA-certified cards. Through that transaction, Defendants obtained Plaintiff's money and possession of his cards, and Plaintiff received the allegedly misrepresented Grading Credentials. These allegations identify each Defendant's role; the substance, timing, location, and means of the fraud; the money and property obtained; and the records used to establish the transaction-level identification of the communications, shipments, payments, certifications, and resulting injury. These allegations, together with allegations of enterprises, predicate acts, pattern, use or investment of racketeering income, interstate-commerce nexus, injury, causation, and timeliness are pleaded in detail below.

**B.    Particularities of Mail Fraud — 18 U.S.C. § 1341**

243.    Defendants' scheme depends on the United States mails and interstate commercial carriers. Consumers submit their cards by interstate mail or carrier to PSA or through Card Grading Intermediaries as PSA-facing intake channels, and then PSA returns graded cards by interstate mail or carrier. Plaintiff's March 2025 submission involved the physical transmission of his cards from Maryland into PSA's grading system and the return of graded cards through the Card Grading Intermediary. *See* supra ¶¶ 38(c)–(f), 57(a)–(c), 214–216, 242. The same transmission structure applies to Class members who submitted directly or through Card Grading Intermediaries.

244.    Under Defendants' scheme, representative mail-fraud predicate acts include: (a) intake shipments of consumer cards induced by PSA's expert-grading, timing, pricing, and Guarantee representations; (b) post-submission invoices, payment demands, upcharge demands, and release-conditioning notices; (c) return shipments of graded cards bearing PSA labels, certification numbers, and grades represented as expert, reliable, and market-authoritative; and (d) mailed or shipped promotional, solicitation, submission, dealer, or partner materials carrying PSA's grading, pricing, timing, and Guarantee representations.

245.    The mail was reasonably foreseeable and essential to the scheme. Defendants could not solicit, receive, control, grade, encapsulate, return, or monetize consumers' cards without interstate shipment. Each submission generated one or more mailings, and each mailing either induced cards submission, transferred possession, transmitted the false credential, demanded or facilitated payment, returned the card, or propagated PSA's grading output into the market. Additional shipment records are within Defendants' and Card Grading Intermediaries' possession, custody, or control and will be identified through discovery.

C.    **Particularities of Wire Fraud — 18 U.S.C. § 1343**

246.    Defendants' use of interstate wires was even more pervasive. The PSA-centered grading ecosystem operates through websites, submission portals, email systems, payment processors, certification databases, population reports, pricing tools, Card Ladder data, Vault systems, Partner Offers, marketplace integrations, and return-shipment communications. Each wire communication described below carried, executed, furthered, or concealed one or more deceptive practices alleged in Sections IV through VI.

247.    Under Defendants' scheme, representative wire-fraud predicate acts include: (a) website solicitations and public webpages, including grading standards, pricing pages, service descriptions, turnaround representations, Guarantee language, population reports, certification

119

tools, and PSA market-authority statements; (b) submission-portal communications, including submission confirmations, service-tier selections, MIV or declared-value entries, status updates, and payment authorizations; (c) upcharge and payment communications, including invoices, payment reminders, adjusted-fee demands, and final-amount-due notices sent after PSA or PSA-facing channels obtained possession of the card; and (d) grading-result communications that sent the assigned grade, certification number, label information, images, grade reveal, or certification-verification data.

248.    Additional representative wire-fraud predicate acts include: (a) population-report publications transmitting PSA grade counts into the market as scarcity signals; (b) Card Ladder pricing and valuation transmissions converting grading and population data into market-facing valuation signals; (c) PSA Vault, PSA Partner Offers, and eBay-linked communications allowing graded cards to be stored, offered, sold, or valued through Collectors-controlled or Collectors-integrated channels; (d) hyperlinked terms, clickwrap screens, disclaimers, arbitration provisions, class-action waivers, warranty disclaimers, and liability caps; and (e) payment-processing transmissions for grading fees, upcharges, speed premiums, review fees, resubmission fees, crossover fees, shipping, handling, insurance, and related grading charges.

249.    Defendants knew, intended, and reasonably foresaw that their wire communications would be received, relied upon, relayed, or acted upon by consumers and Card Grading Intermediaries in states other than where the communications originated. Without those wires, Defendants could not solicit submissions, induce payment, operate the submission and grading systems, impose upcharges, reveal grades, publish population data, transmit certification information, maintain Card Ladder valuation signals, operate PSA Vault or Partner Offers, or

120

monetize downstream valuation effects. The wires were not incidental to the scheme; they were its operational spine.

> **D.**     **Each Predicate Act Caused, Furthered, or Concealed the Deceptive Practices**

250.    The mail- and wire-fraud predicate acts caused, furthered, or concealed the same four categories of fraud alleged in Plaintiff's Fraud and Fraudulent Concealment counts. To that end, Defendants' fraud consists of expertise claims, standards claims, process-and-certification claims, and market-use claims. The mail- and wire-fraud predicate acts were not standalone communications. Website solicitations, submission-portal communications, and social media promotions carried the expertise, objectivity, Guarantee, and pricing representations. Service-tier advertising and turnaround representations carried the price-value-speed deception. Upcharge notices, invoices, and payment communications executed drip pricing, unilateral repricing, and possession-based lock-in. Guarantee representations and certification-lookup transmissions preserved market confidence while concealing limitations. Population-report publications transformed, controlled, or distorted grade outcomes into public scarcity signals. Card Ladder, PSA Vault, PSA Partner Offers, and eBay-related transmissions monetized the fraudulently produced Grading Credential downstream. Return shipments transmitted the assigned grade itself into the market. More precisely, those shipments and related wires transmitted PSA's market-facing certification product—the slab, label, grade, certification number, verification record, and population-report consequences—into the stream of commerce. Hyperlinked terms, clickwraps, disclaimers, arbitration clauses, class waivers, and liability caps concealed limitations and obstructed relief. And Card Grading Intermediaries repeated these same representations, communications, or transmissions as an echo chamber of and as instructed by Defendants.

### E.    Defendants Engaged in a Pattern of Racketeering Activity

251.    Defendants' predicate acts of mail fraud and wire fraud constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5) because they are related and continuous. They are related because they have the same purpose, results, participants, victims, methods, and distinguishing characteristics. They are continuous because they have occurred over years, across large numbers of consumer transactions, and remain Defendants' regular way of operating the PSA-centered grading business. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989); *Brandenburg v. Seidel*, 859 F.2d 1179 (4th Cir. 1988); *Walters v. McMahen*, 684 F.3d 435 (4th Cir. 2012). PSA grades millions of cards each month, meaning millions of consumers, like Plaintiff, are defrauded each year.

252.    The predicate acts are related because each furthers the same fraudulent grading and fee scheme. Each act either induces a consumer to submit a card, causes payment, transfers possession, allows Defendants to retain leverage over the card, transmits a grading outcome, publishes a scarcity or pricing signal, conceals the true nature of the grading process, and/or monetizes the downstream value of Defendants' own grading determinations. No predicate act stands alone; each is a link in the same chain with one reinforcing another. The practical reality is that card grades are inextricably intertwined through Defendants' population and certification reports, and valuation and secondary market channels, which drive more card grading.

253.    The predicate acts share the same purpose, namely to obtain money or property from consumers by presenting PSA Grading Credentials as impartial, expert, objective, criteria-based, reliable, transparent, accountable, guaranteed, and market-authoritative while concealing that the credential is subjective, opaque, variable, production-driven, internally managed, and protected by hidden or contested terms and disclaimers.

254.    The predicate acts produce the same results. Consumers pay grading fees, whether characterized as upcharges, speed premiums, review fees, resubmission fees, crossover fees, shipping, handling, insurance, and related charges for a credential not delivered as represented. At the same time, a Defendant-controlled grade circulates into the secondary market, where it affects price, scarcity, liquidity, custody, resale, offers, lending, and further demand for grading.

255.    The predicate acts involve the same core participants. PSA operates the grading, certification, pricing, fees, Guarantee, population report, and consumer-facing communications functions. Collectors directs and benefits from the acquisition strategy, transaction-level-data infrastructure, custody, offers, lending, marketplace integrations, and downstream monetization. Card Grading Intermediaries serve as PSA-facing intake conduits that solicit or accept cards, aggregate submissions, transmit cards into PSA's system, relay PSA's prices, services and communications, collect or facilitate payment, and return graded cards to beneficial owners. Those intermediaries also participate economically because they earn money on each submitted card, including intake fees, handling fees, submission fees, per-card markups, and/or other compensation layered onto or collected with PSA-related charges. eBay, Card Ladder, PSA Vault, PSA Partner Offers, Collectors Financial Services, and other Collectors-controlled or Collectors-integrated channels transmit, monetize, or amplify PSA grades and grading-dependent market signals.

256.    The predicate acts target the same category of victims: beneficial card owners who submit trading cards for grading, directly or through Card Grading Intermediaries, and who pay or reimburse grading-related charges in reliance on PSA's market-facing representations. Plaintiff falls squarely within that category. The same alleged scheme affected Class members

123

who paid or reimbursed the same categories of charges and bore the same categories of economic consequences.

257. The predicate acts use the same methods: standardized public marketing; representations of fixed grading standards, pricing pages, service-tier descriptions, Guarantee language, labels, holders, population reports, and certification tools; interstate card shipments; interstate portal, email, payment, and database communications; post-submission pricing demands; return shipments of graded cards; and contractual shields presented through hyperlinked or portal-based terms. The uniformity of method across millions of transactions is itself evidence of a coordinated pattern.

258. The scheme's distinguishing characteristic is the integration of the false credential with the deceptive fee model. Defendants did not merely misstate a product feature or misbill a single customer. Plaintiff alleges Defendants used the PSA grade as the market credential, used hidden discretion to produce it, used population and pricing infrastructure to give it market force, used fee architecture to monetize it, used Card Grading Intermediaries to scale intake and transmit PSA's message, and used contractual shields to limit accountability.

259. Defendants' predicate acts satisfy closed-ended continuity. The alleged scheme has operated for years, including during and after Collectors' 2021 acquisition of PSA, the pandemic-era submission surge, the expansion of PSA's capacity, the launch and expansion of PSA-centered market infrastructure, and Collectors' later acquisitions and integrations. The alleged predicate acts occurred repeatedly across large numbers of consumer submissions, payments, grading-result transmissions, upcharge communications, population-report publications, pricing transmissions, and return shipments.

260.    Defendants' predicate acts also satisfy open-ended continuity. The alleged predicate acts are not a completed historical event. They are the regular way Defendants operate the PSA-centered grading business: soliciting submissions, receiving cards, communicating service tiers and pricing, grading and certifying cards, publishing population data, imposing or collecting grading-related charges, transmitting grades and values into the market, returning cards, and monetizing downstream grading-dependent channels. Unless enjoined, the same practices will continue. PSA continues to solicit, receive, grade, encapsulate, certify, and return cards daily using the same advertised grading representations, fee architecture, and market-facing certification system alleged herein. Defendants continue to publish and rely upon PSA grades, certification outputs, and related pricing, resale, custody, and financing channels, and have not disclosed the concealed facts alleged herein or reformed the practices that produced the fraudulent grading and fee scheme. The scheme therefore remains operational as of the filing of this Complaint and threatens continued repetition into the future.

261.    The pattern is not defeated because some submissions occur through Card Grading Intermediaries. That structure is part of the pattern. Defendants authorized, cultivated, accepted, and relied on those intermediaries as PSA-facing intake channels; intermediaries had their own per-card economic incentive to generate and process submissions; and Defendants intended that PSA's representations, prices, upcharges, grades, population data, and certification outputs would travel through those channels to beneficial card owners. And they did.

F.    Defendants Conducted the Affairs of RICO Enterprises

262.    The Grading-Intake Enterprise satisfies the requirements for an association-in-fact enterprise under *Boyle*, 556 U.S. at 938. It had a common purpose in both soliciting and processing consumer-owned cards into PSA's grading system, obtaining money and property through PSA's market-facing representations and fee architecture, and transmitting PSA grades

125

and certification outputs back to consumers and the market. It had ongoing relationships among Defendants, Card Grading Intermediaries, and eBay. And it functioned as a continuing unit through repeated consumer submissions, intake, payment, grading, certification, return, resale, pricing, and marketplace communications.

