**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

**Nicholas Funk**
109 West Hill Street
Baltimore, Maryland 21230
Baltimore City

**George Muresan**
1072 30th ST NW
Washington, DC 20007

**Victor Muresan**
445 West 35th St, Apt 3n
New York, New York 10001

**Daniel J. Meyerpeter**
10730 Judy Lane
Columbia, Maryland 21044
Howard County

**For themselves and for similarly situated individuals,**

Plaintiffs,

**vs.**

**COLLECTORS UNIVERSE, INC., d/b/a**
**PROFESSIONAL SPORTS AUTHENTICATOR,**
1610 East Saint Andrew Place
Santa Ana, California 92705

**COLLECTORS HOLDINGS, INC.,**
1610 East Saint Andrew Place
Santa Ana, California 92705

Defendants.

**JURY TRIAL DEMANDED**

**Civil Action No. 1:26-cv-2933**

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, MONETARY DAMAGES, INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL**

Table of Contents

**NATURE OF THE ACTION** .......... **1**

**PARTIES AND NON-PARTIES** .......... **16**

**JURISDICTION AND VENUE** .......... **34**

**COMMON FACTUAL ALLEGATIONS** .......... **36**

I. The Origins and Consolidation of the Modern Trading-Card Grading Industry .......... 36

II. Defendants' Market Control Has Become Central to the Investment-Driven Trading-Card Market .......... 41

A. Manufacturing and Intellectual Property .......... 42

B. Grading and Authentication - PSA as the Market Credential .......... 43

C. Pricing, Data Aggregation, and Analytics — Card Ladder .......... 44

D. Financialization Through Custody, Resale and Acquisition - PSA Vault, PSA Partner Offers, and Collectors Financial Services .......... 46

E. Marketplace Integration and Secondary-Market Flow .......... 48

F. Market Communication, Influence, Solicitation, and Intake .......... 49

III. Defendants Scaled a PSA-Centered Financial Marketplace Built on PSA Grades .......... 52

IV. Defendants' Consumer-Facing Grading and Authentication Representations and Practices Promising Impartial, Expert, Objective, and Standardized Review .......... 55

A. The Grading Workflow PSA Markets to Consumers .......... 55

B. PSA's Public Promise: Expert, Standardized, Objective, and Reliable Review .......... 57

C. Consumers See PSA's Price, Value, and Speed Package .......... 59

V. Defendants' Fraudulent Grading Scheme and Deceptive Fee Practices .......... 62

A. PSA's Fraudulent Grading Methodology and False Market Credential .......... 62

B. PSA's Deceptive Fee Model Monetizes the False Graded Card Credential .......... 87

C. Collectors Scaled PSA's Fraud Through Vertical Integration .......... 99

D. Card Grading Intermediaries Were Also Misled and Passed PSA's Misrepresentations to Consumers .......... 100

VI. Plaintiffs and the Putative Class Relied on Defendants' Misrepresentations, Omissions, and Market Credential .......... 101

VII. Common Factual Allegations Supporting Plaintiffs' RICO Counts .......... 109

A. Overview of Defendants' RICO Scheme Based in Fraud .......... 109

B. Particularities of Mail Fraud — 18 U.S.C. § 1341 .... 112
C. Particularities of Wire Fraud — 18 U.S.C. § 1343 .... 113
D. Each Predicate Act Caused, Furthered, or Concealed the Deceptive Practices .... 114
E. Defendants Engaged in a Pattern of Racketeering Activity .... 115
F. Defendants Conducted the Affairs of RICO Enterprises .... 117
G. Collectors' Receipt and Use or Investment of Racketeering Income - 18 U.S.C. § 1962(a) .... 118
H. The Enterprises and Predicate Acts Affect Interstate Commerce .... 120
I. Plaintiffs Sustained Injuries by Reason of Defendants' Conduct .... 120
J. Plaintiffs' Claims Are Timely .... 124
**CLASS ACTION ALLEGATIONS .... 125**
I. Proposed Classes and Subclasses .... 126
II. Ascertainability and Class Records .... 128
III. Numerosity .... 129
IV. Commonality .... 129
V. Typicality .... 131
VI. Adequacy .... 132
VII. Predominance Under Rule 23(b)(3) .... 132
VIII. Superiority Under Rule 23(b)(3) .... 133
IX. Rule 23(b)(2) .... 134
X. Classwide Damages and Restitution .... 135
**CAUSES OF ACTION AND CLAIMS FOR RELIEF .... 136**
FIRST CLAIM FOR RELIEF .... 136
SECOND CLAIM FOR RELIEF .... 138
THIRD CLAIM FOR RELIEF .... 141
FOURTH CLAIM FOR RELIEF .... 143
FIFTH CLAIM FOR RELIEF .... 145
SIXTH CLAIM FOR RELIEF .... 149
SEVENTH CLAIM FOR RELIEF .... 152
EIGHTH CLAIM FOR RELIEF .... 155
PRAYER FOR RELIEF .... 156

Plaintiffs Nicholas Funk, George Muresan, Victor Muresan, and Daniel Meyerpeter (collectively, "Plaintiffs"), by and through their undersigned counsel, pursuant to Fed. R. Civ. P. 15(a)(1) and 23(a), (b)(2), and (b)(3), and based on Plaintiffs' personal knowledge and their counsel's reasonable investigation,[1] bring this First Amended Complaint for themselves and for similarly situated consumers against Defendants Collectors Universe, Inc., doing business as Professional Sports Authenticator ("PSA"), and Collectors Holdings, Inc. ("Collectors") (collectively, "Defendants"). In support thereof, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1. Trading cards are paperboard cards that feature athletes, fictional characters, or cultural icons that consumers collect. This case concerns Defendants' process for grading trading cards, which involves evaluating a card's authenticity and physical condition before it is encased in a plastic holder, labeled with a score, and returned to the market as a certified credential.

2. PSA launched the modern card-grading industry in July 1991. From its inception, PSA has represented that strict rules govern card grading:

> *"[Cards that] bear evidence of trimming, re-coloring, restoration, or any other forms of tampering … will not be graded."*
>
> — *PSA Grading Standards*[2]

But the very first card graded by PSA broke that venerable rule.

3. PSA assigned certificate number 00000001 to the most famous baseball card in the world, a T206 Honus Wagner. That card had been secretly trimmed years earlier to improve its appearance before PSA graded it, a fact the grader later acknowledged that he knew when he

---

[1] This complaint's allegations are based on Plaintiffs' personal knowledge and on information and belief for all other matters. Allegations made on information and belief are based on counsel's reasonable investigation and on facts and circumstances within Defendants' exclusive possession or control. Those allegations are identified because they likely will have evidentiary support after a reasonable chance for discovery, consistent with Fed. R. Civ. P. 11(b)(3).

[2] *Grading Standards*, PSA, https://www.psacard.com/gradingstandards (last visited Sept. 28, 2026).

graded the card.[3] PSA's own published standards prohibited grading altered cards. But PSA graded that card anyway, assigning it a Near Mint-Mint 8 (the highest grade a T206 Wagner has ever received). PSA then sealed it in a tamper-evident holder bearing that grade and released it into the trading-card market.[4] PSA neither disclosed the trimming on the holder, nor withdrew the grade when learning about the alteration.[5] That card later sold for $2.8 million and it remains encapsulated in a PSA 8 holder with an active certification today.[6]

4. The number printed on that holder is now worth millions, but that value was born from a lie. PSA's first grade was not a minor defect in a system later corrected; it became the blueprint for the modern grading market that Defendants built. A number sealed in plastic and backed by claimed authority can create extraordinary value only if the market believes that it reflects a neutral, expert, standardized, and reliable determination. What began with one card has become a market exceeding $15 billion annually. Defendants did not escape the fraud created on day one; they scaled it. The market now views PSA's grades as an authoritative credential only because Defendants have concealed material facts about the true nature of those grades.

5. This case challenges PSA's fraudulent grading practices and deceptive fee model, and Collectors' role in making both profitable at scale. PSA sells card grading as expert-driven, criteria-based, unbiased, and reliable, producing an authoritative, market-facing credential. Plaintiffs allege that PSA delivers something materially different: a subjective, inconsistent,

---

[3] *See* Tom Bartsch, Mastro Pleads Guilty, Admits Trimmed Wagner, Sports Collectors Digest (Oct. 10, 2013), https://sportscollectorsdigest.com/collecting-101/mastro-pleads-guilty-admits-trimmed-wagner.

[4] *See* Junk Wax Hero, *The PSA Trimming Scandal on the Wayne Gretzky T206 Honus Wagner*, YOUTUBE (Dec. 2, 2022), https://www.youtube.com/watch?v=_pzkd0mlKjU (PSA grader Bill Hughes "admitted knowing at the time that he graded it that it was altered").

[5] *See Cert #00000001*, PSA, https://www.psacard.com/cert/00000001/psa (last visited Sept. 28, 2026) (reflecting that the T206 Honus Wagner remains certified at grade NM-MT 8 and has never been downgraded or withdrawn).

[6] *See World Record $2.8 Million Paid for Famed T206 Honus Wagner Baseball Card*, PSA (Sept. 6, 2007), https://www.psacard.com/articles/articleview/5077/world-record-2-8-million-paid-famed-t206-honus-wagner-baseball-card.

financially conflicted grading system backed by obscured Online Terms that purport to disclaim standards, compel arbitration, and limit remedies. Plaintiffs paid for expertise, standards, and reliability; PSA delivered manufactured uncertainty and charged them for it using dark-pattern pricing designed to extract more fees. Collectors amplified the scheme by consolidating grading alternatives, connecting PSA grades to Collectors' downstream monetization, and profiting from the market reliance PSA created. Through this system, PSA processed millions of cards monthly and collected more than a billion dollars in fees during the relevant limitations period. Plaintiffs seek recovery of those fraudulently obtained fees for themselves and the putative class under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Maryland Consumer Protection Act, and applicable common law.

***The Trading-Card Market***

6. Trading cards have existed since the late 1800s. What began as a hobby centered on collecting, trading, and preserving childhood memorabilia has evolved into a multibillion-dollar commercial market. The modern card market no longer turns only on nostalgia; it increasingly involves the conversion of cards into trusted, graded financial assets.

7. The trading-card market has both a primary and secondary tier. In the primary tier, manufacturers sell boxes containing sealed packs of randomly assorted, machine-generated cards. Once sold, those boxes enter the secondary market, where purchasers may resell them or open them and sell the individual cards inside. These secondary transactions occur through online platforms, local card shops, trade shows, auction houses, retail channels, and private sales.

8. In the secondary market, a card's value depends largely on popularity, scarcity, authenticity, and condition. The card has value before grading, but its condition often is not independently determined by buyers and sellers. Instead, third-party grading companies, like

PSA, assess a card's condition and assign numerical grades, typically from 1 to 10. That grade becomes a market-recognized proxy for value and can materially change how the existing asset is priced, marketed, and traded, with higher grades often commanding substantial premiums. Grading therefore does not create all of the card' underlying value, but it adds an economically consequential market credential to an asset that already exists.

9. Small differences in a card's condition can translate into substantial differences in value. Thus, the grade has become the market's shorthand for value. It often determines whether a card is treated as a mere keepsake or as an investment-grade asset. As a result, control over the grade represents substantial control over how value is recognized in the trading-card market.

***Defendants Control Key Components of the Card Market While Holding Conflicted Positions***

10. Defendants have substantial control of the trading-card market. Collectors owns Defendant PSA, acquired Sportscard Guaranty ("SGC"), and entered into a transaction to acquire Beckett Grading Services ("BGS" or "Beckett"), formerly independent grading brands. Through that consolidation, Collectors' grading brands account for a dominant share of the third-party card-grading market, with PSA alone reported to account for approximately seventy percent of graded-card volume.[7] Defendants do not dispute this statistic. In their own filings in a separate action challenging their grading monopoly, Defendants state PSA "is the leading card grading service provider," having graded 19.2 million of approximately 26.6 million cards graded by the four major graders in 2025.[8]

11. Collectors' interests extend beyond card grading. Through acquired businesses and commercial integrations, Collectors participates in trading-card pricing and valuation

---

[7] *See* Ben Burrows, *Led by PSA, Collectors corners even more of grading market by acquiring Beckett*, YAHOO! SPORTS (Dec. 16, 2025), https://sports.yahoo.com/articles/led-psa-collectors-corners-even-230000416.html.

[8] Defs.' Mot. to Dismiss, *Rasmussen v. Collectors Holdings Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 8, 2026), ECF No. 21 [hereinafter Rasmussen MTD] at 10.

through Card Ladder; custody and resale through the PSA Vault and related market integrations; liquidity and acquisition through PSA Partner Offers; and even asset-backed lending through Collectors Financial Services. These businesses operate in a feedback loop where PSA grades influence pricing, valuation, acquisition, resale, liquidity, and lending, while those same factors, in turn, influence PSA's grading practices.

12. Within that integrated system, PSA also publishes the market's principal graded card scarcity signal. Each graded card is entered into PSA's population reports, which track how many copies of a given card exist at each grade level. These population reports are widely relied upon by buyers, sellers, marketplaces, and pricing tools as indicators of rarity. A lower population at a given grade level can materially increase perceived scarcity, which then drives price and demand and that translates into more value.

13. Taken together, this integrated system places Defendants on both sides of the card grading market. PSA assigns grades, issues certifications, and publishes population data, while Collectors participates in pricing, custody, resale, lending, liquidity, and marketplace pathways ("Downstream Channels") tied to those same graded credentials. This dual position represents a conflict. The financial interests in those same graded card credentials also extend to Defendants' senior leadership and employees, including graders, who own graded cards personally.[9] Because PSA's grades and population data may affect the value of cards they personally own, these same individuals have a financial interest in the same market their grading work can influence. They help create economically consequential grades and scarcity signals while personally owning cards whose value can be affected by those outputs. This dual position also represents a conflict. Yet, PSA still markets its grading as impartial, independent, and free from financial conflicts.

[9] *Infra* ¶¶ 139–141.

14. PSA has stated repeatedly that its grading is the product of an impartial, objective, third-party process, emphasizing it has no financial stake in the sale of the cards it evaluates.[10] But through their vertically integrated system, Defendants now monetize PSA grades through Collectors' Downstream Channels. And their senior leadership and personnel, including graders, buy and sell graded cards through those same channels. That structure is incompatible with the disinterested, neutral role PSA portrays to consumers and the card market, as Congressman Pat Ryan recently noted.[11]

15. Defendants do not adequately disclose their conflicts. They market PSA grading as impartial and objective while operating a system in which grading decisions are intertwined with Defendants' own downstream monetization or personal interests. That omission is material. Any reasonable consumer would consider it important to know that the entity assigning grades and publishing scarcity data also monetizes, or has a stake in, the value, liquidity, and even the transactions that those very grades help create. By concealing those conflicts, Defendants misled consumers and the market about PSA's impartiality. But those misrepresentations are only one part of the scheme. The deeper fraud is that Defendants have engineered market reliance on PSA's grading credential by concealing the lack of not only neutrality and impartiality, but also the expertise, objectivity, and reliability behind it.

***How Defendants' Fraudulent Card-Grading Scheme Works***

16. PSA engineered market reliance by selling more than a mere abstract opinion. PSA sells a market-facing certification product: the allegedly expert-determined grade result,

---

[10] *See, e.g., Tips for Collectors*, PSA, https://www.psacard.com/resources/guides (last visited Sept. 28, 2026) ("With impartial, third-party validation, someone other than a seller has offered an opinion about the item that's up for sale. . . . Unlike the seller, we have no financial stake in the item's sale. All perceived conflict of interest is eliminated, and so is the risk."); *see also infra* ¶¶ 139–141 (addressing conflicts at a multiple levels).

[11] Rep. Pat Ryan, *Letter to Andrew N. Ferguson, Chairman, Fed. Trade Comm'n* (Dec. 18, 2025), https://patryan.house.gov/sites/evo-subsites/patryan.house.gov/files/evo-media-document/collectors-holdings-letter-12.18.25.pdf.

encapsulated holder or slab, the proprietary label, certification number, certification-verification system, population reports, price guides, dealer programs, guarantee messaging, and even PSA brand recognition (collectively "Graded Card Credential"). Defendants intended the buyers, sellers, collectors, dealers, auction houses, marketplaces, insurers, lenders, pricing tools, Card Grading Intermediaries, and downstream consumers to rely on the representations about that product (collectively "Card Market Participants"). Defendants cultivated reliance on PSA's Graded Card Credential to monetize that reliance through their Downstream Channels. And because the Graded Card Credential derives its authority from PSA's claim that qualified experts produce it, the truth about who actually grades the cards goes to the heart of the fraud.

17. PSA markets its graders as experts, but its own documents tell a different story. Before Collectors took PSA private in 2021, PSA admitted that qualified grading experts were "in short supply," and competition for them was "considerable," and that it relied on training young graders it believed could become experts.[12] Publicly available PSA grader profiles reflect backgrounds unrelated to trading cards or grading,[13] and PSA requires no prior professional card grading experience, specialized training, or certification—merely preferring that candidates have one to three years' experience and treating mere card collecting as qualifying experience.[14] When volume increases, PSA uses outside contractors, "usually [but not always] collectibles dealers," to meet short-term grading demand.[15] And PSA does not disclose who grades consumers' cards or their qualifications. PSA therefore depends materially on its own selection, testing, training, supervision, and quality controls to ensure that personnel performing the represented "expert"

---

[12] *Infra* ¶¶ 69, 131–136.

[13] *Infra* ¶ 134.

[14] *Infra* ¶ 133.

[15] *Infra* ¶¶ 69, 132.

services maintain basic grading skills PSA markets as expertise. PSA's recent $200 million infrastructure investment includes a new "Grader's University," underscoring the problem:[16] PSA is only now building the training infrastructure that consumers were led to believe already existed. But PSA shields these issues from public scrutiny by binding its graders and employees to strict nondisclosure agreements. Collectively, these practices expose the material gap between the marketed expert grading system upon which consumers rely and the opaque system that PSA actually operates. This expertise gap is central to Defendants' fraud.

18. PSA's own published materials expose another aspect of Defendants' fraud. PSA tells consumers that "the vast majority of grading is applied with a basic, objective standard," identifying measurable characteristics such as centering, print defects, staining, and surface wrinkles as objective components.[17] But in reality, its grading process relies on a subjective "eye appeal" override that is neither fixed, measurable, nor suitably disclosed. Rather than define "eye appeal" through a condition criterion, PSA defines it by asking: "What will the market accept for this particular issue?"[18] That question is neither a card grading standard, nor a subjective opinion. It is, at best, a guess about market tolerance. The grade should tell the market a card's condition, but PSA's formulation lets the market appetite tell PSA what the card can receive. That inversion is material. Consumers pay PSA grading fees for an expert-determined credential, not for a speculative, discretionary guess about undefined market acceptance. By selling standardized criteria and objectivity while relying on rampant subjectivity, PSA delivers a graded product that is materially different from the one that it sells to consumers, like Plaintiffs.

---

[16] PSA Staff, *PSA Announces $200 Million Infrastructure Investment to Support Global Demand*, PSA (May 14, 2026), https://www.psacard.com/articles/articleview/15715/200-million-investment-grading-experience.

[17] *Infra* ¶¶ 145–147.

[18] *Grading Standards, supra* note 2.

19. Plaintiffs further allege, on information and belief and as detailed below, that PSA's undisclosed grading practices—including production pressure, differing grader experience and assignment, subjective eye-appeal judgments, changing criteria, batch or ratio-based review, managerial intervention, and other internal practices[19]—can systematically affect which cards receive PSA's highest grades and therefore the scarcity premiums associated with them. These indicia of population control matter. Limiting a card's grade for reasons other than its condition is neither an objective determination nor a good-faith subjective opinion. It is a commercially managed output. Public population data and PSA-related incidents alleged below support the inference that grade populations are outputs of the grading system PSA controls rather than passive reflections of a card's actual condition. What matters is that PSA markets individual grades as criteria-based assessments and publishes their aggregate distribution as meaningful scarcity data without disclosing internal practices capable of systematically affecting either. Plaintiffs allege those practices include PSA population reports that contain known inaccuracies, which PSA has not adequately corrected.[20]

20. Perhaps nothing demonstrates grading's unreliability better than resubmissions, crossover submissions, and cracking. Resubmission allows a consumer to pay PSA to reconsider a prior assigned grade from its "experts." Crossover submissions allow a consumer to pay PSA to grade a card already graded by another company. Cracking involves the process of removing a graded card from its plastic holder and then resubmitting it for a grade without disclosure of the prior score. These practices exist because grading outcomes are highly variable. PSA monetizes that variability while continuing to market grading as consistent and reliable.

---

[19] *Infra* ¶¶ 131–167; *see specifically infra* ¶¶ 159–167 (grader speed, production pressure, ratio-based review, and Gem Mint-rate evidence).

[20] *Infra* ¶¶ 171–173.

21. Consumers do not pay merely to have cards sealed in plastic; they pay for a Graded Card Credential and the market acceptance it carries. Defendants obtained consumers' money while delivering a materially different product and profiting from the grading uncertainty they do not disclose. Shifting criteria, subjectivity, and inconsistent outcomes create chances for paid resubmissions, crossovers, reviews, and cracking, which generate repeat revenues while reinforcing dependence on PSA's Graded Card Credential. Defendants thus monetize grading variability while marketing the process as objective, criteria-based, and reliable.

***Defendants' Deceptive Grading Revenue Model***

22. PSA's pricing also uses deceptive practices. PSA does not charge a disclosed, fixed, final price for grading. It sells 'Service Levels' built around three consumer-facing signals: a headline per-card price, a "Maximum Insured Value," and an estimated turnaround time. PSA's pricing pairs those signals together, presenting grading as a price-value-speed package. Each component contributes to its deceptive pricing practices through dark patterns, which are user interfaces on websites and apps carefully crafted to trick or manipulate users into certain actions.

23. First, PSA advertises turnaround time in business days, which is a practice that misleadingly shortens consumers' perception of how long grading will actually take. PSA places an asterisk next to the advertised turnaround time but not next to the pricing representation. To learn what the asterisk means, the consumer must scroll down to a separate "Disclaimer" section that is presented in less prominent grey font. That section is collapsed and requires consumers to click it to open before seeing the actual disclosure. In other words, PSA sells the visible promise of speed at a set price while hiding the real rules that make both promises materially different from what consumers reasonably understand from PSA's marketing.

24. When opened, the disclaimer materially qualifies PSA's headline offer. PSA states that turnaround times are "not guaranteed"; the clock begins only when an order is "received and scanned into the PSA facility"; timing depends on "submission volume" and "capacity" and may change without notice; and PSA may adjust pricing, services, and processing times to align demand with capacity.[21] These are not minor qualifications. The Service Level chart sells consumers a price-speed-value package, while the separated disclaimer and Online Terms gives PSA substantial discretion to change both after the consumer selects that package.

25. In a market where card values move with player performance, injuries, new product releases, comparable sales, sentiment, and other developments, the time to have that card returned to its beneficial owner is economically material. While PSA holds a card, its owner cannot respond to market movement by selling the graded card without having access to the card. PSA, thus, sells turnaround time as part of the price-value-speed package to induce submissions over different service tiers. But when demand exceeded capacity, PSA raised prices, lengthened turnaround estimates, restricted lower-cost tiers, and suspended submissions below Regular.[22] PSA President Ryan Hoge acknowledged that PSA was receiving approximately 150,000 cards daily while shipping only 90,000 (a 40% shortfall) yet continued accepting submissions and selling tiers differentiated by speed.[23] Hoge also called backlog "very healthy," and said "[w]e like to have that," and identified approximately two months as ideal for staging work.[24] Plaintiffs allege PSA thus knew and managed capacity and backlog conditions to influence the need to pay

---

[21] *Infra* ¶¶ 178–185.

[22] PSA Staff, *Due to Demand Spike, PSA Pauses Value Tiers, Extends Collectors Club Memberships, and Launches Public Backlog Tracker*, PSA (May 28, 2026), https://www.psacard.com/articles/articleview/15210/service-level-update-may-2026.

[23] NEO Cards & Comics, *PSA Is Raising Prices (Again) — Ryan Hoge Explains Why… and More* at 31:19–31:34, YOUTUBE (Feb. 10, 2026), https://www.youtube.com/watch?v=NageYv7EsXA.

[24] *Id.* at 32:57–33:13.

a premium for speed, without adequately disclosing the backlog, clock-start rules, intake delays, and workflow constraints that made its public estimates unreliable. In a time-sensitive market, PSA was selling speed to liquidity while controlling when that liquidity became available.

26. PSA's upcharge uses the same deceptive architecture. Consumers must select a Service Level based not only on the price of the package and value of the submitted card, but also on the expected post-grading value before PSA assigns the grade. That pricing structure requires consumers to make three blind guesses before PSA grades the card: (1) what grade PSA will ultimately assign, (2) when PSA eventually grades the card, and (3) what the market value for that unknown grade will be at the time PSA finally grades it. PSA reaps the benefit of these consumer guesses with higher upfront premiums, while reserving the discretion to increase the selected tier after it receives the card for an additional fee. This additional fee can be assessed both when the card is submitted and after the card is graded. This increased grading fee is known as an upcharge. PSA casts the upcharge as a justified insurance charge calling it the Maximum Insured Value ("MIV") when it is truly an unjustified second grading fee. Neither the speculative pre-grade valuation nor the post-grade value of the card causes PSA to incur additional expenses to justify charging more for the same grading services. This fee represents PSA's ownership stake in the graded card, which is also another dark pattern called drip pricing.

27. Taken together, PSA's fee architecture employs drip, bait-and-switch, partitioned, and illusory speed pricing. In doing so, PSA uses possession coercion tactics after receiving the card by controlling the grading, timing, post-grading valuation and grade disclosure; imposing additional charges sua sponte; and conditioning the return of the card on payment. PSA then fragments the total cost among grading fees, upcharges, shipping, handling, and insurance to make them more appetizing. Here, the "grading" portion of the fee, which is advertised to the

public, appears smaller to induce them to buy the service when the real cost is much more significant. By the time consumers learn the actual price and timing, they already committed their cards and money to PSA's system. Plaintiffs allege this post-submission control operates as deceptive pricing and transaction design. These tactics are then reinforced by Online Terms that purport to authorize the very practices concealed or inadequately disclosed at the point of sale.

***The Alleged Contractual Shield Does Not Reach Plaintiffs or the Class***

28. Defendants' online, clickwrap Online Terms ("Online Terms") are part of the alleged deceptive architecture. They purport to limit accountability through arbitration, class-action waivers, forum-selection and choice-of-law provisions, liability caps, disclaimers, and other restrictions, while reserving broad discretion over PSA's services, including pricing, and Graded Card Credential, which includes the right to "change fees from time to time." [25] The Online Terms also materially qualify the service that PSA markets, recasting the Graded Card Credential as a mere subjective, non-warranted opinion while disclaiming responsibility for the very standards used to induce consumers to purchase it. Plaintiffs allege that this contradiction is fraud making the Online Terms unconscionable. Plaintiffs separately dispute that those terms bind them.

29. Plaintiffs obtained PSA grading services through separate independent businesses who perform card submissions among other hobby-related services. These intermediaries act as agents of PSA under their own accounts.[26] In doing so, Plaintiffs merely select the cards and service tiers and give the cards to the intermediaries as intake channels, who provide submission receipts. At no time are Plaintiffs told, shown or asked to accept PSA's Online Terms. These

[25] Decl. of Jacqueline Curiel, *Rasmussen v. Collectors Holdings Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 4, 2026), ECF No. 20-2, Ex. A (Collectors User Agreement) §§ 2, 18, 19, 24.

[26] *See infra* ¶¶ 327–338.

terms and conditions are unenforceable against collectors, like Plaintiffs. They never opened a PSA submission account and never clicked to accept PSA's online terms. The threshold contract defect here is the absence of assent.

***Plaintiffs and The Class are the Intended Victims who are Entitled to Relief***

30. Plaintiffs and members of the putative Class are the consumers Defendants set out to reach. They are ordinary collectors and hobbyists whom Defendants' grading system was designed to reach. They beneficially owned the cards submitted, supplied the property that PSA graded, paid or reimbursed Grading-Related Charges, and relied on Defendants' representations. They sought what PSA itself promotes: impartial, objective, standardized, expert, and reliable grading credential that can make a card more marketable, liquid, and valuable.[27]

31. PSA sells more than examination and encapsulation. Grading does not improve the physical card. What changes is the credential. PSA adds the grade, slab, certification number, verification record, population entry, and market acceptance that follow it into commerce. PSA even charges to "cross" cards already graded by competitors into PSA holders although the underlying card remains unchanged.[28] PSA cultivated its authority by representing that expert graders produce it through impartial, objective, standardized, criteria-based, and reliable review. Plaintiffs allege those attributes are what give the Graded Card Credential the authority and value that they paid to obtain. But Plaintiffs did not receive that.

32. The central fraud is Defendants induced consumers to surrender their cards and pay for a credential represented as the product of qualified experts, neutral third-party review, consistently applied standards, reliable certification and scarcity data, and defined pricing and

---

[27] *See infra* ¶¶ 77–82, 107–128.

[28] *See infra* ¶ 118.

service terms. They concealed materially contrary facts about grader expertise and qualifications; subjectivity, changing criteria, production demands, prior-grade information, and institutional practices affecting grades; personal and corporate conflicts and financial interests; certification and Population Report reliability; and the actual timing and cost of grading.[29] Those facts negate the very attributes that Defendants used to create trust in the Graded Card Credential and induced Plaintiffs to buy their credentials. Defendants monetized that trust at multiple points. Plaintiffs need not have used every PSA service because the alleged injury occurs when Defendants induce a consumer to surrender their property and pay for a Graded Card Credential materially different from the one represented. Defendants do not have separate schemes. There are different ways that Defendants monetize the same misrepresented Graded Card Credential.

33. This case is not about an isolated grading error, a single fee, market concentration, or disagreement with PSA's opinion about a particular card. While each Plaintiff was dissatisfied with one or more grades based on Defendants' published grading standards, that disagreement is not the principal injury or measure of recovery. Plaintiffs' injury is the economic overpayment in their own grading transactions—the money paid for a grading-and-certification service that is materially different than the attributes Defendants used to induce their purchases of the services. They did not receive the benefit of their bargain. These services are not based exclusively on a card's condition as advertised; rather, they are commercially managed outputs produced through undisclosed practices and interests. That is materially different from what Defendants sold.

34. This is a civil RICO case because Plaintiffs allege that Defendants repeatedly executed that fraud through interstate enterprises, mails, and wires. Websites, grading standards, pricing and service advertisements, intermediary communications, submissions, payments,

---

[29] *See infra* ¶¶ 131–200.

shipments, grading results, certifications, Population Reports, valuations, upcharges, and returns carried, executed, reinforced, or concealed the scheme.[30] Those transactions induced consumers nationwide to surrender their cards and pay for the allegedly misrepresented credential while Defendants controlled material facts consumers could not independently test. Plaintiffs allege Defendants intentionally used that system to obtain and retain more than a billion dollars in grading-related fees during the relevant limitations period. Plaintiffs now sue for themselves and similarly situated beneficial card owners to recover their direct economic losses and other relief authorized by RICO, the Maryland Consumer Protection Act, and applicable common law.

## PARTIES AND NON-PARTIES

35. Plaintiffs are novice card collectors who beneficially owned the cards that they submitted for PSA grading and relied on Defendants' representations that PSA would provide a neutral, expert, objective, criteria-based, and reliable Graded Card Credential on the represented service and pricing terms. Each Plaintiff paid, reimbursed, or bore PSA Grading-Related Charges and the economic consequences of Defendants' grading determinations, pricing practices, delays, representations, omissions, and related conduct. None of them maintained a PSA account, profile, membership, dealer status, or registered-submitter status, nor did any Plaintiff submit directly through Defendants' online portals. Instead, each entrusted his cards to a Card Grading Intermediary for submission to PSA and remained their beneficial owner throughout the grading process. As novice collectors submitting through intermediaries, Plaintiffs lacked independent access to PSA's internal grading practices and reasonably relied on Defendants' representations concerning the expertise, standards, objectivity, reliability, pricing, and delivery of the Graded Card Credential.

---

[30] *See infra* ¶¶ 223–273.

36. **Plaintiff Nicholas Funk.** Plaintiff Funk is, and at all relevant times has been, a citizen and resident of Maryland, residing in Baltimore. Plaintiff Funk submitted his cards for PSA's bulk grading services through a Card Grading Intermediary that operated a Maryland card shop and was a PSA-authorized dealer at the time of his submission. In or around March 2025, Plaintiff Funk delivered approximately seven trading cards, including Cal Ripken Jr. rookie cards, to that authorized Maryland intermediary for submission to PSA for authentication, grading, encapsulation, and related services. The precise date of the submission is available in PSA's and the intermediary's records. Plaintiff Funk paid or reimbursed about $300 in Grading-Related Charges in connection with this submission and incurred the economic injury described below.