263. Card Grading Intermediaries were not passive outsiders to that enterprise. They participated in the enterprise's intake and payment functions by soliciting or accepting consumer cards, aggregating submissions, using PSA-facing accounts or submission privileges, transmitting cards and submission data to PSA, relaying PSA service-tier information and grading-related charges, collecting or facilitating payment, and returning graded cards. They also profited from the enterprise's recurring operation because they made money on each submitted card, whether through a disclosed fee, handling charge, markup, submission charge, or other compensation. That economic participation supports their role as enterprise participants while remaining consistent with Plaintiff's allegation that they did not originate PSA's deception and did not act as Plaintiff's legal agents for contract formation or waiver of rights.

264. PSA's records can distinguish PSA-imposed charges from Card Grading Intermediary charges. PSA maintains records of the service level selected, PSA grading fee, declared value or MIV, adjusted grading fee or upcharge, shipping, insurance, handling, return-shipment charges, payment timing, and account-level charges imposed by PSA in the PSA-facing transaction. Intermediaries separately maintain or can produce records of any per-card intake fee, handling fee, markup, submission fee, or other compensation they charged to the beneficial card owner. Thus, where a consumer paid a combined amount to an intermediary, the PSA-imposed grading-related charges and any intermediary charge can be separated easily

126

through Defendants' and intermediaries' records. This allocation issue does not defeat enterprise participation, causation, common proof, or damages.

265.    The Trading-Card Grading Enterprise, pleaded in the alternative, also satisfies *Boyle*. It had a broader common purpose: using PSA and Collectors-controlled grading, pricing, population, custody, offer, lending, and marketplace infrastructure to solicit, process, value, store, sell, finance, and monetize consumer-owned graded cards. It had ongoing relationships among Collectors, PSA, Card Grading Intermediaries, eBay, Card Ladder, PSA Vault, PSA Partner Offers, Collectors Financial Services, and related Collectors-controlled or affiliated channels. It functioned as a continuing unit by moving cards and grading outputs through the same PSA-centered market stack described in Sections II and III.

266.    Each Defendant is a RICO "person" distinct from the pleaded enterprise. PSA is distinct from the Grading-Intake Enterprise because that enterprise includes non-defendant Card Grading Intermediaries and eBay. Collectors is distinct from that enterprise for the same reason. The alternative Trading-Card Grading Enterprise is also broader than any single Defendant because it includes additional persons, entities, business units, platforms, and channels through which graded-card submissions, pricing, custody, offers, lending, and marketplace transactions operate. *See C Cedric Kushner Promotions*, 533 U.S. at 158.

267.    Defendants conducted or participated in the conduct of the enterprises' affairs within the meaning of *Reves*, 507 U.S. at 170. PSA participated by operating the grading, intake, certification, pricing, upcharge, turnaround, Guarantee, population-report, and grading-communication functions through which the predicate acts occurred. Collectors participated by directing strategy, acquisitions, capacity expansion, market integration, pricing-data infrastructure, custody, offers, lending, marketplace integration, and downstream monetization.

127

Defendants therefore took part in directing the enterprises' affairs and were not merely outside vendors.

G.    **Collectors' Receipt and Use or Investment of Racketeering Income - 18 U.S.C. § 1962(a)**

268.    Through the alleged pattern of racketeering conduct, Collectors received directly and indirectly, including through PSA and affiliated operations, substantial income from grading fees, service-level and speed premiums, MIV-related and adjusted grading fees, upcharges, review and repeat-service fees, shipping, handling, insurance, Vault or transaction revenue, and other grade-dependent downstream revenue.

269.    On information and belief, Collectors used or invested a portion of that fungible income in the acquisition, establishment, operation, and expansion of enterprises affecting interstate commerce, including Card Ladder; SGC; the eBay Vault and PSA Vault; PSA Partner Offers; Collectors Financial Services; grading capacity, facilities, personnel, portals, certification, population, pricing, dealer, intermediary, marketplace, and related infrastructure; and the Beckett transaction. *See* supra ¶¶ 42-45, 70-75, 85-119, and 209-213. Those investments expanded the same grading-centered system, reinforced the authority and circulation of its credentials, increased Defendants' control or influence over grading alternatives and grade-dependent infrastructure, and enabled continuation and scaling of the predicates.

270.    Plaintiff was injured in business or property because of the § 1962(a) violation. While Plaintiff need not allege that his injuries flowed from a distinct later use or investment of racketeering income, that is the case. Plaintiff's investment-related injury arose from Collectors' pre-March 2025 investments that strengthened the PSA-centered authority, that cemented and induced Plaintiff's transaction, that reduced practical grading and pricing alternatives, that weakened competitive discipline over price, quality, transparency, and timing, and that enabled

128

Defendants to charge or retain amounts Plaintiff otherwise would not have paid or would have paid only in lesser amounts. *See Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837 (4th Cir. 1990); *Potomac Electric Power Co. v. Electric Motor & Supply, Inc.*, 262 F.3d 260 (4th Cir. 2001).

271.    These same injuries occurred to millions of other consumers. The amounts, accounts, commingling, transfers, acquisitions, operations, and effects of racketeering income are within Defendants' control and are appropriately addressed through discovery.

### H.    The Enterprises and Predicate Acts Affect Interstate Commerce

272.    The Grading-Intake Enterprise and the alternative Trading-Card Grading Enterprise are engaged in, and affect, interstate commerce. Defendants solicit consumers nationwide; receive cards shipped across state lines; process payments through interstate payment systems; transmit grading results, upcharge demands, certification data, population data, pricing data, and return-shipment communications through interstate wires; publish market-facing information consumed nationwide; and return graded cards through interstate carriers. The scheme could not operate without interstate commerce.

273.    The predicate acts also affect interstate commerce. Every mailing, email, payment transmission, graded-card shipment, certification update, population-report update, Card Ladder pricing transmission, Vault communication, Partner Offer, eBay-linked communication, and return shipment crosses state lines or uses interstate instrumentalities. The interstate-commerce threshold is satisfied.

### I.    Plaintiff Sustained Injury by Reason of Defendants' Conduct

274.    Like others similarly situated, Plaintiff suffered concrete property injury under 18 U.S.C. § 1964(c). He paid or reimbursed approximately $300 to obtain PSA grading and the associated Grading Credential and incurred related transactions cost. His principal RICO injury is the loss of the full PSA-imposed grading and credential charges paid to obtain an indivisible

Grading Credential that Defendants' common fraudulent scheme rendered valueless for its represented purpose. The injury is economic and does not depend on personal injury, emotional harm, or mere dissatisfaction with a grade.

275.    The product purchased was not merely a numerical result, plastic holder, image, shipment, or database entry. Defendants represented an expert, impartial, objective, standardized, criteria-based, reliable, protected, and market-authoritative certification consisting of the grade, holder and label, certification number, verification record, population-and-scarcity signal, Guarantee messaging, and associated market acceptance. Each component derived its meaning from the integrity of the same grading, certification, population, and market-data system. Plaintiff alleges that the concealed systemwide practices deprived the credential of those defining attributes and made the grading and credential charges wholly unearned.

276.    The common defect renders the Grading Credential valueless for its represented purpose through three related mechanisms, independently or together: (a) an inaccurate grade or a grade affected by conflicts, inexperience, concealed subjectivity, production pressure, ratio review, managerial intervention, or departure from represented standards; (b) an inaccurate, stale, duplicate, incomplete, ratio-influenced, or otherwise distorted population entry or scarcity signal; and (c) the admission of improperly graded, commercially managed, or otherwise nonqualifying cards into the same grade population, which corrupts the comparative meaning and scarcity conveyed by every credential in that population. Because each grade is a comparative position and each population entry purports to state its relative supply, a systemically unreliable scale or population cannot supply the standardized rank and scarcity information sold to consumers like Plaintiff.

277.    A PSA 10, therefore, does not necessarily possess the represented credential merely because the individual card may satisfy a disclosed condition standard. If nonqualifying cards entered the PSA 10 population, PSA managed the frequency of PSA 10 outcomes through undisclosed ratios or discretion, or PSA misstated the number of PSA 10s, every PSA 10 carries a false or unreliable comparative and scarcity signal. The same principle applies throughout the grading scale. The defect exists when the credential is issued and does not depend on a later sale or a particular buyer's response.

278.    Plaintiff does not allege that the underlying raw card became worthless. He alleges that the separately purchased PSA Grading Credential had no nonfraudulent value as the product represented. The holder, label, intake, imaging, shipping, and database processing were instrumental or ancillary to delivering that credential, not substitutes for it. A continuing market premium does not establish delivery of the promised product because Plaintiff alleges that Defendants created and preserved that premium through the same challenged representations, scarcity signals, and infrastructure. The full credential-related grading charges are therefore alleged to be wholly unearned; shipping, handling, insurance, and return costs are additionally recoverable as direct transaction expenditures incurred to obtain the misrepresented credential, not necessarily because the carrier's transportation itself lacked value.

279.    The principal measure is susceptible to common, mechanical proof and does not require card-by-card judicial regrading or individualized resale valuation. Common evidence will determine whether Defendants sold the same represented Grading Credential through the same materially defective system. Defendants' and intermediaries' records identify the beneficial owner or payor, submission, service level, PSA-imposed grading and credential charges, MIV, upcharge, repeat-service charges, necessary transaction costs, payment date, certification

number, and return event. Differences in card identity, assigned grade, or trading history do not alter the common principal injury.

280. Without conceding that the Grading Credential retained value or that individualized valuation is required, Plaintiff alternatively preserves common or subclasswide measures of the credential premium, the charge attributable to misrepresented attributes, fee-specific overcharges, speed premiums, MIV or upcharge amounts, repeat-service charges, benefit-of-the-bargain loss, and, where supported by common proof, supplemental diminution associated with inaccurate grades, false scarcity signals, altered certifications, or objectively identifiable card-and-grade submarkets. Plaintiff does not seek duplicative recovery.

281. The causal connection is direct. Defendants' representations, omissions, and market-facing signals induced Plaintiff to select PSA, surrender his cards, and pay. The market further communicated that PSA should be the grader that consumers like Plaintiff select. The mails and wires placed the cards in PSA's system, processed service selection and payment, communicated the represented service, delivered the credential, and completed the transaction. The same Defendants controlled the representations and the grading, certification, population, fee, and payment systems that produced the injury. The injury occurred at payment and issuance and does not depend on intervening market transactions or another person's injury.

282. No more direct victim or independent intervening cause exists. The intermediary did not own Plaintiff's cards, purchase grading for itself, set PSA's standards or charges, assign the grades, create the certification or population record, or bear the loss. Plaintiff supplied the cards and money, was the intended beneficiary and economic payor, received the credential, and bore the loss. The intermediary's separately identifiable compensation can be allocated through records, preventing duplicative recovery. Plaintiff's injury is not derivative of an intermediary

injury. *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992); *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 110-15 (4th Cir. 2025).

283.    First-party reliance on every predicate communication is not required. *See Bridge*, 553 U.S. at 649-61. Plaintiff incorporates the reliance and market allegations in ¶¶ 217-233 and pleads, together and in the alternative, actual transaction-specific reliance, intermediary reliance, a common inference from payment for the represented credential, actual reliance on the credential's cultivated legitimacy and value signal, and a request after discovery and at class certification for a rebuttable credential-market reliance presumption by reasonable extension of *Levinson*, 485 U.S. at 224, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013), *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), and *Goldman Sachs Group, Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113 (2021). Plaintiff does not allege that trading cards are securities. If Defendants' own market representations in **Exhibit C** are accurate about trading cards being an asset class, they support common credential-market reliance and impact. If Defendants deny that PSA's grades, certification events, population data, pricing tools, and integrations materially inform prices or transactions, that position supports the alternative inference that their market-use representations were false or misleading and created to induce consumers to use their services. The requested extension supplements, rather than being indispensable to Plaintiff's other reliance and causation theories, and no post-grading sale is required since the represented market function was part of the credential purchased at submission.

### J.    Plaintiff's Claims Are Timely

284.    Plaintiff's civil RICO claims are governed by the four-year statute of limitations recognized in *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143 (1987), and

accrue when the plaintiff discovered, or reasonably should have discovered, the injury giving rise to the claim. *See Rotella v. Wood*, 528 U.S. 549 (2000).