37. **Plaintiff George Muresan.** Plaintiff G. Muresan was a citizen and resident of Maryland before relocating to Washington, D.C. during college where he still presently resides. Plaintiff G. Muresan submitted his cards for PSA's value-bulk grading services through a Maryland Card Grading Intermediary that commercially aggregated and submitted customer-owned cards for compensation through its own PSA-facing submission relationship. Specifically, Plaintiff G. Muresan made three submissions to PSA in 2025 under the value-bulk service level through the same bulk submitter located in Maryland. His first submission contained a Pokémon card that was mailed on or around February 6, 2025, that PSA acknowledged receiving on or around February 17, 2025, and that was then graded and returned on or around May 27, 2025. His second submission included another Pokémon card that was mailed around mid-May 2025, and that PSA returned graded on September 2, 2025. His third submission had an autographed rookie basketball card that was mailed on or around September 2, 2025, that PSA returned graded on or around December 15, 2025. Each submission was made and received by the same

bulk submitter located in Maryland. The precise date of each submission is available in PSA's and the intermediary's records. Plaintiff G. Muresan paid or reimbursed approximately $75 in Grading-Related Charges in connection with his submissions and incurred the economic injury described below.

38. **Plaintiff Victor Muresan.** Plaintiff V. Muresan was a citizen and resident of Maryland, who now presently resides in New York, New York. Plaintiff V. Muresan submitted his cards for PSA's value-bulk grading services through the same Maryland intermediary used by Plaintiff G. Muresan. Specifically, Plaintiff V. Muresan made a submission that contained three sports cards and six Pokémon cards mailed to PSA on or around September 2, 2025, which PSA identified as receiving on or around September 8, 2025. PSA returned those cards graded on or around December 26, 2025. This submission was received by the same bulk submitter located in Maryland for the benefit of Plaintiff V. Muresan. Plaintiff V. Muresan paid or reimbursed about $300 in Grading-Related Charges in connection with his submissions and thereby suffered the economic injury described below.

39. **Plaintiff Daniel Meyerpeter.** Plaintiff Meyerpeter is, and at all relevant times has been, a citizen and resident of Maryland, residing in Howard County. Plaintiff Meyerpeter submitted his cards for PSA's grading services through a Card Grading Intermediary that operated a Maryland card shop and was a PSA-authorized dealer at the time of his submission. Specifically, on or around March 26, 2025, Plaintiff Meyerpeter submitted ten cards of various sports legends that he collected as a child and kept in protected sleeves to maintain their great condition. These legends included Ken Griffey Jr., Michael Jordan, Jerry Rice, Allen Iverson, Mickey Mantle, Joe Montana, Hank Aaron, Troy Aikman, among others. When submitting his cards, Plaintiff Meyerpeter sought expedited grading services (including super express, express,

regular and value max services) on several of his cards because he wanted to sell them based on their market prices. Plaintiff Meyerpeter did not receive several of his expedited submissions back in the specified timeframe with those cards taking twice as long as the advertised grading period. The precise date of his submission is available in PSA's and the intermediary's records. Plaintiff Meyerpeter paid or reimbursed approximately $1,024 in Grading-Related Charges in connection with his submissions and thereby suffered the economic injury described below.

40. For each submission described above, the following allegations apply to each Plaintiff and each of their respective submissions:

a. **Defendants' Intake Channel; Independent Submission Businesses; Plaintiffs Actual Instructions**. Each Plaintiff used a Card Grading Intermediary that functioned as Defendants' PSA-facing intake channel or authorized submitter, as alleged infra ¶ 55. Each Plaintiff identified and then delivered their personally owned cards to a Card Grading Intermediary and selected and/or approved the PSA service tier. In some cases, Plaintiffs photographed their cards and received receipts and/or exchanged text messages recording the property delivered. Those receipts contained no contractual terms or references to PSA. No Plaintiff signed or was provided a written agreement with the Card Grading Intermediary or PSA governing the submission. Some Plaintiffs paid before submission and others upon pickup. Plaintiffs did not direct the creation of PSA accounts for themselves, accept any legal notices for themselves, or execute any PSA agreements in their names. The precise date of each submission is available in PSA's and the intermediary's records. Plaintiffs had no insight or prior experience with the process of submitting cards for grading. They purchased submission services from independent businesses without ever appointing them as their contracting representative.

b. **Interstate Mail and Wire Communications**. Each submission necessarily involved interstate mail, carrier, electronic, and payment communications. Plaintiffs' cards were transmitted from Maryland to PSA's submission center in California and, as applicable, to PSA grading facilities in California, New Jersey, Florida, Texas, or elsewhere before the completed Graded Card Credentials were returned through the Card Grading Intermediary. Defendants also transmitted or caused to be transmitted interstate communications concerning intake, submission status, service level, payment, grading, certification, verification, and return shipment. The precise dates, routing, facilities, and electronic transmissions are recorded in Defendants' systems and are uniquely within their possession.

c. **Common Economic Injury**. Each Plaintiff suffered concrete economic injury by paying, reimbursing, or bearing Grading-Related Charges for a Graded Card Credential materially different from the expert-driven, criteria-based, unbiased, reliable, and timely Credential Defendants represented. The Credential's value derives from the expertise, standards, objectivity, independence, and reliability of the process represented to produce it, yet Plaintiffs allege their Credentials were produced, priced, and delivered through materially different undisclosed practices. Timing was also part of the bargain. Each Plaintiff alleges PSA retained his independently valuable cards beyond the advertised turnaround time, preventing their sale either in raw or graded form during that additional period. Plaintiffs therefore overpaid for both the represented grading attributes and the timing of the selected service. Had Defendants truthfully disclosed how PSA produced, priced, and delivered the Graded Card Credential, Plaintiffs would not have submitted their cards or would have paid their charges or would have paid materially less.

Their injuries include Grading-Related Charges paid or borne, overpayment for the difference between the Credential represented and received, and the additional economic losses alleged *infra* ¶¶ 260–266 and 321–323.

d. **Reliance**. Before submitting their cards and paying the associated charges, each Plaintiff reviewed PSA's service-level and pricing information, including the displayed price and advertised turnaround time. Each of them also encountered PSA-originated website, advertising, or social-media representations that described PSA as using expert grading, objective standards, physical grading criteria—including surface, centering, and corners—to increase marketability and value of their cards. Together with Plaintiffs' experience with PSA-graded cards, those representations conveyed that PSA would provide a neutral, expert-driven, standardized, criteria-based, and reliable Graded Card Credential under the displayed service terms. Each Plaintiff understood grading to reflect a professional condition assessment materially constrained by identifiable physical criteria and turnaround time to represent how long his independently valuable property was expected to remain unavailable. Those representations were material to Plaintiffs' choice of using PSA and selecting their service tier, and each Plaintiff relied on them in submitting his cards and paying or reimbursing Grading-Related Charges, as further alleged *infra* ¶¶ 206–222.

e. **Grading Fees and Costs**. For each submission, each Plaintiff incurred a PSA grading fee and associated charges or costs. For purposes of this First Amended Complaint, "PSA Grading-Related Charges" means all amounts paid, reimbursed, charged, withheld, imposed, or borne to obtain, accelerate, process, value, insure, disclose, challenge, repeat, convert, correct, reholder, return, or otherwise complete PSA

grading. PSA may label those amounts as Service Level charges; expedited-service premiums; declared-value charges; Maximum Insured Value charges; adjusted grading fees; upcharges; review fees; crossover fees; resubmission fees; reholdering or relabeling charges, imaging or grader-note charges; and/or shipping, handling, insurance, return-shipment charges, or related submission charges, but they are all Grading-Related Charges. The label does not change the economic reality, namely that each charge exists because PSA sells the same market-recognized Graded Card Credential. PSA maintains all Grading-Related Charges information in its databases and systems.

f. **Standing to Sue**. Plaintiffs have standing to bring their claims because they were the beneficial card owners at all times; they paid all PSA grading fees and associated charges and costs arising from the purchase of the same type of market-recognized Graded Card Credential that PSA sells consumers, like Plaintiffs; and each Plaintiff is similarly injured by the fraud and other misconduct set forth herein. Each Plaintiff was dissatisfied with one or more assigned grades and believed higher grades were warranted based on PSA's published standards, but Plaintiffs do not rely on that disagreement alone as their injury or measure of damages.

***Defendant Collectors Holdings, Inc.***

41. Defendant Collectors Holdings, Inc. d/b/a Collectors ("Collectors") is, on information and belief, a Delaware corporation with its principal place of business at or near 1610 East Saint Andrew Place, Santa Ana, California 92705, and is therefore a citizen of Delaware and California under 28 U.S.C. § 1332(c)(1). Collectors is the current Collectors-branded parent, platform, and/or controlling entity through which its corporate family provides websites, services, products, applications, and tools for the authentication, grading, certification,

registration, purchase, sale, storage, pricing, and monetization of collectibles. Collectors identifies these services as provided through Collectors Holdings Inc.'s divisions and affiliated entities, including Collectors Universe, Inc.; PSA; PSA/DNA; PCGS; New SGC LLC; Ladder Studios, Inc.; Beckett Collectibles, LLC; and other Collectors entities.

42. Collectors operates a vertically integrated collectibles enterprise spanning authentication, grading, encapsulation, pricing data, marketplaces, storage, resale, and financing across trading cards, coins, sports memorabilia, and related collectibles. It has acquired or agreed to acquire competing and adjacent grading and collectibles businesses, consolidating grading operations, market-recognized brands, pricing infrastructure, and consumer reliance within a Collectors-controlled ecosystem. These transactions include its acquisition of Sportscard Guaranty ("SGC") on or about February 29, 2024, and its December 15, 2025, announcement of a definitive agreement to acquire Beckett. On information and belief, the Beckett transaction has closed or, at minimum, Beckett has been integrated into Collectors' controlled ecosystem.[31]

43. Collectors transacts substantial interstate business, including in Maryland and this District. Through its own and affiliated websites, email communications, service platforms, interstate carriers, and U.S. mails, Collectors solicits Maryland consumers; accepts or causes the acceptance and processing of their grading submissions; transmits or causes the transmission of grading results, upcharge notices, valuation determinations, service communications, and other charges by interstate wire; returns graded cards through interstate carriers; and profits from Maryland residents' payments for grading, authentication, pricing, storage, resale, and related services. Collectors thus regularly causes the use of interstate wires and mails in connection with grading, authentication, valuation, custody, and related services directed to Maryland consumers.

[31] Plaintiffs will amend these allegations to reflect the precise closing date and any subsequent material transactions after discovery.

44. Collectors is a "person" under 18 U.S.C. § 1961(3). Unless expressly attributed to PSA or another Defendant, allegations concerning acquisition and consolidation of competing graders; capture or control of grading-dependent market infrastructure; corporate integrations; and monetization of grades across a card's lifecycle through Card Ladder, the PSA Vault, PSA Partner Offers, Collectors Financial Services, marketplace integrations, retail submission channels, and related Collectors-affiliated services refer to Collectors.

***Defendant Collectors Universe, Inc. d/b/a Professional Sports Authenticator (PSA')***

45. Defendant Collectors Universe, Inc. d/b/a Professional Sports Authenticator ("PSA") is, on information and belief, a Delaware corporation and Collectors-affiliated entity with its principal place of business at or near 1610 East Saint Andrew Place, Santa Ana, California 92705. PSA is the trade name, brand, and/or operating division through which Collectors Universe, Inc. provides third-party authentication, grading, certification, encapsulation, and related services for trading cards, sports memorabilia, autographs, and related collectibles. PSA's current terms identify Collectors Universe, Inc. and Collectors Universe (Canada) Limited as providing submission services under the PSA, Professional Sports Authenticator, PSA/DNA Authentication Services, and related brands.

46. PSA holds itself out as an authority in trading-card and memorabilia authentication and grading and represents its grading as impartial, expert-driven, objective, reliable, and standardized. PSA authenticates trading cards, assigns numerical grades from 1 to 10, encapsulates them in tamper-evident holders bearing its label and grade, issues certification numbers, publishes population reports, and charges grading and related fees for those services.

47. PSA transacts substantial interstate business, including in Maryland and this District. Through psacard.com, affiliated websites, online marketplaces, third-party platforms,

dealer and group-submission programs, retail channels, and other PSA-facing intake channels, PSA solicits Maryland consumers; accepts or causes the acceptance of their submissions through online portals, email, interstate mail and carriers, dealers, group submitters, and other Card Grading Intermediaries; processes those submissions; transmits grading results, upcharge notices, valuations, additional charges, and service communications by interstate wire, including email and web-based dashboards; returns graded cards through interstate carriers; and profits from grading and related fees paid by Maryland residents.

48. PSA is a "person" under 18 U.S.C. § 1961(3). Unless expressly attributed to Collectors, allegations concerning grading, authentication, dealer or group programs, intake, certification, encapsulation, consumer-facing representations, service tiers, pricing, fees, upcharges, turnaround times, guarantees, population determinations, labels, holders, and related PSA conduct refer to Collectors Universe, Inc. d/b/a PSA.

***Agency, Common Control, and Enterprise Allegations***

49. PSA and Collectors are separate legal entities, each responsible for their own acts and omissions. As alleged below, PSA also acted as Collectors' actual agent in the challenged conduct, subject to Collectors' direction and control and within its granted authority, and Collectors directed, authorized, knowingly participated in, or ratified that conduct, as applicable. Where agency attribution is legally available, PSA's specifically alleged conduct is therefore attributable to Collectors. Plaintiffs do not seek to disregard either Defendant's independent corporate existence or impose alter-ego or veil-piercing liability. For RICO purposes, each Defendant is a separate "person" under 18 U.S.C. § 1961(3), liable for its own conduct and participation in the distinct enterprises alleged below.

50. On information and belief, Collectors directs the broader enterprise's strategy, including acquisitions and consolidation of competing graders, capture and consolidation of the trading-card grading market, capital allocation, and monetization of grades across a card's lifecycle through Card Ladder, the PSA Vault, PSA Partner Offers, Collectors Financial Services, marketplace integrations, and PSA-facing intake channels. Consistent with that role, Collectors acquired Card Ladder in December 2021 and SGC in February 2024; entered April 2024 agreements with eBay, including PSA's acquisition of the eBay Vault; and announced its agreement to acquire BGS on December 15, 2025. *See supra* ¶¶ 41–44; *infra* ¶¶ 71–74. These transactions extended Collectors' direction across the intake-grading-pricing-custody-resale-lending pipeline, including relationships with independent Card Grading Intermediaries and eBay. Through centralized ownership and management, Collectors sets overall strategic direction and derives downstream economic benefit from PSA-branded grading and SGC and BGS operations. These allegations are pleaded on information and belief based on the documented transactions, Collectors' public corporate materials, and its centralized ownership and management structure, with further evidentiary support expected through discovery consistent with Fed. R. Civ. P. 11(b)(3).

51. On information and belief, PSA operates the day-to-day grading business, including grading standards; grader staffing, training, and supervision; intake and submission systems; consumer-facing pricing, service tiers, turnaround representations, and guarantee language; grade assignment; declared-value and other upcharges; population reports; and grading-related communications to consumers and Card Grading Intermediaries.

52. Collectors and PSA each conduct or participate in the affairs of the RICO enterprises alleged below within the meaning of *Reves v. Ernst & Young*, 507 U.S. 170 (1993):

Collectors through the strategic, acquisition, management, and monetization functions alleged in ¶¶ 50–53, 71–74, and 201–204, including its direction of the broader enterprise involving independent Card Grading Intermediaries and eBay; and PSA through operation of the grading business. Each knowingly participated in one or more association-in-fact enterprises within 18 U.S.C. §§ 1961(4) and 1962(c), according to its respective role. Collectors and PSA remain separate legal "persons" under § 1961(3), each distinct from the RICO enterprises, consistent with *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). The enterprises are pleaded in the alternative.

***Non-Party Enterprises***

53. **Non-Party Enterprise Members.** Plaintiffs allege the following non-party members and independent commercial participants in the RICO enterprises:

a. **Primary Enterprise — The Grading-Intake Enterprise**. Plaintiffs' primary § 1962(c) enterprise consists of Defendants and Card Grading Intermediaries that participate in the solicitation, intake, custody, and processing of consumer submissions through Defendants' standardized authorized-intake programs, branded submission channels, and common workflows. Their roles are economically interdependent: intermediaries earn per-card fees and related charges, while Defendants earn grading and downstream monetization revenues, all dependent on the continuing flow of consumer cards through the shared intake-grading-resale pipeline.

b. **Alternative Enterprise — The Trading-Card Grading Enterprise**. Alternatively, Plaintiffs allege a broader association-in-fact consisting of the Grading-Intake Enterprise together with: (i) eBay, Inc., Defendants' designated graded-card marketplace partner; (ii) Beckett Collectibles, LLC ("BGS"); (iii) New SGC LLC

(“SGC”); (iv) Card Ladder, LLC, Collectors’ wholly owned pricing and valuation platform; (v) the PSA Vault and PSA Partner Offers, Defendants’ integrated custody, instant-offer, and resale channels; and (vi) Collectors Financial Services, LLC, Defendants’ lending arm that collateralizes graded cards. eBay’s marketplace and pricing integrations depend upon and amplify the same intake channels, workflows, and grading outputs. This enterprise extends beyond Collectors’ internal affairs to independent Card Grading Intermediaries and eBay, together with legally separate grading, intake, pricing, marketplace, custody, offer, and lending entities performing recurring functions in the solicitation, intake, grading, certification, valuation, custody, resale, and financing of consumer-owned cards.

c. **Independent Existence, Common Purpose, and Continuity**. The non-party participants have independent legal existences and share with Defendants the legitimate commercial purpose of operating the intake-grading-resale pipeline through recurring solicitation, intake, processing, grading, transmission, marketing, valuation, custody, resale, and financing functions. Their continuing relationships satisfy 18 U.S.C. § 1961(4). Card Grading Intermediaries may provide other hobby services and maintain their own premises, personnel, records, accounts, PSA-facing submission relationships, and customers; earn independent fees, handling charges, markups, and submission charges; and pursue their own commercial interests while serving as intake conduits. eBay likewise participates under separate ownership, management, and economic motives. These independent participants make each enterprise broader than, and distinct from either Defendant under *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). Plaintiffs do not allege that eBay or Card Grading Intermediaries knew of, agreed

to, or participated in Defendants' alleged fraud; rather, Defendants allegedly conducted the enterprises' affairs through their own pattern of mail and wire fraud.

d. **Direction and Control by Defendants**. Defendants directed and conducted the enterprises' affairs within the meaning of *Reves v. Ernst & Young*, 507 U.S. 170 (1993), by establishing authorized-dealer programs and other PSA-facing submission channels; vetting, branding, and publicly listing authorized dealers and other approved Card Grading Intermediaries as consumer-facing conduits; soliciting and approving group submitters who are not authorized dealers; supplying the standardized representations intermediaries conveyed; dictating the fees, declared-value upcharges, expedited-service premiums, and post-submission charges they relayed; structuring eBay marketplace and Card Ladder pricing integrations through which graded cards entered and circulated in secondary commerce; and controlling the timing, pricing, valuation, grading, disclosure, return, and remediation of submitted cards. Through these common programs, representations, fee schedules, integrations, and controls, Defendants caused the participants to function as a coordinated and continuing unit with the common purpose, relationships, and longevity required by *Boyle*.

e. **Limited PSA-Facing Agency**. Card Grading Intermediaries participate solely as Defendants' actual, apparent, ostensible, and limited PSA-facing intake and submission agents—not as Defendants' employees, internal divisions, or alter egos, and not as Plaintiffs' or Class members' legal agents. They had no actual or apparent authority to bind Plaintiffs or Class members to any contract, Online Terms, arbitration provision, class-action or jury-trial waiver, forum-selection or choice-of-law clause, limitation of liability, warranty disclaimer, or release. Rather, they served as bailees

transmitting consumer-owned cards into Defendants' PSA-facing intake system and relaying Defendants' standardized representations and submission communications.

f. **PSA-Facing Functions and Separate Contracting Capacity.** Card Grading Intermediaries are independently owned businesses whose separate identities and economic interests preserve enterprise distinctness. Plaintiffs allege Card Grading Intermediaries performed the PSA-facing solicitation, intake, transmission, and return functions described in ¶ 55(a)–(c) under Defendants' authorization, acceptance, or control, including the agency functions on PSA's behalf as specifically alleged herein. They remained independent businesses, not Defendants' employees, internal divisions, or alter egos. Plaintiffs do not allege a Plaintiff-side agency relationship authorizing acceptance of PSA's Online Terms. The Card Grading Intermediaries' commercial role and any PSA-facing authorization are distinct from the disputed authority to bind beneficial owners.

54. **RICO Person-Enterprise Distinctness and Alternative Pleading.** For purposes of 18 U.S.C. §§ 1962(a) and (c), PSA and Collectors are separate legal "persons" under § 1961(3), and each alleged enterprise is distinct from either Defendant. Each enterprise has a structure, legitimate common purpose, and continuing relationships apart from the predicate racketeering acts, while each Defendant allegedly participated in its affairs through its own conduct. Plaintiffs designate the Grading-Intake Enterprise as the primary association-in-fact enterprise for § 1962(c) and plead the broader Trading-Card Grading Enterprise, including Card Ladder, the PSA Vault, PSA Partner Offers, and Collectors Financial Services, in the alternative, consistent with *Cedric Kushner* and *Boyle*.

*Non-Party "Card Grading Intermediary"*

55. **Card Grading Intermediaries.** As used herein, "Card Grading Intermediary" means an independently owned card shop, dealer, authorized dealer, commercial bulk or group submitter, retail submission channel, official submission center, or similar person or entity that receives consumer-owned cards and submits, aggregates, processes, or transmits them to PSA through its own PSA-facing account or submission relationship. eBay is not a Card Grading Intermediary. Card Grading Intermediaries are not Defendants and are not alleged to have originated the deception. They provide submission services and may earn separate fees or other compensation. Plaintiffs further allege:

a. **PSA-Facing Functions**. Plaintiffs allege that Card Grading Intermediaries acted as Defendants' actual, apparent, ostensible, or limited agents for the PSA-facing functions Defendants authorized or controlled: soliciting or accepting submissions, communicating PSA's representations and instructions, transmitting cards and submission information, relaying charges and status information, facilitating payment, and receiving and returning graded cards. The authorized dealer and the commercial bulk submitter identified above used distinct PSA-facing relationships. Plaintiffs do not allege that the bulk submitter necessarily held the dealer's formal status.

b. **No Plaintiff-Side Agency or Contracting Authority**. As to Plaintiffs and Class members, Card Grading Intermediaries served only as physical-custody bailees who transmitted cards into Defendants' PSA-facing system and relayed PSA-related communications and charges relating to the property. They were not Plaintiffs' or Class members' legal agents for contract formation, arbitration, class or jury waiver, forum selection, choice of law, limitation of liability, warranty disclaimer, release, delegation,

or waiver of any statutory, procedural, or substantive right. Authority to transmit cards and relay charges is not authority to waive rights. Plaintiffs engaged Card Grading Intermediaries as bailees who provide independent submission services based on Plaintiffs' instructions as alleged in ¶ 40(a). No Plaintiff instructed a Card Grading Intermediary to accept PSA's Online Terms in the Plaintiff's name, receive contractual notices as the Plaintiff's representative, or represent that the Plaintiff had accepted terms that were never presented to any of them. Plaintiffs allege that the actual transactions did not confer authority to bind them to PSA's Online Terms.

c. **PSA's Process for Card Grading Intermediaries**. Card Grading Intermediaries follow a submission process Defendants designed, authorized, accepted, or relied upon. They advertise PSA and/or their ability to submit cards to PSA; take custody of consumers' cards; create intake, receipt, order, photographic, or similar custody records; and enter the cards into PSA's platform through their own PSA-facing account, dealer relationship, group-submission relationship, or submitter status. They then package and ship the cards according to PSA's instructions and directions; communicate with PSA and consumers concerning intake, grading status, charges, upcharges, payment, certification, and return shipment; receive the graded cards from PSA; collect additional amounts PSA demands; and return the cards to consumers, commonly through the same local shop or submitter.

d. **No Owner-Facing Assent**. Neither PSA nor any of its Card Grading Intermediaries required Plaintiffs, as beneficial owners, to be identified, shown PSA's Online Terms, or asked to assent before PSA accepted their card submissions. Plaintiffs never saw, received, clicked, reviewed, or accepted PSA's Online Terms or any

arbitration provision, class-action or jury-trial waiver, forum-selection or choice-of-law clause, release, limitation-of-liability provision, warranty disclaimer, delegation clause, or other contractual limitation. Defendants controlled the intake programs, submission platform, dealer relationships, and group-submission infrastructure.

e. **Independent Claims; No Enforcement of a Submitter's Contract**. Plaintiffs do not seek to enforce a Dealer Agreement, group-submission agreement, User Agreement, or other agreement between PSA and any Card Grading Intermediary. Their claims arise from Defendants' allegedly false public representations, misleading partial disclosures, concealment, and receipt of Plaintiffs' money. They do not request contractual performance or Guarantee payments under a Card Grading Intermediary's agreement.

f. **No Apparent Contracting Authority or Ratification.** Plaintiffs did not work with the Card Grading Intermediaries at any PSA submission interface, nor were they personally presented a contractual entitlement for submission admission or access, nor communicated that the Card Grading Intermediaries could accept Online Terms for them that would waive substantive rights pertaining to their property. They did not know the terms existed and simply entrusted preexisting property to independent submission businesses as limited bailees with specific directions and later received that property back. Plaintiffs allege that, in the commercial intake model described in ¶¶ 97–100, receipt of their cards through a Card Grading Intermediary's account did not reasonably communicate authority to bind them to the Online Terms. They also deny ratification: when paying and accepting the returned cards, they had not been told that an agreement had purportedly been made in their names and did not know its material terms.

## JURISDICTION AND VENUE

56. This Court has subject-matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including RICO, 18 U.S.C. §§ 1961–1968. Plaintiffs also seek declaratory relief under 28 U.S.C. §§ 2201 and 2202 concerning, among other things, the absence of assent to Defendants' Online Terms, arbitration provisions, class-action waivers, forum-selection clauses, choice-of-law clauses, liability limitations, warranty disclaimers, releases, and delegation clauses.

57. This Court has subject-matter jurisdiction over Plaintiffs' civil RICO claims under 18 U.S.C. § 1964(c), which authorizes any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962 to recover treble damages, costs, and reasonable attorneys' fees. Plaintiffs also seek equitable and declaratory relief to the extent authorized by 28 U.S.C. §§ 2201 and 2202, and the Court's other lawful powers.

58. This Court also has subject-matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because: (a) the proposed Class contains more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) minimal diversity exists because at least one member of the proposed Class is a citizen of a State different from at least one Defendant. Plaintiffs, with one exception, are citizens of Maryland. On information and belief, Collectors Holdings, Inc. is incorporated in Delaware and has its principal place of business in Santa Ana, California, and is therefore a citizen of Delaware and California. On information and belief, Collectors Universe, Inc., doing business as PSA, is a citizen of Delaware, California, or both. No exception to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) or § 1332(d)(9) applies.

59. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III. Plaintiffs' state-law claims arise from the same common nucleus of operative fact as the federal RICO claims, including Defendants' alleged grading fraud, deceptive fee architecture, misrepresentations and omissions, use of PSA-facing intake channels, and attempted reliance on Online Terms Plaintiffs never saw or accepted.

60. This Court has personal jurisdiction over each Defendant under Fed. R. Civ. P. 4(k)(1)(A), Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1), (3), and (4), and the Fourteenth Amendment. As alleged above, Defendants purposefully solicited and conducted grading-related business in Maryland by accepting Maryland-originating submissions; providing grading, certification, pricing, and related services for Maryland consumers; transmitting grading-related representations, invoices, payment demands, and results into Maryland; collecting Maryland-originating charges; and shipping cards into and out of Maryland. Collectors is subject to this Court's jurisdiction based on Collectors' own Maryland-directed conduct and the PSA conduct that Collectors directed, authorized, ratified, and monetized. Plaintiffs' claims arise out of those contacts, which caused economic injury in Maryland, and the exercise of jurisdiction comports with fair play and substantial justice.

61. Plaintiffs' transactions supply the required suit-related nexus. Plaintiffs submitted cards from Maryland through a Card Grading Intermediary operating as Defendants authorized or accepted PSA-facing intake conduit in Maryland; paid or reimbursed Grading-Related Charges from Maryland; received Defendants' grading-related communications and results in Maryland; and received the return of their cards in Maryland, where they suffered economic injury. The use of Card Grading Intermediaries within the intake channels Defendants cultivated

does not negate these Maryland-directed transactions; Plaintiffs' separate dispute over authority to accept the Online Terms is alleged in ¶¶ 40(a) and 55.

62. This Court also has personal jurisdiction over Defendants for Plaintiffs' RICO claims under 18 U.S.C. § 1965(d) and Fed. R. Civ. P. 4(k)(1)(C), because RICO authorizes nationwide service of process and each Defendant has sufficient contacts with the United States. The exercise of jurisdiction comports with Fifth Amendment due process, and the Court may exercise pendent personal jurisdiction over the related state-law claims arising from the same core operative facts.

63. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a) because, as set forth above, a substantial part of the events giving rise to Plaintiffs' claims occurred in Maryland, and Defendants transact their affairs in this District through the Maryland-directed conduct. Plaintiffs also dispute that any contractual forum-selection provision binds them through a Card Grading Intermediary, for the formation and authority reasons alleged in ¶¶ 40(a), 55, and 327–338.

## COMMON FACTUAL ALLEGATIONS

64. The following allegations set out the factual background concerning Defendants' exploitation of their dominant position in the multi-billion-dollar trading-card market through fraudulent and deceptive practices, which caused Plaintiffs and similarly situated consumers to suffer substantial economic harm.

### I. The Origins and Consolidation of the Modern Trading-Card Grading Industry

65. The business of authenticating, evaluating, and encapsulating collectible cards in tamper-evident holders bearing assigned numerical condition grades began in the mid-1980s. The practice is generally traced to Accugrade Sportscard Authentication ("ASA"), founded by Alan Hager. In 1984, ASA introduced the premise, now common to major grading companies,

that a purportedly disinterested third party can evaluate a card's condition on a standardized scale and permanently encapsulate the card with that assigned grade.[32] ASA did not achieve market acceptance; instead, the modern card grading industry emerged with PSA's launch in July 1991.

66. PSA's early growth was modest. On information and belief, PSA graded approximately one million cards during its first seven years of operation, from 1991 through 1998.[33] By the end of the 1990s, competing grading brands had emerged. SGC was founded in July 1998 and positioned itself as a grading alternative with strength in vintage cards. Beckett began operations in 1999 and differentiated itself through subgrades for centering, corners, edges, and surface.[34] By the early 2000s, PSA, SGC, and BGS had become the dominant third-party card-grading brands.

67. During the pandemic-era, PSA submissions surged. By April 2021, PSA's grading throughput had reached approximately 20,000 cards per day, or roughly 500,000 to 600,000 cards per month.[35] In February 2021, during that surge, an investor group acquired Collectors Universe, Inc,[36] PSA's then-publicly traded parent company, which was taken private in a transaction valued at approximately $853 million.[37] By August 2023, it was reported that

---

[32] *See* Greg Bates, *Making the grade*, SPORTS COLLECTORS DIGEST (July 9, 2020), https://sportscollectorsdigest.com/collecting-101/history-of-grading-cards-psa-bgs-sgc-dominating.

[33] *See id.*

[34] *See id*.

[35] *See* Greg Bates, *PSA grading 20,000 cards per day, slowly making progress on 'avalanche' of submissions*, SPORTS COLLECTORS DIGEST (Apr. 22, 2021), https://sportscollectorsdigest.com/cards/psa-card-grading-suspension-update-sports-cards-collectibles-hobby.

[36] *See Investor Group Led by Nat Turner Completes Acquisition of Collectors Universe*, BUS. WIRE (Feb. 22, 2021, 9:00 AM), https://www.businesswire.com/news/home/20210222005284/en/Investor-Group-Led-by-Nat-Turner-Completes-Acquisition-of-Collectors-Universe.

[37] *See Collectors Universe and Investor Group Led by Entrepreneur and Collector Nat Turner Amend and Restate Merger Agreement to Increase Offer Price to $92.00 Per Share in Cash*, STREETINSIDER.COM (Jan. 20, 2021, 8:49 AM), https://www.streetinsider.com/Globe+Newswire/Collectors+Universe+and+Investor+Group+Led+by+Entrepreneur+and+Collector+Nat+Turner+Amend+and+Restate+Merger+Agreement+to+Increase+Offer+Price+to+%2492.00+Per+Share+in+Cash/17840471.html.