285.    Plaintiff's submission occurred within the limitations period, and the resulting injuries were incurred within that same period. Plaintiff's claims are therefore timely as to his submission and payment of PSA grading-related charges.

286.    To the extent earlier conduct is relevant to pattern, background, market structure, or fraudulent concealment, Plaintiff did not discover, and could not reasonably have discovered, the fraudulent nature of Defendants' scheme before the limitations period began. The subjective, production-driven, ratio-influenced, population-controlled, criteria-shifting, and contractually shielded features of Defendants' grading system were concealed through PSA's market-facing representations, grader secrecy, nondisclosure practices, separated disclaimers, hyperlinked terms, Guarantee limitations, and obstruction practices alleged above. The limitations period is therefore tolled under the doctrine of fraudulent concealment to the extent tolling is necessary.

287.    Defendants' scheme is also ongoing. Each new solicitation, submission, payment transmission, upcharge communication, grading-result transmission, population-report publication, pricing-data transmission, return shipment, or contractual-shield communication generates a new predicate act and, where it causes economic loss, a new injury. The allegations above establish that Defendants did not merely engage in isolated deceptive practices; they used interstate enterprises to carry out those practices repeatedly, systematically, and for profit. The mailings and wires were the operational machinery of the fraud; the pattern was continuous; the enterprises were coordinated; and the injuries were direct. Plaintiff therefore asserts civil RICO claims under 18 U.S.C. §§ 1962(a) and 1962(c), as set forth in the counts that follow.

* * *

134

288.    These allegations establish a coordinated and continuing use of interstate enterprises, mails, and wires to obtain consumers' money through material misrepresentations, half-truths, omissions, concealment, and fee practices; related and continuous racketeering activity across repeated national transactions; Defendants' operation or management of the pleaded enterprises; Collectors' receipt and use or investment of racketeering income; and direct property injury by reason of the alleged violations. Plaintiff seeks damages, treble damages, costs, and attorneys' fees under 18 U.S.C. § 1964(c). Any declaratory or injunctive relief requested elsewhere is sought under non-RICO claims and other lawful authority, not as a private RICO remedy. *See Hengle v. Treppa*, 19 F.4th 324, 355-57 (4th Cir. 2021).

## CLASS ACTION ALLEGATIONS

289.    Plaintiff reasserts, re-alleges, and incorporates by reference all preceding allegations of this Complaint as if fully set forth herein.

290.    Plaintiff brings this action on his own behalf and on behalf of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and, where appropriate, 23(c)(4). Plaintiff seeks certification of a nationwide class for his federal RICO, declaratory, and injunctive claims, and certification of a Maryland subclass for Maryland state-law claims, including claims under the Maryland Consumer Protection Act.

291.    "Class Period" means the period beginning four years before the filing of this Complaint and continuing through the date of judgment, unless a longer or shorter period applies to a particular claim by operation of law, tolling, discovery-rule principles, continuing-violation principles, or later order of the Court.

292.    "Maryland Class Period" means the period beginning three years before the filing of this Complaint and continuing through the date of judgment, unless a longer or shorter period

applies to a particular Maryland claim by operation of law, tolling, discovery-rule principles, continuing-violation principles, or later order of the Court.

293.   "PSA Grading-Related Services" means authentication, grading, encapsulation, certification, review, crossover, resubmission, reconsideration, reholdering, relabeling, declared-value review, valuation, shipping, handling, insurance, return shipment, or related services provided, offered, charged, or facilitated by PSA.

294.   "PSA Grading-Related Charges" is defined in paragraph 40 and means any fee, charge, premium, upcharge, reimbursement, shipping charge, handling charge, insurance charge, service-tier charge, declared-value charge, Maximum Insured Value charge, adjusted grading fee, high-value charge, expedited-service charge, review fee, crossover fee, resubmission fee, reholdering fee, relabeling fee, imaging or grader-note charge, and/or related payment imposed, collected, reimbursed, or passed through in connection with PSA Grading-Related Services.

295.   "PSA-Imposed Charges" means the portion of those charges assessed, calculated, demanded, or retained by PSA in the PSA-facing transaction, whether paid directly to PSA or passed through a Card Grading Intermediary.

296.   "Card Grading Intermediary" has the same meaning as set forth in paragraph 57 of this Complaint.

297.   "Beneficial Owner" means the real, natural person who ultimately owns, controls, or enjoys one or more trading cards submitted to PSA through a Card Grading Intermediary and who paid, reimbursed, or otherwise bore one or more PSA Grading-Related Charges in connection with that submission.

I.      **Proposed Classes and Subclasses**

298.   Plaintiff brings this action on behalf of the following Nationwide Beneficial Card Owner Class:

**All persons and entities in the United States who, during the Class Period, ultimately owned one or more trading cards submitted through a Card Grading Intermediary to PSA for PSA Grading-Related Services, and who paid, reimbursed, or bore one or more PSA Grading-Related Charges for those services but who never created a PSA account.**

299. The Nationwide Beneficial Card Owner Class neither includes persons or entities acting solely as Card Grading Intermediaries for cards that they did not own nor any person who submitted cards directly to PSA.

300. Plaintiff brings his civil RICO claims on behalf of the Nationwide Beneficial Card Owner Class and, to the extent a separate RICO class is necessary, on behalf of the following Nationwide RICO Class:

**All members of the Nationwide Beneficial Card Owner Class whose submissions, payments, grading results, upcharge notices, invoices, certification records, population-report entries, pricing-data transmissions, return shipments, or related communications involved the use of interstate mails, interstate commercial carriers, interstate wires, electronic communications, internet transmissions, or interstate payment networks.**

301. Plaintiff brings claims for declaratory and injunctive relief on behalf of the following Rule 23(b)(2) Class:

**All persons and entities in the United States who are members of the Nationwide Beneficial Card Owner Class, who currently own one or more PSA-graded cards submitted through a Card Grading Intermediary, and who are subject to or affected by Defendants' ongoing grading, pricing, upcharge, turnaround, population-report, certification-record, disclaimers, alleged terms and conditions, or related practices.**

302. Plaintiff seeks certification of the Rule 23(b)(2) Class only for declaratory and injunctive relief that applies generally to the class as a whole. Monetary claims are brought under Rule 23(b)(3).

303. For his Maryland state-law claims, including claims under the Maryland Consumer Protection Act, Plaintiff brings claims on behalf of the following Maryland State-Law Subclass:

137

**All members of the Nationwide Beneficial Card Owner Class who, during the Maryland Class Period, were Maryland residents or whose relevant PSA grading transaction was centered in Maryland because they delivered cards from Maryland, paid or reimbursed PSA Grading-Related Charges from Maryland, received grading-related representations, invoices, upcharge notices, payment demands, grading results, certification records, or return shipments in Maryland, or otherwise bore the economic consequences of Defendants' challenged conduct in Maryland.**

304.    Plaintiff does not seek certification of a nationwide class for state-law consumer-protection or common-law claims at this time. Plaintiff pleads the Maryland State-Law Subclass to adjudicate Maryland-law claims for Maryland consumers and Maryland-centered transactions arising from the same common course of conduct alleged throughout this Complaint.

305.    Excluded from the Classes and Subclasses are Defendants; Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; Defendants' legal representatives, successors, and assigns; the judicial officers assigned to this case and their immediate family members; and any person or entity that timely and validly opts out of a Rule 23(b)(3) Class or Subclass. Card Grading Intermediaries are excluded only when acting solely as intermediaries for cards they did not beneficially own and if they themselves, as opposed to a corporate entity at which they work, did not have a PSA account.

306.    Plaintiff reserves the right, pursuant to Rule 23(c)(1)(C) and subject to Court approval, to amend, refine, narrow, expand, or otherwise modify the class and subclass definitions based on discovery, Defendants' records, intermediary records, payment records, submission data, certification records, population-report data, customer-service records, upcharge notices, shipping records, marketplace data, and expert analysis. Plaintiff also reserves the right to seek certification of issue, liability, damages, or transaction subclasses under Rule 23(c)(4), including subclasses corresponding to speed premiums, upcharges, repeat services,

138

ancillary charges, certification events, instant offers, or other objectively identifiable transaction categories.

## II.      Ascertainability and Class Records

307.    The Classes and Subclasses are defined by objective criteria and are ascertainable through records maintained by Defendants that can be confirmed, corroborated, or supplemented by Card Grading Intermediaries. Class membership can be determined through PSA submission records, PSA account records, intermediary submission records, invoices, payment records, upcharge notices, service-tier records, declared-value or MIV records, shipping and return-shipment records, certification numbers, grading-result records, crossover, review, resubmission, reholder, and relabel records, population-report records, PSA Vault records, PSA Partner Offer records, marketplace records, and records maintained by Card Grading Intermediaries.

308.    Defendants and Card Grading Intermediaries possess or control records that identify submitted cards, the beneficial owners, economic payors, service levels selected, grading dates, fees charged, fees paid or reimbursed, upcharges assessed, shipping and handling charges, turnaround representations, grading outcomes, certification numbers, declared values, review or crossover requests, resubmissions, return shipments, and related communications.

309.    The fact that some Class members paid a combined amount to a Card Grading Intermediary does not defeat ascertainability. PSA's records identify the PSA-facing transaction, including the service level selected, PSA grading fee, declared value or MIV, adjusted grading fee or upcharge, shipping, insurance, handling, return-shipment charges, payment timing, and account-level charges imposed by PSA. Intermediary records can identify any separate per-card intake fee, handling fee, markup, submission fee, or other compensation retained by the intermediary. Thus, PSA-imposed charges and intermediary charges can be separated easily through Defendants' and intermediaries' records.

139

310.    The fact that Card Grading Intermediaries may have earned money on each submitted card does not defeat class membership, causation, predominance, or damages. Intermediaries participated in the submission pipeline by soliciting or accepting cards, aggregating submissions, transmitting cards and information to PSA, relaying PSA's prices and communications, collecting or facilitating payment, and returning graded cards. But the Classes are defined by beneficial card ownership and economic payment or reimbursement of PSA Grading-Related Charges, not by the intermediary's separate compensation.

311.    To the extent any individual record is incomplete, Class membership may be confirmed through a claims process using objective documentation, including receipts, invoices, submission forms, grading certificates, certification numbers, payment records, shipping records, emails, text messages, intermediary records, marketplace records, or sworn claim forms supported by available documentation. Such ministerial verification issues do not defeat ascertainability.

## III.    Numerosity

312.    The Classes and Subclasses are so numerous that joinder of all members is impracticable. Defendants operate nationally and process millions of trading-card submissions annually through PSA. The challenged conduct affected consumers nationwide through tens of millions of repeated grading-related transactions over a period of years.

313.    The precise number and identities of Class and Subclass members are presently unknown to Plaintiff but are readily ascertainable through discovery of Defendants' account holder, group submission and dealer records, payment-processing records, shipping records, certification databases, customer-service records, marketplace records, and related documents together with Card Grading Intermediary records.

## IV.      Commonality

314.     Common questions of law and fact exist as to the Classes and Subclasses. These questions are capable of generating classwide answers because they concern Defendants' standardized representations, omissions, grading practices, pricing structures, upcharge practices, service-tier practices, contractual architecture, intermediary channels, enterprise structure, market power, acquisitions, and records.