PSA was on pace to grade approximately 14 million cards per year, or about 1.2 million cards per month.[38]

68. When Collectors took control of PSA, it did not acquire a vast bench of trading-card grading experts. Collectors Universe's public filings identified 18 trading-card experts as of June 30, 2017; 22 as of June 30, 2018; 27 as of June 30, 2019;[39] and 33 as of June 30, 2020.[40] PSA's 2020 Form 10-K reported 77 total experts across all operations, including coins, trading cards, autographs, and memorabilia, and separately identified forty-four customer-service and support personnel.[41] But PSA identified only 33 trading-card experts in that last public annual report before being taken private in the transaction.

69. PSA also disclosed that qualified collectibles authentication and grading experts were "in short supply," that competition for their services was "considerable," and that PSA therefore focused on training young authenticators and graders whom it believed had the skills or knowledge base to become collectibles experts one day.[42] PSA also disclosed that it contracted "with outside experts, usually collectibles dealers," to address short-term increases in authentication and grading orders.[43] But the short-term increases never ceased.

70. PSA's own public disclosures showed that its path to increased output depended on operational expansion. PSA stated in its 2020 Form 10-K that it was increasing capacity to grade "a higher number of primarily collectible cards" by adding operating personnel, reviewing

---

[38] *See PSA on pace to grade 14 Million cards a year.*, COLLECTORS UNIVERSE, https://forums.collectors.com/discussion/1094679/psa-on-pace-to-grade-14-million-cards-a-year (last visited Sept. 28, 2026).

[39] Attached at **Exhibit A**, Collectors Universe Form 10-K for 2017, 2018, 2019.

[40] Attached at **Exhibit B**, Collectors Universe 2020 Form 10-K.

[41] *Id.*

[42] **Exhibit A**, FY2019 10-K, Item 1A (Risk Factors).

[43] *Id.* at 10.

and improving operational processes, introducing multiple daily work shifts, and even making additional operational space available.[44] Immediately after the acquisition, Collectors helped PSA implement that expansion.[45] PSA also suspended four of its most popular lower-cost service tiers in March 2021, leaving only higher-cost options open for new submissions. The suspension was driven by a backlog estimated around 10 million cards when announced, which reportedly grew to about 12 million cards as submissions continued before the suspension took effect.[46] PSA committed to restoring suspended services by July 1, 2021,[47] but the lowest tiers remained closed well beyond that date and were not fully restored until approximately September 2022.

71. Collectors did not operate PSA as a standalone grading service. It pursued a broader consolidation and integration strategy around the commercial life of graded cards. After taking PSA private in February 2021, Collectors acquired Goldin Auctions in July 2021, adding a major high-end collectibles auction business to its portfolio.[48] Collectors acquired Card Ladder, a trading-card valuation and market-data platform, in December 2021.[49] Collectors acquired SGC in February 2024.[50] In April 2024, Collectors entered into a transaction with eBay through

---

[44] **Exhibit B**, FY2020 10-K, Item 1 (Business) – Growth Strategy.

[45] *See* Todd Tobias, *Dream of Being a PSA Grader? This Might Be Your Chance!*, PSA (Mar. 22, 2021), https://www.psacard.com/articles/articleview/10361/dream-being-psa-grader-might-your-chance.

[46] Benjamin Burrows, *PSA partially halting grading submissions amid 10 million card backlog*, THE ATHLETIC (June 1, 2026), https://www.nytimes.com/athletic/7315517/2026/05/28/psa-grading-pause-tiers/.

[47] Steve Sloan, *PSA Customer Update - April 2021*, PSA (Mar. 31, 2021), https://www.psacard.com/articles/articleview/10367/psa-customer-update-april-2021.

[48] *See* SCD Staff, *Goldin Auctions sold to Collectors Holdings amid record sales, red-hot industry*, SPORTS COLLECTORS DIGEST (July 1, 2021), https://sportscollectorsdigest.com/news/goldin-auctions-sold-to-collectors-holdings-sports-card-collectibles-ken-goldin-nat-turner.

[49] *See Collectors Universe Acquires Trading Card Valuation Platform Card Ladder*, PSA (Dec. 2, 2021), https://www.psacard.com/articles/articleview/10556/collectors-universe-acquires-trading-card-valuation-platform-ladder.

[50] Jeffrey Dohm-Sanchez, *PSA Owners Acquire SGC*, ICV2 (Mar. 1, 2024, 7:55 AM), https://icv2.com/articles/news/view/56365/psa-owners-acquire-sgc; *Collectors Acquired SGC: What the Deal Meant for the Hobby (Two Years Later)*, CARD CAPSULE, https://cardcapsule.com/blogs/blog/the-strategic-acquisition-of-sgc-by-collectors-universe (last visited July 1, 2026).

which eBay acquired Goldin and PSA acquired eBay's trading-card vault.[51] PSA then launched the PSA Vault in June 2024.[52] In December 2025, Collectors announced an agreement to acquire BGS, one of the remaining major grading brands in the United States.[53] Collectors also operates lending services tied to collectibles held in PSA Vault custody.[54] These transactions placed Defendants on both sides of the grading-dependent market.

72. PSA's volume and backlog pressure persisted as Collectors' consolidation strategy accelerated. With its throughput doubling from 2021 to 2023, Defendants' aggressive growth strategy added pressure. PSA's annual card volume exceeded 19 million cards in 2025, and by early 2026 PSA was processing approximately 2.0 million cards per month.[55] By comparison, PSA had authenticated and graded approximately 35 million trading cards from its inception in 1991 through June 2020.[56] At a pace of approximately 2.0 million cards per month, PSA was positioned to grade more than 24 million cards in 2026 alone. In May 2026, PSA again announced that it would suspend its four lowest-tier services effective June 2, 2026, citing a backlog that had grown to about 10 million cards and then spiked after the announcement.[57]

---

[51] Press Release, *eBay, Collectors Enter into Commercial Agreement, Sign Deals for Acquisition of Goldin by eBay and Acquisition of the eBay Vault by PSA*, EBAY (Apr. 10, 2024), https://investors.ebayinc.com/investor-news/press-release-details/2024/eBay-Collectors-Enter-into-Commercial-Agreement-Sign-Deals-for-Acquisition-of-Goldin-and-Sale-of-eBay-Vault.

[52] Dylan Manfre, *PSA Trading Card Vault Opens With Goal of Simpler Transactions*, YAHOO! FIN. (June 24, 2024), https://finance.yahoo.com/news/psa-trading-card-vault-opens-170000794.

[53] *See, generally*, Brooks Peck, *PSA parent company Collectors to acquire Beckett, keeping it an independent brand*, THE ATHLETIC (Dec. 15, 2025), https://www.nytimes.com/athletic/6891882/2025/12/15/ collectors-beckett-psa-card-grading/.

[54] *Lending*, COLLECTORS, https://www.collectors.com/lending (last visited July 6, 2026).

[55] *See* Conor B. McGrath, *Over 26 Million Cards Graded in 2025: How the Market Exploded*, SPORTS ILLUSTRATED (Jan. 3, 2026), https://www.si.com/collectibles/over-26-million-cards-graded-in-2025-how-the-market-exploded.

[56] *See* Collectors Universe, Inc., Annual Report (Form 10-K), (Aug. 28, 2019), https://www.sec.gov/Archives/edgar/data/1089143/000143774919017562/clct20190630_10k.htm (reporting that the Company had authenticated and graded approximately 35 million trading cards since PSA's inception in 1991); *see also* Jesse Haynes, *Sports Card Grading Costs Double*, CARDLINES (Mar. 1, 2021), https://cardlines.com/psa-beckett-rates-increase/.

[57] PSA Staff, *Demand Spike*, *supra* note 22.

Around the same period, Collectors announced substantial capacity investments, including plans to expand grading capacity and staffing in response to demand and backlog pressure.[58] These facts show that the same capacity pressures present at the time of Collectors' acquisition remained and intensified as PSA's grading volume increased.

## II. Defendants' Market Control Has Become Central to the Investment-Driven Trading-Card Market

73. The trading-card market has evolved from a mostly hobby-centered marketplace into a financialized collectibles asset market. That market stacks six interdependent components: manufacturing and intellectual property; third-party grading and authentication; pricing, data aggregation, and analytics; storage, custody, resale, and financialization; secondary-market sales and marketplace integration; and market communication, influence, and intake. Grading is the connective component because the assigned PSA grade travels through or impacts each other component, affecting price, scarcity, liquidity, sale timing, financing, and consumer demand.

74. As reflected on the demonstrative illustration on the next page, Collectors does not occupy a single position in this ecosystem. Through PSA, acquired or affiliated businesses, and commercial integrations, Collectors owns, controls, or influences each component of the card ecosystem. Collectors' financial interest can therefore attach at multiple stages of a card's commercial life. That integrated structure matters because the same PSA grade can influence pricing data, vault decisions, resale pathways, offer eligibility, lending capacity, insurance decisions, and consumer demand.[59]

---

[58] *See* Staff Announcement, *supra* note 16; Burrows, *PSA partially halting grading submissions*, *supra note 46* ("PSA has tripled its staff and opened grading facilities in Florida, New Jersey, Texas and Tokyo since 2021").

[59] Decl. of Jacqueline Curiel, Rasmussen v. Collectors Holdings Inc., No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 4, 2026), ECF No. 20-2, Ex. A (Collectors User Agreement) Preamble; *Collectors to Acquire Beckett*, COLLECTORS (Dec. 15, 2025), https://www.collectors.com/company-announcement.




**(Demonstrative illustration of Defendants' influence over multiple components of the trading-card ecosystem, including grading, pricing, custody, resale, financing, and market communication)**

### A. Manufacturing and Intellectual Property

75. The trading-card ecosystem begins with manufacturing and intellectual property. Manufacturers and licensors, including Topps, Panini America, Upper Deck, The Pokémon Company International, and entertainment-property licensors, control the creation of cards and the initial scarcity signals attached to them, including product line, print run, checklist, licensing rights, autograph and relic content, serial numbering, refractor structure, and parallel structure.

76. Fanatics Collectibles, through Topps and related league, player, and brand relationships, controls important sports-card licensing and distribution channels. The Pokémon Company International controls significant Pokémon TCG production infrastructure through its acquisition of Millennium Print Group.[60] These manufacturing and licensing facts matter because

---

[60] Press Release, *Fanatics Acquires Topps Trading Cards and Collectibles Business*, FANATICS (Jan. 4), https://www.fanaticsinc.com/press-releases/fanatics-acquires-topps-trading-cards-and-collectibles-business; Press Release, *The Pokémon Company International Enters Into Agreement to Purchase Millennium Print Group*, THE POKÉMON CO. INT'L (Apr. 18, 2022, 7:00 AM), https://press.pokemon.com/en/THE-POKEMON-COMPANY-INTERNATIONAL-ENTERS-INTO-AGREEMENT-TO-PURCH-44490.

initial scarcity begins with production, but downstream value increasingly depends on grading, population reports, pricing tools, custody, resale, and financing, which all influence what manufacturers create.

**B. Grading and Authentication - PSA as the Market Credential**

77. The next component is third-party grading and authentication. PSA markets its grade as a universal, value-enhancing market credential, stating that it has established a "recognized and respected universal grading standard," its price guide "has enhanced stability in the marketplace," and "[c]ards authenticated and graded by PSA achieve amazing prices at auction."[61] PSA likewise tells consumers that PSA-certified items "tend to sell for more — sometimes significantly more — than uncertified items."[62]

78. PSA converts that Graded Card Credential into public scarcity data through its Population Report, which it describes as an "online record of all PSA-certified" collectibles providing "current population figures" and "an exact count of each item graded, from PSA 1-10," with daily updates.[63] The Population Report thus functions as a prospectus-like scarcity disclosure for the PSA-centered market—not because trading cards are securities, but because Card Market Participants use PSA's published grade-by-grade populations to assess rarity and value.

79. PSA also ties market-value references to those grades. "Its 'official price guide for PSA-certified collectibles' provides 'current market values' derived from 'established price

---

[61] *Grading*, PSA, https://www.psacard.com/services/tradingcardgrading (last visited Sept. 28, 2026).

[62] *PSA Price Guide*, PSA, https://www.psacard.com/priceguide (last visited Sept. 28, 2026) ("The clear benefit of having your items certified by PSA is because, generally speaking, items certified by PSA tend to sell for more — sometimes significantly more — than those that are not.").

[63] *See Population Report*, PSA, https://www.psacard.com/Pop (last visited Sept. 28, 2026) (describing the Population Report as providing "an exact count of each item graded, from PSA 1-10," with category summaries and daily updates).

histories.' PSA states that it uses '[n]o subjective pricing surveys' and that those values 'more accurately reflect what you will realize when you sell or buy PSA graded sports cards.'"[64] PSA's Auction Prices Realized similarly provides more than five million auction results as "crucial references for assessing the market value" of collectibles and tracking market fluctuations.[65]

80. PSA then integrates grade, scarcity, and value at the item level. Auction results can be sorted by PSA grade alongside "population numbers and price guide listings," while CardFacts displays grade-specific "Most Recent Price," "Average Price," "PSA Price," "Population," and "POP Higher" data.[66] The PSA Set Registry further encourages collectors to "track [their] inventory, costs and populations" while linking competition among collectors to PSA's price guides and population reports.[67] Together, these tools reinforce grade-based scarcity, competition, pricing, and demand for PSA-certified cards.

### C. Pricing, Data Aggregation, and Analytics — Card Ladder

81. Pricing and valuation tools function as market infrastructure by converting grades, population and transaction data, comparable sales, and market movement into consumer-facing valuation signals. Consumers use those signals to decide whether to grade, which service tier to purchase, whether to hold or sell, what price or offer to accept, whether to insure a card, and

---

[64] *Price Guide*, *supra* note 62.

[65] *Auction Prices Realized*, PSA, https://www.psacard.com/auctionprices (last visited Sept. 28, 2026).

[66] *Massive Database of Auction Results Unlocked, Free to Collectors*, PSA (Jan. 4, 2018), https://www.psacard.com/articles/articleview/9416/massive-database-auction-results-unlocked-free-collectors (stating that auction results can be "sorted by PSA grade" and viewed with "population numbers and price guide listings"); *Stanley Ketchel (Checklist Back) 1911 T9 Turkey Reds*, PSA, https://www.psacard.com/cardfacts/boxing-cards/1911-t9-turkey-reds/stanley-ketchel-checklist-back-67/18527 (last visited Sept. 28, 2026) (displaying "Prices By Grade" fields including "Most Recent Price," "Average Price," "PSA Price," "Population," and "POP Higher"); *Checklist 1-132 1984 Topps*, PSA, https://www.psacard.com/cardfacts/football-cards/1984-topps/checklist-1-132-394/12238 (last visited Sept. 28, 2026) (same).

[67] *Set Registry Information*, PSA, https://www.psacard.com/psasetregistry/information (last visited Sept. 28, 2026); *PSA Set Registry*, PSA, https://www.psacard.com/psasetregistry/ (last visited Sept. 28, 2026); *PSA Set Registry Rules*, PSA, https://www.psacard.com/psasetregistry/rules (last visited Sept. 28, 2026) (stating that certain functionality "will add another layer of competition within the Registry").

whether to treat it as an investment-like asset. Collectors participates in this infrastructure through Card Ladder, which it publicly describes as a trading-card valuation platform built on sales data, pricing information, transaction history, and predictive pricing technology.

82. Card Ladder represents that it provides access to more than 100 million historical trading-card sales, millions of vetted sales, and thousands of indexes.[68] It expressly invokes public-market concepts: its "Indexes" measure card-market performance "similar to the S&P 500," its software uses those indexes to generate estimated values and predict how cards may move, and it directs users to the CL50 index "to gauge where the market is moving."[69] Card Ladder thus converts grading, population, and sales data into valuation signals consumers use to grade, select service levels, hold, sell, accept offers, and compare graded-card values.




**(Representative Card Ladder dashboard screenshot showing financial-market-style presentation of graded-card pricing charts, collection value, daily change, verified sales volume, shop links, and pricing metrics).**

---

[68] PSA, *Card Ladder*, *supra* note 49; *Card Ladder*, https://www.cardladder.com (last visited Sept. 28, 2026).

[69] *CL50*, CARD LADDER, https://www.cardladder.com/indexes/cl50index (last visited Sept. 28, 2026).

83. By owning Card Ladder, Collectors controls or materially influences a platform that converts PSA grades, population data, and transaction data into market-facing valuation, index, and portfolio signals. Consumers like Plaintiffs rely on this data and it induces them to submit cards for grading. Yet Card Ladder's valuation methodology is opaque. It excludes substantial categories of sales unless reported and verified, including retail-site, card-shop, card-show, and in-person transactions without publicly explaining who verifies them, how verification occurs, or how those exclusions affect valuations.[70] Nor does Card Ladder include PSA's card acquisitions or disclose whether its data is integrated into PSA's own price guides and valuations or why or how they are different. Excluding these transactions necessarily gives greater relative weight to those included, including any of Defendants-linked transactions.

84. This structure creates an opaque feedback loop. PSA supplies core valuation inputs by assigning grades, issuing certification numbers, and publishing population data; Card Ladder combines those inputs with selected sales data to generate market-facing pricing signals; and Collectors monetizes the resulting graded-card values through its custody, resale, partner-offer, marketplace, and lending channels. Consumers cannot determine whether Card Ladder values reflect representative market data, undisclosed exclusions, manual adjustments, algorithmic changes, private-sale inputs, or Defendants' commercial incentives.

### D. Financialization Through Custody, Resale and Acquisition - PSA Vault, PSA Partner Offers, and Collectors Financial Services

85. The next component is financialization through custody, resale, acquisition, and lending. A graded card can be vaulted, held in custody, listed and sold while remaining in vault

---

[70] *What is the Industry Page?*, CARD LADDER, https://cardladder.zendesk.com/hc/en-us/articles/21053788523671-What-is-the-Industry-Page (last visited Sept. 28, 2026).

custody without physical transfer, offered to buyers, or used as collateral. Collectors participates in this component through the PSA Vault, PSA Partner Offers, and Collectors Financial Services.

86. PSA markets the PSA Vault as custody and asset-management infrastructure, offering "100%-insured" storage in a climate-controlled facility with "24/7 security and asset management,"[71] and displaying portfolio-style metrics including "ITEMS VAULTED," "TOTAL VALUE," and "VAULTED & SOLD."[72] Users can also "[c]reate eBay listings in seconds" directly from the Vault while PSA handles "[l]isting, imaging, packaging, [and] shipping."[73]

87. PSA expressly describes Vault consignment as sale execution, stating that consignment means "entrusting PSA to market, sell, ship, and collect payment on your behalf." PSA hosts the listings through its eBay storefront using item details and photography designed to attract buyers who "value the PSA name."[74] Thus, a vaulted card can be marketed, sold, shipped, and paid out through PSA-linked infrastructure without the owner physically handling it.

88. PSA Partner Offers adds instant liquidity to that pipeline. PSA promises "real-time PSA Partner Offers" from vetted buyers that users can "tap to accept" to "lock in a guaranteed sale" and receive payment within days.[75] All PSA-graded cards in the Vault are eligible for Partner Offers and eBay consignment, and Partner Offers are "built directly into the grading and vaulting experience."[76]

---

[71] *PSA Vault*, PSA, https://www.psacard.com/info/psa-vault (last visited Sept. 28, 2026).

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Partner Offers*, PSA, https://www.psacard.com/info/psa-partner-offers (last visited Sept. 28, 2026).

89. Collectors Financial Services adds financing, offering acquisition, pre-sale, and refinancing solutions secured by collectibles deposited in the PSA Vault.[77] Together, these services allow a PSA-graded card to move from grading to custody, offer, sale, and financing without leaving the Collectors-controlled ecosystem. Defendants use the cards custody and valuation tools to acquire, store and transmit the very cards that they grade.

90. Plaintiffs do not allege that every consumer uses these services. The point is structural: Collectors built an ecosystem in which PSA's grade affects market value and, in turn, pricing, custody, sale, offer, and lending decisions, each creating additional revenue opportunities for Collectors or its commercial partners.

**E. Marketplace Integration and Secondary-Market Flow**

91. The secondary market converts graded cards into realized value through sales, auctions, and consignments. Because card values can vary materially by grading company and assigned grade, secondary-market pricing depends heavily on the grading output and confidence in its reliability.

92. The PSA/eBay integration makes that dependence explicit. Collectors and PSA describe their relationship as an "end-to-end" hobby experience integrating "buying, grading, storing and selling," "real-time tracking" of item values using PSA pricing data, and eBay transaction data with PSA Population Report data to enable "smarter buying, selling and trading decisions."[78] Collectors CEO Nat Turner described the ability to grade a card with PSA and then instantly store it in the Vault or offer it to collectors on eBay as "a major win."[79] PSA President

---

[77] *Lending*, *supra* note 54 (describing capital solutions secured by collectibles deposited in the PSA Vault).

[78] *Collectors and eBay Transactions Close, Summer Launch Expected for Integrated, End-to-End Hobby Experience*, PSA (May 16, 2024), https://www.psacard.com/articles/articleview/11059/collectors-and-ebay-transactions-close-summer-launch-expected-for-integrated.

[79] *Id.* (quoting Nat Turner).

Ryan Hoge similarly described the Vault as enabling customers to "strategically time the market" and anticipated "liquidity solutions" for customers "focused on investment."[80]

93. Collectors also participates in secondary-market flow through affiliate links that may generate compensation for Card Ladder, which routes users from pricing dashboards to eBay and other marketplace listings through compensated affiliate links.[81]

94. These relationships matter because the grade is the credential that follows the card into resale. By owning PSA, controlling or participating in the provision of pricing data, operating Vault custody and Partner Offers, maintaining eBay-linked consignment pathways, and using retail submission channels, Collectors participates at multiple stages of the same card's economic lifecycle. Plaintiffs allege that this integration reinforces Collectors' influence over grading-dependent valuation, scarcity, liquidity, pricing signals, and market reliance. These same relationships create an echo chamber about the importance of PSA's grades in the card market.

### F. Market Communication, Influence, Solicitation, and Intake

95. The final component is market communication, influence, solicitation, and third-party intake. Social media, podcasts, video channels, dealer content, hobby-media interviews, grading promotions, livestreams, card-shop events, and hobby personalities shape consumer behavior by promoting cards and grading, reinforcing PSA as the preferred market credential, and routing consumers into PSA-facing submission channels. These market communications serve as an additional echo chamber.

---

[80] *Sports Trading Cards: One Business Helping Collectors Buy & Sell* at 1:37-1:40, YAHOO! FIN. (Jan. 12, 2025), https://finance.yahoo.com/video/sports-trading-cards-one-business-190037851.html (statements by PSA President Ryan Hoge that the Vault allows customers to "strategically time the market" and that PSA expects innovations around "liquidity solutions" for customers "focused on investment").

[81] *Does Card Ladder Have Affiliate Relationships?*, CARD LADDER, https://cardladder.zendesk.com/hc/en-us/articles/20658528964887-Does-Card-Ladder-Have-Affiliate-Relationships (last visited Sept. 28, 2026) (stating that purchases after clicking marketplace links from Card Ladder may result in compensation to Card Ladder and that marketplace links inside Card Ladder are affiliate links).

96. PSA disseminates a standardized market message through official and amplified channels: PSA grading is the preferred market credential, PSA is the leading authenticator and grader, and PSA grades can materially increase card values through expert, neutral, objective, criteria based grading. PSA communicates that message through branded content, executive appearances, dealer and creator materials, affiliate disclosures, sponsored or promotional posts, hobby-media programming, and its own channels.[82] This ecosystem extends PSA's online representations to beneficial card owners who never submit through PSA's portal.

97. PSA also uses dealer and group-submission programs as consumer-facing intake channels. PSA appoints authorized dealers under Dealer Agreements, permits them to submit for individual owners, and offers qualified dealers preferred pricing and advertising benefits. PSA has authorized dealers to use its marketing materials, displays, brochures, direct mail, and brand logotypes and has conducted joint marketing promoting both dealer services and PSA grading together.[83] PSA likewise encourages collectors to join dealer-run group submissions and directs them to its Dealer Directory to find verified group submitters.[84] PSA's 2020 Form 10-K expressly described a "pull" strategy aimed at causing collectors to ask dealers to submit cards for grading to PSA because most authentication and grading submissions were made by third

---

[82] *The PSA Pod*, APPLE PODCASTS, https://podcasts.apple.com/us/podcast/the-psa-pod/id1609006937 (last visited Sept. 28, 2026) ("PSA's Official Podcast. Authentic hobby talk direct from the leading source for trading card authentication and grading."); The Geoff Wilson Show, *PSA Executive Reveals Mistakes Most Collectors Make With Grading*, YOUTUBE (May 13, 2026), https://www.youtube.com/watch?v=Ya5sq98qP5A; *The Geoff Wilson Show*, YOUTUBE, https://www.youtube.com/@itsgeoffwilson (last visited Sept. 28, 2026).

[83] *PSA Sales*, PSA, https://www.psacard.com/sales (last visited Sept. 28, 2026); *How can I become a PSA Dealer?*, PSA (July 19, 2025), https://support.psacard.com/s/article/how-to-become-a-dealer; *Frequently Asked Questions*, PSA, https://www.psacard.com/support/faq (last visited Sept. 28, 2026); Collectors Universe, *Annual Report* (2019), *supra* note 56, Item 1, Authorized Dealer Network.

[84] *PSA Group Submissions*, PSA, https://www.psacard.com/dealers/groupsubmissions (last visited Sept. 28, 2026); *supra* note 83.

parties dealers. It explained that dealers ordinarily comply with a customer's grading-service preference, while PSA separately markets its services to the dealers themselves.[85]

98. PSA's messaging and intake structure work together: its market communications promote PSA grading as an expert, reliable, market-preferred credential, while PSA-facing Card Grading Intermediaries convert that demand into submissions. Plaintiffs do not allege that these intermediaries originated Defendants' deception; they are additional channels through which Defendants' standardized representations, pricing, charges, grading outputs, and market messages reach beneficial card owners. Plaintiffs allege that this deliberately intermediated structure separates the beneficial owner's service purchase from the Card Grading Intermediary's PSA-facing commercial arrangement.

99. Collectors' relationship with Fanatics Collect provides another grading-linked pathway. Fanatics identifies PSA, Beckett, CGC Cards, and SGC as grading partners through which users can authenticate and grade cards with partnership pricing, convenience, and resale-related services. Fanatics also offers vaulting where cards are stored, tracked with live pricing and comparable sales, and kept ready to list, trade, or ship.[86] Plaintiffs do not allege that Fanatics is a Defendant or that the relationship is exclusive; it illustrates how cards move through grading-linked market channels in which value depends on the assigned grade.

100. GameStop provides another retail submission channel. Public filings show that GameStop became an authorized PSA dealer in 2024, PSA agreed to provide authentication and grading through select GameStop stores, and GameStop disclosed the fiscal-2024 dollar value of

---

[85] Collectors Universe, Inc., Annual Report (Form 10-K), at 8–10 (Aug. 26, 2020), Ex. B (describing collector-directed "pull" marketing, dealer-directed "push" marketing, and the Authorized Dealer Network).

[86] *Authentication*, FANATICS COLLECT, https://support.fanaticscollect.com/en_us/authentication-B1V3m0XTxe (last visited Sept. 28, 2026) ("Fanatics Collect offers a simpler way to get your raw cards graded and authenticated by our partners PSA, Beckett, CGC Cards, and SGC."); *How to Grade & Store Your Cards*, FANATICS COLLECT, https://www.fanaticscollect.com/pages/how-to-grade-and-store-your-graded-trading-cards (last visited Sept. 28, 2026).

that collaboration. GameStop also disclosed that Collectors CEO and Chairman Nat Turner serves on its Board.[87] Those relationships support the inference that Defendants' leadership was familiar with a retail model in which an independent Card Grading Intermediary receives consumer-owned cards, makes submissions to PSA grading through its own commercial relationship with PSA (rather than through a PSA account maintained by each beneficial owner). And, importantly, Defendants had knowledge that this relationship does not require or involve assent to or otherwise provide information about PSA Online Terms.

## III. Defendants Scaled a PSA-Centered Financial Marketplace Built on PSA Grades

101. The modern trading-card market is no longer merely a hobby. Cards are bought and sold as alternative assets, tracked through pricing and analytics tools, stored in third-party vaults, pledged as collateral, and transacted through integrated custody and resale channels where individual sales can reach seven figures and sometimes eight.

102. Policymakers and financial analysts increasingly recognize that financialization. In a December 2025 letter, Representative Pat Ryan described collectibles as a "sophisticated asset class" and third-party grading as "essential market infrastructure" enabling "liquidity and price discovery." [88] In July 2026, the media reported a Mizuho analyst's estimate that the trading-card market could reach $20 billion expressly noting growing institutional interest and analysis using methods associated with traditional equities.[89] Days later, a policy group within Japan's ruling Liberal Democratic Party stated that "[t]rading cards are no longer simply consumer

---

[87] GameStop Corp., *Proxy Statement* (Schedule 14A) (Apr. 24, 2025), https://s205.q4cdn.com/272884106/files/doc_downloads/annual-meeting-docs/2025/2025-Proxy-Statement.pdf.

[88] Ryan, *Letter to Ferguson*, *supra* note 11, at 1 (warning Collectors' control of grading "creat[es] severe conflicts of interest" and presents "unique opportunities for market manipulation and unfair self-dealing.").

[89] Rohit Gupta, *Wall Street Says the Trading Card Market Could Be Worth $20 Billion. Here's Why Target and Walmart Are Paying Attention*, YAHOO! FIN. (July 16, 2026, 9:44 PM), https://finance.yahoo.com/markets/stocks/articles/wall-street-says-trading-card-014429305.html (originally published by Athlon Sports and reporting a Mizuho analyst's $10 billion-to-$20 billion estimate of the 2026 trading-card market).

products," citing their expanding market and asset value in calling for regulatory consideration.[90] Industry participants, including Defendants, likewise describe collectibles as alternative assets and the collectibles market as a growing alternative-asset market.

103. Plaintiffs do not allege that Defendants created the trading-card market. They allege that Defendants created, scaled, and now control much of the grading-centered infrastructure through which graded cards are valued, compared, stored, financed, traded, and monetized. PSA's grade is the connective credential because it affects price, scarcity, liquidity, custody, resale, lending, insurance, market timing, and demand.

104. In Defendants' financialized collectibles marketplace, PSA's grade functions as a private rating; its Population Report as a prospectus-like scarcity disclosure; its Price Guide, Auction Prices Realized, and CardFacts as price-discovery tools; Card Ladder as an index, valuation, and portfolio-analytics platform; and the PSA Vault, Partner Offers, eBay integrations, and Collectors Financial Services as custody, execution, liquidity, and lending rails. Plaintiffs do not allege that trading cards are securities. The structural analogy follows from Defendants' own conduct and statements: they built and scaled a financialized marketplace in which PSA's grade supplies the core value signal for a trading-card asset class valued at more than $15 billion.[91]

---

[90] Sarah Hilton & Akemi Terukina, *Japan Weighs Regulating Pokemon Cards Amid Trading Mania*, THE JAPAN TIMES (July 23, 2026), https://www.japantimes.co.jp/business/2026/07/23/japan-weighs-regulating-pokemon-cards/; *see also* **Exhibit C**, setting forth Defendants' market representations and incorporated herein by reference; *Collectors Announces New $100 Million Financing Round*, BUS. WIRE (Mar. 30, 2022, 9:00 AM), https://www.businesswire.com/news/home/20220329006052/en/Collectors-Announces-New-$100-Million-Financing-Round; *Collectors Holdings Acquires Goldin Auctions*, AUCTION REPORT (July 1, 2021), https://www.auctionreport.com/collectors-holdings-acquires-goldin-auctions/ (stating that Collectors develops tools and services for "alternative investors" and that "[t]he collectibles market is now valued at more than $400 billion in annual transactions").

[91] Leore Avidar and Alexis Ohanian, *Tariffs are driving investors to Pokémon and Mickey Mantle as trading cards gain credibility as domestic assets*, N.Y. POST (Apr. 28, 2025, 6:30 AM), https://nypost.com/2025/04/28/opinion/tariffs-are-driving-investors-to-pokemon-and-mickey-mantle-these-arent-your-grandfathers-trading-cards/ ("Collectibles have emerged as a legitimate asset class: a $600 billion+ global industry, with trading cards alone valued at more than $15 billion . . . . These items are no longer mere nostalgic keepsakes; they have evolved into financial instruments with genuine longevity.").

105. The result is a vertically integrated, PSA-centered financial marketplace built around the Graded Card Credential. Defendants control or materially influence grading through PSA; scarcity data through Population Reports; price discovery through the PSA Price Guide, Auction Prices Realized, CardFacts, and Card Ladder; benchmarking through Card Ladder indexes; custody through the PSA Vault; sale execution through eBay-linked listings and consignment; liquidity through Partner Offers; and financing through Collectors Financial Services. Collectors itself describes its services as enabling hobbyists to "grade, authenticate, research, vault and sell" collectibles.[92] Defendants likewise describe grading as central to the established market reflected in **Exhibit C**, incorporated herein by reference. Their own statements portray trading cards as financial assets operating within a financialized market.