315.     Common questions include, without limitation:

a.      whether Defendants represented that PSA grading was impartial, objective, standardized, expert-driven, consistent, reliable, transparent, accountable, or market-authoritative;

b.      whether Defendants omitted or concealed material facts concerning grader qualifications, grading subjectivity, eye appeal, production pressure, criteria changes, resubmission variability, certification changes, Gem Mint population control, population-report accuracy, upcharges, turnaround timing, Guarantee limitations, downstream conflicts, or online contractual limitations;

c.      whether PSA's grading process was materially different from the expert, impartial, objective, criteria-based, reliable process Defendants marketed;

d.      whether PSA's service-level pricing, MIV framework, adjusted grading fees, upcharges, turnaround estimates, and payment-before-reveal-or-return practices were deceptive;

e.      whether PSA's Guarantee functioned as meaningful protection for the consumer who paid for grading or primarily as a market-confidence device;

141

f.      whether PSA's population reports converted subjective, inconsistent, ratio-influenced, stale, duplicate, or otherwise distorted grade counts into market scarcity signals;

g.      whether Card Grading Intermediaries functioned as PSA-facing submission conduits through which PSA's standardized representations, charges, and grading outputs reached beneficial card owners;

h.      whether Card Grading Intermediaries' portal conduct or clickwrap assent can bind Beneficial Card Owners to Defendants' Online Terms;

i.      whether Defendants conducted or participated in the conduct of a RICO enterprise through a pattern of mail and wire fraud;

j.      whether Defendants' misrepresentations and omissions were material to reasonable consumers;

k.      whether Defendants' conduct caused Class members to pay or reimburse PSA Grading-Related Charges they would not otherwise have paid, or would have paid only in lesser amounts; and

l.      whether damages, restitution, disgorgement, declaratory relief, or injunctive relief are appropriate.

m.      These common questions arise from the same course of conduct and can be answered using common proof, including Defendants' public statements, grading standards, job postings, recruitment materials, service pages, pricing schedules, fee records, upcharge records, submission records, population-report data, certification records, Guarantee terms, online terms, intermediary records, payment records, and expert analysis.

V.      **Typicality**

316.    Plaintiff's claims are typical of the claims of the Classes and Subclasses he seeks to represent. Like absent Class members, Plaintiff beneficially owned cards submitted to PSA through a Card Grading Intermediary, paid or reimbursed PSA Grading-Related Charges, relied on PSA's market-facing representations and omissions, and suffered economic injury from the same alleged grading fraud, fee architecture, intermediary transmission structure, and contractual-shield practices.

317.    Plaintiff's claims arise from the same standardized course of conduct that gives rise to the claims of absent Class members. Plaintiff alleges the same core injury: payment or reimbursement of PSA Grading-Related Charges for a grading credential materially different from the one PSA marketed. Differences in particular cards, grades assigned, service tiers selected, or amounts paid do not defeat typicality because those differences have nothing to do with the common liability theories arising from Defendants' fraud nor the common damages theory that impacts each class member the same manner—only the amount of damages will differ.

318.    Plaintiff's use of a Card Grading Intermediary makes him typical of the Nationwide Beneficial Card Owner Class, not atypical. Defendants designed, authorized, cultivated, accepted, or relied on PSA-facing intermediary channels to transmit cards, charges, and grading-related communications into PSA's system. Plaintiff's intermediary submission therefore reflects the same submission structure that defines the Class.

VI.     **Adequacy**

319.    Plaintiff will fairly and adequately represent and protect the interests of the Classes and Subclasses. Plaintiff's interests are aligned with absent Class members because

Plaintiff seeks to establish Defendants' liability for the same deceptive, racketeering, and unlawful practices that injured absent Class members.

320.    Plaintiff has no interests antagonistic to the Classes or Subclasses. Plaintiff seeks the same categories of relief sought for the Classes and Subclasses, including damages, treble damages where authorized, restitution where permitted, declaratory relief, injunctive relief, attorneys' fees, and costs.

321.    Plaintiff's counsel are experienced in complex litigation and class-action litigation and will vigorously prosecute this action on behalf of Plaintiff and the Classes and Subclasses.

## VII.        Predominance Under Rule 23(b)(3)

322.    Common questions of law and fact predominate over questions affecting only individual Class members. Defendants' liability turns primarily on common proof concerning Defendants' standardized representations, omissions, grading practices, fee structures, upcharge practices, service-tier practices, Guarantee terms, online terms, mail and wire communications, enterprise structure, market power, acquisitions, intermediary channels, and records.

323.    The principal liability issues do not require individualized proof. Defendants' conduct was uniform or materially similar across PSA and was directed to the same downstream grading market. Defendants' representations and omissions were communicated through standardized grading standards, public websites, service descriptions, pricing pages, guarantees, labels, holders, population reports, certification systems, Card Ladder data, marketplace integrations, dealer and intermediary channels, invoices, upcharge notices, payment systems, and return shipments.

324.    Reliance, materiality, causation, and injury are susceptible to common proof. Plaintiff does not rely exclusively on individualized proof of subjective reliance. Plaintiff alleges that Defendants' misrepresentations and omissions were material on an objective standard: a

144

reasonable consumer would consider the omitted facts important when deciding whether to submit cards, select service tiers, pay PSA Grading-Related Charges, accept upcharges, pay expedited premiums, pursue reviews, resubmit cards, cross over cards, reholder cards, or rely on PSA grades and population reports in the secondary market. Materiality is a common question susceptible to common proof through Defendants' standardized representations, standardized omissions, and the objective significance of those facts to reasonable consumers who paid PSA Grading-Related Charges.

325.   Plaintiff also pleads market reliance and, in the alternative, direct reliance. Because Defendants allegedly created, controlled, informed, and monetized a PSA-centered market in which PSA grades, labels, certification numbers, population reports, pricing tools, Card Ladder valuations, vault services, partner offers, and marketplace integrations function as authoritative market credentials, reliance can be evaluated through common evidence of Defendants' market-facing course of conduct. That common market reliance was not incidental; it was the intended result of PSA's certification architecture and Collectors' downstream market infrastructure and Downstream Channels. For RICO claims predicated on mail and wire fraud, first-party reliance is not required, but Plaintiff and Class members nevertheless allege direct reliance, market reliance, or both. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649–61 (2008); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013).

326.   Damages do not defeat predominance. Defendants' and intermediaries' records can identify PSA Grading-Related Charges paid, reimbursed, or borne by Class members. Common damages methodologies—including overcharge models, benefit-of-the-bargain models, restitutionary models, disgorgement models, and fee-refund models—can measure classwide and subclasswide injury using Defendants' pricing schedules, service-tier records, upcharge records,

145

payment records, submission records, certification records, return-shipment records, population-report data, transaction records, intermediary records, and expert analysis.

327. To the extent individual damages calculations are required, those calculations are mechanical and record based. PSA's records can identify PSA-Imposed Charges. Intermediary records can identify any separate intermediary charge, markup, handling fee, or submission fee. The need to allocate or calculate the amount owed to each Class member does not predominate over common liability issues and does not defeat class certification. *See Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016).

## VIII. Superiority Under Rule 23(b)(3)

328. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual Class members' claims are likely too small, complex, and expensive to litigate separately, particularly given the cost of proving fraud, the existence and operation of a RICO enterprise, mail- and wire-fraud predicates, market reliance, causation, damages, and Defendants' grading and pricing practices in an action against a national grading company and its corporate parent. It is for this very reason that Defendants introduced class action waivers into their fraudulent system because they understand that class actions are the only true mechanism for challenging their misconduct.

329. Individual litigation would create a risk of inconsistent adjudications, duplicative discovery, inconsistent rulings concerning Defendants' representations and Online Terms, and inefficient use of judicial resources. A class action allows a single court to resolve the common questions arising from Defendants' standardized conduct, centralized records, common enterprise, intermediary channels, and common course of dealing.

330. Class treatment will conserve the resources of the Court and the parties, promote uniformity of decision, and provide meaningful relief to consumers who otherwise would be unable to challenge Defendants' conduct effectively.

## IX.      Rule 23(b)(2)

331. Certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds generally applicable to the Rule 23(b)(2) Class, making declaratory and injunctive relief appropriate for the class as a whole.

332. Plaintiff seeks classwide declaratory and injunctive relief, including declarations that: (a) Defendants' Online Terms and Conditions are not enforceable against Beneficial Card Owners who submitted through Card Grading Intermediaries; (b) any arbitration, class-action waiver, forum-selection, choice-of-law, limitation-of-liability, warranty-disclaimer, delegation, or similar provision was not assented to by such Beneficial Card Owners; and (c) Defendants may not invoke intermediary portal interactions to deprive Beneficial Card Owners of judicial remedies.

333. Plaintiff also seeks injunctive relief requiring Defendants to: (a) cease deceptive grading, pricing, upcharge, turnaround, guarantee, population-report, certification, contractual-shield, and downstream-monetization practices; (b) disclose material facts concerning grading subjectivity, grading standards, timing, upcharges, guarantees, population-report limitations, and contractual limitations; (c) preserve and correct relevant records; and (d) provide transparent and non-deceptive grading and pricing disclosures.

334. Injunctive and declaratory relief is particularly appropriate because Defendants' challenged practices are ongoing, standardized, and directed at a national market of consumers who continue to submit cards for PSA grading, pay PSA Grading-Related Charges, and rely on PSA grades, certification numbers, population reports, and market-facing representations.

147

### X.        Classwide Damages and Restitution

335.    Plaintiff seeks damages and restitution for himself and Class members, including recovery of PSA Grading-Related Charges paid, reimbursed, or borne as a result of Defendants' alleged fraudulent grading scheme, deceptive fee architecture, upcharge practices, turnaround representations, Guarantee misrepresentations, population-report practices, contractual-shield practices, and downstream monetization of PSA grades.

336.    Classwide damages may include, depending on the claim and proof developed in discovery: (a) refunds or restitution of grading fees and PSA Grading-Related Charges; (b) overcharges attributable to deceptive service-tier pricing, MIV pricing, adjusted grading fees, or upcharges; (c) expedited-service premiums paid for timing representations that were materially qualified or not delivered as represented; (d) repeat-service charges paid for review, crossover, resubmission, reholdering, relabeling, or related services made economically rational by PSA's concealed variability; (e) shipping, handling, insurance, or return-shipment charges necessary to obtain the misrepresented credential; and (f) benefit-of-the-bargain or diminution damages where supported by the evidence.

337.    Damages and restitution can be calculated using common, record-based methodologies. PSA's own records identify the PSA-facing service level, fee schedule, MIV, declared value, adjusted grading fee, upcharge, shipping, handling, insurance, return-shipment charge, payment date, certification number, grade assigned, and return status. Card Grading Intermediary records can identify the beneficial card owner, amount collected from the owner, amount remitted or passed through to PSA, and any separate intermediary markup, handling charge, intake fee, or submission fee. Where necessary, expert analysis can allocate PSA-Imposed Charges from separate intermediary compensation.

338. Nothing in the exclusion of Card Grading Intermediaries acting solely as submission conduits prevents an intermediary, dealer, card shop, group submitter, or similar person from participating in a Class or Subclass to the extent that person or entity owned cards for its own account, paid or reimbursed PSA Grading-Related Charges for its own cards, did not have an individual PSA account, and suffered direct injury as a beneficial card owner rather than solely as a ministerial submission conduit.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

339. Based on all the allegations herein, Plaintiff respectfully demands relief under the following causes of action, reasserting, realleging, and incorporating by reference all preceding allegations into each Claim for Relief that follows.

## FIRST CLAIM FOR RELIEF

**DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT DEFENDANTS' ONLINE TERMS AND CONDITIONS, INCLUDING THE ARBITRATION CLAUSE, CLASS-ACTION WAIVER, FORUM-SELECTION CLAUSE, CHOICE-OF-LAW CLAUSE, LIMITATION-OF-LIABILITY CLAUSE, AND WARRANTY DISCLAIMERS, DO NOT BIND PLAINTIFF OR THE CLASS**

340. Plaintiff reasserts, realleges, and incorporates herein by reference all preceding allegations when asserting the foregoing cause of action.

341. Pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks a declaration that Defendants' online Terms and Conditions, including but not limited to any arbitration clause, class-action waiver, forum-selection provision, choice-of-law provision, limitation-of-liability provision, warranty disclaimer, integration clause, modification clause, or delegation clause (collectively, the "Online Terms"), do not bind Plaintiff, the Nationwide Beneficial Card Owner Class, the Nationwide RICO Class, the Rule 23(b)(2) Class, the Maryland State-Law Subclass, or any other Subclass member.

149

342.     Plaintiff, and putative members of the classes and subclasses by definition, never created, registered, opened, maintained, or used an account, profile, login, membership, dealer status, or registered submitter status with PSA. In other words, Plaintiff and putative class members never assented to any contract nor received any separate consideration for such a contract.

343.     Plaintiff submitted his cards to Defendants only through Card Grading Intermediaries acting in a ministerial capacity. Those Intermediaries did not communicate to Plaintiff the existence or content of the Online Terms, did not present the Online Terms to Plaintiff, and did not obtain Plaintiff's assent to the Online Terms.