106. That integration makes Defendants' omissions more material, not less. Consumers deciding whether to grade, sell, hold, insure, finance, vault, accept an offer, or rely on PSA population data would consider it important that the same corporate family assigning the grade and publishing scarcity data also participates in pricing, custody, sale execution, liquidity, lending, marketplace routing, and submission-channel monetization. If PSA's grade is subjective, opaque, inconsistent, revisable, commercially managed, or contractually disclaimed, the consequences extend beyond the slab into grading demand, pricing, scarcity, liquidity, offers, resale, financing, and the fees Defendants extract throughout that market. Yet Defendants face virtually no oversight responsibilities or requirements that prevent them from influencing grades in ways that benefit their own downstream economic interests at the expense of consumers seeking neutral, expert, objective, and reliable Graded Card Credentials.

---

[92] Collectors, *Acquire Beckett*, *supra* note 59.

## IV. Defendants' Consumer-Facing Grading and Authentication Representations and Practices Promising Impartial, Expert, Objective, and Standardized Review

107. Because PSA's Graded Card Credential functions as a core value signal in the PSA-centered market, the integrity of the process producing it is material. The Graded Card Credential derives its value from market trust that PSA assigns its grades through the impartial, expert, standardized, criteria-based, and reliable process it markets. Those representations appear throughout PSA's workflow, pricing, and marketing, including its promotion of PSA grades as a authoritative and value-enhancing credential.

### A. The Grading Workflow PSA Markets to Consumers

108. PSA's public-facing workflow reinforces its representation that grading is neutral, expert, objective, criteria-based, and reliable, as further reflected in **Exhibit D**, incorporated herein by reference. PSA presents a controlled institutional process encompassing service-level selection, submission-form generation, shipping and intake, order tracking, certification-number assignment, authentication, grading, encapsulation, quality review, and return shipment.[93] These representations convey that the final grade results from a standardized, auditable-like process applying defined criteria—not opaque or undisclosed discretion.

109. Direct submitters identify their cards, select service types and levels, generate submission forms, and package and ship cards according to PSA's prescribed procedures, including specified card order, semi-rigid holders, submission forms, and Submission ID Labels.[94] Consumers using Card Grading Intermediaries enter the same PSA grading pipeline

---

[93] *How It Works*, PSA, https://www.psacard.com/info (last visited July 2, 2026); *Online Submission Center*, PSA, https://www.psacard.com/submit (last visited July 2, 2026).

[94] *Online Submission Center*, *supra* note 93; *PSA Update: Journey of a PSA Card*, PSA (Oct. 3, 2020), https://www.psacard.com/articles/articleview/10241/psa-update-journey-card.

through the intermediary's PSA-facing account after selecting their cards and service levels. *See supra* ¶¶ *29, 40(a)–(f), 55(a)–(c).*

110. PSA's intake sequence reinforces the appearance of institutional control. PSA states that once a package arrives at its facility, the Submission ID Label is scanned, an arrival email is sent, account and order pages are updated, all cards are accounted for, cards are placed with the submission form into an individual processing box, submissions are organized by service level, and an order number is assigned.[95] PSA's published workflow further states that the exterior processing box carries the order number, item quantity, service level, and estimated due-out date, allowing operational timing information to remain associated with the order even after customer-identifying information is later removed.[96]

111. PSA then represents that cards proceed through research, authentication, grading, encapsulation, grade check, quality assurance, and return shipment. Its Research Department identifies cards for label accuracy; the customer submission form is sealed away so personally identifying information no longer accompanies the card; and PSA assigns each card a unique certification number used to identify and track it through grading.[97]

112. After grading, PSA sonically seals the card in a tamper-evident holder bearing its proprietary LightHouse label, assigned grade, and certification number. PSA's public certification-verification database then allows market participants to verify information associated with that number.[98]

---

[95] PSA, *Journey of a PSA Card*, *supra* note 94.

[96] PSA, *PSA Update: Journey of a PSA Card*, PSA (Oct. 3, 2020), https://www.psacard.com/articles/articleview/10241/psa-update-journey-card.

[97] *Id.*

[98] *Grading*, *supra* note 61; *Cert Verification*, PSA, https://www.psacard.com/cert (last visited Sept. 28, 2026).

113. The PSA slab is therefore more than packaging. It carries the Graded Card Credential into downstream transactions through the holder, label, grade, and certification number, representing even to purchasers who never visit PSA's website that the card was authenticated, evaluated under PSA's represented standards, assigned the displayed grade, and maintained in PSA's certification system.

114. PSA further publishes those grades in population reports purporting to show the number of copies at each numerical grade.[99] Because PSA both assigns the grades and publishes the counts, those reports necessarily depend on sufficiently stable, consistent, and criteria-based grading for the resulting scarcity data to be meaningful. PSA's workflow thus does not end with the slab; each Graded Card Credential becomes a market signal.

### B. PSA's Public Promise: Expert, Standardized, Objective, and Reliable Review

115. PSA's public-facing materials communicate a common promise: consumers are purchasing a professional grading credential. PSA markets itself as a global leader in trading-card authentication and grading, represents that high PSA grades add status, scarcity, and value and command premiums in sales and auctions,[100] promoting its Authenticity & Grade Guarantee as fundamental to its reputation and assurance that PSA stands behind its determinations.[101]

116. PSA represents that grading applies basic objective standards with a criteria-based condition assessment focused on centering, corners, edges, and surface.[102] PSA represents grades not as arbitrary numbers, but as standardized determinations grounded in defined criteria.

---

[99] *Population Report*, *supra* note 63.

[100] *PSA*, https://www.psacard.com (last visited July 10, 2026); *About PSA*, PSA, https://www.psacard.com/about (last visited July 10, 2026); *Authentication*, PSA, https://www.psacard.com/services/autographauthentication (last visited July 10, 2026).

[101] *Online Terms of the PSA Authenticity and Grade Guarantee*, PSA, https://www.psacard.com/ financialguarantee (last visited July 2, 2026).

[102] *Grading Standards*, *supra* note 2; *PSA Authenticity and Grade Guarantee*, *supra* note 101.

117. PSA further portrays grading as institutional review rather than unsupported individual judgment. It states that PSA graders review cards for authenticity and describes a multi-stage process of identification, authentication, grading, encapsulation, grade check, quality assurance, and shipment.[103] Together, these representations portray PSA grading as an impartial, expert, controlled, objective, and repeatable process.

118. Those representations extend beyond PSA's website through slabs, labels, certification tools, population reports, Card Ladder data, marketplace and eBay integrations, auction listings, dealer materials, hobby media, and Card Grading Intermediaries.[104] PSA's crossover service further demonstrates the independent market value of its credential by allowing cards already graded elsewhere to be reviewed and potentially re-encapsulated in a PSA holder even though the underlying card remains unchanged.[105]

119. PSA sells more than authentication, encapsulation, or a number on a label. The Graded Card Credential represents that qualified experts assessed the card's physical condition under substantially standardized criteria—including centering, corners, edges, and surface—and that the resulting certification reliably compares condition. Plaintiffs allege these attributes create the trust, market acceptance, and economic value for which consumers pay, but PSA materially overstated them by delivering grading and certification that were less consistent, independent, and reliable than represented. The alleged fraud therefore concerns the attributes of the grading service and Credential consumers purchased, not entitlement to any particular numerical grade.

---

[103] *Grading, supra note 61; PSA, Journey of a PSA Card, supra* note 96.

[104] PSA Staff, *PSA Grading—Now Built Into eBay Checkout*, PSA (Apr. 1, 2025), https://www.psacard.com/articles/articleview/15161; Press Release, *Collectors and eBay Transactions Close, Summer Launch Expected for Integrated End-to-End Hobby Experience*, EBAY (May 16, 2024), https://www.prnewswire.com/news-releases/collectors-and-ebay-transactions-close-summer-launch-expected-for-integrated-end-to-end-experience-for-trading-cards-302146064.html.

[105] *Crossover*, PSA, https://www.psacard.com/services/tradingcardgrading/crossover (last visited July 2, 2026).

### C. Consumers See PSA's Price, Value, and Speed Package

120. Each submission starts with the selection of a service. PSA's consumer-facing grading page presents each service level as a single commercial choice organized around three terms: (1) a specific per-card price; (2) a specific Maximum Insured Value ("MIV"); and (3) an estimated turnaround-time range in business days. A "Get Started" button appears immediately below, inviting consumers to proceed based on that price-value-speed package.




**(Representative PSA trading-card grading pricing-page screenshot showing service levels presented with per-card price, Maximum Insured Value, estimated turnaround time, and turnaround-time asterisk.)**

121. PSA does not qualify those terms equally. Only the estimated turnaround time bears an asterisk. No terms-and-conditions link, recommendation to review them, or other adjacent disclosure indicates that the displayed price or MIV is provisional or subject to later adjustment. A consumer viewing the service-level card would therefore understand the asterisk to qualify turnaround time, not price or MIV.

122. PSA presents price as definite: a specific dollar amount per card, not an estimate or range that it may increase. The service-level card does not disclose that PSA may later determine the selected tier insufficient, move the card to a higher-priced tier, or demand an adjusted grading fee based on PSA's unilateral determination of the submitted card's value.

123. Turnaround time is presented differently. PSA expressly labels it "Estimated Turnaround Time," signaling an approximate rather than fixed period, and places an asterisk beside it. But the service-level card does not explain the asterisk, make it clickable, provide an explanatory footnote near the pricing grid, or link nearby to terms explaining its meaning.

124. PSA presents MIV with the same apparent definiteness as price: a specific amount without an asterisk, hyperlink, definition, or adjacent qualification. The service-level card does not explain that MIV limits PSA's compensation for actual loss or damage while an item is in its possession, that submitters are expected to estimate post-grading fair market value and select a tier exceeding that estimate, or that PSA may later demand a higher grading fee if it determines the selected MIV was insufficient. Those qualifications appear elsewhere in PSA's terms, FAQ, Coverage materials, and disclosures rather than alongside the displayed service-level options.

125. PSA places these three terms and the "Get Started" button together, inviting consumers to compare service levels and begin submissions based on the displayed package. Consumers then prepare and commit their cards to the selected services based on those terms and Defendants' representations concerning the Graded Card Credential.

126. The same structure governs submissions through Card Grading Intermediaries. Although the intermediary operates the PSA-facing portal after the beneficial owner decides to submit and pays, reimburses, or bears the Grading-Related Charges, including grading, shipping, handling, insurance, return-shipment, and passed-through value-based or adjusted charges. Card

owners review PSA's service levels directly and/or PSA-provided summaries conveyed through intermediaries, which involve the same pricing structure. Those consumers are further removed from PSA's qualifications because they may never operate its portal or encounter its terms. From the beneficial owner's perspective, the visible bargain remains the stated price-value-speed tiers. Below is a demonstrative that reflects the service level and submission architecture.




**(Demonstrative illustrating how PSA's pricing architecture operates sequentially from Service Level selection through payment before grade reveal, completion, or return.)**

127. After the consumer commits the card, PSA controls intake and timing, processes or grades the card, determines whether the selected value tier was sufficient, calculates any adjustment, and conditions grade disclosure, order completion, or return of the property on payment, regardless of whether the card is ultimately graded. The consumer thus commits before all pricing and timing variables are fixed. PSA presents a menu of consumer choices while retaining post-submission control over every material component except the cards submitted.

* * *

128. Taken together, PSA's grading transaction rests on two connected promises. First, PSA represents that an impartial, expert, objective, criteria-based, standardized, and verifiable process produces a Graded Card Credential that follows the card into the market through its slab, label, certification number, Guarantee, and population data. Second, PSA monetizes that credential through a price-value-speed structure under which it retains post-submission control over timing, value, payment, grade disclosure, and return. Consumers therefore are not buying plastic, paperwork, or a number in isolation; they are buying an expert, market-recognized Graded Card Credential whose value depends on PSA delivering what it represents.

## V. Defendants' Fraudulent Grading Scheme and Deceptive Fee Practices

129. Defendants' scheme has two connected parts: they misrepresent their grading services as impartial, expert, objective, criteria-based, guaranteed, and market-authoritative; and they use that same misrepresented credential to extract grading fees and related charges through deceptive pricing practices. Collectors then scaled both parts of the scheme through its vertically integrated trading-card infrastructure. We discuss each of these issues below.

### A. PSA's Fraudulent Grading Methodology and False Market Credential

130. Defendants' grading fraud begins with a critical misnomer: they market the grade as an impartial, expert-driven, and criteria-based product, while delivering an opaque, subjective, variable, and conflicted grading output affected by the undisclosed practices alleged below. The Graded Card Credential is materially different from Defendants' representations. In this respect, their fraud can be separated into four general categories of market-facing misrepresentations and omissions: (1) expertise fraud, namely that PSA grading involves expert determinations by graders with specialized skill, experience and judgment; (2) professional standards fraud, namely that PSA represented grading as impartial, objective, standardized, criteria-based, consistent, and governed by recognized and respected universal grading standards; (3) process-and-certification

fraud, namely that PSA represented its Graded Card Credential as a durable, verifiable, and market-authoritative credential; and (4) market-use fraud, namely that Defendants represented PSA's Graded Card Credential and the Collectors Downstream Channels could be relied on by consumers and the market to price, buy, sell, insure, finance, vault, and value graded cards. *See* **Ex. D**. Each category of representation was false, misleading, or materially incomplete.

### 1. The Qualifications of PSA's Graders Do Not Match Defendants' Marketed Expertise

131. A central pillar of PSA's marketing is that grading is performed by trained experts with specialized knowledge and experience sufficient to evaluate valuable collectibles with precision and consistency. PSA tells consumers that its "expert graders" can detect differences submitters "might not be able to tell" and assess details "not visible to the naked eye."[106] But PSA's marketing of "expert graders" is misleading.

132. Before Collectors took PSA private, PSA admitted that qualified collectibles authentication and grading experts were "in short supply," that competition for them was "considerable," and that PSA relied on training young graders that it hoped could become experts one day. PSA admitted that when orders increased, it contracted with outside people, "usually collectibles dealers," to address those short-term increases in grading orders.[107] But those "short-term increases" have persisted since 2021, necessitating two partial shutdowns of PSA's services. Thus, over the last five years, PSA apparently has used contractors possessing unknown background, experience, and training on PSA's standards, to perform PSA grading services. These admissions and circumstances undercut PSA's consumer-facing promise of expert grading. They show a constrained labor pool supplemented by trainees and unknown

[106] *PSA's Grading Guide*, PSA, https://www.psacard.com/info/get-started (last visited Sept. 28, 2026).

[107] *Supra* ¶ 69.

contractors—contractors who include market participants potentially with their own self-interest in the grading results for cards. Plaintiffs allege that Defendants' expansion prioritized throughput over the training, calibration, quality control, and reasonable grader-to-card ratios necessary to deliver the expert, consistent, criteria-based grading that PSA marketed.

133. PSA's current hiring and recruiting materials corroborate these issues. PSA does not even require prior grading experience, specialized training, or certification as a condition of hire as a grader. Instead, PSA merely prefers that applicants have one to three years of grading experience "as a professional, dealer or collector."[108] PSA recruiting materials describe the ideal grading applicants as PSA customers who have been successful with their own submissions or who have hobby experience, trainability, and a "good eye."[109] In other words, anybody who collects cards for a year could be hired as a qualified grader. This experience is inconsistent with the professional expertise that PSA's consumer-facing marketing implies.

134. Publicly available biographies for PSA card graders confirm these concerns. As reflected on the next page, these biographies describe work histories that include "cleaning bathrooms" and "fryers at local sub shops," writing music jingles and working at stadiums. Plaintiffs do not contend those occupations are disqualifying. Rather, these experiences are different from the background and experience that a reasonable consumer would attribute to an expert card grader hired to grade cards. Plaintiffs contend that these biographies corroborate PSA's own disclosures that professional grading expertise may be developed internally rather than a candidate possessing the qualifications when s/he enters PSA's workforce. The inference is that graders may be learning on the job while grading cards.

---

[108] *PSA Grader, NJ*, LINKEDIN, https://www.linkedin.com/jobs/view/psa-grader-nj-at-collectors-4243612935 (last visited July 10, 2026); Tobias, *supra* note 45; *cf. Sports Card Grading Jobs*, INDEED, https://www.indeed. com/q-sports-card-grading-jobs.html (last visited Sept. 28, 2026).

[109] *See* Tobias, *supra* note 45.




**(PSA grader who worked in restaurant industry and commercial real estate before joining PSA.)**




**(PSA grader who worked in restaurant industry and commercial real estate before joining PSA.)**

135. That development process matters because personnel can receive responsibility for valuable cards early in their PSA work. A former PSA research-and-identification employee states that personnel in his department handled vintage cards, including 1950s Bowman cards, during their first week of departmental training and that he worked with employees who had entered the department without prior collecting experience.[110] Research and identification are distinct from numerical grading, but they are credential-producing stages in which PSA handles,

[110] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 22:20–22:32, 26:19–28:10 (2026), https://youtu.be/WDLIFTR2qf0.

identifies, and routes the card before grading. Plaintiffs allege that these facts also make the adequacy of training, supervision, and handling controls material to PSA's representation that a series of specialized experts reliably produces the final Graded Card Credential.

136. PSA's confidentiality practices compound that information gap. PSA does not publicly disclose individual grader identities, training records, calibration data, performance metrics, consistency records, or quality-control results.[111] A reported internal Collectors email further reminded employees not to disclose confidential information or trade secrets concerning grading "techniques, methods, practices, [and] processes," while former personnel discussing PSA's operations publicly have invoked NDAs or concealed their identities.[112] Plaintiffs do not contend that confidentiality protections themselves establish wrongdoing. They allege, however, that the need for "trade secrets" protections are unclear when Defendants' competitors make similar information available publicly.[113] Moreover, the breadth of PSA's restrictions, considered together with the specific undisclosed practices alleged herein, materially impedes consumers' ability to test PSA's affirmative claims of expert, standardized, and reliable review and supports the inference that material contrary practices remain concealed. PSA's May 2026 announcement that demand had outpaced expansion and that it would invest heavily in workforce growth and specialized training reinforces the materiality of those undisclosed controls.[114]

---

[111] Boston Card Hunter, *PSA Just Sent Employees A Warning: Why Now?*, YouTube at 0:24–2:28, 6:43–6:59 (Sept. 11, 2026), https://www.youtube.com/watch?v=zGgnrTKQEQc.

[112] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube (2026), https://youtu.be/WDLIFTR2qf0; Boston Card Hunter, [Interview with "Rob"], YouTube (2026), https://www.youtube.com/watch?v=mD2Gh4lYZbQ.

[113] *See, e.g.*, CGC Cards, *Grade School* series, CGC Cards, https://www.cgccards.com/news/article/10837/csg-grade-school/ (describing and demonstrating grading tools and review of surfaces, centering, edges, corners, and alteration detection).

[114] PSA Staff, *$200 Million Infrastructure Investment*, *supra* note 16.

### 2. PSA Markets Grading as Impartial, Objective, Criteria-Based, and Reliable, But Delivers a Conflicted, Subjective, and Variable Product

137. The deception does not stop with who assigns PSA's card grades. PSA also misrepresents how grades are determined. PSA markets grading as impartial, objective, criteria-based, reliable, and consistent, causing consumers to believe each grade reflects fixed standards applied by trained experts. Plaintiffs allege PSA delivers something materially different.

138. PSA President Ryan Hoge publicly described PSA's grading operation as "a lightweight manufacturing facility" where "raw cards come in one end" and "go out slabbed . . . the other end" through "eight or nine discrete steps,"[115] with grading itself only "one of those steps."[116] Plaintiffs allege that PSA's own description reflects a throughput-driven production system materially different from the careful, objective, expert review marketed to consumers. The problem extends beyond the factory mill analogy. PSA's Graded Card Credential is produced through alleged conflicts, malleable criteria, subjective "eye appeal," inconsistent outcomes, certification changes, errors, and production pressure. The production targets and operational evidence alleged below confirm that PSA's manufacturing model is not merely a description of workflow; rather, grading itself operates within a system managed for quantified throughput rather than individual, unbiased condition assessment.[117]

#### a. PSA's Claimed Impartiality Conflicts with Corporate and Personal Financial Interests

139. PSA represents that its grades provide "impartial, third-party validation," that it has "no financial stake in the item's sale," and that "[a]ll perceived conflict of interest is

[115] NEO Cards & Comics, *PSA Is Raising Prices (Again)*, *supra* note 23, at 10:15–10:47.

[116] *Id.*

[117] *See infra* ¶¶ 159–162.

eliminated."[118] But Collectors participates in pricing, custody, offers, resale, marketplace flow, and financing tied to PSA-graded cards, while PSA's own compensation can increase based on the post-grading value materially affected by the grade PSA assigns.[119] Defendants therefore hold economic interests in the value, liquidity, scarcity, and disposition of assets whose market credential PSA itself creates. Plaintiffs allege that PSA's categorical representations of no financial stake and eliminated conflict are false or materially misleading because Defendants do not disclose those interests or the safeguards, if any, that separate them from grading decisions.

140. The conflict also extends to Collectors' senior leadership. Nat Turner is Collectors' CEO and Executive Chairman and one of the hobby's most prominent collectors. In 2023, Turner reported owning approximately 15,000 to 20,000 PSA-graded cards, another approximately 5,000 BGS-graded cards, approximately 5,000 unopened boxes, and hundreds of thousands of additional raw cards.[120] Those holdings give Turner a personal economic interest in the scarcity and relative value of PSA-graded cards because PSA itself assigns the grades and publishes the grade populations that the market uses as scarcity signals. In separate litigation, collector Steve Lichtman alleges a concrete example of that conflict: PSA refused to cross Lichtman's SGC 10 1952 Bowman Mickey Mantle into a PSA 10 while Turner allegedly owned one of only two known PSA 10 examples, meaning another PSA 10 allegedly would have

---

[118] *Tips for Collectors*, *supra* note 10; *see also* **Exhibit D**; Joe Orlando, *Top 5 Tips for Internet Buying & Selling*, PSA (July 28, 2010), https://www.psacard.com/articles/articleview/6318/top-5-tips-internet-buying-selling (stating that PSA has "no financial interest in the sale" and therefore "there is no conflict of interest perceived by the buyer anymore").

[119] *See* supra ¶¶ 11–15, 85–115; *see infra* ¶¶ 186–190.

[120] Greg Bates, *How Passionate Collector, Industry CEO Nat Turner Assembled One of Hobby's Largest, Most Valuable Card Collections*, **Sports Collectors Digest** (June 15, 2023), https://sportscollectorsdigest.com/news/nat-turner-collection-cards-michael-jordan-lebron-james-kobe-bryant-collectors.

reduced the rarity and relative value of Turner's competing card.[121] Plaintiffs do not plead Lichtman's allegations as adjudicated facts; they plead them as a specific factual allegation supporting the reasonable inference that substantial undisclosed personal inventory can create the very financial conflict PSA tells consumers has been eliminated.

141. PSA personnel also participate personally in the same graded-card market. Collectors publicly advertises employee discounts on select grading services.[122] A former PSA Research and Identification employee states that he personally submitted cards through PSA while employed there and noted that graders commonly submitted and resold personally owned graded cards through eBay and card shows.[123] A reported September 2026 internal email from CEO Turner separately reminded Collectors employees that adherence to company policies "protects the integrity of our brand" and prohibited employees from influencing their own orders, family-member orders, or orders of persons with whom they have close personal relationships through grading, verification, authentication, handling, expediting, direct employee contact, or grading-system access. The reported email linked to an Employee Collectible Market Participation Policy and a Grader/Authenticator Anti-Self-Interest Policy.[124] Those restrictions support the reasonable inference that Collectors itself recognizes employee market participation and self-interest as risks to the integrity of its grading brand. The publicly reported summary

---

[121] Complaint ¶¶ 43–48, *Lichtman v. Collectors Universe, Inc.*, No. 30-2026-01587094-CU-BC-CJC (Cal. Super. Ct. Orange Cnty. July 21, 2026), removed, No. 8:26-cv-02048-MRA-ADS (C.D. Cal. July 30, 2026), ECF No. 1-1.

[122] *See* Collectors, *Careers*, https://www.collectors.com/careers (last visited Sept. 27, 2026) (advertising employee discounts consisting of "special savings on select grading services").

[123] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 8:33–11:57 (Sept. 2026), https://youtu.be/WDLIFTR2qf0 (former employee describing his own PSA submissions, employee grading discounts, in-office pickup, and employee resale activity and estimating that 60% to 70% of researchers and graders resold personally owned cards).

[124] Boston Card Hunter, *PSA Just Sent Employees A Warning: Why Now?*, YouTube at 0:24–2:28, 6:43–6:59 (Sept. 11, 2026), https://www.youtube.com/watch?v=zGgnrTKQEQc (reporting and reading an internal email attributed to Turner and identifying linked employee-market-participation and anti-self-interest policies).

does not disclose whether or how the complete policies address a distinct conflict alleged here, namely that graders or other credential-producing personnel own and sell card inventory that competes economically with cards whose grades and scarcity they help determine.

### b. PSA's Undisclosed Criteria Changes Make Its Published Standards Malleable

142. PSA repeatedly markets grading as the application of objective standards, but then it changes those standards from time to time without explanation or notice. For example, in or around January 2025, PSA changed the critical front centering criteria published on its website. Under its prior standards, a card could qualify as a PSA 10 with front centering approximately at 60/40; a PSA 9 at 65/35; and a PSA 8 at 70/30. PSA eliminated those tolerances, limiting the key front centering criteria to 55/45 for PSA 10, 60/40 for PSA 9, and 65/35 for PSA 8. The changes represented a reduction in tolerances from 80% to 90% dead center for the crucial PSA 10 grade with similar reductions down the top grading tiers. Digital archives show how PSA's published standards on January 14, 2025, differed from its standards on January 30, 2025. PSA never told consumers that it changed the tolerances represented on its website that PSA publicly marketed.




**(Comparison screenshot showing PSA's published grading-standard language before and after PSA revised centering tolerances for PSA 8, PSA 9, and PSA 10.)**

143. PSA changed the published tolerances above without any contemporaneous notice identified on the grading-standards page or elsewhere, even though the revised criteria materially changed what the published standards told consumers could qualify for PSA's highest grades. PSA's explanation confirms the deception. On the March 12, 2025, episode of *The PSA Pod*, PSA President Ryan Hoge characterized the revision as merely a "grading standards language update," stating that PSA removed the 60/40 component because 55/45 had "always been the standard" and that PSA "did not" change the rules.[125] That explanation creates two possibilities, and both support Plaintiffs' fraud theory. If 55/45 was always PSA's operative PSA 10 standard, then PSA's prior published standard allowing centering "not to exceed approximately 55/45 to 60/40" materially misrepresented the rule PSA says it actually applied. If PSA's operative standard instead became stricter, then the representation that PSA merely changed website language and "did not" change the rules was materially misleading. Either way, consumers were shown one purportedly objective standard while PSA says it was applying another.

144. The grading-standard issue is not limited to competing interpretations of archived website language. In a separate complaint, Lichtman alleges that during a summer 2025 meeting Turner personally confirmed that PSA's grading standards had changed in recent years and had become stricter and more exacting than before Collectors acquired PSA in 2021.[126] If proven, Turner's statement is management-level evidence that PSA's operative standards changed and that Collectors' leadership knew of those changes while PSA publicly characterized at least some revisions as merely changes in website language. Moreover, these incidents are evidence that

[125] PSA Official, *The PSA Pod- Key early 2025 PSA updates with President Ryan Hoge* at 18:00–21:38, YOUTUBE (Mar. 12, 2025), https://www.youtube.com/watch?v=GjNDFwBWQf0.

[126] Complaint ¶¶ 37–40, 69, *Lichtman v. Collectors Universe, Inc.*, No. 30-2026-01587094-CU-BC-CJC (Cal. Super. Ct. Orange Cnty. July 21, 2026), removed, No. 8:26-cv-02048-MRA-ADS (C.D. Cal. July 30, 2026), ECF No. 1-1.

PSA changes its grading standards without any or proper notice. Plaintiffs allege that their submissions faced hasher scrutiny than PSA's published standards.

### c. PSA's Eye-Appeal Standard Makes Grading Subjective

145. Despite advertising objective standards to build market confidence, PSA employs a subjective override capable of changing the application of otherwise measurable criteria. PSA's grading page states: "***Centering Note**: At the grader's sole discretion, a small variance may be permitted on occasion based on the card's overall eye appeal." PSA separately explains that although "a large part of grading is objective," another component is "somewhat subjective," and states that "the best way to define the subjective element" is to ask: "What will the market accept for this particular issue?"[127] PSA thus does not define that component by a fixed physical-condition measurement. It expressly permits an unidentified grader's judgment about market acceptance to enter the condition grade that PSA then sells to the market as authoritative.

146. That question is not an objective grading criterion or subjective opinion. It is at best a guess that allows PSA to grade cards based on perceived market tolerance rather than on an alleged expert assessment of surface condition, centering, corners, edges, and other physical condition characteristics. The circularity in this definition is material because consumers pay PSA to define for the market a card's condition, but PSA says market acceptance determines the grade PSA assigns. A reasonable consumer would not understand that the final grade may be adjusted upward or downward based on an unidentified (and perhaps unqualified) grader's subjective view of market acceptability. Instead, graders rely on a highly subjective, undefined eye-appeal standard that is inconsistent with the standards Defendants represented to consumers and the market.

[127] *Grading Standards*, PSA, https://www.psacard.com/gradingstandards (last visited Sept. 27, 2026).

147. PSA President Ryan Hoge confirmed the point when responding to strong public criticism about grading inconsistency. Hoge stated that PSA offers an "opinion-based service," that "the opinion can change," and that one grader may view a flaw as more detrimental and penalize the card more than another grader would.[128] Those admissions confirm that materially different grader judgment can affect the final score assigned to the same observed condition. Plaintiffs allege that this grader-to-grader variability materially qualifies PSA's simultaneous representation that its market-authoritative, Graded Card Credential results from objective, standardized, criteria-based review. The fraud here is not that professional judgment exists; it is that PSA sells the authority of standardized grading while materially understating the discretion capable of changing the result. These misperceptions induced Plaintiffs to submit their cards.

**d. Cracking and Resubmission Show Non-Repeatability**

148. PSA's subjective grading framework produces a predictable consequence of cracking and resubmission. In the hobby, "cracking" means removing an already graded card from its plastic holder to resubmit in pursuit of a different grade. Resubmissions occur when a consumer receives a grade that s/he wants PSA to re-review in search of a better result. If PSA grading were criteria-based and reliable, the same unchanged card should receive substantially the same grade under materially similar conditions. Cracking and resubmission exist because that is not how PSA grading functions. The card remains the same, but what changes is the grader, timing, production pressure, and undisclosed guidance applied during review.

149. PSA monetizes this variability through paid review, resubmission, crossover, and related services.[129] Those services permit PSA to collect additional fees when consumers seek

---

[128] The Geoff Wilson Show, *EXPLOSIVE INTERVIEW: PSA President Ryan Hoge on Card Cleaning, New Slabs, AI Grading & More!* at 24:10, YOUTUBE (Apr. 24, 2024), https://www.youtube.com/watch?v=8bfuICkhi4s.

[129] *Frequently Asked Questions, supra* note 83; *Trading Card Review*, PSA, https://www.psacard.com/services/tradingcardgrading/review (last visited July 4, 2026); *Crossover, supra* note 105.

another assessment of the same card or seek to convert an existing competing credential into a PSA Graded Card Credential. Plaintiffs allege that the resulting repeat-service revenue gives PSA a direct economic benefit from variability in the same grading process it markets as reliable. Public examples illustrate this inconsistency in grading approach.

150. In a documented hobby-media experiment, Tyler Nethercott, who publishes under the name "T-Pott," submitted the same 1989 Upper Deck Ken Griffey Jr. rookie card to multiple grading companies and reported materially divergent results. Relevant here, PSA first graded the card a 6 and later graded the same card an 8 on resubmission—dramatically different scores.[130] The reported PSA 6-to-8 change on the same unchanged card is direct evidence that materially different PSA grades can result from repeat assessment and supports Plaintiffs' allegation that PSA's grading is less reliable and standardized than the Graded Card Credential it markets.