344.     No valid offer, acceptance, consideration, mutual assent, inquiry notice, or knowing and voluntary waiver of rights was ever formed between Plaintiff and any Defendant with respect to the Online Terms.

345.     An actual controversy exists because Defendants are expected to invoke the Online Terms—including the arbitration clause and class-action waiver—as a defense to Plaintiff's claims, and Plaintiff disputes that those terms apply to him. Collectors' own motion to compel arbitration in *Rasmussen* illustrates the material factual distinction. There, Collectors relied on evidence that the plaintiff personally created a Collectors account, affirmatively checked a box agreeing to the Collectors User Agreement, and later submitted a card through that account. Plaintiff did none of those things here. Nor did any Card Grading Intermediary have actual or apparent authority to accept the Online Terms or waive Plaintiff's rights on his behalf, and Plaintiff seeks no contractual right or benefit under those terms. On the facts alleged, Defendants have no comparable evidence that Plaintiff agreed to arbitrate. *See* Def. Collectors

Holdings, Inc.'s Notice of Mot. & Mot. to Compel Arb. & Stay Case at 2, 5–6, *Rasmussen v. Collectors Holdings, Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 8, 2026), ECF No. 20.

346.   WHEREFORE, Plaintiff requests that this Court enter judgment declaring that:

a.   No contract was formed between Plaintiff and any Defendant on the basis of Defendants' Online Terms;

b.   The Online Terms, including the arbitration clause, class-action waiver, forum-selection provision, choice-of-law provision, limitation-of-liability provision, warranty disclaimers, and any delegation clause, do not bind Plaintiff or the Class;

c.   This action may proceed in this Court as a putative class action;

d.   Plaintiff is entitled to recover his attorneys' fees and costs; and

e.   Such other and further relief as is necessary and appropriate.

**SECOND CLAIM FOR RELIEF**

**DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT DEFENDANTS' ARBITRATION CLAUSE, CLASS-ACTION WAIVER, AND RELATED PROVISIONS ARE PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE, A PRODUCT OF FRAUD AND UNENFORCEABLE
(PLEADED IN THE ALTERNATIVE)**

347.   Plaintiff reasserts, realleges, and incorporates herein by reference all preceding allegations when asserting the foregoing cause of action.

348.   As an alternative to the First Claim for Relief, and only in the event that this Court somehow determines that any portion of Defendants' Online Terms is enforceable against Plaintiff and/or putative class members, through any theory, Plaintiff seeks a declaration that the arbitration clause, class-action waiver, forum-selection provision, choice-of-law provision, limitation-of-liability provision, and warranty disclaimers within Defendants' Online Terms are procedurally and substantively unconscionable and unenforceable as applied to Plaintiff and the Classes and Subclasses defined in ¶¶ 298–303. The clauses are also a product of fraud and

fraudulent inducement and thus unenforceable as applied to Plaintiff and the Classes and Subclasses defined in ¶¶ 298–303 for this separate reason.

349.    Defendants' Online Terms are contracts of adhesion, drafted unilaterally by Defendants and presented—if at all—on a take-it-or-leave-it basis to consumers and Card Grading Intermediaries with no real opportunity to negotiate.

350.    The arbitration clause and class-action waiver are substantively unconscionable because they are part of an integrated scheme designed to insulate Defendants from accountability for the very fraudulent conduct alleged herein, while extracting fees, upcharges, and downstream revenue from consumers who were never shown, and never knowingly waived, their constitutional, statutory, and procedural rights.

351.    The delegation clause is itself ambiguous and unenforceable because it conflates issues of contract formation with issues of arbitrability and rescission, and because issues of contract formation between Defendants and downstream beneficial owners are reserved for this Court. Plaintiff specifically and exclusively challenges the delegation provision, independently of the arbitration clause as a whole, and alleges that the delegation provision is unconscionable and unenforceable for the reasons stated herein, so that the gateway question of arbitrability is for this Court and not any arbitrator. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010). In all events, because Plaintiff disputes that any agreement to arbitrate was ever formed between them and any Defendant, the antecedent question of contract formation is for this Court regardless of any delegation provision. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010); *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024).

352.    WHEREFORE, Plaintiff requests that this Court enter judgment declaring that:

      a.    The arbitration clause, class-action waiver, forum-selection provision,

choice-of-law provision, limitation-of-liability provision, and warranty disclaimers in Defendants' Online Terms are procedurally and substantively unconscionable and unenforceable as applied to Plaintiff and the Classes and Subclasses;

b.      The delegation clause is ambiguous and unenforceable, and issues of formation are for this Court;

c.      This action may proceed in this Court as a class action;

d.      Plaintiff is entitled to recover his attorneys' fees and costs; and

e.      Such other and further relief as is necessary and appropriate.

## THIRD CLAIM FOR RELIEF

### RICO VIOLATION OF 18 U.S.C. § 1962(c)
### (Against All Defendants)

353.    Plaintiff reasserts, realleges, and incorporates herein by reference all preceding allegations when asserting the foregoing cause of action.

354.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), capable of holding a legal or beneficial interest in property. Defendant PSA is the primary RICO "person" for purposes of this Claim because PSA conducts and participates in the conduct of the enterprise's affairs through the pattern of mail- and wire-fraud predicate acts alleged herein, which consist of PSA's consumer-facing grading, intake, representation, pricing, upcharge, turnaround, guarantee, and population-reporting conduct. Defendant Collectors is also a RICO "person" for purposes of this Claim through its direction and control of the enterprise's affairs as alleged in ¶¶ 50–56, 209–212, and 262–267.

355.    The Grading-Intake Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961(4), engaged in and whose activities affect interstate and foreign commerce. The Grading-Intake Enterprise has a common purpose, ongoing relationships among its members, and

153

longevity sufficient to pursue that purpose, satisfying *Boyle*, 556 U.S. at 938, and is distinct from each Defendant within the meaning of *Cedric Kushner Promotions*, 533 U.S. at 158. Card Grading Intermediaries participate in the Grading-Intake Enterprise solely as Defendants' actual, apparent, ostensible, and limited agents under Defendants' direction and control, and not as independent co-venturers or as agents of Plaintiff or Class members.

356.    The Grading-Intake Enterprise is distinct from each Defendant not merely because Collectors and PSA are separate legal persons, but also because the enterprise's structure and common purpose are constituted by the participation of independent, non-defendant members (including eBay, Inc. and the Card Grading Intermediaries) who are not owned or controlled by, and exist wholly apart from, the Collectors corporate family. The enterprise, therefore, has an existence beyond the parent-subsidiary relationship among Defendants.

357.    In the alternative, the Trading-Card Grading Enterprise — comprising Defendants together with Card Grading Intermediaries, eBay, Inc., Card Ladder, LLC, the PSA Vault, PSA Partner Offers, and Collectors Financial Services, LLC — is an enterprise within the meaning of 18 U.S.C. § 1961(4), engaged in and whose activities affect interstate and foreign commerce, with the same *Boyle* and *Cedric Kushner* characteristics described in ¶¶ 55–56 and 265–267.

358.    Both Defendants conducted and participated in the conduct of the affairs of the Grading-Intake Enterprise within the meaning of 18 U.S.C. § 1962(c) and *Reves*, 507 U.S. at 170, each in a distinct capacity. PSA participated in the operation and management of the enterprise by performing the grading, intake, encapsulation, certification, pricing, upcharge, turnaround, guarantee, and population-reporting functions through which the predicate acts of mail and wire fraud were committed, and by scripting and transmitting, directly and through the Card Grading Intermediaries, the standardized representations on which Plaintiff relied.

154

Collectors participated in the operation and management of the enterprise by directing enterprise strategy, structuring and controlling the authorized-intake programs and the eBay and Card Ladder integrations, dictating the fee and upcharge architecture, and directing monetization of the card grades across the card's lifecycle. Each Defendant thereby took part in directing the enterprise's affairs, and neither acted merely as an outsider providing goods or services to the enterprise. Notwithstanding the foregoing, for purposes of § 1962(c), PSA is the primary RICO person that conducted the affairs of the enterprise through a pattern of racketeering activity.

359.   Defendants' racketeering activity consists of repeated and related predicate acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 (collectively, "Defendants' Predicate Acts"), as set forth above with particularity, including, without limitation:

a.   The interstate transmission of consumer cards by mail and interstate carrier from Plaintiff to Defendants' grading facilities and back;

b.   The interstate transmission of submission confirmations, grading-status communications, invoices, declared-value upcharge notices, expedited-service representations, grading-result communications, certification-database entries, population-report entries, Card Ladder valuations, PSA Partner Offer communications, PSA Vault communications, and return-shipment communications, by wire and mail;

c.   Interstate wire transmissions between Defendants and eBay, Inc., including listing-integration data, certification-verification calls, Card Ladder pricing feeds incorporated into eBay's price-guide and listing experience announced in or about January 2026, PSA Vault-to-eBay consignment communications, PSA Partner Offer transmissions tied to eBay-linked dispositions, and related commercial-agreement

155

communications, each of which carried, furthered, or concealed the expertise, standards, process-and-certification, market-use, pricing, and omission-based deceptions alleged in ¶¶ 143–223 and 246–250, and throughout Sections IV–V; and

d.      The interstate dissemination of Defendants' uniform expertise, standards, process-and-certification, and market-use representations, including representations that PSA grading was expert, standardized, reliable, criteria-based, durable, market-authoritative, and suitable for pricing, resale, insurance, lending, vaulting, and valuation decisions, together with Defendants' uniform omissions concerning subjectivity, quota and speed pressure, undisclosed standards changes, ratio-based grading, certification-record control, population-report distortion, post-submission leverage, Guarantee limitations, and contractual disclaimers.

360.    Defendants' Predicate Acts constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because they are related and continuous, satisfying both closed-ended and open-ended continuity, and have been committed repeatedly across millions of consumer transactions over a period of years.

361.    Defendants directly and indirectly conducted and participated in the conduct of the affairs of the Grading-Intake Enterprise (and, in the alternative, the Trading-Card Grading Enterprise) through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

362.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff and Class members were injured in their business and property. Their injuries are not limited to disagreement with any individual grade. They include payment or reimbursement of PSA Grading-Related Charges for a certification product not

156

delivered as represented; overpayment for grading services marketed as expert, standardized, reliable, and market-authoritative; payment of inflated or excessive fees, speed premiums, upcharges, repeat-service charges, shipping, handling, insurance, return-shipment charges, and related transaction costs; loss of the benefit of the bargain; and, where applicable, diminution in value, marketability, liquidity, or certification reliability of PSA-graded cards.

363.    WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants on this cause of action as follows:

a.    An award of actual damages, the precise measure of which is to be determined;

b.    An award of treble damages pursuant to 18 U.S.C. § 1964(c); and

c.    An award of attorneys' fees and expenses.

### **FOURTH CLAIM FOR RELIEF**

**RICO VIOLATION OF 18 U.S.C. § 1962(a) — REINVESTMENT OF RACKETEERING INCOME IN THE ACQUISITIONS OF SGC AND BGS AND OTHER CHANNELS (Against Defendant Collectors)**

364.    Plaintiff reasserts, realleges, and incorporates herein by reference all preceding allegations when asserting the foregoing cause of action.

365.    Defendant Collectors is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(a).

366.    For purposes of this Claim, Plaintiff further pleads the Grading-Intake Enterprise as the primary enterprise into whose affairs racketeering proceeds were invested, and the Trading-Card Grading Enterprise in the alternative. SGC and BGS are also enterprises in their own right within the meaning of § 1961(4), into which Collectors invested racketeering proceeds through the SGC acquisition (closed February 2024) and the BGS acquisition (announced December 15, 2025, as alleged in ¶¶ 43, 56(b), 74, 212, and 269.

157

367.    Through the pattern of racketeering activity set forth above, Collectors—through its wholly owned subsidiary PSA—derived substantial racketeering income from consumers nationwide, including from Grading-Related Charges, expedited-service premiums, declared-value upcharges, repeat-submission fees, crossover fees, review fees, reholdering fees, Vault custody fees, Partner Offer transaction fees, and downstream revenue tied to PSA's grading determinations.