151. PSA's treatment of at least some identifiable resubmissions further undermines the appearance of a blind reassessment. A former PSA Research and Identification employee states that when PSA's system recognizes a previously graded serial-numbered card, the researcher must identify the prior order, certification number, and grade in a certification comment and select "alert graders."[131] Yet PSA's Terms state that a card removed from a PSA holder will be treated "as if it were never graded by PSA" and may receive a different grade on resubmission.[132] Plaintiffs allege that consumers paying for reassessment would consider it material that PSA may affirmatively provide graders with the very prior grade being reconsidered. That undisclosed information makes the review non-blind and can anchor the new

---

[130] Market Movers by Sports Card Investor, *SHOCKING RESULTS! I Sent The SAME Card to FIVE Different Grading Companies*, YOUTUBE (Feb. 23, 2026), https://www.youtube.com/watch?v=wD7n8kHvySs&t=1304s.

[131] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 38:16–39:27 (Sept. 2026), https://youtu.be/WDLIFTR2qf0.

[132] PSA Submission Services Online Terms § 9, https://www.psacard.com/termsandconditions (last visited Sept. 27, 2026).

determination to the prior result. Moreover, this information allows a reasonable inference that graders may receive other information that can influence the cards that they grade. PSA's nondisclosure agreements shield this critical information from public scrutiny.

#### e. Altered, Erroneous, and Revised Certifications Undermine the Reliability of the PSA Graded Card Credential

152. PSA's grading fraud is not limited to subjective judgment, changing standards, or inconsistent application. The reliability of the Graded Card Credential also depends on PSA correctly determining whether a card is eligible for a numerical grade, accurately executing the grade, and maintaining a reliable certification after issuance. PSA's own Terms state that PSA will not assign a numerical grade to an item that, in PSA's judgment, bears evidence of damaged or altered surfaces or other doctoring, while also reserving PSA's authority later to remove a card from its holder, change its grade or label, or deactivate a certification if PSA determines that the item was incorrectly graded, altered, counterfeit, or otherwise ineligible.[133] Plaintiffs allege that those corrective powers make the frequency, causes, and consequences of cards incorrectly admitted into PSA's grading and certification system material to the reliability PSA sells.

153. Publicly reported incidents show why that omission is material. As reflected in the screenshot on the next page, Nick Andrews, who publishes hobby-media commentary under the name "Boston Card Hunter," documented an instance in which PSA allegedly assigned an incorrect grade to a consumer's card.[134] Yet PSA does not publicly disclose the data showing the categories, frequency, causes, correction, or remediation of grading and certification errors necessary to evaluate its reliability claims.

---

[133] PSA Submission Services Online Terms §§ 12(e), 12(f), 12(k), https://www.psacard.com/ termsandconditions (last visited Sept. 27, 2026).

[134] Boston Card Hunter, *This PSA Error Will Make You Rethink Your ENTIRE Collection*, YOUTUBE (Apr. 15, 2026), https://youtu.be/BwUaZP6tWnc.




(**Screenshot altered to include photo of subject card graded PSA 1 next to PSA email concerning the card**).

154. EDI Sports Cards documented a different example involving a Ken Griffey Jr. minor-league card. In that case, PSA allegedly deactivated the card's certification number, so PSA's website no longer reflected the card as graded. After the owner contacted PSA and then returned the card at PSA's request, PSA allegedly informed the owner that the original PSA 10 grade was a clerical error, cracked the card from its holder, and re-encapsulated it as a PSA 9.[135] Plaintiffs allege the incident is significant because PSA deactivated the publicly accessible certification, took back the slabbed card, reduced the grade, and returned a materially less valuable credential after the original PSA 10 had already entered the stream of commerce.

155. A more recent incident concerns whether a card was eligible for a numerical grade at all. The seller of a serial-numbered 05/10 2024 Panini Clearly Donruss Caleb Williams rookie card states that its acetate backing arrived peeling; Panini classified his replacement claim as "FACTORY DAMAGED / FOIL PEELING" but denied replacement; he then removed the

---

[135] ediSportscards, *PSA Robs Collector of $2200 of Value - What's the Lesson?* at 1:14–2:19, YOUTUBE (Apr. 22, 2026), https://www.youtube.com/watch?v=H5cP62AE83w.

remaining backing and disclosed that removal to PSA in writing when submitting the card.[136] PSA nevertheless issued certification no. 124715958 with a GEM MT 10 grade—the sole PSA 10 example, with none higher.[137] PSA's published standards identify "Altered Stock" as a no-numerical-grade condition, and its Oline Terms state that PSA will not numerically grade items bearing, in its judgment, damaged or altered surfaces or other evidence of doctoring.[138] If the seller's account of his written disclosure is accurate, PSA had express notice that a manufactured component had been removed yet awarded its highest numerical grade.




(**Screenshots eBay posting of altered submitted to PSA that received a Gem Mint Grade**).

156. These incidents expose different failure modes in the same credential-producing system: an incorrect grade or label, a certification later downgraded after entering commerce,

---

[136] *2024 Panini Clearly Donruss—Clearly Bomb Squad Caleb Williams #1 Gold /10 (RC)*, eBay Item No. 307132145679, https://www.ebay.com/p/19079476017 (listing and images preserved Sept. 20, 2026).

[137] PSA Certification Verification No. 124715958 (record and screenshot preserved Sept. 27, 2026).

[138] *Grading Standards*, PSA, https://www.psacard.com/gradingstandards (last visited Sept. 27, 2026) (identifying "N5 Altered Stock" and providing for an "Authentic Altered" designation rather than a numerical grade); PSA Submission Services Online Terms § 12(e), https://www.psacard.com/termsand conditions (last visited Sept. 27, 2026).

and an allegedly altered card admitted into the highest numerical grade despite claimed advance disclosure. Fraud allegation is not the mere occurrence of errors or mistakes. It is that PSA sells the Graded Card Credential as the durable and reliable output of expert review, grade check, and quality assurance while concealing the information necessary to determine how often ineligible or materially incorrect credentials enter the market and later require correction. These issues damage the Graded Card Credentials that Plaintiffs received.

157. PSA President Ryan Hoge has publicly estimated that PSA makes fewer than 100 errors out of approximately two million cards graded in a month.[139] But PSA has not publicly disclosed the methodology underlying that estimate or what PSA counts as an "error"—including whether the figure includes numerical-grade errors, research or identification errors, clerical label errors, altered or ineligible cards that receive numerical grades, errors caught before release, or post-issuance corrections and deactivations. Without those categories and source data, consumers cannot test the estimate against PSA's representation that its Graded Card Credential is reliably produced.

158. PSA also retains continuing control over a Graded Card Credential after it enters the market. Its Online Terms authorize PSA, upon later examination, to change a grade or label, remove an item from its holder, refuse to return an item with a grade PSA now considers incorrect, and deactivate previously issued certifications for items PSA believes are altered, counterfeit, tampered with, or otherwise in violation of its terms.[140] Those powers confirms that the issued credential is not immutable. Plaintiffs allege that PSA materially overstates durability and reliability when it markets a stable, verifiable Graded Card Credential while withholding

---

[139] Sports Cards Nonsense, *PSA Just Exposed a $200M Fake Card Scandal…* at 52:20-64:00, YOUTUBE (May 8, 2026), https://www.youtube.com/watch?v=fadGbN5M1eQ.

[140] PSA Submission Services Online Terms §§ 4(c), 12(f), 12(k), https://www.psacard.com/termsand conditions (last visited Sept. 27, 2026).

how often issued grades and certifications later require correction, downgrade, removal, or deactivation and how those changes affect Population Reports and prior market transactions.

#### f. High Demand and Production Pressure Undermine Reliability

159. PSA's production environment is not merely an analogy. PSA's own current grader posting requires graders to evaluate cards "in an expedient manner," "maintain individual daily grading production goals," and work in a "high-paced environment," while maintaining accuracy.[141] A former PSA Research and Identification employee states that at the East Coast operation known to him, graders were expected to complete approximately 500 units per day, researchers approximately 600 units per day, and the Research Department approximately 26,000 cards per day; he also described mandatory ten-hour shifts during backlog surges.[142] Those operational facts corroborate the previously reported former-grader account estimating approximately 500 to 700 cards per shift and describing grading in seconds.[143] Plaintiffs allege that PSA imposes quantified throughput requirements on the very expert judgment it markets as careful, individualized, and reliable.

160. PSA's public staffing history shows how quickly that production system had to scale. Collectors Universe's 2020 Form 10-K identified forty-four customer-service and support personnel (not 44 graders) and 33 trading-card experts as of June 30, 2020.[144] Industry reporting

---

[141] *PSA Grader, NJ*, Collectors Careers, https://collectorsuniverse.wd1.myworkdayjobs.com/en-US/collectors/job/PSA-Grader--NJ_PL313 (last visited Sept. 27, 2026).

[142] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 14:30–15:35 (Sept. 2026), https://youtu.be/WDLIFTR2qf0.

[143] Boston Card Hunter, *Confessions of an Ex-PSA Grader*, YouTube at 6:40–9:35, 13:05–18:45 (Dec. 30, 2025), https://www.youtube.com/watch?v=YuxbvPhoWhQ.

[144] Collectors Universe, Inc., *Annual Report (Form 10-K)*, Item 1, Business (Aug. 26, 2020), https://www.sec.gov/Archives/edgar/data/1089143/000149315220016754/form10-k.htm; Collectors Universe, *Annual Report* (2019), *supra note 56*, Item 1, Business.

later described PSA as employing approximately 100 graders as of January 2025.[145] Against PSA's reported output of approximately 90,000 cards per day, those figures, together with PSA's express daily production goals and the operational accounts above, support Plaintiffs' inference that PSA's grading model necessarily depends on high-volume throughput rather than extended individualized deliberation over each card's condition to arrive at a grade.

161. Demand spikes intensified those production pressures. PSA states that its global grading capacity increased from approximately 15,000 cards per day in 2021 to approximately 90,000 per day by 2026.[146] The former Research and Identification employee described mandatory ten-hour shifts during a backlog surge and stated that employees understood that failure to meet assigned production numbers could result in performance termination; he described an operational emphasis on repeatedly "hitting your number" and fatigue among Research personnel.[147] Plaintiffs allege that increasing daily output approximately sixfold while imposing quantified production expectations and performance consequences created predictable pressure on the training, supervision, consistency, and quality controls necessary to deliver the expert Graded Card Credential that PSA marketed.

162. The result is a production-driven grading system materially different from the one PSA markets. Consumers are not told at the point of submission that PSA graders work under individual daily production goals, that internal operations allegedly impose specific numerical targets and performance consequences, or that demand spikes have produced mandatory

---

[145] Greg Bates, *Good News for Collectors: PSA, Beckett Making Progress on Backlog of Grading Submissions*, Sports Collectors Digest (Nov. 2, 2021), https://sportscollectorsdigest.com/news/psa-beckett-card-grading-progress-update-submissions; Matt Felumlee, *Behind the Scenes at PSA: The Card Grading Process*, CardHound Vintage (Jan. 23, 2025), https://cardhoundvintage.com/behind-the-scenes-at-psa-the-card-grading-process/.

[146] PSA Staff, *An Update on Pricing and Services at PSA (February 2026)*, PSA (Feb. 10, 2026), https://www.psacard.com/articles/articleview/15663/grading-services-update-february-2026.

[147] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 14:30–15:35, 23:19–24:24 (Sept. 2026), https://youtu.be/WDLIFTR2qf0.

extended shifts. Those facts do not merely describe a busy workplace. Plaintiffs allege that they are material operating conditions affecting the expert judgment, consistency, and reliability for which consumers pay and that PSA's failure to disclose them reinforces the false impression that its credential results from careful, criteria-based review unconstrained by production pressure.

#### g. PSA's Undisclosed Grading Practices Shape Gem-Mint Populations

163. PSA's Online Terms give it substantial continuing control over grades and certifications.[148] PSA necessarily shapes Gem Mint 10 populations through the practices that determine which cards receive its highest and most valuable credential. That effect requires neither an express quota nor an intentional cap. Differences in grader experience, heightened scrutiny of particular cards, subjective eye appeal, changing criteria, production pressure, batch or ratio-based review, managerial intervention, certification changes, and other undisclosed practices can systematically affect PSA 10 outcomes and the scarcity premiums they create. Because PSA publishes those outcomes as market-facing scarcity data, the practices capable of shaping them are material whether their population effects are intended or merely systemic.

164. Defendants' own public statements provide evidence that considerations beyond an individual card's condition can affect grading outcomes. When consumers questioned PSA's acquisition of Pokémon cards from a submitter during grading—cards PSA initially graded 9, acquired through an instant offer, and later regraded 10 for resale—PSA's explanation, conveyed through business partner Geoff Wilson, attributed the secondary review in part to the submitter's

[148] *See PSA Submission Services Online Terms* §§ 12(f), 12(k) (last updated Apr. 22, 2026), https://www.psacard.com/termsandconditions (providing that PSA may "change the grade/label as it deems appropriate," will not return an item bearing its original grade after determining that the item was over graded, and may deactivate a previously issued certification after the item has been encapsulated and returned to its owner); *PSA Authenticity and Grade Guarantee*, *supra note 101*, "Guarantee Remedies" ¶ 2 (providing that PSA may assign an authentic card a lower grade or deem it ineligible for a grade and return the card bearing the revised grade).

"ratio of cards submitted" without receiving a perfect grade.[149] If each card were evaluated solely on its own condition under the represented criteria, the proportion of PSA 10s elsewhere in the submission would have no reason to enter the explanation for re-review. The incident does not require Plaintiffs to prove a formal numerical quota; it supports the reasonable inference that submission-level grade distribution can trigger additional scrutiny capable of changing an individual grade and, consequently, aggregate grade populations. Plaintiffs contend that these same scrutiny practices adversely impacted the determinations for their cards.

165. On information and belief, PSA's internal practices can shape grade distributions at scale even without an express population control quota. Differences in grader assignment and experience, heightened scrutiny of premium or high-value cards, internal calibration, batch review, managerial intervention, production pressure, and eye-appeal overrides systematically affect PSA 10 outcomes. PSA does not disclose whether particular categories of cards receive different scrutiny, whether graders are assigned based on card value, age, or type, or whether graders are trained, evaluated, supervised, or corrected by batch- or population-level outcomes. Those facts are uniquely within Defendants' control and appropriately tested through discovery.

166. Public population data provides additional evidence of systematic population effects. Cards within the same product release generally undergo the same manufacturing and distribution processes regardless of the player, character, or subject depicted. PSA population data reflects materially different Gem Mint rates across cards and categories.[150] Independent

---

[149] The Geoff Wilson Show, *It's NOT a Conspiracy: PSA's Mysterious Grade Swap EXPLAINED* at 3:16–9:48, YOUTUBE (Dec. 10, 2025), https://www.youtube.com/watch?v=CI5TH_eKNkQ (Geoff Wilson stating that he has an "extensive business relationship with PSA" and that he obtained information from PSA about the incident).

[150] NEO Cards & Comics, *Is PSA Grading Harder? Let's Look at the Data* at 13:20–16:17, 17:45–20:30, YOUTUBE (May 22, 2026), https://www.youtube.com/watch?v=Oi0Mx9_sxeY&t=708s (analyzing GemRate data and discussing increased TCG grading volume, declining and later rising TCG Gem Mint rates, comparatively flat sports-card Gem Mint rates, and possible explanations other than raw submission volume).

GemRate analysis also shows substantial changes in PSA Gem Mint rates over time, divergent sports-card and TCG patterns, and grading volume that did not move in lockstep with PSA 10 rates.[151] These patterns do not establish their cause, but they are consistent with Plaintiffs' allegation that undisclosed grading practices systematically shape grade distributions—a practice that adversely impacted their cards.

167. Taken together, these allegations support the inference that PSA's grades and graded populations are not merely passive reflections of card condition; they are outputs of the grading system PSA controls. Whether those population effects result from grader assignment, differing scrutiny, subjective judgment, production pressure, ratio-based review, internal calibration, managerial intervention, numerical-grade eligibility and classification, intentional population management, or some combination thereof is properly tested through discovery. What matters is that PSA markets individual grades as criteria-based assessments, publishes their aggregate distribution as meaningful scarcity data, and does not disclose internal practices capable of systematically affecting either. Far more telling, PSA actively conceals them through nondisclosure agreements.

### 3. PSA's Fraud Lies Not Only in the Grade, but in the Graded Card Credential

168. PSA's Guarantee further demonstrates the gap between the protection PSA markets and the protection its Graded Card Credential actually carries. PSA describes the Guarantee as fundamental to its reputation and assurance that it stands behind the authenticity and grade on its label.[152] But the Guarantee excludes original submitters and those acting on their

[151] *Id.* at 3:09–8:02, 11:41–17:02, 18:04–20:30 (discussing sports-card Gem Mint-rate decline from 2024 into 2025, TCG Gem Mint-rate divergence, GameStop submissions, PSA centering-standard updates, sports-card quality control, market heat, and submitter mix as possible contributors to PSA Gem Mint outcomes).

[152] *Online Terms of the PSA Authenticity and Grade Guarantee*, PSA, https://www.psacard.com /financialguarantee (last visited Sept. 27, 2026).

behalf, as well as clerical errors in the assigned grade or description.[153] Plaintiffs allege that these exclusions materially qualify PSA's broad Guarantee messaging by denying protection both to the consumer who directly obtained the grading service and for a large category of erroneous grades that one would reasonably expect a guarantee to covered for a product.

169. The original submitter exclusion is material because the person who directly purchases and receives the grading service may be the first to discover a problem when the card is returned, yet that person cannot invoke the Guarantee's monetary remedies. PSA may provide separate customer-service, correction, review, or resubmission mechanisms that are not the financially backed Guarantee PSA invokes to support confidence in its Graded Card Credential. The original submitter faces additional payment requirements for some remedies outside the Guarantee.[154]




(**Representative screenshots of how PSA markets its guarantee**)

---

[153] *Id.* (excluding original submitters and clerical errors in assigned grades or descriptions); PSA Submission Services Online Terms § 13, https://www.psacard.com/termsandconditions (last visited Sept. 27, 2026).

[154] *Frequently Asked Questions, supra note 83*; *Trading Card Review, supra* note 129.

170. Plaintiffs allege that Defendants use the Guarantee as a marketing ploy to boost confidence and induce submissions while structuring its eligibility and exclusions more narrowly than the broad assurance PSA markets. PSA invokes the Guarantee to support the credibility, liquidity, and market value of PSA-graded cards, but structures it so the original payor often cannot use it, and with limitations the negate its advertised effectiveness.

### 4. PSA's Population Reports Convert Controlled or Distorted Grade Outcomes Into False Market Scarcity Signals

171. PSA's Population Reports extend the fraud beyond grading decisions and the individual slabs. PSA describes its Population Report as an "online record" or database of PSA-certified items in the marketplace, updated as additional items are added.[155] By publishing grade-by-grade counts, including PSA 10 counts, PSA converts its Graded Card Credentials into public scarcity signals used by Card Market Participants for trading card transactions. A card reported as having ten PSA 10s may command a materially different price than a similar card reported as having one hundred PSA 10s.

172. PSA's Population Reports can be misleading even when the database accurately counts the certification records presently associated with a catalog entry. PSA's main Population Report promotes an "exact count of each item graded," while individual population pages contain a narrower warning that, in some cases, historical cataloging changes may cause population data not to reflect accurate numbers.[156] That limited warning does not disclose the separate distortions alleged here from crack-and-resubmit activity, attempted crossovers,

[155] *Population Report*, *supra note 63* (describing the Population Report as providing "an exact count of each item graded, from PSA 1-10," with "category summaries" and daily updates).

[156] *PSA Population Report*, PSA, https://www.psacard.com/Pop (last visited Sept. 27, 2026) (promoting an "exact count of each item graded, from PSA 1-10"); *see, e.g.*, *1926 Exhibits*, PSA Population Report, https://www.psacard.com/pop/baseball-cards/1926/exhibits/36183 (last visited Sept. 27, 2026) (warning that historical recognition of particular varieties may cause some population data not to reflect accurate numbers).

unreturned labels, stale certifications, duplicate or "ghost" entries, and related database artifacts that industry participants have discussed for years.[157] Plaintiffs allege that presenting population data as an "exact count" without adequately disclosing known mechanisms capable of leaving duplicate, stale, or otherwise misleading grade entries converts defects in PSA's recordkeeping and grading system into market-facing scarcity misinformation. Population integrity depends on whether the cards counted in a numerical grade were eligible to receive that grade under PSA's own standards in addition to whether the grade remains in that category. Plaintiffs allege that this classification-integrity problem is another way defects in PSA's grading process can distort the scarcity information PSA publishes to the market.

173. The Populations Report is critical because it induces both grading and market transactions—including PSA's attempts to acquire the very card that it grades. The reported scarcity encourages consumers to submit raw cards in pursuit of scarce high-grade outcomes, encourages buyers to pay premiums for cards appearing scarce, and feeds Collectors' broader pricing, custody, offer, lending, and marketplace infrastructure. Plaintiffs allege that inaccurate, managed, duplicate, stale, misclassified, or otherwise distorted grade populations exacerbate PSA's fraud by converting defects in the underlying grading and certification system into public scarcity signals that influence prices and consumer behavior throughout the hobby.

* * *

[157] *PSA Population Accuracy Question*, COLLECTORS UNIVERSE FORUMS (May 5, 2012), https://forums.collectors.com/discussion/855317/psa-population-accuracy-question (discussing population-report inaccuracies caused by cracked-out cards and resubmissions, including "ghost" population entries when prior labels are not removed); *Cracked Cards on PSA Pop Reports and Registry?*, NET54BASEBALL.COM (Aug. 18, 2011), https://www.net54baseball.com/showthread.php?t=139081 (discussing how cracked-and-resubmitted cards can be counted more than once and how crossed-over or cracked-out cards may remain in population reports); *PSA Resubmissions*, COLLECTORS UNIVERSE FORUMS (May 3, 2004), https://forums.collectors.com/discussion/ 285575/psa-resubmissions (quoting PSA customer service as stating that collectors may crack PSA holders and that many send the flip back so PSA can delete the card from the Population Report).

174. The foregoing practices, either individually or collectively, render PSA's representations materially false, misleading, or incomplete. They concern grader expertise; the standards and discretion governing grades; undisclosed prior-grade information; production pressure and financial conflicts; numerical grading of altered or otherwise ineligible cards; certification reliability; and the accuracy and protection communicated by PSA's Guarantee and Population Reports. Plaintiffs allege this is not a reliable system marred by occasional error. Rather, PSA sells uncertainty as certainty, discretion as standards, and control as independence. The resulting Graded Card Credential is produced through concealed subjectivity, malleable standards, production pressure, financial conflicts, managed outputs, and PSA's continuing control, then slabbed, certified, published, and sold as neutral, expert, standardized, criteria-based, reliable, and authoritative. On information and belief, Plaintiffs' cards passed through this infirmed grading operation and were subject to its defects. The incidents and insider accounts alleged above show how that system operated and what Defendants knew; Plaintiffs do not allege that each incident occurred in every submission or constitutes a separate injury. The alleged fraud is therefore not incidental to the Graded Card Credential; it is embedded in, carried by, and monetized through it.

**B. PSA's Deceptive Fee Model Monetizes the False Graded Card Credential**

175. PSA's deceptive fee model is the financial engine that monetizes Defendants' fraudulent Graded Card Credential described above. PSA presents consumers with a menu of seemingly discrete choices concerning price, value, and speed, but operates one integrated fee architecture in which PSA controls the entire process including cost. As detailed below, PSA makes that fee model profitable through material omissions; hidden or separated turnaround-time qualifications; an illusory Maximum Insured Value framework; post-grading upcharges; drip and partitioned pricing; possession-based lock-in; related repeat-service loops; and adhesive terms

designed to preserve revenue and obstruct accountability. Thus, the fee model is not collateral to the grading fraud; it is one mechanism through which Defendants convert the allegedly misrepresented Graded Card Credential into consumer payments.

### 1. PSA's Grading Fees Are One Integrated Fee Architecture

176. PSA monetizes the same Graded Card Credential through multiple Grading-Related Charges. The initial grading fee, service-level and speed premiums, value-based adjustments or upcharges, imaging, grader notes, shipping, handling, insurance, and return charges each arise from obtaining a single graded credential service. Plaintiffs allege that separating the total economic transaction into multiple charges makes the true cost less apparent and gives PSA repeated opportunities to charge consumers for the authority of the same Graded Card Credential. The specific deceptive features of those charges are detailed below.

### 2. PSA's Turnaround-Time Pricing is Routinely Missed and Illusory Because the Advertised Speed Is Qualified by Hidden Disclosures

177. PSA exploits its price-value-speed fee architecture to charge consumers more. The integrated fee architecture is illusory. PSA presents the consumer with a menu of seemingly discrete choices while retaining control over those same variables and hiding the real cost. The consumer sees a headline price-value-speed package, *see supra* ¶¶ *120–128*, but PSA controls intake timing, grading timing, grade assignment, grade reveal, post-grade valuation, adjusted grading fees, final amounts due, and return of the card. Consumers commit their property and money before the final price, timing, value, and limitations are fully disclosed or learned.

#### a. PSA marketed turnaround time is later disclaimed

178. PSA omits material fees and service information from the service-level presentation consumers use to purchase grading. The displayed price may increase after PSA values the graded card; turnaround estimates are separately qualified by capacity, volume, clock-

start, and other limitations; consumers may pay again for review or resubmission; and Online Terms contain additional qualifications and remedies that beneficial owners using Card Grading Intermediaries may never see or accept. Plaintiffs allege these separated qualifications materially alter the price-value-speed package used to induce submission. Because consumers surrender their valuable property when selecting that package, misleading turnaround representations are not mere inconveniences; they have real economic consequences in a time sensitive market.

179. Because graded cards are time-sensitive assets, consumers may rely on time estimates to preserve liquidity, capture a pricing window, respond to player or product demand, or reduce market risk. PSA's pricing page markets that speed, then separately qualifies it with an asterisk. But the limitations on the advertised speed appear separately from the terms.




**(PSA pricing-page screenshot with counsel-added arrows and circles showing the disclaimer's placement below the service-level pricing tiers)**

180. When opened, the disclaimer materially qualifies the timing and pricing representations. PSA states that estimated turnaround times are not guaranteed; that timing begins only when the order is received and scanned into PSA's facility; that timing may be affected by submission volume, capacity, and other circumstances; that turnaround times may change rapidly without notice; that PSA may adjust pricing, services, and processing time; and that all Online Terms are subject to change.[158]



Disclaimer

*Estimated Turnaround Times are estimates only and not guaranteed. A service level's Estimated Turnaround Time begins when the order is received and scanned into the PSA facility. These times are based on, and may be impacted by, PSA's submission volume, capacity, and other unforeseen circumstances. Turnaround Times may change rapidly without notice as conditions change.*

As the collectibles industry continues to expand, and the demand for PSA's services continues to expand along with it, PSA may decide to adjust pricing, services offered, and processing time to better align the demand for PSA services with our capacity to deliver those services.

All terms & conditions are subject to change.

**(Representative screenshot of the opened PSA disclaimer from its website.)**

181. Calling a turnaround time an "estimate" does not eliminate deception if PSA uses that estimate to differentiate higher-priced service levels while knowing that material internal conditions make the displayed timing unreliable—conditions are not adequately disclosed where and when consumers choose the service. PSA charges more for tiers associated with faster processing yet reserves the right to alter timing based on submission volume, capacity, and other circumstances and historically delayed when the timing clock began. Plaintiffs allege that the combination of prominent speed-based pricing, separated qualifications, and PSA's knowledge of recurring capacity and workflow constraints makes the advertised timing materially misleading even though PSA labels it an estimate.

[158] *Grading, supra* note 61 (pricing-page disclaimer stating that estimated turnaround times are not guaranteed, timing begins only after receipt and scanning, timing may be affected by submission volume and capacity, turnaround times may change rapidly without notice, PSA may adjust pricing, services offered, and processing time, and terms may change); *PSA Submission Services Online Terms, supra* note 132.

b. **PSA knows its turnaround times are misleading**

182. PSA has known since at least 2020 that its advertised turnaround times were unreliable. In October 2020, PSA admitted that "despite doubling capacity, turnaround times are growing" and announced that "estimated Turnaround Times will be retired in favor of Complete-Through Dates" so customers could see "true data" on backlog progress.[159] In March 2021, PSA reiterated that "[s]ervices defined by turnaround times are a thing of the past."[160] But PSA never retired the time estimates; it still prices its service levels around estimated turnaround times even today.[161] By March 30, 2021, PSA conceded that continuing to accept submissions it would be "unable to process in the foreseeable future" was "disingenuous"—yet it later resumed soliciting those same submissions under the same turnaround-time pricing it deemed a thing of the past.[162] Those admissions are evidence that PSA itself understood the limitations of using estimated turnaround times as the consumer-facing measure of service performance, yet later returned to selling service levels differentiated by that same metric.

183. PSA later changed the point at which its turnaround clock began. Effective November 20, 2025, PSA announced that turnaround time would begin when an order arrived at a PSA facility rather than, as PSA acknowledged had historically occurred, only after the order was unboxed under supervision and itemized.[163] PSA told consumers they would "notice longer

---

[159] Steve Sloan, *PSA Customer Update – October 2020*, PSA, https://www.psacard.com/articles/articleview/10232/psa-customer-update-october-2020 (last visited Sept. 28, 2026).

[160] Steve Sloan, *PSA Customer Update – March 2021*, PSA, https://www.psacard.com/articles/articleview/10345/psa-customer-update-march-2021 (last visited Sept. 28, 2026).

[161] *See Grading, supra* note 61; *An Update on Prices and Services at PSA*, *supra* note 146.

[162] Sloan, *PSA Customer Update – April 2021*, *supra* note 47.

[163] PSA Staff, *Updates to Estimated Turnaround Times*, PSA (Nov. 20, 2025), https://www.psacard.com/—articles/articleview/15625/updates-to-estimated-turnaround-times; *see also* Cole Benz, *PSA Clarifies Turnaround Times as Grading Stays Busy*, Sports Illustrated Collectibles (Nov. 20, 2025), https://www.si.com/collectibles/psa-clarifies-turnaround-times-as-grading-stays-busy.

estimates as a result, but nothing about our process is slowing down." That admission confirms that PSA's prior published timing excluded a period during which consumers' cards were already in PSA's possession but had not yet entered the timing calculation and were misleading. Months later, PSA again lengthened estimates and acknowledged that submission volume was making turnaround times harder to estimate. Plaintiffs were adversely impacted by these issues.

184. PSA's internal workflow adds another source of delay not apparent from the headline service-level display. A former PSA Research and Identification employee describes required supervisory signoffs and research holds that could consume material portions of an order's processing window before numerical grading occurred. He states that certain cards required higher-level signoff even when the researcher already knew the identification, sometimes producing waits of approximately thirty minutes, and that orders requiring additional checklist or identification research could remain on a researcher's desk for approximately two to two-and-a-half weeks while approaching the service level promised to the customer.[164] Plaintiffs allege that these internal holds are material because PSA sells speed while consumers cannot see the internal approval and research procedures consuming that time.

* * *

185. PSA's own statements and reported internal workflow support Plaintiffs' inference that it knowingly sold service levels using a timing metric materially affected by conditions consumers could not evaluate at purchase. PSA called estimated turnaround times unreliable enough to replace with "true data," declared services defined by them "a thing of the past," described accepting submissions it could not timely process as "disingenuous," later acknowledged that its historical clock began only after unboxing and itemization, and maintained

[164] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 3:22–6:39 (Sept. 2026), https://youtu.be/WDLIFTR2qf0.

research holds and approvals capable of consuming substantial portions of the advertised window. Plaintiffs allege these were not occasionally missed estimates: PSA monetized advertised speed while possessing superior knowledge of the backlog, clock rules, capacity constraints, holds, and workflow that materially qualified it. Those undisclosed or separated conditions affected every service tier.

### 3. PSA's MIV Framework is Illusory and Makes Final Pricing Unknowable at Submission

186. PSA's value-based pricing presents a separate deception within the price-value-speed architecture. At the point of sale, PSA presents each service level as a fixed per-card price paired with a stated "Maximum Insured Value" ("MIV"). But PSA does not clearly disclose alongside those terms that service-level selection turns on the card's estimated post-grading fair-market value—a value the submitter must predict before PSA assigns the grade that materially determines value. Instead, PSA relegates the operative rule to its hidden terms, which instructs the submitter to select a service level whose MIV exceeds the estimated post-grading fair-market value of each item. PSA then reserves the right, in its sole discretion and at any point in the process, to determine that an item's fair-market value exceeds the selected MIV and to require an "adjusted grading fee."[165] That unilateral post-submission price increase is PSA's "upcharge," which is a service-level adjustment that PSA may impose without further authorization.[166]

187. The apparent service-level choice is therefore illusory. To select a tier, the consumer or PSA-facing submitter must make three interdependent guesses: what grade PSA will assign, when PSA will assign it, and what the market value of that unknown grade will be at that later time. The consumer must either select a higher-priced tier in advance to guard against

[165] *PSA Submission Services Online Terms*, *supra* note 132, § 2.

[166] *Frequently Asked Questions: Maximum Insured Value*, PSA, https://www.psacard.com/support/faq#maxinsuredvalue (last visited Sept. 28, 2026); *PSA Submission Services Online Terms*, *supra* note 132, §§ 15–16.