368.    Collectors used and invested a portion of that racketeering income, directly and indirectly, in the establishment, operation, and expansion of one or more enterprises engaged in interstate commerce. Specifically, on information and belief, Collectors used or invested racketeering income to fund or facilitate:

a.    The February 2024 acquisition of SGC, through which Collectors absorbed PSA's historical price-and-turnaround competitor and converted SGC into a Collectors-controlled grading brand operating within the same enterprise;

b.    The acquisition of BGS, announced on or about December 15, 2025, through which Collectors absorbed PSA's historical subgrade and Black-Label competitor and converted BGS into a Collectors-controlled grading brand operating within the same enterprise;

c.    The acquisition of Card Ladder in December 2021, the establishment and expansion of the PSA Vault, the establishment of PSA Partner Offers, and the establishment of Collectors Financial Services, each of which is an enterprise affecting interstate commerce; and

d.    The April 2024 commercial agreements with eBay, including PSA's acquisition of the eBay Vault.

369.    The acquisitions of SGC and BGS were not isolated business transactions. They were the financial vehicles through which Collectors converted racketeering proceeds extracted from consumers into permanent structural market power, eliminating PSA's two principal historical competitors, raising PSA-affiliated grading market share to approximately 80% of all U.S. third-party trading-card grading volume, and entrenching the very deceptive grading practices alleged herein within the Collectors enterprise.

370.    Plaintiff and members of the putative classes and subclasses have suffered injury to their money or property by reason of Collectors' use and investment of racketeering income, separate and apart from the injuries caused by the predicate acts themselves. Collectors' use and investment of racketeering income caused Plaintiff and the Class a separate and distinct injury from the grading-fee injury caused by the predicate acts themselves. By using fraud-derived grading revenues to acquire competing graders, expand integrated pricing and resale infrastructure, and further entrench PSA's role as the dominant grading credential, Collectors reduced consumer choice, weakened competitive pricing discipline, and foreclosed meaningful independent alternatives that otherwise would have constrained PSA's fees, practices, and market power. The injury from that investment includes payment of supracompetitive or inflated Grading-Related Charges in a market whose competitive checks were diminished by Collectors' reinvestment of racketeering proceeds. Specifically, the SGC and BGS acquisitions, funded or facilitated by racketeering income, caused and continue to cause Plaintiff and the Class:

a.    Supracompetitive prices for grading services that, but for the consolidation, would have been disciplined by independent SGC and BGS price competition;

b.      Reduced quality, transparency, and accountability in grading services that, but for the consolidation, would have been disciplined by independent SGC and BGS quality competition;

c.      Reduced consumer choice and elimination of meaningful alternatives to PSA-controlled grading infrastructure; and

d.      Diminution in the value, marketability, and liquidity of cards previously graded by SGC and BGS as standalone competitors, whose credentials are now subsumed within the Collectors enterprise.

371.    For purposes of § 1962(a), Collectors is the primary RICO person that received, used, and invested income derived from the pattern of racketeering activity. Collectors' conduct violates 18 U.S.C. § 1962(a). Plaintiff's injury under this Claim arises from Collectors' use and investment of racketeering income in the SGC and BGS acquisitions and is distinct from, and additional to, the injury caused by the predicate acts themselves. The acquisitions created and entrenched the supracompetitive pricing, degraded service quality, and elimination of competitive alternatives alleged above, and those harms would not have occurred but for the investment of racketeering proceeds. Plaintiff therefore alleges a distinct investment-use injury, separate from any predicate-act injury, as required to state a claim under 18 U.S.C. § 1962(a).

372.    WHEREFORE, Plaintiff requests that this Court enter judgment against Collectors on this cause of action as follows:

a.      An award of actual damages, the precise measure of which is to be determined;

b.      An award of treble damages pursuant to 18 U.S.C. § 1964(c);

c.      An award of attorneys' fees and expenses.

160

**FIFTH CLAIM FOR RELIEF**

**FRAUD OR DECEIT**
**(Against All Defendants)**

373.    Plaintiff reasserts, realleges, and incorporates herein by reference all preceding allegations when asserting the foregoing cause of action.

374.    Defendants made false and misleading representations of material fact concerning the PSA Grading Credential to Plaintiff and the putative Class in four categories:

a.    **Expertise claims.** Defendants represented that PSA grading was expert-driven and performed by trained experts with specialized skill, experience, and judgment sufficient to evaluate valuable trading cards with precision and consistency. Those representations were false or misleading because PSA allegedly relied on anonymous graders of subpar qualifications, trainee-dependent staffing, hobbyist-based hiring criteria, newly hired personnel, outside contractors, and insufficient grader training, calibration, consistency, and performance data.

b.    **Standards claims.** Defendants represented that PSA grading was standardized, objective, criteria-based, consistent, transparent, accountable, and governed by recognized and respected universal grading standards. Those representations were false or misleading because PSA allegedly applied malleable criteria, undisclosed or shifting grading standards, subjective "eye appeal" judgments, market-acceptance reasoning, inconsistent grader judgment, and ratio-based or population-level grading practices.

c.    **Process-and-certification claims.** Defendants represented that PSA's grading and certification process produced a reliable, durable, verifiable, and market-authoritative credential, including authentication, grading, encapsulation, a PSA label, a

certification number, certification verification, population-report inclusion, guarantee messaging, and return of the graded card. Those representations were false or misleading because PSA allegedly operated a high-volume, production-driven grading process that produced an undetermined amount of errors; allowed grades to vary on resubmission; retained and used the ability to alter, deactivate, downgrade, or effectively erase certification records; limited the practical protection of its Guarantee; and attempted through Online Terms to recast the marketed certification product as a subjective, non-warranted opinion.

        d.    **Market-use claims.** Defendants represented, expressly and by implication, that PSA grades, slabs, labels, certification numbers, certification tools, population reports, price guides, Card Ladder valuation data, PSA Vault services, PSA Partner Offers, marketplace integrations, and related market infrastructure could be relied upon in pricing, buying, selling, holding, insuring, financing, lending against, vaulting, and valuing graded cards. Those representations were false or misleading because the market-facing credential and data products allegedly rested on subjective, inconsistent, opaque, revisable, ratio-influenced, stale, duplicate, error-filled, or otherwise distorted grading and certification practices, while Collectors monetized the same grade-dependent values through pricing, custody, offers, resale, lending, marketplace routing, and grading-related fees.

375.    Defendants made those representations to Plaintiff, Class members, Card Grading Intermediaries, and the market each time consumers submitted cards for PSA grading, paid or reimbursed PSA Grading-Related Charges, received grading results, relied on PSA certification data, or used PSA grades and population reports in market transactions. The representations were

communicated through PSA's websites, grading standards, service pages, pricing schedules, Guarantee language, graded-card labels, encapsulated holders, certification-verification tools, population reports, CardFacts pages, price guides, Card Ladder valuation data, PSA Vault materials, Downstream Channels, PSA Partner Offers, dealer programs, marketplace integrations, hobby-media messaging, sponsored or amplified content, emails, invoices, upcharge notices, payment communications, return shipments, and statements repeated or relayed by Card Grading Intermediaries acting as PSA-facing conduits.

376.    As alleged herein, PSA disseminated the challenged expertise, standards, process-and-certification, and market-use representations through the consumer-facing and intermediary channels identified above, while Collectors directed, amplified, and monetized those fraudulent representations through its integrated platforms and Downstream Channels. Before and during Plaintiff's March 2025 submission, and in materially similar transactions throughout the limitations period, those representations induced Plaintiff and Class members to submit cards and pay or reimburse PSA Grading-Related Charges for a certification product marketed as impartial, expert, objective, standardized, criteria-based, reliable, durable, and market-authoritative. Defendants obtained those payments while concealing the subjective, inconsistent, high-volume, revisable, and financially conflicted system that produced the credential.

377.    Defendants' representations were also actionable half-truths. PSA chose to speak about expertise, universal standards, process reliability, certification verification, guarantee protection, population reports, turnaround timing, pricing, and market authority. Having chosen to speak on those subjects, Defendants were required to disclose the facts that materially qualified those representations, including grader anonymity and undisclosed qualifications, trainee or contractor participation, subjective eye appeal, inconsistent grader judgment, high-

163

volume speed pressure, undisclosed standards changes, resubmission variability, certification-record alteration, Guarantee limitations, population-report distortion, post-submission upcharge leverage, and Collectors' downstream conflicts. Defendants' omissions made their affirmative statements misleading.

378.    Defendants knew these representations were false or misleading, or acted with reckless disregard for their truth, because Defendants possessed superior knowledge of PSA's graders, grading process, standards, quality-control systems, production environment, population reports, certification records, fee architecture, Guarantee limitations, and downstream conflicts.

379.    Defendants intended Plaintiff, Class members, Card Grading Intermediaries, and the market to rely on those representations because PSA's business model depends on consumers and downstream market participants treating PSA's grade, slab, label, certification number, population-report entry, and certification-verification record as trustworthy market credentials.

380.    Plaintiff justifiably relied on Defendants' false and misleading representations when he submitted cards for PSA grading, paid or reimbursed PSA Grading-Related Charges, treated PSA grades and population data as authoritative, and accepted PSA's market-facing certification product as the reliable output of expert, standardized, criteria-based grading.

381.    As a direct and proximate result of Defendants' fraudulent misrepresentations and half-truths and omissions, Plaintiff sustained actual economic damages, including payment or reimbursement of PSA Grading-Related Charges for a certification product materially different from the one represented, overpayment for grading services marketed as expert and standardized, payment of upcharges, speed premiums, repeat-service fees, shipping, handling, insurance, and related charges, and loss of the benefit of the bargain.

382.    Defendants acted knowingly, intentionally, and with malice because they continued marketing PSA's grading and certification product as expert, standardized, reliable, durable, and market-authoritative while concealing facts within their possession that made those representations false or materially misleading. Plaintiff is therefore entitled to punitive damages to the extent permitted by law.

383.    WHEREFORE, Plaintiff, individually and on behalf of the putative Class, requests that this Court enter judgment against Defendants on the Fifth Claim for Relief as follows:

a.    an award of actual damages, including overpayment, loss-of-benefit-of-the-bargain damages, PSA Grading-Related Charges paid or reimbursed for a certification product or Grading Credential not delivered as represented, transaction costs, and any diminished value, reduced marketability, reduced liquidity, or reduced certification reliability proven at trial;

b.    an award of restitution and/or disgorgement to the extent permitted by law, including the return of fraudulently obtained grading fees, upcharges, expedited-service premiums, repeat-service fees, shipping, handling, insurance, return-shipment charges, and other PSA Grading-Related Charges;

c.    an award of punitive damages based on Defendants' knowing, intentional, malicious, and reckless misconduct, to the extent permitted by law;

d.    an award of pre-judgment and post-judgment interest;

e.    an award of attorneys' fees and costs to the extent permitted by law; and

f.    such other and further relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

### FRAUDULENT CONCEALMENT
### (Against All Defendants)

384.    Plaintiff reasserts, realleges, and incorporates by reference all preceding allegations when asserting this cause of action.

385.    Defendants' fraudulent concealment was not silence in a vacuum. Defendants chose to speak about PSA's grading expertise, standards, methodology, reliability, certification system, guarantee protection, population reports, turnaround times, and pricing structure. Those statements created the misleading impression that PSA grading and Grading Credential were performed by true experts applying stable, objective, universal standards through a reliable and durable certification process. Defendants then omitted material facts that made those statements misleading, including:

a.    that PSA grading depended on subjective "eye appeal" judgments and market-acceptance determinations that were not fixed, measurable, or independently verifiable;

b.    that different graders could view the same flaw differently, penalize the same card differently, and reach materially different grading outcomes;

c.    that PSA's graders were anonymous and of undisclosed qualifications, training, calibration, consistency, and performance history;

d.    that PSA did not require prior professional grading experience, specialized training, or certification for card-grader positions and relied on trainees, hobbyists, newly hired personnel, and outside contractors whose role and qualifications were not disclosed;

166

e.      that PSA's grading process operated under high-volume speed pressure, production expectations, and short review windows inconsistent with the careful, expert, individualized review PSA marketed;

f.      that PSA's published grading criteria could be changed, reinterpreted, or qualified by undisclosed discretion, including the January 2025 centering-tolerance changes;

g.      that PSA's grades could be materially inconsistent on resubmission, review, crossover, or cracking of the same unchanged card;

h.      that PSA retained and used the ability to deactivate, modify, downgrade, alter, or effectively erase certification records after issuance;

i.      that PSA's population reports could reflect subjective, inconsistent, ratio-influenced, duplicate, stale, cracked-out, crossed-over, or otherwise distorted grade counts;

j.      that PSA could impose post-submission declared-value, Maximum Insured Value, adjusted grading fee, or upcharge demands after obtaining possession of the card and after its own grade helped create or confirm the card's market value;

k.      that PSA's Guarantee did not provide the protection consumers would reasonably expect, including because the original submitter or payor may be excluded and because PSA controls error determination, valuation, and remedy;

l.      that PSA's online terms, including arbitration provisions, class waivers, liability caps, warranty disclaimers, and subjective-opinion language, were not shown to downstream beneficial owners submitting through Card Grading Intermediaries; and

167

m.     that Collectors' vertically integrated pricing, custody, offer, resale, lending, marketplace, and submission-channel infrastructure created undisclosed conflicts tied to the very grades and scarcity signals PSA marketed as neutral.