PSA's later valuation or risk a post-submission upcharge. And the consumer must group cards within the same submission at the same service level, meaning the consumer must pay more for lower valued cards grouped with a higher card or pay more in sending cards in different batches because of incidental grading charges like mail and insurance.[167] PSA, meanwhile, controls the grade, the timing of the grade, the market-recognized credential, the post-grading valuation, and the determination of whether the consumer selected a sufficient tier. The displayed service-level price is therefore not a final price. It is an opening price that PSA may revise after the consumer has committed money and surrendered possession of the card. The pricing problem is therefore structural: the consumer must estimate the value of a Graded Card Credential that does not yet exist, while PSA later determines both the grade that materially affects that value and whether the resulting value entitles PSA to more money.

188. The upcharge is imposed only after the consumer's practical ability to withdraw has disappeared. PSA states that it makes the relevant value determination after grading.[168] By then, the grading service is no longer cancellable. If the consumer refuses the upcharge, PSA's terms permit PSA to return the card "unprocessed," at the consumer's expense, while retaining the original service-level fee; PSA may also impose aggregate service-level adjustments of up to $500—or a lower cap disclosed during submission—without further notice or authorization.[169] PSA further requires payment of all amounts due before it completes processing, reveals the

[167] Frequently Asked Questions: Maximum Insured Value, PSA, https://www.psacard.com/support/faq#maxinsuredvalue (last visited Sept. 28, 2026); *see also PSA & PSA/DNA Postage Rates*, PSA (last updated Aug. 29, 2025), https://www.psacard.com/ info/postage (setting domestic return-shipping-and-insurance charges according to the shipment's MIV and number of items); *PSA Submission Services Online Terms*, *supra* note 132, §§ 5–6 (providing that PSA may charge separately for return-shipment insurance).

[168] *PSA Submission Services Online Terms*, *supra* note 132, § 2; *PSA Coverage*, PSA, https://www.psacard.com/info/coverage (last visited Sept. 28, 2026).

[169] *PSA Submission Services Online Terms*, *supra* note 132, §§ 2, 15–16.

grade, or returns the card.[170] The upcharge is not a consumer-selected upgrade. Plaintiffs allege it is unilateral post-submission repricing after PSA has obtained the property, assigned the valuation-triggering grade, and acquired contractual leverage over completion, grade disclosure, and property return.

#### 4. PSA's "Maximum Insured Value" Is a Liability Cap, Not Insurance, and Does Not Justify the Upcharge

189. Despite its name, MIV does not state the amount for which PSA has insured the card. It is not an insurance policy, an agreed valuation, or a guaranteed payout; rather, it is only a contractual ceiling on PSA's potential liability.[171] Plaintiffs allege even the name is misleading. PSA limits any compensation for a card in its care to the lesser of the MIV or the card's fair-market value and then reserves sole discretion to determine fair-market value "by any means," and may return a damaged card while paying only diminution in value caused by the damage.[172] Nothing in PSA's terms requires the valuation used to resolve a loss-or-damage claim to match the valuation used to impose an upcharge. This framework permits PSA to value the same card one way when collecting an additional fee and another way when determining what it owes.

190. PSA's own disclosures are materially inconsistent about what additional protection, if any, follows a post-grading service-level adjustment. PSA's Coverage page states that a higher MIV becomes effective after the additional fee is paid, while PSA's FAQ states that an adjustment for understated value affects only the service-level charge and "will not change"

---

[170] *See Frequently Asked Questions, supra* note 83 (stating that payment is requested when grading is completed and that grades are revealed once payment is received); *PSA Submission Services Online Terms, supra* note 132, §15.

[171] *PSA Submission Services Online Terms*, *supra* note 132, §§ 2, 10 (defining MIV as the maximum compensation available for actual damage or loss while an item is in PSA's possession and limiting PSA's potential liability to the lesser of the item's fair-market value or the applicable MIV).

[172] *PSA Submission Services Online Terms*, *supra* note 132, § 10 (reserving to PSA sole discretion to determine an item's fair-market value by any means PSA selects and permitting PSA to return a damaged item while compensating the submitter only for the resulting reduction in value).

the card's MIV for claim or shipping-insurance purposes.[173] Whatever the ultimate effect on MIV, the additional charge does not purchase another grading determination. PSA's published workflow places "Results Review," when a pricing specialist communicates value-based pricing corrections, after grading, label creation, sealing, and a second-grade check.[174] Plaintiffs thus allege that PSA uses the post-grading market value (materially influenced by its own completed grade) to increase the price of the grading transaction. PSA simply shares in the card's value.

### 5. PSA Uses Dark Patterns to Extract Grading-Related Charges

191. PSA's fee model uses deceptive design practices commonly described as dark patterns. The Federal Trade Commission has identified dark patterns as practices that manipulate or trick consumers into taking actions they would not otherwise take by hiding material information, obscuring true costs, sneaking limitations into the transaction, or making it difficult for consumers to avoid unwanted consequences.[175] Plaintiffs allege PSA uses these practices.

192. *PSA uses bait-and-switch.* PSA markets grading as expert, reliable, objective, and guaranteed, while its terms and practices treat grades as subjective, revisable, discretionary, qualified, and difficult to challenge. PSA sells the authority of an expert Graded Card Credential while reserving discretion that materially qualifies the attributes used to sell it.

193. *PSA uses drip pricing and unilateral repricing.* PSA advertises a service-level price before submission but may not determine the final charge until after obtaining possession, grading the card, and assessing whether its post-grading value merits an upcharge.

---

[173] *PSA Coverage*, PSA, https://www.psacard.com/info/coverage (last visited Sept. 28, 2026); *Frequently Asked Questions: Maximum Insured Value*, PSA, https://www.psacard.com/support/faq#maxinsuredvalue (last visited Sept. 28, 2026).

[174] PSA, *PSA Update: Journey of a PSA Card*, PSA (Oct. 3, 2020), https://www.psacard.com/articles/articleview/10241/psa-update-journey-card.

[175] Fed. Trade Comm'n, *Bringing Dark Patterns to Light: Staff Report* (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

194. *PSA uses partitioned pricing.* PSA separates the economic cost of obtaining and maintaining the Graded Card Credential among grading fees, speed premiums, value-based adjustments, shipping, handling, insurance, and additional services. The existence of separate charges is not itself deceptive. The alleged deception is that PSA presents consumers with a headline service-level price while material additional charges, contingencies, and later repricing can emerge elsewhere in the transaction, making the total cost less transparent when the consumer initially commits the card.

195. *PSA uses coercion and possession-based lock-in.* Once PSA or a PSA-facing channel possesses the card, PSA controls grading, valuation, grade disclosure, order completion, payment demands, and return. An upcharge or final-payment demand therefore is backed by PSA's control over both the consumer's property and the Graded Card Credential attached to it.

196. *PSA uses sneaking.* PSA prominently markets expertise, speed, reliability, Guarantee protection, Population Report authority, and market acceptance while placing material qualifications elsewhere in separated disclaimers and hyperlinked terms containing exclusions, liability caps, pricing and timing discretion, and language characterizing grading as subjective opinion.[176]

197. *PSA uses a variable-reward resubmission loop.* PSA monetizes variability through paid repeat-assessment services. When consumers receive an unexpected or disputed grade, PSA permits them to pay again for review or resubmission; crossover separately allows consumers to pay PSA to replace a competing company's credential with a PSA Graded Card Credential if PSA accepts the grade.[177] Plaintiffs allege that PSA therefore earns additional

---

[176] *See supra* ¶¶ 28–29, 55(d)–(f), 128–137, 154–184, 185–200.

[177] *Trading Card Review*, PSA, https://www.psacard.com/services/tradingcardgrading/review (last visited July 4, 2026); *Crossover*, PSA, https://www.psacard.com/services/tradingcard grading/crossover (last visited July 2, 2026); *Frequently Asked Questions*, PSA, https://www.psacard.com/support/faq (last visited Sept. 28, 2026).

revenue when consumers seek another determination from the same grading authority whose first determination they dispute, while marketing the process as expert, standardized, and reliable.

198. *PSA's fee model and grading authority depend on information asymmetry*. PSA controls information consumers need to test the representations used to sell the Graded Card Credential, including grader identity and qualifications; production targets and time per card; internal guidance and calibration; prior-grade information supplied to graders; alteration-screening and numerical-grade eligibility practices; error categories and correction data; certification changes; Population Report methodology and classification integrity; employee and executive conflict controls; upcharge triggers and valuation methodology; Guarantee outcomes; and internal research and timing holds. Plaintiffs allege this opacity is part of the fraud because consumers must purchase the Graded Card Credential based largely on PSA's representations while PSA withholds the information necessary to determine if those representations are true.

### 6. PSA's Contract Terms Are Unconscionable and Operate as Obstruction

199. PSA's Online Terms are not merely background conditions. They are part of the architecture PSA uses to preserve revenue and obstruct accountability. PSA purports to impose arbitration provisions, class-action waivers, jury-trial waivers, forum-selection clauses, choice-of-law clauses, liability caps, warranty disclaimers, releases, delegation provisions, fee-retention terms, sole-discretion valuation provisions, and remedy limitations.[178] Those provisions attempt to convert PSA's marketed promise of expert, reliable grading into a transaction of adhesion.

200. Plaintiffs deny that the Online Terms bind them for the transaction-specific reasons alleged in ¶¶ 28–29, 40(a), and 55. They did not create PSA accounts or personally

[178] Decl. of Jacqueline Curiel, *Rasmussen v. Collectors Holdings Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 4, 2026), ECF No. 20-2, Ex. A (Collectors User Agreement) §§ 2, 18, 19, 24; *PSA Submission Services Online Terms*, *supra* note 132, §§ 10, 12(f), 12(k), 15, 16.

accept the Online Terms and dispute that their Card Grading Intermediaries had authority to accept those terms for them. Even if PSA could somehow establish assent as to some submitters, which it cannot, the challenged terms remain part of the alleged deception. PSA markets a valuable, reliable, guaranteed credential to consumers and the market, but then seeks to rely on provisions that limit responsibility for the grade, restrict remedies, cap liability, force private arbitration, bar classwide relief, and reserve PSA's control over valuation, error determination, payment, return, and remedy. A contract architecture preserving PSA's revenue while preventing meaningful accountability is at a minimum unfair and unconscionable.

### C. Collectors Scaled PSA's Fraud Through Vertical Integration

201. Collectors' role in the alleged fraud extended beyond passive ownership of PSA. Collectors built the infrastructure to scale, monetize, and entrench PSA's allegedly false Graded Card Credential. Its acquisition of Card Ladder in December 2021 and SGC in February 2024, April 2024 commercial agreements with eBay and acquisition of the eBay Vault, and December 15, 2025 agreement to acquire BGS demonstrate Collectors' strategic expansion across the grading ecosystem, including intake, grading, pricing, custody, resale, lending, marketplaces, and intermediary channels. *See supra* ¶¶ 41–44, 49–55, 71–74. On information and belief, Collectors exercised operation-and-management authority over that broader enterprise through enterprise-level pricing, integration, and capital-allocation decisions, including expansion of PSA submission capacity, consumer-facing marketing used to drive submission volume, eBay and Card Ladder integrations, and downstream monetization tied to PSA grades. The precise allocation of that authority remains within Defendants' exclusive possession, but the documented transactions and public corporate materials cited herein provide a reasonable basis for these allegations to be tested through discovery.

202. Collectors connected PSA's grade to a vertically integrated ecosystem whose value depends on the grade's market authority. *See supra* ¶¶ 75–115. That integration creates undisclosed financial conflicts inconsistent with PSA's representation of neutral third-party grading. *See supra* ¶¶ 14–15, 83–115, 139–141. Yet Collectors' ecosystem gives Defendants economic interests in the values, scarcity signals, and transactions affected by the Graded Card Credentials that PSA assigns.

203. Collectors' consolidation of competing grading alternatives further entrenched that ecosystem. PSA already held a dominant position in card grading when Collectors acquired or agreed to acquire formerly independent or competing brands, including SGC and BGS, while expanding PSA's submission channels and market integrations. *See supra* ¶¶ 10, 42, 71–74, 97–102. On information and belief, that consolidation enables Collectors to capture grading demand across multiple brands even when PSA suspends lower-cost tiers, raises prices, experiences backlog pressure, or directs overflow to other Collectors-controlled grading options, while reducing independent grading alternatives available to consumers.

### D. Card Grading Intermediaries Were Also Misled and Passed PSA's Misrepresentations to Consumers

204. The same deception operated through Card Grading Intermediaries, as their role and mechanics are alleged in ¶ 55. Those intermediaries did not originate the card grading deception. Plaintiffs allege that Card Grading Intermediaries were themselves misled or left without material information by Defendants' standardized market messaging and concealed practices. Those misrepresentations and omissions traveled through Defendants' submission intake channels to beneficial owners. The designed transmission structure, including the role of beneficial owners who paid or reimbursed PSA Grading-Related Charges and bore the economic consequences of PSA's grading output as alleged in ¶ 55 and ¶¶ 206–222.

* * *

205. The scheme alleged above is not a series of isolated misgrades, delayed orders, or disputed invoices. It is one integrated fraud with two connected parts detailed above. In short, PSA sold trust and Collectors scaled it. Defendants allegedly turned a materially misrepresented Graded Card Credential into a market-wide revenue system by using hidden discretion to create the grade through an infirmed process, dark-pattern pricing to monetize it, a contract of adhesion to shield it, intermediaries to transmit it, and vertical integration to profit from it throughout the card's commercial life. Consumers and the market were led to believe that PSA's Graded Card Credential reflected the card's authenticity and condition. Instead, Plaintiffs allege that that credential reflects Defendants' fraudulent grading system, for which consumers paid without receiving the benefit of the marketed service.

## VI. Plaintiffs and the Putative Class Relied on Defendants' Misrepresentations, Omissions, and Market Credential

206. Defendants' scheme depended on consumer reliance. As alleged in ¶40(d), before choosing PSA each Plaintiff personally viewed PSA's service tiers (including the advertised turnaround times) and grading criteria and encountered its representations of expert, criteria-based grading. Plaintiffs' experience with PSA slabs, labels, certification tools, Population Reports, and the market use of PSA grades reinforced the same message that PSA grading was expert, standardized, criteria-based, and reliable. Plaintiffs do not allege exposure to every statement compiled in **Exhibits C and D**. Those exhibits demonstrate the standardized, repeated, and materially consistent nature of Defendants' representations that saturated the market.

207. Plaintiffs and Class members were the consumers Defendants intended to reach. They beneficially owned cards submitted for PSA grading, paid or reimbursed Grading-Related Charges, and bore the economic consequences of Defendants' grading, pricing, delays,

representations, omissions, and certification outputs. Defendants designed the Graded Card Credential, Downstream Channels, and submission pathways to induce beneficial owners to surrender their cards, purchase grading, pay related charges, and rely on PSA's grades and certifications, whether submitting directly or through Card Grading Intermediaries. *See supra* ¶¶ 28–31, 36–40, 55, 73–137, 201–204. The third-party incidents, former-employee accounts, internal practices, and other examples alleged above are not pleaded as independent injuries for which Plaintiffs seek recovery; they are pleaded as evidence of the common system's operation, the falsity and materiality of Defendants' representations and omissions, Defendants' knowledge and intent, and the means by which the alleged fraud was concealed.

208. Plaintiffs' primary reliance theory is direct and transactional. That direct reliance included PSA's representation that expert graders would assess identifiable physical criteria such as surface, centering, corners, and edges, and the service-tier representation concerning how long PSA expected to retain the submitted cards. They relied on Defendants' common representation that PSA grading was neutral, independent, expert-driven, standardized, criteria-based, objective, and reliable; followed published standards; employed graders capable of making distinctions consumers could not; and accurately represented its service levels and pricing. Class members were induced by the same core message through Defendants' standardized public, intermediary, certification, or market-facing channels, although the precise channel may differ.

209. Plaintiffs and Class members also relied on Defendants' omission of material facts that contradicted or qualified those affirmative representations, including:

a. PSA graders' identities, qualifications, experience, and whether they possessed the represented expertise when grading consumers' cards;

b. PSA's use of trainees, contractors, and other market participants whose qualifications and potential financial conflicts were undisclosed;

c. employee and executive personal financial interests in graded-card inventory and the controls, if any, separating those interests from grading and certification decisions;

d. the extent to which grades depended on subjective eye appeal, perceived market acceptance, individual judgment, and discretion not governed by fixed or independently verifiable condition criteria;

e. undisclosed changes to grading standards and PSA's ability to tighten, relax, reinterpret, or depart from published criteria;

f. production targets, time pressure, backlog conditions, extended shifts, internal research holds, approval requirements, and their effects on timing, consistency, and review;

g. PSA's use of prior PSA grade information on at least certain identifiable serialized resubmissions;

h. inconsistent review outcomes and PSA's ability to revise, deactivate, revoke, downgrade, or otherwise alter issued certifications;

i. alteration-screening, numerical-grade eligibility, and quality-control practices capable of admitting nonqualifying cards into numerical grade populations;

j. batch-level review, ratio-based scrutiny, internal calibration, managerial intervention, and other mechanisms capable of affecting grade distributions;

k. Defendants' alleged ability, incentives, and undisclosed means to manage or otherwise systematically affect grade populations and resulting scarcity premiums;

l. Population Report distortions from cracking, resubmissions, attempted crossovers, unreturned labels, stale certifications, duplicate or "ghost" entries, cataloging changes, misclassification, and other database or grading artifacts;

m. Defendants' downstream financial interests in pricing, custody, acquisition, resale, financing, and liquidity of cards whose grades, certifications, and scarcity signals PSA creates;

n. PSA's post-submission pricing leverage, upcharge methodology, variable charges, valuation discretion, control over grade disclosure and return, and ability to demand additional payment after obtaining and grading consumers' cards;

o. how PSA calculated and internally managed turnaround time, including clock-start rules and research-stage holds;

p. the Guarantee's eligibility restrictions and exclusions; and

q. separated or hyperlinked Online Terms and disclosures Defendants later invoked or could invoke to qualify the grading standards, pricing, timing, Guarantee protection, remedies, and accountability PSA marketed.

210. Plaintiffs and Class members reasonably understood that no undisclosed practices, conflicts, restrictions, exclusions, or pricing mechanisms materially undermined the represented service. Their reliance on these omissions was transactional and concrete.

211. Plaintiffs' use of Card Grading Intermediaries does not alter that reliance or injury. Intermediaries performed limited intake and transmission functions by forwarding cards, relaying PSA's service tiers, pricing, timing, charges, payment demands, instructions, grading results, and return information, and facilitating payment. Plaintiffs remained the beneficial owners, persons for whose benefit grading was obtained, sources of the funds used to pay or reimburse Grading-Related Charges, and persons bearing the economic consequences. The

intermediaries did not originate the alleged deception or break the causal chain; they were PSA-facing conduits through which Defendants' standardized representations, charges, services, and outputs reached the beneficial owners who paid for and relied on them.

212. The Card Grading Intermediaries likewise received and relayed PSA's standardized pricing, service tiers, turnaround representations, instructions, upcharges, grading results, return information, Guarantee assurances, and claims of expertise, neutrality, standards, and reliability. Plaintiffs allege that the intermediaries similarly lacked the omitted material information. When they transmitted PSA's incomplete or misleading information, the alleged deception originated with Defendants, who intended their representations and outputs to reach the beneficial owners whose cards, payments, and reliance sustained the transactions.

213. The representations and omissions were material because they concerned the core attributes and total economic terms of the bargain. A reasonable consumer deciding whether to submit a card, select or expedite a service tier, pay or contest an upcharge, resubmit, seek crossover or review, rely on a grade, or sell, hold, insure, finance, or otherwise use a graded card would consider the concealed information important.

214. Defendants knew the concealed information was material because they created, controlled, and possessed superior access to PSA's hiring and staffing criteria, employee conflict policies, grader qualifications, grading standards, production expectations, prior-grade alerts, research workflows and approval requirements, certification and correction systems, alteration-screening and numerical-grade eligibility practices, Population Reports, service tiers, turnaround calculations, valuation methodology, upcharges, Guarantee terms, payment demands, and Collectors' downstream integrations. Moreover, they implemented a process to keep the omissions a secret to such a degree that whistleblowers conceal their identities and voices.

215. Defendants' omissions also served the system's monetization. Representations of expert, neutral, standardized grading induced submissions; opacity preserved dependence on PSA's judgment; subjective and variable outcomes generated opportunities for reviews, resubmissions, crossovers, and other repeat services; prior-grade information and internal review practices remained undisclosed to consumers purchasing those repeat assessments; declared-value pricing permitted post-submission upcharges after PSA possessed and graded the card; advertised turnaround times supported expedited premiums while separated terms purported to qualify them; and Guarantee language supported market confidence while imposing original-submitter, arm's-length-purchase, active-certification, and other restrictions. Population Reports, certification tools, Card Ladder, Vault services, Partner Offers, marketplace integrations, resale pathways, and financing then allowed Defendants to monetize the grades, scarcity signals, and market values produced or influenced by that system.

216. For claims requiring reliance, Plaintiffs actually relied on Defendants' representations and omissions in deciding to use PSA, submit cards, select service tiers, relying on the associated turnaround representations, pay or reimburse Grading-Related Charges and, where applicable, pay or contest post-submission charges, permit PSA-facing channels to retain their cards, and treat PSA grades, certifications, and population data as reliable and authoritative. This transaction-specific reliance is Plaintiffs' primary theory for fraud, fraudulent concealment, and Maryland Consumer Protection Act claims. The market-credential theory alleged above remains an alternative for discovery and class-certification purposes.

217. Class members likewise relied on PSA-originated representations, submission communications, and material omissions in their grading transactions and card-use decisions. Defendants' common representations, omissions, grading system, pricing architecture, and

market infrastructure provide common proof. Even if the alternative market-credential theory is not established for every Class member, Plaintiffs' direct reliance independently caused their submissions, payments, and injuries.

218. That reliance was reasonable because Defendants possessed superior or exclusive knowledge of the concealed facts. Before submission and payment, consumers could not meaningfully determine who would grade their cards or whether those persons possessed the expertise PSA represented; the production targets and internal time pressures under which the work was performed; the prior-grade information supplied in identifiable resubmissions; the extent of subjective or market-based grading judgment; undisclosed standards changes; alteration-screening and numerical-grade eligibility practices; internal error and correction data; Population Report accuracy and classification integrity; research-stage timing holds; upcharge triggers and valuation methodology; employee and executive financial conflicts; Guarantee restrictions; or rights-limiting terms Defendants might later invoke. Defendants had a duty to disclose those matters because their affirmative and partial representations were materially misleading without them and consumers and intermediaries lacked access to the information necessary to discover them.

219. Neither Plaintiffs nor similarly situated Class members received reasonable notice of, relied upon, or assented to Defendants' purported online contract. As alleged *supra* ¶¶ 28–29 and 55(b)–(f), Plaintiffs did not authorize intermediaries to accept those terms or waive their rights, and any portal interaction occurred in the intermediary's own PSA-facing commercial capacity. Plaintiffs' injuries therefore arise from the representations and omissions on which they relied, not contractual limitations they never saw or accepted.

220. Plaintiffs' and Class members' injuries were direct and economic. They paid or reimbursed Grading-Related Charges for Graded Card Credentials materially different from those represented. The Credential's value derives from the represented expertise, standards, objectivity, independence, reliability, and service terms, yet Plaintiffs allege it was produced, priced, and delivered through materially different undisclosed practices. Timing was part of the same bargain: each Plaintiff surrendered independently valuable property based on an advertised turnaround period and alleges PSA retained his cards longer than represented. Plaintiffs therefore allege overpayment for both the Credential and its represented timing. Their injuries include Grading-Related Charges and associated costs, benefit-of-the-bargain overpayment, and, where separately established, diminished marketability, liquidity, or other direct economic loss.

221. Had Plaintiffs known the truth, they would not have submitted the same cards on the same terms or paid the same Grading-Related Charges; at minimum, they would have paid less. Accurate disclosure of PSA's backlog, clock-start rules, intake practices, research holds, capacity constraints, and workflow would have led Plaintiffs to pay less, choose different terms or another provider, delay submission, or retain their cards for raw sale. Likewise, Class members would not have paid the same upcharges, expedited premiums, repeat-service fees, or related costs had the underlying facts been disclosed. Defendants sold impartiality, expertise, objectivity, reliability, transparent pricing, represented turnaround times, Guarantee protection, and market authority; Plaintiffs allege they received materially different Credentials produced and monetized through undisclosed discretion, production pressure, financial conflicts, variable pricing, timing constraints, and certification and population practices. That difference caused their economic loss.

222. Defendants' own market representations provide a common, testable premise. They represent that PSA provides a universal grading standard that enhances marketability, liquidity, stability, and value; that Population Reports provide grade-level scarcity data; and that PSA's pricing, valuation, Vault, Partner Offer, and marketplace integrations facilitate informed transactions. Those representations support Plaintiffs' allegation that PSA grades, certifications, population data, and valuations are material, price-forming market inputs. If Defendants contend otherwise, that position supports the alternative inference that their own market-use representations were materially misleading. Plaintiffs plead this market-credential theory in the alternative and do not depend on it for their direct transactional reliance or injury.

## VII. Common Factual Allegations Supporting Plaintiffs' RICO Counts

223. Plaintiffs reassert and incorporate the preceding allegations. Sections I through VI and Exhibits A–D plead the particularized facts supporting the RICO claims, including the PSA-centered card market, marketed grading transaction, materially misrepresented Graded Card Credential, deceptive fee architecture, Card Grading Intermediaries, Plaintiffs' reliance and injuries, and Defendants' use of interstate mails and wires.

224. Plaintiffs allege violations of 18 U.S.C. §§ 1962(c) and 1962(a), predicated on repeated acts indictable as mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

### A. Overview of Defendants' RICO Scheme Based in Fraud

225. This case is not about a single disappointing grade, delay, or billing error. Plaintiffs allege a coordinated scheme in which Defendants used representations of impartial, expert, objective, criteria-based grading—and the time within which PSA would possess and return independently valuable property—to induce consumers to surrender their cards and money. Through repeated misrepresentations, half-truths, omissions, post-submission charges, and possession-based leverage, Defendants sold trust, market authority, and time while

knowingly delivering and monetizing a materially different Graded Card Credential through interstate mails and wires.

226. The scheme principally targeted consumers' money, including the PSA Grading-Related Charges defined in ¶ 40(e). Defendants also obtained possession and control of consumers' cards (valuable property) and used that leverage to secure additional payments and, in some instances, facilitate card acquisitions. Market trust and acceptance of the Graded Card Credential were the means through which Defendants obtained that property.

227. The scheme had two integrated components. First, Defendants sold and circulated the Graded Card Credential through the expertise, standards, process, certification, conflict, and market-use deceptions alleged in ¶¶ 130–174. Second, they monetized that misrepresented Graded Card Credential through the deceptive price-value-speed, MIV, upcharge, turnaround, Guarantee, repeat-service, dark-pattern, and contractual-shield practices alleged in ¶¶ 175–200. Collectors scaled both through the Downstream Channels and vertically integrated infrastructure alleged in ¶¶ 73–106 and 201–204. Consumer-facing representations induced submissions and payments; PSA produced the Graded Card Credential; Defendants' population, pricing, custody, offer, marketplace, and lending systems reinforced and monetized it; and limitations and contractual shields concealed material qualifications and obstructed accountability. Each predicate act furthered, executed, maintained, completed, or concealed part of that integrated scheme.

228. The RICO claims do not depend merely on disagreement with individual grades. They concern verifiable commercial facts and actionable half-truths about grader expertise and qualifications; misrepresented adherence to published standards; undisclosed prior-grade information; alteration-screening and numerical-grade eligibility; production requirements and

internal review practices; certification and Population Report reliability; employee and executive financial conflicts; unjustified pricing and upcharges; concealed turnaround times; illusory Guarantee eligibility; and undisclosed Defendants' financial interests in grade-dependent transactions. The grade, holder, label, certification number, verification record, population entry, scarcity signal, Guarantee messaging, and PSA-associated market acceptance together comprise the paid Graded Card Credential.

229. The preceding allegations also establish materiality, knowledge, and intent. The challenged representations and omissions concerned the personnel, standards, reliability, price, timing, protection, scarcity, conflicts, and market utility for which consumers selected and paid PSA. Defendants created, controlled, or possessed superior access to the underlying hiring, grading, production, prior-grade alert, certification, alteration-screening, Population Report, pricing, valuation, Guarantee, timing, payment, intermediary, conflict-control, and downstream systems. Defendants continued their representations despite the admissions, criteria changes, production requirements, conflict policies, certification events, backlog disclosures, Guarantee limitations, and other facts alleged in ¶¶ 130–204. Plaintiffs allege those facts and Defendants' concealment support the reasonable inference that Defendants knowingly intended to obtain consumer money through fraud.

230. Plaintiffs' submissions provide representative transaction-level examples. As alleged in ¶¶ 36–40 and 206–222, each Plaintiff encountered PSA-originated grading, service-level, pricing, standards, Guarantee, and market-facing representations; submitted beneficially owned cards through a Card Grading Intermediary; and paid or reimbursed PSA Grading-Related Charges. The Card Grading Intermediaries used PSA accounts and interstate systems to transmit Plaintiffs' cards, submission information, payments, and PSA communications and later received

the PSA-certified cards. The associated mail and wire events included intake shipments, submission or intake confirmations, payment requests or invoices, grading and certification communications, and return shipments. Defendants thereby obtained Plaintiffs' money and possession of their cards and delivered the allegedly misrepresented Graded Card Credentials. To the extent not presently known, the precise dates, routing, senders, recipients, payment transmissions, submission identifiers, and related electronic records are maintained in Defendants' and the Card Grading Intermediaries' systems and are not accessible to Plaintiffs, who did not maintain PSA accounts or operate the PSA-facing submission portals. Those particulars are therefore within Defendants' and the Intermediaries' possession or control and are appropriately established through discovery.

**B. Particularities of Mail Fraud — 18 U.S.C. § 1341**

231. Defendants' scheme depends on interstate mail and commercial carriers. Consumers ship cards to PSA directly or through Card Grading Intermediaries, and PSA returns graded cards through the same interstate channels. Plaintiffs' cards traveled from Maryland into PSA's grading system and back through their intermediaries. *See supra* ¶¶ 36–40, 55(a)–(c), 211–212, 223–230.

232. Representative mail-fraud predicates include: (a) intake shipments induced by PSA's grading, timing, pricing, and Guarantee representations; (b) mailed or shipped invoices, payment or upcharge demands, and release-conditioning notices; (c) return shipments bearing PSA labels, grades, and certification numbers represented as expert, reliable, and market-authoritative; and (d) promotional, solicitation, submission, dealer, or partner materials carrying PSA's grading, pricing, timing, and Guarantee representations.

233. These mailings were foreseeable and integral to the scheme. Defendants could not receive, control, grade, encapsulate, return, or monetize consumer cards without interstate

shipment. The mailings induced submissions, transferred possession, facilitated payment, delivered the Graded Card Credential, returned cards, or propagated PSA's grading output into the market. Additional shipment records are within Defendants' and Card Grading Intermediaries' possession and will be identified through discovery.

**C. Particularities of Wire Fraud — 18 U.S.C. § 1343**

234. Interstate wires are the operational infrastructure of Defendants' grading ecosystem, including websites, submission portals, email, payment processors, certification databases, population reports, pricing tools, Card Ladder, Vault systems, Partner Offers, marketplace integrations, and shipment communications.

235. Representative wire-fraud predicates include: (a) grading standards, pricing pages, service descriptions, turnaround representations, Guarantee language, population reports, certification tools, and market-authority statements; (b) submission confirmations, service-tier selections, MIV or declared-value entries, status updates, and payment authorizations; (c) invoices, upcharge and adjusted-fee demands, payment reminders, and final-amount notices issued after PSA obtained possession; and (d) grading-result communications transmitting grades, certification numbers, label information, images, grade reveals, or verification data.

236. Additional predicates include: (a) Population Report and certification transmissions communicating grade counts as scarcity signals; (b) Card Ladder pricing and valuation transmissions; (c) PSA Vault, Partner Offer, and eBay-linked communications enabling graded cards to be stored, valued, offered, or sold; (d) hyperlinked terms, clickwraps, disclaimers, arbitration and class-waiver provisions, warranty disclaimers, and liability caps; and (e) payment transmissions for grading, upcharges, speed premiums, reviews, resubmissions, crossovers, shipping, handling, insurance, and related charges.

237. Defendants intended and reasonably foresaw that these interstate communications would reach and be acted upon by consumers and Card Grading Intermediaries nationwide. Without them, Defendants could not solicit submissions, collect payments, operate grading and submission systems, impose upcharges, reveal grades, publish population and certification data, maintain valuation tools, operate the Vault or Partner Offers, or monetize downstream activity. The wires were integral to the scheme.