386.   Defendants had a duty to disclose those material facts because they chose to speak about the very subjects the omitted facts qualified. PSA affirmatively represented that grading was expert-driven, standardized, criteria-based, reliable, accountable, and market-authoritative; that trained experts applied recognized and respected universal grading standards; that PSA grades, holders, labels, certification numbers, population reports, and guarantees could be trusted; and that PSA's service tiers, pricing, turnaround times, and upcharge practices accurately described the services being purchased. Once Defendants made those partial representations, they had a duty to disclose the omitted facts necessary to make their statements not misleading.

387.   Defendants concealed those facts through affirmative conduct and controlled omissions, including anonymous grading; nondisclosure of grader identities, qualifications, training, calibration, consistency, and performance metrics; confidentiality restrictions on graders and former graders; separated and collapsed pricing disclaimers; hyperlinked Online Terms; limited Guarantee language; nondisclosure of resubmission grade-change rates; nondisclosure of error, deactivation, downgrade, or certification-alteration rates; nondisclosure of population-report limitations; and market-facing slabs, labels, certification tools, population reports, and pricing tools that communicated reliability without disclosing the internal facts that undermined it.

388.   Defendants intended Plaintiff and Class members to rely on the misleading impression created by their half-truths and omissions. PSA engineered that reliance through its websites, grading standards, pricing pages, guarantee language, graded-card slabs, labels,

168

certification numbers, certification-verification tools, population reports, dealer programs, Card Grading Intermediaries, hobby-media messaging, and marketplace integrations.

389.     Plaintiff and members of the putative classes and subclasses took action in reliance on Defendants' concealment and the misleading impression Defendants created, including submitting cards for PSA grading and Grading Credential, selecting service tiers, paying or reimbursing PSA Grading-Related Charges, paying shipping, handling, insurance, or return charges, accepting or paying post-submission charges, and treating PSA grades, certification numbers, and population reports as reliable market credentials. Had Defendants disclosed the omitted facts, Plaintiff and reasonable consumers would not have submitted cards on the same terms, paid the same charges, accepted the same upcharges, relied on PSA's certification product in the same way, or paid as much.

390.     As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff and members of the putative classes and subclasses sustained actual economic damages that include payment or reimbursement of Grading-Related Charges for a certification product or Grading Credential materially different from the one PSA marketed, including payment of upcharges, repeat-service fees, speed premiums, shipping, handling, insurance, and related charges; overpayment for services represented as expert, standardized, reliable, and market-authoritative; and loss of the benefit of the bargain.

391.     Defendants acted knowingly, intentionally, and with malice because they had superior knowledge of their own graders, grading process, production environment, standards, certification records, fee architecture, population-report limitations, guarantee limitations, and downstream conflicts, yet continued to market PSA grading as expert, objective, standardized, reliable, guaranteed, and market-authoritative while concealing the facts that made those

169

statements misleading. Plaintiff is therefore entitled to recover punitive damages to the extent permitted by law.

392.    WHEREFORE, Plaintiff, individually and on behalf of the putative Class, requests that this Court enter judgment against Defendants on this cause of action as follows:

a.    an award of actual damages, including overpayment, loss-of-benefit-of-the-bargain damages, PSA Grading-Related Charges paid or reimbursed for a certification product or Grading Credential not delivered as represented, transaction costs, and any diminished value, reduced marketability, reduced liquidity, or reduced certification reliability proven at trial;

b.    an award of restitution and/or disgorgement to the extent permitted by law, including the return of fraudulently obtained grading fees, upcharges, expedited-service premiums, repeat-service fees, shipping, handling, insurance, return-shipment charges, and other PSA Grading-Related Charges;

c.    an award of punitive damages based on Defendants' knowing, intentional, malicious, and reckless misconduct, to the extent permitted by law;

d.    an award of pre-judgment and post-judgment interest;

e.    an award of attorneys' fees and costs to the extent permitted by law; and

f.    such other and further relief as the Court deems just and proper.

### SEVENTH CLAIM FOR RELIEF

**NEGLIGENT MISREPRESENTATION**
**(PLEADED IN THE ALTERNATIVE)**
**(Against All Defendants)**

393.    Plaintiff reasserts, realleges, and incorporates herein by reference all preceding allegations when asserting the foregoing cause of action.

394.    This claim is brought under Maryland common law, including principles reflected in Restatement (Second) of Torts § 552 (Am. L. Inst. 1977), as recognized and applied by Maryland courts in negligent-misrepresentation cases involving economic loss, professional information, and privity-equivalent relationships. *See Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645 (2000); *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527 (1986).

395.    Pleaded in the alternative to Plaintiff's intentional-fraud claims, Defendants, in the course of their business, profession, employment, and transactions in which they had a pecuniary interest, supplied false and misleading information for the guidance of Plaintiff, Class members, Card Grading Intermediaries, and the market in business and economic transactions.

396.    The information Defendants supplied was not casual commentary or a mere private opinion. Defendants supplied market-facing information designed to guide economic conduct, including representations and data concerning PSA's expert graders, universal grading standards, grading methodology, grading reliability, service tiers, pricing, Maximum Insured Value, upcharges, turnaround times, certification numbers, certification-verification records, slabs, labels, population reports, guarantees, price guides, Card Ladder valuation data, PSA Vault services, PSA Partner Offers, and marketplace integrations.

397.    Defendants knew, or should have known, that Plaintiff, Class members, Card Market Participants, and other market participants would use that information to decide whether to submit cards, pay PSA Grading-Related Charges, select service tiers, pay speed premiums, accept or pay upcharges, resubmit cards, pursue review or crossover, buy, sell, hold, insure, finance, lend against, vault, or otherwise rely on PSA-certified cards.

398.    The relationship between Defendants' information and Plaintiff's economic decisions created the required intimate nexus. Defendants did not merely publish information to

171

an indeterminate public for unknown use. PSA designed its certification architecture so that a determinate and foreseeable class of beneficial card owners, submitters, Card Market Participants would rely on PSA's grading, certification, population, pricing, and market-authority information in connection with the PSA Grading . Defendants intended and expected that reliance because the value of PSA's business depends on it.

399. Defendants failed to exercise reasonable care or competence in obtaining, verifying, and communicating the information they supplied. Among other things, Defendants failed to exercise reasonable care in representing that PSA grading was expert-driven, objective, criteria-based, standardized, reliable, guaranteed, durable, and market-authoritative while omitting or miscommunicating material facts about grader qualifications, anonymous graders, trainee-dependent staffing, outside contractors, subjective eye appeal, inconsistent outcomes, production pressure, undisclosed standards changes, certification-record alteration, population-report limitations, Guarantee exclusions, upcharge practices, and Defendants' downstream conflicts.

400. Defendants' information was false, misleading, or materially incomplete. PSA represented that its grading was performed by expert graders applying recognized and respected universal standards through a reliable certification process. In reality, Plaintiff alleges PSA's process depended on undisclosed subjectivity, malleable criteria, inconsistent application, production pressure, anonymous or insufficiently credentialed graders, hidden discretion, revisable certification records, and population data that could be distorted, stale, duplicate, ratio-influenced, or otherwise misleading.

401. Plaintiff and Class members justifiably relied on Defendants' false or misleading information. Plaintiff relied on this information when he submitted his cards for PSA grading,

selected service tiers, paid or reimbursed PSA Grading-Related Charges, treated PSA grades and population data as authoritative, and accepted PSA's market-facing certification product as the reliable output of expert and standardized grading. Class members relied on this information in the same or materially similar ways, directly or through Card Grading Intermediaries and the PSA-centered market Defendants built.

402.    Plaintiff's reliance was reasonable because Defendants possessed superior and specialized knowledge concerning their own graders, grading process, standards, quality-control systems, production environment, fee architecture, Guarantee limitations, certification records, population-report data, and downstream conflicts. Plaintiff and Class members could not reasonably discover those facts before submission or payment.

403.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff and Class members suffered pecuniary loss, including payment or reimbursement of PSA Grading-Related Charges for a certification product materially different from the one represented; overpayment for grading services marketed as expert, standardized, reliable, and market-authoritative; payment of upcharges, speed premiums, repeat-service fees, shipping, handling, insurance, and related charges; and loss of the benefit of the bargain to the extent recoverable under Maryland law.

404.    This claim does not seek to enforce any PSA Online Terms, submission contract, dealer agreement, or group-submission agreement. Plaintiff pleads this claim in tort and in the alternative, based on Defendants' supply of false or misleading information for the guidance of others in economic transactions.

405.    WHEREFORE, Plaintiff requests actual damages, restitution to the extent permitted by law, prejudgment and post-judgment interest, attorneys' fees and costs where recoverable, and all other relief the Court deems just and proper.

### EIGHTH CLAIM FOR RELIEF

**NEGLIGENCE IN RENDERING SPECIALIZED TRADE SERVICES**
**MARYLAND COMMON LAW AND**
**RESTATEMENT (SECOND) OF TORTS § 299A**
**(PLEADED IN THE ALTERNATIVE)**
**(Against All Defendants)**

406.    Plaintiff reasserts, realleges, and incorporates by reference all preceding allegations when asserting this cause of action.

407.    This claim is brought under Maryland common law and the principles reflected in Restatement (Second) of Torts § 299A (Am. L. Inst. 1965), titled "Undertaking in Profession or Trade." One who undertakes to render services in the practice of a profession or trade must exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities. *See id.* Maryland law similarly recognizes that professionals and specialized service providers are held to the standard of care applicable to their profession or trade. *See Jacques*, 307 Md. At 527 (1986); *Walpert*, 361 Md. 645.

408.    PSA undertook to render specialized trade services by offering authentication, grading, encapsulation, certification, certification verification, population reporting, review, crossover, resubmission, reholdering, relabeling, and related trading-card grading services. PSA held itself out as possessing superior skill, specialized knowledge, expert graders, universal grading standards, reliable methodology, and market-authoritative certification infrastructure.

409.    PSA's undertaking was not limited to assigning a number. PSA also provided a market-facing certification product and Grading Credential that included authentication, condition evaluation, a numerical grade, encapsulation in a PSA holder, a proprietary label, a

certification number, an entry in PSA's certification-verification system, population-report consequences, guarantee messaging, and PSA brand authority.

410.    PSA owed Plaintiff and Class members a duty to exercise reasonable care, skill, knowledge, and competence in rendering those specialized trade services. That duty arose from PSA's undertaking, PSA's superior knowledge, PSA's market-facing representations of expertise and reliability, the known economic use of PSA's certification product, and the intimate nexus between PSA's grading work and the pricing, resale, insurance, lending, financing, liquidity, and marketability of PSA-certified cards.

411.    Collectors owed the same duty to the extent it directed, controlled, ratified, or participated in PSA's grading operations, grading-capacity expansion, staffing, fee architecture, population-report practices, certification infrastructure, downstream monetization, and market-facing representations. Collectors cannot direct and profit from PSA's specialized grading infrastructure while avoiding responsibility for the negligent operation of the trade services it controlled and monetized.