238. Plaintiffs have pleaded the participants, approximate time periods, content, purpose, and transactional context of the representative mail and wire predicates presently known to them. To the extent the precise transmission date, routing, sender, recipient, payment processor, electronic identifier, or internal communication is not alleged, that information resides in Defendants' and the Card Grading Intermediaries' submission, payment, email, shipping, and database records and is unavailable to Plaintiffs before discovery.

**D. Each Predicate Act Caused, Furthered, or Concealed the Deceptive Practices**

239. The mail and wire predicates carried, executed, furthered or concealed the alleged expertise, impartiality, standards, process, certification, pricing, timing, Guarantee, and market-use deceptions. Solicitations and service-level communications induced consumers to surrender independently valuable cards by presenting the price-value-speed package, including the represented period of PSA possession; payment communications converted those submissions into money received or retained by Defendants; invoices and upcharge demands executed post-submission repricing and possession-based leverage; grading, Guarantee, and certification communications delivered the Graded Card Credential and reinforced market confidence while concealing material limitations; Population Reports converted grading outcomes into scarcity signals; Card Ladder, the Vault, Partner Offers, and eBay integrations monetized the Credential downstream; and return shipments restored possession after PSA's actual retention period while

placing the slab, grade, certification, verification record, and resulting population consequences into commerce. Hyperlinked terms and contractual limitations separately qualified the rights and protections marketed to consumers, while Intermediaries relayed Defendants' standardized communications and outputs.

**E. Defendants Engaged in a Pattern of Racketeering Activity**

240. Defendants' mail- and wire-fraud predicates constitute a related and continuous pattern under 18 U.S.C. § 1961(5). They share the same purpose, participants, victims, methods, and results; have occurred repeatedly for years across large numbers of consumer transactions; and remain part of Defendants' regular operation of the PSA-centered grading business.

241. The predicates share a common purpose: obtaining consumer money and property by presenting Graded Card Credentials as impartial, expert, objective, criteria-based, reliable, transparent, accountable, protected, and market-authoritative while concealing the materially contrary expertise, discretion, production, prior-grade, conflict, certification, population, pricing, timing, and contractual facts alleged herein.

242. They produce common results: consumers pay Grading-Related Charges for Graded Card Credentials not delivered as represented, while PSA grades enter the secondary market and affect scarcity, price, liquidity, custody, resale, offers, lending, and further grading demand.

243. The predicates involve the same core participants identified in ¶¶ 49–55 and target the same victims: beneficial card owners who submit directly or through Card Grading Intermediaries and pay or reimburse Grading-Related Charges in reliance on PSA's misrepresentations.

244. They also employ common methods: standardized marketing and grading standards; pricing and service-tier pages; Guarantee, label, holder, population, and certification

representations; interstate shipments; portal, email, payment, and database communications; post-submission pricing demands; return shipments; and hyperlinked or portal-based contractual limitations.

245. The scheme's distinguishing feature is the integration of the allegedly misrepresented Graded Card Credential with Defendants' fee and market infrastructure. Defendants allegedly used undisclosed discretion to produce their Graded Card Credential, population and pricing systems to give it market force, fee architecture to monetize it, Card Grading Intermediaries to scale intake and communications, Downstream Channels to monetize its continuing market effects, and contractual limitations to restrict accountability.

246. Closed-ended continuity exists because the alleged scheme has operated for years, including at least since Collectors' 2021 acquisition of PSA, the pandemic-era submission surge, PSA's capacity expansion, and Collectors' subsequent acquisitions and integrations, generating repeated submissions, payments, upcharges, grading-result transmissions, population publications, pricing transmissions, and shipments.

247. Open-ended continuity exists because the alleged predicates remain Defendants' regular method of operation: soliciting submissions, receiving and grading cards, communicating service tiers and prices, publishing certification and population data, collecting Grading-Related Charges, transmitting grades and values, returning cards, and monetizing Downstream Channels. Plaintiffs allege that Defendants continue these practices without disclosing or correcting the concealed facts alleged herein, creating a continuing threat of repetition.

248. Submissions through Card Grading Intermediaries are part of this pattern as alleged in ¶55.

### F. Defendants Conducted the Affairs of RICO Enterprises

249. The primary Grading-Intake Enterprise has the common legitimate purpose of operating the intake-grading-resale pipeline: soliciting and receiving consumer cards, processing and grading them, issuing certifications, processing payments, returning cards, and circulating grading outputs through the market. Defendants and Card Grading Intermediaries maintained continuing relationships through repeated submissions, intake, payment, grading, certification, and return. Plaintiffs allege that PSA and Collectors—not the Intermediaries—conducted the enterprise's affairs through the alleged mail- and wire-fraud pattern.

250. Card Grading Intermediaries were instrumental but innocent commercial participants, not alleged co-schemers. They accepted or solicited cards, aggregated submissions, used PSA-facing accounts or privileges, transmitted cards and data, relayed PSA service information and charges, facilitated payment, returned graded cards, and earned separate disclosed fees, handling charges, markups, or other compensation. Plaintiffs do not allege that the Card Grading Intermediaries originated, knew of, agreed to, or participated in Defendants' deception; Plaintiffs separately deny that their submission arrangements authorized acceptance of the Online Terms on Plaintiffs' behalf, as alleged in ¶¶ 40(a) and 55.

251. PSA's and the Card Grading Intermediaries' records permit their respective charges to be separated. PSA records identify service levels, grading fees, declared value or MIV, upcharges, shipping, insurance, handling, return charges, payment timing, and other PSA-imposed amounts. Card Grading Intermediaries separately record their own intake fees, markups, handling, submission charges, or compensation. Combined consumer payments can therefore be allocated without defeating enterprise participation, causation, common proof, or damages.

252. Alternatively, the broader Trading-Card Grading Enterprise has the legitimate common purpose of using the PSA- and Collectors-centered grading, pricing, population,

custody, offer, lending, and marketplace infrastructure to solicit, process, value, store, sell, finance, and monetize consumer-owned graded cards. It includes Collectors, PSA, Card Grading Intermediaries, eBay, Card Ladder, the PSA Vault, Partner Offers, Collectors Financial Services, and related channels functioning as a continuing unit. Plaintiffs do not allege that eBay or the Card Grading Intermediaries knew of or participated in the fraud; PSA and Collectors allegedly conducted the broader enterprise's affairs through their own racketeering pattern.

253. Each Defendant is a RICO "person" distinct from the pleaded enterprises. Both enterprises include participants and functions beyond either Defendant individually.

254. PSA conducted or participated in the enterprises through its grading, intake, certification, pricing, upcharge, turnaround, Guarantee, population-report, and consumer-communication functions. Collectors participated through strategy, acquisitions, capacity expansion, pricing-data infrastructure, custody, offers, lending, marketplace integration, and downstream monetization. These allegations concern Defendants' operation and management of the enterprises, not knowledge or participation in the alleged fraud by eBay or the Card Grading Intermediaries.

### G. Collectors' Receipt and Use or Investment of Racketeering Income - 18 U.S.C. § 1962(a)

255. Through the alleged racketeering pattern, Collectors received directly and indirectly, including through PSA and affiliates, substantial income from PSA grading fees, service-level and speed premiums, MIV-related and adjusted fees, upcharges, reviews, repeat services, shipping, handling, insurance, and, to the extent generated through or attributable to the allegedly misrepresented Graded Card Credential, downstream transaction and grade-dependent revenue.

256. On information and belief, Collectors used or invested portions of that fungible income to acquire, establish, operate, or expand enterprises affecting interstate commerce, including Card Ladder, SGC, the eBay and PSA Vaults, Partner Offers, Collectors Financial Services, grading capacity and personnel, submission and certification systems, pricing and intermediary infrastructure, marketplace integrations, and Beckett. *See supra* ¶¶ 42–44, 68–74, 83–106, 201–204.[179] Those investments expanded the grading-centered system, reinforced the authority and circulation of its Graded Card Credentials, reduced independent grading alternatives, and enabled the alleged predicates to continue and scale. PSA's substantial grading revenues and the timing of those investments support the inference that grading-derived income funded or economically enabled at least part of Collectors' expansion. Plaintiffs do not allege one-to-one tracing of commingled funds; use or investment may be established through receipts, transfers, budgets, financing records, timing, and economic substitution.

257. Plaintiffs' direct property injuries from the alleged racketeering pattern are sufficient under controlling Fourth Circuit law and need not be separately traceable only to the later investment or use of racketeering income.[180] In any event, Plaintiffs also allege that Collectors' use and investment of grading-derived income reinforced and expanded the same PSA-centered system through acquisitions, capacity expansion, pricing and market infrastructure, and integration of grading-dependent channels, thereby enabling the alleged

[179] On information and belief, PSA-generated revenue contributed to or financially supported Collectors' acquisition of Beckett. A September 2026 verified federal complaint alleges that Collectors acquired Beckett for approximately $134 million, although the purchase price and transaction documents were not publicly disclosed. *See* Verified Complaint ¶¶ 93–94, *Lindberg v. Causey*, No. 1:26-cv-07938-LTS (S.D.N.Y. Sept. 11, 2026), ECF No. 1. Given PSA's substantial grading revenues, Plaintiffs allege that those revenues contributed to the acquisition directly, through available cash or intercompany transfers, or indirectly by supporting acquisition financing. The precise sources and uses of the acquisition consideration are reflected in Defendants' nonpublic financial, financing, acquisition, and closing records.

[180] *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837–40 (4th Cir. 1990) (rejecting a separate "investment injury" requirement under 18 U.S.C. § 1962(a) and applying traditional causation principles).

scheme to continue and scale. The relevant receipts, accounts, commingling, transfers, acquisitions, budgets, and investments are within Defendants' control and subject to discovery

### H. The Enterprises and Predicate Acts Affect Interstate Commerce

258. Both enterprises engage in and affect interstate commerce. Defendants solicit consumers nationwide, receive cards across state lines, process interstate payments, transmit grading results, upcharges, certification, population, pricing, and shipment information through interstate wires, publish nationwide market information, and return cards through interstate carriers. The alleged scheme could not operate without interstate commerce.

259. The predicate acts likewise use interstate instrumentalities through mailings, emails, payments, card shipments, certification and population updates, Card Ladder pricing, Vault communications, Partner Offers, eBay integrations, and return shipments.

### I. Plaintiffs Sustained Injuries by Reason of Defendants' Conduct

260. Plaintiffs suffered concrete property injury under 18 U.S.C. § 1964(c) when they paid, reimbursed, or bore Grading-Related Charges for Graded Card Credentials materially different from the expert-driven, criteria-based, unbiased, reliable, timely, and market-authoritative Credentials Defendants represented. Their economic injury includes those charges, resulting overpayment, and related transaction costs. Timing was part of the same bargain. Plaintiffs therefore overpaid for both the materially misrepresented grading attributes and timing of the completed transaction.

261. Plaintiffs did not purchase merely a numerical grade, plastic holder, image, shipment, or database entry, nor were their cards valueless before PSA acted. Each card was an independently owned asset with preexisting market value that Plaintiffs surrendered for a represented period so PSA could add a market-facing Graded Card Credential comprising the grade, holder and label, certification number, verification record, population and scarcity signal,

Guarantee messaging, and associated market acceptance. Defendants represented that Graded Card Credential as the product of expert, impartial, objective, standardized, criteria-based, reliable, and protected grading and certification—the attributes that give it market authority and value. Plaintiffs allege that concealed systemwide practices materially deprived their credentials of those defining attributes and therefore denied them the benefit of their bargain.

262. Plaintiffs allege on information and belief that their 2025 submissions were processed through PSA's ordinary grading operation described in ¶¶131–174 and were therefore subject to its common characteristics. That system affected the Graded Card Credential through three related mechanisms, independently or together: (a) grades affected by conflicts, absence of represented expertise, concealed subjectivity, production pressure, ratio review, managerial intervention, or departures from represented standards; (b) inaccurate, stale, duplicate, ratio-influenced, or otherwise distorted population and scarcity data; and (c) admission of improperly graded, commercially managed, or otherwise nonqualifying cards into grade populations, distorting the comparative condition and scarcity those Credentials convey. Because grades communicate comparative condition and Population Reports relative supply, unreliable grading or population data cannot provide the standardized condition and scarcity information that Defendants sold.

263. Plaintiffs do not allege that every practice or incident described above occurred in each submission; those allegations evidence the common system through which Plaintiffs' Graded Card Credentials were produced. Population-related allegations likewise demonstrate how undisclosed grading practices can systematically affect the scarcity signals PSA derives from aggregate grades. Even a correctly graded card may carry an unreliable scarcity signal if the population against which it is compared is inaccurate or distorted. Plaintiffs' principal injury

does not depend on proving such an error in any particular population; where established, population inaccuracies provide additional evidence of the common system and may support additional loss tied to a particular credential.

264. Plaintiffs do not allege that their raw cards lacked or lost their independent value. They purchased PSA's service to assess and credential those existing assets and potentially enhance their marketability and value. Plaintiffs allege instead that the separately purchased Graded Card Credentials were worth less than represented because they were produced through materially different and undisclosed systems alleged herein. The holder, label, intake, imaging, shipping, and database processing merely deliver that Credential. They do not substitute for its represented attributes. Nor does continuing market recognition or some residual utility establish delivery of the represented bargain, particularly where Plaintiffs allege that PSA's market premium itself rests on the challenged representations, scarcity signals, and infrastructure. The relevant injury is whether Plaintiffs overpaid for materially misrepresented grading attributes and timing. Plaintiffs therefore seek recovery of Grading-Related Charges and overpayment attributable to the difference between the Credential represented and received, together with applicable shipping, handling, insurance, and other direct transaction costs.

265. This principal injury is susceptible to common, mechanical proof without judicially regarding individual cards or determining individualized resale values. Common evidence can establish whether Defendants sold the same represented Graded Card Credential through the same materially different system. Defendants' and Intermediaries' records identify beneficial owners or payors, submissions, service levels, PSA-imposed charges, MIVs, upcharges, repeat-service charges, transaction costs, payment dates, certification numbers, and return events. Those records identify what each consumer paid and the transaction-level inputs

needed to apply a supported common or subclasswide methodology for measuring the economic loss caused by the challenged grading and timing representations.

266. Without conceding that the Graded Card Credentials retained their represented value or that individualized valuation is required, Plaintiffs alternatively preserve common or subclasswide measures including the Graded Card Credential premium, overpayment attributable to misrepresented attributes, fee-specific overcharges, speed premiums, time-component overpayment attributable to materially misstated turnaround performance, MIV or upcharge amounts, repeat-service charges, benefit-of-the-bargain loss, and, where supported by common proof, supplemental diminution associated with inaccurate grades, false scarcity signals, altered certifications, or objectively identifiable card-and-grade submarkets. Plaintiffs do not seek duplicative recovery.

267. Causation is direct. Defendants' representations, omissions, and market-facing signals induced Plaintiffs to select PSA, surrender their cards, and pay Grading-Related Charges. The mails and wires transmitted those representations, placed the cards into PSA's system, processed service selections and payments, delivered the Graded Card Credentials, and completed the transactions. Defendants controlled both the representations and the grading, certification, population, pricing, fee, and payment systems that produced the alleged loss. Plaintiffs' economic injuries arose from their own payments and transactions, without depending on another person's injury or a later market transaction.

268. Card Grading Intermediaries do not interrupt that causal chain. They did not own Plaintiffs' cards, purchase grading for themselves, establish PSA's standards or charges, assign grades, create certifications or population entries, or bear Plaintiffs' losses. Plaintiffs supplied the cards and money, were the intended beneficiaries and economic payors, received the Graded

Card Credentials, and bore the alleged losses. Any separately identifiable Intermediary compensation can be allocated through transaction records, preventing duplicative recovery. Plaintiffs' injuries therefore are direct, not derivative of an Intermediary's injury.

269. Plaintiffs need not establish personal reliance on every predicate communication to establish RICO causation. Their theory is that Defendants' alleged mail- and wire-fraud scheme directly caused their property injuries through the submission, payment, and issuance transactions described above. Plaintiffs paid or reimbursed charges for the represented Graded Card Credentials and allegedly received materially different Graded Card Credentials through the same transactions, without a more direct victim or independent intervening cause. Any alternative credential-market reliance theory is reserved for class certification and common-proof proceedings and is unnecessary to Plaintiffs' RICO proximate-cause theory.

### J. Plaintiffs' Claims Are Timely

270. Plaintiffs' civil RICO claims are subject to a four-year statute of limitations, which accrues when a plaintiff discovered or reasonably should have discovered the injury giving rise to the claim. Plaintiffs' card submissions, payments, and resulting economic injuries occurred within that limitations period. Their claims, therefore, are timely.

271. Earlier conduct remains relevant to the pattern, scheme, market structure, knowledge, intent, and concealment. Plaintiffs allege that they did not discover and could not reasonably have discovered Defendants' fraudulent scheme earlier because its expertise-related, subjective, production-driven, conflict-laden, prior-grade-informed, ratio-influenced, classification-dependent, population-managed, criteria-shifting, and contractually shielded features were concealed through PSA's market-facing representations, grader secrecy and nondisclosure practices, separated disclaimers, hyperlinked terms, Guarantee limitations, and the

other concealment alleged herein. To the extent necessary, Plaintiffs therefore plead fraudulent concealment and resulting tolling.

272. The alleged scheme also remains ongoing. New solicitations, submissions, payments, upcharges, grading-result transmissions, population and pricing publications, return shipments, and contractual communications continue to execute the alleged scheme and, where they cause economic loss, generate new injuries. Plaintiffs allege repeated and systematic use of interstate enterprises, mails, and wires for profit, not completed or isolated conduct. They therefore assert civil RICO claims under 18 U.S.C. §§ 1962(a) and (c) as set forth below.

* * *

273. In sum, Plaintiffs allege that Defendants used continuing interstate enterprises, mails, and wires to obtain consumer money through material misrepresentations, half-truths, omissions, concealment, and deceptive fee practices; engaged in related and continuous racketeering across repeated national transactions; operated or managed the pleaded enterprises; and, as to Collectors, received and used or invested racketeering income, directly causing Plaintiffs' property injuries. Plaintiffs seek the damages, treble damages, costs, and attorneys' fees authorized by 18 U.S.C. § 1964(c). Any declaratory or injunctive relief sought elsewhere arises under non-RICO claims or other lawful authority, not as a private RICO remedy.

## CLASS ACTION ALLEGATIONS

274. Plaintiffs reassert and incorporate the preceding allegations.

275. Plaintiffs bring this action on behalf of themselves and similarly situated persons and entities under Rules 23(a), 23(b)(2), 23(b)(3), and, where appropriate, 23(c)(4). They seek a nationwide class for federal RICO and appropriate declaratory and injunctive claims and a Maryland subclass for Maryland-law claims, including the Maryland Consumer Protection Act.

276. "Class Period" means four years before the filing of this First Amended Complaint through judgment, subject to any different period required by law, tolling, discovery principles, continuing violations, or Court order.

277. "Maryland Class Period" means three years before filing through judgment, subject to any different period required by Maryland law, tolling, discovery principles, continuing violations, or Court order.

278. "PSA Grading-Related Services" means authentication, grading, encapsulation, certification, review, crossover, submission, resubmission, reconsideration, reholdering, relabeling, turnaround times, declared-value review, valuation, shipping, handling, insurance, return shipment, payments, grading results, upcharge notices, invoices, certification records, population-report entries, pricing-data transmissions, return shipments, and related services and/or communications transmitted, provided, offered, charged, or facilitated by PSA.

279. "PSA Grading-Related Charges" has the meaning defined in ¶ 40(e).

280. "PSA-Imposed Charges" means PSA Grading-Related Charges assessed, calculated, demanded, or retained by PSA in the PSA-facing transaction, whether paid directly or through a Card Grading Intermediary.

281. "Card Grading Intermediary" has the meaning defined in ¶ 55.

282. "Beneficial Owner" means the person or entity that ultimately owned, controlled, or enjoyed one or more cards submitted through a Card Grading Intermediary and paid, reimbursed, or bore PSA Grading-Related Charges for that submission.

**I. Proposed Classes and Subclasses**

283. Plaintiffs bring this action on behalf of the following Nationwide Beneficial Card Owner Class:

**All persons and entities in the United States who, during the Class Period, ultimately owned one or more trading cards submitted through a Card Grading Intermediary to PSA for PSA Grading-Related Services, and who paid, reimbursed, or bore PSA Grading-Related Charges but who neither created a PSA account nor authorized a PSA account to be created.**

284. The Nationwide Beneficial Card Owner Class neither includes persons or entities acting solely as Card Grading Intermediaries for cards that they did not own nor any person who submitted cards directly to PSA.

285. Plaintiffs bring their civil RICO claims on behalf of the Nationwide Beneficial Card Owner Class and, to the extent a separate RICO class is necessary, on behalf of the following Nationwide RICO Class:

**All members of the Nationwide Beneficial Card Owner Class whose PSA Grading-Related Services involved the use of interstate mails, interstate commercial carriers, interstate wires, electronic communications, internet transmissions, or interstate payment networks.**

286. Plaintiffs bring claims for declaratory and injunctive relief on behalf of the following Rule 23(b)(2) Class:

**All persons and entities in the United States who are members of the Nationwide Beneficial Card Owner Class, who currently own one or more PSA-graded cards submitted through a Card Grading Intermediary, and who are subject to or affected by Defendants' PSA Grading-Related Services.**

287. Plaintiffs seek certification of the Rule 23(b)(2) Class only for declaratory and injunctive relief that applies generally to the class as a whole. Monetary claims are brought under Rule 23(b)(3).

288. For their Maryland state-law claims, including claims under the Maryland Consumer Protection Act, Plaintiffs bring claims on behalf of the following Maryland State-Law Subclass:

**All members of the Nationwide Beneficial Card Owner Class who, during the Maryland Class Period, were Maryland residents or whose relevant PSA grading transaction was centered in Maryland because they delivered**

**cards from Maryland, paid or reimbursed PSA Grading-Related Charges in Maryland, received or initiated PSA Grading Related Services in Maryland, or otherwise bore the economic consequences of Defendants' challenged conduct in Maryland.**

289. Plaintiffs presently seek no nationwide class for state-law consumer-protection or common-law claims. The Maryland Subclass addresses Maryland consumers and Maryland-centered transactions arising from the common conduct alleged herein.

290. Excluded from the Classes and Subclasses are Defendants; their officers, directors, and employees; entities they control; their legal representatives, successors, and assigns; the assigned judicial officers and their immediate families; and persons or entities that timely opt out of a Rule 23(b)(3) Class or Subclass.

291. Plaintiffs reserve the right, subject to Rule 23 and Court approval, to refine the definitions based on discovery and to seek appropriate issues, liability, damages, or transaction subclasses, including subclasses concerning speed premiums, upcharges, repeat services, ancillary charges, certification events, instant offers, or other objectively identifiable transactions.

## II. Ascertainability and Class Records

292. The Classes and Subclasses are defined by objective criteria ascertainable from Defendants' records, supplemented where necessary by Card Grading Intermediary records. Relevant records include PSA account and submission data, Card Grading Intermediary submissions, invoices, payments, service tiers, MIV or declared values, upcharges, shipping and return shipments, certification and grading records, repeat-service records, population data, Vault and Partner Offer records, marketplace records, and related communications.

293. Those records identify or permit identification of submitted cards, beneficial owners and economic payors, service levels, grading dates and outcomes, charges paid or

reimbursed, upcharges, shipping and handling, turnaround representations, certification numbers, declared values, repeat services, return shipments, and related communications.

294. Combined payments to Card Grading Intermediaries do not prevent ascertainment or allocation. PSA's records identify PSA-Imposed Charges, while Card Grading Intermediary records identify their separate intake fees, handling charges, markups, submission fees, or other compensation. The two can therefore be separated through transaction records.

295. Nor does an Card Grading Intermediary's separate compensation affect membership, causation, or damages. Membership turns on beneficial ownership and payment, reimbursement, or bearing of PSA Grading-Related Charges—not the Card Grading Intermediary's separate compensation.

296. Any incomplete individual record can be supplemented through a ministerial claims process using objective documentation such as receipts, invoices, submission forms, certifications, payment and shipping records, communications, Card Grading Intermediary or marketplace records, and, where appropriate, supported claim forms.

**III. Numerosity**

297. The Classes and Subclasses are sufficiently numerous so that joinder is impracticable. PSA operates nationally and processes millions of trading-card submissions annually, and the challenged practices allegedly affected consumers through millions of grading-related transactions during the Class Period.

298. The precise number and identities of members are presently unknown but can be determined through the records identified in ¶¶ 292–296.

**IV. Commonality**

299. Common questions arise from Defendants' standardized representations, omissions, grading practices, pricing and upcharge structures, service tiers, contractual

architecture, intermediary channels, enterprise structure, acquisitions, market infrastructure, and centralized records.

300. Common questions include:

a. whether Defendants represented PSA grading as impartial, objective, standardized, expert-driven, consistent, reliable, transparent, accountable, or market-authoritative;

b. whether Defendants omitted material facts concerning grader expertise and qualifications; employee and executive financial conflicts; subjectivity and eye appeal; production pressure and internal research holds; prior-grade information; criteria changes; resubmission variability; alteration-screening and numerical-grade eligibility; certification changes; Gem Mint population practices; population classification and accuracy; upcharges; turnaround timing; Guarantee restrictions; downstream conflicts; or contractual limitations;

c. whether PSA's actual grading process materially differed from the expert, impartial, objective, criteria-based, and reliable process represented;

d. whether PSA's service-level pricing, MIV framework, adjusted fees, upcharges, turnaround representations, and payment-before-reveal-or-return practices were deceptive;

e. whether the Guarantee provided the consumer protection represented;

f. whether PSA Population Reports converted subjective, inconsistent, ratio-influenced, duplicate, stale, misclassified, nonqualifying, or otherwise distorted grade populations into market-facing scarcity signals;

g. whether Card Grading Intermediaries operated as PSA-facing conduits for Defendants' standardized representations, charges, and grading outputs;

h. whether Intermediaries' portal conduct or assent can bind Beneficial Owners to Defendants' purported Online Terms;

i. whether Defendants conducted or participated in RICO enterprises through a pattern of mail and wire fraud;

j. whether Defendants' representations and omissions were material;

k. whether Defendants caused Class members to pay PSA Grading-Related Charges they otherwise would not have paid or would have paid only in lesser amounts;

l. the availability and measure of damages, restitution, declaratory relief, and injunctive relief;

m. whether PSA's advertised turnaround periods were material components of each service tier and whether actual turnaround performance materially differed from those representations because of the alleged clock rules, backlog, capacity constraints, intake delays, research holds, or other workflow practices; and

n. whether Class members paid more for service tiers, including their time component, than they would have paid had the material timing facts been disclosed.

301. These questions are susceptible to common proof, including the materials and records alleged throughout the Complaint and expert analysis.

**V. Typicality**

302. Plaintiffs' claims are typical. Like absent members, Plaintiffs beneficially owned cards submitted through Card Grading Intermediaries, paid or reimbursed PSA Grading-Related Charges, relied on PSA's market-facing representations and omissions, and allegedly suffered economic injury from the same grading system, fee architecture, intermediary structure, and contractual practices.

303. Plaintiffs allege the same core injury as the Class: payment or reimbursement of PSA Grading-Related Charges for Graded Card Credentials materially different from those

represented. Differences in cards, grades, service tiers, or amounts paid do not alter the common liability or injury theory; they principally affect the amount of recoverable damages.

304. Plaintiffs' use of Card Grading Intermediaries makes them typical of the Class. Defendants designed, authorized, cultivated, accepted, or relied upon those PSA-facing channels to transmit cards, charges, and grading communications into and out of PSA's system.

## VI. Adequacy

305. Plaintiffs will fairly and adequately protect the Classes and Subclasses. Their interests align with absent members because they seek to establish liability for the same allegedly deceptive, racketeering, and unlawful practices.

306. Plaintiffs have no interests antagonistic to absent members and seek the same categories of available relief, including damages, treble damages where authorized, restitution where permitted, declaratory and injunctive relief, attorneys' fees, and costs.

307. Plaintiffs' counsel are experienced in complex and class-action litigation and will vigorously prosecute this action.

## VII. Predominance Under Rule 23(b)(3)

308. Common questions predominate because liability turns principally on the common issues identified in ¶¶ 299–301 and proof concerning Defendants' standardized representations, omissions, grading system, fee architecture, Guarantee and purported Online Terms, enterprise structure, market infrastructure, Intermediary channels, and centralized records.

309. Those issues do not require card-by-card proof. Defendants communicated the challenged representations and omissions through materially standardized grading standards, websites, service descriptions, pricing pages, Guarantees, slabs and labels, Population Reports,

certification systems, pricing data, marketplace integrations, Card Grading Intermediaries, invoices, upcharge notices, payment systems, and return shipments.

310. Materiality, causation, and injury are likewise susceptible to common proof. The materiality question is whether reasonable consumers would consider the concealed facts important when deciding whether and on what terms to submit cards, purchase service tiers, pay Grading-Related Charges or upcharges, obtain repeat services, or rely on PSA Graded Card Credentials and population data. Plaintiffs' common injury theory asks whether Class members paid for Graded Card Credentials materially different from those Defendants represented.

311. For claims requiring reliance, Plaintiffs' primary theory is the direct transactional reliance alleged in ¶¶ 206–222. Their alternative market-credential theory is pleaded in the alternative. RICO causation is independently alleged in ¶¶ 267–269 and does not depend on that alternative theory.

312. Damages also are susceptible to common proof. As alleged in ¶¶ 260–266 and 321–323, Defendants' and Intermediaries' records permit calculation of Grading-Related Charges and application of common or subclasswide methodologies, including overpayment, benefit-of-the-bargain, restitutionary, disgorgement where legally available, and fee-refund measures.

313. Any remaining individual calculations are mechanical and record-based. PSA records identify PSA-Imposed Charges, while Intermediary records identify separate markups or fees. Allocation among members therefore does not predominate over the common liability and injury questions.

## VIII. Superiority Under Rule 23(b)(3)

314. A class action is superior because individual claims are generally too small, complex, and expensive to litigate separately given the proof required concerning Defendants'

grading system, alleged fraud, RICO enterprises and predicates, pricing practices, causation, and damages. Plaintiffs further allege that Defendants' use of class-action waivers reflects their awareness that aggregation materially affects consumers' practical ability to challenge the conduct alleged herein.

315. Individual litigation would also risk inconsistent adjudications and duplicate discovery concerning the same representations, purported Online Terms, centralized records, enterprise structure, Intermediary channels, and common course of conduct. Class treatment permits those issues to be resolved once.

316. Class treatment will conserve judicial and party resources, promote consistent decisions, and provide a practical means of relief for consumers whose individual claims may not justify separate litigation.

## IX. Rule 23(b)(2)

317. Certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds generally applicable to the proposed Class, making classwide declaratory and injunctive relief appropriate.

318. Plaintiffs seek declarations that Beneficial Card Owners submitting through Card Grading Intermediaries did not assent to Defendants' purported Online Terms and therefore are not bound through Intermediary portal activity by arbitration, class-action or jury-trial waivers, forum-selection or choice-of-law clauses, limitations of liability, warranty disclaimers, delegation provisions, or similar restrictions.

319. Plaintiffs also seek appropriate injunctive relief requiring Defendants to cease the challenged deceptive grading, pricing, upcharge, turnaround, Guarantee, Population Report, certification, contractual-shield, and downstream-monetization practices; disclose material

grading, timing, pricing, Guarantee, and population, information; preserve and correct relevant records; and provide transparent, non-deceptive grading and pricing disclosures.

320. Such relief is sought against ongoing, standardized practices directed to consumers who continue to submit cards, pay PSA Grading-Related Charges, and rely on PSA grades, certifications, Population Reports, and market-facing representations.

## X. Classwide Damages and Restitution

321. Plaintiffs seek classwide damages and restitution consistent with the common injury and damages theories alleged in ¶¶ 260–266 for PSA Grading-Related Charges paid, reimbursed, or borne as a result of Defendants' alleged grading fraud, deceptive fee architecture, upcharges, turnaround and Guarantee representations, population practices, contractual shields, and downstream monetization.

322. Depending on the claim and common proof, recoverable amounts may include: (a) grading fees and other PSA Grading-Related Charges; (b) overpayment attributable to the difference between the Graded Card Credential represented and received; (c) deceptive service-tier, MIV, adjusted-fee, and upcharge amounts; (d) expedited-service premiums; (e) review, crossover, resubmission, and other repeat-assessment charges allegedly made economically rational by concealed variability, and reholdering, relabeling, or other charges where separately shown to result from the challenged practices; (f) shipping, handling, insurance, and return costs incurred to obtain the allegedly misrepresented Credential; and (g) benefit-of-the-bargain or diminution damages where supported. Plaintiffs do not seek duplicative recovery.