412.    Defendants breached their duty by failing to exercise the skill, knowledge, and care normally required of a specialized trade service holding itself out as expert, standardized, reliable, and market authoritative. Defendants' breaches included, without limitation:

a.    failing to use sufficiently qualified, trained, calibrated, and supervised graders;

b.    failing to require prior professional grading experience, specialized training, independent certification, or comparable credentials before allowing graders to participate in the grading process;

175

c.    relying on trainees, recently hired personnel, hobbyists, and outside contractors of undisclosed qualifications while marketing grading as expert review;

d.    failing to disclose or control the role of subjective "eye appeal" judgments in grading outcomes;

e.    failing to maintain stable, transparent, and consistently applied grading criteria;

f.    changing, reinterpreting, or qualifying published standards without adequate consumer notice;

g.    operating a high-volume production environment with short review windows, production expectations, and speed pressure inconsistent with careful expert review;

h.    failing to maintain adequate grader tracking, quality-control, calibration, and error-review systems;

i.    failing to disclose the frequency of inconsistent grades, resubmission grade changes, clerical errors, certification deactivations, downgrades, and after-the-fact certification alterations;

j.    failing to maintain accurate, reliable, and non-duplicative population-report data;

k.    failing to provide meaningful recourse or quality assurance for the consumer who paid for the grading service; and

l.    failing to render the grading and certification services with the care commensurate with a service Defendants knew would influence pricing, resale, insurance, lending, financing, liquidity, and consumer reliance.

413.    Plaintiff does not allege in this count that PSA was required to achieve perfection or that every grading disagreement constitutes negligence. Plaintiff alleges Defendants failed to use reasonable care in the process, staffing, training, calibration, quality control, standards administration, certification-record management, and disclosure practices behind the market-facing certification product PSA sold.

414.    This claim survives even if Defendants characterize PSA grades as mere opinions. A trade professional may provide an opinion while still having a duty to use reasonable care, skill, knowledge, methodology, and competence in forming, communicating, documenting, and certifying that opinion. PSA did not sell an abstract opinion; it sold specialized grading and certification services represented as expert, standardized, reliable, and market-authoritative.

415.    Defendants' breaches proximately caused Plaintiff and Class members to suffer economic injury. Plaintiff and Class members paid or reimbursed PSA Grading-Related Charges for specialized grading services not rendered with the care, skill, knowledge, and competence PSA represented and the trade required. Those charges included grading fees, service-tier charges, speed premiums, Maximum Insured Value charges, upcharges, review fees, resubmission fees, crossover fees, reholdering or relabeling charges, shipping, handling, insurance, return-shipment charges, and related costs.

416.    Had Defendants exercised reasonable care in rendering PSA's specialized trade services—or had Defendants disclosed the true nature of their grading process, staffing, standards, production environment, quality control, certification-record practices, population-report limitations, and fee leverage—Plaintiff and Class members would not have submitted cards on the same terms, selected the same service tiers, paid the same charges, accepted the same upcharges, or paid as much.

417.     This claim is pleaded in the alternative as an independent tort duty arising from Defendants' undertaking to render specialized grading and certification services while holding themselves out as expert, standardized, reliable, and market-authoritative.

418.     WHEREFORE, Plaintiff requests actual damages, restitution to the extent permitted by law, prejudgment and post-judgment interest, costs, and all other relief the Court deems just and proper.

## NINTH CLAIM FOR RELIEF

### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT, MD. CODE ANN., COM. LAW §§ 13-101 ET SEQ.
### (Against All Defendants)

419.     Plaintiff reasserts, realleges, and incorporates herein by reference all preceding allegations when asserting the foregoing cause of action.

420.     Plaintiff is a consumer within the meaning of Md. Code Ann., Com. Law § 13-101(c)(1).

421.     Each Defendant is a merchant within the meaning of Md. Code Ann., Com. Law § 13-101(g)(1) in that each directly or indirectly offers or makes available to consumer goods or consumer services.

422.     PSA Grading-Related Services are consumer services within the meaning of the Maryland Consumer Protection Act. Defendants did not merely sell a numerical opinion. They sold a market-facing certification product that included authentication, grading, encapsulation, a proprietary label, a certification number, access to PSA's certification-verification system, population-report inclusion, guarantee messaging, and PSA brand recognition. Defendants marketed that certification product as the output of expert graders applying recognized universal standards through a reliable and market-authoritative process.

178

423.    Defendants engaged in unfair, abusive, and deceptive trade practices in violation of the Maryland Consumer Protection Act, including the following:

a.    **Expert-grader misrepresentations.** Defendants represented that PSA grading was performed by expert graders with specialized skill, experience, and judgment sufficient to evaluate valuable cards with precision and consistency. Those representations had the capacity, tendency, and effect of deceiving consumers because PSA allegedly used anonymous graders of undisclosed qualifications, trainee-dependent staffing, hobbyist-based hiring criteria, and outside contractors while concealing grader identities, qualifications, training, consistency data, and performance metrics.

b.    **Universal-standard misrepresentations.** Defendants represented that PSA grading was objective, criteria-based, standardized, and governed by recognized and respected universal grading standards. Those representations were misleading because PSA allegedly applied malleable criteria, undisclosed or shifting grading standards, subjective "eye appeal" judgments, market-acceptance reasoning, and inconsistent grading outcomes that made the actual process materially different from the uniform standards PSA advertised.

c.    **Reliable-certification misrepresentations.** Defendants represented that a PSA grade, slab, label, certification number, guarantee, certification-verification record, and population-report entry created a reliable, durable, market-recognized credential. Those representations were misleading because PSA allegedly retained and used the ability to revise, deactivate, downgrade, alter, or effectively erase certification records; limited the practical protection of its Guarantee; and published population data that could be stale, duplicate, distorted, or based on subjective and inconsistent grading outcomes.

179

d.     **Price-premium and market-value misrepresentations.** Defendants represented, expressly and by implication, that PSA certification justified grading fees, price premiums, increased liquidity, enhanced marketability, and market reliance because PSA grades were expert, standardized, reliable, and authoritative. Those representations were misleading because the value premium Defendants encouraged consumers to pay depended on the very expertise, standards, reliability, neutrality, and certification integrity Defendants allegedly failed to provide.

e.     **Material omissions.** Defendants failed to disclose material facts concerning grader qualifications, grader anonymity, training limitations, subjective eye-appeal discretion, undisclosed standards changes, grading variability, production pressure, certification-record alteration, population-report limitations, Guarantee exclusions, upcharge practices, possession-based pricing leverage, and Defendants' downstream conflicts in pricing, custody, resale, offers, lending, and marketplace channels.

f.     **Deceptive fee practices.** Defendants used misleading pricing and fee practices, including the visible price-value-speed package, separated turnaround-time disclaimers, Maximum Insured Value and declared-value pricing, adjusted grading fees, upcharges, partitioned pricing, repeat-service charges, and possession-based payment leverage, to extract PSA Grading-Related Charges from consumers who had already committed their cards to PSA's system.

424.   Taken together, Defendants' statements and omissions created the misleading impression that PSA-certified cards received their market value from expert graders applying fixed universal standards through a reliable certification system. That impression was false or

180

materially incomplete. Consumers were led to believe that PSA grades reflected the card's condition under standardized criteria, when Plaintiff alleges the PSA credential was instead affected by undisclosed subjectivity, grader limitations, shifting standards, production pressure, internal discretion, certification-record control, and financial conflicts.

425.    Plaintiff and/or Maryland Subclass members relied on Defendants' misleading representations and omissions when they submitted cards for PSA grading, paid or reimbursed PSA Grading-Related Charges, selected service tiers, paid speed premiums, accepted or paid upcharges, paid shipping, handling, insurance, or return charges, pursued review, resubmission, crossover, reholdering, relabeling, or related services, and treated PSA grades, certification numbers, and population reports as reliable market credentials. Had Defendants disclosed the truth, reasonable consumers would not have submitted cards on the same terms, paid the same charges, accepted the same upcharges, or paid as much.

426.    As a direct and proximate result of Defendants' violations of the Maryland Consumer Protection Act, Plaintiff and Maryland Subclass members sustained injuries.

427.    Plaintiff and Maryland Subclass members suffered actual economic injury, including payment or reimbursement of PSA Grading-Related Charges for a certification product not delivered as represented; overpayment for grading services marketed as expert, standardized, reliable, and market-authoritative; payment of Grading-Related Charges caused by Defendants' deceptive pricing and fraudulent grading practices; and loss of the benefit of the bargain because consumers paid for a reliable PSA certification credential but received a materially different product.

428.   WHEREFORE, Plaintiff requests actual damages, restitution and disgorgement to the extent permitted by law, declaratory and injunctive relief, reasonable attorneys' fees, costs, and all other relief authorized by Md. Code Ann., Com. Law § 13-408 and applicable law.

## TENTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED
### (PLEADED IN THE ALTERNATIVE)
### (Against All Defendants)

429.   Plaintiff reasserts, realleges, and incorporates herein by reference all preceding allegations when asserting the foregoing cause of action

430.   Pleaded in the alternative to Plaintiff's statutory claims, Plaintiff conferred a benefit on Defendants by paying or reimbursing Grading-Related Charges. The benefit Plaintiff seeks to recover is the money they paid or reimbursed, not the performance of any contract. This Claim is pleaded solely in the alternative, does not seek to enforce and does not depend upon any submission contract or Online Terms, and is asserted to prevent Defendants' inequitable retention of those payments; it is not, and shall not be construed as, an election to embrace, ratify, or accept the benefits of any contract containing an arbitration provision, class-action waiver, or other limitation of rights.

431.   Defendants knew of and appreciated the benefit conferred.

432.   Defendants accepted and retained the benefit under circumstances in which it would be inequitable for Defendants to retain the benefit without paying value in return, given the fraudulent, deceptive conduct alleged herein.

433.   As a direct and proximate result of Defendants' unjust enrichment, Plaintiff sustained damages.

434.   WHEREFORE, Plaintiff requests restitution, disgorgement, and such other and further equitable relief as is just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Class, and the Subclasses DEMAND:

A.  A jury trial on all issues so triable;

B.  Such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets where appropriate, and an order preserving the status quo with respect to the announced BGS acquisition;

C.  Entry of a permanent injunction prohibiting Defendants from engaging in further fraudulent, deceptive conduct, including, where supported by the evidence, divestiture of the SGC and BGS acquisitions.

D.  A declaration that Defendants' Online Terms, including the arbitration clause and class-action waiver, do not bind Plaintiff or the Class, and, in the alternative, that those terms are unconscionable and unenforceable as applied;

E.  An award of actual, statutory, treble, and punitive damages as authorized by law, including treble damages under 18 U.S.C. § 1964(c);

F.  Restitution, disgorgement, rescission, and reformation as appropriate;

G.  An award of attorneys' fees, expert fees, and costs of suit as authorized by 18 U.S.C. § 1964(c), Md. Code Ann., Com. Law § 13-408, and other applicable law; and

H.  Such other and additional relief as the Court may determine to be just and proper.

On this 28th day of July, 2026.                      Respectfully submitted,

                                        */s/ Thomas R. Bundy III*

                                        Thomas R. Bundy III
                                        Federal Bar No. 15265

183

ADVOCARE LEGAL GROUP,
A Member of Zealous Advocates
8115 Maple Lawn Boulevard
Suite 275
Fulton, Maryland 20789
Telephone:    (240) 500-3595
Facsimile:    (240) 657-1109
Thomas.Bundy@Z-Advocates.com

Jeremy Eldridge
Federal Bar No. 29830
Adam Crandell
Federal Bar No. 29463
ELDRIDGE CRANDELL LLC,
A Member of Zealous Advocates
One South Street
Suite 2150
Baltimore, Maryland 21202
Telephone:    (443) 559-4384
Facsimile:    (443) 288-6633
Jeremy.Eldridge@Z-Advocates.com
Adam.Crandell@Z-Advocates.com

Andrew D. Herman
Pro Hac Vice Motion Forthcoming
Stanley Brand
Pro Hac Vice Motion Forthcoming
THE HERMAN LAW FIRM LLC
A Member of Zealous Advocates
1775 Pennsylvania Ave., NW
Suite 650
Washington, D.C. 20006
Telephone:    (202) 350-3397
Andrew.Herman@Z-Advocates.com
Stan.Brand@Z-Advocates.com

*Counsel for Plaintiff*

184