323. Those amounts can be calculated from common records. PSA records identify service levels, fee schedules, MIVs and declared values, adjusted fees and upcharges, shipping, handling, insurance, return charges, payment dates, certifications, grades, and return status; Intermediary records identify beneficial owners, amounts collected and remitted to PSA, and

separate Intermediary compensation. Expert analysis can allocate PSA-Imposed Charges where necessary and establish the loss value of the Graded Card Credential based on Defendants acts herein.

324. Plaintiffs also still own one or more of the PSA-graded cards at issue; and remains presently affected by an active PSA certification, Population Report entry, or other ongoing challenged practice and thus are entitled to injunctive relief.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

325. Based on the allegations herein, Plaintiffs respectfully demand relief under the following causes of action.

## FIRST CLAIM FOR RELIEF

### DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT DEFENDANTS' ONLINE TERMS, INCLUDING THE ARBITRATION CLAUSE, CLASS-ACTION WAIVER, FORUM-SELECTION CLAUSE, CHOICE-OF-LAW CLAUSE, LIMITATION-OF-LIABILITY CLAUSE, AND WARRANTY DISCLAIMERS, DO NOT BIND PLAINTIFFS OR THE CLASS

326. Plaintiffs reassert, reallege, and incorporate herein by reference all preceding factual allegations, including specifically paragraphs 1–40, 53–55, 97–100, 210–212, and 274–325, when asserting this cause of action.

327. Pursuant to 28 U.S.C. §§ 2201–2202 and Rule 57, Plaintiffs seek a declaration that Defendants' Online Terms—including arbitration, class-action waiver, forum-selection, choice-of-law, limitation-of-liability, warranty-disclaimer, integration, modification, and delegation provisions—do not bind Plaintiffs or the Classes and Subclasses.

328. Plaintiffs never created or used PSA submission accounts and did not personally accept the Online Terms. As alleged in ¶¶ 36–40 and 55, they engaged independent commercial Card Grading Intermediaries, selected cards and service tiers, received custody-only receipts, and were not shown contractual terms. Plaintiffs allege that those transactions neither appointed the

Card Grading Intermediaries as their contracting representatives nor otherwise made the Card Grading Intermediaries' acceptance of PSA's Online Terms attributable to Plaintiffs.

329. Plaintiffs submitted their cards only through Card Grading Intermediaries acting as agents of Defendants. Plaintiffs dispute actual authority, apparent authority, ratification, and estoppel on the facts alleged in ¶ 55. They do not seek contractual performance or benefits under a Dealer Agreement, User Agreement, or other agreement between Defendants and a Card Grading Intermediary. Their purchase of submission services, continued ownership of their cards, and fraud-based demand for recovery do not establish, by themselves, acceptance of the Online Terms. The legal effect of those acts must be assessed in the actual commercial setting rather than presumed from the arrival of third-party property in PSA's system.

330. Plaintiffs never received any offer, acceptance, consideration, mutual assent, inquiry notice, or knowing and voluntary waiver between Plaintiffs and any Defendant concerning the Online Terms; thus, the formation of a contract would be illusory, lack assent and consideration and would be otherwise unenforceable, including procedurally and substantively unconscionable. The Court must determine whether an agreement binding Plaintiffs exists and whether the Card Grading Intermediaries' alleged acceptance is attributable to them. Plaintiffs dispute both the transaction-specific agreement Defendants may invoke and the asserted authority to bind the beneficial owners. Those antecedent questions are distinct from the scope of an arbitration clause within an agreement already established to bind the parties.

331. An actual controversy exists because Defendants are expected to invoke the Online Terms, including arbitration and the class-action waiver, and Plaintiffs dispute their applicability. Collectors' motion to compel arbitration in *Rasmussen* illustrates the factual distinction: there, Collectors relied on evidence that the plaintiff personally created an account,

checked a box accepting the User Agreement, and submitted a card through that account. Plaintiffs did none of those things here. Plaintiffs also dispute any authority to accept the Online Terms on their behalf and seek no contractual performance under a Card Grading Intermediary's agreement. If Defendants seek enforcement based on those separate relationships, Plaintiffs request targeted discovery into the applicable Dealer Agreement and other submission agreements, historical terms and acceptance records, owner-notification and authorization requirements, and facts concerning PSA's knowledge and reliance. They request a reasonable opportunity to address that evidence before final resolution of the formation and authority issues, together with any further proceedings necessary to resolve genuine factual disputes.

332. WHEREFORE, Plaintiffs request that this Court enter judgment declaring that:

a. No contract was formed between Plaintiffs and any Defendant on the basis of Defendants' Online Terms;

b. The Online Terms, including the arbitration clause, class-action waiver, forum-selection provision, choice-of-law provision, limitation-of-liability provision, warranty disclaimers, and any delegation clause, do not bind Plaintiffs or the Class; and

c. This action may proceed in this Court as a putative class action.

## SECOND CLAIM FOR RELIEF

### DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT DEFENDANTS' ARBITRATION CLAUSE, CLASS-ACTION WAIVER, AND RELATED PROVISIONS ARE PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE, A PRODUCT OF FRAUD AND UNENFORCEABLE (PLEADED IN THE ALTERNATIVE)

333. Plaintiffs reassert, reallege, and incorporate herein by reference all preceding factual allegations, including specifically paragraphs 28–29, 36–40, 53–55, 97–100, 120–139, 199–200, 210–212, 274–325, and 327–332 when asserting this cause of action.

334. Plaintiffs plead their alternative enforceability challenge without admitting formation. Alternatively, if the Court determines that any portion of the Online Terms applies to Plaintiffs or putative Class members, Plaintiffs seek a declaration that the arbitration, class-action waiver, forum-selection, choice-of-law, limitation-of-liability, warranty-disclaimer, and related provisions are procedurally and substantively unconscionable, illusory, lack assent and consideration and are otherwise unenforceable. Plaintiffs further allege those provisions are products of fraud or fraudulent inducement and unenforceable for that independent reason.

335. The Online Terms are contracts of adhesion drafted unilaterally by Defendants and presented, if at all, on a take-it-or-leave-it basis. PSA controlled the intake structure and could have required beneficial-owner identification and assent at submission but did not. Defendants drafted the Online Terms and controlled the PSA-facing submission process. In the transactions alleged here, Plaintiffs received in some instances custody receipts rather than contractual terms and did not personally encounter an offer to accept the Online Terms. The separately maintained records concerning what Defendants required Card Grading Intermediaries to communicate or obtain, and what occurred under those requirements, bear on the procedural circumstances of any agreement Defendants contend binds Plaintiffs. *See supra* ¶¶ 40(a), 55, 97–100.

336. Plaintiffs allege the arbitration clause and class-action waiver are substantively unconscionable because they operate within the challenged transaction to restrict accountability for the same conduct used to obtain consumer fees, upcharges, and downstream revenue from beneficial owners who were not shown and did not knowingly waive their statutory and procedural rights.

337. Plaintiffs independently dispute that any delegation agreement binds them. Their objection concerns the formation and attribution of assent to the delegation provision itself, not merely the validity of the grading transaction as a whole. A delegation provision contained in a Card Grading Intermediary's agreement cannot supply the missing determination that Plaintiffs became bound to that provision. Plaintiffs therefore request judicial resolution of the antecedent formation and authority questions identified in ¶¶ 329–336 before any delegation provision is enforced against them. Moreover, Plaintiffs independently challenge the delegation clause as ambiguous, procedurally and substantively unconscionable, lacking consideration and assent, illusory and otherwise unenforceable. Because Plaintiffs dispute that any agreement to arbitrate was formed, they allege the antecedent question of formation remains for the Court.

338. WHEREFORE, Plaintiffs request that this Court enter judgment declaring that:

a. The arbitration clause, class-action waiver, forum-selection provision, choice-of-law provision, limitation-of-liability provision, and warranty disclaimers in Defendants' Online Terms are procedurally and substantively unconscionable and unenforceable as applied to Plaintiffs and the Classes and Subclasses;

b. No delegation provision may be enforced against Plaintiffs absent judicial determination that they became bound to it, and the disputed antecedent questions of formation and contracting authority are for this Court; and

c. This action may proceed in this Court as a class action.

## THIRD CLAIM FOR RELIEF

### RICO VIOLATION OF 18 U.S.C. § 1962(c)
### (Against All Defendants)

339. Plaintiffs reassert, reallege, and incorporate herein by reference all preceding allegations, including specifically paragraphs 1–55, 68–222, and 223–273, when asserting this cause of action.

340. Each Defendant is a RICO "person" under 18 U.S.C. §§ 1961(3) and 1962(c). PSA is the primary RICO person because it operated the grading and intake functions through which the predicates occurred; Collectors is also a RICO person based on its alleged direction and control of the enterprise. *See supra* ¶¶ 49–55.

341. As alleged in ¶¶ 53–55 and 248–253, the Grading-Intake Enterprise is an enterprise under 18 U.S.C. § 1961(4) affecting interstate and foreign commerce, with a common purpose, continuing relationships, and sufficient longevity. Card Grading Intermediaries participated as independent PSA-facing commercial intake and submission businesses, including the agency functions alleged in ¶ 55, not as alleged co-schemers.

342. The Grading-Intake Enterprise is distinct from each Defendant because it includes independent, non-Defendant participants, including Card Grading Intermediaries, that exist apart from the Collectors corporate family. The enterprise therefore extends beyond the parent-subsidiary relationship between Defendants.

343. Alternatively, Plaintiffs plead the Trading-Card Grading Enterprise defined in ¶¶ 53(b), 252–253, comprising Defendants together with Card Grading Intermediaries, eBay, Card Ladder, the PSA Vault, PSA Partner Offers, Collectors Financial Services, and related channels. It likewise affects interstate and foreign commerce and is distinct from either Defendant.

344. Both Defendants allegedly conducted or participated in the Grading-Intake Enterprise's affairs under 18 U.S.C. § 1962(c), each in a distinct capacity. PSA operated the grading, intake, encapsulation, certification, pricing, upcharge, turnaround, Guarantee, Population Report, and communication functions through which the predicates occurred. Collectors allegedly directed broader strategy, authorized-intake and marketplace integrations, fee architecture, capital allocation, and downstream monetization tied to PSA grades. See supra ¶¶ 49–55, 201–204, 248–253. PSA remains the primary RICO person for this Claim.

345. Defendants' racketeering activity consists of the repeated mail- and wire-fraud predicates alleged with particularity in ¶¶ 231–238, including: (a) interstate shipment and return of consumer cards; (b) interstate submission, status, invoice, upcharge, grading-result, certification, Population Report, valuation, Vault, Partner Offer, and return communications; (c) eBay-linked certification, pricing, consignment, and related transmissions; and (d) interstate dissemination of the expertise, standards, process-and-certification, market-use, pricing, and omission-based deceptions alleged throughout the Complaint.

346. Defendants' Predicate Acts constitute a pattern under 18 U.S.C. § 1961(5) because they are related and continuous, occurred repeatedly across large numbers of consumer transactions over years, and remain part of the alleged regular operation of the PSA-centered grading business. *See supra* ¶¶ 239–247.

347. Defendants directly and indirectly conducted or participated in the affairs of the Grading-Intake Enterprise and, alternatively, the Trading-Card Grading Enterprise through that racketeering pattern, in violation of 18 U.S.C. § 1962(c).

348. As a direct and proximate result, Plaintiffs and Class members suffered the property injuries alleged in ¶¶ 260–269, including payment or reimbursement of PSA Grading-

Related Charges for Graded Card Credentials materially different from those represented, resulting overpayment and transaction costs, and other recoverable economic losses.

349. WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants on this cause of action as follows:

a. An award of actual damages, the precise measure of which is to be determined;

b. An award of treble damages pursuant to 18 U.S.C. § 1964(c); and

c. An award of attorneys' fees and expenses.

## FOURTH CLAIM FOR RELIEF

### RICO VIOLATION OF 18 U.S.C. § 1962(a) — REINVESTMENT OF RACKETEERING INCOME IN THE ACQUISITIONS OF SGC AND BGS AND OTHER CHANNELS (Against Defendant Collectors)

350. Plaintiffs reassert, reallege, and incorporate herein by reference all preceding factual allegations, including specifically paragraphs 1–55, 68–222, and 223–273, when asserting this cause of action.

351. Collectors is a RICO "person" under 18 U.S.C. §§ 1961(3) and 1962(a).

352. Plaintiffs plead the Grading-Intake Enterprise as the primary enterprise into which Collectors allegedly used or invested racketeering income and the Trading-Card Grading Enterprise in the alternative. Plaintiffs further allege SGC and, to the extent the announced transaction closed or was implemented, BGS as enterprises into which Collectors invested through the transactions alleged in ¶¶ 42–44, 53(b), 71–74, 201–204, and 255–256.

353. Through the racketeering pattern alleged above, Collectors, directly and through PSA and affiliated operations, derived substantial income from the grading-related and downstream revenues identified in ¶ 255.

354. On information and belief, Collectors used or invested portions of that income to establish, operate, and expand enterprises affecting interstate commerce, including: (a) the

February 2024 SGC acquisition; (b) the December 15, 2025, announced agreement to acquire BGS; (c) Card Ladder, the PSA Vault, PSA Partner Offers, Collectors Financial Services, and related grading and market infrastructure; and (d) the April 2024 eBay agreements and acquisition of the eBay Vault. Plaintiffs do not allege one-to-one tracing; where proceeds were commingled with other fungible revenue, use or investment may be shown through aggregate receipts, timing, transfers, budgets, and economic substitution.

355. Plaintiffs allege these transactions were not isolated investments but vehicles through which Collectors used grading-derived income to expand structural control over competing grading brands and the integrated grading ecosystem. *See supra* ¶¶ 201–204, 255–256.

356. Plaintiffs allege the property injuries described in ¶¶ 260–269 resulted directly from the racketeering pattern and, as alternatively alleged in ¶¶ 255–256, that Collectors used or invested proceeds from that pattern to expand and reinforce the grading-centered system through which the alleged fraud continued. By using grading-derived proceeds to acquire competing graders and expand integrated pricing, resale, and grading infrastructure, Collectors allegedly reduced independent grading alternatives and competitive discipline, causing supracompetitive PSA-Imposed Charges and reduced choice, quality, transparency, and accountability. Plaintiffs further allege resulting in diminution, where proven, in the value, marketability, or liquidity of cards graded by formerly independent competitors.

357. Collectors is the RICO person that allegedly received, used, and invested racketeering income, and Plaintiffs allege that those investments directly caused the injuries described above.

358. WHEREFORE, Plaintiffs request that this Court enter judgment against Collectors on this cause of action as follows:

a. An award of actual damages, the precise measure of which is to be determined;

b. An award of treble damages pursuant to 18 U.S.C. § 1964(c);

c. An award of attorneys' fees and expenses.

## FIFTH CLAIM FOR RELIEF

### FRAUD OR DECEIT
### (Against All Defendants)

359. Plaintiffs reassert, reallege, and incorporate herein by reference all preceding factual allegations, including specifically paragraphs 1–40, 73–204, and 206–222, when asserting this cause of action.

360. Defendants made false and misleading representations of material fact concerning the Graded Card Credential to Plaintiffs and the putative Class in four categories:

**a. Expertise claims.** Defendants represented that PSA grading was expert-driven and performed by trained experts possessing specialized skill, experience, and judgment sufficient to evaluate valuable trading cards with precision and consistency. Plaintiffs allege those representations were false or misleading because PSA concealed who performed the work and their qualifications; relied on a constrained expert labor pool, internally developed personnel, trainees and outside market participants; permitted collector experience to qualify as relevant grading experience; and did not disclose whether personnel possessed the represented expertise when they graded consumers' cards.

**b. Standards claims.** Defendants represented that PSA grading was standardized, objective, criteria-based, consistent, transparent, accountable, and governed by recognized and respected universal grading standards. Plaintiffs allege those representations were false or

misleading because PSA applied materially discretionary eye-appeal and market-acceptance judgments, changed or reinterpreted published criteria, permitted grader-to-grader variability, operated under production requirements, and allegedly used ratio-, batch-, or other institutional review practices capable of affecting grade outcomes.

**c. Process-and-certification claims.** Defendants represented that PSA's grading and certification process produced a reliable, durable, verifiable, and market-authoritative Graded Card Credential. Plaintiffs allege those representations were false or misleading because PSA operated a high-volume production system; supplied prior PSA grade information to graders on at least certain identifiable resubmissions; allowed materially different outcomes on repeat assessment; allegedly admitted altered or otherwise nonqualifying cards into numerical-grade populations; retained the power to revise, deactivate, downgrade, or otherwise alter issued certifications; published population data susceptible to stale, duplicate, misclassified, and other distorted entries; materially limited the Guarantee; and attempted through Online Terms to recast the marketed Graded Card Credential as a subjective, non-warranted opinion.

**d. Market-use and independence claims.** Defendants represented, expressly and by implication, that PSA grades, slabs, labels, certification numbers, certification tools, Population Reports, pricing and valuation data, and related market infrastructure could be relied upon in pricing, buying, selling, holding, insuring, financing, lending against, vaulting, and valuing graded cards, and represented PSA's role as impartial and free of financial conflict. Plaintiffs allege those representations were false or misleading because the market-facing Graded Card Credential and scarcity data rested on the undisclosed grading, certification, population, and conflict practices alleged above, while Collectors, senior leadership, and PSA personnel held

corporate or personal economic interests tied to grades, scarcity, and grade-dependent transactions.

361. Defendants communicated the challenged representations to Plaintiffs, Class members, Card Grading Intermediaries, and the market through the standardized channels alleged in ¶¶ 73–139 and 206–222, including PSA's websites and standards, pricing and Guarantee materials, slabs and certification tools, Population Reports, valuation and Downstream Channels, marketplace and dealer integrations, communications, invoices, upcharges, and return shipments.

362. PSA disseminated the expertise, standards, process-and-certification, and market-use representations through those consumer-facing and intermediary channels, while Collectors allegedly amplified and monetized them through its integrated platforms and Downstream Channels. Those representations induced Plaintiffs and Class members to submit cards and pay PSA Grading-Related Charges for Graded Card Credentials marketed as impartial, expert, objective, standardized, criteria-based, reliable, durable, and market-authoritative, while Defendants allegedly concealed the materially different system described above.

363. Defendants' representations were also actionable half-truths. Having chosen to speak about expertise, standards, reliability, certification, Guarantee protection, Population Reports, timing, pricing, and market authority, Defendants allegedly omitted material facts that qualified those representations, including the grader, subjectivity, production, standards, certification, Guarantee, population, pricing, and downstream-conflict facts alleged in ¶¶ 130–204.

364. Plaintiffs allege Defendants knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendants created, controlled, or possessed

superior knowledge of PSA's grader selection and qualifications, grading standards, production requirements, prior-grade alerts, internal review and research workflows, employee conflict policies, executive and employee market participation, alteration-screening and numerical-grade eligibility practices, certification and correction records, Population Reports, fee architecture, Guarantee limitations, turnaround calculations, and downstream financial interests.

365. Defendants intended Plaintiffs, Class members, Card Grading Intermediaries, and market participants to rely on those representations because PSA's business model depends on market trust in its grade, slab, label, certification number, Population Report entry, and verification record.

366. Plaintiffs justifiably relied on those representations and omissions when they submitted cards, paid or reimbursed PSA Grading-Related Charges, and treated PSA grades, certifications, and Population Reports as authoritative outputs of expert, standardized, criteria-based grading. *See supra* ¶¶ 206–222. That reliance included PSA's representation that identifiable physical criteria—including surface, centering, corners, and edges—materially structured the professional condition assessment, as well as the advertised turnaround time associated with the selected service tier.

367. As a direct and proximate result, Plaintiffs suffered the economic injuries alleged in ¶¶ 220–222 and 260–266, including Grading-Related Charges and overpayment for Graded Card Credentials materially different from those represented, related transaction costs, and loss of the benefit of the bargain. Plaintiffs further allege that PSA's excess retention of their independently valuable cards beyond the advertised service-tier periods contributed to the economic overpayment and, where separately proven, additional market-timing or liquidity loss.

368. Plaintiffs allege Defendants acted knowingly, intentionally, and with malice by continuing to market PSA's Credential as expert, standardized, reliable, durable, and market-authoritative while concealing material contrary facts within their possession. Plaintiffs seek punitive damages to the extent permitted by law.

369. WHEREFORE, Plaintiffs, individually and on behalf of the putative Class, request that the Court enter judgment against Defendants on the Fifth Claim for Relief and award:

a. actual damages, including overpayment, benefit-of-the-bargain damages, PSA Grading-Related Charges paid or reimbursed for Graded Card Credentials not delivered as represented, transaction costs, and any diminished value, marketability, liquidity, or certification reliability proven at trial;

b. restitution and disgorgement to the extent permitted by law, including fraudulently obtained grading fees, upcharges, expedited-service premiums, repeat-service fees, shipping, handling, insurance, return-shipment charges, and other PSA Grading-Related Charges;

c. punitive damages based on Defendants' knowing, intentional, malicious, or reckless misconduct, to the extent permitted by law;

d. pre-judgment and post-judgment interest;

e. attorneys' fees and costs to the extent permitted by law; and

f. such other and further relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

### FRAUDULENT CONCEALMENT
### (Against All Defendants)

370. Plaintiffs incorporate the preceding allegations, including specifically paragraphs 1–40, 73–204, and 206–222, when asserting this cause of action.

371. Defendants' alleged concealment was not silence in a vacuum. After choosing to speak about PSA's expertise, standards, methodology, reliability, certification, Guarantee, Population Reports, timing, pricing, and independence, Defendants allegedly omitted material facts that qualified those statements, including: (a) grader qualifications and whether graders possessed the represented expertise when performing the work; (b) subjective eye-appeal and market-acceptance judgments; (c) grader-to-grader variability; (d) trainees, internally developed personnel, contractors, and other market participants; (e) production targets, extended shifts, internal research holds, and approval requirements; (f) changing or discretionary grading criteria; (g) prior PSA grade information supplied on at least certain identifiable resubmissions; (h) review, resubmission, crossover, and cracking variability; (i) alteration-screening and numerical-grade eligibility practices; (j) certification correction, deactivation, or downgrade; (k) duplicate, stale, misclassified, nonqualifying, or otherwise distorted Population Report data; (l) employee and executive personal financial conflicts; (m) Collectors' downstream financial interests; (n) post-submission MIV, valuation, and upcharge leverage; (o) Guarantee limitations; and (p) Online Terms not shown to beneficial owners. *See supra* ¶¶ 130–204.

372. Plaintiffs allege Defendants had a duty to disclose those facts because they materially qualified Defendants' affirmative and partial representations concerning the same subjects. *See supra* ¶¶ 206–222.

373. Defendants allegedly concealed those facts through anonymous grading; nondisclosure of grader qualifications, training, calibration, production metrics, prior-grade alerts, internal review and research workflows, conflict controls, and performance data; confidentiality restrictions; separated or collapsed pricing and timing disclosures; hyperlinked Online Terms; limited Guarantee language; nondisclosure of alteration-screening, grade-change,

error, certification-correction, and Population Report limitations; and market-facing tools that communicated reliability and independence without the qualifying internal information.

374. Defendants intended Plaintiffs and Class members to rely on the resulting impression through PSA's websites, standards, pricing pages, Guarantee, slabs, labels, certification tools, Population Reports, dealer and intermediary programs, hobby-media messaging, and marketplace integrations.

375. Plaintiffs and Class members relied on that impression by submitting cards, selecting service tiers, paying or reimbursing PSA Grading-Related Charges and related transaction costs, where applicable accepting post-submission or repeat-service charges, and treating PSA grades, certifications, and Population Reports as reliable market credentials. Had the omitted facts been disclosed, they would not have transacted on the same terms or paid as much.

376. As a direct and proximate result, Plaintiffs and Class members suffered the economic injuries alleged in ¶¶ 220–222 and 260–266, including Grading-Related Charges and overpayment for materially different Graded Card Credentials, related fees and transaction costs, and loss of the benefit of the bargain. The concealed timing facts likewise caused Plaintiffs to purchase service tiers at prices and on possession terms they allege they would not have accepted had PSA accurately disclosed the time reasonably required under its actual operating conditions.

377. Plaintiffs allege Defendants acted knowingly, intentionally, and with malice because they possessed superior knowledge of the concealed facts yet continued marketing PSA grading as expert, objective, standardized, reliable, guaranteed, and market-authoritative. Plaintiffs seek punitive damages to the extent permitted by law.

378. WHEREFORE, Plaintiffs, individually and on behalf of the putative Class, request that this Court enter judgment against Defendants on this cause of action as follows:

a. an award of actual damages, including overpayment, loss-of-benefit-of-the-bargain damages, PSA Grading-Related Charges paid or reimbursed for a certification product or Graded Card Credential not delivered as represented, transaction costs, and any diminished value, reduced marketability, reduced liquidity, or reduced certification reliability proven at trial;

b. an award of restitution and/or disgorgement to the extent permitted by law, including the return of fraudulently obtained grading fees, upcharges, expedited-service premiums, repeat-service fees, shipping, handling, insurance, return-shipment charges, and other PSA Grading-Related Charges;

c. an award of punitive damages based on Defendants' knowing, intentional, malicious, and reckless misconduct, to the extent permitted by law;

d. an award of pre-judgment and post-judgment interest;

e. an award of attorneys' fees and costs to the extent permitted by law; and

f. such other and further relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF

## VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT, MD. CODE ANN., COM. LAW §§ 13-101 ET SEQ. (Against All Defendants)

379. Plaintiffs reassert, reallege, and incorporate herein by reference all preceding factual allegations, including specifically paragraphs 1–40, 73–204, 206–222, and 274–325, when asserting this cause of action.

380. Plaintiffs are consumers within Md. Code Ann., Com. Law § 13-101(c)(1).

381. Each Defendant is alleged to be a merchant within Md. Code Ann., Com. Law § 13-101(g)(1) because it directly or indirectly offers or makes available consumer goods or services.

382. PSA Grading-Related Services are consumer services. Each service tier also included a consumer-facing turnaround representation that communicated how long PSA expected the consumer's independently valuable property to remain unavailable during grading. Defendants sold more than a numerical opinion: a market-facing Graded Card Credential comprising authentication, grading, encapsulation, a proprietary label, certification number and verification system, Population Report inclusion, Guarantee messaging, and PSA brand recognition, marketed as the output of expert graders applying recognized standards through a reliable, market-authoritative process.

383. Defendants allegedly engaged in unfair, abusive, or deceptive trade practices through the common conduct detailed in ¶¶ 130–204, including: (a) expert-grader misrepresentations; (b) objective and universal-standard misrepresentations; (c) reliable-certification and Guarantee misrepresentations; (d) independence and conflict misrepresentations; (e) price-premium and market-value representations dependent on the allegedly absent expertise, standards, neutrality, and reliability; (f) material omissions concerning grader qualifications, subjectivity, standards changes, production pressure, prior-grade information, alteration-screening and numerical-grade eligibility, certification and Population Report limitations, personal and corporate financial conflicts, Guarantee restrictions, pricing leverage, and timing practices; and (g) deceptive pricing practices involving the price-value-speed package, turnaround qualifications, MIV and declared-value pricing, upcharges, drip and partitioned pricing, repeat services, and possession-based leverage.

384. Taken together, Plaintiffs allege those statements and omissions created the materially misleading impression that PSA Graded Card Credentials derived their market authority from expert graders applying stable standards through a reliable certification system, when the Graded Card Credentials were instead affected by the undisclosed practices alleged above.

385. Plaintiffs and Maryland Subclass members relied on those representations and omissions when submitting cards, selecting service tiers, relying on the associated turnaround representations, paying or reimbursing PSA Grading-Related Charges and related costs, accepting post-submission charges, obtaining repeat services, and treating PSA Credentials and Population Reports as reliable. Had the truth been disclosed, reasonable consumers would not have transacted on the same terms or paid as much.

386. Defendants' alleged MCPA violations directly and proximately caused Plaintiffs and Maryland Subclass members actual economic injury.

387. That injury includes the common economic injuries alleged in ¶¶ 220–222 and 260–266, namely payment or reimbursement of PSA Grading-Related Charges for materially different Graded Card Credentials, resulting overpayment and related charges, and loss of the benefit of the bargain.

388. WHEREFORE, Plaintiffs request actual damages, restitution and disgorgement to the extent permitted by law, declaratory and injunctive relief, reasonable attorneys' fees, costs, and all other relief authorized by Md. Code Ann., Com. Law § 13-408 and applicable law.

## EIGHTH CLAIM FOR RELIEF

**UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED**
**(PLEADED IN THE ALTERNATIVE)**
**(Against All Defendants)**

389. Plaintiffs reassert, reallege, and incorporate herein by reference all preceding factual allegations, including specifically paragraphs 1–40, 130–204, 206–222, and 321–325, when asserting this cause of action.

390. Alternatively, Plaintiffs conferred a monetary benefit on Defendants through PSA Grading-Related Charges they paid or reimbursed. This Claim is limited to amounts Defendants actually received or retained, does not seek the value of any market premium or enforce any contract or Online Terms, and is pleaded solely to prevent inequitable retention of those payments. Payment or reimbursement does not constitute assent, ratification, direct-benefits estoppel, or acceptance of any arbitration, class waiver, or other contractual limitation.

391. Defendants knew of and appreciated the monetary benefit.

392. Plaintiffs allege Defendants accepted and retained that benefit under circumstances making retention inequitable in light of the fraudulent and deceptive conduct alleged herein.

393. As a direct result of that alleged unjust enrichment, Plaintiffs suffered economic loss.

394. WHEREFORE, Plaintiffs request restitution, disgorgement, and such other and further equitable relief as is just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the Class, and the Subclasses request that the Court:

A. Certify the proposed Classes and Subclasses under Federal Rule of Civil Procedure 23, appoint Plaintiffs as Class representatives, and appoint Plaintiffs' counsel as Class counsel;

B. Enter judgment in favor of Plaintiffs and the Classes and Subclasses and against Defendants on the claims asserted herein;

C. Declare that Defendants' purported Online Terms, including any arbitration provision, class-action waiver, jury-trial waiver, forum-selection provision, choice-of-law provision, limitation-of-liability provision, warranty disclaimer, delegation provision, or similar restriction, do not bind Plaintiffs and similarly situated Beneficial Card Owners who did not assent to those terms, or, alternatively, are unenforceable as alleged herein;

D. Award Plaintiffs and the Classes and Subclasses all actual, compensatory, statutory, and treble damages authorized by law, including treble damages under 18 U.S.C. § 1964(c), in amounts to be determined at trial;

E. Award punitive damages on the claims and to the extent authorized by applicable law;

F. Award restitution, disgorgement, or other equitable monetary relief to the extent authorized by the claims asserted and applicable law, without enforcing contractual rights or performance obligations under any agreement between PSA and a Card Grading Intermediary;

G. Enter appropriate declaratory and injunctive relief, to the extent authorized by law, requiring Defendants to cease the deceptive practices established at trial and to provide materially accurate and non-deceptive disclosures concerning the Graded Card Credential,

grading practices, pricing, upcharges, turnaround times, Guarantee limitations, Population Reports, certification practices, and purported contractual limitations;

H. Award pre-judgment and post-judgment interest as permitted by law;

I. Award Plaintiffs reasonable attorneys' fees, expert expenses where recoverable, and costs of suit, including those authorized by 18 U.S.C. § 1964(c), Md. Code Ann., Com. Law § 13-408, and other applicable law;

J. Grant a jury trial on all issues so triable; and

K. Grant such other and further relief as the Court deems just and proper.

On this 29th day of September, 2026.

Respectfully submitted,

*/s/ Thomas R. Bundy III*

Thomas R. Bundy III
Federal Bar No. 15265
ADVOCARE LEGAL GROUP,
A Member of Zealous Advocates
8115 Maple Lawn Boulevard
Suite 275
Fulton, Maryland 20789
Telephone: (240) 500-3595
Facsimile: (240) 657-1109
Thomas.Bundy@Z-Advocates.com

Jeremy Eldridge
Federal Bar No. 29830
Adam Crandell
Federal Bar No. 29463
ELDRIDGE CRANDELL LLC,
A Member of Zealous Advocates
One South Street
Suite 2150
Baltimore, Maryland 21202
Telephone: (443) 559-4384
Facsimile: (443) 288-6633
Jeremy.Eldridge@Z-Advocates.com
Adam.Crandell@Z-Advocates.com

Andrew D. Herman
Admitted Pro Hac Vice

Stanley Brand
Admitted Pro Hac Vice
THE HERMAN LAW FIRM LLC
A Member of Zealous Advocates
1775 Pennsylvania Ave., NW
Suite 650
Washington, D.C. 20006
Telephone: (202) 350-3397
Andrew.Herman@Z-Advocates.com
Stan.Brand@Z-Advocates.com

*Counsel for Plaintiffs*