**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

**Nicholas Funk**
109 West Hill Street
Baltimore, Maryland 21230
Baltimore City

**George Muresan**
1072 30th ST NW
Washington, DC 20007

**Victor Muresan**
445 West 35th St, Apt 3n
New York, New York 10001

**Daniel J. Meyerpeter**
10730 Judy Lane
Columbia, Maryland 21044
Howard County

**For ~~himself~~themselves and for similarly situated individuals,** **JURY TRIAL DEMANDED**

~~Plaintiff~~
Plaintiffs,

**vs.** **Civil Action No. 1:26-cv-2933**

**COLLECTORS UNIVERSE, INC., d/b/a PROFESSIONAL SPORTS AUTHENTICATOR,**
1610 East Saint Andrew Place
Santa Ana, California 92705

**COLLECTORS HOLDINGS, INC.,**
1610 East Saint Andrew Place
Santa Ana, California 92705

Defendants.

# FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, MONETARY DAMAGES, INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL

**Table of Contents**

**NATURE OF THE ACTION** ........ **1**

**PARTIES AND NON-PARTIES** ........ **24**

**JURISDICTION AND VENUE** ........ **54**

**COMMON FACTUAL ALLEGATIONS** ........ **57**

I. The Origins and Consolidation of the Modern Trading-Card Grading Industry ........ 57

II. Defendants' Market Control Has Become Central to the Investment-Driven Trading-Card Market ........ 62

A. Manufacturing and Intellectual Property ........ 63

B. Grading and Authentication - PSA as the Market Credential ........ 64

C. Pricing, Data Aggregation, and Analytics — Card Ladder ........ 67

D. Financialization Through Custody, Resale and Acquisition - PSA Vault, PSA Partner Offers, and Collectors Financial Services ........ 72

E. Marketplace Integration and Secondary-Market Flow ........ 74

F. Market Communication, Influence, Solicitation, and Intake ........ 76

III. Defendants Scaled a PSA-Centered Financial Marketplace Built on PSA Grades ........ 79

IV. Defendants' Consumer-Facing Grading and Authentication Representations and Practices Promising Impartial, Expert, Objective, and Standardized Review ........ 87

A. The Grading Workflow PSA Markets to Consumers ........ 87

B. PSA's Public Promise: Expert, Standardized, Objective, and Reliable Review ........ 90

C. Consumers See PSA's Price, Value, and Speed Package ........ 92

V. Defendants' Fraudulent Grading Scheme and Deceptive Fee Practices ........ 98

A. PSA's Fraudulent Grading Methodology and False Market Credential ........ 99

B. PSA's Deceptive Fee Model Monetizes the False Graded Card Credential ........ 135

C. Collectors Scaled PSA's Fraud Through Vertical Integration ........ 154

D. Card Grading Intermediaries Were Also Misled and Passed PSA's Misrepresentations to Consumers ........ 156

VI. Plaintiffs and the Putative Class Relied on Defendants' Misrepresentations, Omissions, and Market Credential ........ 157

VII. Common Factual Allegations Supporting Plaintiffs' RICO Counts ........ 171

A. Overview of Defendants' RICO Scheme Based in Fraud ........ 172

B. Particularities of Mail Fraud — 18 U.S.C. § 1341 .................... 176
C. Particularities of Wire Fraud — 18 U.S.C. § 1343 .................... 177
D. Each Predicate Act Caused, Furthered, or Concealed the Deceptive Practices .......... 179
E. Defendants Engaged in a Pattern of Racketeering Activity .................... 180
F. Defendants Conducted the Affairs of RICO Enterprises .................... 184
G. Collectors' Receipt and Use or Investment of Racketeering Income - 18 U.S.C. § 1962(a) .................... 187
H. The Enterprises and Predicate Acts Affect Interstate Commerce .................... 190
I. Plaintiffs Sustained Injuries by Reason of Defendants' Conduct .................... 190
J. Plaintiffs' Claims Are Timely .................... 197
**CLASS ACTION ALLEGATIONS .................... 199**
I. Proposed Classes and Subclasses .................... 201
II. Ascertainability and Class Records .................... 203
III. Numerosity .................... 205
IV. Commonality .................... 206
V. Typicality .................... 208
VI. Adequacy .................... 209
VII. Predominance Under Rule 23(b)(3) .................... 210
VIII. Superiority Under Rule 23(b)(3) .................... 212
IX. Rule 23(b)(2) .................... 213
X. Classwide Damages and Restitution .................... 214
**CAUSES OF ACTION AND CLAIMS FOR RELIEF .................... 216**
FIRST CLAIM FOR RELIEF .................... 216
SECOND CLAIM FOR RELIEF .................... 220
THIRD CLAIM FOR RELIEF .................... 223
FOURTH CLAIM FOR RELIEF .................... 228
FIFTH CLAIM FOR RELIEF .................... 233
SIXTH CLAIM FOR RELIEF .................... 239
SEVENTH CLAIM FOR RELIEF .................... 247
EIGHTH CLAIM FOR RELIEF .................... 259
PRAYER FOR RELIEF .................... 260

Plaintiffs~~COMES NOW Plaintiff~~ Nicholas Funk, George Muresan, Victor Muresan, and Daniel Meyerpeter (collectively, "Plaintiffs"), by and through their undersigned counsel, ~~who,~~pursuant to Fed. R. Civ. P. 15(a)(1) and 23(a), (b)(2), and (b)(3), and based on ~~Plaintiff's~~Plaintiffs' personal knowledge and ~~his~~their counsel's reasonable investigation,[1] ~~files~~bring this ~~putative class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3),~~ First Amended Complaint for ~~himself~~themselves and for similarly situated consumers~~,~~ against Defendants Collectors Universe, Inc., doing business as Professional Sports Authenticator ("PSA"), and ~~against~~ Collectors Holdings, Inc. ("Collectors") (collectively, "Defendants~~"), and, in~~"). In support thereof, ~~alleges~~Plaintiffs allege as follows:

**NATURE OF THE ACTION**

1. Trading cards are ~~collectible~~paperboard cards ~~featuring~~that feature athletes, fictional characters, or cultural icons~~.~~ that consumers collect. This case concerns ~~PSA's~~Defendants' process for grading trading cards, which involves evaluating ~~the cards'~~a card's authenticity and physical condition before ~~they are~~it is encased in a plastic holder, labeled with a score, and returned to the market as a certified credential.

2. PSA launched the modern card-grading industry in July 1991. From its inception, PSA has represented that strict rules govern card grading:

> *"[Cards that] bear evidence of trimming, re-coloring, restoration, or any other forms of tampering … will not be graded."*
>
> — *PSA Grading Standards*[2]

---

[1] ~~The~~This complaint's allegations ~~in this Complaint~~ are based on ~~Plaintiff's~~Plaintiffs' personal knowledge ~~as to himself~~ and on information and belief ~~as to~~for all other matters. Allegations made on information and belief are based on counsel's reasonable investigation and on facts and circumstances within Defendants' exclusive possession or control. Those allegations are ~~specifically~~ identified because they likely will have evidentiary support after a reasonable ~~opportunity~~chance for discovery, consistent with Fed. R. Civ. P. 11(b)(3).

[2] *Grading Standards*, PSA, https://www.psacard.com/gradingstandards (last visited ~~July 22~~Sept. 28, 2026).

But the very first card graded by PSA broke that venerable rule.

3. PSA assigned certificate number 00000001 to the most famous baseball card in the world, a T206 Honus Wagner. That card had been secretly trimmed years earlier to improve its appearance before PSA graded it, a fact the grader later acknowledged that he knew when he graded the card.[3] PSA's own published standards prohibited grading altered cards. But PSA graded ~~the~~that card anyway, assigning it a Near Mint-Mint 8 (the highest grade a T206 Wagner has ever received). PSA then sealed it in a tamper-evident holder bearing that grade and released it into the trading-card market.[4] PSA neither disclosed the trimming on the holder, nor withdrew the grade when learning about the alteration.[5] That card later sold for $2.8 million and it remains encapsulated in ~~that same~~a PSA 8 holder with an active certification today.[6]

4. The number printed on that holder is now worth millions, but that value was born from a lie. PSA's first grade was not a minor defect in a system later corrected; it became the blueprint for the modern grading market that Defendants built. A number sealed in plastic and backed by claimed authority can create extraordinary value only if the market believes that it reflects a neutral, expert, standardized, and reliable determination. What began with one card has become a market exceeding $15 billion annually. Defendants did not escape the fraud ~~of~~created

---

[3] *See* ~~Chris Olds~~Tom Bartsch, Mastro Pleads Guilty ~~*to Mail Fraud*~~, Admits ~~*Trimming Famed Honus*~~Trimmed Wagner ~~*Card*, BECKETT~~, Sports Collectors Digest (Oct. ~~11, 2013), ; Plea Agreement, *United States v. Mastro*, No. 12-CR-781 (N.D. Ill. Oct.~~ 10, 2013), https://sportscollectorsdigest.com/collecting-101/mastro-pleads-guilty-admits-trimmed-wagner~~)~~..

[4] *See* Junk Wax Hero, *The PSA Trimming Scandal on the Wayne Gretzky T206 Honus Wagner*, YOUTUBE (Dec. 2, 2022), https://www.youtube.com/watch?v=_pzkd0mlKjU (PSA grader Bill Hughes "admitted knowing at the time that he graded it that it was altered").

[5] *See Cert #00000001*, PSA, https://www.psacard.com/cert/00000001/psa (last visited ~~July 22~~Sept. 28, 2026) (reflecting that the ~~McNall/Gretzky~~ T206 Honus Wagner remains certified at grade NM-MT 8 and has never been downgraded or withdrawn).

[6] *See World Record $2.8 Million Paid for Famed T206 Honus Wagner Baseball Card*, PSA (Sept. 6, 2007), https://www.psacard.com/articles/articleview/5077/world-record-2-8-million-paid-famed-t206-honus-wagner-baseball-card.

on day one; they scaled it. ~~Since its inception, the~~The market ~~has depended on~~now views PSA's grades as an authoritative credential only because Defendants have concealed material facts about the true nature of those grades.

5. This case challenges PSA's fraudulent grading practices and deceptive fee model, and Collectors' role in making both profitable at scale. PSA sells card grading as ~~an~~ expert-driven, criteria-based, unbiased, and reliable, producing an authoritative, market-facing credential. Plaintiffs allege that ~~the market treats as authoritative. It~~ PSA delivers something materially different~~. Its grading involves~~: a subjective, ~~opaque,~~ inconsistent, financially conflicted grading system backed by ~~an~~ obscured ~~online "contract"~~Online Terms that ~~purportedly disclaims reliability, caps remedies, and forces~~purport to disclaim standards, compel arbitration~~. Consumers~~, and limit remedies. Plaintiffs paid for expertise, standards, and reliability~~, but~~; PSA ~~sold them~~delivered manufactured uncertainty and ~~then~~ charged them for it~~. PSA extracted those charges through deceptive~~ using dark-pattern pricing~~, manipulating consumers to spend even~~ designed to extract more fees. Collectors ~~compounded~~amplified the ~~harm~~scheme by consolidating grading alternatives, connecting PSA grades to Collectors' downstream monetization, and profiting from the market reliance PSA created. ~~Under~~Through this ~~scheme~~system, PSA processed millions of cards ~~each month~~monthly and ~~generated~~collected more than a billion dollars in fees ~~over~~during the relevant limitations period. ~~This action seeks to recover~~Plaintiffs seek recovery of those fraudulently obtained fees for ~~Plaintiff~~themselves and the putative class under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Maryland Consumer Protection Act, and applicable common law.

***The Trading-Card Market***

6. Trading cards have existed since the late 1800s. What began as a hobby centered on collecting, trading, and preserving childhood memorabilia has evolved into a multibillion-dollar commercial market. The modern card market no longer turns only on nostalgia; it increasingly involves the conversion of cards into trusted, graded financial assets.

7. The trading-card market has both a primary and secondary tier. In the primary tier, manufacturers sell boxes containing sealed packs of randomly assorted, machine-generated cards. Once sold, those boxes enter the secondary market, where purchasers may resell them or open them and sell the individual cards inside. These secondary transactions occur through online platforms, local card shops, trade shows, auction houses, retail channels, and private sales.

~~8.~~ In the secondary market, a card's value ~~is driven~~depends largely ~~by perceived~~on popularity, scarcity, authenticity, and condition. ~~Often, a card's~~The card has value before grading, but its condition often is not ~~determined~~ independently determined by buyers ~~or~~and sellers~~; it is assigned by~~. Instead, third-party grading companies, ~~including~~like PSA, ~~who place cards into~~assess a card's condition and assign numerical ~~condition tiers~~grades, typically ~~on a scale~~ from 1 to 10. ~~Those grades materially influence market price because cards assigned higher grades often command substantial premiums. In practice, the assigned~~ That grade ~~frequently~~ becomes ~~the~~a market-recognized proxy for ~~condition.~~

8. ~~That single number, assigned by a private grader and affixed to a plastic holder encasing a card,~~value and can ~~determine~~materially change how ~~that card~~the existing asset is ~~perceived,~~ priced, ~~insured,~~ marketed, ~~financed, and sold.~~ and traded, with higher grades often commanding substantial premiums. Grading therefore does not create all of the card' underlying value, but it adds an economically consequential market credential to an asset that already exists.

9. Small differences in a card’s condition can translate into substantial differences in value. ~~The~~Thus, the grade has become the market’s shorthand for value. It often determines whether a card is treated as a mere keepsake or as an investment-grade asset. As a result, control over the grade represents substantial control over how value is recognized in the trading-card market.

***Defendants Control Key Components of the Card Market While Holding Conflicted Positions***

10. Defendants have substantial control of the trading-card market. Collectors owns Defendant PSA, acquired Sportscard Guaranty (“SGC”), and entered into a transaction to acquire Beckett Grading Services (“BGS” or “Beckett”), formerly independent grading brands. Through that consolidation, Collectors’ grading brands account for a dominant share of the third-party card-grading market, with PSA alone reported to account for approximately seventy percent of graded-card volume.[7] Defendants do not dispute this statistic. In their own filings in a separate action challenging their grading monopoly, Defendants state~~ that~~ PSA “is the leading card grading service provider,” having graded 19.2 million of approximately 26.6 million cards graded by the four major graders in 2025.[8]

11. Collectors’ interests extend beyond card grading. Through acquired businesses and commercial integrations, Collectors participates in trading-card pricing ~~or~~and valuation through Card Ladder; custody and resale through the PSA Vault and related market integrations; liquidity and acquisition through PSA Partner Offers; and even asset-backed lending through Collectors Financial Services. ~~These business lines each derive value from PSA grades, PSA certification, and PSA population data, all of which Defendants control~~These businesses operate

---

[7] *See* Ben Burrows, *Led by PSA, Collectors corners even more of grading market by acquiring Beckett*, YAHOO! SPORTS (Dec. 16, 2025), https://sports.yahoo.com/articles/led-psa-collectors-corners-even-230000416.html.

[8] Defs.’ Mot. to Dismiss, *Rasmussen v. Collectors Holdings Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 8, 2026), ECF No. 21 [hereinafter Rasmussen MTD] at 10.

in a feedback loop where PSA grades influence pricing, valuation, acquisition, resale, liquidity, and lending, while those same factors, in turn, influence PSA's grading practices.

12. Within that integrated system, PSA ~~does not merely assign card grades; it~~ also publishes the market's principal ~~grade-based~~graded card scarcity signal. Each graded card is entered into PSA's population reports, which track how many copies of a given card exist at each grade level. These population reports are widely relied upon by buyers, sellers, marketplaces, and pricing tools as indicators of rarity. A lower population at a given grade level can materially increase perceived scarcity, which then drives price and demand and that translates into more value.

13. Taken together, this integrated system places Defendants on both sides of the card grading~~-dependent~~ market. ~~On the one hand,~~ PSA ~~authenticates cards,~~ assigns grades, issues ~~certification numbers~~certifications, and publishes population data~~. On the other hand,~~, while Collectors participates in ~~the~~ pricing, custody, resale, ~~offers,~~ lending, ~~insurance, financing,~~ liquidity, and marketplace pathways ~~tied to those same cards~~ ("Downstream Channels~~").~~") tied to those same graded credentials. This dual position represents a conflict. The financial interests in those same graded card credentials also extend to Defendants' senior leadership and employees, including graders, who own graded cards personally.[9] Because ~~each grade level~~PSA's grades and population ~~report~~data may affect the value of cards they personally own, these ~~Downstream Channels and even consumer demand, Defendants~~same individuals have a financial ~~interests not only~~interest in ~~individual~~the same market their grading ~~outcomes, but also in how those outcomes are communicated through PSA's~~ work can influence. They help create economically consequential grades and scarcity signals~~. Depending on their downstream position, Defendants~~

[9] *Infra* ¶¶ 139–141.

~~can benefit from~~ while personally owning cards whose value can be affected by those outputs. This dual position also represents a conflict. Yet, PSA still markets its grading ~~outcomes that expand, restrict, or preserve the number of cards at specific grade levels. Defendants can also benefit from stale or inaccurate population data, a problem PSA admits exists but has done little to resolve.~~[10] ~~These~~as impartial, independent, and free from financial conflicts~~ are embedded in the same system that PSA markets as reliable, objective, and neutral.~~.

14. PSA has stated repeatedly that its grading is the product of an impartial, objective, third-party process, emphasizing ~~that~~ it has no financial stake in the sale of the cards it evaluates.[11] But through their vertically integrated system, Defendants now monetize ~~the values, scarcity signals, and transactions that~~ PSA grades ~~help create~~ through Collectors' Downstream Channels. And their senior leadership and personnel, including graders, buy and sell graded cards through those same channels. That structure is incompatible with the disinterested, neutral role ~~that~~ PSA ~~represents~~portrays to consumers and the card market, as Congressman Pat Ryan ~~even~~ recently noted.[12]

15. Defendants do not adequately disclose ~~those~~their conflicts. They market PSA grading as impartial and objective while operating a system in which grading decisions ~~and scarcity data~~ are intertwined with Defendants' own downstream monetization~~.~~ or personal interests. That omission is material. ~~A~~Any reasonable consumer would consider it ~~very~~ important

~~[10] *Infra* ¶¶ 180–182.~~

[11] *See*, *e.g.*, *Tips for Collectors*, PSA, https://www.psacard.com/resources/guides (last visited ~~July 22~~Sept. 28, 2026) ("With impartial, third-party validation, someone other than a seller has offered an opinion about the item that's up for sale. . . . Unlike the seller, we have no financial stake in the item's sale. All perceived conflict of interest is eliminated, and so is the risk."); ~~Joe Orlando, *Top 5 Tips for Internet Buying & Selling*, PSA (July 28, 2010), (stating that PSA has "no financial interest in the sale" and therefore "there is no conflict of interest perceived by the buyer anymore").~~*see also infra* ¶¶ 139–141 (addressing conflicts at a multiple levels).

[12] Rep. Pat Ryan, *Letter to Andrew N. Ferguson, Chairman, Fed. Trade Comm'n* (Dec. 18, 2025), https://patryan.house.gov/sites/evo-subsites/patryan.house.gov/files/evo-media-document/collectors-holdings-letter-12.18.25.pdf.

to know that the entity assigning grades and publishing scarcity data also monetizes, or has a stake in, the value, liquidity, and even the transactions that those very grades help create. By concealing those conflicts, Defendants misled consumers and the market about PSA's ~~neutrality and~~ impartiality. But those ~~conflicts~~misrepresentations are only one part of the scheme. The deeper fraud is that Defendants have engineered market reliance on PSA's grading credential ~~while~~by concealing the lack of not only neutrality~~,~~ and impartiality, but also the expertise, objectivity, and reliability behind it.

***How Defendants' Fraudulent Card-Grading Scheme Works***

16. PSA engineered ~~and monetized~~market reliance by selling more than a mere abstract opinion. PSA ~~sold~~sells a market-facing certification product: the ~~assigned~~allegedly expert-determined grade result, encapsulated holder or slab, the proprietary label, certification number, certification-verification system, population reports, price guides, dealer programs, guarantee messaging, and even PSA brand recognition (collectively "Graded Card ~~Grading~~ Credential"). Defendants ~~knew there was a direct and~~ intended ~~nexus between PSA's grading work and Collectors' Downstream Channels because impacting card values is precisely what PSA grades were designed and marketed to affect. Defendants intended~~the buyers, sellers, collectors, dealers, auction houses, marketplaces, insurers, lenders, pricing tools, Card Grading Intermediaries, and downstream consumers to rely on the representations about that product (collectively "Card Market Participants"). ~~PSA engineered these participants'~~Defendants cultivated reliance ~~through its Grading~~on PSA's Graded Card Credential~~, price guides, dealer programs, and even market integrations. Collectors then monetized it through its~~ to monetize that reliance through their Downstream Channels. ~~Because the credential's value depends on trust in PSA's authoritative standards and methodologies,~~And because the Graded Card Credential

derives its authority from PSA's claim that qualified experts produce it, the truth about who actually grades the cards goes to the heart of the fraud~~ begins with the people that PSA says supply that expertise, namely its graders~~.

~~***How Defendants' Fraudulent Card-Grading Scheme Works***~~

17. PSA markets its graders as experts, but its own ~~filings and materials reveal~~documents tell a ~~far ~~different ~~system~~story. Before Collectors took PSA private in 2021, PSA admitted that qualified grading experts were "in short supply," and competition for them was "considerable," and that it relied on training young graders it believed could become experts.[13] ~~PSA's publicly~~Publicly available PSA grader profiles ~~are consistent with that admission, reflecting~~reflect backgrounds ~~outside professional ~~unrelated to trading cards or grading,~~ including restaurant work, sports-stadium roles,~~[14] and ~~songwriting.[15] PSA does not even require~~PSA requires no prior professional card grading experience, specialized training, or certification~~ for card-grader positions; rather, it ~~—merely ~~says it prefers~~preferring that candidates ~~with~~have one to three years' experience and ~~treats~~treating mere card collecting as qualifying experience.[16] ~~PSA describes such candidates as ideal for the position.[17] And when card~~When volume increases, PSA ~~contracts with~~uses outside ~~individuals~~contractors, "usually [but not always] collectibles dealers~~. . . .~~," to ~~address~~meet short-term ~~increases in . . . ~~grading ~~orders,"[18] while concealing~~demand.[19] And PSA does not disclose who ~~actually ~~grades consumers' cards~~,~~

[13] *Infra* ¶¶ ~~72, 144~~69, 131–136.

[14] *Infra* ¶ 134.

~~[15] *Infra* ¶¶ 147–148.~~

[16] *Infra* ¶ ~~145~~133.

~~[17] *Infra* ¶ 145.~~

~~[18] *Infra* ¶¶ 72, 144.~~

[19] *Infra* ¶¶ 69, 132.

~~what~~ or their qualifications ~~they have, and whether they are in fact experts. PSA then binds graders with strict nondisclosure agreements to keep the market from learning these material facts. Its recent $200 million investment announcement, including~~. PSA therefore depends materially on its own selection, testing, training, supervision, and quality controls to ensure that personnel performing the represented "expert" services maintain basic grading skills PSA markets as expertise. PSA's recent $200 million infrastructure investment includes a new "Grader's University," ~~underscores~~underscoring the problem ~~here, namely~~:[20] PSA is only now building the training infrastructure that consumers were led to believe already existed.~~[21] The~~ But PSA shields these issues from public scrutiny by binding its graders and employees to strict nondisclosure agreements. Collectively, these practices expose the material gap between ~~PSA's~~the marketed ~~expertise and its~~ expert grading system upon which consumers rely and the opaque ~~grader~~ system that PSA actually operates. This expertise gap is ~~material, misleading, and~~ central to ~~the~~Defendants' fraud.

18. PSA's own published materials expose another aspect of Defendants' fraud. PSA tells consumers that "the vast majority of grading is ~~criteria-based, standardized~~applied with a basic, objective standard," identifying measurable characteristics such as centering, print defects, staining, and ~~reliable, but~~surface wrinkles as objective components.[22] But in reality, its grading process relies ~~heavily~~ on a subjective "eye appeal" override that is neither fixed, measurable, nor

---

[20] PSA Staff, *PSA Announces $200 Million Infrastructure Investment to Support Global Demand*, PSA (May 14, 2026), https://www.psacard.com/articles/articleview/15715/200-million-investment-grading-experience.

~~[21] PSA Staff, *PSA Announces $200 Million Infrastructure Investment to Support Global Demand*, PSA (May 14, 2026), https://www.psacard.com/articles/articleview/15715/200-million-investment-grading-experience; Teddy Ricketson, *Card grading giant PSA nets $200 million investment for expansion*, YAHOO! SPORTS (May 14, 2026), https://sports.yahoo.com/collectibles/article/card-grading-giant-psa-nets-200-million-investment-for-expansion-185758534.html.~~

[22] *Infra* ¶¶ 145–147.

~~properly~~suitably disclosed. Rather than define "eye appeal" through ~~objective~~a condition ~~criteria~~criterion, PSA defines it by asking: "What will the market accept for this particular issue?"[23] That question is neither a card grading standard, nor a subjective opinion. It is, at best, a guess about market tolerance. The grade should tell the market ~~the~~a card's condition, but PSA's formulation lets the market appetite tell PSA what the card can receive. That inversion is material. Consumers pay PSA grading fees for an expert~~ condition~~-determined credential, not for a speculative, discretionary guess about undefined market acceptance. By selling standardized criteria and objectivity ~~and reliability~~ while relying on rampant subjectivity, PSA delivers a ~~grading~~graded product that is materially different from the one that it ~~markets~~sells to consumers~~.~~, like Plaintiffs.

19. ~~Plaintiff~~Plaintiffs further ~~alleges, based~~allege, on information and belief and as detailed below, that PSA's ~~grading outcomes are adversely affected by production quotas, pressure from short review windows,~~ undisclosed ~~changes to grading criteria, inconsistent application of published standards, and population-level~~ grading practices ~~that PSA does not disclose to consumers at the point of submission. Each of these issues adversely impacts the reliability and objectivity of card grading. Publicly available data shows that graders spend less than a minute per card and that the rates of a perfect grade have experienced sustained swings that Plaintiff contends cannot be reconciled with PSA's criteria-based marketing.[24] Plaintiff alleges that PSA manages gem-mint populations (PSA's highest score) by training~~ —including production pressure, differing grader experience and assignment, subjective eye-appeal judgments, changing criteria, batch or ratio-based ~~grading practices, heightened scrutiny of cards~~

---

[23] ~~*Infra* ¶¶ 155–157.~~ *Grading Standards, supra* note 2.

[24] ~~*Infra* ¶¶ 153–175, 180–182; *see specifically infra* ¶¶ 167–175 (grader speed, production pressure, ratio-based review, and Gem Mint-rate evidence).~~

~~that feature premium players or characters~~review, managerial intervention, and other ~~concealed grading practices. And PSA's focus on market appetite for eye appeal creates a slippery slope where PSA~~ internal practices[25]—can ~~contend that market forces want limits on higher~~ systematically affect which cards receive PSA's highest grades ~~for certain cards rather than grading cards objectively.~~and therefore the scarcity premiums associated with them. These indicia of population control matter. ~~A limit placed on~~Limiting a card's grade for ~~any reason~~reasons other than its condition is ~~not and cannot be~~neither an objective determination~~. It is not even~~ nor a good-faith subjective opinion. It is a commercially managed output~~, calculated to preserve scarcity,~~. Public population data and PSA-related incidents alleged below support ~~pricing, and extract fees from the market that~~the inference that grade populations are outputs of the grading system PSA controls rather than passive reflections of a card's actual condition. What matters is that PSA markets individual grades as criteria-based assessments and publishes their aggregate distribution as meaningful scarcity data without disclosing internal practices capable of systematically affecting either. Plaintiffs allege those practices include PSA ~~created and from which Defendants themselves benefit downstream.~~ population reports that contain known inaccuracies, which PSA has not adequately corrected.[26]

20. Perhaps nothing demonstrates grading's unreliability better than resubmissions, crossover submissions, and cracking. Resubmission allows a consumer to pay PSA to reconsider a prior assigned grade from its "experts~~.~~." Crossover submissions allow a consumer to pay PSA to grade a card already graded by another company. Cracking involves the process of removing a graded card from its plastic holder and then resubmitting it ~~to PSA~~for a grade without disclosure

---

[25] *Infra* ¶¶ 131–167; *see specifically infra* ¶¶ 159–167 (grader speed, production pressure, ratio-based review, and Gem Mint-rate evidence).

[26] *Infra* ¶¶ 171–173.

of the prior score. These practices exist because grading outcomes are highly variable. PSA monetizes that variability while continuing to market grading as ~~expert, consistent, and reliable. PSA then buries the true nature of its service in dense, legal contract disclaimers that it knows or should know consumers rarely read or understand.[27] Those hidden disclosures seek to recast PSA's grade as a mere subjective opinion after consumers are committed to their grading process because of Defendants' persistent messaging that their expert, neutral graders, who use objective criteria in a reliable process, add substantial value. That bait-and-switch approach represents fraud.~~consistent and reliable.

21. Consumers do not pay merely to have ~~a card~~cards sealed in plastic; ~~rather,~~ they pay for a ~~PSA Grading~~Graded Card Credential ~~along with~~and the market acceptance ~~that follows~~it carries. Defendants obtained consumers' money while delivering a ~~grading product~~ materially different product and profiting from the ~~one that PSA marketed. Plaintiff alleges these features are not accidental flaws.~~grading uncertainty they do not disclose. Shifting criteria, ~~undisclosed~~ subjectivity, and inconsistent ~~grading~~outcomes create ~~repeat demand, which preserves dependence on the PSA's credential, thereby generating additional revenue through~~chances for paid resubmissions, crossovers, reviews, and cracking~~. Stable, transparent, and consistently applied grading would reduce that repeat demand.~~, which generate repeat revenues while reinforcing dependence on PSA's Graded Card Credential. Defendants thus ~~profit from uncertainty,~~monetize grading variability while marketing ~~that grading is reliable and~~the process as objective~~.~~, criteria-based, and reliable.

***Defendants' Deceptive Grading Revenue Model***

---

~~[27] *See* Caroline Cakebread, *You're not alone, no one reads terms of service agreements*, BUS. INSIDER (Nov. 15, 2017, 7:30 AM), https://www.businessinsider.com/deloitte-study-91-percent-agree-terms-of-service-without-reading-2017-11 (reporting that a Deloitte survey of 2,000 U.S. consumers found that 91% consent to legal terms and service conditions without reading them).~~

22. PSA's pricing also uses deceptive practices. PSA does not charge a disclosed, fixed, final price for grading. It sells 'Service Levels' built around three consumer-facing signals: a headline per-card price, a "Maximum Insured Value," and an estimated turnaround time. PSA's pricing pairs those signals together, presenting grading as a price-value-speed package. Each component contributes to its deceptive pricing practices through dark patterns, which are user interfaces on websites and apps carefully crafted to trick or manipulate users into certain actions.

23. First, PSA advertises turnaround time in business days, which is a practice that misleadingly shortens consumers' perception of how long grading will actually take. PSA places an asterisk next to the advertised turnaround time but not next to the pricing representation. To learn what the asterisk means, the consumer must scroll down to a separate "Disclaimer" section that is presented in less prominent grey font. That section is collapsed and requires consumers to click it to open before seeing the actual disclosure. In other words, PSA sells the visible promise of speed at a set price while hiding the real rules that make both promises materially different from what consumers reasonably understand from PSA's marketing.

24. When opened, the ~~hidden~~ disclaimer ~~reveals the truth that the~~materially qualifies PSA's headline ~~conceals~~offer. PSA states that turnaround times are "not guaranteed"; the clock begins only when an order is "received and scanned into the PSA facility"; timing ~~may be affected by PSA's~~depends on "submission volume" and "capacity~~"; turnaround times~~ " and may change ~~rapidly~~ without notice; and PSA may adjust pricing, services ~~offered~~, and processing ~~time~~times to align demand with capacity~~; and all terms and conditions are subject to change.~~[28] ~~Those~~.[29] These are not minor qualifications ~~are not minor. They strip the advertised timing and~~

---

[28] ~~*Infra* ¶¶ 188–190.~~
[29] *Infra* ¶¶ 178–185.

pricing of their practical meaning.. The Service Level chart tellssells consumers and the market that they are buying speed anda price certainty. The hidden speed-value package, while the separated disclaimer reveals thatand Online Terms gives PSA really promises neither. substantial discretion to change both after the consumer selects that package.

25. PSA's own conduct confirms In a market where card values move with player performance, injuries, new product releases, comparable sales, sentiment, and other developments, the time to have that the hidden disclaimercard returned to its beneficial owner is economically material. When grading volume overwhelmed PSA'sWhile PSA holds a card, its owner cannot respond to market movement by selling the graded card without having access to the card. PSA, thus, sells turnaround time as part of the price-value-speed package to induce submissions over different service tiers. But when demand exceeded capacity, itPSA raised prices, increased advertisedlengthened turnaround times, limited access toestimates, restricted lower-cost service levelstiers, and stopped gradingsuspended submissions below Regular tier submission level. These actions occurred because PSA could not process the volume it had solicited.[30] PSA President Ryan Hoge admitsacknowledged that PSA was receiving approximately 150,000 cards per day but coulddaily while shipping only ship about 90,000 each day.[31] That's a (a 40% daily deficit while still advertising turnaround times and accepting money. These facts matter. PSA knew that its submission volume adversely impacted its ability to satisfy the advertised turnaround time, but PSAshortfall) yet continued to sell grading through Service Levels organized around advertised speed that PSA knew it could not reliably deliver. At some

[30] PSA Staff, *Due to Demand Spike, PSA Pauses Value Tiers, Extends Collectors Club Memberships, and Launches Public Backlog Tracker*, PSA (May 28, 2026), https://www.psacard.com/articles/articleview/15210/service-level-update-may-2026.

[31] NEO Cards & Comics, *PSA Is Raising Prices (Again) — Ryan Hoge Explains Why... and More* at 31:19–31:34, YOUTUBE (Feb. 10, 2026), https://www.youtube.com/watch?v=NageYv7EsXA.

~~point, an estimate becomes a lie. Plaintiff alleges that PSA crossed that line when it used turnaround estimates to induce payment while knowing that~~accepting submissions and selling tiers differentiated by speed.[32] Hoge also called backlog~~,~~ "very healthy," and said "[w]e like to have that," and identified approximately two months as ideal for staging work.[33] Plaintiffs allege PSA thus knew and managed capacity ~~constraints~~and backlog conditions to influence the need to pay a premium for speed, without adequately disclosing the backlog, clock-start rules, intake delays, and ~~internal processing practices~~ workflow constraints that made ~~the advertised timing~~its public estimates unreliable~~ or illusory. At the same time, PSA President Ryan Hoge said, "It's very healthy for us to have a backlog. We like to have that. That's just – it helps us stage work and kind of queue it up."[34] He identifies "two months' worth of backlog" as PSA's ideal. PSA *wants* to hold consumers' cards for months, forcing them to pay more to get their property back faster given PSA's possession-based coercion. That is indicia of fraud~~. In a time-sensitive market, PSA was selling speed to liquidity while controlling when that liquidity became available.

26. PSA's upcharge uses the same deceptive architecture. ~~PSA requires consumers to choose~~Consumers must select a Service Level ~~before submitting cards but does not clearly disclose that that service level choice turns~~based not only on the ~~card's~~ price of the package and value of the submitted card, but also on the expected post-grading ~~fair market~~ value before PSA assigns the grade. That pricing structure requires consumers to make three blind guesses before PSA grades the card: (1) what grade PSA will ultimately assign, (2) when PSA eventually grades the card, and (3) what the market value for that unknown grade will be ~~when~~at the time PSA

---

[32] NEO Cards & Comics, *PSA Is Raising Prices (Again) — Ryan Hoge Explains Why… and More* at 31:19–31:34, YOUTUBE (Feb. 10, 2026), https://www.youtube.com/watch?v=NageYv7EsXA.

[33] *Id.* at 32:57–33:13.

~~[34] *Id.* at 32:57–33:13.~~

finally grades it. PSA reaps the benefit of these consumer guesses~~, but still reserves~~ with higher upfront premiums, while reserving the discretion to ~~decide,~~ increase the selected tier after it receives the card~~, that the selected tier was too low and that~~ for an additional ~~grading~~ fee ~~is due~~. This additional fee can be assessed both when the card is submitted and after the card is graded. This increased grading fee is known as an upcharge. PSA casts the upcharge as a justified insurance charge ~~(“~~calling it the Maximum Insured Value (“MIV”) when it is truly an unjustified second grading fee. ~~The~~Neither the speculative pre-grade valuation nor the post-grade value of the card ~~does not require~~causes PSA to incur ~~any~~ additional ~~expense~~expenses to justify charging more~~.~~ for the same grading services. This ~~second~~ fee represents PSA’s ownership stake in the graded card, which is also another dark pattern called drip pricing.

~~27.~~ Taken together, PSA’s fee architecture employs drip ~~pricing~~, bait-and-switch ~~pricing~~, partitioned ~~pricing,~~, and illusory speed pricing~~, and~~. In doing so, PSA uses possession~~-based~~ coercion~~. These dark pattern practices are~~ tactics after receiving the ~~hallmark of consumer fraud. PSA advertises misleading Service Levels; takes possession of the consumer’s property; controls~~card by controlling the grading ~~process; determines the~~, timing, post-grading ~~value; reserves the right to change grades and values; conditions~~ valuation and grade disclosure; imposing additional charges sua sponte; and conditioning the return of the card on payment~~; and~~. PSA then fragments the total cost ~~into~~among grading fees, ~~Maximum Insured Value or declared-value~~ upcharges, shipping, handling, and insurance ~~charges.~~to make them more appetizing. Here, the “grading” portion of the fee, which is advertised to the public, appears smaller to induce them to buy the service when the real cost is much more significant. By the time consumers learn the ~~consumer learns the real~~actual price~~, real~~ and timing, ~~and real rules, the card is~~ they already ~~in~~ committed their cards and money to PSA’s system. ~~Defendants do not simply charge for grading~~

cards. They monetize uncertainty, delay, and possession through fraud. And PSA's own alleged contract tries to legitimize these Plaintiffs allege this post-submission control operates as deceptive practices by providing broad discretion that includes the right to "change [those] fees from time to time."[35]

***Plaintiff and The Class are the Intended Victims who Relied on Defendants' Representations***

28. Plaintiff and members of the putative Class are the consumers Defendants set out to reach. As demonstrated herein, they beneficially owned the cards submitted for grading, paid or reimbursed PSA grading-related charges, and bore the economic consequences of PSA's fees, upcharges, grading outcomes, representations, omissions, and certification outputs. They are the card owners whose money, property, and reliance the grading market was designed to capture.

29. Plaintiff, like many other collectors, submitted his cards through a PSA-facing intermediary, such as a local card shop, PSA dealer, or group submitter. Those intermediaries pass cards into PSA's system, relay PSA's pricespricing and grading-related information, collect PSA-related charges, and return graded cards to beneficial owners for a small, per-card fee on top of what PSA charges. That reach and structure is by design. PSA aims its standards, labels, holders, guarantees, pricing, population reports, service tiers, certification tools, dealer programs, and hobby-media presence at beneficial card owners, whether they submit directly or through an intermediary. The deception originated with Defendants and traveled through Defendants' submission channels to the consumers who paid for and relied on PSA grades.

30. Plaintiff and members of the putative Class relied on Defendants' fraudulent grading and pricing practices in the manner that Defendants intended. Direct reliance arose from PSA's uniform representations and omissions disseminated through its public materials, pricing

[35] Decl. of Jacqueline Curiel, *Rasmussen v. Collectors Holdings Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 4, 2026), ECF No. 20-2, Ex. A (Collectors User Agreement) §§ 2, 18, 19, 24.

~~schedules, grading standards, guarantees, population reports, certification tools, hobby-media messaging, Card Grading Intermediaries, and other PSA-facing channels. Alternatively, Plaintiff also relied on the integrity of the PSA-centered trading-card market that Defendants created, informed, controlled, and monetized, warranting a rebuttable market-reliance presumption by extension of *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). This is a market case because PSA and Collectors made it one. They made PSA's credential a market-facing certification product that is designed to be relied upon by all consumers and the market who buy, sell, and trade cards.~~

~~31.~~27. ~~As a result of Defendants' fraud, Plaintiff and the putative class suffered concrete economic injury. They paid PSA grading-related charges for a service that was not delivered as represented — charges they would not have paid, or would have paid in lesser amounts, had Defendants~~transaction design. These tactics are then reinforced by Online Terms that purport to authorize the very practices concealed or inadequately disclosed ~~the truth. Because Defendants' misrepresentations and omissions were uniform, market-facing, and common to the PSA-centered market they built, reliance may be established through common proof by direct reliance, market reliance, or both.~~at the point of sale.

***The Alleged Contractual Shield Does Not Reach ~~Plaintiff~~Plaintiffs or the Class***

~~32.~~28. ~~Defendants built their grading system around an~~ Defendants' online, clickwrap ~~agreement that is intentionally designed to protect their fraudulent conduct. Those online terms attempt~~Online Terms ("Online Terms") are part of the alleged deceptive architecture. They purport to limit ~~Defendants'~~ accountability through arbitration ~~clauses~~, class-action waivers, forum-selection and choice-of-law provisions, liability caps, ~~warranty~~ disclaimers, and ~~language that tries to recast the market-facing certification product PSA sold~~other restrictions, while reserving broad discretion over PSA's services, including pricing, and Graded Card Credential,

which includes the right to "change fees from time to time."[36] The Online Terms also materially qualify the service that PSA markets, recasting the Graded Card Credential as a mere subjective, non-warranted opinion. In Plaintiff's view, PSA's terms and conditions are a critical part of the fraud alleged here and are while disclaiming responsibility for the very standards used to induce consumers to purchase it. Plaintiffs allege that this contradiction is fraud making the Online Terms unconscionable even if Defendants could enforce them here, which they cannot. These terms are unenforceable because Plaintiff, and consumer collectors like him, made submissions through intermediaries, not directly to Defendants.. Plaintiffs separately dispute that those terms bind them.

33.29. Neither Plaintiff nor members of the putative class are bound by PSA's purported contract.Plaintiffs obtained PSA grading services through separate independent businesses who perform card submissions among other hobby-related services. These intermediaries act as agents of PSA under their own accounts.[37] In doing so, Plaintiffs merely select the cards and service tiers and give the cards to the intermediaries as intake channels, who provide submission receipts. At no time are Plaintiffs told, shown or asked to accept PSA's Online Terms. These terms and conditions are unenforceable against collectors, like Plaintiffs. They never opened a PSA submission account and never clicked to accept PSA's online terms. Nor were they asked to accept any contract for PSA, including any term that waives their constitutional, statutory, and procedural rights as stated in PSA's purported online contract. The threshold contract defect here is the absence of assent. Defendants cannot solicit downstream card owners, aim representations at them, profit from their money, and then bind them to terms they never saw or accepted.

---

[36] Decl. of Jacqueline Curiel, *Rasmussen v. Collectors Holdings Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 4, 2026), ECF No. 20-2, Ex. A (Collectors User Agreement) §§ 2, 18, 19, 24.

[37] *See infra* ¶¶ 327–338.

***~~Relief Sought~~***

~~34. This case is not about an isolated grading error or a dispute over a single fee. Nor is it solely about market concentration. This case arises from a specific grading system in which dominant enterprises used representations of neutrality, objectivity, expertise, and reliability, coupled with control over market-defining credentials, and reliance on contractual limitations, to fraudulently obtain money and property from consumers through repeated interstate transactions.~~

~~35. This is a civil RICO case because Defendants did not obtain Plaintiff's money through a single misrepresentation or isolated transaction. Rather, they associated with others as an ongoing enterprise that used interstate mail and wires to repeatedly disseminate materially false and misleading representations about grading expertise, objectivity, reliability, pricing, turnaround times, and market neutrality, while concealing the true nature of the grading process and fee structure. Those representations induced consumers nationwide to repeatedly surrender their property, pay grading-related charges, and participate in a market whose value Defendants themselves controlled and monetized. Plaintiff alleges this continuous pattern of racketeering activity enabled Defendants to fraudulently obtain and retain hundreds of millions of dollars each year in grading-related fees that directly injured Plaintiff and the Class.~~

~~36. Plaintiff is an ordinary collector and hobbyist. He entered a market that treated PSA grades as authoritative because PSA told him, its intermediaries, and the market that PSA grading meant impartial expertise that is objective and reliable. Plaintiff had no practical way to discover, before submitting his cards and paying his fees, that the Grading Credential that he purchased actually rested on nonexpert graders, undisclosed subjectivity, shifting standards, production pressure, financial conflicts, and hidden fee leverage. Plaintiff alleges that PSA turned grading into a mere gamble, while marketing it as reliable. This case seeks to enforce a~~

~~simple principle, namely that a company selling neutrality, objectivity, expertise, and reliability must either deliver that or plainly disclose that it does not.~~

~~37. Over the last four years, Defendants have made more than a billion dollars from consumers in fraudulent, unearned grading fees. Plaintiff brings this action for himself and other consumers nationwide who paid or reimbursed PSA grading-related charges through PSA's third-party submission channels. Plaintiff seeks actual damages, treble damages, restitution, declaratory relief, injunctive relief, attorneys' fees, costs, and all other relief permitted by law to stop Defendants' deceptive and racketeering conduct, remedy the economic harm it caused, and restore transparency and accountability to the trading-card grading market.~~

***Plaintiffs and The Class are the Intended Victims who are Entitled to Relief***

30. Plaintiffs and members of the putative Class are the consumers Defendants set out to reach. They are ordinary collectors and hobbyists whom Defendants' grading system was designed to reach. They beneficially owned the cards submitted, supplied the property that PSA graded, paid or reimbursed Grading-Related Charges, and relied on Defendants' representations. They sought what PSA itself promotes: impartial, objective, standardized, expert, and reliable grading credential that can make a card more marketable, liquid, and valuable.[38]

31. PSA sells more than examination and encapsulation. Grading does not improve the physical card. What changes is the credential. PSA adds the grade, slab, certification number, verification record, population entry, and market acceptance that follow it into commerce. PSA even charges to "cross" cards already graded by competitors into PSA holders although the underlying card remains unchanged.[39] PSA cultivated its authority by representing that expert

[38] *See infra* ¶¶ 77–82, 107–128.

[39] *See infra* ¶ 118.

graders produce it through impartial, objective, standardized, criteria-based, and reliable review. Plaintiffs allege those attributes are what give the Graded Card Credential the authority and value that they paid to obtain. But Plaintiffs did not receive that.

32. The central fraud is Defendants induced consumers to surrender their cards and pay for a credential represented as the product of qualified experts, neutral third-party review, consistently applied standards, reliable certification and scarcity data, and defined pricing and service terms. They concealed materially contrary facts about grader expertise and qualifications; subjectivity, changing criteria, production demands, prior-grade information, and institutional practices affecting grades; personal and corporate conflicts and financial interests; certification and Population Report reliability; and the actual timing and cost of grading.[40] Those facts negate the very attributes that Defendants used to create trust in the Graded Card Credential and induced Plaintiffs to buy their credentials. Defendants monetized that trust at multiple points. Plaintiffs need not have used every PSA service because the alleged injury occurs when Defendants induce a consumer to surrender their property and pay for a Graded Card Credential materially different from the one represented. Defendants do not have separate schemes. There are different ways that Defendants monetize the same misrepresented Graded Card Credential.

33. This case is not about an isolated grading error, a single fee, market concentration, or disagreement with PSA's opinion about a particular card. While each Plaintiff was dissatisfied with one or more grades based on Defendants' published grading standards, that disagreement is not the principal injury or measure of recovery. Plaintiffs' injury is the economic overpayment in their own grading transactions—the money paid for a grading-and-certification service that is materially different than the attributes Defendants used to induce their purchases of the services.

---

[40] *See infra* ¶¶ 131–200.

They did not receive the benefit of their bargain. These services are not based exclusively on a card's condition as advertised; rather, they are commercially managed outputs produced through undisclosed practices and interests. That is materially different from what Defendants sold.

34. This is a civil RICO case because Plaintiffs allege that Defendants repeatedly executed that fraud through interstate enterprises, mails, and wires. Websites, grading standards, pricing and service advertisements, intermediary communications, submissions, payments, shipments, grading results, certifications, Population Reports, valuations, upcharges, and returns carried, executed, reinforced, or concealed the scheme.[41] Those transactions induced consumers nationwide to surrender their cards and pay for the allegedly misrepresented credential while Defendants controlled material facts consumers could not independently test. Plaintiffs allege Defendants intentionally used that system to obtain and retain more than a billion dollars in grading-related fees during the relevant limitations period. Plaintiffs now sue for themselves and similarly situated beneficial card owners to recover their direct economic losses and other relief authorized by RICO, the Maryland Consumer Protection Act, and applicable common law.

## PARTIES AND NON-PARTIES

35. Plaintiffs are novice card collectors who beneficially owned the cards that they submitted for PSA grading and relied on Defendants' representations that PSA would provide a neutral, expert, objective, criteria-based, and reliable Graded Card Credential on the represented service and pricing terms. Each Plaintiff paid, reimbursed, or bore PSA Grading-Related Charges and the economic consequences of Defendants' grading determinations, pricing practices, delays, representations, omissions, and related conduct. None of them maintained a PSA account, profile, membership, dealer status, or registered-submitter status, nor did any Plaintiff submit

[41] *See infra* ¶¶ 223–273.

directly through Defendants' online portals. Instead, each entrusted his cards to a Card Grading Intermediary for submission to PSA and remained their beneficial owner throughout the grading process. As novice collectors submitting through intermediaries, Plaintiffs lacked independent access to PSA's internal grading practices and reasonably relied on Defendants' representations concerning the expertise, standards, objectivity, reliability, pricing, and delivery of the Graded Card Credential.

~~38.~~ **Plaintiff Nicholas Funk.** Plaintiff ~~Nicholas~~ Funk is, and at all relevant times has been, a citizen and resident of Maryland, residing in Baltimore. ~~Plaintiff beneficially owned the trading cards he submitted for PSA grading, paid or reimbursed the PSA grading-related charges associated with those submissions, and bore the economic consequences of PSA's grading determinations, pricing practices, delays, upcharges, representations, omissions, and related conduct. Plaintiff has never created, registered, opened, maintained, or used an account, profile, login, membership, dealer status, or registered submitter status with PSA, Collectors, or any Collectors-affiliated submission portal. Instead, Plaintiff submitted his cards~~ Plaintiff Funk submitted his cards for PSA's bulk grading services through a Card Grading Intermediary ~~located in Maryland, which is a process that involved the following:~~

~~a. **Defendants' Intake Agent.** The Card Grading Intermediary through which Plaintiff Funk submitted his cards~~ that operated a Maryland card shop and was~~, in fact, Defendants' actual, apparent, ostensible, and limited agent,~~ a PSA-authorized~~, cultivated, and held out by Defendants as their consumer-facing intake and~~ dealer at the time of his submission ~~channel, and acted in that capacity by soliciting, and/or handling Plaintiff Funk's submissions, communicating Defendants' standardized representations and submission instructions, transmitting Plaintiff Funk's cards and submission~~

information into Defendants' grading systems, relaying Defendants' post-submission charges and grading-related communications, and/or facilitating payment of grading-related fees.

b. **No Plaintiff-Side Authority to Waive Rights.** As to Plaintiff, the Card Grading Intermediary was not Plaintiff's legal agent for contract formation, arbitration, class waiver, jury waiver, forum selection, choice of law, limitation of liability, warranty disclaimer, release, delegation, or surrender of statutory, procedural, or substantive rights. Plaintiff did not authorize the intermediary to enter into contracts with PSA or Collectors on Plaintiff's behalf, assent to PSA or Collectors online terms, accept any arbitration provision, waive class or jury rights, accept any forum-selection or choice-of-law clause, accept any liability limitation or warranty disclaimer, release claims, or surrender any right belonging to Plaintiff.

c.36. **March 2025 Submission.**. In or around March 2025, Plaintiff Funk delivered approximately seven trading cards, including Cal Ripken Jr. rookie cards, to a Card Grading Intermediary inthat authorized Maryland intermediary for submission to PSA for authentication, grading, encapsulation, and related services. Plaintiff remained the beneficial owner of each submitted card, was the person for whose benefit the grading services were sought, was the source of the funds used to pay or reimburse PSA grading-related charges, and bore the economic consequences of PSA's grading determinations, pricing practices, delays, upcharges, representations, omissions, and related conduct. The precise date of the submission is available in PSA's and the intermediary's records. Plaintiff Funk paid or reimbursed about $300 in Grading-Related Charges in connection with this submission and incurred the economic injury described below.

d. **Charges Paid.** Plaintiff paid or reimbursed approximately $300 in connection with this single submission transaction. That payment included PSA-imposed grading-related charges passed through by the Maryland Intermediary, together with a nominal separate fee retained by the Maryland Intermediary. PSA's records identify the charges imposed in the PSA-facing transaction, and the Maryland Intermediary's records identify any separate amount it retained. Before deciding to submit, Plaintiff reviewed PSA's consumer-facing service-level and pricing information and PSA materials describing its grading standards and expert grading process. Those materials, together with PSA's broader public messaging and Plaintiff's preexisting experience with PSA-graded cards, conveyed a materially uniform commercial message: PSA would provide a neutral, expert, standardized, criteria-based, and reliable Grading Credential under the displayed service-level terms. Plaintiff relied on that message in choosing PSA, surrendering his cards, and paying or reimbursing the charges.

e. **PSA-Facing Portal Conduct.** The Card Grading Intermediary entered Plaintiff's cards into PSA's online submission platform under the intermediary's own PSA account, dealer relationship, group-submission relationship, or submitter status, and did so in its own commercial capacity as Defendants' accepted intake channel. Any portal interaction, clickwrap acceptance, account-based submission, or other contractual assent that occurred in connection with Plaintiff's cards occurred in the intermediary's PSA-facing commercial capacity as Defendants' intake agent or authorized submitter. It was not authorized by Plaintiff, was not communicated to Plaintiff, and did not constitute assent by Plaintiff as the beneficial card owner and economic payor. Plaintiff did not know that any such agreement existed and was unaware of any such terms.

f. **Interstate Mail and Wire Communications.** Plaintiff's cards were physically transmitted by interstate carrier from Maryland to PSA's grading facility in California and later returned by interstate carrier through the Card Grading Intermediary and then to Plaintiff in Maryland. In connection with his submission, PSA transmitted, or caused to be transmitted, interstate wire and mail communications into Maryland, which include submission confirmations, intake confirmations, grading-status communications, payment communications, certification-related communications, return-shipment communications, and grade-result communications. The timings of these communications are available in Defendants' records, which can be obtained during discovery.

g. **Injury.** Had Plaintiff known the true facts alleged in this Complaint, he would not have submitted his cards on the same terms, would not have selected the same service tier, would not have paid or reimbursed the same PSA grading-related charges, would not have accepted the same post-submission charges, and/or would have paid materially less. As a direct and proximate result, Plaintiff suffered economic injury, including overpayment for PSA grading services marketed as expert, standardized, reliable, and market-authoritative; payment or reimbursement of grading fees, shipping, handling, insurance, return-shipment charges, and related transaction costs for a service not delivered as represented; and loss of the benefit of the bargain. Plaintiff's injury is not merely that he disagrees with any individual grade; rather, it is that he paid for a PSA certification product materially different from the one Defendants marketed.

39. For all submissions, Plaintiff relied on PSA's standardized representations when deciding to submit his cards, select PSA service tiers, pay or reimburse PSA-related fees and costs, and treat PSA grades and population data as authoritative market credentials. Plaintiff

~~submitted through Card Grading Intermediaries, but remained the beneficial owner of the cards, the person for whose benefit the grading services were purchased, the source of the grading-related payments or reimbursements, and the person who bore the economic consequences of PSA's grading determinations, fees, upcharges, delays, and market-facing outputs. Plaintiff relied on PSA's market representation that its Grading Credential represents an authoritative, reliable product. Even apart from market-wide reliance, Plaintiff directly relied on PSA's uniform and standardized representations in deciding to submit his cards, select the service tier, and pay the charges at issue. Plaintiff relied on PSA's representations that its grading was neutral, expert-driven, standardized, criteria-based, consistent, objective, reliable, and market-recognized; that PSA's service tiers, pricing schedules, declared-value thresholds, fees, upcharge practices, and advertised turnaround times accurately described the service being purchased, the time for return of the cards and the price for services; and that PSA's grades, certification tools, guarantees, and population reports could be trusted. Plaintiff understood those representations to mean that he was purchasing a defined grading service at the advertised tier, price, and return window, not a variable, opaque, discretionary process involving undisclosed charges, delayed return, or materially different terms after PSA or PSA-facing intake channels obtained possession of his cards. Plaintiff's reliance was reasonable because the true facts alleged in this Complaint were within Defendants' control and possession and were not practically discoverable before submission. The detailed facts concerning Plaintiff's reliance, Defendants' omissions, the role of Card Grading Intermediaries, market reliance, causation, injury, and Defendants' use of interstate mails and wires are alleged more fully below.~~

37. **Plaintiff George Muresan.** Plaintiff G. Muresan was a citizen and resident of Maryland before relocating to Washington, D.C. during college where he still presently resides.

Plaintiff G. Muresan submitted his cards for PSA's value-bulk grading services through a Maryland Card Grading Intermediary that commercially aggregated and submitted customer-owned cards for compensation through its own PSA-facing submission relationship. Specifically, Plaintiff G. Muresan made three submissions to PSA in 2025 under the value-bulk service level through the same bulk submitter located in Maryland. His first submission contained a Pokémon card that was mailed on or around February 6, 2025, that PSA acknowledged receiving on or around February 17, 2025, and that was then graded and returned on or around May 27, 2025. His second submission included another Pokémon card that was mailed around mid-May 2025, and that PSA returned graded on September 2, 2025. His third submission had an autographed rookie basketball card that was mailed on or around September 2, 2025, that PSA returned graded on or around December 15, 2025. Each submission was made and received by the same bulk submitter located in Maryland. The precise date of each submission is available in PSA's and the intermediary's records. Plaintiff G. Muresan paid or reimbursed approximately $75 in Grading-Related Charges in connection with his submissions and incurred the economic injury described below.

38. **Plaintiff Victor Muresan.** Plaintiff V. Muresan was a citizen and resident of Maryland, who now presently resides in New York, New York. Plaintiff V. Muresan submitted his cards for PSA's value-bulk grading services through the same Maryland intermediary used by Plaintiff G. Muresan. Specifically, Plaintiff V. Muresan made a submission that contained three sports cards and six Pokémon cards mailed to PSA on or around September 2, 2025, which PSA identified as receiving on or around September 8, 2025. PSA returned those cards graded on or around December 26, 2025. This submission was received by the same bulk submitter located in Maryland for the benefit of Plaintiff V. Muresan. Plaintiff V. Muresan paid or reimbursed

about $300 in Grading-Related Charges in connection with his submissions and thereby suffered the economic injury described below.

39. **Plaintiff Daniel Meyerpeter.** Plaintiff Meyerpeter is, and at all relevant times has been, a citizen and resident of Maryland, residing in Howard County. Plaintiff Meyerpeter submitted his cards for PSA's grading services through a Card Grading Intermediary that operated a Maryland card shop and was a PSA-authorized dealer at the time of his submission. Specifically, on or around March 26, 2025, Plaintiff Meyerpeter submitted ten cards of various sports legends that he collected as a child and kept in protected sleeves to maintain their great condition. These legends included Ken Griffey Jr., Michael Jordan, Jerry Rice, Allen Iverson, Mickey Mantle, Joe Montana, Hank Aaron, Troy Aikman, among others. When submitting his cards, Plaintiff Meyerpeter sought expedited grading services (including super express, express, regular and value max services) on several of his cards because he wanted to sell them based on their market prices. Plaintiff Meyerpeter did not receive several of his expedited submissions back in the specified timeframe with those cards taking twice as long as the advertised grading period. The precise date of his submission is available in PSA's and the intermediary's records. Plaintiff Meyerpeter paid or reimbursed approximately $1,024 in Grading-Related Charges in connection with his submissions and thereby suffered the economic injury described below.

40. For each submission described above, the following allegations apply to each Plaintiff and each of their respective submissions:

a. **Defendants' Intake Channel; Independent Submission Businesses; Plaintiffs Actual Instructions**. Each Plaintiff used a Card Grading Intermediary that functioned as Defendants' PSA-facing intake channel or authorized submitter, as alleged infra ¶ 55. Each Plaintiff identified and then delivered their personally owned cards to a

Card Grading Intermediary and selected and/or approved the PSA service tier. In some cases, Plaintiffs photographed their cards and received receipts and/or exchanged text messages recording the property delivered. Those receipts contained no contractual terms or references to PSA. No Plaintiff signed or was provided a written agreement with the Card Grading Intermediary or PSA governing the submission. Some Plaintiffs paid before submission and others upon pickup. Plaintiffs did not direct the creation of PSA accounts for themselves, accept any legal notices for themselves, or execute any PSA agreements in their names. The precise date of each submission is available in PSA's and the intermediary's records. Plaintiffs had no insight or prior experience with the process of submitting cards for grading. They purchased submission services from independent businesses without ever appointing them as their contracting representative.

b. **Interstate Mail and Wire Communications**. Each submission necessarily involved interstate mail, carrier, electronic, and payment communications. Plaintiffs' cards were transmitted from Maryland to PSA's submission center in California and, as applicable, to PSA grading facilities in California, New Jersey, Florida, Texas, or elsewhere before the completed Graded Card Credentials were returned through the Card Grading Intermediary. Defendants also transmitted or caused to be transmitted interstate communications concerning intake, submission status, service level, payment, grading, certification, verification, and return shipment. The precise dates, routing, facilities, and electronic transmissions are recorded in Defendants' systems and are uniquely within their possession.

c. **Common Economic Injury**. Each Plaintiff suffered concrete economic injury by paying, reimbursing, or bearing Grading-Related Charges for a Graded Card

Credential materially different from the expert-driven, criteria-based, unbiased, reliable, and timely Credential Defendants represented. The Credential's value derives from the expertise, standards, objectivity, independence, and reliability of the process represented to produce it, yet Plaintiffs allege their Credentials were produced, priced, and delivered through materially different undisclosed practices. Timing was also part of the bargain. Each Plaintiff alleges PSA retained his independently valuable cards beyond the advertised turnaround time, preventing their sale either in raw or graded form during that additional period. Plaintiffs therefore overpaid for both the represented grading attributes and the timing of the selected service. Had Defendants truthfully disclosed how PSA produced, priced, and delivered the Graded Card Credential, Plaintiffs would not have submitted their cards or would have paid their charges or would have paid materially less. Their injuries include Grading-Related Charges paid or borne, overpayment for the difference between the Credential represented and received, and the additional economic losses alleged *infra* ¶¶ 260–266 and 321–323.

d. **Reliance**. Before submitting their cards and paying the associated charges, each Plaintiff reviewed PSA's service-level and pricing information, including the displayed price and advertised turnaround time. Each of them also encountered PSA-originated website, advertising, or social-media representations that described PSA as using expert grading, objective standards, physical grading criteria—including surface, centering, and corners—to increase marketability and value of their cards. Together with Plaintiffs' experience with PSA-graded cards, those representations conveyed that PSA would provide a neutral, expert-driven, standardized, criteria-based, and reliable Graded Card Credential under the displayed service terms. Each Plaintiff understood grading to

reflect a professional condition assessment materially constrained by identifiable physical criteria and turnaround time to represent how long his independently valuable property was expected to remain unavailable. Those representations were material to Plaintiffs' choice of using PSA and selecting their service tier, and each Plaintiff relied on them in submitting his cards and paying or reimbursing Grading-Related Charges, as further alleged *infra* ¶¶ 206–222.

40.e. **Grading Fees and Costs**. For all submissions,each submission, each Plaintiff incurred a PSA grading fee and associated charges or costs. For purposes of this First Amended Complaint, "PSA grading fees and associated charges and costsGrading-Related Charges" means all amounts paid, reimbursed, charged, withheld, imposed, or borne to obtain, accelerate, process, value, insure, disclose, challenge, repeat, convert, correct, reholder, return, or otherwise complete PSA grading. PSA may label those amounts as Service Level charges; expedited-service premiums; declared-value charges; Maximum Insured Value charges; adjusted grading fees; upcharges; review fees; crossover fees; resubmission fees; reholdering or relabeling charges, imaging or grader-note charges; and/or shipping, handling, insurance, return-shipment charges, or related submission charges (collectively "grading-related charges"),, but they are all grading-related chargesGrading-Related Charges. The label does not change the economic reality, namely that each charge exists because PSA sells the same market-recognized Card Grading Credential. Plaintiff incurred PSA grading-related charges, and class members incurred similar economic injuries when they paid, reimbursed, or bore any such charges under PSA's common practices. PSA maintains all grading-related chargesGraded Card

Credential. PSA maintains all Grading-Related Charges information in its databases and systems.

f. **Standing to Sue**. Plaintiffs have standing to bring their claims because they were the beneficial card owners at all times; they paid all PSA grading fees and associated charges and costs arising from the purchase of the same type of market-recognized Graded Card Credential that PSA sells consumers, like Plaintiffs; and each Plaintiff is similarly injured by the fraud and other misconduct set forth herein. Each Plaintiff was dissatisfied with one or more assigned grades and believed higher grades were warranted based on PSA's published standards, but Plaintiffs do not rely on that disagreement alone as their injury or measure of damages.

***Defendant Collectors Holdings, Inc.***

41. Defendant Collectors Holdings, Inc. d/b/a Collectors ("Collectors") is, on information and belief, a Delaware corporation~~ organized and existing under the laws of the State of Delaware,~~ with its principal place of business at or near 1610 East Saint Andrew Place, Santa Ana, California 92705~~. Collectors~~, and is therefore a citizen of Delaware and California ~~within the meaning of~~under 28 U.S.C. § 1332(c)(1). Collectors is the current Collectors-branded parent, platform, and/or controlling entity through which ~~the Collectors~~its corporate family ~~maintains~~provides websites, services, products, applications, and tools ~~relating to~~for the authentication, grading, certification, registration, purchase, sale, storage, pricing, and monetization of ~~collectible items. Collectors' own current user agreement~~collectibles. Collectors identifies ~~those~~these services as provided through Collectors Holdings Inc.'s divisions and affiliated entities, including Collectors Universe, Inc~~. through~~.; PSA~~,~~; PSA/DNA~~, and~~; PCGS; New SGC LLC; Ladder Studios, Inc.; Beckett Collectibles, LLC; and other Collectors entities.

42. Before its acquisition, Collectors Universe operated PSA as one of its principal authentication and grading brands. Collectors Universe publicly described "PSA" as the brand name for its independent sports and trading-card authentication and grading service and stated that it launched PSA's trading-card authentication and grading service in 1991. On or about February 8, 2021, following a tender offer at $92.00 per share by an investor group led by Nat Turner and D1 Capital Partners L.P., among others, Cards Acquisition Inc. merged with and into Collectors Universe, Inc., with Collectors Universe continuing as the surviving corporation and becoming privately held. After the go-private transaction, the business publicly changed its name and/or rebranded under the Collectors/Collectors Holdings name, while Collectors Universe continued to appear in Collectors' corporate terms as an affiliated entity providing PSA-related services.

43.42. Collectors operates as a vertically integrated collectibles enterprise and holds itself out as providingspanning authentication, grading, encapsulation, pricing data, marketplacemarketplaces, storage, resale, and financing services across trading cards, coins, sports memorabilia, and related collectibles. CollectorsIt has also acquired or agreed to acquire multiple competing orand adjacent third-party grading and collectibles businesses to consolidate, consolidating grading operations, market-recognized grading brands, pricing infrastructure, and consumer reliance within a single Collectors-controlled ecosystem. ThoseThese transactions include theits acquisition of Sportscard Guaranty ("SGC") on or about February 29, 2024, and Collectors' its December 15, 2025, announcement that it had entered intoof a definitive agreement to acquire Beckett. Public Collectors materials further stated that Beckett would remain an independent brand within the Collectors family, and Collectors' current user agreement identifies Beckett Collectibles, LLC as a Collectors entity. Therefore, onOn

information and belief, Plaintiff alleges that the Beckett transaction has closed or, at minimum, that Beckett has been integrated into Collectors' corporate terms and Collectors-controlled ecosystem, and Plaintiff reserves the right to amend these allegations to reflect the precise closing date and any subsequent material transactions..[42]

44.43. Collectors transacts business insubstantial interstate commerce throughout the United Statesbusiness, including in the State of Maryland and within this District. Through its own and affiliated websites, email communications, service platforms, interstate carriers, and U.S. mails, Collectors solicits Maryland consumers through its websites, including collectors.com and affiliated websites such as psacard.com; accepts or causes the acceptance of card-grading submissions from Maryland residents through online submission portals, PSA-facing intake channels, interstate mail, and interstate carriers; processes or controls theand processing of thosetheir grading submissions; transmits or causes the transmission of grading results, upcharge notices, valuation determinations, service communications, and other charges to Maryland consumers through interstate wires, including email and web-based dashboards; ships or causesby interstate wire; returns graded cards to be shipped back to Maryland consumers through interstate carriers; and profits from fees and charges paid by Maryland residentsresidents' payments for grading, authentication, pricing, storage, resale, and related services. Through its websites, submission portals, email communications, service platforms, and shipment of graded collectibles via interstate carriers and the U.S. mails, Collectors Collectors thus regularly causes the use of interstate wires and mails in connection with its grading, authentication, valuation, custody, resale, and related services directed to Maryland consumers.

[42] Plaintiffs will amend these allegations to reflect the precise closing date and any subsequent material transactions after discovery.

44. Collectors is a “person” ~~within the meaning of~~ under 18 U.S.C. § 1961(3). ~~Except where~~Unless expressly attributed to PSA or another Defendant, allegations concerning ~~the~~ acquisition and consolidation of competing graders~~, the~~; capture or control of grading-dependent market infrastructure~~, Collectors’~~; corporate integrations~~,~~; and ~~the~~ monetization of grades across a card’s lifecycle through Card Ladder, the PSA Vault, PSA Partner Offers, Collectors Financial Services, marketplace integrations, ~~dealer programs, group-submission programs,~~ retail submission channels, and related Collectors-affiliated services refer to Collectors.

~~45.~~ ***Defendant Collectors***~~.~~

***~~Defendant Collectors~~ Universe, Inc. d/b/a Professional Sports Authenticator ~~(“~~(PSA’)***

~~46.~~45. Defendant Collectors Universe, Inc. d/b/a Professional Sports Authenticator (“PSA”) is, on information and belief, a Delaware corporation and Collectors-affiliated entity with its principal place of business at or near 1610 East Saint Andrew Place, Santa Ana, California 92705. PSA is the trade name, brand, and/or operating division through which Collectors Universe, Inc. provides third-party authentication, grading, certification, encapsulation, and related services for trading cards, sports memorabilia, autographs, and related collectibles. ~~Current PSA~~PSA’s current terms ~~state that PSA submission services are provided by~~identify Collectors Universe, Inc. and Collectors Universe (Canada) Limited as providing submission services under the PSA, Professional Sports Authenticator, PSA/DNA Authentication Services, and related brands.

~~47.~~46. PSA holds itself out as an ~~authentication and grading~~ authority ~~for~~in trading ~~cards~~-card and memorabilia authentication and grading and represents ~~that~~ its grading ~~process is~~as impartial, expert-driven, ~~accurate~~objective, reliable, and standardized. PSA authenticates trading cards, assigns numerical grades ~~on a scale~~ from 1 to 10, encapsulates ~~graded cards~~them

in tamper-evident holders bearing ~~the PSA~~its label and grade, issues certification numbers, publishes population reports, ~~issues certification numbers,~~ and charges ~~consumers~~ grading ~~fees~~ and related fees ~~in connection with~~ for those services.

~~48.~~47. PSA transacts ~~business in~~substantial interstate ~~commerce throughout the United States~~business, including in ~~the State of~~ Maryland and ~~within~~ this District. ~~PSA solicits Maryland consumers through~~Through psacard.com, ~~Collectors~~ affiliated websites, online marketplaces, third-party platforms, dealer ~~programs,~~and group-submission programs, retail ~~submission~~ channels, and other PSA-facing intake channels~~. PSA~~, PSA solicits Maryland consumers; accepts or causes the acceptance of ~~card-grading~~their submissions ~~from Maryland residents~~ through online ~~submission~~ portals, email, interstate mail~~, interstate~~ and carriers, dealers, group submitters, and other Card Grading Intermediaries; processes those submissions; transmits grading results, upcharge notices, valuations, additional charges, and service communications ~~to Maryland consumers through~~ by interstate ~~wires~~wire, including email and web-based dashboards; ~~ships~~returns graded cards ~~back to Maryland consumers~~ through interstate carriers; and profits from grading and related fees ~~and charges~~ paid by Maryland residents ~~for PSA grading and related services~~.

~~49.~~48. PSA is a “person” ~~within the meaning of~~under 18 U.S.C. § 1961(3). ~~Except where~~Unless expressly attributed to ~~Defendant~~ Collectors, ~~all~~ allegations concerning grading, authentication, dealer or group programs, intake, certification, encapsulation~~, intake~~, consumer-facing representations, service tiers, pricing, fees, upcharges, turnaround times, guarantees, population determinations, labels, holders, and related PSA conduct refer to ~~Defendant~~ Collectors Universe, Inc. d/b/a PSA.

***Agency, Common Control, and Enterprise Allegations***

~~50.~~49. PSA and Collectors are separate legal entities, ~~and~~ each ~~is~~ responsible for ~~its~~their own acts and omissions. As ~~specifically~~ alleged below, PSA also acted as Collectors' actual agent ~~with respect to~~in the challenged conduct, subject to Collectors' direction and control and within ~~the scope of~~its granted authority ~~Collectors granted.~~, and Collectors directed, authorized, knowingly participated in, or ratified that conduct, as applicable. ~~Accordingly, for claims as to which~~Where agency ~~-based~~ attribution is legally available, ~~the~~PSA's specifically alleged conduct ~~of PSA~~ is therefore attributable to Collectors. ~~These allegations~~Plaintiffs do not seek to disregard either Defendant's ~~separate legal~~independent corporate existence or impose ~~liability under an~~ alter-ego or veil-piercing ~~theory~~liability. For RICO purposes ~~of the RICO claims~~, each Defendant is ~~alleged to be~~ a separate "person" ~~within the meaning of~~ under 18 U.S.C. § 1961(3), ~~and each Defendant's liability is based on~~ liable for its own ~~alleged~~ conduct and participation in the ~~affairs of the~~ distinct ~~RICO~~ enterprises alleged below.

~~50.~~ ~~Upon~~On information and belief, ~~Defendant~~ Collectors directs ~~and controls enterprise~~ the broader enterprise's strategy, ~~the acquisition~~ including acquisitions and consolidation of competing ~~third-party grading businesses, the~~ graders, capture and consolidation of the trading-card grading market, capital allocation, and ~~the~~ monetization of grades across ~~the~~a card's lifecycle through Card Ladder, the PSA Vault, PSA Partner Offers, Collectors Financial Services, ~~and~~ marketplace integrations ~~including the eBay arrangement.~~ , and PSA-facing intake channels. Consistent with that role, Collectors ~~maintains a centralized ownership and management structure through which it~~ acquired Card Ladder in December 2021 and SGC in February 2024; entered April 2024 agreements with eBay, including PSA's acquisition of the eBay Vault; and announced its agreement to acquire BGS on December 15, 2025. *See supra* ¶¶ 41–44; *infra* ¶¶ 71–74. These transactions extended Collectors' direction across the intake-

grading-pricing-custody-resale-lending pipeline, including relationships with independent Card Grading Intermediaries and eBay. Through centralized ownership and management, Collectors sets overall strategic direction for, and derives the downstream economic benefit of, thefrom PSA-branded grading and SGC and BGS operations conducted under the PSA brand and the acquired SGC and BGS operations.

50. Upon. These allegations are pleaded on information and belief, Defendant based on the documented transactions, Collectors' public corporate materials, and its centralized ownership and management structure, with further evidentiary support expected through discovery consistent with Fed. R. Civ. P. 11(b)(3).

52.51. On information and belief, PSA conductsoperates the day-to-day grading business, including the application of grading standards, the; grader staffing, training, and supervision of graders, the operation of the ; intake and submission systems, the setting and communication of; consumer-facing pricing, service tiers, turnaround representations, and guarantee language, the; grade assignment of grades, the determination and imposition of; declared-value and other upcharges, the publication of; population reports,; and the transmission of grading-related communications to consumers and Card Grading Intermediaries.

52. Collectors directs and conductsPSA each conduct or participate in the affairs of the RICO enterprises alleged below within the meaning of *Reves v. Ernst & Young*, 507 U.S. 170 (1993),): Collectors through itsthe strategic, acquisition, management, and monetization role, and PSA conducts the affairs of those enterprises functions alleged in ¶¶ 50–53, 71–74, and 201–204, including its direction of the broader enterprise involving independent Card Grading Intermediaries and eBay; and PSA through its operation of the grading business. This paragraph alleges direction, control, and participation for purposes of RICO liability and attribution only. It

does not allege that PSA is the alter ego of, or is indistinct from, Collectors. To the contrary, Collectors and PSA are separate and distinct legal persons within the meaning of 18 U.S.C. § 1961(3), and each is distinct from the RICO enterprises pleaded herein, consistent with *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001).

54.52. Each Defendant knowingly conducted or participated in the conduct of the affairs of one or more association-in-fact enterprises alleged below, within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), throughaccording to its respective strategic, managerial, or operational role in those enterprises, as alleged herein.. Collectors and PSA remain separate legal "persons" under § 1961(3), each distinct from the RICO enterprises, consistent with *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). The enterprises pleaded below are pleaded in the alternative.

***Non-Party Enterprises***

54. For purposes of 18 U.S.C. §§ 1962(a) and (c), each Defendant is a distinct legal "person" within the meaning of 18 U.S.C. § 1961(3), while the RICO "enterprises" pleaded in the alternative below are separate and distinct from each Defendant. Each enterprise has an existence, structure, common purpose, and continuity of relationships separate and apart from the predicate acts of racketeering activity, and each Defendant participated in the conduct of one or more such enterprises while remaining a legally distinct person from the enterprise. Plaintiff pleads these enterprises in the alternative to ensure satisfaction of the distinctness requirement under *Cedric Kushner Promotions*, 533 U.S. at 158, and *Boyle v. United States*, 556 U.S. 938 (2009). Plaintiff designates the Grading-Intake Enterprise (defined below) as the primary association-in-fact enterprise for purposes of the § 1962(c) claim and pleads the broader vertical

enterprise—including Card Ladder, the PSA Vault, PSA Partner Offers, and Collectors Financial Services—in the alternative.

56.53. **Non--Party Enterprise Members.** Plaintiff alleges that the RICO enterprises consist ofPlaintiffs allege the following non--party members and independent commercial participants. in the RICO enterprises:

a. **a. Primary Enterprise — The Grading--Intake Enterprise**. **Plaintiff pleads as the**Plaintiffs' primary **RICO**§ 1962(c) enterprise **under 18 U.S.C. § 1962(c) the Grading-Intake Enterprise, which** consists of Defendants **together with the following non-party participants whose coordinated relationships with Defendants form part of the enterprise:** and Card Grading Intermediaries that **participated**participate in the solicitation, intake, custody, and processing of consumer submissions **to Defendants. Card Grading Intermediaries operate under** through Defendants' standardized authorized--intake programs, branded submission channels, and common **submission** workflows. **The members'**Their roles are economically interdependent: **the intermediaries'**intermediaries earn per--card fees and **Defendants'**related charges, while Defendants earn grading and downstream monetization revenues, all **depend**dependent on the **sustained**continuing flow of consumer cards through the shared **submission**intake-grading-resale pipeline.

b. **b. Alternative Enterprise — The Trading--Card Grading Enterprise**. **Plaintiff alleges in the alternative**Alternatively, Plaintiffs allege a broader association--in--fact **enterprise, which consists of the members**consisting of the Grading--Intake Enterprise together with: (i) eBay, Inc., **as** Defendants' designated graded-card marketplace partner **for graded cards as detailed herein**; (ii) Beckett

Collectibles, LLC ("BGS"); (iii) New SGC LLC ("SGC"); (iv) Card Ladder, LLC, ~~as Defendants' price-data~~Collectors' wholly owned pricing and valuation platform~~ now wholly owned by Collectors~~; (v) the PSA Vault and PSA Partner Offers, ~~as~~ Defendants' integrated custody, instant~~-~~-offer, and resale channels; and (vi) Collectors Financial Services, LLC,~~ which serves as~~ Defendants' lending arm that collateralizes graded cards. eBay's marketplace and pricing integrations depend ~~on~~upon and amplify the same ~~graded-card~~ intake channels~~ and~~, workflows, and grading ~~output impact.~~outputs. This ~~broader~~ enterprise ~~is not merely Collectors conducting its own~~extends beyond Collectors' internal affairs ~~through subsidiaries or divisions. It includes non-Defendant participants (including~~to independent Card Grading Intermediaries and eBay~~) and~~, together with legally separate grading, intake, pricing, marketplace, custody, offer, and lending entities~~, each~~ performing~~ distinct,~~ recurring functions in the solicitation, intake, grading, certification, valuation, custody, resale, and financing of consumer~~-~~-owned~~ trading~~ cards.

c. ~~c.~~ **Independent Existence~~ and~~, Common Purpose~~. Each~~, and Continuity**. The non~~-~~-party ~~participant identified in subparagraphs (a) and (b) has an~~participants have independent legal ~~existence apart from Defendants, a common purpose~~ existences and share with Defendants ~~in soliciting, processing, grading, transmitting, marketing, and monetizing consumer-owned trading cards, and continuing relationships with Defendants supporting~~ the ~~association-in-fact enterprises pleaded under~~legitimate commercial purpose of operating the intake-grading-resale pipeline through recurring solicitation, intake, processing, grading, transmission, marketing, valuation, custody, resale, and financing functions. Their

continuing relationships satisfy 18 U.S.C. § 1961(4~~) and *Boyle*, 556 U.S. at 938.~~). Card Grading Intermediaries ~~are independent businesses that~~may provide other hobby services and maintain their own premises, ~~staff, business~~personnel, records, accounts, PSA~~-~~-facing submission relationships, and ~~consumer bases. They~~ customers; earn ~~separate compensation on PSA submissions at their place of business, including~~ independent fees, handling charges, markups, and submission charges~~. They~~; and pursue their own commercial interests ~~when servicing consumer demand for PSA grading. eBay, Inc. also~~while serving as intake conduits. eBay likewise participates ~~for its own independent commercial interests, sharing the enterprises' common purpose of monetizing graded cards~~ under separate ownership, management, and economic motives. ~~The Grading-Intake Enterprise and the alternative Trading-Card Grading Enterprise are~~These independent participants make each enterprise broader than, and distinct from ~~each~~either Defendant ~~within the meaning of~~ under *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. ~~at~~ 158~~. Each enterprise is separate from each Defendant because the enterprises include independent businesses (such as eBay and the Card Grading Intermediaries) that Defendants do not own and that exist apart from them. While Defendants directed the enterprise's activities, the outside participants retained their own legal identities and commercial interests. Plaintiff does~~ (2001). Plaintiffs do not allege that eBay or Card Grading Intermediaries knew of, agreed to, or participated in Defendants' alleged fraud~~. PSA and Collectors~~; rather, Defendants allegedly conducted the enterprises' affairs ~~of that broader commercial enterprise~~ through their own pattern of mail and wire fraud.

d. ~~d.~~ **Direction and Control by Defendants**. Defendants directed and ~~controlled~~conducted the enterprises' affairs ~~of each enterprise~~ within the meaning of *Reves v. Ernst & Young*, 507 U.S. ~~at~~ 170~~,~~ (1993), by~~, among other things:~~ establishing ~~the~~ authorized~~-intake~~-dealer programs ~~through which Card Grading Intermediaries operate~~and other PSA-facing submission channels; vetting, branding, and publicly listing authorized dealers and other approved Card Grading Intermediaries as ~~approved~~ consumer~~-~~-facing conduits; ~~providing~~soliciting and approving group submitters who are not authorized dealers; supplying the standardized representations ~~Card Grading Intermediaries communicated to consumers~~intermediaries conveyed; dictating the fees, declared~~-~~-value upcharges, expedited~~-~~-service premiums, and post~~-~~-submission charges ~~Card Grading Intermediaries~~they relayed; structuring ~~the~~ eBay marketplace and Card Ladder pricing~~ feed~~ integrations through which graded cards entered and circulated in secondary commerce; and controlling the timing, pricing, valuation, grading, disclosure, return, and remediation of ~~every consumer card~~ submitted ~~into the enterprise~~cards. Through these common programs, representations, fee schedules, ~~pricing~~ integrations, and controls~~ over intake, grading, and market outputs~~, Defendants caused ~~all enterprise~~ the participants to function as a coordinated~~,~~ and continuing unit ~~rather than as isolated, parallel actors, thereby satisfying *Boyle*'s requirement of an association-in-fact enterprise~~ with ~~a~~the common purpose, relationships~~ among associates~~, and longevity ~~sufficient to permit pursuit of that purpose~~required by *Boyle*.

e. ~~e.~~ **Limited PSA~~-~~-Facing Agency**~~ and RICO Distinctness.~~. Card Grading Intermediaries participate ~~in the Grading-Intake Enterprise and in the~~

~~alternative Trading-Card Grading Enterprise~~ solely as Defendants' actual, apparent, ostensible, and limited PSA-facing intake and submission agents~~, and~~ not as Defendants' employees, internal divisions, or alter egos, ~~or principal-side legal agents of Plaintiff or Class members. Nothing in these allegations is meant to alter or contradict Plaintiff's allegations elsewhere in this Complaint that Card Grading Intermediaries (i) were not Plaintiff's~~and not as Plaintiffs' or Class members' legal agents ~~for any purpose; (ii) lacked~~. They had no actual or apparent authority to bind ~~Plaintiff~~Plaintiffs or Class members to any contract, ~~online terms~~Online Terms, arbitration provision, class-action ~~waiver,~~or jury-trial waiver, forum-selection ~~clause,~~or choice-of-law clause, limitation of liability ~~clause~~, warranty disclaimer, or release ~~with any Defendant; and (iii)~~. Rather, they served as bailees ~~for the physical transmission of~~transmitting consumer-owned cards into Defendants' PSA-facing intake system and ~~the~~ relaying ~~of~~ Defendants' standardized representations and submission~~-related~~ communications. ~~For RICO purposes,~~

f. **PSA-Facing Functions and Separate Contracting Capacity.** Card Grading Intermediaries ~~and eBay remain legally separate,~~are independently owned ~~enterprise participants~~ businesses whose ~~distinct corporate~~separate identities and ~~independent~~ economic ~~motives make each RICO enterprise broader than, and~~ interests preserve enterprise distinctness. Plaintiffs allege Card Grading Intermediaries performed the PSA-facing solicitation, intake, transmission, and return functions described in ¶ 55(a)–(c) under Defendants' authorization, acceptance, or control, including the agency functions on PSA's behalf as specifically alleged herein. They remained independent businesses, not Defendants' employees, internal divisions, or alter

egos. Plaintiffs do not allege a Plaintiff-side agency relationship authorizing acceptance of PSA's Online Terms. The Card Grading Intermediaries' commercial role and any PSA-facing authorization are distinct from the disputed authority to bind beneficial owners.

54. **RICO Person-Enterprise Distinctness and Alternative Pleading.** For purposes of 18 U.S.C. §§ 1962(a) and (c), PSA and Collectors are separate legal "persons" under § 1961(3), and each alleged enterprise is distinct from~~, any single Defendant~~ either Defendant. Each enterprise has a structure, legitimate common purpose, and continuing relationships apart from the predicate racketeering acts, while each Defendant allegedly participated in its affairs through its own conduct. Plaintiffs designate the Grading-Intake Enterprise as the primary association-in-fact enterprise for § 1962(c) and plead the broader Trading-Card Grading Enterprise, including Card Ladder, the PSA Vault, PSA Partner Offers, and Collectors Financial Services, in the alternative, consistent with *Cedric Kushner* and *Boyle*.

***Non-Party "Card Grading Intermediary"***

55. **Card Grading Intermediaries.** As used ~~in this Complaint~~herein, "Card Grading Intermediary" means ~~any~~ an independently owned card shop, dealer, authorized dealer, commercial bulk or group submitter, retail submission channel, official submission center, or similar person or entity ~~through which~~ that receives consumer-owned ~~trading~~ cards ~~are submitted, transmitted, processed, aggregated, or placed into PSA's grading pipeline~~ and ~~that is not owned directly~~submits, aggregates, processes, or ~~indirectly by Defendants and that does not bind its consumers and users to PSA's terms and conditions, for example, like eBay.~~transmits them to PSA through its own PSA-facing account or submission relationship. eBay is not a Card

Grading Intermediary. Card Grading Intermediaries are not Defendants and are not alleged to have originated the deceptive practices alleged herein. Defendants used authorized, cultivated, accepted submissions from; gave portal access or submission privileges to; and verified, listed, allowed, branded, or held out Card Grading Intermediaries as Defendants' consumer-facing intake and deception. They provide submission channels into PSA's grading system. services and may earn separate fees or other compensation. Plaintiffs further allege:

56. PSA-Facing Functions. Plaintiffs allege that Card Grading Intermediaries place a small fee on top of the fees and costs that Defendants charge with respect to consumers' PSA submissions through intermediaries' services. With respect to Card Grading Intermediaries, Plaintiff alleges:

a. **Defendants' Agents. Card Grading Intermediaries are, and at all relevant times have been, Defendants'** acted as Defendants' actual, apparent, ostensible, **and**or limited agents for the **purpose of**PSA-facing functions Defendants authorized or controlled: soliciting or accepting **PSA** submissions, communicating PSA's **standardized** representations and **submission** instructions, transmitting cards and submission information **into PSA's systems**, relaying **PSA's post-submission** charges and **grading-related communications**status information, facilitating payment **of PSA grading-related charges,** , and receiving **graded cards from PSA,** and returning graded cards **to beneficial owners. For purposes of the Grading-Intake Enterprise pleaded**. The authorized dealer and the commercial bulk submitter identified above**, Card Grading Intermediaries participate as Defendants' authorized or accepted intake agents, submission channels, and consumer-facing conduits under Defendants' direction, control, authorization and/or approval.** used distinct PSA-facing

relationships. Plaintiffs do not allege that the bulk submitter necessarily held the dealer's formal status.

b. **No ~~Authority from~~ Plaintiff~~-~~Side Agency or ~~Class Members to Waive Rights.~~Contracting Authority.** As to ~~**Plaintiff**~~Plaintiffs and Class members, Card Grading Intermediaries served only as ~~**PSA's limited ministerial conduits and**~~ physical-custody bailees ~~**for transmitting**~~who transmitted cards into Defendants' PSA-facing ~~**intake**~~ system and ~~**relaying**~~relayed PSA-related communications and charges~~.~~ relating to the property. They were not ~~**Plaintiff's**~~Plaintiffs' or Class members' legal agents for contract formation, arbitration, class ~~**waiver,**~~or jury waiver, forum selection, choice of law, limitation of liability, warranty disclaimer, release, delegation, or waiver of any statutory, procedural, or substantive ~~**rights**~~right. Authority to transmit cards and relay ~~**PSA**~~ charges is not authority to waive rights. Plaintiffs engaged Card Grading Intermediaries as bailees who provide independent submission services based on Plaintiffs' instructions as alleged in ¶ 40(a). No Plaintiff instructed a Card Grading Intermediary to accept PSA's Online Terms in the Plaintiff's name, receive contractual notices as the Plaintiff's representative, or represent that the Plaintiff had accepted terms that were never presented to any of them. Plaintiffs allege that the actual transactions did not confer authority to bind them to PSA's Online Terms.

c. **~~How~~PSA's Process for Card Grading Intermediaries~~ Operate. A~~.** Card Grading ~~**Intermediary's role follows**~~Intermediaries follow a ~~**sequence**~~submission process Defendants designed, authorized, accepted, or relied upon. ~~**A Card Grading Intermediary advertises PSA's marketing and/or that the intermediary performs trading card submissions for**~~ They advertise PSA~~**. The consumer brings physical**~~

~~cards to the intermediary and surrenders possession for~~ and/or their ~~PSA submission. The intermediary records the~~ability to submit cards~~, commonly creates an~~ to PSA; take custody of consumers' cards; create intake~~ sheet~~, receipt, order~~ form, ticket, photograph, image~~, photographic, or ~~other~~similar custody ~~record,~~records; and ~~later enters~~enter the cards into PSA's ~~submission~~ platform ~~under the intermediary's~~through their own PSA-facing account, dealer relationship, group-submission relationship, or submitter status. ~~The intermediary packs~~They then package and ~~ships~~ship the cards ~~to PSA~~ according to PSA's ~~submission~~ instructions~~, communicates~~ and directions; communicate with PSA and ~~the consumer about~~consumers concerning intake, grading status, charges, upcharges, payment, certification, and return shipment~~, receives~~; receive the graded cards ~~back~~ from PSA~~, collects any~~; collect additional ~~funds corresponding to PSA's~~amounts PSA demands~~, and returns the cards to the consumer. The intermediary relays PSA's communications to the consumer submitter. When the cards~~ ; and return~~, the consumer receives them from a~~ the cards to consumers, commonly through the same local shop or submitter.

d. **No Owner-Facing Assent ~~to Contract. At no point does~~**. Neither PSA ~~or~~nor any of its Card Grading Intermediaries ~~require the~~required Plaintiffs, as beneficial ~~owner~~owners, to be identified, shown PSA's ~~online terms~~Online Terms, or asked to assent ~~to the terms~~ before ~~the card is~~PSA accepted their card submissions. Plaintiffs never saw, received, clicked, reviewed, or accepted ~~into PSA's grading system. At no point did Plaintiff see, receive, click, review, or accept PSA's online terms. Nor was Plaintiff asked to accept~~ PSA's Online Terms or any arbitration provision, class-action

~~waiver,~~or jury-trial waiver, forum-selection ~~clause,~~or choice-of-law clause, release, limitation-of-liability ~~clause~~provision, warranty disclaimer, ~~release,~~ delegation clause, or other contractual limitation. Defendants ~~control~~controlled the intake programs, submission platform, dealer relationships, and group-submission infrastructure. ~~They could have required beneficial-owner assent before accepting cards into PSA's system. But they did not.~~

~~e. **Submitter Warranty Is Not Owner Assent.** To the extent PSA's terms require a submitting party to represent or warrant that it has authority to submit items on behalf~~Independent Claims; No Enforcement of a ~~third-party owner, that warranty is a representation by the submitter to PSA. It is~~Submitter's Contract. Plaintiffs do not ~~the beneficial owner's assent to PSA's online terms. If PSA contends the submitter was required to obtain beneficial-owner authorization, that contention confirms the owner is a separate non-party whose assent cannot be presumed.~~

~~f.~~e. ~~**No Contract-Based Claim. Plaintiff and class members claim no right or benefit under any submission contract, dealer agreement**~~seek to enforce a Dealer Agreement, group-submission agreement, ~~**or online terms**~~User Agreement, or other agreement between PSA and any Card Grading Intermediary. ~~**Plaintiff disclaims only the submission contract and online terms between PSA and the intermediary. He does not disclaim the underlying transaction, his ownership of the submitted cards, his payment or reimbursement of PSA grading-related charges, his surrender of property into PSA-facing intake system, his reliance on PSA's representations and omissions, or his resulting injury. Plaintiff's**~~ Their claims arise from ~~**that transaction, reliance, payment, and injury, not from any online PSA contract.**~~Defendants'

allegedly false public representations, misleading partial disclosures, concealment, and receipt of Plaintiffs' money. They do not request contractual performance or Guarantee payments under a Card Grading Intermediary's agreement.

~~g. **No Direct-Benefits Estoppel.** Any clickwrap, portal-based, or contractual assent by a Card Grading Intermediary occurred in the intermediary's own commercial capacity as Defendants' agent, authorized submitter, accepted submitter, or PSA-facing intake channel. It did not constitute assent by the beneficial card owner. Plaintiff and Class members are not bound to any arbitration provision, class-action waiver, jury-trial waiver, forum-selection clause, choice-of-law clause, limitation-of-liability clause, warranty disclaimer, release, or delegation clause under any owner-side agency theory, assumption, incorporation by reference, third-party beneficiary theory, equitable estoppel, or direct-benefits estoppel. Plaintiff seeks relief for fraud, statutory deception, racketeering injury, negligent misrepresentation, unjust enrichment, and money wrongfully obtained, not enforcement of PSA's submission contract or online terms.~~

f. **No Apparent Contracting Authority or Ratification.** Plaintiffs did not work with the Card Grading Intermediaries at any PSA submission interface, nor were they personally presented a contractual entitlement for submission admission or access, nor communicated that the Card Grading Intermediaries could accept Online Terms for them that would waive substantive rights pertaining to their property. They did not know the terms existed and simply entrusted preexisting property to independent submission businesses as limited bailees with specific directions and later received that property back. Plaintiffs allege that, in the commercial intake model described in ¶¶ 97–100, receipt of their cards through a Card Grading Intermediary's account did not reasonably

communicate authority to bind them to the Online Terms. They also deny ratification: when paying and accepting the returned cards, they had not been told that an agreement had purportedly been made in their names and did not know its material terms.

## JURISDICTION AND VENUE

~~58.~~56. This Court has subject-matter jurisdiction over ~~Plaintiff's~~Plaintiffs' federal claims under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including RICO, 18 U.S.C. §§ 1961–1968. ~~Plaintiff~~Plaintiffs also ~~seeks~~seek declaratory relief under 28 U.S.C. §§ 2201 and 2202 concerning, among other things, the absence of assent to Defendants' ~~online terms~~Online Terms, arbitration provisions, class-action waivers, forum-selection clauses, choice-of-law clauses, liability limitations, warranty disclaimers, releases, and delegation clauses.

~~59.~~57. This Court has subject-matter jurisdiction over ~~Plaintiff's~~Plaintiffs' civil RICO claims under 18 U.S.C. § 1964(c), which authorizes any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962 to recover treble damages, costs, and reasonable attorneys' fees. ~~Plaintiff~~Plaintiffs also ~~seeks~~seek equitable and declaratory relief to the extent authorized by 28 U.S.C. §§ 2201 and 2202, and the Court's other lawful powers.

~~60.~~58. This Court also has subject-matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because: (a) the proposed Class contains more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) minimal diversity exists because at least one member of the proposed Class is a citizen of a State different from at least one Defendant. ~~Plaintiff is a citizen~~Plaintiffs, with one exception, are citizens of Maryland. On information and belief, Collectors Holdings, Inc. is incorporated in Delaware and has its principal place of business in Santa Ana, California, and is

therefore a citizen of Delaware and California. On information and belief, Collectors Universe, Inc., doing business as PSA, is ~~not a citizen of Maryland and is~~ a citizen of Delaware, California, or both. No exception to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) or § 1332(d)(9) applies.

~~61.~~59. This Court has supplemental jurisdiction over ~~Plaintiff's~~Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to ~~Plaintiff's~~Plaintiffs' federal claims that they form part of the same case or controversy under Article III. ~~Plaintiff's~~Plaintiffs' state-law claims arise from the same common nucleus of operative fact as the federal RICO claims, including Defendants' alleged grading fraud, deceptive fee architecture, misrepresentations and omissions, use of PSA-facing intake channels, and attempted reliance on ~~online terms Plaintiff~~Online Terms Plaintiffs never saw or accepted.

~~62.~~60. This Court has personal jurisdiction over each Defendant under Fed. R. Civ. P. 4(k)(1)(A), Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1), (3), and (4), and the Fourteenth Amendment. As alleged above, Defendants purposefully solicited and conducted grading-related business in Maryland by accepting Maryland-originating submissions; providing grading, certification, pricing, and related services for Maryland consumers; transmitting grading-related representations, invoices, payment demands, and results into Maryland; collecting Maryland-originating charges; and shipping cards into and out of Maryland. Collectors is subject to this Court's jurisdiction based on Collectors' own Maryland-directed conduct and the PSA conduct that Collectors directed, authorized, ratified, and monetized. ~~Plaintiff's~~Plaintiffs' claims arise out of those contacts, which caused economic injury in Maryland, and the exercise of jurisdiction comports with fair play and substantial justice.

~~63.~~61. ~~Plaintiff's transaction supplies~~Plaintiffs' transactions supply the required suit-related nexus. ~~Plaintiff~~Plaintiffs submitted cards from Maryland through a Card Grading Intermediary operating as ~~Defendants'~~Defendants authorized or accepted PSA-facing intake conduit in Maryland; paid or reimbursed ~~grading-related charges~~Grading-Related Charges from Maryland; received Defendants' grading-related communications and results in Maryland; and received the return of ~~his~~their cards in Maryland, where ~~he~~they suffered economic injury. The ~~intermediary's role~~use of Card Grading Intermediaries within the intake channels Defendants cultivated does not ~~render~~negate these ~~contacts unilateral and, as alleged above, did not constitute Plaintiff-side~~Maryland-directed transactions; Plaintiffs' separate dispute over authority to ~~form contracts or waive rights~~accept the Online Terms is alleged in ¶¶ 40(a) and 55.

~~64.~~62. This Court also has personal jurisdiction over Defendants for ~~Plaintiff's~~Plaintiffs' RICO claims under 18 U.S.C. § 1965(d) and Fed. R. Civ. P. 4(k)(1)(C), because RICO authorizes nationwide service of process and each Defendant has sufficient contacts with the United States. The exercise of jurisdiction comports with Fifth Amendment due process, and the Court may exercise pendent personal jurisdiction over the related state-law claims arising from the same core operative facts. ~~*See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997).~~

~~65.~~63. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a) because, as set forth above, a substantial part of the events giving rise to ~~Plaintiff's~~Plaintiffs' claims occurred in Maryland, and Defendants transact their affairs in this District through the Maryland-directed conduct. Plaintiffs also dispute that any contractual forum-selection provision binds them through a Card Grading Intermediary, for the formation and authority reasons alleged in ¶¶ 40(a), 55, and 327–338.

## COMMON FACTUAL ALLEGATIONS

~~66.~~64. The following allegations set out the factual background concerning ~~the origin~~Defendants' exploitation of ~~third-party card grading, and how Defendants grew and then exploited~~ their dominant position in the multi-billion-dollar trading-card market through fraudulent and deceptive practices, which caused ~~Plaintiff~~Plaintiffs and similarly situated consumers to suffer substantial economic harm.

### I. The Origins and Consolidation of the Modern Trading-Card Grading Industry

~~67.~~65. The business of authenticating, evaluating, and encapsulating collectible cards in tamper-evident holders bearing assigned numerical condition grades began in the mid-1980s. The practice is generally traced to Accugrade Sportscard Authentication ("ASA"), founded by Alan Hager. In 1984, ASA introduced the premise, now common to major grading companies, that a purportedly disinterested third party can evaluate a card's condition on a standardized scale and permanently encapsulate the card with that assigned grade.[43] ASA did not achieve market acceptance; instead, the modern card grading industry emerged with PSA's launch in July 1991.

~~66. PSA's first grade illustrates the contradiction between PSA's published grading standards and its actual grading practice. As alleged above, PSA assigned certificate number 00000001 to a physically trimmed T206 Honus Wagner despite PSA's standards prohibiting grading any card bearing evidence of trimming, recoloring, restoration, or other tampering. PSA still graded that card and never withdrew the grade after the alteration became known.~~

~~69.~~66. PSA's early growth was modest. On information and belief, PSA graded approximately one million cards during its first seven years of operation, from 1991 through

[43] *See* Greg Bates, *Making the grade*, SPORTS COLLECTORS DIGEST (July 9, 2020), https://sportscollectorsdigest.com/collecting-101/history-of-grading-cards-psa-bgs-sgc-dominating.

1998.[44] By the end of the 1990s, competing grading brands had emerged. ~~Sportscard Guaranty Corporation ("SGC")~~SGC was founded in July 1998 and positioned itself as a grading alternative with strength in vintage cards. Beckett ~~Grading Services ("BGS")~~ began operations in 1999 and differentiated itself through subgrades for centering, corners, edges, and surface.[45] By the early 2000s, PSA, SGC, and BGS had become the dominant third-party card-grading brands.

~~70.~~67. During the pandemic-era, PSA submissions surged. By April 2021, PSA's grading throughput had reached approximately 20,000 cards per day, or roughly 500,000 to 600,000 cards per month.[46] ~~By August 2023, PSA was publicly reported to be on pace to grade approximately 14 million cards per year, or about 1.2 million cards per month.[47]~~ In February 2021, during that surge, an investor group acquired Collectors Universe, Inc,[48] PSA's then-publicly traded parent company, ~~and took it~~which was taken private in a transaction valued at approximately $853 million.[49] By August 2023, it was reported that PSA was on pace to grade approximately 14 million cards per year, or about 1.2 million cards per month.[50]

---

44 *See id.*

45 *See id*.

46 *See* Greg Bates, *PSA grading 20,000 cards per day, slowly making progress on 'avalanche' of submissions*, SPORTS COLLECTORS DIGEST (Apr. 22, 2021), https://sportscollectorsdigest.com/cards/psa-card-grading-suspension-update-sports-cards-collectibles-hobby.

~~47 *See PSA on pace to grade 14 Million cards a year.*, COLLECTORS UNIVERSE, https://forums.collectors.com /discussion/1094679/psa-on-pace-to-grade-14-million-cards-a-year (last visited July 22, 2026).~~

48 *See Investor Group Led by Nat Turner Completes Acquisition of Collectors Universe*, BUS. WIRE (Feb. 22, 2021, 9:00 AM), https://www.businesswire.com/news/home/20210222005284/en/Investor-Group-Led-by-Nat-Turner-Completes-Acquisition-of-Collectors-Universe.

49 *See Collectors Universe and Investor Group Led by Entrepreneur and Collector Nat Turner Amend and Restate Merger Agreement to Increase Offer Price to $92.00 Per Share in Cash*, STREETINSIDER.COM (Jan. 20, 2021, 8:49 AM), https://www.streetinsider.com/Globe+Newswire/Collectors+Universe+and+Investor+Group+Led+by+Entrepreneur+and+Collector+Nat+Turner+Amend+and+Restate+Merger+Agreement+to+Increase+Offer+Price+to+%2492.00+Per+Share+in+Cash/17840471.html.

50 *See PSA on pace to grade 14 Million cards a year.*, COLLECTORS UNIVERSE, https://forums.collectors.com /discussion/1094679/psa-on-pace-to-grade-14-million-cards-a-year (last visited Sept. 28, 2026).

71.68. When Collectors took control of PSA, it did not acquire a vast bench of trading-card grading experts. Collectors Universe's public filings identified 18 trading-card experts as of June 30, 2017; 22 as of June 30, 2018; 27 as of June 30, 2019;[51] and 33 as of June 30, 2020.[52] PSA's 2020 Form 10-K reported 77 total experts across all authentication and grading operations, including coins, trading cards, autographs, and memorabilia, and separately identified forty-four customer-service and support personnel.[53] But PSA identified only 33 trading-card experts in that last public annual report before being taken private in the transaction.

72.69. PSA also disclosed that qualified collectibles authentication and grading experts were "in short supply," that competition for their services was "considerable," and that PSA therefore focused on training young authenticators and graders whom it believed had the skills or knowledge base to become collectibles experts one day.[54] PSA also disclosed that it contracted "with outside experts, usually collectibles dealers," to address short-term increases in authentication and grading orders.[55] But the short-term increases never ceased.

73.70. PSA's own public disclosures showed that its path to increased output depended on operational expansion. PSA stated in its 2020 Form 10-K that it was increasing capacity to grade "a higher number of primarily collectible cards" by adding operating personnel, reviewing and improving operational processes, introducing multiple daily work shifts, and even making additional operational space available.[56] Immediately after the acquisition, Collectors helped

[51] Attached at **Exhibit A**, Collectors Universe Form 10-K for 2017, 2018, 2019.

[52] Attached at **Exhibit B**, Collectors Universe 2020 Form 10-K.

[53] *Id.*

[54] **Exhibit A**, FY2019 10-K, Item 1A (Risk Factors).

[55] *Id.* at 10.

[56] **Exhibit B**, FY2020 10-K, Item 1 (Business) – Growth Strategy.

PSA implement that expansion.[57] PSA also suspended four of its most popular lower-cost service tiers in March 2021, leaving only higher-cost options open for new submissions. The suspension was driven by a backlog estimated around 10 million cards when announced, which reportedly grew to about 12 million cards as submissions continued before the suspension took effect.[58] PSA committed to restoring suspended services by July 1, 2021,[59] but the lowest tiers remained closed well beyond that date and were not fully restored until approximately September 2022.

~~74.~~71. Collectors did not operate PSA as a standalone grading service. It pursued a broader consolidation and integration strategy around the commercial life of graded cards. After taking PSA private in February 2021, Collectors acquired Goldin Auctions in July 2021, adding a major high-end collectibles auction business to its portfolio.[60] Collectors acquired Card Ladder, a trading-card valuation and market-data platform, in December 2021.[61] Collectors acquired SGC in February 2024.[62] In April 2024, Collectors entered into a transaction with eBay through which eBay acquired Goldin and PSA acquired eBay's trading-card vault.[63] PSA then launched

---

[57] *See* Todd Tobias, *Dream of Being a PSA Grader? This Might Be Your Chance!*, PSA (Mar. 22, 2021), https://www.psacard.com/articles/articleview/10361/dream-being-psa-grader-might-your-chance.

[58] Benjamin Burrows, *PSA partially halting grading submissions amid 10 million card backlog*, THE ATHLETIC (June 1, 2026), https://www.nytimes.com/athletic/7315517/2026/05/28/psa-grading-pause-tiers/.

[59] Steve Sloan, *PSA Customer Update - April 2021*, PSA (Mar. 31, 2021), https://www.psacard.com/articles/articleview/10367/psa-customer-update-april-2021.

[60] *See* SCD Staff, *Goldin Auctions sold to Collectors Holdings amid record sales, red-hot industry*, SPORTS COLLECTORS DIGEST (July 1, 2021), https://sportscollectorsdigest.com/news/goldin-auctions-sold-to-collectors-holdings-sports-card-collectibles-ken-goldin-nat-turner.

[61] *See Collectors Universe Acquires Trading Card Valuation Platform Card Ladder*, PSA (Dec. 2, 2021), https://www.psacard.com/articles/articleview/10556/collectors-universe-acquires-trading-card-valuation-platform-ladder.

[62] Jeffrey Dohm-Sanchez, *PSA Owners Acquire SGC*, ICV2 (Mar. 1, 2024, 7:55 AM), https://icv2.com/articles/news/view/56365/psa-owners-acquire-sgc; *Collectors Acquired SGC: What the Deal Meant for the Hobby (Two Years Later)*, CARD CAPSULE, https://cardcapsule.com/blogs/blog/the-strategic-acquisition-of-sgc-by-collectors-universe (last visited July 1, 2026).

[63] Press Release, *eBay, Collectors Enter into Commercial Agreement, Sign Deals for Acquisition of Goldin by eBay and Acquisition of the eBay Vault by PSA*, EBAY (Apr. 10, 2024), https://investors.ebayinc.com/investor-news/press-release-details/2024/eBay-Collectors-Enter-into-Commercial-Agreement-Sign-Deals-for-Acquisition-of-Goldin-and-Sale-of-eBay-Vault.

the PSA Vault in June 2024.[64] In December 2025, Collectors announced an agreement to acquire BGS, one of the remaining major grading brands in the United States.[65] Collectors also operates lending services tied to collectibles held in PSA Vault custody.[66] These transactions placed Defendants on both sides of the grading-dependent market~~, which creates conflicts~~.

~~75.~~72. PSA's volume and backlog pressure ~~continued after~~persisted as Collectors' consolidation strategy accelerated. ~~After doubling~~ With its throughput doubling from 2021 to 2023, Defendants' aggressive growth strategy ~~contributed to that~~added pressure. PSA's annual card volume exceeded 19 million cards in 2025, and by early 2026 PSA was processing approximately 2.0 million cards per month.[67] By comparison, PSA had authenticated and graded approximately 35 million trading cards from its inception in 1991 through June 2020.[68] At a pace of approximately 2.0 million cards per month, PSA was positioned to grade more than 24 million cards in 2026 alone. In May 2026, PSA again announced that it would suspend its four lowest-tier services effective June 2, 2026, citing a backlog that had grown to about 10 million cards and then spiked after the announcement.[69] Around the same period, Collectors announced substantial capacity investments, including plans to expand grading capacity and staffing in response to

---

[64] Dylan Manfre, *PSA Trading Card Vault Opens With Goal of Simpler Transactions*, YAHOO! FIN. (June 24, 2024), https://finance.yahoo.com/news/psa-trading-card-vault-opens-170000794.

[65] *See, generally*, Brooks Peck, *PSA parent company Collectors to acquire Beckett, keeping it an independent brand*, THE ATHLETIC (Dec. 15, 2025), https://www.nytimes.com/athletic/6891882/2025/12/15/ collectors-beckett-psa-card-grading/.

[66] *Lending*, COLLECTORS, https://www.collectors.com/lending (last visited July 6, 2026).

[67] *See* Conor B. McGrath, *Over 26 Million Cards Graded in 2025: How the Market Exploded*, SPORTS ILLUSTRATED (Jan. 3, 2026), https://www.si.com/collectibles/over-26-million-cards-graded-in-2025-how-the-market-exploded.

[68] *See* Collectors Universe, Inc., Annual Report (Form 10-K), (Aug. 28, 2019), https://www.sec.gov/Archives/edgar/data/1089143/000143774919017562/clct20190630_10k.htm (reporting that the Company had authenticated and graded approximately 35 million trading cards since PSA's inception in 1991); *see also* Jesse Haynes, *Sports Card Grading Costs Double*, CARDLINES (Mar. 1, 2021), https://cardlines.com/psa-beckett-rates-increase/.

[69] PSA Staff, *Demand Spike*, *supra* note 22.

demand and backlog pressure.[70] These facts show that the same capacity pressures present at the time of Collectors' acquisition remained and intensified as PSA's grading volume increased.

## II. Defendants' Market Control Has Become Central to the Investment-Driven Trading-Card Market

~~76.~~73. ~~From the late 2010s and then accelerating during and after the COVID-19 period, the~~The trading-card market has evolved from a mostly hobby-centered marketplace into a financialized collectibles asset market. That market stacks six interdependent components: manufacturing and intellectual property; third-party grading and authentication; pricing, data aggregation, and analytics; storage, custody, resale, and financialization; secondary-market sales and marketplace integration; and market communication, influence, and intake. Grading is the connective component because the assigned PSA grade travels through or impacts each other component, affecting price, scarcity, liquidity, sale timing, financing, and consumer demand.

~~77.~~74. As reflected on the demonstrative illustration on the next page, Collectors does not occupy a single position in this ecosystem. Through PSA, acquired or affiliated businesses, and commercial integrations, Collectors owns, controls, or influences each component ~~besides manufacturing.~~of the card ecosystem. Collectors' financial interest can therefore attach at multiple stages of a card's commercial life. That integrated structure matters because the same PSA grade can influence pricing data, vault decisions, resale pathways, offer eligibility, lending capacity, insurance decisions, and consumer demand.[71]

---

[70] *See* ~~Ricketson~~Staff Announcement, *supra* note ~~17~~16; Burrows, *PSA partially halting grading submissions*, *supra note* ~~40~~*46* ("PSA has tripled its staff and opened grading facilities in Florida, New Jersey, Texas and Tokyo since 2021").

[71] Decl. of Jacqueline Curiel, Rasmussen v. Collectors Holdings Inc., No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 4, 2026), ECF No. 20-2, Ex. A (Collectors User Agreement) Preamble; *Collectors to Acquire Beckett*, COLLECTORS (Dec. 15, 2025), https://www.collectors.com/company-announcement.







**(Demonstrative illustration of Defendants' influence over multiple components of the trading-card ecosystem, including grading, pricing, custody, resale, financing, and market communication)**

### A. Manufacturing and Intellectual Property

~~78.~~75. The trading-card ecosystem begins with manufacturing and intellectual property. Manufacturers and licensors, including Topps, Panini America, Upper Deck, The Pokémon

Company International, and entertainment-property licensors, control the creation of cards and the initial scarcity signals attached to them, including product line, print run, checklist, licensing rights, autograph and relic content, serial numbering, refractor structure, and parallel structure.

~~79.~~76. Fanatics Collectibles, through Topps and related league, player, and brand relationships, controls important sports-card licensing and distribution channels. The Pokémon Company International controls significant Pokémon TCG production infrastructure through its acquisition of Millennium Print Group.[72] These manufacturing and licensing facts matter because initial scarcity begins with production, but downstream value increasingly depends on grading, population reports, pricing tools, custody, resale, and financing, which all influence what manufacturers create.

~~77. Once sealed products are sold, manufacturers and licensors largely exit the downstream valuation chain. The card's later commercial life—including grading, pricing, storage, resale, financing, insurance, and marketing—increasingly depends on systems and signals Defendants own, operate, influence, or monetize.~~

**B. Grading and Authentication - PSA as the Market Credential**

~~81.~~77. The next component is third-party grading and authentication. ~~PSA's own marketing presents~~PSA markets its grade as a universal, value-enhancing market ~~standard. PSA states~~credential, stating that it ~~"~~has established ~~[a]~~ "recognized and respected universal grading standard~~ for trading-card collectors," that the PSA-graded card~~," its price guide "has enhanced stability in the marketplace," and ~~that~~ "[c]ards authenticated and graded by PSA achieve amazing

[72] Press Release, *Fanatics Acquires Topps Trading Cards and Collectibles Business*, FANATICS (Jan. 4), https://www.fanaticsinc.com/press-releases/fanatics-acquires-topps-trading-cards-and-collectibles-business; Press Release, *The Pokémon Company International Enters Into Agreement to Purchase Millennium Print Group*, THE POKÉMON CO. INT'L (Apr. 18, 2022, 7:00 AM), https://press.pokemon.com/en/THE-POKEMON-COMPANY-INTERNATIONAL-ENTERS-INTO-AGREEMENT-TO-PURCH-44490.

prices at auction."[73] PSA ~~also~~likewise tells consumers that PSA-certified items "tend to sell for more — sometimes significantly more — than ~~those that are not."[74] These statements market the PSA grade as a value-enhancing market credential.~~uncertified items."[75]

~~82.~~78. PSA ~~also turns~~converts that ~~Grading~~Graded Card Credential into public scarcity data~~. PSA describes~~ through its Population Report, which it describes as an "online record of all PSA-certified ~~trading cards, tickets, packs, coins and pins in today's marketplace" and states that the tool retrieves "~~" collectibles providing "current population figures~~." PSA separately describes the Population Report as providing "~~" and "an exact count of each item graded, from PSA 1-10," with ~~category summaries and~~ daily updates.[76] ~~In that role, the~~The Population Report ~~is not a passive database. It~~thus functions as a prospectus-like scarcity disclosure for the PSA-centered market—not because trading cards are securities, but because ~~PSA publishes grade-by-grade counts that~~ Card Market Participants use PSA's published grade-by-grade populations to ~~evaluate~~assess rarity and value.

~~83.~~79. PSA ~~further supplies~~also ties market-value references ~~tied~~ to ~~that same grade. PSA tells consumers they can "[s]ort through the current market values" of PSA-certified collectibles using the PSA Price Guide, which PSA calls the "~~those grades. "Its 'official price guide for PSA-certified ~~collectibles." PSA also states that its prices are based on "~~collectibles' provides 'current market values' derived from 'established price histories~~," include "~~[.' PSA

[73] *Grading*, PSA, https://www.psacard.com/services/tradingcardgrading (last visited ~~July 22~~Sept. 28, 2026).

~~[74] *PSA Price Guide*, PSA, https://www.psacard.com/priceguide (last visited July 22, 2026) ("The clear benefit of having your items certified by PSA is because, generally speaking, items certified by PSA tend to sell for more — sometimes significantly more — than those that are not.").~~

[75] *PSA Price Guide*, PSA, https://www.psacard.com/priceguide (last visited Sept. 28, 2026) ("The clear benefit of having your items certified by PSA is because, generally speaking, items certified by PSA tend to sell for more — sometimes significantly more — than those that are not.").

[76] *See Population Report*, PSA, https://www.psacard.com/Pop (last visited ~~July 22~~Sept. 28, 2026) (describing the Population Report as providing "an exact count of each item graded, from PSA 1-10," with category summaries and daily updates).

states that it uses '[n]o subjective pricing ~~surveys,"~~surveys' and ~~"~~that those values 'more accurately reflect what you will realize when you sell or buy PSA graded sports cards~~."~~.'"[77] PSA's Auction Prices Realized ~~product likewise states that realized prices serve~~similarly provides more than five million auction results as "crucial references for assessing the market value" of collectibles~~, provides access to "over 5 million auction results,"~~ and ~~allows users to "[s]tay ahead of~~tracking market fluctuations~~."~~.[78]

80. PSA then integrates grade, ~~price, population~~scarcity, and ~~auction data~~value at the item level. ~~PSA states that collectors can access auction~~Auction results ~~"~~"can be sorted by PSA grade~~" together with~~ alongside "population numbers and price guide listings~~." PSA~~," while CardFacts ~~pages likewise display~~displays grade-~~level fields including~~specific "Most Recent Price," "Average Price," "PSA Price," "Population," and "POP Higher~~."~~" data.[79] ~~PSA's~~The PSA Set Registry ~~adds another market-supporting mechanism by encouraging~~further encourages collectors to "track ~~your~~[their] inventory, costs and populations~~,"~~" while linking ~~Registry participation~~competition among collectors to PSA's ~~official~~ price ~~guide~~guides and population reports.[80] ~~These~~Together, these tools reinforce grade-based scarcity, competition, pricing, and demand for PSA-certified cards.

---

[77] *Price Guide*, *supra* note ~~56~~62.

[78] *Auction Prices Realized*, PSA, https://www.psacard.com/auctionprices (last visited ~~July 22~~Sept. 28, 2026).

[79] *Massive Database of Auction Results Unlocked, Free to Collectors*, PSA (Jan. 4, 2018), https://www.psacard.com/articles/articleview/9416/massive-database-auction-results-unlocked-free-collectors (stating that auction results can be "sorted by PSA grade" and viewed with "population numbers and price guide listings"); *Stanley Ketchel (Checklist Back) 1911 T9 Turkey Reds*, PSA, https://www.psacard.com/cardfacts/boxing-cards/1911-t9-turkey-reds/stanley-ketchel-checklist-back-67/18527 (last visited ~~July 22~~Sept. 28, 2026) (displaying "Prices By Grade" fields including "Most Recent Price," "Average Price," "PSA Price," "Population," and "POP Higher"); *Checklist 1-132 1984 Topps*, PSA, https://www.psacard.com/cardfacts/football-cards/1984-topps/checklist-1-132-394/12238 (last visited ~~July 22~~Sept. 28, 2026) (same).

[80] *Set Registry Information*, PSA, https://www.psacard.com/psasetregistry/information (last visited ~~July 22~~Sept. 28, 2026); *PSA Set Registry*, PSA, https://www.psacard.com/psasetregistry/ (last visited ~~July 22~~Sept. 28, 2026); *PSA Set Registry Rules*, PSA, https://www.psacard.com/psasetregistry/rules (last visited ~~July 22~~Sept. 28, 2026) (stating that certain functionality "will add another layer of competition within the Registry").

### C. Pricing, Data Aggregation, and Analytics — Card Ladder

~~86.~~81. Pricing and valuation tools function as market infrastructure~~. They translate~~ by converting grades, population ~~data,~~and transaction data, comparable sales, and market movement into consumer-facing valuation signals. Consumers use those signals to decide whether to grade, which service tier to ~~select~~purchase, whether to hold or sell~~ or hold~~, what price ~~to ask, what~~or offer to accept, whether to insure a card, and whether ~~a card should be treated~~to treat it as an investment-like asset. Collectors participates in this ~~pricing and valuation~~ infrastructure through Card Ladder~~. Collectors~~, which it publicly ~~described Card Ladder~~describes as a trading-card valuation platform built on sales data, pricing information, transaction history, and predictive pricing technology.

~~87.~~82. Card Ladder ~~states~~represents that it provides access to more than 100 million historical trading-card sales, millions of vetted sales, and thousands of indexes.[81] ~~Those representations matter because Card Ladder converts grading and population data, together with sales data, into valuation outputs consumers use when deciding whether to submit cards for grading, pay for higher service levels, hold cards, sell cards, accept offers, or compare graded-card values. Card Ladder uses explicit~~It expressly invokes public-market ~~language. Card Ladder states that~~concepts: its ~~“‘Indexes’ describe the~~ “Indexes” measure card-market performance ~~for a given set of cards~~ “similar to the S&P 500,” ~~and that~~ its software uses those indexes to ~~“~~generate estimated values~~”~~ and ~~“~~predict~~”~~ how ~~a card in a user’s collection~~ cards may move~~ based on index performance. Card Ladder also tells~~, and it directs users to ~~check~~ the CL50 index “to gauge

[81] PSA, *Card Ladder*, *supra* note ~~43~~49; *Card Ladder*, https://www.cardladder.com (last visited ~~July 22~~Sept. 28, 2026).

where the market is moving.”[82] [83] Card Ladder thus converts grading, population, and sales data into valuation signals consumers use to grade, select service levels, hold, sell, accept offers, and compare graded-card values.




[82] ~~*What Are Indexes?*, CARD LADDER, https://cardladder.zendesk.com/hc/en-us/articles/11943014102167-What-are-Indexes (last visited July 22, 2026); *CL50*, CARD LADDER, https://www.cardladder.com/indexes/cl50index (last visited July 22, 2026); *Indexes*, CARD LADDER, https://www.cardladder.com/indexes (last visited July 22, 2026).~~

[83] *CL50*, CARD LADDER, https://www.cardladder.com/indexes/cl50index (last visited Sept. 28, 2026).




**(Representative Card Ladder dashboard screenshot showing financial-market-style presentation of graded-card pricing charts, collection value, daily change, verified sales volume, shop links, and pricing metrics).**

By owning Card Ladder, Collectors controls or materially influences a platform that converts PSA grades, population data, and transaction data into market-facing valuation, index, and portfolio signals.

~~88.~~83. ~~By owning Card Ladder, Collectors controls or materially influences a platform that turns PSA grades and population and transaction data into market-facing valuation, index,~~ Consumers like Plaintiffs rely on this data and ~~portfolio signals.~~it induces them to submit cards for grading. Yet Card Ladder's valuation ~~method~~methodology is opaque. ~~Card Ladder~~It excludes ~~large~~substantial categories of sales unless reported and verified, including retail-site~~ sales~~, card-shop~~ sales~~, card-show~~ sales~~, and in-person transactions~~. Card Ladder does not~~ without publicly ~~explain~~explaining who verifies ~~such sales~~them, how verification ~~is performed~~occurs, or how

those exclusions affect Card Ladder values.[84] By excludingvaluations.[85] Nor does Card Ladder include PSA's card acquisitions or disclose whether its data is integrated into PSA's own price guides and valuations or why or how they are different. Excluding these categories of sales transactions, Defendants cause necessarily gives greater relative weight to those included transactions, including any of Defendants-linked transactions, to receive greater relative weight. .

84. On information and belief, and as reflected on the representative screenshot on the following page, the Card Ladder values have sharp, unexplained day-to-day changes followed by reversals. While the algorithmic basis, data inputs, model changes, private-sale inputs, or manual adjustments underlying those movements remain within Collectors' possession, Plaintiff avers that the frequency and size of these adjustments suggest issues with valuation methodologies beyond mere market movement.

---

[84] *What is the Industry Page?*, CARD LADDER, https://cardladder.zendesk.com/hc/en-us/articles/21053788523671-What-is-the-Industry-Page (last visited July 22, 2026) (stating that sales on retail websites, social-media marketplaces, card shops, card shows, and in-person transactions are not included unless reported and verified by a Card Ladder researcher).

[85] *What is the Industry Page?*, CARD LADDER, https://cardladder.zendesk.com/hc/en-us/articles/21053788523671-What-is-the-Industry-Page (last visited Sept. 28, 2026).







~~**May 6, 2026**~~ ~~**May 7, 2026**~~

~~90.~~84. ~~These structural issues create~~ This structure creates an opaque feedback loop. PSA ~~creates or confirms the~~supplies core valuation ~~input~~inputs by assigning ~~the grade~~grades, issuing ~~the~~ certification ~~number~~numbers, and publishing population data~~.~~; Card Ladder ~~then converts~~combines those ~~grading-dependent~~ inputs~~, together~~ with selected sales data~~, into~~ to generate market-facing pricing signals~~.~~; and Collectors ~~then uses~~monetizes the resulting graded-card values through its custody, resale, partner-offer, marketplace, and lending channels ~~to monetize the same graded-card values those signals help shape. Consumers do not know.~~ Consumers cannot determine whether Card Ladder values reflect representative market data, undisclosed exclusions, manual adjustments, algorithmic changes, private-sale inputs, or Defendants' commercial incentives.

**D. Financialization Through Custody, Resale and Acquisition - PSA Vault, PSA Partner Offers, and Collectors Financial Services**

~~91.~~85. The next component is financialization through custody, resale, ~~and~~ acquisition~~. In the modern trading-card market, a~~, and lending. A graded card ~~is routed into a vault~~can be vaulted, held in custody, listed ~~for sale~~and sold while remaining in vault custody without physical transfer, offered to buyers, or used as collateral. Collectors participates in this component through the PSA Vault, PSA Partner Offers, and Collectors Financial Services.

~~92.~~86. PSA markets the PSA Vault as custody and asset-management infrastructure~~. PSA states that vaulted items are~~, offering "100%-insured" storage in a~~ modern,~~ climate-controlled facility with "24/7 security and asset management~~."[86] The Vault interface also includes,~~"[87] and displaying portfolio-style metrics ~~such as~~including "ITEMS VAULTED," "TOTAL VALUE," and "VAULTED & SOLD."[88] ~~PSA also tells users they~~Users can also "[c]reate eBay listings in seconds" directly from ~~your PSA Vault," choose when listings go live, and let PSA handle~~the Vault while PSA handles "[l]isting, imaging, packaging, [and] shipping~~" on the user's behalf.[89]~~."[90]

~~93.~~87. PSA expressly describes Vault consignment as sale execution, ~~not passive storage. PSA states that "[c]onsigning your card~~stating that consignment means "entrusting PSA to market, sell, ship, and collect payment on your behalf~~," and that~~." PSA ~~will host~~hosts the listings ~~on~~through its eBay storefront using item details and photography designed to attract

~~[86] *PSA Vault*, PSA, https://www.psacard.com/info/psa-vault (last visited July 22, 2026).~~

[87] *PSA Vault*, PSA, https://www.psacard.com/info/psa-vault (last visited Sept. 28, 2026).

[88] *Id.*

~~[89] *Id.*~~

[90] *Id.*

buyers who "value the PSA name."[91] ~~A~~Thus, a vaulted card ~~therefore may~~can be marketed, sold, shipped, and paid out through PSA-linked infrastructure without the owner physically handling ~~the card~~it.

~~94.~~88. PSA Partner Offers ~~add~~adds instant liquidity to ~~the same~~that pipeline. PSA ~~tells users they can receive~~promises "real-time PSA Partner Offers" from ~~a~~ vetted ~~buyer network,~~buyers that users can "tap to accept,~~"~~" to "lock in a guaranteed sale,~~"~~" and receive payment within days.[92] ~~PSA also states that all~~All PSA-graded cards in the Vault are eligible for Partner Offers and eBay consignment, and ~~that PSA~~ Partner Offers are "built directly into the grading and vaulting experience."[93]

~~95.~~89. Collectors Financial Services adds ~~the~~ financing ~~layer. Collectors publicly offers capital~~, offering acquisition, pre-sale, and refinancing solutions secured by collectibles deposited in the PSA Vault~~, including acquisition financing, pre-sale financing, and refinancing.~~[94][95]. Together, these ~~functions~~services allow a PSA-graded card to move from grading~~,~~ to custody, ~~to~~ offer, ~~to~~ sale, ~~to~~and financing without leaving the Collectors-controlled ecosystem. Defendants use the cards custody and valuation tools to acquire, store and transmit the very cards that they grade.

~~96.~~90. ~~Plaintiff does~~Plaintiffs do not allege that every consumer uses ~~the PSA Vault, PSA Partner Offers, or Collectors Financial Services.~~these services. The point is structural~~.~~: Collectors built ~~infrastructure~~an ecosystem in which PSA's grade ~~can affect custody, offer, sale,~~ affects market value and, in turn, pricing, custody, sale, offer, and lending decisions ~~after~~

[91] *Id.*

[92] *Id.*

[93] *Partner Offers*, PSA, https://www.psacard.com/info/psa-partner-offers (last visited ~~July 22~~Sept. 28, 2026).

~~[94] *Lending*, *supra* note 48 (describing capital solutions secured by collectibles deposited in the PSA Vault).~~

[95] *Lending*, *supra* note 54 (describing capital solutions secured by collectibles deposited in the PSA Vault).

grading. The grade affects market value; market value affects pricing data, vault decisions, sale decisions, offer eligibility, and lending capacity; and those downstream services create, each creating additional revenue opportunities for Collectors or its commercial partners.

### E. Marketplace Integration and Secondary-Market Flow

97.91. Secondary-market sales are another core component of the trading-card ecosystem. The secondary market is where cards are bought, sold, auctioned, consigned, flipped, liquidated, and converted converts graded cards into realized value. through sales, auctions, and consignments. Because graded cards may commandcard values can vary materially different prices depending on theby grading company and grade assigned grade, secondary-market activitypricing depends heavily on the grading outputsoutput and market confidence in those outputsits reliability.

98.92. The PSA/eBay integration makes that dependence explicit. Collectors and PSA described the PSA/eBay describe their relationship as an "end-to-end" hobby experience designed to streamlineintegrating "buying, grading, storing and selling," provide "real-time tracking of any item's value . . . utilizing PSA's " of item values using PSA pricing data,", and integrate "real-time eBay transaction data" with PSA Population Report data so users can maketo enable "smarter buying, selling and trading decisions."[96] Collectors CEO Nat Turner described "the idea of being ableability to grade a card with PSA, and then utilize the vault to eitherinstantly store it securelyin the Vault or makeoffer it available to other collectors on eBay in an instant" as "a major win for everyone who participates in this hobby."[97]."[98] PSA President

[96] *Collectors and eBay Transactions Close, Summer Launch Expected for Integrated, End-to-End Hobby Experience*, PSA (May 16, 2024), https://www.psacard.com/articles/articleview/11059/collectors-and-ebay-transactions-close-summer-launch-expected-for-integrated.

[97] *Id.* (quoting Nat Turner).

[98] *Id.* (quoting Nat Turner).

Ryan Hoge ~~likewise~~similarly described the Vault as ~~allowing~~enabling customers to “strategically time the market” and ~~referenced future~~anticipated “liquidity solutions” for customers “focused on investment.”[99]

~~99.~~93. Collectors also participates in secondary-market flow through affiliate links that may generate compensation for Card Ladder~~. Card Ladder~~, which routes users from pricing~~ data~~ dashboards to eBay and other marketplace listings through compensated affiliate links~~, including links to eBay and other marketplaces.~~~~[100]~~.[101]

~~100.~~94. These ~~secondary-market~~ relationships matter because the grade is the credential that ~~travels~~ follows the card into resale~~ channels. When Collectors owns~~. By owning PSA, ~~controls~~controlling or ~~participates~~participating in the provision of pricing data, ~~operates vault~~operating Vault custody and ~~partner-offer channels, maintains~~Partner Offers, maintaining eBay-linked consignment pathways, and ~~uses~~using retail submission ~~relationships~~channels, Collectors ~~can participate in~~participates at multiple stages of the same card’s economic lifecycle. ~~Plaintiff alleges~~Plaintiffs allege that this ~~integrated structure~~integration reinforces Collectors’ influence over grading-dependent valuation, scarcity, liquidity, pricing signals, and ~~consumer~~market reliance~~ throughout~~. These same relationships create an echo chamber about the ~~trading~~ importance of PSA’s grades in the card market.

---

[99] *Sports Trading Cards: One Business Helping Collectors Buy & Sell* at 1:37-1:40, YAHOO! FIN. (Jan. 12, 2025), https://finance.yahoo.com/video/sports-trading-cards-one-business-190037851.html (statements by PSA President Ryan Hoge that the Vault allows customers to “strategically time the market” and that PSA expects innovations around “liquidity solutions” for customers “focused on investment”).

~~[100] *Does Card Ladder Have Affiliate Relationships?*, CARD LADDER, https://cardladder.zendesk.com/hc/en-us/articles/20658528964887-Does-Card-Ladder-Have-Affiliate-Relationships (last visited July 22, 2026) (stating that purchases after clicking marketplace links from Card Ladder may result in compensation to Card Ladder and that marketplace links inside Card Ladder are affiliate links).~~

[101] *Does Card Ladder Have Affiliate Relationships?*, CARD LADDER, https://cardladder.zendesk.com/hc/en-us/articles/20658528964887-Does-Card-Ladder-Have-Affiliate-Relationships (last visited Sept. 28, 2026) (stating that purchases after clicking marketplace links from Card Ladder may result in compensation to Card Ladder and that marketplace links inside Card Ladder are affiliate links).

### F. Market Communication, Influence, Solicitation, and Intake

~~101.~~95. The final component is market communication, influence, solicitation, and third-party intake~~ channels or submission pathways. Consumer behavior in the modern card market is shaped by social ~~. Social media~~ platforms~~, podcasts, video channels, dealer content, hobby-media interviews, grading promotions, ~~live-streamed card openings~~livestreams, card-shop events, and hobby personalities~~. These new media promote~~ shape consumer behavior by promoting cards and grading, ~~reinforce~~reinforcing PSA as the preferred market credential, and ~~route~~routing consumers into PSA-facing submission ~~pathways~~channels. These market communications serve as an additional echo chamber.

~~102.~~96. PSA disseminates ~~and reinforces~~ a standardized market message through official and amplified~~ social media~~ channels: PSA grading is the preferred market credential, PSA is the leading authenticator and grader, and ~~a~~ PSA ~~grade may~~grades can materially increase ~~a card's value.~~card values through expert, neutral, objective, criteria based grading. PSA communicates that message through ~~PSA-~~branded content, executive appearances, dealer~~-facing~~ and creator materials, ~~creator-facing promotions,~~ affiliate disclosures, sponsored or promotional posts, ~~public~~ hobby-media programming, and its own ~~official~~ channels.[102] ~~That~~This ecosystem ~~matters because~~extends PSA's online representations ~~reach~~to beneficial card owners ~~even when those owners do not~~who never submit~~ directly~~ through PSA's portal.

~~103.~~97. PSA also ~~operates~~uses dealer and group-submission programs ~~that serve~~ as consumer-facing intake channels. PSA ~~describes~~appoints authorized dealers ~~as appointed~~

[102] *The PSA Pod*, APPLE PODCASTS, https://podcasts.apple.com/us/podcast/the-psa-pod/id1609006937 (last visited ~~July 22~~Sept. 28, 2026) ("PSA's Official Podcast. Authentic hobby talk direct from the leading source for trading card authentication and grading."); The Geoff Wilson Show, *PSA Executive Reveals Mistakes Most Collectors Make With Grading*, YOUTUBE (May 13, 2026), https://www.youtube.com/watch?v=Ya5sq98qP5A; *The Geoff Wilson Show*, YOUTUBE, https://www.youtube.com/@itsgeoffwilson (last visited ~~July 22~~Sept. 28, 2026).

under ~~PSA~~ Dealer Agreements, permits ~~authorized dealers~~ them to submit ~~cards on behalf of individuals~~for individual owners, and ~~provides~~ offers qualified dealers preferred pricing and advertising benefits~~ subject to PSA's qualifications.~~. PSA has ~~also represented that~~ authorized dealers ~~may~~to use ~~PSA~~its marketing materials, ~~point-of-sale~~ displays, brochures, direct ~~-~~mail ~~pieces~~, and ~~PSA~~ brand logotypes~~,~~ and ~~that PSA conducts~~has conducted joint marketing ~~programs with authorized dealers that promote~~ promoting both ~~the dealer's~~dealer services and ~~PSA's authentication and grading services.~~[~~103~~] ~~PSA also promotes group submissions directly to~~ PSA grading together.[104] PSA likewise encourages collectors~~, telling them they may~~ to join ~~group submissions~~ dealer-run ~~by PSA dealers~~group submissions and ~~directing~~directs them to ~~PSA's~~its Dealer Directory to ~~locate~~find verified group submitters.[105] PSA's 2020 Form 10-K expressly described a "pull" strategy aimed at causing collectors to ask dealers to submit cards for grading to PSA because most authentication and grading submissions were made by third parties dealers. It explained that dealers ordinarily comply with a customer's grading-service preference, while PSA separately markets its services to the dealers themselves.[106]

~~104.~~98. ~~The communication ecosystem~~ PSA's messaging and intake structure ~~operate~~work together~~. PSA's official and amplified~~: its market ~~messaging promotes~~communications promote PSA grading as ~~the~~an expert, reliable, ~~and~~ market-preferred

---

~~[103] *PSA Sales*, PSA, https://www.psacard.com/sales (last visited July 22, 2026); *How can I become a PSA Dealer?*, PSA (July 19, 2025), https://support.psacard.com/s/article/how-to-become-a-dealer; *Frequently Asked Questions*, PSA, https://www.psacard.com/support/faq (last visited July 22, 2026); Collectors Universe, *Annual Report* (2019), *supra* note 50, Item 1, Authorized Dealer Network.~~

[104] *PSA Sales*, PSA, https://www.psacard.com/sales (last visited Sept. 28, 2026); *How can I become a PSA Dealer?*, PSA (July 19, 2025), https://support.psacard.com/s/article/how-to-become-a-dealer; *Frequently Asked Questions*, PSA, https://www.psacard.com/support/faq (last visited Sept. 28, 2026); Collectors Universe, *Annual Report* (2019), *supra* note 56, Item 1, Authorized Dealer Network.

[105] *PSA Group Submissions*, PSA, https://www.psacard.com/dealers/groupsubmissions (last visited ~~July 22~~Sept. 28, 2026); *supra* note ~~77~~83.

[106] Collectors Universe, Inc., Annual Report (Form 10-K), at 8–10 (Aug. 26, 2020), Ex. B (describing collector-directed "pull" marketing, dealer-directed "push" marketing, and the Authorized Dealer Network).

credential;, while PSA-facing dealers, group submitters, retail partners, card shops, and other Card Grading Intermediaries then convert that messagingdemand into submissions. Those Plaintiffs do not allege that these intermediaries are not alleged to have originated Defendants' deception or messaging. They; they are the submissionadditional channels through which Defendants' standardized representations, pricespricing, charges, grading outputs, and market messages reach beneficial card owners. Plaintiffs allege that this deliberately intermediated structure separates the beneficial owner's service purchase from the Card Grading Intermediary's PSA-facing commercial arrangement.

105.99. Collectors' relationship with Fanatics Collect provides another grading-linked market pathway. Fanatics publicly identifies PSA, Beckett, CGC Cards, and SGC as grading partners and states that through which users can authenticate and grade cards through those partners while accessingwith partnership pricing, convenience, and resale-related services. Fanatics also describesoffers vaulting services through which where cards are stored, tracked with live pricing and comparable sales, and kept ready to list, trade, or ship.[107] Plaintiff doesPlaintiffs do not allege that Fanatics is a Defendant or that the relationship is exclusive. The relationship is relevant because ; it illustrates how cards can move through grading-linked market pathwayschannels in which value depends on the assigned grade.

106.100. Collectors' secondary-market and intake-channel relationships also include GameStop. provides another retail submission channel. Public filings indicateshow that GameStop became an authorized PSA dealer in November 2024, that PSA agreed to provide

---

[107] *Authentication*, FANATICS COLLECT, https://support.fanaticscollect.com/en_us/authentication-B1V3m0XTxe (last visited July 22Sept. 28, 2026) ("Fanatics Collect offers a simpler way to get your raw cards graded and authenticated by our partners PSA, Beckett, CGC Cards, and SGC."); *How to Grade & Store Your Cards*, FANATICS COLLECT, https:// www.fanaticscollect.com/pages/how-to-grade-and-store-your-graded-trading-cards (last visited July 22Sept. 28, 2026).

authentication and grading ~~services~~ through select GameStop stores, and ~~that~~ GameStop disclosed the fiscal-2024 dollar value of ~~its PSA~~that collaboration~~ in fiscal 2024.~~. GameStop also disclosed that ~~Nat Turner, Collectors' Chief Executive Officer~~Collectors CEO and Chairman~~,~~ Nat Turner serves on ~~GameStop's~~its Board~~ of Directors.[108] That overlap is relevant market-structure context for~~ .[109] Those relationships support the inference that Defendants' leadership was familiar with a retail model in which an independent Card Grading Intermediary receives consumer-owned cards, makes submissions to PSA grading through its own commercial relationship with PSA (rather than through a PSA account maintained by each beneficial owner). And, importantly, Defendants had knowledge that this relationship ~~between PSA and a national retail submission channel~~does not require or involve assent to or otherwise provide information about PSA Online Terms.

## III. Defendants Scaled a PSA-Centered Financial Marketplace Built on PSA Grades

101. The modern trading-card market is no longer merely a ~~mere~~ hobby. Cards are bought and sold as alternative assets, tracked through pricing and analytics tools, stored in third-party vaults, ~~used~~pledged as collateral~~ for asset-backed financing~~, and transacted through integrated ~~resale and~~ custody and resale channels where individual sales ~~routinely exceed~~can reach seven figures and ~~occasionally exceed~~sometimes eight~~ figures. The market's financialization is increasingly acknowledged by policymakers~~.

102. Policymakers and financial analysts~~.~~ increasingly recognize that financialization. ~~107.~~In a December 2025 letter~~ requesting an FTC investigation into Collectors' consolidation strategy~~, Representative Pat Ryan described ~~the~~ collectibles~~ industry~~ as a "sophisticated asset

~~[108] GameStop Corp., *Proxy Statement* (Schedule 14A) (Apr. 24, 2025), https://s205.q4cdn.com/272884106/files/doc_downloads/annual-meeting-docs/2025/2025-Proxy-Statement.pdf.~~

[109] GameStop Corp., *Proxy Statement* (Schedule 14A) (Apr. 24, 2025), https://s205.q4cdn.com/272884106/files/doc_downloads/annual-meeting-docs/2025/2025-Proxy-Statement.pdf.

class" and third-party grading as "essential market infrastructure" enabling "liquidity and price discovery."[110] In July 2026, ~~an article reporting on~~the media reported a Mizuho analyst's estimate that the trading-card market could reach $20 billion ~~stated that financial firms see substantial potential in the category and that~~expressly noting growing institutional ~~analysts increasingly evaluate sports and gaming cards with~~interest and analysis using methods associated with traditional equities.[111] Days later, a policy group within Japan's ruling Liberal Democratic Party stated that "[t]rading cards are no longer simply consumer products~~"~~," citing their expanding market and ~~cited the market's rapid expansion and the cards' growing~~ asset value in calling ~~attention to problems warranting~~for regulatory consideration.[112] ~~These statements reflect increasing recognition that trading cards function as assets whose value is measured, tracked, traded, financed, and subjected to market-level analysis and oversight.~~ Industry participants, including Defendants, likewise describe collectibles as alternative assets and the collectibles market as a growing alternative-asset market.

~~108.~~103. ~~Plaintiff does~~Plaintiffs do not allege that Defendants created the trading-card market ~~from scratch. Plaintiff alleges instead~~. They allege that Defendants created, scaled, and now control much of the grading-centered infrastructure through which graded cards are

---

[110] Ryan, *Letter to Ferguson*, *supra* note 11, at 1 (warning Collectors' control of grading "creat[es] severe conflicts of interest" and presents "unique opportunities for market manipulation and unfair self-dealing.").

[111] Rohit Gupta, *Wall Street Says the Trading Card Market Could Be Worth $20 Billion. Here's Why Target and Walmart Are Paying Attention*, YAHOO! FIN. (July 16, 2026, 9:44 PM), https://finance.yahoo.com/markets/stocks/articles/wall-street-says-trading-card-014429305.html (originally published by Athlon Sports and reporting a Mizuho analyst's $10 billion-to-$20 billion estimate of the 2026 trading-card market).

[112] Sarah Hilton & Akemi Terukina, *Japan Weighs Regulating Pokemon Cards Amid Trading Mania*, THE JAPAN TIMES (July 23, 2026), https://www.japantimes.co.jp/business/2026/07/23/japan-weighs-regulating-pokemon-cards/; *see also* **Exhibit C**, setting forth Defendants' market representations and incorporated herein by reference; *Collectors Announces New $100 Million Financing Round*, BUS. WIRE (Mar. 30, 2022, 9:00 AM), https://www.businesswire.com/news/home/20220329006052/en/Collectors-Announces-New-$100-Million-Financing-Round; *Collectors Holdings Acquires Goldin Auctions*, AUCTION REPORT (July 1, 2021), https://www.auctionreport.com/collectors-holdings-acquires-goldin-auctions/ (stating that Collectors develops tools and services for "alternative investors" and that "[t]he collectibles market is now valued at more than $400 billion in annual transactions").

valued, compared, stored, financed, traded, and monetized. ~~As alleged above,~~ PSA's grade is the connective credential ~~across that infrastructure~~ because it affects price, scarcity, liquidity, custody, resale, lending, insurance, market timing, and ~~consumer~~ demand.

~~109.~~104. ~~PSA's grade functions as the core market credential in~~In Defendants' financialized collectibles marketplace~~.~~, PSA's grade ~~operates like~~functions as a private rating~~.~~ ~~PSA's~~; its Population Report ~~functions~~ as a prospectus-like scarcity disclosure ~~for PSA-certified cards. PSA's~~; its Price Guide, Auction Prices Realized, and CardFacts ~~function~~ as price-discovery tools~~.~~; Card Ladder ~~functions~~ as an index, valuation, and portfolio-analytics platform~~.~~ ~~And~~; and the PSA Vault, ~~PSA~~ Partner Offers, eBay integrations, and Collectors Financial Services ~~function~~ as custody, execution, liquidity, and lending rails. ~~Plaintiff does~~Plaintiffs do not allege that trading cards are securities. ~~But the~~The structural analogy ~~is compelling based on~~ follows from Defendants' own ~~actions~~conduct and statements~~. They~~: they built and scaled a financialized ~~collectibles~~ marketplace in which PSA's grade supplies the core value signal for a trading-card asset class ~~(or market cap) with a total value exceeding~~ valued at more than $15 billion.[113]

~~104. Defendants' own words confirm that grading functions as market infrastructure, not merely as a hobby service. Before Collectors Holdings took PSA private, Collectors Universe told investors that authentication and grading services "add value" to collectibles by "enhancing their marketability" and providing "increased liquidity" to dealers, collectors, and consumers who own, buy, and sell collectibles. Collectors Universe also stated that PSA grading~~

[113] Leore Avidar and Alexis Ohanian, *Tariffs are driving investors to Pokémon and Mickey Mantle as trading cards gain credibility as domestic assets*, N.Y. POST (Apr. 28, 2025, 6:30 AM), https://nypost.com/2025/04/28/opinion/tariffs-are-driving-investors-to-pokemon-and-mickey-mantle-these-arent-your-grandfathers-trading-cards/ ("Collectibles have emerged as a legitimate asset class: a $600 billion+ global industry, with trading cards alone valued at more than $15 billion . . . . These items are no longer mere nostalgic keepsakes; they have evolved into financial instruments with genuine longevity.").

improved the overall marketability of and facilitated commerce in trading cards and allowed trading cards to be traded sight-unseen.[114]

105. PSA tells consumers the same thing. PSA states that it "has established [a] recognized and respected universal grading standard for trading card collectors," that its PSA-graded card price guide "has enhanced stability in the marketplace," and that "[c]ards authenticated and graded by PSA achieve amazing prices at auction."[115] PSA also tells consumers that PSA-certified items "tend to sell for more — sometimes significantly more — than those that are not."[116] These are not modest claims about authentication or plastic holders. PSA markets its grade as a value-enhancing standard that changes how the market prices the card.

106. PSA then converts that grade into public scarcity and price-discovery data. PSA then converts that grade into public scarcity and price-discovery data. PSA markets their Population Report as containing "records for all cards, tickets, packs, coins and pins graded by PSA."[117] PSA separately describes the Population Report as providing "an exact count of each item graded, from PSA 1-10," with category summaries and daily updates.[118] The Population Report functions as a prospectus-like scarcity disclosure for PSA certified cards—not because

[114] *See* Collectors Universe, *Annual Report* (2019), *supra* note 50, Item 1, Authorized Dealer Network ("We believe that our authentication and grading services add value to these collectibles by enhancing their marketability and thereby providing increased liquidity to the dealers, collectors and consumers that own and buy and sell them.").

[115] *Grading*, *supra* note 55 (stating that PSA "has established [a] recognized and respected universal grading standard for trading card collectors," that the PSA-graded card price guide "has enhanced stability in the marketplace," and that "[c]ards authenticated and graded by PSA achieve amazing prices at auction").

[116] *Price Guide*, *supra* note 56 ("The clear benefit of having your items certified by PSA is because, generally speaking, items certified by PSA tend to sell for more — sometimes significantly more — than those that are not.").

[117] *Population Report*, *supra* note 57.

[118] *Id.*

trading cards are securities, but because PSA publishes grade-by-grade scarcity data that the market uses to price, trade, finance, insure, and value graded assets.

107. PSA also supplies the market's valuation references. PSA tells consumers they can "[s]ort through the current market values" of PSA-certified collectibles using the PSA Price Guide, which PSA calls the "only official price guide for PSA-certified collectibles." PSA further represents that its prices are based on "established price histories," include "[n]o subjective pricing surveys," and "more accurately reflect what you will realize when you sell or buy PSA graded sports cards."[119] PSA's Auction Prices Realized product likewise states that realized prices serve as "crucial references for assessing the market value" of collectibles, provides access to "over 5 million auction results," and allows users to "[s]tay ahead of market fluctuations."[120] PSA CardFacts pages integrate these inputs by displaying grade-level fields such as "Most Recent Price," "Average Price," "PSA Price," "Population," and "POP Higher."[121] Thus, PSA does not merely assign a grade; it supplies the grade, scarcity count, and valuation references used to price the graded asset.

108. Collectors expanded that market architecture through Card Ladder. Card Ladder describes its indexes as measuring market performance for sets of cards "similar to the S&P 500," and states that its software uses those indexes to "generate estimated values" and "predict" how cards in a user's collection may move based on index performance.[122] Card Ladder also invites users to "[r]esearch specific markets [on the CL50 index] within the hobby to gauge

[119] *Price Guide*, *supra* note 56.

[120] *Auction Prices Realized*, *supra* note 59.

[121] PSA, *Massive Database of Auction Results*, *supra* note 60 (stating that auction results can be "sorted by PSA grade" and viewed with "population numbers and price guide listings"); PSA, *Stanley Ketchel*, *supra* note 60 (displaying "Prices By Grade" fields including "Most Recent Price," "Average Price," "PSA Price," "Population," and "POP Higher"); PSA, *Checklist 1-132*, *supra* note 60 (same).

[122] *What Are Indexes?*, *supra* note 63.

where the market is moving."[123] By owning Card Ladder, Collectors controls or materially influences a platform that converts PSA grades, population data, and transaction data into market-facing valuation, index, and portfolio signals.

109. Defendants then connected grading and valuation to custody, execution, liquidity, and financing. PSA markets the PSA Vault as a custody and asset-management platform where items are "100%-insured" in a climate-controlled facility with "24/7 security and asset management."[124] PSA tells users they can "[c]reate eBay listings in seconds from your PSA Vault" and that PSA handles "[l]isting, imaging, packaging, shipping" on the user's behalf.[125] PSA further states that consignment means "entrusting PSA to market, sell, ship, and collect payment on your behalf," with listings hosted on PSA's eBay storefront for buyers who "value the PSA name."[126]

110. PSA Partner Offers add instant liquidity to that same pipeline. PSA tells users they can receive "real-time PSA Partner Offers" from a vetted buyer network, "tap to accept," "lock in a guaranteed sale," and receive payment within days.[127] PSA also states that all PSA-graded cards in the Vault are eligible for Partner Offers and eBay consignment, and that PSA Partner Offers are "built directly into the grading and vaulting experience."[128] Collectors

[123] *Id.*; Card Ladder, *CL50*, *supra* note 63 ("Check out the CL50 index to gauge where the market is moving."); Card Ladder, *Indexes*, *supra* note 63 (inviting users to "[r]esearch specific markets within the hobby to gauge where the market is moving").

[124] *PSA Vault*, *supra* note 65 ("Items are 100%-insured in a modern, climate-controlled facility with 24/7 security and asset management").

[125] *Id.*

[126] *Id.* ("Consigning your card means entrusting PSA to market, sell, ship, and collect payment on your behalf."); id. (stating that "PSA will create and host your listing on its eBay storefront, with marketable item details and photography attracting buyers who value the PSA name").

[127] *Id.* (stating users may "[r]eceive real-time PSA Partner Offers from PSA's vetted network — no listings required," "tap to accept," and "lock in a guaranteed sale," with payment processed instantly and arriving in one to three business days); *Partner Offers*, *supra* note 70 ("Accept with one tap. Funds initiate instantly with no fees.").

[128] *Partner Offers*, *supra* note 70.

Financial Services adds the financing layer by offering capital solutions secured by collectibles deposited in the PSA Vault.[129]

111. The eBay integration completes the transaction stack. Collectors and PSA described the PSA/eBay relationship as an "end-to-end" hobby experience designed to streamline "buying, grading, storing and selling," provide "real-time tracking of any item's value . . . utilizing PSA's pricing data," and integrate "real-time transaction data" with PSA Population Report data so users can make "smarter buying, selling and trading decisions."[130] Collectors CEO Nat Turner described the ability to grade a card with PSA, then use the Vault to store it or make it available on eBay "in an instant," as "a major win for everyone who participates in this hobby."[131] PSA President Ryan Hoge likewise described the Vault as allowing customers to "strategically time the market" and referenced future "liquidity solutions" for customers "focused on investment."[132]

118.105. The result of thisis a vertically integrated system based on Collectors' Downstream Channels is a, PSA-centered financial marketplace built around the GradingGraded Card Credential. Defendants control or materially influence the rating function grading through PSA; scarcity data through Population Reports; price discovery through PSA grading; the scarcity-disclosure function through PSA population reports; price discovery through PSA Price Guide, Auction Prices Realized, CardFacts, and Card Ladder; benchmarking through Card Ladder indexes; custody through the PSA Vault; sale execution through eBay-linked Vault listings and consignment; liquidity through PSA Partner Offers; and financing through Collectors

[129] *Lending*, *supra* note 48 (describing capital solutions secured by collectibles deposited in the PSA Vault).

[130] PSA, *Collectors and eBay Transactions Close*, *supra* note 72.

[131] *Id.* (quoting Nat Turner, CEO).

[132] Yahoo! Fin., *Helping Collectors Buy & Sell*, *supra* note 74.

Financial Services. Collectors itself describes its ~~business as providing~~ services ~~that allow~~as enabling hobbyists to "grade, authenticate, research, vault and sell" collectibles.[133] ~~And equally important,~~ Defendants ~~themselves~~likewise describe grading as central to ~~this~~the established~~,~~ ~~functional~~ market ~~for this asset class as~~ reflected in **Exhibit C**, ~~which is~~ incorporated herein by reference. ~~These extensive market~~ Their own statements ~~represent~~portray trading cards as ~~a~~ financial ~~asset and part of~~assets operating within a ~~financial~~financialized market.

~~119.~~106. That ~~structure~~integration makes Defendants' omissions more material, not less. ~~A consumer~~Consumers deciding whether to grade, sell, hold, insure, finance, vault, accept an offer, or rely on ~~a~~ PSA population ~~count~~data would consider it important that the same corporate family assigning the grade and publishing ~~the~~ scarcity ~~disclosure~~data also participates in pricing, custody, sale execution,~~ instant~~ liquidity, lending, marketplace routing, and submission-channel monetization. If PSA's grade is subjective, opaque, inconsistent, revisable, commercially managed, or contractually disclaimed, the ~~harm does not remain confined to the individual slab. It propagates through the financialized market stack Defendants built, affecting~~consequences extend beyond the slab into grading demand, pricing, scarcity, liquidity, offers, resale, financing, and the fees Defendants extract ~~from consumers.~~throughout that market. Yet Defendants ~~are unconstrained to issue or influence~~face virtually no oversight responsibilities or requirements that prevent them from influencing grades in ways that benefit their own downstream ~~positions~~economic interests at the ~~sake~~expense of consumers seeking neutral, expert, objective, and reliable ~~credentials. There are virtually no rules or regulations that constrain their actions~~Graded Card Credentials.

---

[133] Collectors, *Acquire Beckett*, *supra* note ~~53~~59.

## IV. Defendants' Consumer-Facing Grading and Authentication Representations and Practices Promising Impartial, Expert, Objective, and Standardized Review

~~120.~~107. Because PSA's ~~Grading~~Graded Card Credential functions as ~~the~~a core value signal in the PSA-centered ~~card marketplace~~market, the integrity of the process ~~that produces that grade~~ producing it is material. ~~A grade that affects Downstream Channels and consumer demand has~~ The Graded Card Credential derives its value ~~only if the~~from market~~ can~~ trust that ~~it was assigned~~ PSA assigns its grades through the impartial, expert, standardized, criteria-based, and reliable process ~~that PSA represents.~~it markets. Those representations ~~are apparent in~~appear throughout PSA's ~~claimed~~ workflow, ~~its~~ pricing~~ structure~~, and ~~even its~~ marketing~~ that promotes~~, including its promotion of PSA grades as a authoritative and ~~designed to increase the~~ value~~ of trading cards.~~ -enhancing credential.

### A. The Grading Workflow PSA Markets to Consumers

~~121.~~108. PSA's public-facing workflow reinforces its ~~central promise, namely~~representation that grading is neutral, expert, objective, criteria-based, and reliable, as further reflected ~~by the extensive public representations~~ in **Exhibit D**, ~~which is~~ incorporated herein by reference. ~~In doing so,~~ PSA presents ~~the grading transaction as~~ a controlled institutional process ~~that starts with an online or app-based submission that involves~~encompassing service-level selection, submission-form generation, ~~shipment labeling, package scanning~~shipping and intake, order ~~entry~~tracking, certification-number assignment, ~~account-based tracking,~~ authentication, grading, encapsulation, quality review, and return shipment.[134] These ~~operational~~ representations ~~matter because they lead consumers to believe~~convey that the final grade results from a standardized, auditable-like process applying

[134] *How It Works*, PSA, https://www.psacard.com/info (last visited July 2, 2026); *Online Submission Center*, PSA, https://www.psacard.com/submit (last visited July 2, 2026).

defined ~~grading~~ criteria—not ~~from an~~ opaque~~, discretionary, or subjective judgment hidden inside PSA's system.~~~~[135]~~ or undisclosed discretion.

~~122.~~109. ~~In the direct-submission pathway, PSA requires the submitter to~~ Direct submitters identify ~~the~~their cards, select ~~a~~ service ~~type~~types and ~~service level~~levels, generate ~~a~~ submission ~~form~~forms, and package and ship ~~the~~ cards according to PSA's ~~instructions. PSA instructs submitters to place cards in the same order listed on the submission form, secure each~~prescribed procedures, including specified card ~~in~~order, semi-rigid holders, ~~include the printed~~ submission ~~form~~forms, and ~~affix the~~ Submission ID ~~Label to the outside of the package~~Labels.[136] Consumers ~~who submit through~~using Card Grading Intermediaries enter the same PSA grading pipeline~~, but~~ through the intermediary's PSA-facing account after ~~the consumer has selected the~~selecting their cards and ~~the~~ service levels. *See supra* ¶¶ *29, ~~38~~40(a)–(f), ~~57~~55(a)–(c).*

~~123.~~110. PSA's intake sequence reinforces the appearance of institutional control. PSA states that once a package arrives at its facility, the Submission ID Label is scanned, an arrival email is sent, account and order pages are updated, all cards are accounted for, cards are placed with the submission form into an individual processing box, submissions are organized by service level, and an order number is assigned.[137] PSA's published workflow further states that the exterior processing box carries the order number, item quantity, service level, and estimated

~~[135] *How It Works*, PSA, https://www.psacard.com/info (last visited July 2, 2026); *Online Submission Center*, PSA, https://www.psacard.com/submit (last visited July 2, 2026).~~

[136] *Online Submission Center*, *supra* note ~~105~~93; *PSA Update: Journey of a PSA Card*, PSA (Oct. 3, 2020), https://www.psacard.com/articles/articleview/10241/psa-update-journey-card.

[137] PSA, *Journey of a PSA Card*, *supra* note ~~106~~94.

due-out date, allowing operational timing information to remain associated with the order even after customer-identifying information is later removed.[138]

~~124.~~111. PSA then represents that cards ~~move~~proceed through research, authentication, grading, encapsulation, grade check, quality assurance, and return shipment. ~~PSA states that its~~Its Research Department identifies cards for label accuracy~~, that~~; the customer submission form is sealed away~~, and that nothing~~ so personally ~~identifiable remains associated with~~identifying information no longer accompanies the card~~. PSA also places order-identification stickers on submitted cards and~~ ; and PSA assigns each card a unique certification number~~, which becomes the key identifier~~ used to identify and track ~~the card~~it through grading.[139]

~~125.~~112. After grading, PSA sonically seals the card in a tamper-evident holder bearing ~~PSA's~~its proprietary LightHouse label, assigned grade, and ~~unique~~ certification number. ~~PSA publicly describes the trading card as sonically sealed in a tamper-evident holder and states that each card's grade and certification number appear on the PSA LightHouse label. PSA's publicly available~~PSA's public certification-verification database then allows market participants to ~~confirm~~verify information associated with ~~the certification~~that number.[140]

~~126.~~113. The PSA slab~~,~~ is therefore~~, is not passive~~ more than packaging. It ~~is a representational credential that~~ carries ~~PSA's promises~~the Graded Card Credential into downstream transactions~~. A purchaser~~ through the holder, label, grade, and certification number, representing even to purchasers who never ~~visits~~visit PSA's website ~~may still rely on the holder,~~

---

[138] PSA, *PSA Update: Journey of a PSA Card*, PSA (Oct. 3, 2020), https://www.psacard.com/articles/articleview/10241/psa-update-journey-card.

[139] *Id.*

[140] *Grading*, *supra* note ~~55~~61; *Cert Verification*, PSA, https://www.psacard.com/cert (last visited ~~July 22~~Sept. 28, 2026).

label, grade, and certification number as representations that the card was authenticated, evaluated under PSA's markedrepresented standards, assigned the displayed grade, and maintained in PSA's certification system.

127.114. PSA alsofurther publishes those grades intoin population reports that purportpurporting to show how many the number of copies of a card exist at each numerical grade.[141] Because PSA both assigns the gradegrades and publishes the count, the Population Report implicitly represents that the underlying grades were assigned undercounts, those reports necessarily depend on sufficiently stable, consistent, and criteria-based standardsgrading for the countresulting scarcity data to be meaningful. In other words, PSA's workflow thus does not end with the slab. PSA transforms; each GradingGraded Card Credential intobecomes a market signal.

### B. PSA's Public Promise: Expert, Standardized, Objective, and Reliable Review

128.115. PSA's public-facing materials communicate a common promise: consumers are purchasing a professional grading credential. PSA markets itself as thea global leader in trading-card authentication and grading, statingrepresents that a high PSA grade addsgrades add status, scarcity, and value, and represents that PSA-certified items outsell the fieldcommand premiums in many sales and auctions.,[142] PSA also marketspromoting its Authenticity and& Grade Guarantee as fundamental to its reputation and assuresassurance that itPSA stands behind its authenticity and grade determinations.[143]

---

[141] *Population Report*, *supra* note 5763.

[142] *PSA*, https://www.psacard.com (last visited July 10, 2026); *About PSA*, PSA, https://www.psacard.com/about (last visited July 10, 2026); *Authentication*, PSA, https://www.psacard.com/services/autographauthentication (last visited July 10, 2026).

[143] *Online Terms and Conditions of the PSA Authenticity and Grade Guarantee*, PSA, https://www.psacard.com/financialguarantee (last visited July 2, 2026).

~~129.~~116. ~~PSA's market representations reinforce the same message.~~ PSA represents that grading ~~is applied through~~applies basic objective standards~~. PSA presents grading as~~ with a criteria-based condition assessment focused on centering, corners, edges, and surface.[144] ~~Those representations lead consumers to believe that PSA~~ PSA represents grades ~~are~~ not as arbitrary numbers, but as standardized ~~condition~~ determinations grounded in defined criteria.

~~130.~~117. PSA further ~~represents that~~portrays grading ~~involves~~as institutional review rather than ~~a single~~ unsupported individual judgment. ~~PSA~~It states that ~~a series of~~ PSA graders review cards for authenticity~~,~~ and ~~PSA's "Journey of a PSA Card" materials describe~~describes a multi-stage process ~~involving~~of identification, authentication, grading, encapsulation, grade check, quality assurance, and shipment.[145] ~~These~~Together, these representations ~~contribute to consumers' understanding that a~~portray PSA ~~grade reflects~~grading as an impartial, expert, controlled, objective, and repeatable process.

~~131.~~118. ~~PSA's~~Those representations ~~do not remain confined to~~extend beyond PSA's website~~. They travel~~ through slabs, labels, certification tools, population reports, Card Ladder ~~valuation~~ data, ~~eBay and~~ marketplace and eBay integrations, auction listings, dealer materials, hobby ~~-~~media ~~messaging~~, and Card Grading Intermediaries.[146] PSA's crossover service ~~reinforces~~further demonstrates the independent market value of ~~the PSA label~~ its credential by allowing ~~a card~~cards already graded ~~by another company~~elsewhere to be ~~submitted~~

---

[144] *Grading Standards*, *supra* note 2; *PSA Authenticity and Grade Guarantee*, *supra* note ~~112~~101.

[145] *Grading, supra note ~~55~~61; PSA, Journey of a PSA Card, supra* note ~~106~~96.

[146] PSA Staff, *PSA Grading—Now Built Into eBay Checkout*, PSA (Apr. 1, 2025), https://www.psacard.com/articles/articleview/15161; Press Release, *Collectors and eBay Transactions Close, Summer Launch Expected for Integrated End-to-End Hobby Experience*, EBAY (May 16, 2024), https://www.prnewswire.com/news-releases/collectors-and-ebay-transactions-close-summer-launch-expected-for-integrated-end-to-end-experience-for-trading-cards-302146064.html.

~~to PSA for review~~reviewed and ~~possible encapsulation~~potentially re-encapsulated in a PSA holder~~,~~ even though the underlying card ~~itself~~ remains unchanged.[147]

~~132.~~119. ~~The commercial reality is that~~ PSA sells more than authentication, encapsulation, or a number on a label. ~~PSA sells a market credential whose value depends on consumers and the market believing that the grade is impartial, expert-driven,~~The Graded Card Credential represents that qualified experts assessed the card's physical condition under substantially standardized~~, objective, verifiable,~~ criteria—including centering, corners, edges, and surface—and ~~worthy of reliance. If those~~that the resulting certification reliably compares condition. Plaintiffs allege these attributes ~~are absent,~~ create the trust, market acceptance, and economic value for which consumers pay, but PSA materially ~~qualified, or contradicted by undisclosed practices, consumers receive a materially different~~overstated them by delivering grading and certification that were less consistent, independent, and reliable than represented. The alleged fraud therefore concerns the attributes of the grading service ~~from the one PSA sold~~and Credential consumers purchased, not entitlement to any particular numerical grade.

### C. Consumers See PSA's Price, Value, and Speed Package

~~133.~~120. Each submission starts with the selection of a service. PSA's consumer-facing ~~trading-card~~ grading page ~~organizes its grading services into individual~~presents each service -level ~~cards. Within that presentation, PSA places~~as a single commercial choice organized around three terms~~ together: ~~: (1) a specific per-card price; (2) a specific Maximum Insured Value ("MIV"); and (3) an estimated turnaround-time ~~stated as a~~ range ~~of~~in business days. A "Get Started" button appears immediately below~~ those terms. PSA thereby presents the~~

[147] *Crossover*, PSA, https://www.psacard.com/services/tradingcardgrading/crossover (last visited July 2, 2026).

~~consumer with a single commercial choice organized around~~, inviting consumers to proceed based on that price~~, -~~value~~, and -~~speed package.






**(Representative PSA trading-card grading pricing-page screenshot showing service levels presented with per-card price, Maximum Insured Value, estimated turnaround time, and turnaround-time asterisk.)**

~~134.~~121. PSA does not ~~present~~qualify those ~~components with the same degree of qualification. The asterisk appears only after the~~ terms equally. Only the estimated turnaround ~~-~~time ~~range.~~bears an asterisk. No ~~asterisk appears after the displayed per-card price, or after the stated MIV.~~terms-and-conditions link, recommendation to review them, or other adjacent disclosure indicates that the displayed price or MIV is provisional or subject to later adjustment. A consumer viewing the service-level card would therefore understand ~~that~~ the asterisk ~~relates~~ to ~~the~~qualify turnaround ~~-~~time ~~estimate —~~, not ~~that it also qualifies the displayed~~ price or ~~the stated~~ MIV. ~~Importantly, there are no links to the terms and conditions anywhere near the service level window. Nor does PSA recommend consumers review them.~~

~~135.~~122. ~~The~~PSA presents price ~~is presented~~ as definite~~. For each service level shown, PSA provides an unqualified,~~: a specific dollar amount per card~~. The price is~~, not ~~labeled~~ an estimate~~, is not presented as a range, and is not accompanied by an asterisk or an adjacent statement that the amount~~ or range that it may ~~later~~ increase. The service-level card does not ~~tell the consumer~~disclose that PSA may ~~subsequently~~later determine ~~that~~ the selected ~~service level was~~tier insufficient, ~~place~~move the ~~item into~~card to a higher-priced ~~service level~~tier, or ~~require~~demand an adjusted grading fee~~. On the face of the service-level card, PSA's price is not an estimated or provisional price~~ based on PSA's unilateral determination of the submitted card's value.

~~136.~~123. ~~PSA presents turnaround~~Turnaround time is presented differently. ~~It~~PSA expressly ~~uses the phrase~~labels it "Estimated Turnaround Time~~" in business days. The word estimate denotes a rough, close or~~," signaling an approximate ~~representation — not exact. Unlike the price, turnaround-time representations contain an asterisk signal that indicates additional~~

~~qualifications may exist.~~rather than fixed period, and places an asterisk beside it. But the service-level card does not explain ~~that asterisk, and that asterisk itself does not function as a hyperlink through which the consumer may obtain information about its meaning. Nor does~~ the asterisk, make it clickable, provide an explanatory footnote ~~appear immediately beneath the service-level card or~~ near the pricing grid ~~about the asterisks. Nor does PSA provide a link to the terms and conditions~~, or link nearby~~. It is just an unexplained asterisk~~ to terms explaining its meaning.

~~137.~~124. PSA presents MIV with the same apparent definiteness as price~~. Each of the representative service-level cards states~~: a specific ~~MIV amount associated with that tier. The MIV is not accompanied by~~amount without an asterisk, hyperlink, definition, or adjacent qualification. The service-level card does not explain that MIV ~~is the maximum~~ limits PSA's compensation ~~PSA may provide~~ for actual loss or damage while ~~the~~an item is in ~~PSA's~~its possession~~. Nor do the service tiers tell the consumer~~, that ~~PSA expects the submitter~~submitters are expected to estimate ~~the item's~~ post-grading fair market value~~,~~ and select a tier ~~whose MIV exceeds~~exceeding that estimate, or ~~potentially pay~~that PSA may later demand a higher grading fee if ~~PSA later~~it determines ~~that~~ the selected MIV was insufficient. ~~These~~Those qualifications ~~are hidden~~appear elsewhere in PSA's terms, FAQ, Coverage materials, and disclosures rather than alongside the displayed service-level options.

125. ~~PSA's use of the~~PSA places these three ~~pricing components together invites a straightforward consumer comparison. PSA then places the large~~ terms and the "Get Started" button ~~within the same visual card~~together, inviting ~~the consumer~~consumers to ~~proceed~~compare service levels and begin submissions based on ~~those~~the displayed ~~terms. Once a consumer clicks the Get Started button, the submission process begins, and consumers~~ package. Consumers then

prepare and commit their ~~orders for their~~ cards to the selected services based on those terms and Defendants' ~~market~~ representations ~~about~~concerning the ~~Grading~~Graded Card Credential.

~~138.~~126. The same structure governs submissions through Card Grading Intermediaries. Although the intermediary operates the PSA-facing portal after the beneficial owner decides to submit and pays, reimburses, or bears the Grading-Related Charges, including grading, shipping, handling, insurance, return-shipment, and passed-through value-based or adjusted charges. Card owners review PSA's service levels directly and/or PSA-provided summaries conveyed through intermediaries, which involve the same pricing structure. Those consumers are further removed from PSA's qualifications because they may never operate its portal or encounter its terms. From the beneficial owner's perspective, the visible bargain remains the stated price-value-speed tiers. Below is a demonstrative that reflects the service level and submission architecture.






**(Demonstrative illustrating how PSA's pricing architecture operates sequentially from Service Level selection through payment before grade reveal, completion, or return.)**

~~126. For consumers who submit through Card Grading Intermediaries,~~After the ~~same structure governs that transaction. The intermediary may operate~~ consumer commits the ~~PSA-facing portal, but the beneficial~~ card ~~owner makes the submission determination, and pays, reimburses, or bears the grading-related charges, including grading fees, shipping, handling, insurance, return-shipment charges, and any passed-through value-based or adjusted charges. The card owners examine PSA's service levels or a service level summary that PSA provides the intermediary to show card owners. Even when the intermediary prepares submissions, they encounter the same deception as consumers. But consumers submitting through Card Grading Intermediaries are further removed from PSA's service qualifications because the beneficial card owner may never operate the PSA-facing portal or never have the chance to encounter PSA's terms. From the consumer's standpoint, the visible package remains straightforward: one stated price, one stated MIV, and one estimated turnaround time.~~

~~140.~~127. ~~In practical terms, PSA first obtains the card,~~, PSA controls intake and timing, ~~grades or~~ processes or grades the card, determines whether the selected value tier was sufficient, calculates any ~~adjusted amount due~~adjustment, and ~~then~~ conditions grade disclosure, order completion, or return of the property on payment, regardless of whether the card is ultimately graded. The consumer ~~therefore~~thus commits ~~to the transaction~~ before all pricing and timing variables are fixed. ~~PSA's pricing structure is a layered monetization stack.~~ PSA presents ~~the front end as~~ a menu of consumer choices~~, but retains actual~~ while retaining post-submission control over ~~each choice~~every material component except ~~what~~the cards ~~are~~ submitted.

* * *

~~141.~~128. Taken together, PSA's ~~marketed~~ grading transaction rests on two connected promises. First, PSA ~~tells consumers that the grade is produced through~~represents that an impartial, expert, objective, criteria-based, standardized, and verifiable process~~, which~~ produces a Graded Card Credential that follows ~~that grade~~the card into the market through ~~the~~its slab, label, certification number, ~~guarantee language~~Guarantee, and population ~~reporting~~data. Second, PSA monetizes that credential through a price-value-speed structure ~~that allows PSA to~~under which it retains post-submission control over timing, value, payment, grade disclosure, and return ~~after the consumer has committed the card to PSA's system. Those representations matter because consumers~~. Consumers therefore are not buying plastic, paperwork, or a number in isolation~~. They~~; they are buying an expert, market-recognized ~~credential~~Graded Card Credential whose value depends on ~~PSA's promises.~~ PSA delivering what it represents.

## V. Defendants' Fraudulent Grading Scheme and Deceptive Fee Practices

~~142.~~129. Defendants' scheme has two connected parts: they misrepresent their grading services as impartial, expert, objective, criteria-based, guaranteed, and market-

authoritative;[148] and they use that same misrepresented credential to extract grading fees and related charges through deceptive pricing practices. Collectors then scaled both parts of the scheme through its vertically integrated trading-card infrastructure. These scaled frauds adversely impacted Card Grading Intermediaries, consumers, and the market. We discuss each of these issues below.

### A. PSA's Fraudulent Grading Methodology and False Market Credential

143.130. Defendants' grading fraud begins with a critical misnomer: they market the grade as an impartial, expert-driven, and criteria-based product, while delivering an opaque, subjective, variable, and conflicted, and managed grading output. affected by the undisclosed practices alleged below. The GradingGraded Card Credential is materially different from Defendants' representations. In this respect, their fraud can be separated into four general categories of market-facing misrepresentations and omissions: (1) expertise fraud, namely that PSA grading involves expert determinations by graders with specialized skill, experience and judgment; (2) professional standards fraud, namely that PSA represented grading as impartial, objective, standardized, criteria-based, consistent, and governed by recognized and respected universal grading standards; (3) process-and-certification fraud, namely that PSA represented its GradingGraded Card Credential as a durable, verifiable, and market-authoritative credential; and (4) market-use fraud, namely that Defendants represented the PSA GradingPSA's Graded Card Credential and the Collectors Downstream Channels could be relied on by consumers and the market to price, buy, sell, insure, finance, lend against, vault, and value graded cards. *See* **ExhibitEx. D**. Each category of representation was false, misleading, or materially incomplete.

[148] **Exhibit D**, Defendants' repeated representations about their grading credentials incorporated herein by reference.

### 1. The Qualifications of PSA's Graders Do Not Match Defendants' Marketed Expertise

131. A central pillar of PSA's marketing is that grading is performed by trained experts with specialized knowledge and experience sufficient to evaluate valuable collectibles with precision and consistency. PSA tells consumers that its "expert graders" can detect differences submitters "might not be able to tell" and assess details "not visible to the naked eye."[149] But beforeBut PSA's marketing of "expert graders" is misleading.

144.132. Before Collectors took PSA private, PSA admitted that qualified collectibles authentication and grading experts were "in short supply," that competition for them was "considerable," and that PSA relied on training young graders that it hoped could become experts one day. PSA also admitted that when orders increased, it contracted with outside people, "usually collectibles dealers," to address those short-term increases in grading orders.[150] But those "short-term increases" have persisted since 2021, necessitating two partial shutdowns of PSA's services. Thus, over the last five years, PSA apparently has used contractors possessing unknown background, experience, and training on PSA's standards, to perform PSA grading services. These admissions and circumstances undercut PSA's consumer-facing promise of expert grading. They show a constrained labor pool supplemented by trainees and unknown contractors—contractors who include market participants potentially with their own self-interest in the grading results for cards. Plaintiff alleges, therefore,Plaintiffs allege that Defendants' expansion prioritized throughput over the training, calibration, quality control, and reasonable

---

[149] *PSA's Grading Guide*, PSA, https://www.psacard.com/info/get-started (last visited July 22, 2026) (PSA tells consumers that its "expert graders" can detect differences submitters "might not be able to tell," and that its graders "assess every detail of every card, including those not visible to the naked eye.").Sept. 28, 2026).

[150] **Exhibit A**, Collectors Universe, Inc., Annual Report (Form 10-K) (FY 2019), risk-factor and business disclosures regarding grading experts being "in short supply," competition being "considerable," training young graders, and use of outside experts "usually collectibles dealers." *Supra* ¶ 69.

grader-to-card ratios necessary to deliver the expert, consistent, criteria-based grading that PSA marketed.

~~145.~~133. PSA's current hiring and recruiting materials corroborate these issues. PSA does not even require prior grading experience, specialized training, or certification as a condition of hire as a grader. Instead, PSA merely prefers that applicants have one to three years of grading experience "as a professional, dealer or collector."[151] PSA recruiting materials describe the ideal grading ~~applicant~~applicants as PSA customers who have been successful with their own submissions or who have hobby experience, trainability, and a "good eye."[152] In other words, anybody who collects cards for a year could be hired as a qualified grader. This experience is inconsistent with the professional expertise that PSA's consumer-facing marketing implies.

~~133. PSA's marketing of "expert graders" is therefore misleading. PSA tells consumers that its "expert graders" can detect differences submitters "might not be able to tell" and assess details "not visible to the naked eye."[153] But PSA's job description says that graders will "[s]erve as an expert of PSA's card authentication and grading standards."[154] That phrasing suggests the "expert" status is a mere role played within PSA's internal system, not a preexisting professional qualification verified before hire. And PSA's apparent persistent use of contractors, and lack of required grading experience, shows that PSA's designation of graders as experts is performative.~~

[151] *PSA Grader, NJ*, LINKEDIN, https://www.linkedin.com/jobs/view/psa-grader-nj-at-collectors-4243612935 (last visited July 10, 2026); Tobias, *supra* note ~~39~~45; *cf. Sports Card Grading Jobs*, INDEED, https://www.indeed. com/q-sports-card-grading-jobs.html (last visited ~~July 22~~Sept. 28, 2026).

[152] *See* Tobias, *supra* note ~~39~~45.

~~[153] *PSA's Grading Guide*, PSA, https://www.psacard.com/info/get-started (last visited July 22, 2026) (PSA tells consumers that its "expert graders" can detect differences submitters "might not be able to tell," and that its graders "assess every detail of every card, including those not visible to the naked eye.").Sept. 28, 2026).~~

~~[154] *PSA Grader, Santa Ana*, COLLECTORS CAREERS, https://collectorsuniverse.wd1.myworkdayjobs.com/en-US/collectors/job/PSA-Grader--SNA_PL415 (last visited July 22, 2026).~~

~~147.~~134. Publicly available biographies for PSA card graders confirm these concerns. As reflected ~~below~~on the next page, these biographies ~~contain experience~~describe work histories that ~~involve~~include "cleaning bathrooms" and "fryers at local sub shops," writing music jingles and working at stadiums. ~~While noble professions~~Plaintiffs do not contend those occupations are disqualifying. Rather, these experiences are~~ far~~ different from the background and experience that a reasonable consumer would attribute to an expert card grader~~.~~ hired to grade cards. Plaintiffs contend that these biographies corroborate PSA's own disclosures that professional grading expertise may be developed internally rather than a candidate possessing the qualifications when s/he enters PSA's workforce. The inference is that graders may be learning on the job while grading cards.




(PSA grader who worked in restaurant industry and commercial real estate before joining PSA.)






**(PSA grader who worked in restaurant industry and commercial real estate before joining PSA.)**




135. That development process matters because personnel can receive responsibility for valuable cards early in their PSA work. A former PSA research-and-identification employee states that personnel in his department handled vintage cards, including 1950s Bowman cards,

during their first week of departmental training and that he worked with employees who had entered the department without prior collecting experience.[155] Research and identification are distinct from numerical grading, but they are credential-producing stages in which PSA handles, identifies, and routes the card before grading. Plaintiffs allege that these facts also make the adequacy of training, supervision, and handling controls material to PSA's representation that a series of specialized experts reliably produces the final Graded Card Credential.

PSA's confidentiality practices compound that information gap. PSA does not publicly disclose individual grader identities, training records, calibration data, performance metrics, consistency records, or quality-control results.[156] A reported internal Collectors email further reminded employees not to disclose confidential information or trade secrets concerning grading "techniques, methods, practices, [and] processes," while former personnel discussing PSA's operations publicly have invoked NDAs or concealed their identities.[157] Plaintiffs do not contend that confidentiality protections themselves establish wrongdoing. They allege, however, that the need for "trade secrets" protections are unclear when Defendants' competitors make similar information available publicly.[158] Moreover, the breadth of PSA's restrictions, considered together with the specific undisclosed practices alleged herein, materially impedes consumers' ability to test PSA's affirmative claims of expert, standardized, and reliable review and supports the inference that material contrary practices remain concealed. PSA's May 2026 announcement

---

[155] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 22:20–22:32, 26:19–28:10 (2026), https://youtu.be/WDLIFTR2qf0.

[156] Boston Card Hunter, *PSA Just Sent Employees A Warning: Why Now?*, YouTube at 0:24–2:28, 6:43–6:59 (Sept. 11, 2026), https://www.youtube.com/watch?v=zGgnrTKQEQc.

[157] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube (2026), https://youtu.be/WDLIFTR2qf0; Boston Card Hunter, [Interview with "Rob"], YouTube (2026), https://www.youtube.com/watch?v=mD2Gh4lYZbQ.

[158] *See, e.g.*, CGC Cards, *Grade School* series, CGC Cards, https://www.cgccards.com/news/article/10837/csg-grade-school/ (describing and demonstrating grading tools and review of surfaces, centering, edges, corners, and alteration detection).

that demand had outpaced expansion and that it would invest heavily in workforce growth and specialized training reinforces the materiality of those undisclosed controls.[159] **(PSA grader who worked in restaurant industry and commercial real estate before joining PSA.)**

135. The above backgrounds are honorable professions, and Plaintiff does not contend they are disqualifying as a matter of character or intelligence. Rather, Plaintiff contends that they are not the professional grading experience consumers would reasonably associate with an expert-driven service that impacts cards having hundreds, thousands, millions, or tens of millions of dollars in market value.

149.136. PSA's secrecy compounds the problem. On information and belief, PSA requires graders and workers to sign confidentiality agreements limiting what they can disclose about PSA's operations, and PSA does not disclose the identities, qualifications, training records, calibration data, performance metrics, consistency records, or quality-control data of individual graders. No apparent trade secrets warrant such secrecy. Plaintiff contends that these restrictions on disclosure may arise from the desire to conceal an extremely infirmed grading process. PSA's recent announcement that it will invest $200 million in grading infrastructure, including a much-needed "Grader's University," underscores that point.[160] PSA is only now building the formal training infrastructure consumers were led to believe already existed.

**2. PSA Markets Grading as Impartial, Objective, Criteria-Based, and Reliable, But Delivers a Conflicted, Subjective, and Variable Product**

150.137. The deception does not stop with who assigns PSA's card grades. PSA also misrepresents how those grades are determined. PSA markets grading as impartial, objective, criteria-based, reliable, and consistent, causing consumers to believe each grade

---

[159] PSA Staff, *$200 Million Infrastructure Investment*, *supra* note 16.

[160] PSA Staff, *$200 Million Infrastructure Investment*, *supra* note 17; Ricketson, *supra* note 17.

reflects fixed standards applied by trained experts. ~~But again,~~Plaintiffs allege PSA delivers something ~~far~~materially different.

~~151.~~138. PSA President Ryan Hoge ~~has~~ publicly described PSA's grading ~~operations~~operation as "a lightweight manufacturing facility" ~~in which~~where "raw cards come in one end ~~of the building~~" and "go out slabbed . . . the other end,~~"~~" through "eight or nine discrete steps ~~in the manufacturing process,"~~,"[161] with grading itself ~~being~~ only "one of those steps."[162] ~~By Defendants'~~ Plaintiffs allege that PSA's own description~~, PSA's process is structured as~~ reflects a throughput-driven production ~~rather than~~ system materially different from the careful, objective, ~~individualized~~ expert review marketed to consumers. ~~But the issues are far greater than this telling~~The problem extends beyond the factory mill analogy. ~~PSA provides a conflicted Grading~~PSA's Graded Card Credential ~~that is governed by~~is produced through alleged conflicts, malleable criteria, ~~an ambiguous~~subjective "eye appeal~~" override, and proven unreliable by cracking, resubmission,~~" inconsistent outcomes, certification changes, errors, and production ~~-~~ pressure. The production targets and operational evidence~~.~~ alleged below confirm that PSA's manufacturing model is not merely a description of workflow; rather, grading itself operates within a system managed for quantified throughput rather than individual, unbiased condition assessment.[163]

### a. PSA's Claimed Impartiality ~~is Incompatible~~Conflicts with ~~Collectors' Downstream~~Corporate and Personal Financial Interests

~~152.~~139. PSA represents that its grades provide "impartial, third-party validation," that it has "no financial stake in the item's sale," and that "[a]ll perceived conflict of interest is

---

[161] NEO Cards & Comics, *PSA Is Raising Prices (Again)*, *supra* note 23, at 10:15–10:47.

[162] ~~NEO Cards & Comics, *PSA Is Raising Prices (Again)*, *supra* note 23, at 10:15–10:47.~~ *Id.*

[163] *See infra* ¶¶ 159–162.

eliminated."[164] But~~, as alleged above,~~ Collectors participates in pricing, custody, offers, resale, marketplace flow, and financing tied to PSA-graded cards~~.~~[165] ~~Those downstream positions give,~~ while PSA's own compensation can increase based on the post-grading value materially affected by the grade PSA assigns.[166] Defendants therefore hold economic interests in the value, liquidity, scarcity, and disposition of assets whose market credential PSA itself ~~assigns. Plaintiff alleges, therefore,~~creates. Plaintiffs allege that PSA's categorical ~~claims~~representations of no financial stake and eliminated conflict are false or materially misleading~~. Whether~~ because Defendants do not disclose those interests ~~affected~~ or the safeguards, if any ~~particular grade is a matter for discovery, but the undisclosed existence is material~~, that separate them from grading decisions.

140. The conflict also extends to Collectors' senior leadership. Nat Turner is Collectors' CEO and Executive Chairman and one of the hobby's most prominent collectors. In 2023, Turner reported owning approximately 15,000 to 20,000 PSA-graded cards, another approximately 5,000 BGS-graded cards, approximately 5,000 unopened boxes, and hundreds of thousands of additional raw cards.[167] Those holdings give Turner a personal economic interest in the scarcity and relative value of PSA-graded cards because PSA itself assigns the grades and publishes the grade populations that the market uses as scarcity signals. In separate litigation, collector Steve Lichtman alleges a concrete example of that conflict: PSA refused to cross Lichtman's SGC 10 1952 Bowman Mickey Mantle into a PSA 10 while Turner allegedly owned

---

[164] *Tips for Collectors*, *supra* note 10; *see also* **Exhibit D**; Joe Orlando, *Top 5 Tips for Internet Buying & Selling*, PSA (July 28, 2010), https://www.psacard.com/articles/articleview/6318/top-5-tips-internet-buying-selling~~*supra* note 10.~~ (stating that PSA has "no financial interest in the sale" and therefore "there is no conflict of interest perceived by the buyer anymore").

~~[165] *See supra* ¶¶ 11–15, 85–100.~~

[166] *See* supra ¶¶ 11–15, 85–115; *see infra* ¶¶ 186–190.

[167] Greg Bates, *How Passionate Collector, Industry CEO Nat Turner Assembled One of Hobby's Largest, Most Valuable Card Collections*, **Sports Collectors Digest** (June 15, 2023), https://sportscollectorsdigest.com/news/nat-turner-collection-cards-michael-jordan-lebron-james-kobe-bryant-collectors.

one of only two known PSA 10 examples, meaning another PSA 10 allegedly would have reduced the rarity and relative value of Turner's competing card.[168] Plaintiffs do not plead Lichtman's allegations as adjudicated facts; they plead them as a specific factual allegation supporting the reasonable inference that substantial undisclosed personal inventory can create the very financial conflict PSA tells consumers has been eliminated.

141. PSA personnel also participate personally in the same graded-card market. Collectors publicly advertises employee discounts on select grading services.[169] A former PSA Research and Identification employee states that he personally submitted cards through PSA while employed there and noted that graders commonly submitted and resold personally owned graded cards through eBay and card shows.[170] A reported September 2026 internal email from CEO Turner separately reminded Collectors employees that adherence to company policies "protects the integrity of our brand" and prohibited employees from influencing their own orders, family-member orders, or orders of persons with whom they have close personal relationships through grading, verification, authentication, handling, expediting, direct employee contact, or grading-system access. The reported email linked to an Employee Collectible Market Participation Policy and a Grader/Authenticator Anti-Self-Interest Policy.[171] Those restrictions support the reasonable inference that Collectors itself recognizes employee market participation

---

[168] Complaint ¶¶ 43–48, *Lichtman v. Collectors Universe, Inc.*, No. 30-2026-01587094-CU-BC-CJC (Cal. Super. Ct. Orange Cnty. July 21, 2026), removed, No. 8:26-cv-02048-MRA-ADS (C.D. Cal. July 30, 2026), ECF No. 1-1.

[169] *See* Collectors, *Careers*, https://www.collectors.com/careers (last visited Sept. 27, 2026) (advertising employee discounts consisting of "special savings on select grading services").

[170] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 8:33–11:57 (Sept. 2026), https://youtu.be/WDLIFTR2qf0 (former employee describing his own PSA submissions, employee grading discounts, in-office pickup, and employee resale activity and estimating that 60% to 70% of researchers and graders resold personally owned cards).

[171] Boston Card Hunter, *PSA Just Sent Employees A Warning: Why Now?*, YouTube at 0:24–2:28, 6:43–6:59 (Sept. 11, 2026), https://www.youtube.com/watch?v=zGgnrTKQEQc (reporting and reading an internal email attributed to Turner and identifying linked employee-market-participation and anti-self-interest policies).

and self-interest as risks to the integrity of its grading brand. The publicly reported summary does not disclose whether or how the complete policies address a distinct conflict alleged here, namely that graders or other credential-producing personnel own and sell card inventory that competes economically with cards whose grades and scarcity they help determine.

#### b. PSA's Undisclosed Criteria Changes Make Its Published Standards Malleable

~~153.~~142. PSA repeatedly markets grading as the application of objective standards, but then it changes those standards from time -to -time without explanation or notice. For example, in or around January 2025, PSA changed the critical front centering criteria published on its website. Under its prior standards, a card could qualify as a PSA 10 with front centering approximately at 60/40; a PSA 9 at 65/35; and a PSA 8 at 70/30. PSA eliminated those tolerances, limiting the key front centering criteria to 55/45 for PSA 10, 60/40 for PSA 9, and 65/35 for PSA 8. The changes represented a reduction in tolerances from 80% to 90% dead center for the crucial PSA 10 grade with similar reductions down the top grading tiers. Digital archives show how PSA's published standards on January 14, 2025, differed from its standards on January 30, 2025. PSA never told consumers that it changed the tolerances represented on its website that PSA publicly marketed.







**(Comparison screenshot showing PSA's published grading-standard language before and after PSA revised centering tolerances for PSA 8, PSA 9, and PSA 10.)**

143. PSA changed the published tolerances above without any contemporaneous notice identified on the grading-standards page or elsewhere, even though the revised criteria materially changed what the published standards told consumers could qualify for PSA's highest grades. PSA's explanation ~~about the change~~ confirms the deception. On the March 12, 2025, episode of

*The PSA Pod*, PSA President Ryan Hoge ~~downplayed~~characterized the ~~change~~revision as merely a "grading standards language update," stating that PSA ~~"revised the language to remove~~removed the 60/40 component~~,"~~ because 55/45 had "always been the standard~~," meaning~~" and that PSA "did not" change the rules.[172] That explanation ~~is not reassuring.~~creates two possibilities, and both support Plaintiffs' fraud theory. If 55/45 was always ~~the true~~PSA's operative PSA 10 standard, then PSA's prior published ~~tolerance~~standard allowing centering "not to exceed approximately 55/45 to 60/40" materially misrepresented the rule PSA says it actually applied. If PSA's operative standard instead became stricter, then the representation that PSA merely changed website language and "did not" change the rules was materially misleading. ~~PSA's supposedly~~Either way, consumers were shown one purportedly objective ~~centering standards~~ standard while PSA says it was applying another.

~~154.~~144. The grading-standard issue is not limited to competing interpretations of archived website language. In a separate complaint, Lichtman alleges that during a summer 2025 meeting Turner personally confirmed that PSA's grading standards had changed in recent years and had become stricter and more exacting than before Collectors acquired PSA in 2021.[173] If proven, Turner's statement is management-level evidence that PSA's operative standards changed and that Collectors' leadership knew of those changes while PSA publicly characterized at least some revisions as merely changes in website language. Moreover, these incidents are ~~not fixed~~evidence that PSA changes its grading standards~~. They are discretionary guidelines that PSA can apply, relax, tighten, or rewrite~~ without ~~notice at any time for~~ any ~~card. That is~~

[172] PSA Official, *The PSA Pod- Key early 2025 PSA updates with President Ryan Hoge* at 18:00–21:38, YOUTUBE (Mar. 12, 2025), https://www.youtube.com/watch?v=GjNDFwBWQf0.

[173] Complaint ¶¶ 37–40, 69, *Lichtman v. Collectors Universe, Inc.*, No. 30-2026-01587094-CU-BC-CJC (Cal. Super. Ct. Orange Cnty. July 21, 2026), removed, No. 8:26-cv-02048-MRA-ADS (C.D. Cal. July 30, 2026), ECF No. 1-1.

~~misleading and detrimental to consumers~~or proper notice. Plaintiffs allege that their submissions faced hasher scrutiny than PSA's published standards.

### c. PSA's Eye-Appeal Standard Makes Grading Subjective

~~155.~~145. Despite advertising objective standards to build market confidence, ~~PSA's own materials reveal that grading ultimately turns on~~PSA employs a subjective override~~.~~ ~~Scrolling far below~~ capable of changing the ~~grading standards on its website, PSA added a centering note around the time that it changed the centering criteria in 2025. That statement reads,~~application of otherwise measurable criteria. PSA's grading page states: "***Centering Note**: At the grader's sole discretion, a small variance may be permitted on occasion based on the card's overall eye appeal." ~~In an article immediately above that note titled "The Importance of Eye Appeal and Subjectivity in Grading," PSA states "there are a host of grading questions that arise and the one basic question that comes up the most has to do with eye appeal and centering."[174]~~ ~~PSA~~ PSA separately explains~~,~~ that although "a large part of grading is objective," ~~including locating print defects, staining, surface wrinkles, and measuring centering, "the other~~another component ~~of grading~~ is "somewhat subjective~~."[175] PSA did not state it determines that subjective grading component through fixed, measurable, or independently verifiable criteria like the use of spectrophotometers or densitometers, video spectral comparators or UV-Vis-IR imaging. PSA~~ ," and states~~, instead,~~ that "the best way to define the subjective element" is ~~by asking~~to ask: "What will the market accept for this particular issue?"[176] PSA thus does not define that component by a fixed physical-condition measurement. It expressly permits an unidentified

---

~~174 *Grading Standards*, *supra* note 2.~~

~~175 *Id.*~~

176 *Grading Standards*, PSA, https://www.psacard.com/gradingstandards ~~*Id.*~~ (last visited Sept. 27, 2026).

grader's judgment about market acceptance to enter the condition grade that PSA then sells to the market as authoritative.

~~156.~~146. That question is not an objective grading criterion or subjective opinion. It is at best a guess that allows PSA to grade cards based on perceived market tolerance rather than on ~~a fixed card condition.~~an alleged expert assessment of surface condition, centering, corners, edges, and other physical condition characteristics. The circularity in this definition is material because consumers pay PSA to define for the market a card's condition, but ~~PSA's~~PSA says market acceptance determines the grade PSA assigns. A reasonable consumer would not understand that the final grade may be adjusted upward or downward based on an unidentified (and perhaps unqualified) grader's subjective view of market acceptability. ~~Plaintiff alleges, upon information and belief, that while PSA may use imaging equipment to authenticate cards (a process that is likely automated), its graders do not use such equipment given time constraints.~~ Instead, graders rely on a highly subjective, undefined eye-appeal standard that is inconsistent with the standards ~~upon which~~ Defendants ~~told~~represented to consumers and ~~sold~~ the market.

~~157.~~147. PSA President Ryan Hoge confirmed the point when responding to strong public criticism about grading inconsistency. Hoge stated that PSA offers an "opinion-based service," that "the opinion can change," and that one grader may view a flaw as more detrimental and penalize the card more than another grader would.[177] ~~That admission is inconsistent with PSA's marketed image of objective, uniform, criteria-based grading. It turns grading from "somewhat subjective" to entirely subjective~~Those admissions confirm that materially different grader judgment can affect the final score assigned to the same observed condition. Plaintiffs

---

[177] The Geoff Wilson Show, *EXPLOSIVE INTERVIEW: PSA President Ryan Hoge on Card Cleaning, New Slabs, AI Grading & More!* at 24:10, YOUTUBE (Apr. 24, 2024), https://www.youtube.com/watch?v=8bfuICkhi4s.

allege that this grader-to-grader variability materially qualifies PSA's simultaneous representation that its market-authoritative, Graded Card Credential results from objective, standardized, criteria-based review. The fraud here is not that professional judgment exists; it is that PSA sells the authority of standardized grading while materially understating the discretion capable of changing the result. These misperceptions induced Plaintiffs to submit their cards.

d. **Cracking and Resubmission Show Non-Repeatability**

~~158.~~148. PSA's subjective grading framework produces a predictable consequence of cracking and resubmission. In the hobby, "cracking" means removing an already graded card from its plastic holder to resubmit in pursuit of a different grade. Resubmissions occur when a consumer receives a grade that s/he wants PSA to re-review in search of a better result. If PSA grading were criteria-based and reliable, the same unchanged card should receive substantially the same grade under materially similar conditions. Cracking and resubmission exist because that is not how PSA grading functions. The card remains the same, but what changes is the grader, timing, production pressure, and undisclosed ~~internal~~ guidance~~, and subjective judgment~~ applied during review.

~~159.~~149. ~~PSA's service architecture is designed to generate repeat grading~~ PSA monetizes this variability through paid review, resubmission, crossover, and related services~~, for additional fees~~.[178] Those services ~~confirm that PSA does not treat grades as final, fixed determinations. Rather,~~permit PSA ~~anticipates that cards will be reconsidered, reprocessed,~~to collect additional fees when consumers seek another assessment of the same card or ~~converted~~seek to convert an existing competing credential into a PSA Graded Card Credential. Plaintiffs allege that the resulting repeat-service revenue gives PSA a direct economic benefit

[178] *Frequently Asked Questions, supra* note ~~77~~83; *Trading Card Review*, PSA, https://www.psacard.com/services/tradingcardgrading/review (last visited July 4, 2026); *Crossover, supra* note ~~116~~105.

from variability in ~~ways that may produce a different market result for more money~~the same grading process it markets as reliable. Public examples illustrate this inconsistency in grading approach.

~~160.~~150. In a documented hobby-media experiment, Tyler Nethercott, who publishes under the name "T-Pott," submitted the same 1989 Upper Deck Ken Griffey Jr. rookie card to multiple grading companies and reported materially divergent results. Relevant here, PSA first graded the card a 6 and later graded the same card an 8 on resubmission—dramatically different scores.[179] The ~~PSA result is inconsistent with its representation that grading reflects a standardized, objective, reliable expert process~~reported PSA 6-to-8 change on the same unchanged card is direct evidence that materially different PSA grades can result from repeat assessment and supports Plaintiffs' allegation that PSA's grading is less reliable and standardized than the Graded Card Credential it markets.

~~**e. Clerical Errors, Certification Deactivation, and After-the-Fact Grade Changes Show the PSA Credential Is Not Durable**~~

~~148. PSA's grading fraud is not limited to subjective judgment, undisclosed standards shift, or inconsistent application of grading criteria. It also includes execution errors and PSA's unilateral ability to correct, alter, revoke, downgrade, or deactivate certification records even after a grade has entered the market. But like its operations, graders' identity and performance, PSA keeps its errors and deactivations a secret.~~

151. PSA's treatment of at least some identifiable resubmissions further undermines the appearance of a blind reassessment. A former PSA Research and Identification employee states that when PSA's system recognizes a previously graded serial-numbered card, the

[179] Market Movers by Sports Card Investor, *SHOCKING RESULTS! I Sent The SAME Card to FIVE Different Grading Companies*, YOUTUBE (Feb. 23, 2026), https://www.youtube.com/watch?v=wD7n8kHvySs&t=1304s.

researcher must identify the prior order, certification number, and grade in a certification comment and select "alert graders."[180] Yet PSA's Terms state that a card removed from a PSA holder will be treated "as if it were never graded by PSA" and may receive a different grade on resubmission.[181] Plaintiffs allege that consumers paying for reassessment would consider it material that PSA may affirmatively provide graders with the very prior grade being reconsidered. That undisclosed information makes the review non-blind and can anchor the new determination to the prior result. Moreover, this information allows a reasonable inference that graders may receive other information that can influence the cards that they grade. PSA's nondisclosure agreements shield this critical information from public scrutiny.

### e. **Altered, Erroneous, and Revised Certifications Undermine the Reliability of the PSA Graded Card Credential**

152. PSA's grading fraud is not limited to subjective judgment, changing standards, or inconsistent application. The reliability of the Graded Card Credential also depends on PSA correctly determining whether a card is eligible for a numerical grade, accurately executing the grade, and maintaining a reliable certification after issuance. PSA's own Terms state that PSA will not assign a numerical grade to an item that, in PSA's judgment, bears evidence of damaged or altered surfaces or other doctoring, while also reserving PSA's authority later to remove a card from its holder, change its grade or label, or deactivate a certification if PSA determines that the item was incorrectly graded, altered, counterfeit, or otherwise ineligible.[182] Plaintiffs allege that

[180] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 38:16–39:27 (Sept. 2026), https://youtu.be/WDLIFTR2qf0.

[181] PSA Submission Services Online Terms § 9, https://www.psacard.com/termsandconditions (last visited Sept. 27, 2026).

[182] PSA Submission Services Online Terms §§ 12(e), 12(f), 12(k), https://www.psacard.com/ termsandconditions (last visited Sept. 27, 2026).

those corrective powers make the frequency, causes, and consequences of cards incorrectly admitted into PSA's grading and certification system material to the reliability PSA sells.

~~162.~~153. Publicly reported incidents show why that omission is material. As reflected in the screenshot on the next page, Nick Andrews, who publishes hobby-media commentary under the name "Boston Card Hunter," documented an instance in which PSA allegedly assigned an incorrect grade to a consumer's card.[183] Yet PSA does not publicly disclose the data showing the categories, frequency, ~~scope,~~ causes, correction, or remediation ~~rate~~ of ~~such clerical~~ grading and certification errors~~.~~ necessary to evaluate its reliability claims.




[183] Boston Card Hunter, *This PSA Error Will Make You Rethink Your ENTIRE Collection*, YOUTUBE (Apr. 15, 2026), https://youtu.be/BwUaZP6tWnc.




(**Screenshot altered to include photo of subject card ~~grade~~graded PSA 1 next to PSA email concerning the card**).

~~163.~~154. EDI Sports Cards documented a different example involving a Ken Griffey Jr. minor-league card. In that case, PSA allegedly deactivated the card's certification number, so PSA's website no longer reflected the card as graded. After the owner contacted PSA and then returned the card at PSA's request, PSA allegedly informed the owner that the original PSA 10 grade was a clerical error, cracked the card from its holder, and re-encapsulated it as a PSA 9.[184] ~~The~~ Plaintiffs allege the incident is significant because PSA ~~erased~~deactivated the ~~existing~~publicly accessible certification ~~record~~, took back the slabbed card, reduced the grade, and returned a materially less valuable credential after the original PSA 10 had already entered the stream of commerce.

~~151. These incidents expose a fundamental weakness in the PSA credential. PSA presents each grade as a durable output of an expert-driven process and affixes that grade to a~~

[184] ediSportscards, *PSA Robs Collector of $2200 of Value - What's the Lesson?* at 1:14–2:19, YOUTUBE (Apr. 22, 2026), https://www.youtube.com/watch?v=H5cP62AE83w.

tamper-evident holder bearing a unique certification number that consumers and the market treat as permanent and verifiable. Yet, the Grading Credential are prone to error at a rate undisclosed to consumers and the market. PSA's limited public response to error-rate concerns underscores the problem rather than cure it.

152. In a public interview, PSA President Ryan Hoge addressed grading mistakes, stating that PSA grades approximately two million cards per month and the "vast majority" are done correctly and estimated fewer than 100 errors out of roughly two million monthly grades.[185] If PSA maintained a reliable, tracked, and auditable error rate, PSA would disclose that metric, methodology, and categories of included errors. But PSA only offers an unofficial vague estimate while withholding the data needed to assess the reliability of its estimate and processes.

153. Like errors, PSA retains and uses the ability to alter or deactivate cards without publicly disclosing how often it does so, why it does so, or how those changes affect consumers who paid for the original grading service or populations reports. A grade that can be altered, deactivated, downgraded, or effectively erased after issuance is not the durable market credential PSA markets. It is a database entry controlled by PSA. Any time a consumer submits a card to PSA for an ancillary service, like reholdering, that consumer risks the grade being changed. Consumers pay PSA believing that the grade, holder, label, and certification number create a stable, verifiable asset. But PSA's undisclosed ability to revise that credential after the fact shows that the product consumers receive is less durable, final, and reliable than what PSA sells.

155. A more recent incident concerns whether a card was eligible for a numerical grade at all. The seller of a serial-numbered 05/10 2024 Panini Clearly Donruss Caleb Williams rookie card states that its acetate backing arrived peeling; Panini classified his replacement claim

[185] Sports Cards Nonsense, *PSA Just Exposed a $200M Fake Card Scandal…* at 52:20-64:00, YOUTUBE (May 8, 2026), https://www.youtube.com/watch?v=fadGbN5M1eQ.

as "FACTORY DAMAGED / FOIL PEELING" but denied replacement; he then removed the remaining backing and disclosed that removal to PSA in writing when submitting the card.[186] PSA nevertheless issued certification no. 124715958 with a GEM MT 10 grade—the sole PSA 10 example, with none higher.[187] PSA's published standards identify "Altered Stock" as a no-numerical-grade condition, and its Oline Terms state that PSA will not numerically grade items bearing, in its judgment, damaged or altered surfaces or other evidence of doctoring.[188] If the seller's account of his written disclosure is accurate, PSA had express notice that a manufactured component had been removed yet awarded its highest numerical grade.




**(Screenshots eBay posting of altered submitted to PSA that received a Gem Mint Grade)**.

[186] *2024 Panini Clearly Donruss—Clearly Bomb Squad Caleb Williams #1 Gold /10 (RC)*, eBay Item No. 307132145679, https://www.ebay.com/p/19079476017 (listing and images preserved Sept. 20, 2026).

[187] PSA Certification Verification No. 124715958 (record and screenshot preserved Sept. 27, 2026).

[188] *Grading Standards*, PSA, https://www.psacard.com/gradingstandards (last visited Sept. 27, 2026) (identifying "N5 Altered Stock" and providing for an "Authentic Altered" designation rather than a numerical grade); PSA Submission Services Online Terms § 12(e), https://www.psacard.com/termsand conditions (last visited Sept. 27, 2026).

156. These incidents expose different failure modes in the same credential-producing system: an incorrect grade or label, a certification later downgraded after entering commerce, and an allegedly altered card admitted into the highest numerical grade despite claimed advance disclosure. Fraud allegation is not the mere occurrence of errors or mistakes. It is that PSA sells the Graded Card Credential as the durable and reliable output of expert review, grade check, and quality assurance while concealing the information necessary to determine how often ineligible or materially incorrect credentials enter the market and later require correction. These issues damage the Graded Card Credentials that Plaintiffs received.

157. PSA President Ryan Hoge has publicly estimated that PSA makes fewer than 100 errors out of approximately two million cards graded in a month.[189] But PSA has not publicly disclosed the methodology underlying that estimate or what PSA counts as an "error"—including whether the figure includes numerical-grade errors, research or identification errors, clerical label errors, altered or ineligible cards that receive numerical grades, errors caught before release, or post-issuance corrections and deactivations. Without those categories and source data, consumers cannot test the estimate against PSA's representation that its Graded Card Credential is reliably produced.

158. PSA also retains continuing control over a Graded Card Credential after it enters the market. Its Online Terms authorize PSA, upon later examination, to change a grade or label, remove an item from its holder, refuse to return an item with a grade PSA now considers incorrect, and deactivate previously issued certifications for items PSA believes are altered, counterfeit, tampered with, or otherwise in violation of its terms.[190] Those powers confirms that

[189] Sports Cards Nonsense, *PSA Just Exposed a $200M Fake Card Scandal…* at 52:20-64:00, YOUTUBE (May 8, 2026), https://www.youtube.com/watch?v=fadGbN5M1eQ.

[190] PSA Submission Services Online Terms §§ 4(c), 12(f), 12(k), https://www.psacard.com/termsand conditions (last visited Sept. 27, 2026).

the issued credential is not immutable. Plaintiffs allege that PSA materially overstates durability and reliability when it markets a stable, verifiable Graded Card Credential while withholding how often issued grades and certifications later require correction, downgrade, removal, or deactivation and how those changes affect Population Reports and prior market transactions.

### f. High Demand and Production Pressure Undermine PSA's Claimed Reliability

154. PSA's own volume and former-grader accounts show a production environment inconsistent with careful, expert, criteria-based review. PSA said that it grades about 90,000 cards per day.[191] In a Boston Card Hunter segment, an alleged former PSA grader described the grading process as taking "seconds" per card, estimated a grader will review 500 to 700 cards per eight-hour shift as a "close," which was possibly a low estimate, and then suggested that speed and production quotas are root causes of inconsistent grading outcomes.[192]

155. Defendants' public statements about grading capacity also demonstrate a lack of sufficient grading resources to handle grading volume. PSA employed as few as 14 graders for many years, before expanding to 44 graders by the time of Collectors' acquisition, and allegedly grew to "more than 100 graders" by 2022.[193] Collectors' CEO Nat Turner acknowledged that grading is difficult work for which good candidates are hard to find.[194] As of January 2025, hobby-industry reporting based on present and former PSA employee sources stated that PSA

[191] *An Update on Pricing and Services at PSA (February 2026)*, PSA, https://www.psacard.com/info/submission-updates (last visited July 22, 2026).

[192] Boston Card Hunter, *Confessions of An Ex-PSA Grader* at 6:40–9:35, 13:05–18:45, YouTube (Dec. 30, 2025), https://www.youtube.com/watch?v=YuxbvPhoWhQ.

[193] Collectors Universe, Inc., *Annual Report (Form 10-K)*, Item 1, Business (Aug. 26, 2020), https://www.sec.gov/Archives/edgar/data/1089143/000149315220016754/form10-k.htm; Collectors Universe, *Annual Report* (2019), *supra* note 50, Item 1, Business.

[194] Greg Bates, *Good news for collectors: PSA, Beckett making progress on backlog of grading submissions*, Sports Collectors Digest (Nov. 2, 2021), https://sportscollectorsdigest.com/news/psa-beckett-card-grading-progress-update-submissions (quoting Nat Turner, then-CEO of Collectors Universe, parent of PSA).

reportedly employed about 100 graders.[195] Against PSA's reported daily card grading volume, that limited workforce does not afford a careful, expert review for each card. Rather the grading card volume against the estimated grading workforce supports the daily production figures represented on the Boston Card Hunter episode with the former grader.

156. Demand spikes make the problem worse. In 2021, PSA CEO Nat Turner stated that PSA had doubled capacity and doubled the size of its grading team in response to backlog pressure.[196] In February 2026, PSA stated that it had expanded capacity through investments in people, facilities, and technology, increasing from approximately 15,000 cards per day globally in 2021 to approximately 90,000 cards per day globally in 2026.[197] These facts support Plaintiff's inference that PSA's quality-control infrastructure lagged behind its volume-driven expansion.

159. PSA's production environment is not merely an analogy. PSA's own current grader posting requires graders to evaluate cards "in an expedient manner," "maintain individual daily grading production goals," and work in a "high-paced environment," while maintaining accuracy.[198] A former PSA Research and Identification employee states that at the East Coast operation known to him, graders were expected to complete approximately 500 units per day, researchers approximately 600 units per day, and the Research Department approximately 26,000 cards per day; he also described mandatory ten-hour shifts during backlog surges.[199] Those operational facts corroborate the previously reported former-grader account estimating

[195] Matt Felumlee, *Behind the Scenes at PSA: the Card Grading Process*, CARDHOUND VINTAGE (Jan. 23, 2025), https://cardhoundvintage.com/behind-the-scenes-at-psa-the-card-grading-process/.

[196] Bates, *Good news for collectors*, *supra* note 140.

[197] PSA Staff, *An Update on Pricing and Services at PSA (February 2026)*, PSA (Feb. 10, 2026), https://www.psacard.com/articles/articleview/15663/grading-services-update-february-2026.

[198] *PSA Grader, NJ*, Collectors Careers, https://collectorsuniverse.wd1.myworkdayjobs.com/en-US/collectors/job/PSA-Grader--NJ_PL313 (last visited Sept. 27, 2026).

[199] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 14:30–15:35 (Sept. 2026), https://youtu.be/WDLIFTR2qf0.

approximately 500 to 700 cards per shift and describing grading in seconds.[200] Plaintiffs allege that PSA imposes quantified throughput requirements on the very expert judgment it markets as careful, individualized, and reliable.

160. PSA's public staffing history shows how quickly that production system had to scale. Collectors Universe's 2020 Form 10-K identified forty-four customer-service and support personnel (not 44 graders) and 33 trading-card experts as of June 30, 2020.[201] Industry reporting later described PSA as employing approximately 100 graders as of January 2025.[202] Against PSA's reported output of approximately 90,000 cards per day, those figures, together with PSA's express daily production goals and the operational accounts above, support Plaintiffs' inference that PSA's grading model necessarily depends on high-volume throughput rather than extended individualized deliberation over each card's condition to arrive at a grade.

161. Demand spikes intensified those production pressures. PSA states that its global grading capacity increased from approximately 15,000 cards per day in 2021 to approximately 90,000 per day by 2026.[203] The former Research and Identification employee described mandatory ten-hour shifts during a backlog surge and stated that employees understood that failure to meet assigned production numbers could result in performance termination; he described an operational emphasis on repeatedly "hitting your number" and fatigue among

[200] Boston Card Hunter, *Confessions of an Ex-PSA Grader*, YouTube at 6:40–9:35, 13:05–18:45 (Dec. 30, 2025), https://www.youtube.com/watch?v=YuxbvPhoWhQ.

[201] Collectors Universe, Inc., *Annual Report (Form 10-K)*, Item 1, Business (Aug. 26, 2020), https://www.sec.gov/Archives/edgar/data/1089143/000149315220016754/form10-k.htm; Collectors Universe, *Annual Report* (2019), *supra note 56*, Item 1, Business.

[202] Greg Bates, *Good News for Collectors: PSA, Beckett Making Progress on Backlog of Grading Submissions*, Sports Collectors Digest (Nov. 2, 2021), https://sportscollectorsdigest.com/news/psa-beckett-card-grading-progress-update-submissions; Matt Felumlee, *Behind the Scenes at PSA: The Card Grading Process*, CardHound Vintage (Jan. 23, 2025), https://cardhoundvintage.com/behind-the-scenes-at-psa-the-card-grading-process/.

[203] PSA Staff, *An Update on Pricing and Services at PSA (February 2026)*, PSA (Feb. 10, 2026), https://www.psacard.com/articles/articleview/15663/grading-services-update-february-2026.

Research personnel.[204] Plaintiffs allege that increasing daily output approximately sixfold while imposing quantified production expectations and performance consequences created predictable pressure on the training, supervision, consistency, and quality controls necessary to deliver the expert Graded Card Credential that PSA marketed.

~~170.~~162. The result is a production-driven grading system materially different from the one PSA markets. Consumers are not told at the point of submission that ~~their cards may be graded in seconds, by recently trained or rapidly added staff or contractors, under production quotas. Those omissions reinforce the false impression that PSA grades are the product of careful objective review rather than high-volume discretionary judgment exercised under speed-output~~PSA graders work under individual daily production goals, that internal operations allegedly impose specific numerical targets and performance consequences, or that demand spikes have produced mandatory extended shifts. Those facts do not merely describe a busy workplace. Plaintiffs allege that they are material operating conditions affecting the expert judgment, consistency, and reliability for which consumers pay and that PSA's failure to disclose them reinforces the false impression that its credential results from careful, criteria-based review unconstrained by production pressure.

#### g. ~~**PSA Controls**~~**PSA's Undisclosed Grading Practices Shape Gem-Mint Populations** ~~**Through Hidden Discretion and Ratio-Based Grading**~~

~~171.~~163. PSA's ~~terms and conditions provide~~Online Terms give it ~~with unfettered~~substantial continuing control over ~~card~~ grades~~,~~ and certifications.[205] ~~including the~~

---

[204] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 14:30–15:35, 23:19–24:24 (Sept. 2026), https://youtu.be/WDLIFTR2qf0.

[205] *See PSA Submission Services Online Terms ~~and Conditions~~* §§ 12(f), 12(k) (last updated Apr. 22, 2026), https://www.psacard.com/termsandconditions (providing that PSA may "change the grade/label as it deems appropriate," will not return an item bearing its original grade after determining that the item was ~~overgraded~~over graded, and may deactivate a previously issued certification after the item has been encapsulated and returned to its owner); *PSA Authenticity and Grade Guarantee*, *supra* note ~~112~~*101*, "Guarantee Remedies" ¶ 2~~,~~ (providing that

~~ability to manage the supply of~~ PSA necessarily shapes Gem Mint 10 ~~grades—the~~ populations through the practices that determine which cards receive its highest and most valuable credential ~~that PSA issues. A PSA 10 grade receives market premium values, and the number of PSA 10s for a given card is the result of PSA's decisions to award or withhold that Gem Mint credential. When PSA uses~~. That effect requires neither an express quota nor an intentional cap. Differences in grader experience, heightened scrutiny of particular cards, subjective eye appeal, ~~undisclosed~~changing criteria ~~changes,~~ , production pressure, batch or ratio-based review, managerial intervention, certification ~~deactivation, after-the-fact grade alteration, high-speed grading, or internal guidance to decide which cards receive PSA 10s~~ changes, and ~~which are diverted into PSA 9 or lower grades, PSA controls~~other undisclosed practices can systematically affect PSA 10 outcomes and the scarcity ~~premium attached to Gem Mint status. Plaintiff alleges that Defendants intentionally use these mechanisms to control Gem Mint populations~~premiums they create. Because PSA publishes those outcomes as market-facing scarcity data, the practices capable of shaping them are material whether their population effects are intended or merely systemic.

~~172.~~164. Defendants' own public statements provide evidence ~~of ratio-based Gem Mint control.~~that considerations beyond an individual card's condition can affect grading outcomes. When consumers questioned PSA's acquisition of Pokémon cards from a submitter during grading—cards PSA initially graded 9, acquired through an instant offer, and ~~then~~ later regraded 10 for resale—~~PSA defended the regrades~~PSA's explanation, conveyed through ~~its~~ business partner ~~or spokesperson~~ Geoff Wilson~~. He explained that the grade changes occurred~~

PSA may assign an authentic card a lower grade or deem it ineligible for a grade and return the card bearing the revised grade).

~~after the acquisition because of a~~ , attributed the secondary review ~~driven by~~in part to the submitter's "ratio of cards submitted" without receiving a ~~single~~ perfect grade.[206] If each card were ~~graded solely on its own condition, the submitter's Gem Mint ratio would be irrelevant. Based on PSA's marketing, consumers expect the grade to turn on the card's centering, corners, edges, surface, and condition — not on how many cards in the batch received PSA 10s.~~ evaluated solely on its own condition under the represented criteria, the proportion of PSA 10s elsewhere in the submission would have no reason to enter the explanation for re-review. The incident does not require Plaintiffs to prove a formal numerical quota; it supports the reasonable inference that submission-level grade distribution can trigger additional scrutiny capable of changing an individual grade and, consequently, aggregate grade populations. Plaintiffs contend that these same scrutiny practices adversely impacted the determinations for their cards.

~~173.~~165. ~~In the alternative, Defendants have the ability, incentive, and undisclosed means to manage grade outputs, and the resulting~~On information and belief, PSA's internal practices can shape grade distributions ~~are plausibly consistent with that control. Ratio-based grading like in the Pokémon incident converts grading from an individual condition assessment into a managed distribution of Gem Mint outcomes. PSA's high-speed production environment makes Gem Mint control scalable. Internal guidance, batch monitoring,~~at scale even without an express population control quota. Differences in grader assignment and experience, heightened scrutiny of premium or high-value cards, internal calibration~~ instructions, or~~ , batch review, managerial intervention, production pressure, and eye-appeal overrides ~~can~~systematically affect PSA 10 outcomes~~ across large volumes of graded cards, yet~~. PSA does not disclose whether

[206] The Geoff Wilson Show, *It's NOT a Conspiracy: PSA's Mysterious Grade Swap EXPLAINED* at 3:16–9:48, YOUTUBE (Dec. 10, 2025), https://www.youtube.com/watch?v=CI5TH_eKNkQ (Geoff Wilson stating that he has an "extensive business relationship with PSA" and that he obtained information from PSA about the incident).

particular categories of cards receive different scrutiny, whether graders are assigned based on card value, age, or type, or whether graders are trained, evaluated, supervised, or corrected ~~based on expected Gem Mint ratios. The non-disclosure agreements prevent sharing any of those details.~~ by batch- or population-level outcomes. Those facts are uniquely within Defendants' control and appropriately tested through discovery.

~~174.~~166. ~~But the public Gem Mint patterns are inconsistent with purely condition-based grading.~~Public population data provides additional evidence of systematic population effects. Cards within the same product release ~~are produced through~~generally undergo the same ~~printing, cutting, packaging,~~manufacturing and distribution processes regardless of the player, character, or subject depicted. ~~A superstar's base card and a lower-demand base card from the same issue are not manufactured under different quality standards merely because one later becomes more valuable. Plaintiff alleges that aggregated PSA population data show recurring Gem Mint-rate disparities in which scarcity concentrates around commercially important cards~~PSA population data reflects materially different Gem Mint rates across cards and categories.[207] Independent ~~Gem Rate-based~~GemRate analysis also ~~reports material~~ shows substantial changes in PSA Gem Mint rates over time, ~~different Gem Mint-rate patterns for~~ divergent sports~~-cards~~-card and TCG ~~cards~~patterns, and ~~raw~~ grading volume that did not move in lockstep with PSA 10 rates.[208] These patterns do not establish their cause, but they are consistent

[207] NEO Cards & Comics, *Is PSA Grading Harder? Let's Look at the Data* at 13:20–16:17, 17:45–20:30, YOUTUBE (May 22, 2026), https://www.youtube.com/watch?v=Oi0Mx9_sxeY&t=708s (analyzing GemRate data and discussing increased TCG grading volume, declining and later rising TCG Gem Mint rates, comparatively flat sports-card Gem Mint rates, and possible explanations other than raw submission volume).

[208] *Id.* at 3:09–8:02, 11:41–17:02, 18:04–20:30 (discussing sports-card Gem Mint-rate decline from 2024 into 2025, TCG Gem Mint-rate divergence, GameStop submissions, PSA centering-standard updates, sports-card quality control, market heat, and submitter mix as possible contributors to PSA Gem Mint outcomes).

with Plaintiffs' allegation that undisclosed grading practices systematically shape grade distributions—a practice that adversely impacted their cards.

175.167. Taken together, these factsallegations support a reasonablethe inference that PSA's Gem Mintgrades and graded populations are controlled outputs, not neutralmerely passive reflections of card condition. Civil discovery will verify the accuracy; they are outputs of the inference. PSA markets grading as an objective, criteria-based process applied to each card individually. But its high-speed grading environmentsystem PSA controls. Whether those population effects result from grader assignment, differing scrutiny, subjective judgment, production pressure, ratio-based grading explanation, deactivation of certifications, hidden discretion, and demand-correlated Gem Mint patterns indicatereview, internal calibration, managerial intervention, numerical-grade eligibility and classification, intentional population management, or some combination thereof is properly tested through discovery. What matters is that PSA shapes how manymarkets individual grades as criteria-based assessments, publishes their aggregate distribution as meaningful scarcity data, and does not disclose internal practices capable of systematically affecting either. Far more telling, PSA 10s enter the market. Consumers do not pay PSA for undisclosed constraints on Gem Mint supply.actively conceals them through nondisclosure agreements.

### 3. PSA's Fraud Lies Not Only in the Grade, but in the Graded Card Credential

163. PSA's Guarantee exacerbates the problems alleged above. PSA markets its guarantee as a broad, financially backed assurance that PSA-certified cards are accurately graded and may be relied upon in buying, selling, lending, and valuing cards.[209] But by its own terms,

[209] *About PSA*, *supra* note 112; *PSA Authenticity and Grade Guarantee*, *supra* note 111.

~~the Guarantee does not protect the original submitter—the consumer who paid PSA to grade the card and for the guarantee that travels with the graded card. Instead, the Guarantee extends only to subsequent downstream purchasers contrary to how PSA markets the guarantee.[210] Thus, when PSA's own grading errors, clerical mistakes, and/or certification-record changes reduce the value of a card, the customer who submits the card and pays for the benefit of the Guarantee is not able to use that Guarantee, contrary to a reasonable expectation for a service marketed as guaranteed.~~










168. PSA's Guarantee further demonstrates the gap between the protection PSA markets and the protection its Graded Card Credential actually carries. PSA describes the Guarantee as fundamental to its reputation and assurance that it stands behind the authenticity and grade on its label.[211] But the Guarantee excludes original submitters and those acting on their behalf, as well as clerical errors in the assigned grade or description.[212] Plaintiffs allege that these

---

~~[210] *PSA Authenticity and Grade Guarantee*, *supra* note 112 (excluding original submitters and their agents).~~

[211] *Online Terms of the PSA Authenticity and Grade Guarantee*, PSA, https://www.psacard.com /financialguarantee (last visited Sept. 27, 2026).

[212] *Id.* (excluding original submitters and clerical errors in assigned grades or descriptions); PSA Submission Services Online Terms § 13, https://www.psacard.com/termsandconditions (last visited Sept. 27, 2026).

exclusions materially qualify PSA's broad Guarantee messaging by denying protection both to the consumer who directly obtained the grading service and for a large category of erroneous grades that one would reasonably expect a guarantee to covered for a product.

169. The original submitter exclusion is material because the person who directly purchases and receives the grading service may be the first to discover a problem when the card is returned, yet that person cannot invoke the Guarantee's monetary remedies. PSA may provide separate customer-service, correction, review, or resubmission mechanisms that are not the financially backed Guarantee PSA invokes to support confidence in its Graded Card Credential. The original submitter faces additional payment requirements for some remedies outside the Guarantee.[213]




**(Representative screenshots of how PSA markets its guarantee)**

~~164. This exclusion is material because the original submitter is often the person most likely to discover a problem when the card is returned. Instead of allowing~~Plaintiffs allege that

[213] *Frequently Asked Questions, supra note 83; Trading Card Review, supra* note 129.

~~consumer to invoke~~Defendants use the Guarantee~~, dissatisfied submitters' only recourse is paying for resubmission.~~[214]

~~178.~~170. ~~These limitations show that PSA's Guarantee functions primarily~~ as a ~~market~~ marketing ploy to boost confidence ~~advertisement that induces~~and induce submissions ~~rather~~while structuring its eligibility and exclusions more narrowly than ~~protect consumers who paid for grading~~the broad assurance PSA markets. PSA invokes the Guarantee to support the credibility, liquidity, and market value of PSA-graded cards, but structures it so the original payor often cannot use it, ~~must pay PSA again to challenge its grade, and remains subject to PSA's unilateral control over associated decisions.~~and with limitations the negate its advertised effectiveness.

### 4. PSA's Population Reports Convert Controlled or Distorted Grade Outcomes Into False Market Scarcity Signals

~~179.~~171. PSA's ~~population reports~~Population Reports extend the fraud beyond grading decisions and the individual slabs. PSA describes its Population Report as an "online record" or database of PSA-certified items in the marketplace, updated as additional items are added.[215] By publishing grade-by-grade counts, including PSA 10 counts, PSA converts its ~~Grading~~Graded Card Credentials into public scarcity signals used by Card Market Participants for trading card transactions. A card reported as having ten PSA 10s may command a materially different price than a similar card reported as having one hundred PSA 10s.

172. PSA's ~~population reports are~~Population Reports can be misleading~~. PSA knew, or should have known, that population~~ even when the database accurately counts ~~are distorted by~~the

---

~~[214] *Frequently Asked Questions*, *supra* note 77; *Trading Card Review*, *supra* note 132.~~

[215] *Population Report*, *supra note* ~~57~~*63* (describing the Population Report as providing "an exact count of each item graded, from PSA 1-10," with "category summaries" and daily updates).

certification records presently associated with a catalog entry. PSA's main Population Report promotes an "exact count of each item graded," while individual population pages contain a narrower warning that, in some cases, historical cataloging changes may cause population data not to reflect accurate numbers.[216] That limited warning does not disclose the separate distortions alleged here from crack-and-resubmit activity, attempted crossovers, unreturned labels, stale certifications, duplicate entries, or "ghost" entries, and cataloging or related database artifacts. Industry discussions have long recognized that cracked-out, crossed-over, or resubmitted cards may remain counted unless prior labels are returned and removed, and PSA has acknowledgedindustry participants have discussed for years.[217] Plaintiffs allege that presenting population data "may not reflect accurate numbers" where PSA's cataloging practices changed after cards had already been graded.[218] But PSA provides no explicit warning about the unreliability of the as an "exact count" without adequately disclosing known mechanisms capable of leaving duplicate, stale, or otherwise misleading grade entries converts defects in

[216] *PSA Population Report*, PSA, https://www.psacard.com/Pop (last visited Sept. 27, 2026) (promoting an "exact count of each item graded, from PSA 1-10"); *see, e.g.*, *1926 Exhibits*, PSA Population Report, https://www.psacard.com/pop/baseball-cards/1926/exhibits/36183 (last visited Sept. 27, 2026) (warning that historical recognition of particular varieties may cause some population data not to reflect accurate numbers).

[217] *PSA Population Accuracy Question*, COLLECTORS UNIVERSE FORUMS (May 5, 2012), https://forums.collectors.com/discussion/855317/psa-population-accuracy-question (discussing population-report inaccuracies caused by cracked-out cards and resubmissions, including "ghost" population entries when prior labels are not removed); *Cracked Cards on PSA Pop Reports and Registry?*, NET54BASEBALL.COM (Aug. 18, 2011), https://www.net54baseball.com/showthread.php?t=139081 (discussing how cracked-and-resubmitted cards can be counted more than once and how crossed-over or cracked-out cards may remain in population reports); *PSA Resubmissions*, COLLECTORS UNIVERSE FORUMS (May 3, 2004), https://forums.collectors.com/discussion/ 285575/psa-resubmissions (quoting PSA customer service as stating that collectors may crack PSA holders and that many send the flip back so PSA can delete the card from the Population Report).

[218] *PSA Population Accuracy Question*, COLLECTORS UNIVERSE FORUMS (May 5, 2012), https://forums.collectors.com/discussion/855317/psa-population-accuracy-question (discussing population-report inaccuracies caused by cracked-out cards and resubmissions, including "ghost" population entries when prior labels are not removed); *Cracked Cards on PSA Pop Reports and Registry?*, NET54BASEBALL.COM (Aug. 18, 2011), https://www.net54baseball.com/showthread.php?t=139081 (discussing how cracked-and-resubmitted cards can be counted more than once and how crossed-over or cracked-out cards may remain in population reports); *PSA Resubmissions*, COLLECTORS UNIVERSE FORUMS (May 3, 2004), https://forums.collectors.com/discussion/ 285575/psa-resubmissions (quoting PSA customer service as stating that collectors may crack PSA holders and that many send the flip back so PSA can delete the card from the Population Report).

PSA's recordkeeping and grading system into market-facing scarcity misinformation. Population integrity depends on whether the cards counted in a numerical grade were eligible to receive that grade under PSA's own standards in addition to whether the grade remains in that category. Plaintiffs allege that this classification-integrity problem is another way defects in PSA's grading process can distort the scarcity information ~~in the report near the population report database.~~ PSA publishes to the market.

~~167.~~ The ~~distorted reports act to consumers' detriment.~~

~~181.~~173. ~~That signal~~Populations Report is critical because it induces both grading and market transactions—including PSA's attempts to acquire the very card that it grades. The reported scarcity encourages consumers to submit raw cards in pursuit of scarce high-grade outcomes, encourages buyers to pay premiums for cards appearing scarce, and feeds Collectors' broader pricing, custody, offer, lending, and marketplace infrastructure. ~~Plaintiff alleges~~Plaintiffs allege that inaccurate~~ or~~, managed ~~population reports exacerbate PSA's fraud by converting subjective, inconsistent, ratio-influenced~~, duplicate, stale, misclassified, or otherwise distorted grade populations exacerbate PSA's fraud by converting defects in the ~~count of grades~~underlying grading and certification system into public scarcity signals that influence prices and consumer behavior throughout the hobby.

* * *

~~182.~~174. ~~Each of the~~The foregoing practices ~~independently renders~~, either individually or collectively, render PSA's representations ~~about its grading process~~ materially false ~~or~~, misleading~~. Taken together, they reveal deception at every material stage of the process: who grades the cards and with what qualifications; what~~ , or incomplete. They concern grader expertise; the standards ~~govern the review and whether those standards are fixed; how subjective~~

~~judgment,~~and discretion governing grades; undisclosed prior-grade information; production pressure~~, ratio-based practices,~~ and ~~undisclosed discretion shape~~financial conflicts; numerical grading ~~outcomes; whether grades and~~of altered or otherwise ineligible cards; certification ~~records are durable; and whether~~ reliability; and the accuracy and protection communicated by PSA's Guarantee and ~~its population reports accurately communicate reliability and scarcity. PSA~~Population Reports. Plaintiffs allege this is ~~therefore~~ not ~~selling~~ a reliable ~~grading~~ system ~~or credential~~ marred by occasional error. ~~It~~Rather, PSA sells uncertainty as certainty, discretion as standards, and control as independence. The ~~Grading~~resulting Graded Card Credential ~~consumers receive~~ is ~~not the neutral, expert, standardized, criteria-based, and reliable assessment PSA promises. It is the product of~~ produced through concealed subjectivity, malleable standards, production~~-driven judgment~~ pressure, financial conflicts, managed outputs, and PSA's ~~unilateral~~continuing control~~—packaged in a slab, assigned a certification number~~, then slabbed, certified, published~~ to the market~~, and sold as neutral, expert, standardized, criteria-based, reliable, and authoritative. ~~The~~On information and belief, Plaintiffs' cards passed through this infirmed grading operation and were subject to its defects. The incidents and insider accounts alleged above show how that system operated and what Defendants knew; Plaintiffs do not allege that each incident occurred in every submission or constitutes a separate injury. The alleged fraud is therefore not incidental to the ~~Grading~~Graded Card Credential; it is embedded in, carried by, and monetized through ~~that credential~~it.

### B. PSA's Deceptive Fee Model Monetizes the False Graded Card Credential

~~183.~~175. PSA's deceptive fee model is the financial engine that monetizes Defendants' ~~false Grading~~fraudulent Graded Card Credential described above. PSA presents consumers with a menu of seemingly discrete choices concerning price, value, and speed, but operates one integrated fee architecture in which PSA controls the entire process including cost.

As detailed below, PSA makes that fee model profitable through material omissions; hidden or separated turnaround-time qualifications; an illusory Maximum Insured Value framework; post-grading upcharges; drip and partitioned pricing; possession-based lock-in; related repeat-service loops; and ~~adhesion~~adhesive terms designed to preserve revenue and obstruct accountability. ~~The~~Thus, the fee model is ~~therefore~~ not collateral to the grading fraud; it is ~~the~~one mechanism through which Defendants ~~repeatedly profit from it~~convert the allegedly misrepresented Graded Card Credential into consumer payments.

### 1. PSA's Grading Fees Are One Integrated Fee Architecture

~~184.~~176. ~~While~~ PSA ~~labels its charges in different ways, those labels do not change the economic reality that the fees and charges are one and~~ monetizes the same~~.~~ Graded Card Credential through multiple Grading-Related Charges. The initial grading fee, service-level ~~charge,~~and speed ~~premium, Maximum Insured Value charge, adjusted grading fee, upcharge, review fee, crossover fee, resubmission fee, reholdering~~premiums, value-based adjustments or ~~relabeling charge~~upcharges, imaging~~ or~~, grader~~ note charge~~ notes, shipping, handling, insurance, and return~~ shipment charge, and related submission charge all exist because the consumer seeks the same commercial product:~~ charges each arise from obtaining a ~~PSA~~ single graded~~, PSA-labeled, PSA-certified, market-recognized trading card. *See* supra ¶¶ 40, 133–142. PSA separates those fees to smaller amounts to make them more appetizing to~~ credential service. Plaintiffs allege that separating the total economic transaction into multiple charges makes the true cost less apparent and gives PSA repeated opportunities to charge consumers~~, which is a~~ for the authority of the same Graded Card Credential. The specific deceptive ~~patterns to induce consumers to spend more. The end results are PSA has greater flexibility in charging more for the same service~~features of those charges are detailed below.

**2. PSA's Turnaround-Time Pricing ~~Is~~is Routinely Missed and Illusory Because the Advertised Speed Is Qualified by Hidden Disclosures ~~and Routinely Missed~~**

~~185.~~177. PSA exploits its price-value-speed fee architecture to charge consumers more. The integrated fee architecture is illusory. PSA presents the consumer with a menu of seemingly discrete choices while retaining control over those same variables and hiding the real cost. The consumer sees a headline price-value-speed package, *see supra* ¶¶ ~~133–142~~*120–128*, but PSA controls intake timing, grading timing, grade assignment, grade reveal, post-grade valuation, adjusted grading fees, final amounts due, and return of the card. Consumers commit their property and money before the final price, timing, value, and limitations are fully disclosed or learned.

a. **PSA marketed turnaround time is later disclaimed**

~~173. PSA omits material fee-related facts at the point of submission when its services are seen and requested. These omissions include that the advertised price may not be final; that the final fee may depend on PSA's post-grading valuation; that speed consumers purchase is routinely not satisfied; that consumers may need to pay PSA again to challenge PSA's first grade; and that each representation consumers see on the website is materially impacted by online terms buried on the website—terms that many beneficial owners never see or understand and that none of the putative class members ever accept.~~

178. PSA omits material fees and service information from the service-level presentation consumers use to purchase grading. The displayed price may increase after PSA values the graded card; turnaround estimates are separately qualified by capacity, volume, clock-start, and other limitations; consumers may pay again for review or resubmission; and Online Terms contain additional qualifications and remedies that beneficial owners using Card Grading Intermediaries may never see or accept. Plaintiffs allege these separated qualifications materially

alter the price-value-speed package used to induce submission. Because consumers surrender their valuable property when selecting that package, misleading turnaround representations are not mere inconveniences; they have real economic consequences in a time sensitive market.

~~187.~~179. Because graded cards are time-sensitive assets, consumers may ~~pay more to return a card to market quickly~~rely on time estimates to preserve liquidity, ~~sell into~~capture a pricing window, respond to player or product demand, or reduce market~~ movement~~ risk~~ while PSA possesses the card.~~. PSA's pricing page ~~tells consumers~~markets that ~~they can buy~~ speed~~ but~~, then ~~disclaims those same representations. PSA places~~ separately qualifies it with an asterisk ~~next to advertised turnaround time (without any asterisk next to pricing). The disclaimer associated with the asterisk appears far below the service-level display, in a separate expandable section that consumers have to scroll to find and open. That placement matters. The consumer clearly sees a visible price-value-speed package, but the material limitations~~. But the limitations on the advertised speed appear ~~later, away~~separately from the ~~speed and pricing tiers that induce the transaction~~terms.


PSA
Getting Started
Pricing & Services
Vault & Sell
Set Registry
Research
PSA Near Me
Start Submission
and clarify the outcome
and clarify the outcome
Card worth more than $10,000? See Premium Options
Benefits of PSA Grading
Established Standards
PSA has established recognized and respected universal grading standard for trading card collectors.
Learn More
Trading Card PSA Price Guide
PSA has established a PSA-graded card price guide that has enhanced stability in the marketplace for both collectors and dealers alike.
Learn More
Security
PSA encapsulates every trading card in a tamper-evident, sonically sealed case. These attractive, hard plastic cases provide protection from pressure and most damage.
Learn More
Set Registry
PSA has a Set Registry for card collectors and the possibilities are virtually endless in terms of creating interesting and fun trading card sets.
Learn More
Value
for your cards. Cards authenticated and graded by PSA achieve amazing prices at auction.
Learn More
We've Got the Facts
information on your favorite PSA-graded trading cards. Discover expert narratives, collecting articles, pricing, populations and checklists all in one place with PSA CardFacts®.
Learn More
Bottom of Pricing Tiers
Trading Card Authentication & Grading Process
Step 1
Authentication
A series of PSA graders review your cards for authenticity. If genuine, PSA looks for evidence of doctoring, such as re-coloring or trimming.
Step 2
Grading
If your cards pass authentication, PSA grades the condition of each card on a scale of 1-10, with 10 being best.
Step 3
Encapsulation
PSA encapsulates each card in its own sonically sealed, tamper-evident case. The card's grade and certification number are displayed on the PSA LightHouse™ label.
Disclaimer




**(PSA pricing-page screenshot with counsel-added arrows and circles showing the disclaimer's placement below the service-level pricing tiers)**

~~188.~~180. When opened, the disclaimer materially qualifies the timing and pricing representations. PSA states that estimated turnaround times are not guaranteed; that timing begins only when the order is received and scanned into PSA's facility; that timing may be affected by submission volume, capacity, and other circumstances; that turnaround times may change rapidly without notice; that PSA may adjust pricing, services, and processing time; and that all ~~terms and conditions~~Online Terms are subject to change.[219]

[219] *Grading, supra* note ~~55~~61 (pricing-page disclaimer stating that estimated turnaround times are not guaranteed, timing begins only after receipt and scanning, timing may be affected by submission volume and capacity, turnaround times may change rapidly without notice, PSA may adjust pricing, services offered, and processing time, and terms may change); *PSA Submission Services Online Terms ~~and Conditions~~, supra* note ~~144~~132.


Disclaimer

*Estimated Turnaround Times are estimates only and not guaranteed. A service level's Estimated Turnaround Time begins when the order is received and scanned into the PSA facility. These times are based on, and may be impacted by, PSA's submission volume, capacity, and other unforeseen circumstances. Turnaround Times may change rapidly without notice as conditions change.*

As the collectibles industry continues to expand, and the demand for PSA's services continues to expand along with it, PSA may decide to adjust pricing, services offered, and processing time to better align the demand for PSA services with our capacity to deliver those services.

All terms & conditions are subject to change.


Disclaimer

*Estimated Turnaround Times are estimates only and not guaranteed. A service level's Estimated Turnaround Time begins when the order is received and scanned into the PSA facility. These times are based on, and may be impacted by, PSA's submission volume, capacity, and other unforeseen circumstances. Turnaround Times may change rapidly without notice as conditions change.*

As the collectibles industry continues to expand, and the demand for PSA's services continues to expand along with it, PSA may decide to adjust pricing, services offered, and processing time to better align the demand for PSA services with our capacity to deliver those services.

All terms & conditions are subject to change.

**(Representative screenshot of the opened PSA disclaimer from its website.)**

~~189.~~181. ~~Those qualifications do~~Calling a turnaround time an "estimate" does not ~~merely clarify timing. They strip the speed premium of the certainty~~eliminate deception if PSA uses that estimate to ~~sell it. PSA organizes~~differentiate higher-priced service levels ~~around estimated turnaround and~~while knowing that material internal conditions make the displayed timing unreliable—conditions are not adequately disclosed where and when consumers choose the service. PSA charges more for tiers associated with faster ~~service. But PSA~~ processing yet reserves the right to ~~miss~~alter timing based on submission volume, capacity, and other circumstances and historically delayed when the timing clock began. Plaintiffs allege that the combination of prominent speed-based pricing, separated qualifications, and PSA's knowledge of recurring capacity and workflow constraints makes the advertised ~~estimate, to delay starting the clock for grading time, and to change timing, pricing, and services based on volume and capacity.~~ timing materially misleading even though PSA labels it an estimate.

### b. PSA knows its turnaround times are misleading

~~190.~~182. PSA has known since at least 2020 that its advertised turnaround times were unreliable. In October 2020, PSA admitted that “despite doubling capacity, turnaround times are growing” and announced that “estimated Turnaround Times will be retired in favor of Complete-Through Dates” so customers could see “true data” on backlog progress.[220] In March 2021, PSA reiterated that “[s]ervices defined by turnaround times are a thing of the past.”[221] But PSA never retired the time estimates; it still prices its service levels around estimated turnaround times even today.[222] By March 30, 2021, PSA conceded that continuing to accept submissions it would be “unable to process in the foreseeable future” was “disingenuous”—yet it later resumed soliciting those same submissions under the same turnaround-time pricing it deemed a thing of the past.[223] Those admissions are evidence that PSA itself understood the limitations of using estimated turnaround times as the consumer-facing measure of service performance, yet later returned to selling service levels differentiated by that same metric.

~~191.~~183. ~~When~~ PSA ~~finally revised~~ later changed the point at which its turnaround ~~estimates, the changes were nominal and offset by a new~~ clock ~~start rule that went into effect on~~ began. Effective November 20, 2025~~.~~, PSA ~~admitted~~announced that turnaround ~~times had “[h]istorically . . . began once an order was unboxed under supervision and itemized” but~~ time would ~~now “~~begin ~~the moment your~~when an order ~~arrives~~arrived at a PSA facility~~.”~~[224] ~~PSA,~~

---

[220] Steve Sloan, *PSA Customer Update – October 2020*, PSA, https://www.psacard.com/articles/articleview/10232/psa-customer-update-october-2020 (last visited ~~July 22~~Sept. 28, 2026).

[221] Steve Sloan, *PSA Customer Update – March 2021*, PSA, https://www.psacard.com/articles/articleview/10345/psa-customer-update-march-2021 (last visited ~~July 22~~Sept. 28, 2026).

[222] *See Grading, supra* note ~~55~~61; *An Update on Prices and Services at PSA*, *supra* note ~~143~~146.

[223] Sloan, *PSA Customer Update – April 2021*, *supra* note ~~41~~47.

~~[224] PSA Staff, *Updates to Estimated Turnaround Times*, PSA (Nov. 20, 2025), https://www.psacard.com/articles/articleview/15625/updates-to-estimated-turnaround-times.~~

thus, conceded that its prior timing estimates excluded weeks during which consumers' property sat unprocessed in PSA's possession. The November 2025 "increases" were largely illusory. PSA lengthened its published numbers primarily because it was finally counting time it had always been consuming but never disclosing. rather than, as PSA acknowledged had historically occurred, only after the order was unboxed under supervision and itemized.[225] PSA told consumers they would "notice longer estimates as a result, but nothing about our process is slowing down," confirming." That admission confirms that PSA's prior published timing excluded a period during which consumers' cards were already in PSA's possession but had not yet entered the prior estimates understated actual custody time.[226] timing calculation and were misleading. Months later, PSA again raised prices lengthened estimates and lengthened estimates, admittingacknowledged that submission volume was making turnaround times "harder to estimate."[227] Those omissions are material. . Plaintiffs were adversely impacted by these issues.

* * *

179. A company does not hide details about its advertised delivery metric in obscure disclosures and then retire that metric unless it knows the metric is misleading. PSA's explicit contrast between its existing "estimates" and its proposed disclosure of "true data" supports the inference that PSA itself understood its turnaround times did not accurately depict the actual processing periods that it sold consumers—and PSA made a deliberate choice to keep selling

[225] PSA Staff, *Updates to Estimated Turnaround Times*, PSA (Nov. 20, 2025), https://www.psacard.com/—articles/articleview/15625/updates-to-estimated-turnaround-times; *see also* Cole Benz, *PSA Clarifies Turnaround Times as Grading Stays Busy*, Sports Illustrated Collectibles (Nov. 20, 2025), https://www.si.com/collectibles/psa-clarifies-turnaround-times-as-grading-stays-busy.

[226] Cole Benz, *PSA clarifies turnaround times as grading stays busy*, SPORTS ILLUSTRATED COLLECTIBLES (Nov. 20, 2025), https://www.si.com/collectibles/psa-clarifies-turnaround-times-as-grading-stays-busy.

[227] *An Update on Prices and Services at PSA*, *supra* note 143 (increasing Value Plus from 40 to 45 business days, Value Max from 30 to 35, and Regular from 20 to 25; applicable only to new submissions beginning February 10, 2026).

grading on the basis of a metric it had publicly branded unreliable and obsolete. PSA's own statements establish a continuous course of knowledge, not an isolated operational emergency. By October 2020, PSA knew its turnaround times were inaccurate. It announced it would retire them. It declared them "a thing of the past." It admitted that soliciting submissions under such conditions was "disingenuous." But it continued the very practice it had condemned. And when it finally lengthened its published estimates, PSA simultaneously admitted that its prior estimates excluded weeks of custody time, confirming consumers had been misled about how long PSA would hold their property all along. This is not a series of good-faith estimates gone occasionally awry. It is a documented, multi-year pattern in which PSA knowingly represented a delivery timeline it could not meet, while continuing to collect fees premised on that very timeline.

184. PSA's internal workflow adds another source of delay not apparent from the headline service-level display. A former PSA Research and Identification employee describes required supervisory signoffs and research holds that could consume material portions of an order's processing window before numerical grading occurred. He states that certain cards required higher-level signoff even when the researcher already knew the identification, sometimes producing waits of approximately thirty minutes, and that orders requiring additional checklist or identification research could remain on a researcher's desk for approximately two to two-and-a-half weeks while approaching the service level promised to the customer.[228] Plaintiffs allege that these internal holds are material because PSA sells speed while consumers cannot see the internal approval and research procedures consuming that time.

* * *

[228] Boston Card Hunter, *Former PSA Research & ID Employee Breaks His Silence*, YouTube at 3:22–6:39 (Sept. 2026), https://youtu.be/WDLIFTR2qf0.

185. PSA's own statements and reported internal workflow support Plaintiffs' inference that it knowingly sold service levels using a timing metric materially affected by conditions consumers could not evaluate at purchase. PSA called estimated turnaround times unreliable enough to replace with "true data," declared services defined by them "a thing of the past," described accepting submissions it could not timely process as "disingenuous," later acknowledged that its historical clock began only after unboxing and itemization, and maintained research holds and approvals capable of consuming substantial portions of the advertised window. Plaintiffs allege these were not occasionally missed estimates: PSA monetized advertised speed while possessing superior knowledge of the backlog, clock rules, capacity constraints, holds, and workflow that materially qualified it. Those undisclosed or separated conditions affected every service tier.

### 3. PSA's MIV Framework is Illusory and Makes Final Pricing Unknowable at Submission

~~193.~~186. ~~PSA also exploits~~PSA's value-based pricing presents a separate deception within the ~~value component of its~~ price-value-speed ~~fee~~ architecture. At the point of sale, PSA presents each service level as a fixed per-card price paired with a stated "Maximum Insured Value" ("MIV"). But PSA does not clearly disclose alongside those terms that service-level selection turns on the card's estimated post-grading fair-market value—a value the submitter must predict before PSA assigns the grade that ~~will~~ materially ~~determine it~~determines value. Instead, PSA relegates the operative rule to its hidden terms, which instructs the submitter to select a service level whose MIV exceeds the estimated post-grading fair-market value of each item. PSA then reserves the right, in its sole discretion and at any point in the process, to determine that an item's fair-market value exceeds the selected MIV and to require an "adjusted

grading fee."[229] That unilateral post-submission price increase is PSA's "upcharge," which is a service-level ~~adjustments~~adjustment that PSA may impose without further authorization.[230]

~~194.~~187. The apparent service-level choice is therefore illusory. To select a tier, the consumer or PSA-facing submitter must make three interdependent guesses: what grade PSA will assign, when PSA will assign it, and what the market value of that unknown grade will be at that later time. The consumer must either select a higher-priced tier in advance to guard against PSA's later valuation or risk a post-submission upcharge. And the consumer must group cards within the same submission at the same service level, meaning the consumer must pay more for lower valued cards grouped with a higher card or pay more in sending cards in different batches because of incidental grading charges like mail and insurance.[231] PSA, meanwhile, controls the grade, the timing of the grade, the market-recognized credential, the post-grading valuation, and the determination of whether the consumer selected a sufficient tier. The displayed service-level price is therefore not a final price. It is an opening price that PSA may revise after the consumer has committed money and surrendered possession of the card. The pricing problem is therefore structural: the consumer must estimate the value of a Graded Card Credential that does not yet exist, while PSA later determines both the grade that materially affects that value and whether the resulting value entitles PSA to more money.

[229] *PSA Submission Services Online Terms ~~and Conditions~~*, *supra* note ~~144~~132, § 2.

[230] *Frequently Asked Questions: Maximum Insured Value*, PSA, https://www.psacard.com/support/faq#maxinsuredvalue (last visited ~~July 22~~Sept. 28, 2026); *PSA Submission Services Online Terms ~~and Conditions~~*, *supra* note ~~144~~132, §§ 15–16.

[231] Frequently Asked Questions: Maximum Insured Value, PSA, https://www.psacard.com/support/faq#maxinsuredvalue~~*supra* note 162;~~ (last visited Sept. 28, 2026); *see also PSA & PSA/DNA Postage Rates*, PSA (last updated Aug. 29, 2025), https://www.psacard.com/ info/postage (setting domestic return-shipping-and-insurance charges according to the shipment's MIV and number of items); *PSA Submission Services Online Terms ~~and Conditions~~*, *supra* note ~~144, §§~~132, §§ 5–6 (providing that PSA may charge separately for return-shipment insurance).

~~195.~~188. The upcharge is imposed only after the consumer's practical ability to withdraw has disappeared. PSA states that it makes the relevant value determination after grading.[232] By then, the grading service is no longer ~~cancelable~~cancellable. If the consumer refuses the upcharge, PSA's terms permit PSA to return the card "unprocessed," at the consumer's expense, while retaining the original service-level fee; PSA may also impose aggregate service-level adjustments of up to $500—or a lower cap disclosed during submission—without further notice or authorization.[233] PSA further requires payment of all amounts due before it completes processing, reveals the grade, or returns the card.[234] The upcharge is ~~therefore~~ not a consumer-selected upgrade. ~~It~~Plaintiffs allege it is unilateral post-submission repricing after PSA has obtained the property, ~~performed~~assigned the valuation-triggering grade, and acquired contractual leverage over completion, grade disclosure, and property return.

**4. PSA's "Maximum Insured Value" Is a Liability Cap, Not Insurance, and Does Not Justify the Upcharge**

~~196.~~189. Despite its name, MIV does not state the amount for which PSA has insured the card. It is not an insurance policy, an agreed valuation, or a guaranteed payout; rather, it is only a contractual ceiling on PSA's potential liability.[235] ~~Thus,~~Plaintiffs allege even the name is misleading. PSA limits any compensation for a card in its care to the lesser of the MIV or the card's fair-market value and then reserves sole discretion to determine fair-market

---

[232] *PSA Submission Services Online Terms ~~and Conditions~~*, *supra* note ~~144~~132, § 2; *PSA Coverage*, PSA, https://www.psacard .com/info/coverage (last visited ~~July 22~~Sept. 28, 2026).

[233] *PSA Submission Services Online Terms ~~and Conditions~~*, *supra* note ~~144~~132, §§ 2, 15–16.

[234] *See Frequently Asked Questions, supra* note ~~77~~83 (stating that payment is requested when grading is completed and that grades are revealed once payment is received); *PSA Submission Services Online Terms ~~and Conditions~~, supra* note ~~144~~132, §15.

[235] *PSA Submission Services Online Terms ~~and Conditions~~*, *supra* note ~~144~~132, §§ 2, 10 (defining MIV as the maximum compensation available for actual damage or loss while an item is in PSA's possession and limiting PSA's potential liability to the lesser of the item's fair-market value or the applicable MIV).

value “by any means,” and may return a damaged card while paying only ~~the~~ diminution in value caused by the damage.[236] Nothing in PSA’s terms requires the valuation used to resolve a loss-or-damage claim to match the valuation used to impose an upcharge. ~~The~~This framework ~~thus~~ permits PSA to value the same card one way when collecting an additional fee and another way when determining what ~~PSA must pay~~it owes.

~~197.~~190. PSA’s own disclosures ~~further confirm that the upcharge does not function as an insurance premium.~~are materially inconsistent about what additional protection, if any, follows a post-grading service-level adjustment. PSA’s Coverage page states that a higher MIV becomes effective ~~only~~ after the ~~submitter pays the~~ additional fee~~.~~ is paid, while PSA’s FAQ~~, however,~~ states that ~~when PSA determines that a card’s value was~~an adjustment for understated~~, the resulting adjustment~~ value affects only the service-level charge and “will not change” the card’s MIV for claim or shipping-insurance purposes.[237] ~~Under either formulation~~Whatever the ultimate effect on MIV, the additional charge ~~is not tied to meaningful additional insurance protection. Under the Coverage-page formulation, any increase in MIV occurs only after PSA demands payment near the end of processing; under the FAQ formulation, PSA collects the additional fee without increasing MIV at all. Nor is the upcharge tied to additional grading, encapsulation, or shipping services.~~does not purchase another grading determination. PSA’s published workflow places “Results Review~~” — the stage at which~~,” when a pricing specialist

[236] *PSA Submission Services Online Terms ~~and Conditions~~*, *supra* note ~~144~~132, § 10 (reserving to PSA sole discretion to determine an item’s fair-market value by any means PSA selects and permitting PSA to return a damaged item while compensating the submitter only for the resulting reduction in value).

[237] *PSA Coverage*, PSA, https://www.psacard.com/info/coverage (last visited Sept. 28, 2026); *Frequently Asked Questions: Maximum Insured Value*, PSA, https://www.psacard.com/support/faq#maxinsuredvalue ~~*PSA Coverage*, *supra* note 164 (stating that, if PSA determines after grading that an item exceeds the selected MIV, PSA will upgrade the service level and the item will receive the higher MIV only after the additional fees are paid); *Maximum Insured Value*, *supra* note 162 (stating that PSA’s determination that MIV was understated affects only the service-level charge and does not change the MIV used for claim or shipping-insurance purposes).~~ (last visited Sept. 28, 2026).

communicates value-based ~~“~~pricing corrections~~”—~~, after grading, label creation, sealing, and a second-grade check.[238] ~~PSA’s FAQ likewise states that payment is requested only after grading is complete and that PSA withholds the grade until payment is received. Thus, by the time PSA imposes the upcharge, the grading and encapsulation work has already been performed, and the added charge does not correspond to additional work or risk incurred during those completed stages. On information and belief, the upcharge therefore compensates PSA neither for additional grading or encapsulation nor for separately purchased shipping protection. It is an additional grading fee tied to the card’s~~ Plaintiffs thus allege that PSA uses the post-grading market value ~~that PSA’s~~ (materially influenced by its own completed grade ~~helps create and make recognizable~~) to increase the ~~market. In other words,~~price of the grading transaction. PSA simply shares in the card’s value ~~of the card that its Grading Credential created~~.

### 5. PSA Uses Dark Patterns to Extract Grading-Related Charges

~~198.~~191. PSA’s fee model uses deceptive design practices commonly described as dark patterns. The Federal Trade Commission has identified dark patterns as practices that manipulate or trick consumers into taking actions they would not otherwise take by hiding material information, obscuring true costs, sneaking limitations into the transaction, or making it difficult for consumers to avoid unwanted consequences.[239] ~~PSA’s~~Plaintiffs allege PSA uses these practices ~~fall into those categories~~.

~~199.~~192. *PSA uses ~~a~~ bait-and-switch.* PSA markets grading as expert, reliable, objective, and guaranteed, ~~but~~while its terms and ~~actual~~ practices treat ~~the grade~~grades as

[238] PSA, *PSA Update: Journey of a PSA Card*, PSA (Oct. 3, 2020), https://www.psacard.com/articles/articleview/10241/psa-update-journey-card ~~PSA, *Journey of a PSA Card*, *supra* note 106 (placing “Results Review” during the Quality Assurance stage, after grading, label creation, sealing, and a second grade check, and explaining that a PSA Pricing Specialist communicates pricing corrections based on the card’s PSA-graded value).~~.

[239] Fed. Trade Comm’n, *Bringing Dark Patterns to Light: Staff Report* (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

subjective, revisable, discretionary, ~~limited~~qualified, and difficult to challenge. ~~The inducement is~~ PSA sells the authority~~,~~ of an expert Graded Card Credential while reserving discretion that materially qualifies the ~~delivery is a qualified opinion surrounded by disclaimers, limitations, and paid challenge mechanisms~~attributes used to sell it.

~~200.~~193. *PSA uses drip pricing and unilateral repricing.* PSA advertises a service-level price before submission~~,~~ but ~~the consumer~~ may not ~~learn~~determine the final ~~amount~~charge until after ~~PSA has~~obtaining possession ~~of~~, grading the card, ~~grades it, assesses~~and assessing whether its post-grading value~~, and decides whether to impose~~ merits an ~~adjusted grading fee~~upcharge.

~~201.~~194. *PSA uses partitioned pricing.* PSA ~~fragments~~separates the ~~true~~economic cost of ~~grading into multiple smaller charges:~~obtaining and maintaining the Graded Card Credential among grading fees, speed premiums, ~~MIV charges, upcharges~~value-based adjustments, shipping, handling, insurance, ~~review fees, crossover fees, resubmission fees, reholdering fees, relabeling fees, and related charges. Fragmentation makes the total cost appear more palatable~~ and ~~less comparable than a single, fully disclosed price~~additional services. The existence of separate charges is not itself deceptive. The alleged deception is that PSA presents consumers with a headline service-level price while material additional charges, contingencies, and later repricing can emerge elsewhere in the transaction, making the total cost less transparent when the consumer initially commits the card.

~~202.~~195. *PSA uses ~~forced action~~coercion and possession-based lock-in.* Once PSA or a PSA-facing ~~intake~~ channel ~~has~~possesses the card, PSA controls ~~the card, the~~grading, valuation, grade~~, grade reveal~~ disclosure, order completion, ~~valuation,~~ payment ~~demand~~demands, and return. ~~A consumer confronted with an~~ An upcharge or final-~~amount-due demand does not~~

~~face an ordinary invoice; the consumer faces a demand~~payment demand therefore is backed by PSA's control over both the consumer's property and the ~~market credential~~ Graded Card Credential attached to it.

~~203.~~196. *PSA uses sneaking.* ~~PSA's most important limitations are not presented with equal prominence alongside the representations that induce submission. PSA~~PSA prominently markets expertise, speed, reliability, ~~guarantee~~Guarantee protection, ~~population-report~~Population Report authority, and market acceptance ~~in consumer facing materials, while the limitations appear~~while placing material qualifications elsewhere in separated disclaimers~~,~~ and hyperlinked terms ~~buried at the bottom of webpages that contain~~containing exclusions, liability caps, ~~disclaimers, provisions reserving~~ pricing and timing discretion, and language ~~recasting~~characterizing grading as subjective opinion. ~~For consumers submitting through Card Grading Intermediaries, the problem is sharper because the beneficial owner may never have the chance to see or accept PSA's online terms at all. *See* supra ¶¶ 32–33, 57(d)–(g), 128–139, 155–166, 176–199; *see* infra ¶¶ 206–208.~~[240]

~~204.~~197. *PSA uses a variable-reward resubmission loop.* PSA monetizes variability through paid repeat-assessment services. When ~~a consumer receives a disappointing or~~ consumers receive an unexpected or disputed grade, ~~PSA's own service architecture allows the consumer~~PSA permits them to pay again for review~~, resubmission, crossover, reholdering, relabeling, or related services. PSA benefits~~ or resubmission; crossover separately allows consumers to pay PSA to replace a competing company's credential with a PSA Graded Card Credential if PSA accepts the grade.[241] Plaintiffs allege that PSA therefore earns additional

---

[240] *See supra* ¶¶ 28–29, 55(d)–(f), 128–137, 154–184, 185–200.

[241] *Trading Card Review*, PSA, https://www.psacard.com/services/tradingcardgrading/review (last visited July 4, 2026); *Crossover*, PSA, https://www.psacard.com/services/tradingcard grading/crossover (last visited July 2, 2026); *Frequently Asked Questions*, PSA, https://www.psacard.com/support/faq (last visited Sept. 28, 2026).

revenue when consumers seek another determination from the ~~repeat-purchase loop created by~~same grading ~~variability while continuing to market grading~~ authority whose first determination they dispute, while marketing the process as expert, standardized, and reliable~~, and criteria-based~~.

~~205.~~198. *~~PSA depends on opacity and~~ PSA's fee model and grading authority depend on information asymmetry*. PSA controls ~~nearly all~~ information ~~needed~~consumers need to ~~evaluate the transaction:~~test the representations used to sell the Graded Card Credential, including grader identity~~, grader~~ and qualifications~~,~~; production targets and time ~~spent~~ per card~~, training,~~; internal guidance~~,~~ and calibration; prior-grade information supplied to graders; alteration-screening and numerical-grade eligibility practices; error ~~rates, consistency metrics, grade-change rates, upcharge triggers,~~categories and correction data; certification changes; Population Report methodology and classification integrity; employee and executive conflict controls; upcharge triggers and valuation methodology~~, population-report accuracy,~~; Guarantee outcomes~~, and certification-record changes. PSA's concealment makes the fee model work. Consumers pay because PSA's public message conveys expertise and reliability, while the facts that would undermine that message remain inside PSA's system~~; and internal research and timing holds. Plaintiffs allege this opacity is part of the fraud because consumers must purchase the Graded Card Credential based largely on PSA's representations while PSA withholds the information necessary to determine if those representations are true.

**6. PSA's Contract Terms Are Unconscionable and Operate as Obstruction**

~~206.~~199. PSA's ~~online terms~~Online Terms are not merely background conditions. They are part of the architecture PSA uses to preserve revenue and obstruct accountability. PSA purports to impose arbitration provisions, class-action waivers, jury-trial waivers, forum-

selection clauses, choice-of-law clauses, liability caps, warranty disclaimers, releases, delegation provisions, fee-retention terms, sole-discretion valuation provisions, and remedy limitations.[242] Those provisions attempt to convert PSA's marketed promise of expert, reliable grading into a ~~one-sided, limited, discretionary, and hard-to-challenge~~ transaction of adhesion.

~~194. Plaintiff and similarly situated beneficial card owners did not assent to~~ Plaintiffs deny that ~~contractual shield. Plaintiff~~the Online Terms bind them for the transaction-specific reasons alleged in ¶¶ 28–29, 40(a), and 55. They did not create ~~a~~ PSA ~~account, use PSA's submission portal, click PSA's terms, authorize an intermediary to waive his rights,~~accounts or ~~agree to arbitration, class waiver, forum selection, choice of law, liability caps, warranty disclaimers, releases, delegation, or any other rights-waiving provision. *See* supra ¶¶ 32–33, 38(a)–(e), 57(b)–(g), 139. Any portal interaction or clickwrap acceptance by a~~personally accept the Online Terms and dispute that their Card Grading ~~Intermediary occurred in the intermediary's own PSA-facing commercial capacity. It did not transform the intermediary into Plaintiff's legal agent for contract formation or rights waiver.~~

~~208.~~200. Intermediaries had authority to accept those terms for them. Even if PSA could ~~show~~somehow establish assent ~~by~~as to some submitters ~~like Plaintiff~~, which it cannot, the challenged terms remain part of the alleged deception ~~here~~. PSA markets a valuable, reliable, guaranteed credential to consumers and the market, but then seeks to rely on provisions that limit responsibility for the grade, restrict remedies, cap liability, force private arbitration, bar classwide relief, and reserve PSA's control over valuation, error determination, payment, return, and remedy. A contract architecture ~~that preserves~~preserving PSA's revenue while preventing

---

[242] Decl. of Jacqueline Curiel, *Rasmussen v. Collectors Holdings Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 4, 2026), ECF No. 20-2, Ex. A (Collectors User Agreement) §§ 2, 18, 19, 24; *PSA Submission Services Online Terms ~~and Conditions~~*, *supra* note ~~144~~132, §§ 10, 12(f), 12(k), 15, 16.

meaningful accountability for the representations used to obtain that revenue is substantivelyis at a minimum unfair and unconscionable.

### C. Collectors Scaled PSA's Fraud Through Vertical Integration

209. 201. Collectors' role in the alleged fraud was not limited toextended beyond passive ownership of PSA. Collectors took PSA's allegedly false grading credential and built the infrastructure necessary to scale, monetize, and entrench it. After acquiring PSA during a period of unprecedented demand, limited expert staffing, and severe backlog pressure, Collectors then directed enterprise strategy, capital allocation,PSA's allegedly false Graded Card Credential. Its acquisition activityof Card Ladder in December 2021 and SGC in February 2024, April 2024 commercial agreements with eBay and acquisition of the eBay Vault, and December 15, 2025 agreement to acquire BGS demonstrate Collectors' strategic expansion across the grading ecosystem, including intake, grading capacity expansion, and designed downstream monetization across the card's lifecycle., pricing, custody, resale, lending, marketplaces, and intermediary channels. *See supra* ¶¶ 42–45, 5041–44, 49–55, 70–75, 85–119. Upon71–74. On information and belief, Collectors exercised operation-orand-management authority over thethat broader enterprise by approving and directingthrough enterprise-level pricing, integration, and capital-allocation decisions, including the expansion of PSA submission capacity, the maintenance of consumer-facing marketing representations designedused to inducedrive submission volume, the eBay marketplace and Card Ladder integrations, the Card Ladder pricing integrations, and the expansion ofand downstream monetization channels tied to PSA grades. The precise allocation of that authority remains within Defendants' exclusive possession, but the documented transactions and public corporate materials cited herein provide a reasonable basis for these allegations to be tested through discovery.

~~197.~~ Collectors connected PSA's grade to a vertically integrated ecosystem ~~that~~whose value depends on the grade's market authority. ~~Through Card Ladder, Collectors participates in pricing and valuation; through the PSA Vault and PSA Partner Offers, it participates in custody, acquisition, resale, and liquidity; through Collectors Financial Services, it participates in lending against graded-card value; and through marketplace integrations, retail channels, dealer programs, and Card Grading Intermediaries, it routes consumers and transactions into PSA-facing pathways.~~ *See supra* ¶¶ ~~76–119. PSA supplies the allegedly misleading grade; Collectors supplies the scale, channels, and monetization structure that make the grade more profitable and market pervasive.~~

~~211.~~202. 75–115. That integration ~~created~~creates undisclosed financial conflicts inconsistent with PSA's representation of neutral third-party ~~marketing. PSA has long represented that it provides impartial, third-party validation and has no financial stake in the sale of the item it evaluates.~~grading. *See supra* ¶¶ 14–15, 83–~~120. But~~115, 139–141. Yet Collectors' ecosystem gives Defendants economic interests in the ~~very~~ values, scarcity signals, and transactions ~~PSA's grades help create.~~ affected by the Graded Card Credentials that PSA assigns ~~the grade, publishes the population data, and issues the certification; Collectors then participates in pricing, custody, offers, resale, lending, marketplace flow, and submission-channel monetization tied to that same credential~~.

~~212.~~203. Collectors' consolidation of competing grading alternatives further entrenched ~~the scheme.~~that ecosystem. PSA already held a dominant position in ~~the~~card grading ~~market.~~when Collectors ~~then~~ acquired or agreed to acquire formerly independent or competing ~~grading~~ brands, including SGC and BGS, while ~~also~~ expanding PSA's ~~own~~ submission channels and market integrations. *See supra* ¶¶ 10, ~~43–44,~~ 42, 71–74~~–75~~, 97–~~106~~102. On information and

belief, that consolidation ~~allows~~enables Collectors to capture grading demand across multiple brands even when PSA suspends lower-cost tiers, raises prices, ~~suffers~~experiences backlog pressure, or directs overflow ~~toward~~to other Collectors-controlled grading options~~. That consolidation also eliminates~~, while reducing independent grading alternatives ~~for~~available to consumers~~ like Plaintiff~~.

**D. Card Grading Intermediaries Were Also Misled and Passed PSA's Misrepresentations to Consumers**

~~200.~~ The same deception ~~operates~~operated through Card Grading Intermediaries~~. Many beneficial card owners, including Plaintiff, submit through card shops, dealers, group submitters, retail intake channels,~~, as their role and ~~similar PSA-facing conduits. Those intermediaries transmit cards into PSA's system, relay PSA's pricing and grading-related information, collect or pass through PSA-related charges, and return graded cards to beneficial owners. *See* supra ¶¶ 29, 38(a)–(f), 57(a)–(e).~~mechanics are alleged in ¶ 55. Those intermediaries did not originate the card grading deception.

~~201. Plaintiff alleges the~~ Plaintiffs allege that Card Grading Intermediaries were themselves ~~were~~ misled or left without material information by ~~PSA's~~Defendants' standardized market messaging~~,~~ and concealed ~~grading~~ practices~~, pricing leverage, guarantee limitations, and hidden contract terms. These material~~. Those misrepresentations and omissions traveled through ~~PSA's~~Defendants' submission intake channels ~~(intermediaries)~~ to ~~the~~ beneficial owners~~ whose cards, money, and reliance sustain the grading market~~. The ~~intermediary may collect or relay PSA's charges, but the deception originates with Defendants' concealed practices and standardized market message.~~

~~215.~~204. ~~This~~designed transmission structure~~ was by design. PSA aims its standards, labels, holders, guarantees, pricing, population reports, service tiers, certification~~

tools, dealer programs, group submissions, hobby-media messaging, and market-facing communications at consumers, like Plaintiff, whose money and reliance sustain the market, whether those consumers submit directly or through an intermediary. The beneficial owner remains the person, including the role of beneficial owners who pays or reimburses the grading-related charges, relies on PSA's market authority, and bearspaid or reimbursed PSA Grading-Related Charges and bore the economic consequences of PSA's grading output as alleged in ¶ 55 and ¶¶ 206–222.

* * *

216.205. The scheme alleged above is not a series of isolated misgrades, delayed orders, or disputed invoices. It is one integrated fraud with two connected parts detailed above. In short, PSA sold trust and Collectors scaled it. Defendants allegedly turned a false grading credentialmaterially misrepresented Graded Card Credential into a market-wide fee machinerevenue system by using hidden discretion to create the grade through an infirmed process, dark-pattern pricing to monetize it, contractual termsa contract of adhesion to shield it, intermediaries to transmit it, and vertical integration to profit from it throughout the card's commercial life. Consumers and the market were led to believe that the PSA GradingPSA's Graded Card Credential reflected the card's authenticity and condition. Instead, Plaintiff allegesPlaintiffs allege that thethat credential reflects Defendants' fraudulent grading system, for which consumers paid without receiving the benefit of the marketed service.

## VI. PlaintiffPlaintiffs and the Putative Class Relied on Defendants' Misrepresentations, Omissions, and Market Credential

217. Defendants' scheme depended on obtaining consumer reliance. Defendants made repeated, targeted representations through the channels identified herein and in **Exhibits C and D**. Before the March 2025 submission, As alleged in ¶40(d), before choosing PSA each

Plaintiff reviewedpersonally viewed PSA's consumer-facing service tiers, pricing information, and published (including the advertised turnaround times) and grading criteria. He also and encountered PSA public messaging describing PSAits representations of expert, criteria-based grading as expert, standardized, criteria-based, and reliable. And through his preexisting participation in the trading-card market, Plaintiff had also encountered . Plaintiffs' experience with PSA slabs, labels, certification-verification tools, population reportsPopulation Reports, and the market use of PSA grades, which reinforced the same core message. Plaintiff does that PSA grading was expert, standardized, criteria-based, and reliable. Plaintiffs do not allege that he encountered exposure to every representative statement compiled in **Exhibits C and D**; those Exhibits. Those exhibits demonstrate the standardized, repeated, and materially consistent nature of Defendants' market-facing representations .

206. Plaintiff and members of the putative class were the consumers that saturated the market.

207. Plaintiffs and Class members were the consumers Defendants intended to reach and did reach with their marketing and representations.. They beneficially owned cards submitted for PSA grading, paid or reimbursed PSA grading-related chargesGrading-Related Charges, and bore the economic consequences of Defendants' fees, upchargesgrading, pricing, delays, grading outcomes, representations, omissions, and certification outputs. Defendants createddesigned the GradingGraded Card Credential, Downstream Channels, and submission channelspathways to induce beneficial card owners to surrender possession of their cards, purchase PSA grading services, pay PSA-related charges, and rely on PSA's grades and certifications, whether those owners submitted submitting directly to PSA or through Card Grading Intermediaries. *See supra* ¶¶ 28–31, 38–40, 57, 76–119, 214–216. Defendants'

coordinated 36–40, 55, 73–137, 201–204. The third-party incidents, former-employee accounts, internal practices, and other examples alleged above are not pleaded as independent injuries for which Plaintiffs seek recovery; they are pleaded as evidence of the common system's operation, the falsity and materiality of Defendants' representations and omissions directly induced consumers to act, Defendants' knowledge and intent, and saturated the trading-card market withmeans by which the materially false or incomplete understanding that alleged fraud was concealed.

218. Plaintiffs' primary reliance theory is direct and transactional. That direct reliance included PSA's Grading Credential was impartial, objective, independent,representation that expert graders would assess identifiable physical criteria-based, and reliable. Plaintiff such as surface, centering, corners, and members ofedges, and the putative Classservice-tier representation concerning how long PSA expected to retain the submitted cards. They relied on Defendants' grading, pricing, timing, valuation, Guarantee, and market-authority representations in several mutually reinforcing ways.

219.208. First, Plaintiff directly relied on the core commercial message conveyed by Defendants' common consumer-facing representations:representation that PSA grading was neutral, independent, expert-driven, standardized, criteria-based, consistent, objective, and reliable; that PSA followed its published grading standards and scales; that its graders possessed specialized skill sufficient to identify; employed graders capable of making distinctions consumers could not detect themselves; and that PSA's service-level descriptions and pricing schedules; and accurately described the grading represented its service being purchased. Plaintiff alleges thatlevels and pricing. Class members were induced by the same core message and Grading Credential through one or more of Defendants' standardized public, intermediary,

certification, or market-facing channels, ~~even though~~although the precise ~~route by which the message reached each beneficial owner~~ channel may differ.

~~220. Second, as reflected in **Exhibit C**, Plaintiff and members of the putative Class actually relied on the integrity, legitimacy, liquidity, market acceptance, and value signal attached to the PSA Grading Credential and to the PSA-centered market that Defendants created, cultivated, and controlled, influenced, and/or monetized. Through PSA's dominant share of graded-card volume; Collectors' alleged control over PSA grading, certification, and population reporting; Collectors' vertically integrated participation in pricing data, custody, acquisition offers, resale, financing, marketplace integrations, and submission-channel relationships; and Defendants' pervasive presence across hobby communications and transaction channels, Defendants promoted and reinforced the market understanding that PSA grades materially increase card value and that PSA grades, certification records, and population reports are stable, neutral, and objective measures of authenticity, condition, scarcity, and value. *See* supra ¶¶ 10–16, 76–119, 126–131.~~

~~221. Third, Plaintiff and the putative Class relied on Defendants' omissions of material facts that contradicted or materially qualified Defendants' affirmative representations, including:~~

209. ~~the~~Plaintiffs and Class members also relied on Defendants' omission of material facts that contradicted or qualified those affirmative representations, including:

~~a.~~ a. PSA graders' identities, qualifications, ~~prior~~ experience, ~~training,~~ and ~~quality-control results of PSA graders~~whether they possessed the represented expertise when grading consumers' cards;

~~b.~~ b. PSA's use of trainees, contractors ~~or~~, and other market participants whose qualifications and potential financial conflicts were ~~not disclosed~~undisclosed;

c. employee and executive personal financial interests in graded-card inventory and the controls, if any, separating those interests from grading and certification decisions;

c. d. the extent to which grades depended on subjective eye -appeal judgments, perceived market acceptance, individual grader opinionjudgment, and discretion not governed by fixed or independently verifiable condition criteria;

d. PSA's e. undisclosed changes to published grading standards and itsPSA's ability to tighten, relax, reinterpret, or depart from those standards without meaningful noticepublished criteria;

e. the time allocated to each card, f. production quotastargets, time pressure, backlog pressures, grader-to-card ratios, and the effect of each on grading accuracy and conditions, extended shifts, internal research holds, approval requirements, and their effects on timing, consistency, and review;

the frequency ofg. PSA's use of prior PSA grade information on at least certain identifiable serialized resubmissions;

f. h. inconsistent review outcomes on review; and PSA's ability to revise, deactivate, revoke, or downgrade, or otherwise alter issued certifications after issuance;

i. alteration-screening, numerical-grade eligibility, and quality-control practices capable of admitting nonqualifying cards into numerical grade populations;

g. j. batch-level review, ratio-based grading practicesscrutiny, internal calibration instructions, managerial overrides, orintervention, and other mechanisms capable of influencing the number of PSA 10 grades entering the marketaffecting grade distributions;

~~h.~~ k. Defendants' alleged~~ efforts,~~ ability, incentives, and undisclosed means to manage or otherwise systematically affect grade populations and ~~the~~resulting scarcity premiums ~~associated with them~~;

~~i.~~ l. Population Report distortions ~~in PSA population reports caused by~~from cracking, ~~resubmission~~resubmissions, attempted crossovers, unreturned labels, stale certifications, duplicate or "ghost" entries, ~~changing catalog practices~~cataloging changes, misclassification, and other database or grading artifacts;

~~j.~~ m. Defendants' downstream financial interests in~~ the~~ pricing, custody, acquisition, resale, financing, and liquidity of cards whose grades, certifications, and scarcity signals PSA ~~itself created~~creates;

~~k.~~ n. PSA's post-submission pricing leverage, upcharge methodology, variable charges, valuation discretion, control over grade disclosure and return, and ability to demand additional payment after obtaining ~~possession of~~ and grading consumers' cards;

~~l.~~ ~~the manner in which~~o. how PSA calculated and internally managed turnaround time, including clock-start rules and research-stage holds;

~~m.~~ ~~the limits of~~p. the Guarantee's eligibility restrictions and exclusions; and

~~n.~~ ~~the hidden terms and disclosures in~~q. separated or hyperlinked ~~areas that~~ Online Terms and disclosures Defendants later invoked or could invoke to qualify ~~or disclaim~~ the grading standards, pricing, timing~~ commitments~~, Guarantee protection, remedies, and accountability PSA marketed~~ to consumers~~.

210. ~~Plaintiff~~Plaintiffs and Class members~~ of the putative Class~~ reasonably understood that no undisclosed practices, conflicts, restrictions, exclusions, or pricing mechanisms

materially undermined the ~~advertised~~represented service. Their reliance on ~~the~~these omissions was transactional and concrete.

~~222.~~211. ~~Fourth, Plaintiff, like many collectors, submitted cards through a Card Grading Intermediary. That intermediary~~Plaintiffs' use of Card Grading Intermediaries does not alter that reliance or injury. Intermediaries performed limited intake and transmission functions~~:~~ by forwarding ~~Plaintiff's cards to PSA; communicating submission-related information;~~cards, relaying PSA's service~~-tier descriptions, prices, turnaround representations, grading-related~~ tiers, pricing, timing, charges, payment demands, instructions, grading results, and return information, and ~~submission instructions; and remitting or~~ facilitating payment. ~~Plaintiff~~Plaintiffs remained the beneficial ~~owner of the cards, the person~~owners, persons for whose benefit grading was ~~sought, the source~~obtained, sources of the funds used to pay or reimburse ~~PSA-related charges~~Grading-Related Charges, and ~~the person who bore~~persons bearing the economic consequences~~ of Defendants' grading, fees, delays, certifications, and market-facing outputs.~~. The ~~intermediary~~ intermediaries did not originate the alleged deception~~,~~ or break the causal chain~~, or transform Plaintiff into an indirect or derivative victim. It was a PSA-facing conduit~~; they were PSA-facing conduits through which Defendants' standardized representations, charges, services, and ~~grading~~ outputs reached the beneficial ~~card~~ owners who paid for and relied on them.

~~223.~~212. The Card Grading Intermediaries ~~were also exposed to Defendants' misleading market message. They~~likewise received and relayed PSA's standardized pricing, service~~-tier information, pricing~~ tiers, turnaround representations, ~~submission~~ instructions, ~~upcharge communications~~upcharges, grading results, return information, Guarantee~~-related~~ assurances, and ~~market-facing~~ claims ~~concerning PSA's~~of expertise, neutrality, standards, and

reliability. ~~Plaintiff alleges~~Plaintiffs allege that ~~those~~the intermediaries ~~were themselves misled or left without~~similarly lacked the omitted material information~~ concerning PSA's misrepresentations and omissions alleged herein.~~. When ~~an intermediary passed~~they transmitted PSA's incomplete or misleading information~~ to a beneficial card owner~~, the alleged deception originated with Defendants, who ~~knew and~~ intended ~~that intermediaries would transmit PSA-originated~~their representations and outputs to reach the beneficial owners whose cards, ~~money~~payments, and reliance sustained the ~~transaction~~transactions.

~~224.~~213. The representations and omissions were~~ common and~~ material because they concerned the core attributes and total economic terms of the bargain. A reasonable consumer deciding whether to submit a card, select or expedite a service tier, pay ~~for expedited service, pay~~ or contest ~~a declared-value~~an upcharge, resubmit~~ a card, pursue~~, seek crossover or review, rely on a grade, or sell, hold, insure, finance, ~~lend against,~~ or otherwise use a graded card ~~in the secondary market~~ would consider ~~it~~the concealed information important~~ to each of the issues set forth above in paragraphs 217 through 223~~.

214. Defendants knew ~~that~~ the concealed ~~facts were~~information was material~~.~~ ~~Defendants~~ because they created, controlled, and ~~had~~possessed superior access to PSA's hiring and staffing criteria, employee conflict policies, grader qualifications, grading standards, ~~grader training, internal guidance,~~ production expectations, ~~published criteria,~~ prior-grade alerts, research workflows and approval requirements, certification ~~database, population reports~~and correction systems, alteration-screening and numerical-grade eligibility practices, Population Reports, service~~ tier architecture~~ tiers, turnaround calculations, valuation methodology, ~~upcharge process~~upcharges, Guarantee terms, ~~turnaround disclosures,~~ payment demands, and Collectors' downstream integrations. ~~The concealed facts were therefore not external conditions~~

~~unknown~~Moreover, they implemented a process to ~~Defendants; rather, they were features of~~keep the ~~system that Defendants designed, operated, monitored, revised, and monetized. Defendants~~omissions a secret to such a degree that whistleblowers conceal their identities and voices.

~~209.~~ Defendants' omissions also ~~knew that consumers and intermediaries lacked access to~~ served the ~~internal information necessary to evaluate whether PSA's market-facing representations were accurate and complete.~~

~~226.~~215. ~~Defendants concealed those facts because the undisclosed system generated revenue at multiple stages. The promise~~system's monetization. Representations of expert, neutral, standardized grading induced ~~initial~~ submissions~~. The~~; opacity ~~of the grading process~~ preserved ~~consumer~~ dependence on PSA's judgment~~. Subjective~~; subjective and variable outcomes ~~encouraged cracking,~~generated opportunities for reviews, resubmissions, crossovers, and other repeat services~~. The declared-value structure~~; prior-grade information and internal review practices remained undisclosed to consumers purchasing those repeat assessments; declared-value pricing permitted post-submission upcharges after PSA ~~had obtained possession and assigned the grade that materially affected market value. The~~possessed and graded the card; advertised turnaround ~~structure induced consumers to pay premiums for faster service that PSA allegedly did not reliably deliver and simultaneously purported to disclaim or materially qualify through~~ times supported expedited premiums while separated terms~~.~~ purported to qualify them; and Guarantee language ~~preserved~~supported market confidence while ~~excluding the~~ imposing original-submitter ~~and persons acting on the original submitter's behalf or for the original submitter's benefit, and while conditioning any eligible current owner's claim on a qualifying,~~ arm's-length-purchase, ~~an~~ active-certification ~~at the time of purchase~~, and other restrictions ~~and~~

~~exclusions. PSA's population reports~~. Population Reports, certification tools, Card Ladder ~~pricing data, vaulting,~~ Vault services, ~~partner-offer mechanisms~~Partner Offers, marketplace integrations, resale pathways, and financing ~~channels~~ then allowed Defendants to ~~profit from~~monetize the grades, scarcity signals, ~~grading outcomes,~~ and market values ~~that their own system created,~~ produced or influenced~~, and controlled.~~ by that system.

~~227.~~216. ~~Although unnecessary for certain~~For claims~~, Plaintiff relied on Defendants' conduct. Plaintiff personally~~ requiring reliance, Plaintiffs actually relied on Defendants' representations and omissions ~~when~~in deciding to use PSA, ~~cause~~submit cards ~~to be submitted~~, select ~~PSA~~ service tiers, relying on the associated turnaround representations, pay or reimburse ~~PSA grading-related charges, pay~~ Grading-Related Charges and, where applicable, pay or contest post-submission charges, permit PSA ~~or PSA~~-facing channels to retain ~~possession of his~~their cards, and treat ~~PSA's~~PSA grades, certifications, and population data as reliable and authoritative. ~~Plaintiff also actually relied on the legitimacy, market acceptance, and value signal that Defendants intentionally attached to the PSA credential through their standardized representations and vertically integrated market infrastructure. Accordingly, Plaintiff pleads actual~~This transaction-specific reliance ~~in two mutually reinforcing forms, together and in the~~ is Plaintiffs' primary theory for fraud, fraudulent concealment, and Maryland Consumer Protection Act claims. The market-credential theory alleged above remains an alternative~~: (1) direct reliance on Defendants' material representations and omissions; and (2) actual reliance on the PSA Grading Credential and the market value signal Defendants attached to it when Plaintiff submitted his cards for grading.~~ for discovery and class-certification purposes.

~~228.~~217. ~~Plaintiff alleges that~~ Class members ~~of the putative Class~~ likewise relied on ~~specific statements,~~ PSA-originated representations, submission communications, and

material omissions~~, the PSA credential's cultivated market legitimacy, the value signal attached to that credential, or some combination of those sources~~ in ~~making~~ their ~~own~~grading transactions and card-use decisions. ~~In each instance, reliance arose from~~ Defendants' ~~same~~ common ~~course of conduct, common omissions, common~~ representations, ~~common~~omissions, grading system, pricing architecture, ~~common grading system,~~ and ~~common~~ market~~-making~~ infrastructure provide common proof. Even ~~absent proof of actual~~if the alternative market-credential ~~or value-signal reliance by~~theory is not established for every Class member, ~~Plaintiff's~~Plaintiffs' direct reliance ~~on PSA's common representations and omissions~~ independently caused ~~his submission, payment~~their submissions, payments, and ~~resulting injury~~injuries.

~~229.~~218. That reliance was reasonable because Defendants possessed superior or exclusive knowledge of~~, and controlled access to,~~ the ~~information material to the grading transaction.~~concealed facts. Before ~~submitting cards or paying charges, Plaintiff had no meaningful ability to know the identities, qualifications, experience, or training of graders; the time allocated to each card;~~ submission and payment, consumers could not meaningfully determine who would grade their cards or whether those persons possessed the expertise PSA represented; the production ~~quotas or backlog~~ targets and internal time pressures under which the work was performed; the ~~role~~prior-grade information supplied in identifiable resubmissions; the extent of subjective ~~eye-appeal and perceived~~ or market~~ acceptance; the frequency of inconsistent or changed grading outcomes~~-based grading judgment; undisclosed ~~changes to grading criteria; the basis for population-report entries; Defendants' alleged efforts and mechanisms to influence Gem Mint populations; how turnaround times were calculated; what triggered declared-value upcharges; whether favored commercial submitters received priority; the full scope and practical effect of the Guarantee's original-submitter exclusion, arm's-length-~~

~~purchase requirement, active-certification requirement, clerical-error exclusion, and other limitations; Defendants' downstream~~standards changes; alteration-screening and numerical-grade eligibility practices; internal error and correction data; Population Report accuracy and classification integrity; research-stage timing holds; upcharge triggers and valuation methodology; employee and executive financial conflicts; ~~or the~~ Guarantee restrictions; or rights-limiting terms Defendants ~~would~~might later invoke ~~to qualify or disavow the reliability, standards, timing, Guarantee protection, and accountability they marketed.~~. Defendants had a duty to disclose those ~~facts~~matters because ~~they made~~their affirmative and partial representations ~~that~~ were materially misleading without ~~the omitted information, possessed superior or exclusive knowledge of the true grading process and fee practices, knew consumers~~ them and consumers and intermediaries lacked access to ~~that information, and controlled the terms and information structure of the transactions~~the information necessary to discover them.

~~230.~~219. Neither ~~Plaintiff~~Plaintiffs nor similarly situated Class members ~~of the putative Class~~ received reasonable notice of, relied ~~on~~upon, or assented to Defendants' purported online contract ~~of adhesion embodied in the terms~~. As alleged *supra* ¶¶ 28–29 and ~~conditions Defendants may invoke to limit their claims or remedies. Nor~~55(b)–(f), Plaintiffs did ~~Plaintiff~~not authorize ~~the Card Grading Intermediary~~intermediaries to accept ~~such~~those terms or waive ~~his~~their rights, ~~represent to Defendants that the intermediary had apparent authority to do so, or ratify~~and any ~~purported acceptance with knowledge of the material terms. Any~~portal interaction ~~by the intermediary with Defendants' website, portal, forms, or submission materials~~ occurred in the intermediary's own PSA-facing commercial capacity. ~~Accordingly, Plaintiff's~~Plaintiffs' injuries ~~alleged below arose~~therefore arise from the representations and omissions on which ~~he~~

~~actually~~they relied, not ~~from undisclosed~~contractual limitations ~~that he~~they never saw or accepted. ~~*See* supra ¶¶ 32–33, 38(a)–(e), 57(b)–(g), 139, 206–208.~~

~~231.~~220. ~~Plaintiff's~~Plaintiffs' and ~~the putative Class's~~Class members' injuries were direct and economic. They paid or reimbursed ~~grading-related charges~~Grading-Related Charges for ~~services that were~~Graded Card Credentials materially different from ~~what Defendants~~those represented. The Credential's value derives from the represented expertise, standards, objectivity, independence, reliability, and ~~paid more~~service terms, yet Plaintiffs allege it was produced, priced, and delivered through materially different undisclosed practices. Timing was part of the same bargain: each Plaintiff surrendered independently valuable property based on an advertised turnaround period and alleges PSA retained his cards longer than ~~they otherwise would have paid—or purchased services they otherwise would not have purchased—because of Defendants' misrepresentations and omissions. Those charges included, as applicable, grading fees, regardless of how they are characterized,~~represented. Plaintiffs therefore allege overpayment for both the Credential and its represented timing. Their injuries include Grading-Related Charges and associated costs ~~like shipping, handling, and insurance. Plaintiff and members of the putative Class also lost the~~ , benefit-of-~~their~~ -the-bargain overpayment, and, where ~~applicable, suffered~~separately established, diminished ~~value,~~ marketability, ~~or~~ liquidity ~~when cards received credentials produced through concealed, inconsistent, subjective, arbitrary, manipulated, variable, conflicted, or otherwise unreliable practices~~, or other direct economic loss.

~~232.~~221. ~~Had Plaintiff and members of the putative Class~~Had Plaintiffs known the truth, they would not have submitted the same cards on the same terms~~, selected~~ or paid the same ~~service tiers, paid the same grading fees,~~ Grading-Related Charges; at minimum, they would

have paid less. Accurate disclosure of PSA's backlog, clock-start rules, intake practices, research holds, capacity constraints, and workflow would have led Plaintiffs to pay less, choose different terms or another provider, delay submission, or retain their cards for raw sale. Likewise, Class members would not have paid the same upcharges, expedited premiums, repeat-service fees, or related costs~~, allowed PSA or PSA-facing intake channels to retain possession of their cards under materially different pricing or timing conditions, or relied on PSA's grades, certifications, and population reports in the same manner. At minimum, they would have paid less. In substance, Defendants represented that they were selling~~ had the underlying facts been disclosed. Defendants sold impartiality, expertise, objectivity, ~~accountability,~~ reliability, ~~and disclosed service-tier~~transparent pricing, ~~service-level distinctions,~~ represented turnaround ~~periods~~times, Guarantee protection, and market authority~~. Instead, Plaintiff and the putative Class received~~ ; Plaintiffs allege they received materially different Credentials produced and monetized through undisclosed discretion, ~~monetized uncertainty, variable charges, post-submission repricing, delayed return, limited practical recourse, and a credential whose market value depended on representations Defendants knew were materially incomplete or misleading. That substitution is the alleged fraud, and the difference between what Defendants represented and what Plaintiff and the putative Class received~~ production pressure, financial conflicts, variable pricing, timing constraints, and certification and population practices. That difference caused their economic loss.

~~217.~~ Defendants' own market representations ~~create~~provide a common~~ and~~, testable ~~factual alternative. Defendants have represented~~premise. They represent that PSA ~~established~~provides a ~~recognized~~ universal grading standard~~;~~ that ~~PSA grading~~ enhances marketability, liquidity, stability, and ~~sale~~ value; that ~~PSA's~~ Population ~~Report provides current~~

~~or exact~~Reports provide grade-level scarcity data; and that PSA's pricing, valuation, Vault, Partner Offer, and marketplace integrations ~~enable~~facilitate informed ~~buying, selling, trading, custody, and financing decisions. If those~~transactions. Those representations ~~are accurate, they~~ support ~~Plaintiff's~~Plaintiffs' allegation that PSA grades, ~~certification records,~~ certifications, population data, and ~~valuation outputs~~valuations are material, price-forming market inputs ~~incorporated into transactions in the PSA-centered market. To the extent Defendants instead~~ . If Defendants contend ~~that those outputs are not materially relied upon, informationally transmitted, or capable of producing common market effects, that contention~~otherwise, that position supports the alternative inference that ~~Defendants'~~their own market-use representations were ~~false or~~ materially misleading ~~when made. Plaintiff pleads these alternatives together and will test them through common discovery and expert evidence.~~

~~234.~~222. ~~Plaintiff therefore preserves a request, following discovery and at class certification, for a rebuttable~~ . Plaintiffs plead this market-credential ~~market reliance presumption by reasonable extension of *Basic*, without making that presumption~~ theory in the ~~exclusive basis~~alternative and do not depend on it for their direct transactional reliance or ~~RICO causation~~injury.

## VII. Common Factual Allegations Supporting ~~Plaintiff's~~Plaintiffs' RICO Counts

~~235.~~223. ~~Plaintiff reasserts, realleges, and incorporates by reference all~~Plaintiffs reassert and incorporate the preceding allegations. Sections I through VI~~, including~~ and Exhibits A–D~~, supply~~ plead the particularized facts supporting the RICO claims, including the PSA-centered card market, ~~the~~ marketed grading transaction,~~ the~~ materially misrepresented ~~Grading~~Graded Card Credential, ~~the~~ deceptive fee architecture, ~~the use of~~ Card Grading Intermediaries, ~~Plaintiff's~~Plaintiffs' reliance and ~~injury~~injuries, and Defendants' use of interstate mails and wires.

~~236.~~224. ~~Plaintiff alleges~~Plaintiffs allege violations of 18 U.S.C. §§ 1962(c) and 1962(a), predicated on repeated acts ~~that are~~ indictable as mail ~~fraud under 18 U.S.C. § 1341~~ and wire fraud under 18 U.S.C. ~~§~~§§ 1341 and 1343.

**A. Overview of Defendants' RICO Scheme Based in Fraud**

225. This case is not ~~a dispute over~~about a single disappointing grade, ~~delayed shipment~~delay, or ~~isolated~~ billing error. ~~It concerns~~Plaintiffs allege a coordinated ~~commercial~~ scheme in which Defendants used ~~the appearance~~representations of impartial, expert, objective, criteria-based~~, objective~~ grading ~~to obtain consumers' money~~ and the time within which PSA would possess and return independently valuable property ~~through~~ to induce consumers to surrender their cards and money. Through repeated ~~material~~ misrepresentations, half-truths, omissions, ~~concealment,~~ post-submission charges, and possession-based leverage~~.~~, Defendants sold trust ~~and~~, market authority ~~but~~, and time while knowingly ~~delivered~~delivering and ~~monetized~~monetizing a materially different ~~Grading~~Graded Card Credential~~, using the~~ through interstate mails and wires ~~to implement their~~ .

~~224.~~ The scheme~~.~~

~~238.~~226. ~~The scheme's principal property object was~~ principally targeted consumers' money, including the PSA Grading-Related Charges defined in ¶ 40~~.~~(e). Defendants also obtained possession and control of consumers' cards (valuable property) and used that ~~control~~leverage to secure additional payments and, in some ~~cases, to~~instances, facilitate ~~acquisition of the cards themselves. Beyond direct misrepresentations and omissions, market~~card acquisitions. Market trust~~, information,~~ and acceptance of the ~~Grading~~Graded Card Credential were the ~~manner and~~ means ~~of how~~through which Defendants obtained that property.

~~239.~~227. The scheme had two integrated components. First, Defendants sold~~, produced,~~ and circulated the ~~Grading~~Graded Card Credential through the expertise, standards,

process~~ and ~~, certification, conflict, and market-use deceptions alleged in ¶¶~~143–182~~ 130–174. Second, ~~Defendants~~they monetized that ~~credential~~misrepresented Graded Card Credential through the deceptive price-value-speed, MIV, upcharge, turnaround, Guarantee, repeat-service, dark-pattern, and contractual-shield practices alleged in ¶¶~~183–208~~ 175–200. Collectors scaled both ~~components ~~through ~~its~~the Downstream Channels and vertically integrated infrastructure alleged in ¶¶~~76–119~~ 73–106 and ~~209–216. Together, the consumer~~201–204. Consumer-facing representations induced ~~card grading ~~submissions and payments; ~~PSA's grading and certification systems~~PSA produced the ~~credential~~Graded Card Credential; Defendants' population, pricing, custody, offer, marketplace, and lending systems reinforced and monetized it; and ~~their~~ limitations and contractual shields concealed material qualifications and obstructed accountability. Each predicate act ~~alleged below executed, ~~furthered, executed, maintained, completed, or concealed ~~one or more parts~~part of that integrated ~~system~~scheme.

~~240.~~228. The RICO claims do not ~~rest~~depend merely on disagreement with ~~an~~ individual ~~numerical grade or on the premise that every evaluative judgment is objectively true or false.~~grades. They concern verifiable commercial facts and actionable half-truths about ~~who performed the work~~grader expertise and ~~with what ~~qualifications; ~~whether PSA followed the~~misrepresented adherence to published standards~~ it invoked; whether the process was standardized, repeatable, independent, and free from~~; undisclosed prior-grade information; alteration-screening and numerical-grade eligibility; production ~~or ratio controls; whether the displayed price was final~~requirements and ~~what an upcharge purchased; how~~internal review practices; certification and Population Report reliability; employee and executive financial conflicts; unjustified pricing and upcharges; concealed turnaround ~~time was calculated; who could use the~~times; illusory Guarantee~~; whether certifications and population counts were~~

~~reliable; and whether Defendants had~~ eligibility; and undisclosed Defendants' financial interests in grade-dependent transactions. The grade, holder, label, certification number, verification record, population entry, scarcity signal, Guarantee messaging, and PSA-associated market acceptance ~~were related, interdependent components of one paid commercial product: the Grading~~together comprise the paid Graded Card Credential.

~~241.~~229. The preceding allegations also ~~plead~~establish materiality, knowledge, and ~~specific~~ intent. The challenged representations and omissions concerned the personnel, standards, reliability, price, timing, protection, scarcity, conflicts, and market utility for which consumers selected ~~PSA~~ and paid ~~them~~PSA. Defendants created~~ and~~, controlled, or possessed superior access to the ~~concealed~~underlying hiring, grading, production, prior-grade alert, certification, ~~population~~alteration-screening, Population Report, pricing, valuation, Guarantee, timing, payment, intermediary, conflict-control, and downstream systems~~ and~~. Defendants continued ~~the challenged~~ their representations ~~after~~despite the ~~public~~ admissions, criteria changes, production requirements, conflict policies, certification events, backlog disclosures, Guarantee limitations, and other ~~events~~facts alleged in ¶¶~~144–208. Those facts, together with their~~ 130–204. Plaintiffs allege those facts and Defendants' concealment ~~practices alleged above,~~ support the reasonable inference that Defendants ~~acted~~ knowingly ~~and with intent~~intended to obtain ~~consumers'~~consumer money ~~by~~through fraud.~~ *See* supra ¶¶217–233; *Neder v. United States*, 527 U.S. 1, 22–25 (1999).~~

~~242.~~230. ~~Plaintiff's March 2025 transactions are~~ Plaintiffs' submissions provide representative transaction-level examples~~ of millions of similar consumer grading transactions that take place each month in the same way.~~. As alleged in ¶¶~~38(c)–(g), 39~~ 36–40~~,~~ and ~~217–233,~~206–222, each Plaintiff ~~reviewed~~encountered PSA-originated grading, service-level, pricing,

standards, Guarantee, and market-facing ~~materials in Maryland and heard on social media PSA's messaging; he delivered approximately seven~~representations; submitted beneficially owned cards~~, including Cal Ripken Jr. rookie cards, to a Maryland~~ through a Card Grading Intermediary; and ~~he~~ paid or reimbursed ~~about $300 in~~ PSA ~~grading-related charges and associated transaction costs.~~Grading-Related Charges. The ~~intermediary~~Card Grading Intermediaries used ~~its~~ PSA ~~account~~accounts and interstate systems to transmit ~~Plaintiff's~~Plaintiffs' cards, submission information, payments, and PSA~~-originated~~ communications~~,~~ and later received ~~and returned~~ the PSA-certified cards. ~~Through that transaction,~~The associated mail and wire events included intake shipments, submission or intake confirmations, payment requests or invoices, grading and certification communications, and return shipments. Defendants thereby obtained ~~Plaintiff's~~Plaintiffs' money and possession of ~~his~~their cards~~,~~ and ~~Plaintiff received~~delivered the allegedly misrepresented ~~Grading~~Graded Card Credentials. ~~These allegations identify each Defendant's role; the substance, timing, location, and means of~~ To the extent not presently known, the precise dates, routing, senders, recipients, payment transmissions, submission identifiers, and related electronic records are maintained in Defendants' and the ~~fraud;~~Card Grading Intermediaries' systems and are not accessible to Plaintiffs, who did not maintain PSA accounts or operate the ~~money and property obtained;~~PSA-facing submission portals. Those particulars are therefore within Defendants' and the ~~records used to establish the transaction-level identification of the communications, shipments, payments, certifications, and resulting injury. These allegations, together with allegations of enterprises, predicate acts, pattern, use or investment of racketeering income, interstate-commerce nexus, injury, causation,~~Intermediaries' possession or control and ~~timeliness are pleaded in detail below~~are appropriately established through discovery.

**B. Particularities of Mail Fraud — 18 U.S.C. § 1341**

~~243.~~231. Defendants' scheme depends on ~~the United States mails~~ interstate mail and ~~interstate~~ commercial carriers. Consumers ~~submit their~~ship cards ~~by interstate mail or carrier~~ to PSA directly or through Card Grading Intermediaries~~ as PSA-facing intake channels~~, and ~~then~~ PSA returns graded cards ~~by interstate mail or carrier. Plaintiff's March 2025 submission involved the physical transmission of his~~through the same interstate channels. Plaintiffs' cards traveled from Maryland into PSA's grading system and ~~the return of graded cards~~back through ~~the Card Grading Intermediary~~their intermediaries. *See supra* ¶¶ ~~38(c)–(f), 57~~36–40, 55(a)~~–~~(c), ~~214–216, 242. The same transmission structure applies to Class members who submitted directly or through Card Grading Intermediaries~~211–212, 223–230.

~~244.~~232. ~~Under Defendants' scheme, representative~~Representative mail-fraud ~~predicate acts~~predicates include: (a) intake shipments ~~of consumer cards~~ induced by PSA's ~~expert~~ grading, timing, pricing, and Guarantee representations; (b) ~~post-submission~~mailed or shipped invoices, payment ~~demands,~~or upcharge demands, and release-conditioning notices; (c) return shipments ~~of graded cards~~ bearing PSA labels, grades, and certification numbers~~, and grades~~ represented as expert, reliable, and market-authoritative; and (d)~~ mailed or shipped~~ promotional, solicitation, submission, dealer, or partner materials carrying PSA's grading, pricing, timing, and Guarantee representations.

~~245.~~233. ~~The mail was reasonably~~These mailings were foreseeable and ~~essential~~integral to the scheme. Defendants could not ~~solicit,~~ receive, control, grade, encapsulate, return, or monetize ~~consumers'~~consumer cards without interstate shipment. ~~Each submission generated one or more mailings, and each mailing either~~The mailings induced ~~cards submission~~submissions, transferred possession, ~~transmitted the false credential, demanded or~~ facilitated payment, delivered the Graded Card Credential, returned ~~the card~~cards, or propagated

PSA's grading output into the market. Additional shipment records are within Defendants' and Card Grading Intermediaries' possession~~, custody, or control~~ and will be identified through discovery.

**C. Particularities of Wire Fraud — 18 U.S.C. § 1343**

~~246.~~234. Interstate wires are the operational infrastructure of Defendants' ~~use of interstate wires was even more pervasive. The PSA-centered~~ grading ecosystem~~ operates through~~, including websites, submission portals, email~~ systems~~, payment processors, certification databases, population reports, pricing tools, Card Ladder~~ data~~, Vault systems, Partner Offers, marketplace integrations, and ~~return~~ shipment communications.~~ Each wire communication described below carried, executed, furthered, or concealed one or more deceptive practices alleged in Sections IV through VI.~~

~~247.~~235. ~~Under Defendants' scheme, representative~~Representative wire-fraud ~~predicate acts~~predicates include: ~~— (a) website solicitations and public webpages, including~~(a) grading standards, pricing pages, service descriptions, turnaround representations, Guarantee language, population reports, certification tools, and ~~PSA~~ market-authority statements; (b) ~~submission-portal communications, including~~ submission confirmations, service-tier selections, MIV or declared-value entries, status updates, and payment authorizations; (c) invoices, upcharge and ~~payment communications, including invoices, payment reminders,~~ adjusted-fee demands, payment reminders, and final-amount~~ due~~ notices ~~sent~~issued after PSA ~~or PSA-facing channels~~ obtained possession~~ of the card~~; and (d) grading-result communications ~~that sent the assigned grade~~transmitting grades, certification ~~number~~numbers, label information, images, grade ~~reveal~~reveals, or ~~certification~~ verification data.

~~248.~~236. Additional ~~representative wire-fraud predicate acts~~predicates include: (a) ~~population-report publications transmitting PSA~~Population Report and certification

transmissions communicating grade counts ~~into the market~~ as scarcity signals; (b) Card Ladder pricing and valuation transmissions ~~converting grading and population data into market-facing valuation signals~~; (c) PSA Vault, ~~PSA~~ Partner ~~Offers~~Offer, and eBay-linked communications ~~allowing~~enabling graded cards to be stored, valued, offered, or sold~~, or valued through Collectors-controlled or Collectors-integrated channels~~; (d) hyperlinked terms, ~~clickwrap screens~~clickwraps, disclaimers, arbitration and class-waiver provisions, ~~class-action waivers,~~ warranty disclaimers, and liability caps; and (e) payment ~~-processing~~ transmissions for grading ~~fees~~, upcharges, speed premiums, ~~review fees, resubmission fees, crossover fees~~reviews, resubmissions, crossovers, shipping, handling, insurance, and related ~~grading~~ charges.

237. Defendants ~~knew,~~ intended~~,~~ and reasonably foresaw that ~~their wire~~these interstate communications would ~~be received, relied upon, relayed, or~~reach and be acted upon by consumers and Card Grading Intermediaries ~~in states other than where the communications originated.~~nationwide. Without ~~those wires~~them, Defendants could not solicit submissions, ~~induce payment~~collect payments, operate ~~the~~grading and submission ~~and grading~~ systems, impose upcharges, reveal grades, publish population ~~data, transmit~~and certification ~~information~~data, maintain ~~Card Ladder~~ valuation ~~signals~~tools, operate ~~PSA~~the Vault or Partner Offers, or monetize downstream ~~valuation effects.~~activity. The wires were ~~not incidental~~integral to the scheme~~; they were its operational spine~~.

~~249.~~238. Plaintiffs have pleaded the participants, approximate time periods, content, purpose, and transactional context of the representative mail and wire predicates presently known to them. To the extent the precise transmission date, routing, sender, recipient, payment processor, electronic identifier, or internal communication is not alleged, that information resides

in Defendants' and the Card Grading Intermediaries' submission, payment, email, shipping, and database records and is unavailable to Plaintiffs before discovery.

### D. Each Predicate Act Caused, Furthered, or Concealed the Deceptive Practices

~~250.~~239. The mail~~-~~ and wire~~-fraud predicate acts caused~~ predicates carried, executed, furthered~~,~~ or concealed the ~~same four categories of fraud~~ alleged ~~in Plaintiff's Fraud and Fraudulent Concealment counts. To that end, Defendants' fraud consists of~~ expertise~~ claims~~, impartiality, standards~~ claims~~, process~~ and~~ , certification~~ claims~~, pricing, timing, Guarantee, and market-use ~~claims. The mail- and wire-fraud predicate acts were not standalone~~deceptions. Solicitations and service-level communications~~. Website solicitations, submission-portal communications, and social media promotions carried the expertise, objectivity, Guarantee, and pricing representations. Service-tier advertising and turnaround representations carried~~ induced consumers to surrender independently valuable cards by presenting the price-value-speed ~~deception. Upcharge notices, invoices, and~~ package, including the represented period of PSA possession; payment communications ~~executed drip pricing, unilateral~~converted those submissions into money received or retained by Defendants; invoices and upcharge demands executed post-submission repricing~~,~~ and possession-based ~~lock-in.~~leverage; grading, Guarantee ~~representations~~, and certification~~ lookup transmissions preserved~~ communications delivered the Graded Card Credential and reinforced market confidence while concealing material limitations~~.~~; Population~~ report publications transformed, controlled, or distorted grade~~ Reports converted grading outcomes into ~~public~~ scarcity signals~~.~~; Card Ladder, ~~PSA~~the Vault, ~~PSA~~ Partner Offers, and eBay~~ related transmissions~~ integrations monetized the ~~fraudulently produced Grading~~ Credential downstream~~. Return~~; and return shipments ~~transmitted the assigned grade itself into the market. More precisely, those shipments and related wires transmitted~~restored possession after PSA's ~~market-facing~~actual retention period while placing the slab, grade, certification

product—the slab, label, grade, certification number, verification record, and resulting population-report consequences —into the stream of commerce. Hyperlinked terms, clickwraps, disclaimers, arbitration clauses, class waivers, and liability caps concealed and contractual limitations and obstructed relief. And Card Gradingseparately qualified the rights and protections marketed to consumers, while Intermediaries repeated these same representations,relayed Defendants' standardized communications, or transmissions as an echo chamber of and as instructed by Defendants and outputs.

**E. Defendants Engaged in a Pattern of Racketeering Activity**

251.240. Defendants' predicate acts of mail fraud- and wire-fraud predicates constitute a related and continuous pattern of racketeering activity under 18 U.S.C. § 1961(5) because they are related and continuous.). They are related because they haveshare the same purpose, results, participants, victims, methods, and distinguishing characteristics. They are continuous because theyresults; have occurred overrepeatedly for years, across large numbers of consumer transactions,; and remain part of Defendants' regular wayoperation of operating the PSA-centered grading business. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989); *Brandenburg v. Seidel*, 859 F.2d 1179 (4th Cir. 1988); *Walters v. McMahen*, 684 F.3d 435 (4th Cir. 2012). PSA grades millions of cards each month, meaning millions of consumers, like Plaintiff, are defrauded each year.

252. The predicate acts are related because each furthers the same fraudulent grading and fee scheme. Each act either inducespredicates share a common purpose: obtaining consumer to submit a card, causes payment, transfers possession, allows Defendants to retain leverage over the card, transmits a grading outcome, publishes a scarcity or pricing signal, conceals the true nature of the grading process, and/or monetizes the downstream value of Defendants' own grading determinations. No predicate act stands alone; each is a link in the same chain with one

~~reinforcing another. The practical reality is that card grades are inextricably intertwined through Defendants' population and certification reports, and valuation and secondary market channels, which drive more card grading.~~

~~253.~~241. ~~The predicate acts share the same purpose, namely to obtain~~ money ~~or~~and property ~~from consumers~~ by presenting ~~PSA Grading~~Graded Card Credentials as impartial, expert, objective, criteria-based, reliable, transparent, accountable, ~~guaranteed~~protected, and market-authoritative while concealing ~~that the credential is subjective, opaque, variable~~the materially contrary expertise, discretion, production~~-driven, internally managed, and protected by hidden or contested terms and disclaimers~~, prior-grade, conflict, certification, population, pricing, timing, and contractual facts alleged herein.

~~254.~~242. ~~The predicate acts produce the same results. Consumers pay grading fees, whether characterized as upcharges, speed premiums, review fees, resubmission fees, crossover fees, shipping, handling, insurance, and related charges for a credential~~They produce common results: consumers pay Grading-Related Charges for Graded Card Credentials not delivered as represented~~. At the same time, a Defendant-controlled grade circulates into~~, while PSA grades enter the secondary market~~, where it affects~~ and affect scarcity, price, ~~scarcity,~~ liquidity, custody, resale, offers, lending, and further grading demand~~ for grading~~.

~~255.~~ The ~~predicate acts~~predicates involve the same core participants~~. PSA operates the grading, certification, pricing, fees, Guarantee, population report, and consumer-facing communications functions. Collectors directs and benefits from the acquisition strategy, transaction-level-data infrastructure, custody, offers, lending, marketplace integrations, and downstream monetization. Card Grading Intermediaries serve as PSA-facing intake conduits that solicit or accept cards, aggregate submissions, transmit cards into PSA's system, relay PSA's~~

~~prices, services and communications, collect or facilitate payment, and return graded cards to beneficial owners. Those intermediaries also participate economically because they earn money on each submitted card, including intake fees, handling fees, submission fees, per-card markups, and/or other compensation layered onto or collected with PSA-related charges. eBay, Card Ladder, PSA Vault, PSA Partner Offers, Collectors Financial Services, and other Collectors-controlled or Collectors-integrated channels transmit, monetize, or amplify PSA grades and grading-dependent market signals.~~

~~256.~~243. ~~The predicate acts~~ identified in ¶¶ 49–55 and target the same ~~category of~~ victims: beneficial card owners who submit ~~trading cards for grading,~~ directly or through Card Grading Intermediaries~~,~~ and ~~who~~ pay or reimburse ~~grading-related charges~~Grading-Related Charges in reliance on PSA's ~~market-facing representations. Plaintiff falls squarely within that category. The same alleged scheme affected Class members who paid or reimbursed the same categories of charges and bore the same categories of economic consequences~~misrepresentations.

~~257.~~244. ~~The predicate acts use the same~~They also employ common methods: standardized ~~public~~ marketing~~; representations of fixed~~ and grading standards~~,~~; pricing ~~pages,~~and service-tier ~~descriptions,~~pages; Guarantee ~~language, labels, holders~~, label, holder, population ~~reports~~, and certification ~~tools~~representations; interstate ~~card~~ shipments; ~~interstate~~ portal, email, payment, and database communications; post-submission pricing demands; return shipments ~~of graded cards; and contractual shields presented through~~ ; and hyperlinked or portal-based ~~terms. The uniformity of method across millions of transactions is itself evidence of a coordinated pattern~~contractual limitations.

~~258.~~245. The scheme's distinguishing ~~characteristic~~ feature is the integration of the ~~false credential~~allegedly misrepresented Graded Card Credential with ~~the deceptive~~Defendants'

fee ~~model.~~and market infrastructure. Defendants ~~did not merely misstate a product feature or misbill a single customer. Plaintiff alleges Defendants~~allegedly used ~~the PSA grade as the market credential, used hidden~~undisclosed discretion to produce ~~it, used~~their Graded Card Credential, population and pricing ~~infrastructure~~systems to give it market force, ~~used~~ fee architecture to monetize it, ~~used~~ Card Grading Intermediaries to scale intake and ~~transmit PSA's message~~communications, Downstream Channels to monetize its continuing market effects, and ~~used~~ contractual ~~shields~~limitations to ~~limit~~restrict accountability.

~~259.~~246. ~~Defendants' predicate acts satisfy closed~~Closed-ended continuity~~. The~~ exists because the alleged scheme has operated for years, including ~~during and after~~at least since Collectors' 2021 acquisition of PSA, the pandemic-era submission surge, ~~the expansion of~~ PSA's capacity~~, the launch and~~ expansion~~ of PSA-centered market infrastructure~~, and Collectors' ~~later~~subsequent acquisitions and integrations~~. The alleged predicate acts occurred repeatedly across large numbers of consumer~~, generating repeated submissions, payments, upcharges, grading-result transmissions, ~~upcharge communications,~~ population~~-report~~ publications, pricing transmissions, and ~~return~~ shipments.

~~260.~~247. ~~Defendants' predicate acts also satisfy open~~Open-ended continuity~~. The alleged predicate acts are not a completed historical event. They are the~~ exists because the alleged predicates remain Defendants' regular ~~way Defendants operate the PSA-centered grading business~~method of operation: soliciting submissions, receiving and grading cards, communicating service tiers and ~~pricing, grading and certifying cards,~~ prices, publishing certification and population data,~~ imposing or~~ collecting ~~grading-related charges~~Grading-Related Charges, transmitting grades and values~~ into the market~~, returning cards, and monetizing ~~downstream grading-dependent channels. Unless enjoined, the same~~Downstream Channels.

Plaintiffs allege that Defendants continue these practices ~~will continue. PSA continues to solicit, receive, grade, encapsulate, certify, and return cards daily using the same advertised grading representations, fee architecture, and market-facing certification system alleged herein. Defendants continue to publish and rely upon PSA grades, certification outputs, and related pricing, resale, custody, and financing channels, and have not disclosed~~without disclosing or correcting the concealed facts alleged herein~~ or reformed the practices that produced the fraudulent grading and fee scheme. The scheme therefore remains operational as of the filing of this Complaint and threatens continued~~ , creating a continuing threat of repetition~~ into the future~~.

~~261. The pattern is not defeated because some submissions occur through Card Grading Intermediaries. That structure is part of the pattern. Defendants authorized, cultivated, accepted, and relied on those intermediaries as PSA-facing intake channels; intermediaries had their own per-card economic incentive to generate and process submissions; and Defendants intended that PSA's representations, prices, upcharges, grades, population data, and certification outputs would travel through those channels to beneficial card owners. And they did.~~

248. Submissions through Card Grading Intermediaries are part of this pattern as alleged in ¶55.

**F. Defendants Conducted the Affairs of RICO Enterprises**

~~262.~~249. The primary Grading-Intake Enterprise ~~satisfies~~has the ~~requirements for an association-in-fact enterprise under *Boyle*, 556 U.S. at 938. It had a~~ common legitimate purpose ~~in both~~of operating the intake-grading-resale pipeline: soliciting and ~~processing~~receiving consumer~~-owned~~ cards~~ into PSA's grading system, obtaining money~~ , processing and ~~property through PSA's market-facing representations and fee architecture, and transmitting PSA grades and certification outputs back to consumers and the market. It had ongoing relationships among~~grading them, issuing certifications, processing payments, returning cards, and circulating

grading outputs through the market. Defendants~~,~~ and Card Grading Intermediaries~~, and eBay. And it functioned as a~~ maintained continuing ~~unit~~ relationships through repeated ~~consumer~~ submissions, intake, payment, grading, certification, and return~~, resale, pricing, and marketplace communications~~. Plaintiffs allege that PSA and Collectors—not the Intermediaries—conducted the enterprise's affairs through the alleged mail- and wire-fraud pattern.

~~263.~~ Card Grading Intermediaries were instrumental but innocent commercial participants, not ~~passive outsiders to that enterprise.~~alleged co-schemers. They ~~participated in the enterprise's intake and payment functions by soliciting~~accepted or ~~accepting consumer~~solicited cards, ~~aggregating~~aggregated submissions, ~~using~~used PSA-facing accounts or ~~submission~~ privileges, ~~transmitting~~transmitted cards and ~~submission~~ data ~~to PSA, relaying~~, relayed PSA service ~~tier~~ information and ~~grading-related~~ charges, ~~collecting or facilitating~~facilitated payment, ~~and returning~~returned graded cards~~. They also profited from the enterprise's recurring operation because they made money on each submitted card, whether through a~~, and earned separate disclosed ~~fee~~fees, handling ~~charge, markup, submission charge~~charges, markups, or other compensation. ~~That economic participation supports their role as enterprise participants while remaining consistent with Plaintiff's allegation~~Plaintiffs do not allege that ~~they did not originate PSA's deception and did not act as Plaintiff's legal agents for contract formation or waiver of rights.~~

250. ~~PSA's records can distinguish PSA-imposed charges from~~ the Card Grading ~~Intermediary charges. PSA maintains records~~ Intermediaries originated, knew of, agreed to, or participated in Defendants' deception; Plaintiffs separately deny that their submission arrangements authorized acceptance of the Online Terms on Plaintiffs' behalf, as alleged in ¶¶ 40(a) and 55.

264.251. PSA's and the Card Grading Intermediaries' records permit their respective charges to be separated. PSA records identify service level selected, PSA levels, grading feefees, declared value or MIV, adjusted grading fee or upchargeupcharges, shipping, insurance, handling, return-shipment charges, payment timing, and account-level charges other PSA-imposed by PSA in the PSA-facing transaction.amounts. Card Grading Intermediaries separately maintain or can produce records of any per-cardrecord their own intake feefees, markups, handling fee, markup, submission feecharges, or other compensation they charged to the beneficial card owner. Thus, where a consumer paid a combined amount to an intermediary, the PSA-imposed grading-related charges and any intermediary charge can be separated easily through Defendants' and intermediaries' records. This allocation issue does not defeat. Combined consumer payments can therefore be allocated without defeating enterprise participation, causation, common proof, or damages.

265.252. The Alternatively, the broader Trading-Card Grading Enterprise, pleaded in the alternative, also satisfies *Boyle*. It had a broader has the legitimate common purpose: of using the PSA- and Collectors-controlledcentered grading, pricing, population, custody, offer, lending, and marketplace infrastructure to solicit, process, value, store, sell, finance, and monetize consumer-owned graded cards. It had ongoing relationships amongincludes Collectors, PSA, Card Grading Intermediaries, eBay, Card Ladder, the PSA Vault, PSA Partner Offers, Collectors Financial Services, and related Collectors-controlled or affiliated channels. It functioned functioning as a continuing unit by moving cards . Plaintiffs do not allege that eBay or the Card Grading Intermediaries knew of or participated in the fraud; PSA and grading outputsCollectors allegedly conducted the broader enterprise's affairs through the same PSA-centered market stack described in Sections II and IIItheir own racketeering pattern.

~~266. Each Defendant is a RICO "person" distinct from the pleaded enterprise. PSA is distinct from the Grading-Intake Enterprise because that enterprise includes non-defendant Card Grading Intermediaries and eBay. Collectors is distinct from that enterprise for the same reason. The alternative Trading-Card Grading Enterprise is also broader than any single Defendant because it includes additional persons, entities, business units, platforms, and channels through which graded-card submissions, pricing, custody, offers, lending, and marketplace transactions operate. *See C Cedric Kushner Promotions*, 533 U.S. at 158.~~

253. ~~Defendants~~ Each Defendant is a RICO "person" distinct from the pleaded enterprises. Both enterprises include participants and functions beyond either Defendant individually.

~~267.~~254. PSA conducted or participated in the ~~conduct of the enterprises' affairs within the meaning of *Reves*, 507 U.S. at 170. PSA participated by operating the~~enterprises through its grading, intake, certification, pricing, upcharge, turnaround, Guarantee, population-report, and ~~grading~~consumer-communication functions. Collectors participated through ~~which the predicate acts occurred. Collectors participated by directing~~ strategy, acquisitions, capacity expansion~~, market integration~~, pricing-data infrastructure, custody, offers, lending, marketplace integration, and downstream monetization. ~~Defendants therefore took part in directing the enterprises' affairs and were not merely outside vendors~~These allegations concern Defendants' operation and management of the enterprises, not knowledge or participation in the alleged fraud by eBay or the Card Grading Intermediaries.

### G. Collectors' Receipt and Use or Investment of Racketeering Income - 18 U.S.C. § 1962(a)

~~268.~~255. Through the alleged ~~pattern of~~ racketeering ~~conduct~~pattern, Collectors received directly and indirectly, including through PSA and ~~affiliated operations~~affiliates,

substantial income from PSA grading fees, service-level and speed premiums, MIV-related and adjusted grading fees, upcharges, review andreviews, repeat service fees services, shipping, handling, insurance, Vault or transaction revenue, and other and, to the extent generated through or attributable to the allegedly misrepresented Graded Card Credential, downstream transaction and grade-dependent downstream revenue.

269. On information and belief, Collectors used or invested a portionportions of that fungible income in the acquisition, establishment, operation, and expansion ofto acquire, establish, operate, or expand enterprises affecting interstate commerce, including Card Ladder;, SGC;, the eBay Vault and PSA Vault; PSA Vaults, Partner Offers;, Collectors Financial Services;, grading capacity, facilities, and personnel, portals, submission and certification, population systems, pricing, dealer, and intermediary, marketplace, and related infrastructure;, marketplace integrations, and the Beckett transaction. *See supra* ¶¶ 42-45, 70-75, 85-119, and 209-213. 44, 68–74, 83–106, 201–204.[243] Those investments expanded the same grading-centered system, reinforced the authority and circulation of its credentials, increased Defendants' control or influence overGraded Card Credentials, reduced independent grading alternatives and grade-dependent infrastructure, and enabled continuation and scaling of the alleged predicates.

270.256. Plaintiff was injured in business or property because of to continue and scale. PSA's substantial grading revenues and the § 1962(a) violation. While Plaintiff need not allege that his injuries flowed from a distinct later use or investment of racketeering income, that

---

[243] On information and belief, PSA-generated revenue contributed to or financially supported Collectors' acquisition of Beckett. A September 2026 verified federal complaint alleges that Collectors acquired Beckett for approximately $134 million, although the purchase price and transaction documents were not publicly disclosed. *See* Verified Complaint ¶¶ 93–94, *Lindberg v. Causey*, No. 1:26-cv-07938-LTS (S.D.N.Y. Sept. 11, 2026), ECF No. 1. Given PSA's substantial grading revenues, Plaintiffs allege that those revenues contributed to the acquisition directly, through available cash or intercompany transfers, or indirectly by supporting acquisition financing. The precise sources and uses of the acquisition consideration are reflected in Defendants' nonpublic financial, financing, acquisition, and closing records.

is the case. Plaintiff's investment-related injury arose from Collectors' pre-March 2025timing of those investments that strengthened the PSA-centered authority, that cemented and induced Plaintiff's transaction, that reduced practical support the inference that grading and pricing alternatives, that weakened competitive discipline over price, quality, transparency, and timing, and that derived income funded or economically enabled Defendants to charge or retain amounts Plaintiff otherwise would not have paid or would have paid only in lesser amounts. *See Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837 (4th Cir. 1990); *Potomac Electric Power Co. v. Electric Motor & Supply, Inc.*, 262 F.3d 260 (4th Cir. 2001).at least part of Collectors' expansion. Plaintiffs do not allege one-to-one tracing of commingled funds; use or investment may be established through receipts, transfers, budgets, financing records, timing, and economic substitution.

271.257. These same Plaintiffs' direct property injuries occurred to millions of other consumers.from the alleged racketeering pattern are sufficient under controlling Fourth Circuit law and need not be separately traceable only to the later investment or use of racketeering income.[244] In any event, Plaintiffs also allege that Collectors' use and investment of grading-derived income reinforced and expanded the same PSA-centered system through acquisitions, capacity expansion, pricing and market infrastructure, and integration of grading-dependent channels, thereby enabling the alleged scheme to continue and scale. The amountsrelevant receipts, accounts, commingling, transfers, acquisitions, operationsbudgets, and effects of racketeering incomeinvestments are within Defendants' control and are appropriately addressed through subject to discovery.

[244] *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837–40 (4th Cir. 1990) (rejecting a separate "investment injury" requirement under 18 U.S.C. § 1962(a) and applying traditional causation principles).

### H. The Enterprises and Predicate Acts Affect Interstate Commerce

~~272.~~258. ~~The Grading-Intake Enterprise and the alternative Trading-Card Grading Enterprise are engaged~~Both enterprises engage in~~,~~ and affect~~,~~ interstate commerce. Defendants solicit consumers nationwide~~;~~, receive cards ~~shipped~~ across state lines~~;~~, process ~~payments through~~ interstate ~~payment systems;~~payments, transmit grading results, ~~upcharge demands~~upcharges, certification~~ data~~, population~~ data~~, pricing~~ data~~, and ~~return~~ shipment ~~communications~~ information through interstate wires~~;~~, publish ~~market-facing information consumed~~ nationwide~~;~~ market information, and return~~ graded~~ cards through interstate carriers. The alleged scheme could not operate without interstate commerce.

~~273.~~259. The predicate acts ~~also affect~~likewise use interstate ~~commerce. Every mailing, email, payment transmission, graded~~ instrumentalities through mailings, emails, payments, card ~~shipment~~shipments, certification ~~update,~~and population~~ report update~~ updates, Card Ladder pricing~~ transmission~~, Vault ~~communication~~communications, Partner ~~Offer~~Offers, eBay~~ linked communication~~ integrations, and return ~~shipment crosses state lines or uses interstate instrumentalities. The interstate-commerce threshold is satisfied~~shipments.

### I. ~~Plaintiff~~Plaintiffs Sustained ~~Injury~~Injuries by Reason of Defendants' Conduct

~~274. Like others similarly situated, Plaintiff~~Plaintiffs suffered concrete property injury under 18 U.S.C. § 1964(c~~). He~~) when they paid~~ or~~, reimbursed~~ approximately $300 to obtain PSA grading and the associated Grading Credential and incurred related transactions cost. His principal RICO injury is the loss of the full PSA-imposed grading and credential charges paid to obtain an indivisible Grading Credential that Defendants' common fraudulent scheme rendered valueless~~ , or bore Grading-Related Charges for ~~its represented purpose. The injury is economic and does not depend on personal injury, emotional harm, or mere dissatisfaction with a grade.~~

260. The product purchased was not merely a numerical result, plastic holder, image, shipment, or database entry. Defendants represented anGraded Card Credentials materially different from the expert, impartial, objective, standardized-driven, criteria-based, unbiased, reliable, protectedtimely, and market-authoritative certification consisting ofCredentials Defendants represented. Their economic injury includes those charges, resulting overpayment, and related transaction costs. Timing was part of the same bargain. Plaintiffs therefore overpaid for both the materially misrepresented grading attributes and timing of the completed transaction.

275. Plaintiffs did not purchase merely a numerical grade, plastic holder, image, shipment, or database entry, nor were their cards valueless before PSA acted. Each card was an independently owned asset with preexisting market value that Plaintiffs surrendered for a represented period so PSA could add a market-facing Graded Card Credential comprising the grade, holder and label, certification number, verification record, population -and -scarcity signal, Guarantee messaging, and associated market acceptance. Each component derived its meaning from the integrity of the same grading, certification, population, and market-data system. Plaintiff alleges that the concealed systemwide practices deprived the credential of those defining attributes and made the grading and credential charges wholly unearned.

261. The common defect renders the Grading Credential valueless for its Defendants represented purpose through that Graded Card Credential as the product of expert, impartial, objective, standardized, criteria-based, reliable, and protected grading and certification—the attributes that give it market authority and value. Plaintiffs allege that concealed systemwide practices materially deprived their credentials of those defining attributes and therefore denied them the benefit of their bargain.

~~276.~~262. Plaintiffs allege on information and belief that their 2025 submissions were processed through PSA's ordinary grading operation described in ¶¶131–174 and were therefore subject to its common characteristics. That system affected the Graded Card Credential through three related mechanisms, independently or together: (a) ~~an inaccurate grade or a grade~~grades affected by conflicts, ~~inexperience~~absence of represented expertise, concealed subjectivity, production pressure, ratio review, managerial intervention, or ~~departure~~departures from represented standards; (b) ~~an~~ inaccurate, stale, duplicate, ~~incomplete,~~ ratio-influenced, or otherwise distorted population ~~entry or~~and scarcity ~~signal~~data; and (c) ~~the~~ admission of improperly graded, commercially managed, or otherwise nonqualifying cards into ~~the same~~ grade ~~population, which corrupts~~populations, distorting the comparative ~~meaning~~condition and scarcity ~~conveyed by every credential in that population.~~those Credentials convey. Because ~~each grade is a~~grades communicate comparative ~~position and each population entry purports to state its~~condition and Population Reports relative supply, ~~a systemically~~ unreliable ~~scale~~grading or population data cannot ~~supply~~provide the standardized ~~rank~~condition and scarcity information that Defendants sold ~~to consumers like Plaintiff.~~.

~~277. A PSA 10, therefore, does not necessarily possess the represented credential merely because the individual card may satisfy a disclosed condition standard. If nonqualifying cards entered the PSA 10 population, PSA managed the frequency of PSA 10 outcomes through undisclosed ratios or discretion, or PSA misstated the number of PSA 10s, every PSA 10 carries a false or unreliable comparative and scarcity signal. The same principle applies throughout the grading scale. The defect exists when the credential is issued and does not depend on a later sale or a particular buyer's response.~~

263. ~~Plaintiff does not allege that the underlying raw card became worthless. He alleges~~Plaintiffs do not allege that every practice or incident described above occurred in each submission; those allegations evidence the common system through which Plaintiffs' Graded Card Credentials were produced. Population-related allegations likewise demonstrate how undisclosed grading practices can systematically affect the scarcity signals PSA derives from aggregate grades. Even a correctly graded card may carry an unreliable scarcity signal if the population against which it is compared is inaccurate or distorted. Plaintiffs' principal injury does not depend on proving such an error in any particular population; where established, population inaccuracies provide additional evidence of the common system and may support additional loss tied to a particular credential.

~~278.~~264. Plaintiffs do not allege that their raw cards lacked or lost their independent value. They purchased PSA's service to assess and credential those existing assets and potentially enhance their marketability and value. Plaintiffs allege instead that the separately purchased ~~PSA Grading Credential had no nonfraudulent value as the product~~ Graded Card Credentials were worth less than represented~~.~~ because they were produced through materially different and undisclosed systems alleged herein. The holder, label, intake, imaging, shipping, and database processing ~~were instrumental or ancillary to delivering~~merely deliver that ~~credential,~~Credential. They do not ~~substitutes~~substitute for ~~it. A~~its represented attributes. Nor does continuing market ~~premium does not~~recognition or some residual utility establish delivery of the ~~promised product because Plaintiff alleges~~represented bargain, particularly where Plaintiffs allege that ~~Defendants created and preserved that~~PSA's market premium ~~through~~itself rests on the ~~same~~ challenged representations, scarcity signals, and infrastructure. ~~The full credential-related~~ The relevant injury is whether Plaintiffs overpaid for materially misrepresented

grading ~~charges are therefore alleged to be wholly unearned;~~attributes and timing. Plaintiffs therefore seek recovery of Grading-Related Charges and overpayment attributable to the difference between the Credential represented and received, together with applicable shipping, handling, insurance, and ~~return costs are additionally recoverable as~~other direct transaction ~~expenditures incurred to obtain the misrepresented credential, not necessarily because the carrier's transportation itself lacked value~~costs.

~~279.~~265. ~~The~~This principal ~~measure~~injury is susceptible to common, mechanical proof ~~and does not require card-by-card judicial regrading or~~without judicially regarding individual cards or determining individualized resale ~~valuation~~values. Common evidence ~~will determine~~can establish whether Defendants sold the same represented ~~Grading~~Graded Card Credential through the same materially ~~defective~~different system. Defendants' and ~~intermediaries'~~Intermediaries' records identify ~~the~~ beneficial ~~owner~~owners or ~~payor, submission~~payors, submissions, service ~~level~~levels, PSA-imposed ~~grading and credential~~ charges, ~~MIV, upcharge~~MIVs, upcharges, repeat-service charges, ~~necessary~~ transaction costs, payment ~~date~~dates, certification ~~number~~numbers, and return ~~event. Differences in card identity, assigned grade, or trading history do not alter~~events. Those records identify what each consumer paid and the transaction-level inputs needed to apply a supported common ~~principal injury~~or subclasswide methodology for measuring the economic loss caused by the challenged grading and timing representations.

~~280.~~266. Without conceding that the ~~Grading Credential~~ Graded Card Credentials retained their represented value or that individualized valuation is required, ~~Plaintiff~~Plaintiffs alternatively ~~preserves~~preserve common or subclasswide measures ~~of~~including the ~~credential~~Graded Card Credential premium, ~~the charge~~overpayment attributable to

misrepresented attributes, fee-specific overcharges, speed premiums, time-component overpayment attributable to materially misstated turnaround performance, MIV or upcharge amounts, repeat-service charges, benefit-of-the-bargain loss, and, where supported by common proof, supplemental diminution associated with inaccurate grades, false scarcity signals, altered certifications, or objectively identifiable card-and-grade submarkets. ~~Plaintiff does~~Plaintiffs do not seek duplicative recovery.

~~281.~~267. ~~The causal connection~~Causation is direct. Defendants' representations, omissions, and market-facing signals induced ~~Plaintiff~~Plaintiffs to select PSA, surrender ~~his~~their cards, and pay~~. The market further communicated that PSA should be the grader that consumers like Plaintiff select.~~ Grading-Related Charges. The mails and wires transmitted those representations, placed the cards ~~in~~into PSA's system, processed service ~~selection~~selections and ~~payment, communicated the represented service~~payments, delivered the ~~credential~~Graded Card Credentials, and completed the ~~transaction. The same~~ transactions. Defendants controlled both the representations and the grading, certification, population, pricing, fee, and payment systems that produced the ~~injury. The injury occurred at payment~~alleged loss. Plaintiffs' economic injuries arose from their own payments and ~~issuance and does not depend on intervening market~~ transactions~~ or~~, without depending on another person's injury or a later market transaction.

~~282.~~268. ~~No more direct victim or independent intervening cause exists. The intermediary did not own Plaintiff's~~Card Grading Intermediaries do not interrupt that causal chain. They did not own Plaintiffs' cards, purchase grading for ~~itself, set~~ themselves, establish PSA's standards or charges, assign ~~the~~ grades, create ~~the certification~~certifications or population ~~record~~entries, or bear ~~the loss. Plaintiff~~Plaintiffs' losses. Plaintiffs supplied the cards and money, ~~was~~were the intended ~~beneficiary~~beneficiaries and economic ~~payor~~payors, received the

~~credential~~Graded Card Credentials, and bore the ~~loss. The intermediary's~~ alleged losses. Any separately identifiable Intermediary compensation can be allocated through transaction records, preventing duplicative recovery. ~~Plaintiff's injury is~~ Plaintiffs' injuries therefore are direct, not derivative of an ~~intermediary injury. *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992); *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 110-15 (4th Cir. 2025).~~Intermediary's injury.

~~283. First-party reliance on every predicate communication is not required. *See Bridge*, 553 U.S. at 649-61. Plaintiff incorporates the reliance and market allegations in ¶¶ 217-233 and pleads, together and in the alternative, actual transaction-specific reliance, intermediary reliance, a common inference from payment for the represented credential, actual reliance on the credential's cultivated legitimacy and value signal, and a request after discovery and at class certification for a rebuttable credential-market reliance presumption by reasonable extension of *Levinson*, 485 U.S. at 224, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013), *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), and *Goldman Sachs Group, Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113 (2021). Plaintiff does not allege that trading cards are securities. If Defendants' own market representations in **Exhibit C** are accurate about trading cards being an asset class, they support common credential-market reliance and impact. If Defendants deny that PSA's grades, certification events, population data, pricing tools, and integrations materially inform prices or transactions, that position supports the alternative inference that their market-use representations were false or misleading and created to induce consumers to use their services. The requested extension supplements, rather than being indispensable to Plaintiff's other reliance and causation theories, and no post-grading sale is~~

~~required since the represented market function was part of the credential purchased at submission.~~

269. ~~Plaintiff's~~Plaintiffs need not establish personal reliance on every predicate communication to establish RICO causation. Their theory is that Defendants' alleged mail- and wire-fraud scheme directly caused their property injuries through the submission, payment, and issuance transactions described above. Plaintiffs paid or reimbursed charges for the represented Graded Card Credentials and allegedly received materially different Graded Card Credentials through the same transactions, without a more direct victim or independent intervening cause. Any alternative credential-market reliance theory is reserved for class certification and common-proof proceedings and is unnecessary to Plaintiffs' RICO proximate-cause theory.

### J. Plaintiffs' Claims Are Timely

~~284.~~ ~~Plaintiff's~~Plaintiffs' civil RICO claims are ~~governed by the~~subject to a four-year statute of limitations~~ recognized in *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143 (1987), and accrue~~, which accrues when ~~the~~a plaintiff discovered~~,~~ or reasonably should have discovered~~,~~ the injury giving rise to the claim. ~~*See Rotella v. Wood*, 528 U.S. 549 (2000).~~

~~285.~~270. ~~Plaintiff's submission~~Plaintiffs' card submissions, payments, and resulting economic injuries occurred within ~~the~~that limitations period~~, and the resulting injuries were incurred within that same period. Plaintiff's~~. Their claims ~~are~~, therefore, are timely ~~as to his submission and payment of PSA grading-related charges~~.

~~286.~~271. ~~To the extent earlier~~Earlier conduct ~~is~~remains relevant to the pattern, ~~background~~scheme, market structure, ~~or fraudulent~~ knowledge, intent, and concealment~~, Plaintiff~~. Plaintiffs allege that they did not discover~~,~~ and could not reasonably have discovered~~, the fraudulent nature of~~ Defendants' ~~scheme before the limitations period began. The~~fraudulent scheme earlier because its expertise-related, subjective, production-driven, conflict-laden, prior-

grade-informed, ratio-influenced, classification-dependent, population-~~controlled~~managed, criteria-shifting, and contractually shielded features ~~of Defendants' grading system~~ were concealed through PSA's market-facing representations, grader secrecy~~,~~ and nondisclosure practices, separated disclaimers, hyperlinked terms, Guarantee limitations, and ~~obstruction practices alleged above. The limitations period is therefore tolled under the doctrine of fraudulent~~ the other concealment ~~to~~alleged herein. To the extent ~~tolling is~~ necessary, Plaintiffs therefore plead fraudulent concealment and resulting tolling.

~~287.~~272. ~~Defendants'~~The alleged scheme ~~is~~ also remains ongoing. ~~Each new solicitation, submission, payment transmission, upcharge communication~~New solicitations, submissions, payments, upcharges, grading-result ~~transmission~~transmissions, population~~-report publication,~~ and pricing~~-data transmission~~ publications, return ~~shipment, or~~ shipments, and contractual~~-shield communication generates a new predicate act~~ communications continue to execute the alleged scheme and, where ~~it causes economic loss, a new injury. The allegations above establish that Defendants did not merely engage in isolated deceptive practices;~~ they ~~used~~ cause economic loss, generate new injuries. Plaintiffs allege repeated and systematic use of interstate enterprises~~ to carry out those practices repeatedly, systematically, and for profit. The mailings,~~ mails, and wires ~~were the operational machinery of the fraud; the pattern was continuous; the enterprises were coordinated; and the injuries were direct. Plaintiff~~for profit, not completed or isolated conduct. They therefore ~~asserts~~assert civil RICO claims under 18 U.S.C. §§ 1962(a) and ~~1962~~(c~~),~~,) as set forth ~~in the counts that follow~~below.

* * *

~~288.~~273. ~~These allegations establish a coordinated and~~ In sum, Plaintiffs allege that Defendants used continuing ~~use of~~ interstate enterprises, mails, and wires to obtain

~~consumers'~~ consumer money through material misrepresentations, half-truths, omissions, concealment, and deceptive fee practices; engaged in related and continuous racketeering ~~activity~~ across repeated national transactions; ~~Defendants' operation or management of~~operated or managed the pleaded enterprises; ~~Collectors' receipt~~ and ~~use~~, as to Collectors, received and used or ~~investment of~~invested racketeering income~~; and direct~~, directly causing Plaintiffs' property ~~injury by reason of~~injuries. Plaintiffs seek the ~~alleged violations. Plaintiff seeks~~ damages, treble damages, costs, and attorneys' fees ~~under~~ authorized by 18 U.S.C. § 1964(c). Any declaratory or injunctive relief ~~requested~~sought elsewhere ~~is sought~~arises under non-RICO claims ~~and~~or other lawful authority, not as a private RICO remedy. ~~*See Hengle v. Treppa*, 19 F.4th 324, 355-57 (4th Cir. 2021).~~

**CLASS ACTION ALLEGATIONS**

~~289.~~274. ~~Plaintiff reasserts, re-alleges,~~Plaintiffs reassert and ~~incorporates by reference all~~ incorporate the preceding allegations ~~of this Complaint as if fully set forth herein~~.

~~290.~~275. ~~Plaintiff brings~~Plaintiffs bring this action on ~~his own~~ behalf of themselves and ~~on behalf of~~ similarly situated persons and entities ~~pursuant to Federal~~under Rules ~~of Civil Procedure~~ 23(a), 23(b)(2), 23(b)(3), and, where appropriate, 23(c)(4). ~~Plaintiff seeks certification of~~They seek a nationwide class for ~~his~~ federal RICO~~,~~ and appropriate declaratory~~,~~ and injunctive claims~~,~~ and ~~certification of~~ a Maryland subclass for Maryland ~~state~~-law claims, including ~~claims under~~ the Maryland Consumer Protection Act.

~~291.~~276. "Class Period" means ~~the period beginning~~ four years before the filing of this First Amended Complaint ~~and continuing~~ through ~~the date of~~ judgment, ~~unless a longer or shorter~~subject to any different period ~~applies to a particular claim~~required by ~~operation of~~ law,

tolling, discovery~~ rule~~ principles, continuing~~ violation principles~~ violations, or ~~later~~Court order ~~of the Court~~.

~~292.~~277. “Maryland Class Period” means ~~the period beginning~~ three years before ~~the~~ filing ~~of this Complaint and continuing~~ through ~~the date of~~ judgment, ~~unless a longer or shorter~~subject to any different period ~~applies to a particular~~required by Maryland ~~claim by operation of~~ law, tolling, discovery~~ rule~~ principles, continuing~~ violation principles~~ violations, or ~~later~~Court order~~ of the Court~~.

~~293.~~278. “PSA Grading-Related Services” means authentication, grading, encapsulation, certification, review, crossover, submission, resubmission, reconsideration, reholdering, relabeling, turnaround times, declared-value review, valuation, shipping, handling, insurance, return shipment, ~~or~~ payments, grading results, upcharge notices, invoices, certification records, population-report entries, pricing-data transmissions, return shipments, and related services and/or communications transmitted, provided, offered, charged, or facilitated by PSA.

~~279. “PSA Grading-Related Charges” is defined in paragraph 40 and means any fee, charge, premium, upcharge, reimbursement, shipping charge, handling charge, insurance charge, service-tier charge, declared-value charge, Maximum Insured Value charge, adjusted grading fee, high-value charge, expedited-service charge, review fee, crossover fee, resubmission fee, reholdering fee, relabeling fee, imaging or grader-note charge, and/or related payment imposed, collected, reimbursed, or passed through in connection with PSA Grading-Related Services.~~

279. “PSA Grading-Related Charges” has the meaning defined in ¶ 40(e).

~~295.~~280. “PSA-Imposed Charges” means ~~the portion of those charges~~ PSA Grading-Related Charges assessed, calculated, demanded, or retained by PSA in the PSA-facing transaction, whether paid directly ~~to PSA~~ or~~ passed~~ through a Card Grading Intermediary.

296.281. "Card Grading Intermediary" has the same meaning as set forthdefined in paragraph 57 of this Complaint. ¶ 55.

297.282. "Beneficial Owner" means the real, natural person who or entity that ultimately owns, controlsowned, controlled, or enjoysenjoyed one or more trading cards submitted to PSA through a Card Grading Intermediary and who paid, reimbursed, or otherwise bore one or more PSA Grading-Related Charges in connection withfor that submission.

## I. Proposed Classes and Subclasses

## I. Proposed Classes and Subclasses

298.283. Plaintiff bringsPlaintiffs bring this action on behalf of the following Nationwide Beneficial Card Owner Class:

> **All persons and entities in the United States who, during the Class Period, ultimately owned one or more trading cards submitted through a Card Grading Intermediary to PSA for PSA Grading-Related Services, and who paid, reimbursed, or bore one or more PSA Grading-Related Charges for those services but who neverneither created a PSA account nor authorized a PSA account to be created.**

299.284. The Nationwide Beneficial Card Owner Class neither includes persons or entities acting solely as Card Grading Intermediaries for cards that they did not own nor any person who submitted cards directly to PSA.

300.285. Plaintiff brings hisPlaintiffs bring their civil RICO claims on behalf of the Nationwide Beneficial Card Owner Class and, to the extent a separate RICO class is necessary, on behalf of the following Nationwide RICO Class:

> **All members of the Nationwide Beneficial Card Owner Class whose submissions, payments, grading results, upcharge notices, invoices, certification records, population-report entries, pricing-data transmissions, return shipments, or related communicationsPSA Grading-Related Services involved the use of interstate mails, interstate commercial carriers, interstate wires, electronic communications, internet transmissions, or interstate payment networks.**

~~301.~~286. ~~Plaintiff brings~~Plaintiffs bring claims for declaratory and injunctive relief on behalf of the following Rule 23(b)(2) Class:

> **All persons and entities in the United States who are members of the Nationwide Beneficial Card Owner Class, who currently own one or more PSA-graded cards submitted through a Card Grading Intermediary, and who are subject to or affected by Defendants' ~~ongoing grading, pricing, upcharge, turnaround, population-report, certification-record, disclaimers, alleged terms and conditions, or related practices~~PSA Grading-Related Services.**

~~302.~~287. ~~Plaintiff seeks~~Plaintiffs seek certification of the Rule 23(b)(2) Class only for declaratory and injunctive relief that applies generally to the class as a whole. Monetary claims are brought under Rule 23(b)(3).

~~303.~~288. For ~~his~~their Maryland state-law claims, including claims under the Maryland Consumer Protection Act, ~~Plaintiff brings~~Plaintiffs bring claims on behalf of the following Maryland State-Law Subclass:

> **All members of the Nationwide Beneficial Card Owner Class who, during the Maryland Class Period, were Maryland residents or whose relevant PSA grading transaction was centered in Maryland because they delivered cards from Maryland, paid or reimbursed PSA Grading-Related Charges ~~from Maryland, received grading-related representations, invoices, upcharge notices, payment demands, grading results, certification records, or return shipments~~in Maryland, received or initiated PSA Grading Related Services in Maryland, or otherwise bore the economic consequences of Defendants' challenged conduct in Maryland.**

~~304.~~289. ~~Plaintiff does not~~Plaintiffs presently seek ~~certification of a~~no nationwide class for state-law consumer-protection or common-law claims~~ at this time. Plaintiff pleads the~~. The Maryland ~~State-Law~~ Subclass ~~to adjudicate Maryland-law claims for~~addresses Maryland consumers and Maryland-centered transactions arising from the ~~same~~ common ~~course of~~ conduct alleged ~~throughout this Complaint~~herein.

~~305.~~290. Excluded from the Classes and Subclasses are Defendants; ~~Defendants'~~their officers, directors, and employees; ~~any entity in which Defendants have a~~

~~controlling interest; Defendants'~~entities they control; their legal representatives, successors, and assigns; the assigned judicial officers ~~assigned to this case~~ and their immediate ~~family members~~families; and ~~any person~~persons or ~~entity~~entities that timely ~~and validly opts~~opt out of a Rule 23(b)(3) Class or Subclass. ~~Card Grading Intermediaries are excluded only when acting solely as intermediaries for cards they did not beneficially own and if they themselves, as opposed to a corporate entity at which they work, did not have a PSA account.~~

~~306.~~291. ~~Plaintiff reserves~~Plaintiffs reserve the right, ~~pursuant to Rule 23(c)(1)(C) and~~ subject to Rule 23 and Court approval, to ~~amend,~~ refine~~, narrow, expand, or otherwise modify the class and subclass~~ the definitions based on discovery~~, Defendants' records, intermediary records, payment records, submission data, certification records, population-report data, customer-service records, upcharge notices, shipping records, marketplace data, and expert analysis. Plaintiff also reserves the right~~ and to seek ~~certification of issue~~appropriate issues, liability, damages, or transaction subclasses~~ under Rule 23(c)(4),~~, including subclasses ~~corresponding to~~concerning speed premiums, upcharges, repeat services, ancillary charges, certification events, instant offers, or other objectively identifiable ~~transaction categories~~transactions.

## II. Ascertainability and Class Records

~~307.~~292. The Classes and Subclasses are defined by objective criteria ~~and are~~ ascertainable ~~through~~ from Defendants' records~~ maintained by Defendants that can be confirmed, corroborated, or~~ , supplemented where necessary by Card Grading ~~Intermediaries. Class membership can be determined through PSA~~ Intermediary records. Relevant records include PSA account and submission ~~records, PSA account records, intermediary submission records,~~ data, Card Grading Intermediary submissions, invoices, ~~payment records, upcharge notices~~payments, service~~ tier records, declared-value or~~ tiers, MIV ~~records~~or declared values,

upcharges, shipping and return~~-shipment records~~ shipments, certification ~~numbers,~~and grading~~-result~~ records, ~~crossover, review, resubmission, reholder, and relabel~~repeat-service records, population~~-report records, PSA~~ data, Vault ~~records, PSA~~and Partner Offer records, marketplace records, and ~~records maintained by Card Grading Intermediaries~~related communications.

~~308.~~293. ~~Defendants and Card Grading Intermediaries possess or control records that~~Those records identify or permit identification of submitted cards, ~~the~~ beneficial owners~~,~~ and economic payors, service levels~~-selected~~, grading dates~~, fees charged, fees~~ and outcomes, charges paid or reimbursed, upcharges~~-assessed~~, shipping and handling~~-charges~~, turnaround representations, ~~grading outcomes,~~ certification numbers, declared values, ~~review or crossover requests, resubmissions~~repeat services, return shipments, and related communications.

~~309.~~294. ~~The fact that some Class members paid a combined amount~~Combined payments to ~~a~~ Card Grading ~~Intermediary does~~Intermediaries do not ~~defeat ascertainability.~~prevent ascertainment or allocation. PSA's records identify ~~the~~ PSA-~~facing transaction, including the service level selected, PSA grading fee, declared value or MIV, adjusted grading fee or upcharge, shipping, insurance, handling, return-shipment charges, payment timing, and account-level charges imposed by PSA. Intermediary~~ Imposed Charges, while Card Grading Intermediary records ~~can~~ identify ~~any~~their separate ~~per-card~~ intake ~~fee~~fees, handling ~~fee, markup~~charges, markups, submission ~~fee~~fees, or other compensation~~-retained by the intermediary. Thus, PSA-imposed charges and intermediary charges can~~. The two can therefore be separated ~~easily~~ through ~~Defendants' and intermediaries'~~transaction records.

~~310.~~295. ~~The fact that~~Nor does an Card Grading ~~Intermediaries may have earned money on each submitted card does not defeat class~~Intermediary's separate compensation affect membership, causation, ~~predominance,~~ or damages. ~~Intermediaries participated in the submission~~

~~pipeline by soliciting or accepting cards, aggregating submissions, transmitting cards and information to PSA, relaying PSA's prices and communications, collecting or facilitating payment, and returning graded cards. But the Classes are defined by~~ Membership turns on beneficial ~~card~~ ownership and ~~economic~~ payment ~~or~~, reimbursement, or bearing of PSA Grading-Related Charges~~, —~~not ~~by~~ the ~~intermediary's~~Card Grading Intermediary's separate compensation.

~~311.~~296. ~~To the extent any~~Any incomplete individual record ~~is incomplete, Class membership may~~can be ~~confirmed~~supplemented through a ministerial claims process using objective documentation~~, including~~ such as receipts, invoices, submission forms, ~~grading certificates, certification numbers~~certifications, payment ~~records,~~and shipping records, ~~emails, text messages, intermediary records,~~communications, Card Grading Intermediary or marketplace records, ~~or sworn claim forms~~and, where appropriate, supported ~~by available documentation. Such ministerial verification issues do not defeat ascertainability~~claim forms.

**III. Numerosity**

~~312.~~297. The Classes and Subclasses are ~~so~~sufficiently numerous so that joinder ~~of all members~~ is impracticable. ~~Defendants operate~~PSA operates nationally and ~~process~~processes millions of trading-card submissions annually~~ through PSA. The~~, and the challenged ~~conduct~~practices allegedly affected consumers ~~nationwide~~ through ~~tens of~~ millions of ~~repeated~~ grading-related transactions ~~over a period of years~~during the Class Period.

~~313.~~298. The precise number and identities of ~~Class and Subclass~~ members are presently unknown ~~to Plaintiff~~ but ~~are readily ascertainable through discovery of Defendants' account holder, group submission and dealer~~can be determined through the records~~, payment-processing records, shipping records, certification databases, customer-service records,~~

marketplace records, and related documents together with Card Grading Intermediary records identified in ¶¶ 292–296.

## IV. Commonality

314.299. Common questions of law and fact exist as to the Classes and Subclasses. These questions are capable of generating classwide answers because they concernarise from Defendants' standardized representations, omissions, grading practices, pricing and upcharge structures, upcharge practices, service-tier practices tiers, contractual architecture, intermediary channels, enterprise structure, market power, acquisitions, andmarket infrastructure, and centralized records.

315.300. Common questions include, without limitation:

a.a. whether Defendants represented that PSA grading wasas impartial, objective, standardized, expert-driven, consistent, reliable, transparent, accountable, or market-authoritative;

b.b. whether Defendants omitted or concealed material facts concerning grader expertise and qualifications, grading; employee and executive financial conflicts; subjectivity, and eye appeal,; production pressure, and internal research holds; prior-grade information; criteria changes,; resubmission variability,; alteration-screening and numerical-grade eligibility; certification changes,; Gem Mint population control,practices; population report classification and accuracy,; upcharges,; turnaround timing,; Guarantee limitations,restrictions; downstream conflicts,; or online contractual limitations;

c.c. whether PSA's actual grading process was materially differentdiffered from the expert, impartial, objective, criteria-based, and reliable process Defendants marketedrepresented;

~~d.~~d. whether PSA's service-level pricing, MIV framework, adjusted ~~grading~~ fees, upcharges, turnaround ~~estimates~~representations, and payment-before-reveal-or-return practices were deceptive;

~~e.~~e. whether ~~PSA's~~the Guarantee ~~functioned as meaningful protection for~~ provided the consumer ~~who paid for grading or primarily as a market-confidence device~~protection represented;

~~f.~~f. whether ~~PSA's population reports~~PSA Population Reports converted subjective, inconsistent, ratio-influenced, ~~stale,~~ duplicate, stale, misclassified, nonqualifying, or otherwise distorted grade ~~counts~~populations into market-facing scarcity signals;

~~g.~~g. whether Card Grading Intermediaries ~~functioned~~operated as PSA-facing ~~submission~~ conduits ~~through which PSA's~~ for Defendants' standardized representations, charges, and grading outputs ~~reached beneficial card owners~~;

~~h.~~h. whether ~~Card Grading~~ Intermediaries' portal conduct or ~~clickwrap~~ assent can bind Beneficial ~~Card~~ Owners to Defendants' purported Online Terms;

~~i.~~i. whether Defendants conducted or participated in ~~the conduct of a~~ RICO ~~enterprise~~enterprises through a pattern of mail and wire fraud;

~~j.~~j. whether Defendants' ~~misrepresentations~~representations and omissions were material ~~to reasonable consumers~~;

~~k.~~k. whether ~~Defendants' conduct~~Defendants caused Class members to pay ~~or reimburse~~ PSA Grading-Related Charges they otherwise would not ~~otherwise~~ have paid~~,~~ or would have paid only in lesser amounts; ~~and~~

~~l.whether~~ l. the availability and measure of damages, restitution, ~~disgorgement,~~ declaratory relief, ~~or~~and injunctive relief ~~are appropriate.~~;

~~These common questions arise from the same course~~m. whether PSA's advertised turnaround periods were material components of ~~conduct and can be answered using~~ each service tier and whether actual turnaround performance materially differed from those representations because of the alleged clock rules, backlog, capacity constraints, intake delays, research holds, or other workflow practices; and

n. whether Class members paid more for service tiers, including their time component, than they would have paid had the material timing facts been disclosed.

~~m.~~301. These questions are susceptible to common proof, including ~~Defendants' public statements, grading standards, job postings, recruitment~~the materials~~, service pages, pricing schedules, fee~~ and records~~, upcharge records, submission records, population-report data, certification records, Guarantee terms, online terms, intermediary records, payment records,~~ alleged throughout the Complaint and expert analysis.

**V. Typicality**

~~316.~~302. ~~Plaintiff's~~Plaintiffs' claims are typical~~ of the claims of the Classes and Subclasses he seeks to represent.~~. Like absent ~~Class~~ members, ~~Plaintiff~~Plaintiffs beneficially owned cards submitted ~~to PSA~~ through ~~a~~ Card Grading ~~Intermediary~~Intermediaries, paid or reimbursed PSA Grading-Related Charges, relied on PSA's market-facing representations and omissions, and allegedly suffered economic injury from the same ~~alleged~~ grading ~~fraud~~system, fee architecture, intermediary ~~transmission~~ structure, and contractual~~-shield~~ practices.

~~317.~~303. ~~Plaintiff's claims arise from the same standardized course of conduct that gives rise to the claims of absent Class members. Plaintiff alleges~~Plaintiffs allege the same core injury as the Class: payment or reimbursement of PSA Grading-Related Charges for ~~a grading credential~~Graded Card Credentials materially different from ~~the one PSA marketed.~~those represented. Differences in ~~particular~~ cards, grades~~ assigned~~, service tiers~~ selected~~, or amounts

paid do not ~~defeat typicality because those differences have nothing to do with~~alter the common liability ~~theories arising from Defendants' fraud nor the common damages~~or injury theory ~~that impacts each class member the same manner—only~~; they principally affect the amount of recoverable damages ~~will differ~~.

~~318.~~304. ~~Plaintiff's~~Plaintiffs' use of ~~a~~ Card Grading ~~Intermediary~~Intermediaries makes ~~him~~them typical of the ~~Nationwide Beneficial Card Owner~~ Class~~, not atypical.~~. Defendants designed, authorized, cultivated, accepted, or relied ~~on~~upon those PSA-facing ~~intermediary~~ channels to transmit cards, charges, and grading~~-related~~ communications into and out of PSA's system. ~~Plaintiff's intermediary submission therefore reflects the same submission structure that defines the Class.~~

## VI. Adequacy

~~319.~~305. ~~Plaintiff~~Plaintiffs will fairly and adequately ~~represent and~~ protect the ~~interests of the~~ Classes and Subclasses. ~~Plaintiff's~~Their interests ~~are aligned~~align with absent ~~Class~~ members because ~~Plaintiff seeks~~they seek to establish ~~Defendants'~~ liability for the same allegedly deceptive, racketeering, and unlawful practices ~~that injured absent Class members~~.

~~320.~~306. ~~Plaintiff has~~Plaintiffs have no interests antagonistic to ~~the Classes or Subclasses. Plaintiff seeks~~absent members and seek the same categories of available relief ~~sought for the Classes and Subclasses~~, including damages, treble damages where authorized, restitution where permitted, declaratory ~~relief,~~and injunctive relief, attorneys' fees, and costs.

~~321.~~307. ~~Plaintiff's~~Plaintiffs' counsel are experienced in complex ~~litigation~~ and class-action litigation and will vigorously prosecute this action ~~on behalf of Plaintiff and the Classes and Subclasses~~.

## VII. Predominance Under Rule 23(b)(3)

~~322.~~308. Common questions ~~of law and fact~~ predominate ~~over questions affecting only individual Class members. Defendants'~~because liability turns ~~primarily~~principally on the common issues identified in ¶¶ 299–301 and proof concerning Defendants' standardized representations, omissions, grading ~~practices~~system, fee ~~structures, upcharge practices, service-tier practices~~architecture, Guarantee ~~terms, online terms, mail~~ and ~~wire communications~~purported Online Terms, enterprise structure, market ~~power, acquisitions, intermediary~~ infrastructure, Intermediary channels, and centralized records.

~~323.~~309. ~~The principal liability~~ Those issues do not require ~~individualized~~card-by-card proof. ~~Defendants' conduct was uniform or materially similar across PSA and was directed to the same downstream grading market. Defendants'~~Defendants communicated the challenged representations and omissions ~~were communicated~~ through materially standardized grading standards, ~~public~~ websites, service descriptions, pricing pages, ~~guarantees,~~ Guarantees, slabs and labels, ~~holders, population reports~~Population Reports, certification systems, ~~Card Ladder~~pricing data, marketplace integrations, ~~dealer and intermediary channels~~Card Grading Intermediaries, invoices, upcharge notices, payment systems, and return shipments.

310. ~~Reliance, materiality~~Materiality, causation, and injury are likewise susceptible to common proof. ~~Plaintiff does not rely exclusively on individualized proof of subjective reliance. Plaintiff alleges that Defendants' misrepresentations and omissions were material on an objective standard: a reasonable consumer~~ The materiality question is whether reasonable consumers would consider the ~~omitted~~concealed facts important when deciding whether and on what terms to submit cards, ~~select~~purchase service tiers, pay ~~PSA~~ Grading-Related Charges~~, accept~~ or upcharges, ~~pay expedited premiums, pursue reviews, resubmit cards, cross over cards, reholder cards~~obtain repeat services, or rely on PSA ~~grades~~Graded Card Credentials and population

~~reports in~~ data. Plaintiffs' common injury theory asks whether Class members paid for Graded Card Credentials materially different from those Defendants represented.

311. For claims requiring reliance, Plaintiffs' primary theory is the ~~secondary~~direct transactional reliance alleged in ¶¶ 206–222. Their alternative market~~. Materiality is a common question~~ credential theory is pleaded in the alternative. RICO causation is independently alleged in ¶¶ 267–269 and does not depend on that alternative theory.

~~324.~~312. Damages also are susceptible to common proof ~~through Defendants' standardized representations, standardized omissions,~~. As alleged in ¶¶ 260–266 and ~~the objective significance of those facts to reasonable consumers who paid PSA Grading-Related Charges~~321–323, Defendants' and Intermediaries' records permit calculation of Grading-Related Charges and application of common or subclasswide methodologies, including overpayment, benefit-of-the-bargain, restitutionary, disgorgement where legally available, and fee-refund measures.

~~310. Plaintiff also pleads market reliance and, in the alternative, direct reliance. Because Defendants allegedly created, controlled, informed, and monetized a PSA-centered market in which PSA grades, labels, certification numbers, population reports, pricing tools, Card Ladder valuations, vault services, partner offers, and marketplace integrations function as authoritative market credentials, reliance can be evaluated through common evidence of Defendants' market-facing course of conduct. That common market reliance was not incidental; it was the intended result of PSA's certification architecture and Collectors' downstream market infrastructure and Downstream Channels. For RICO claims predicated on mail and wire fraud, first-party reliance is not required, but Plaintiff and Class members nevertheless allege direct~~

~~reliance, market reliance, or both. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649–61 (2008); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013).~~

~~311. Damages do not defeat predominance. Defendants' and intermediaries' records can identify PSA Grading-Related Charges paid, reimbursed, or borne by Class members. Common damages methodologies—including overcharge models, benefit-of-the-bargain models, restitutionary models, disgorgement models, and fee-refund models—can measure classwide and subclasswide injury using Defendants' pricing schedules, service-tier records, upcharge records, payment records, submission records, certification records, return-shipment records, population-report data, transaction records, intermediary records, and expert analysis.~~

~~327.~~313. ~~To the extent~~Any remaining individual ~~damages calculations are required, those~~ calculations are mechanical and record~~-~~based. ~~PSA's~~PSA records ~~can~~ identify PSA-Imposed Charges~~.~~, while Intermediary records ~~can~~ identify ~~any~~ separate ~~intermediary charge, markup, handling fee, or submission fee. The need to allocate or calculate the amount owed to each Class member~~markups or fees. Allocation among members therefore does not predominate over ~~common liability issues and does not defeat class certification. *See Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016).~~the common liability and injury questions.

**VIII. Superiority Under Rule 23(b)(3)**

~~328.~~314. A class action is superior ~~to other available methods for the fair and efficient adjudication of this controversy. Individual Class members'~~because individual claims are ~~likely~~generally too small, complex, and expensive to litigate separately~~, particularly~~ given the ~~cost of proving~~proof required concerning Defendants' grading system, alleged fraud, ~~the existence and operation of a~~ RICO ~~enterprise, mail-~~enterprises and ~~wire-fraud~~ predicates, ~~market reliance~~pricing practices, causation, and damages~~, and Defendants' grading and pricing practices~~

~~in an action against a national grading company and its corporate parent. It is for this very reason~~. Plaintiffs further allege that ~~Defendants introduced~~ Defendants' use of class~~-~~action waivers ~~into~~reflects their ~~fraudulent system because they understand~~awareness that ~~class actions are the only true mechanism for challenging their misconduct~~aggregation materially affects consumers' practical ability to challenge the conduct alleged herein.

~~329.~~315. Individual litigation would ~~create a~~also risk ~~of~~ inconsistent adjudications~~, duplicative~~ and duplicate discovery~~, inconsistent rulings~~ concerning ~~Defendants'~~the same representations~~ and~~, purported Online Terms, ~~and inefficient use of judicial resources. A class action allows a single court to resolve the common questions arising from Defendants' standardized conduct,~~ centralized records, ~~common~~ enterprise~~, intermediary~~ structure, Intermediary channels, and common course of ~~dealing~~conduct. Class treatment permits those issues to be resolved once.

~~330.~~316. Class treatment will conserve ~~the~~judicial and party resources~~ of the Court and the parties~~, promote ~~uniformity of decision~~consistent decisions, and provide ~~meaningful~~ a practical means of relief ~~to~~for consumers ~~who otherwise would be unable to challenge Defendants' conduct effectively~~whose individual claims may not justify separate litigation.

## IX. Rule 23(b)(2)

~~331.~~317. Certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds generally applicable to the ~~Rule 23(b)(2)~~proposed Class, making classwide declaratory and injunctive relief appropriate~~ for the class as a whole~~.

~~332.~~318. ~~Plaintiff seeks classwide declaratory and injunctive relief, including~~Plaintiffs seek declarations that ~~: (a) Defendants' Online Terms and Conditions are not enforceable against~~ Beneficial Card Owners ~~who submitted~~submitting through Card Grading Intermediaries~~; (b) any~~ did not assent to Defendants' purported Online Terms and therefore are

not bound through Intermediary portal activity by arbitration, class-action ~~waiver~~or jury-trial waivers, forum-selection~~,~~ or choice-of-law~~, limitation of~~ clauses, limitations of liability, warranty ~~disclaimer~~ disclaimers, delegation provisions, or similar ~~provision was not assented to by such Beneficial Card Owners; and (c) Defendants may not invoke intermediary portal interactions to deprive Beneficial Card Owners of judicial remedies~~restrictions.

~~333.~~319. ~~Plaintiff~~Plaintiffs also ~~seeks~~ seek appropriate injunctive relief requiring Defendants to~~: (a)~~ cease the challenged deceptive grading, pricing, upcharge, turnaround, ~~guarantee, population-report~~Guarantee, Population Report, certification, contractual-shield, and downstream-monetization practices; ~~(b)~~ disclose material ~~facts concerning~~ grading ~~subjectivity, grading standards~~, timing, ~~upcharges, guarantees, population-report limitations, and contractual limitations; (c)~~pricing, Guarantee, and population, information; preserve and correct relevant records; and ~~(d)~~ provide transparent ~~and~~, non-deceptive grading and pricing disclosures.

~~334.~~320. ~~Injunctive and declaratory~~Such relief is ~~particularly appropriate because Defendants' challenged practices are~~ sought against ongoing, standardized~~, and~~ practices directed ~~at a national market of~~to consumers who continue to submit cards ~~for PSA grading~~, pay PSA Grading-Related Charges, and rely on PSA grades, ~~certification numbers, population reports~~certifications, Population Reports, and market-facing representations.

## X. Classwide Damages and Restitution

~~335.~~321. ~~Plaintiff seeks~~Plaintiffs seek classwide damages and restitution ~~for himself and Class members, including recovery of~~consistent with the common injury and damages theories alleged in ¶¶ 260–266 for PSA Grading-Related Charges paid, reimbursed, or borne as a result of Defendants' alleged ~~fraudulent~~ grading ~~scheme~~fraud, deceptive fee architecture, ~~upcharge practices~~upcharges, turnaround and Guarantee representations, ~~Guarantee~~

~~misrepresentations,~~ population~~ report~~ practices, contractual~~ shield practices~~ shields, and downstream monetization~~ of PSA grades~~.

~~336.~~322. ~~Classwide damages may include, depending~~Depending on the claim and common proof~~ developed in discovery~~, recoverable amounts may include: (a) ~~refunds or restitution of~~ grading fees and other PSA Grading-Related Charges; (b) ~~overcharges~~overpayment attributable to the difference between the Graded Card Credential represented and received; (c) deceptive service-tier~~ pricing~~, MIV~~ pricing~~, adjusted~~ grading fees, or upcharges; (c)~~ -fee, and upcharge amounts; (d) expedited-service premiums~~ paid for timing representations that were materially qualified or not delivered as represented; (d) repeat-service charges paid for~~ ; (e) review, crossover, resubmission, ~~reholdering, relabeling, or related services~~and other repeat-assessment charges allegedly made economically rational by ~~PSA's~~ concealed variability~~; (e)~~ , and reholdering, relabeling, or other charges where separately shown to result from the challenged practices; (f) shipping, handling, insurance, ~~or~~and return~~ shipment charges necessary~~ costs incurred to obtain the allegedly misrepresented ~~credential~~Credential; and (~~f~~g) benefit-of-the-bargain or diminution damages where supported~~ by the evidence~~. Plaintiffs do not seek duplicative recovery.

~~322. Damages and restitution~~Those amounts can be calculated ~~using~~from common~~, record-based methodologies. PSA's own~~ records. PSA records identify ~~the PSA-facing~~ service ~~level~~levels, fee ~~schedule, MIV,~~schedules, MIVs and declared ~~value~~values, adjusted ~~grading fee, upcharge~~fees and upcharges, shipping, handling, insurance, return~~-shipment charge~~ charges, payment ~~date, certification number, grade assigned~~dates, certifications, grades, and return status~~. Card Grading~~; Intermediary records ~~can~~ identify ~~the~~ beneficial ~~card owner, amount~~owners, amounts collected ~~from the owner, amount~~and remitted ~~or passed through~~ to PSA, and~~ any~~

separate ~~intermediary markup, handling charge, intake fee, or submission fee. Where necessary, expert~~Intermediary compensation. Expert analysis can allocate PSA-Imposed Charges ~~from separate intermediary compensation.~~

~~338.~~323. ~~Nothing in~~where necessary and establish the ~~exclusion~~loss value of the Graded Card ~~Grading Intermediaries acting solely as submission conduits prevents an intermediary, dealer, card shop, group submitter, or similar person from participating in a Class or Subclass to the extent that person or entity owned cards for its own account, paid or reimbursed PSA Grading-Related Charges for its own cards, did not have an individual PSA account, and suffered direct injury as a beneficial card owner rather than solely as a ministerial submission conduit~~Credential based on Defendants acts herein.

324. Plaintiffs also still own one or more of the PSA-graded cards at issue; and remains presently affected by an active PSA certification, Population Report entry, or other ongoing challenged practice and thus are entitled to injunctive relief.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

~~339.~~325. Based on ~~all~~ the allegations herein, ~~Plaintiff~~Plaintiffs respectfully ~~demands~~demand relief under the following causes of action~~, reasserting, realleging, and incorporating by reference all preceding allegations into each Claim for Relief that follows~~.

## FIRST CLAIM FOR RELIEF

### DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT DEFENDANTS' ONLINE TERMS ~~AND CONDITIONS~~, INCLUDING THE ARBITRATION CLAUSE, CLASS-ACTION WAIVER, FORUM-SELECTION CLAUSE, CHOICE-OF-LAW CLAUSE, LIMITATION-OF-LIABILITY CLAUSE, AND WARRANTY DISCLAIMERS, DO NOT BIND ~~PLAINTIFF~~PLAINTIFFS OR THE CLASS

~~340.~~326. ~~Plaintiff reasserts, realleges~~Plaintiffs reassert, reallege, and ~~incorporates~~incorporate herein by reference all preceding factual allegations, including

specifically paragraphs 1–40, 53–55, 97–100, 210–212, and 274–325, when asserting ~~the foregoing~~ this cause of action.

~~326.~~ Pursuant to 28 U.S.C. §§ 2201 ~~and~~ 2202~~,~~ and ~~Federal~~ Rule ~~of Civil Procedure~~ 57, ~~Plaintiff seeks~~Plaintiffs seek a declaration that Defendants' ~~online~~Online Terms ~~and Conditions,~~ —including ~~but not limited to any~~ arbitration ~~clause~~, class-action waiver, forum-selection ~~provision~~, choice-of-law ~~provision~~, limitation-of-liability ~~provision~~, warranty-disclaimer, integration ~~clause~~, modification ~~clause, or~~, and delegation ~~clause (collectively, the "Online Terms"),~~ provisions—do not bind ~~Plaintiff, the Nationwide Beneficial Card Owner Class, the Nationwide RICO Class, the Rule 23(b)(2) Class, the Maryland State-Law Subclass, or any other Subclass member.~~

~~342.~~327. ~~Plaintiff,~~Plaintiffs or the Classes and ~~putative members of the classes and subclasses by definition, never created, registered, opened, maintained, or used an account, profile, login, membership, dealer status, or registered submitter status with PSA. In other words, Plaintiff and putative class members never assented to any contract nor received any separate consideration for such a contract~~Subclasses.

~~328. Plaintiff submitted his cards to Defendants only through Card Grading Intermediaries acting in a ministerial capacity. Those Intermediaries did not communicate to Plaintiff the existence or content of the Online Terms, did not present the Online Terms to Plaintiff, and did not obtain Plaintiff's assent to the Online Terms.~~

328. ~~No valid~~Plaintiffs never created or used PSA submission accounts and did not personally accept the Online Terms. As alleged in ¶¶ 36–40 and 55, they engaged independent commercial Card Grading Intermediaries, selected cards and service tiers, received custody-only receipts, and were not shown contractual terms. Plaintiffs allege that those transactions neither

appointed the Card Grading Intermediaries as their contracting representatives nor otherwise made the Card Grading Intermediaries' acceptance of PSA's Online Terms attributable to Plaintiffs.

329. Plaintiffs submitted their cards only through Card Grading Intermediaries acting as agents of Defendants. Plaintiffs dispute actual authority, apparent authority, ratification, and estoppel on the facts alleged in ¶ 55. They do not seek contractual performance or benefits under a Dealer Agreement, User Agreement, or other agreement between Defendants and a Card Grading Intermediary. Their purchase of submission services, continued ownership of their cards, and fraud-based demand for recovery do not establish, by themselves, acceptance of the Online Terms. The legal effect of those acts must be assessed in the actual commercial setting rather than presumed from the arrival of third-party property in PSA's system.

~~344.~~330. Plaintiffs never received any offer, acceptance, consideration, mutual assent, inquiry notice, or knowing and voluntary waiver ~~of rights was ever formed~~ between ~~Plaintiff~~Plaintiffs and any Defendant ~~with respect to~~concerning the Online Terms; thus, the formation of a contract would be illusory, lack assent and consideration and would be otherwise unenforceable, including procedurally and substantively unconscionable. The Court must determine whether an agreement binding Plaintiffs exists and whether the Card Grading Intermediaries' alleged acceptance is attributable to them. Plaintiffs dispute both the transaction-specific agreement Defendants may invoke and the asserted authority to bind the beneficial owners. Those antecedent questions are distinct from the scope of an arbitration clause within an agreement already established to bind the parties.

~~345.~~331. An actual controversy exists because Defendants are expected to invoke the Online Terms~~—~~, including ~~the~~ arbitration ~~clause~~ and the class-action waiver~~—as a defense to~~

~~Plaintiff's claims, and Plaintiff disputes that those terms apply to him.~~, and Plaintiffs dispute their applicability. Collectors' ~~own~~ motion to compel arbitration in *Rasmussen* illustrates the ~~material~~ factual distinction~~. There~~: there, Collectors relied on evidence that the plaintiff personally created ~~a Collectors~~an account, ~~affirmatively~~ checked a box ~~agreeing to~~accepting the ~~Collectors~~ User Agreement, and ~~later~~ submitted a card through that account. ~~Plaintiff~~Plaintiffs did none of those things here. ~~Nor did~~Plaintiffs also dispute any ~~Card Grading Intermediary have actual or apparent~~ authority to accept the Online Terms ~~or waive Plaintiff's rights on his~~on their behalf~~,~~ and ~~Plaintiff seeks~~seek no contractual ~~right or benefit under those~~performance under a Card Grading Intermediary's agreement. If Defendants seek enforcement based on those separate relationships, Plaintiffs request targeted discovery into the applicable Dealer Agreement and other submission agreements, historical terms~~. On the facts alleged, Defendants have no comparable~~ and acceptance records, owner-notification and authorization requirements, and facts concerning PSA's knowledge and reliance. They request a reasonable opportunity to address that evidence ~~that Plaintiff agreed to arbitrate. *See* Def. Collectors Holdings, Inc.'s Notice of Mot. & Mot. to Compel Arb. & Stay Case at 2, 5–6, *Rasmussen v. Collectors Holdings, Inc.*, No. 8:26-cv-00897-JWH-MAR (C.D. Cal. June 8, 2026), ECF No. 20~~before final resolution of the formation and authority issues, together with any further proceedings necessary to resolve genuine factual disputes.

~~346.~~332. WHEREFORE, ~~Plaintiff requests~~Plaintiffs request that this Court enter judgment declaring that:

a. No contract was formed between ~~Plaintiff~~Plaintiffs and any Defendant on the basis of Defendants' Online Terms;

b. The Online Terms, including the arbitration clause, class-action waiver, forum-selection provision, choice-of-law provision, limitation-of-liability provision, warranty disclaimers, and any delegation clause, do not bind ~~Plaintiff~~Plaintiffs or the Class; and

c. This action may proceed in this Court as a putative class action~~;~~

~~d. Plaintiff is entitled to recover his attorneys' fees and costs; and~~

~~e. Such other and further relief as is necessary and appropriate~~.

**SECOND CLAIM FOR RELIEF**

**DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT DEFENDANTS' ARBITRATION CLAUSE, CLASS-ACTION WAIVER, AND RELATED PROVISIONS ARE PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE, A PRODUCT OF FRAUD AND UNENFORCEABLE (PLEADED IN THE ALTERNATIVE)**

~~347.~~333. ~~Plaintiff reasserts, realleges~~Plaintiffs reassert, reallege, and ~~incorporates~~incorporate herein by reference all preceding factual allegations, including specifically paragraphs 28–29, 36–40, 53–55, 97–100, 120–139, 199–200, 210–212, 274–325, and 327–332 when asserting ~~the foregoing~~ this cause of action.

~~348.~~334. ~~As an~~ Plaintiffs plead their alternative ~~to the First Claim for Relief, and only in the event that this Court somehow~~ enforceability challenge without admitting formation. Alternatively, if the Court determines that any portion of ~~Defendants'~~the Online Terms ~~is enforceable against Plaintiff and/~~applies to Plaintiffs or putative ~~class~~Class members, ~~through any theory, Plaintiff seeks~~Plaintiffs seek a declaration that the arbitration ~~clause~~, class-action waiver, forum-selection ~~provision~~, choice-of-law ~~provision~~, limitation-of-liability ~~provision, and~~, warranty ~~disclaimers within Defendants' Online Terms~~ disclaimer, and related provisions are procedurally and substantively unconscionable, illusory, lack assent and consideration and are otherwise unenforceable ~~as applied to Plaintiff and the Classes and Subclasses defined in ¶¶ 298–303. The clauses are also a product~~. Plaintiffs further allege those provisions are products of

fraud ~~and~~or fraudulent inducement and ~~thus~~ unenforceable ~~as applied to Plaintiff and the Classes and Subclasses defined in ¶¶ 298–303 for this separate~~for that independent reason.

~~349.~~335. ~~Defendants'~~The Online Terms are contracts of adhesion~~,~~ drafted unilaterally by Defendants and presented~~—~~, if at all~~—~~, on a take-it-or-leave-it basis ~~to consumers and~~. PSA controlled the intake structure and could have required beneficial-owner identification and assent at submission but did not. Defendants drafted the Online Terms and controlled the PSA-facing submission process. In the transactions alleged here, Plaintiffs received in some instances custody receipts rather than contractual terms and did not personally encounter an offer to accept the Online Terms. The separately maintained records concerning what Defendants required Card Grading Intermediaries ~~with no real opportunity to negotiate~~to communicate or obtain, and what occurred under those requirements, bear on the procedural circumstances of any agreement Defendants contend binds Plaintiffs. *See supra* ¶¶ 40(a), 55, 97–100.

~~350.~~336. ~~The~~Plaintiffs allege the arbitration clause and class-action waiver are substantively unconscionable because they ~~are part of an integrated scheme designed to insulate Defendants from~~operate within the challenged transaction to restrict accountability for the ~~very fraudulent~~same conduct ~~alleged herein, while extracting~~used to obtain consumer fees, upcharges, and downstream revenue from ~~consumers~~ beneficial owners who were ~~never~~not shown~~,~~ and ~~never~~did not knowingly ~~waived,~~waive their ~~constitutional,~~ statutory~~,~~ and procedural rights.

~~336. The delegation clause is itself ambiguous and unenforceable because it conflates issues of contract formation with issues of arbitrability and rescission, and because issues of contract formation between Defendants and downstream beneficial owners are reserved for this Court. Plaintiff specifically and exclusively challenges the delegation provision, independently~~

~~of the arbitration clause as a whole, and alleges that the delegation provision is unconscionable and unenforceable for the reasons stated herein, so that the gateway question of arbitrability is for this Court and not any arbitrator. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010). In all events, because Plaintiff disputes that any agreement to arbitrate was ever formed between them and any Defendant, the antecedent question of contract formation is for this Court regardless of any delegation provision. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010); *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024).~~

337. Plaintiffs independently dispute that any delegation agreement binds them. Their objection concerns the formation and attribution of assent to the delegation provision itself, not merely the validity of the grading transaction as a whole. A delegation provision contained in a Card Grading Intermediary's agreement cannot supply the missing determination that Plaintiffs became bound to that provision. Plaintiffs therefore request judicial resolution of the antecedent formation and authority questions identified in ¶¶ 329–336 before any delegation provision is enforced against them. Moreover, Plaintiffs independently challenge the delegation clause as ambiguous, procedurally and substantively unconscionable, lacking consideration and assent, illusory and otherwise unenforceable. Because Plaintiffs dispute that any agreement to arbitrate was formed, they allege the antecedent question of formation remains for the Court.

~~337.~~338. WHEREFORE, ~~Plaintiff requests~~Plaintiffs request that this Court enter judgment declaring that:

~~352.~~a. The arbitration clause, class-action waiver, forum-selection provision, choice-of-law provision, limitation-of-liability provision, and warranty disclaimers in Defendants' Online Terms are procedurally and substantively unconscionable and unenforceable as applied to ~~Plaintiff~~Plaintiffs and the Classes and Subclasses;

~~b.~~ ~~The~~b. No delegation ~~clause is ambiguous~~provision may be enforced against Plaintiffs absent judicial determination that they became bound to it, and ~~unenforceable, and issues~~the disputed antecedent questions of formation and contracting authority are for this Court; and

~~c.~~ c. This action may proceed in this Court as a class action~~;~~

~~d. Plaintiff is entitled to recover his attorneys' fees and costs; and~~

~~e. Such other and further relief as is necessary and appropriate~~.

**THIRD CLAIM FOR RELIEF**

**RICO VIOLATION OF 18 U.S.C. § 1962(c)**
**(Against All Defendants)**

~~353.~~339. ~~Plaintiff reasserts, realleges~~Plaintiffs reassert, reallege, and ~~incorporates~~incorporate herein by reference all preceding allegations, including specifically paragraphs 1–55, 68–222, and 223–273, when asserting ~~the foregoing~~ this cause of action.

340. Each Defendant is a RICO "person" ~~within the meaning of~~under 18 U.S.C. §§ 1961(3) and 1962(c~~), capable of holding a legal or beneficial interest in property. Defendant~~). PSA is the primary RICO ~~"~~person~~" for purposes of this Claim~~ because ~~PSA conducts and participates in the conduct of the enterprise's affairs through the pattern of mail- and wire-fraud predicate acts alleged herein, which consist of PSA's consumer-facing~~ it operated the grading~~,~~ and intake~~, representation, pricing, upcharge, turnaround, guarantee, and population-reporting conduct. Defendant~~ functions through which the predicates occurred; Collectors is also a RICO ~~"~~person~~" for purposes of this Claim through~~ based on its alleged direction and control of the ~~enterprise's affairs as~~enterprise. *See supra* ¶¶ 49–55.

~~354.~~341. As alleged in ¶¶ ~~50–56, 209–212, and 262–267~~53–55 and 248–253, the Grading-Intake Enterprise is an enterprise under 18 U.S.C. § 1961(4) affecting interstate and

foreign commerce, with a common purpose, continuing relationships, and sufficient longevity. Card Grading Intermediaries participated as independent PSA-facing commercial intake and submission businesses, including the agency functions alleged in ¶ 55, not as alleged co-schemers.

~~341.~~ The Grading-Intake Enterprise is ~~an enterprise within the meaning of 18 U.S.C. § 1961(4), engaged in and whose activities affect interstate and foreign commerce. The Grading-Intake Enterprise has a common purpose, ongoing relationships among its members, and longevity sufficient to pursue that purpose, satisfying *Boyle*, 556 U.S. at 938, and is~~ distinct from each Defendant ~~within the meaning of *Cedric Kushner Promotions*, 533 U.S. at 158. Card Grading Intermediaries participate in the Grading-Intake Enterprise solely as Defendants' actual, apparent, ostensible, and limited agents under Defendants' direction and control, and not as independent co-venturers or as agents of Plaintiff or Class members.~~

~~356.~~342. ~~The Grading-Intake Enterprise is distinct from each Defendant not merely~~ because ~~Collectors and PSA are separate legal persons, but also because the enterprise's structure and common purpose are constituted by the participation of~~it includes independent, non-~~defendant members (~~Defendant participants, including ~~eBay, Inc. and the~~ Card Grading Intermediaries~~) who are not owned or controlled by, and~~ , that exist ~~wholly~~ apart from~~,~~ the Collectors corporate family. The enterprise~~,~~ therefore~~, has an existence~~ extends beyond the parent-subsidiary relationship ~~among~~between Defendants.

~~357.~~343. ~~In the alternative,~~Alternatively, Plaintiffs plead the Trading-Card Grading Enterprise ~~—~~defined in ¶¶ 53(b), 252–253, comprising Defendants together with Card Grading Intermediaries, eBay, ~~Inc.,~~ Card Ladder, ~~LLC,~~ the PSA Vault, PSA Partner Offers, ~~and~~ Collectors Financial Services, ~~LLC — is an enterprise within the meaning of 18 U.S.C. §~~

~~1961(4), engaged in and whose activities affect~~and related channels. It likewise affects interstate and foreign commerce~~, with the same *Boyle* and *Cedric Kushner* characteristics described in ¶¶ 55–56 and 265–267~~ and is distinct from either Defendant.

~~358.~~344. Both Defendants allegedly conducted ~~and~~or participated in the ~~conduct of the affairs of the~~ Grading-Intake ~~Enterprise within the meaning of~~Enterprise's affairs under 18 U.S.C. § 1962(c~~) and *Reves*, 507 U.S. at 170,~~), each in a distinct capacity. ~~PSA participated in the operation and management of the enterprise by performing~~PSA operated the grading, intake, encapsulation, certification, pricing, upcharge, turnaround, ~~guarantee, and population-reporting functions through which the predicate acts of mail and wire fraud were committed, and by scripting and transmitting, directly and through the Card Grading Intermediaries, the standardized representations on which Plaintiff relied. Collectors participated in the operation and management of the enterprise by directing enterprise~~Guarantee, Population Report, and communication functions through which the predicates occurred. Collectors allegedly directed broader strategy, ~~structuring and controlling the~~ authorized-intake ~~programs and the eBay and Card Ladder~~and marketplace integrations, ~~dictating the~~ fee ~~and upcharge~~ architecture, ~~and directing~~capital allocation, and downstream monetization ~~of the card~~tied to PSA grades ~~across the card's lifecycle. Each Defendant thereby took part in directing the enterprise's affairs, and neither acted merely as an outsider providing goods or services to the enterprise. Notwithstanding the foregoing, for purposes of § 1962(c),~~. See supra ¶¶ 49–55, 201–204, 248–253. PSA ~~is~~remains the primary RICO person ~~that conducted the affairs of the enterprise through a pattern of racketeering activity~~for this Claim.

~~345.~~ Defendants' racketeering activity consists of ~~repeated and related predicate acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343~~

(collectively, "Defendants' Predicate Acts"), as set forth abovethe repeated mail- and wire-fraud predicates alleged with particularity in ¶¶ 231–238, including, without limitation:

a. The: (a) interstate transmissionshipment and return of consumer cards by mail and; (b) interstate carrier from Plaintiff to Defendants' grading facilities and back;

b. Thesubmission, status, invoice, upcharge, grading-result, certification, Population Report, valuation, Vault, Partner Offer, and return communications; (c) eBay-linked certification, pricing, consignment, and related transmissions; and (d) interstate transmission of submission confirmations, grading-status communications, invoices, declared-value upcharge notices, expedited-service representations, grading-result communications, certification-database entries, population-report entries, Card Ladder valuations, PSA Partner Offer communications, PSA Vault communications, and return-shipment communications, by wire and mail;

c.345. Interstate wire transmissions between Defendants and eBay, Inc., including listing-integration data, certification-verification calls, Card Ladder pricing feeds incorporated into eBay's price-guide and listing experience announced in or about January 2026, PSA Vault-to-eBay consignment communications, PSA Partner Offer transmissions tied to eBay-linked dispositions, and related commercial-agreement communications, each of which carried, furthered, or concealeddissemination of the expertise, standards, process-and-certification, market-use, pricing, and omission-based deceptions alleged in ¶¶ 143–223 and 246–250, and throughout Sections IV–V; andthe Complaint.

d. The interstate dissemination of Defendants' uniform expertise, standards, process-and-certification, and market-use representations, including representations that PSA grading was expert, standardized, reliable, criteria-based, durable, market-

authoritative, and suitable for pricing, resale, insurance, lending, vaulting, and valuation decisions, together with Defendants' uniform omissions concerning subjectivity, quota and speed pressure, undisclosed standards changes, ratio-based grading, certification-record control, population-report distortion, post-submission leverage, Guarantee limitations, and contractual disclaimers.

360.346. Defendants' Predicate Acts constitute a pattern of racketeering activity within the meaning of under 18 U.S.C. § 1961(5) because they are related and continuous, satisfying both closed-ended and open-ended continuity, and have been committed occurred repeatedly across millions large numbers of consumer transactions over a period of years, and remain part of the alleged regular operation of the PSA-centered grading business. *See supra* ¶¶ 239–247.

361.347. Defendants directly and indirectly conducted and or participated in the conduct of the affairs of the Grading-Intake Enterprise (and, in the alternative alternatively, the Trading-Card Grading Enterprise) through the that racketeering pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

362.348. As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff, Plaintiffs and Class members were injured in their business and suffered the property. Their injuries are not limited to disagreement with any individual grade. They include alleged in ¶¶ 260–269, including payment or reimbursement of PSA Grading-Related Charges for a certification product not delivered as Graded Card Credentials materially different from those represented;, resulting overpayment for grading services marketed as expert, standardized, reliable, and market-authoritative; payment of inflated or excessive fees, speed premiums, upcharges, repeat-service charges, shipping, handling,

insurance, return-shipment charges, and related and transaction costs; loss of the benefit of the bargain; and, where applicable, diminution in value, marketability, liquidity, or certification reliability of PSA-graded cards, and other recoverable economic losses.

363.349. WHEREFORE, Plaintiff requestsPlaintiffs request that this Court enter judgment against Defendants on this cause of action as follows:

a.a. An award of actual damages, the precise measure of which is to be determined;

b.b. An award of treble damages pursuant to 18 U.S.C. § 1964(c); and

c.c. An award of attorneys' fees and expenses.

**FOURTH CLAIM FOR RELIEF**

**RICO VIOLATION OF 18 U.S.C. § 1962(a) — REINVESTMENT OF RACKETEERING INCOME IN THE ACQUISITIONS OF SGC AND BGS AND OTHER CHANNELS (Against Defendant Collectors)**

364.350. Plaintiff reasserts, reallegesPlaintiffs reassert, reallege, and incorporatesincorporate herein by reference all preceding factual allegations, including specifically paragraphs 1–55, 68–222, and 223–273, when asserting the foregoing this cause of action.

365.351. Defendant Collectors is a RICO "person" within the meaning of under 18 U.S.C. §§ 1961(3) and 1962(a).

366.352. For purposes of this Claim, Plaintiff further pleadsPlaintiffs plead the Grading-Intake Enterprise as the primary enterprise into whose affairswhich Collectors allegedly used or invested racketeering proceeds were invested,income and the Trading-Card Grading Enterprise in the alternative. Plaintiffs further allege SGC and, to the extent the announced transaction closed or was implemented, BGS are alsoas enterprises in their own right within the meaning of § 1961(4), into which Collectors invested racketeering proceeds through the SGC

acquisition (closed February 2024) and the BGS acquisition (announced December 15, 2025, as transactions alleged in ¶¶ 43, 5642–44, 53(b), 71–74, 212201–204, and 269255–256.

357. Through the pattern of racketeering activity set forthpattern alleged above, Collectors—, directly and through its wholly owned subsidiary PSA— and affiliated operations, derived substantial racketeering income from consumers nationwide, including from Grading-Related Charges, expedited-service premiums, declared-value upcharges, repeat-submission fees, crossover fees, review fees, reholdering fees, Vault custody fees, Partner Offer transaction fees,the grading-related and downstream revenue tied to PSA's grading determinations.

353. Collectors used and invested a portion of that racketeering income, directly and indirectly,revenues identified in the establishment, operation, and expansion of one or more enterprises engaged in interstate commerce. Specifically, on¶ 255.

358. On information and belief, Collectors used or invested racketeering portions of that income to fund or facilitate:

a. The February 2024 acquisition of SGC, through which Collectors absorbed PSA's historical price-and-turnaround competitor and converted SGC into a Collectors-controlled grading brand operating within the same enterprise;

b. The acquisition of BGS, announced on or about December 15, 2025, through which Collectors absorbed PSA's historical subgrade and Black-Label competitor and converted BGS into a Collectors-controlled grading brand operating within the same enterprise;

c. The acquisition of Card Ladder in December 2021, the establishment and expansion of the PSA Vault, the establishment of PSA Partner Offers, and the

establishment of Collectors Financial Services, each of which is an enterprise establish, operate, and expand enterprises affecting interstate commerce; and

d.354. The April 2024 commercial agreements with eBay, including PSA's : (a) the February 2024 SGC acquisition; (b) the December 15, 2025, announced agreement to acquire BGS; (c) Card Ladder, the PSA Vault, PSA Partner Offers, Collectors Financial Services, and related grading and market infrastructure; and (d) the April 2024 eBay agreements and acquisition of the eBay Vault. Plaintiffs do not allege one-to-one tracing; where proceeds were commingled with other fungible revenue, use or investment may be shown through aggregate receipts, timing, transfers, budgets, and economic substitution.

369.355. The acquisitions of SGC and BGSPlaintiffs allege these transactions were not isolated business transactions. They were the financial investments but vehicles through which Collectors converted racketeering proceeds extracted from consumers into permanentused grading-derived income to expand structural market power, eliminating PSA's two principal historical competitors, raising PSA-affiliated control over competing grading market share to approximately 80% of all U.S. third-party trading-card brands and the integrated grading volume, and entrenching the very deceptive grading practices alleged herein within the Collectors enterprise.ecosystem. *See supra* ¶¶ 201–204, 255–256.

360. Plaintiff and members ofPlaintiffs allege the putative classes and subclasses have suffered injury to their money or property by reason of Collectors' use and investment of racketeering income, separate and apart from the injuries caused by the predicate acts themselves. Collectors' use and investment of described in ¶¶ 260–269 resulted directly from the racketeering income caused Plaintiffpattern and, as alternatively alleged in ¶¶ 255–256, that Collectors used or invested proceeds from that pattern to expand and the Class a separate and

~~distinct injury from the~~ reinforce the grading-~~fee injury caused by the predicate acts themselves.~~centered system through which the alleged fraud continued. By using ~~fraud~~grading-derived ~~grading revenues~~proceeds to acquire competing graders~~,~~ and expand integrated pricing ~~and~~, resale, and grading infrastructure, ~~and further entrench PSA's role as the dominant grading credential, Collectors reduced consumer choice, weakened competitive pricing discipline, and foreclosed meaningful~~ Collectors allegedly reduced independent grading alternatives ~~that otherwise would have constrained PSA's fees, practices, and market power. The injury from that investment includes payment of~~and competitive discipline, causing supracompetitive ~~or inflated Grading-Related~~PSA-Imposed Charges ~~in a market whose competitive checks were diminished by Collectors' reinvestment of racketeering proceeds. Specifically, the SGC and BGS acquisitions, funded or facilitated by racketeering income, caused and continue to cause Plaintiff and the Class:~~

~~a. Supracompetitive prices for grading services that, but for the consolidation, would have been disciplined by independent SGC and BGS price competition;~~

~~b. Reduced~~ and reduced choice, quality, transparency, and accountability ~~in grading services that, but for the consolidation, would have been disciplined by independent SGC and BGS quality competition;~~

~~c. Reduced consumer choice and elimination of meaningful alternatives to PSA-controlled grading infrastructure; and~~

~~d.~~356. ~~Diminution~~. Plaintiffs further allege resulting in diminution, where proven, in the value, marketability, ~~and~~or liquidity of cards ~~previously~~ graded by ~~SGC and BGS as standalone~~

formerly independent competitors, whose credentials are now subsumed within the Collectors enterprise.

371. For purposes of § 1962(a), Collectors is the primary RICO person that received, used, and invested income derived from the pattern of racketeering activity. Collectors' conduct violates 18 U.S.C. § 1962(a). Plaintiff's injury under this Claim arises from Collectors' use and investment of racketeering income in the SGC and BGS acquisitions and is distinct from, and additional to, the injury caused by the predicate acts themselves. The acquisitions created and entrenched the supracompetitive pricing, degraded service quality, and elimination of competitive alternatives alleged above, and those harms would not have occurred but for the investment of racketeering proceeds. Plaintiff therefore alleges a distinct investment-use injury, separate from any predicate-act injury, as required to state a claim under 18 U.S.C. § 1962(a).

357. Collectors is the RICO person that allegedly received, used, and invested racketeering income, and Plaintiffs allege that those investments directly caused the injuries described above.

372.358. WHEREFORE, Plaintiff requestsPlaintiffs request that this Court enter judgment against Collectors on this cause of action as follows:

a. a. An award of actual damages, the precise measure of which is to be determined;

b. b. An award of treble damages pursuant to 18 U.S.C. § 1964(c);

c. c. An award of attorneys' fees and expenses.

## FIFTH CLAIM FOR RELIEF

### FRAUD OR DECEIT
### (Against All Defendants)

~~373.~~359. ~~Plaintiff reasserts, realleges~~Plaintiffs reassert, reallege, and ~~incorporates~~incorporate herein by reference all preceding factual allegations, including specifically paragraphs 1–40, 73–204, and 206–222, when asserting ~~the foregoing~~this cause of action.

~~374.~~360. Defendants made false and misleading representations of material fact concerning the ~~PSA Grading~~Graded Card Credential to ~~Plaintiff~~Plaintiffs and the putative Class in four categories:

~~a.~~**a. Expertise claims.** Defendants represented that PSA grading was expert-driven and performed by trained experts ~~with~~possessing specialized skill, experience, and judgment sufficient to evaluate valuable trading cards with precision and consistency. ~~Those~~Plaintiffs allege those representations were false or misleading because PSA ~~allegedly relied on anonymous graders of subpar~~concealed who performed the work and their qualifications~~, trainee-dependent staffing, hobbyist-based hiring criteria, newly hired~~; relied on a constrained expert labor pool, internally developed personnel, trainees and outside ~~contractors, and insufficient grader training, calibration, consistency, and performance data~~market participants; permitted collector experience to qualify as relevant grading experience; and did not disclose whether personnel possessed the represented expertise when they graded consumers' cards.

~~b.~~**b. Standards claims.** Defendants represented that PSA grading was standardized, objective, criteria-based, consistent, transparent, accountable, and governed by recognized and respected universal grading standards. ~~Those~~Plaintiffs allege those representations were false or misleading because PSA ~~allegedly~~ applied ~~malleable criteria, undisclosed or shifting grading~~

~~standards, subjective "~~materially discretionary eye-appeal~~" judgments,~~ and market-acceptance ~~reasoning, inconsistent~~judgments, changed or reinterpreted published criteria, permitted grader ~~judgment, and~~ -to-grader variability, operated under production requirements, and allegedly used ratio~~-based-~~, batch-, or ~~population-level grading~~other institutional review practices capable of affecting grade outcomes.

~~c.~~**c. Process-and-certification claims.** Defendants represented that PSA's grading and certification process produced a reliable, durable, verifiable, and market-authoritative ~~credential, including authentication, grading, encapsulation, a PSA label, a certification number, certification verification, population-report inclusion, guarantee messaging, and return of the graded card. Those~~Graded Card Credential. Plaintiffs allege those representations were false or misleading because PSA ~~allegedly~~ operated a high-volume~~,~~ production~~-driven grading process that produced an undetermined amount of errors~~ system; supplied prior PSA grade information to graders on at least certain identifiable resubmissions; allowed ~~grades to vary on resubmission~~materially different outcomes on repeat assessment; allegedly admitted altered or otherwise nonqualifying cards into numerical-grade populations; retained ~~and used~~ the ~~ability~~power to ~~alter~~revise, deactivate, downgrade, or ~~effectively erase certification records;~~otherwise alter issued certifications; published population data susceptible to stale, duplicate, misclassified, and other distorted entries; materially limited the ~~practical protection of its~~ Guarantee; and attempted through Online Terms to recast the marketed ~~certification product~~Graded Card Credential as a subjective, non-warranted opinion.

~~d.~~**d. Market-use and independence claims.** Defendants represented, expressly and by implication, that PSA grades, slabs, labels, certification numbers, certification tools, ~~population reports, price guides, Card Ladder valuation data, PSA Vault services, PSA Partner Offers,~~

marketplace integrationsPopulation Reports, pricing and valuation data, and related market infrastructure could be relied upon in pricing, buying, selling, holding, insuring, financing, lending against, vaulting, and valuing graded cards. Those, and represented PSA's role as impartial and free of financial conflict. Plaintiffs allege those representations were false or misleading because the market-facing credentialGraded Card Credential and scarcity data products allegedly rested on subjective, inconsistent, opaque, revisable, ratio-influenced, stale, duplicate, error-filled, or otherwise distortedthe undisclosed grading and, certification, population, and conflict practices alleged above, while Collectors monetized the same, senior leadership, and PSA personnel held corporate or personal economic interests tied to grades, scarcity, and grade-dependent values through pricing, custody, offers, resale, lending, marketplace routing, and grading-related feestransactions.

375.361. Defendants made those communicated the challenged representations to PlaintiffPlaintiffs, Class members, Card Grading Intermediaries, and the market each time consumers submitted cards for PSA grading, paid or reimbursed PSA Grading-Related Charges, received grading results, relied on PSA certification data, or used PSA gradesthrough the standardized channels alleged in ¶¶ 73–139 and population reports in market transactions. The representations were communicated through 206–222, including PSA's websites, grading and standards, service pages, pricing schedules,and Guarantee language, graded-card labels, encapsulated holders,materials, slabs and certification-verification tools, population reports, CardFacts pages, price guides, Card LadderPopulation Reports, valuation data, PSA Vault materials, and Downstream Channels, PSA Partner Offers, dealer programs, marketplace and dealer integrations, hobby-media messaging, sponsored or amplified content, emails, invoices, upcharge notices, payment

communications, invoices, upcharges, and return shipments~~, and statements repeated or relayed by Card Grading Intermediaries acting as PSA-facing conduits~~.

~~376.~~362. ~~As alleged herein,~~ PSA disseminated the ~~challenged~~ expertise, standards, process-and-certification, and market-use representations through ~~the~~those consumer-facing and intermediary channels~~ identified above~~, while Collectors ~~directed,~~allegedly amplified~~,~~ and monetized ~~those fraudulent representations~~them through its integrated platforms and Downstream Channels. ~~Before and during Plaintiff's March 2025 submission, and in materially similar transactions throughout the limitations period, those~~Those representations induced ~~Plaintiff~~Plaintiffs and Class members to submit cards and pay ~~or reimburse~~ PSA Grading-Related Charges for ~~a certification product~~Graded Card Credentials marketed as impartial, expert, objective, standardized, criteria-based, reliable, durable, and market-authoritative~~.~~, while Defendants ~~obtained those payments while concealing the subjective, inconsistent, high-volume, revisable, and financially conflicted~~allegedly concealed the materially different system ~~that produced the credential~~described above.

~~377.~~363. Defendants' representations were also actionable half-truths. ~~PSA chose~~Having chosen to speak about expertise, ~~universal~~ standards, ~~process~~ reliability, certification~~ verification, guarantee~~ , Guarantee protection, ~~population reports, turnaround~~Population Reports, timing, pricing, and market authority~~. Having chosen to speak on those subjects~~, Defendants ~~were required to disclose the~~allegedly omitted material facts that ~~materially~~ qualified those representations, including the grader~~ anonymity and undisclosed qualifications, trainee or contractor participation, subjective eye appeal, inconsistent grader judgment, high-volume speed pressure, undisclosed~~, subjectivity,

production, standards ~~changes, resubmission variability~~, certification ~~record alteration~~, Guarantee ~~limitations~~, population ~~report distortion, post-submission upcharge leverage, and Collectors'~~, pricing, and downstream ~~conflicts. Defendants' omissions made their affirmative statements misleading~~ conflict facts alleged in ¶¶ 130–204.

~~378.~~364. Plaintiffs allege Defendants knew ~~these~~the representations were false or misleading, or acted with reckless disregard for their truth, because Defendants created, controlled, or possessed superior knowledge of PSA's ~~graders~~grader selection and qualifications, grading ~~process,~~ standards, ~~quality-control systems,~~ production ~~environment, population reports~~requirements, prior-grade alerts, internal review and research workflows, employee conflict policies, executive and employee market participation, alteration-screening and numerical-grade eligibility practices, certification and correction records, Population Reports, fee architecture, Guarantee limitations, turnaround calculations, and downstream ~~conflicts~~financial interests.

~~379.~~365. Defendants intended ~~Plaintiff~~Plaintiffs, Class members, Card Grading Intermediaries, and ~~the~~ market participants to rely on those representations because PSA's business model depends on ~~consumers and downstream market participants treating PSA's~~ market trust in its grade, slab, label, certification number, ~~population-report~~Population Report entry, and ~~certification-~~verification record ~~as trustworthy market credentials~~.

~~380.~~366. ~~Plaintiff~~Plaintiffs justifiably relied on ~~Defendants' false and misleading~~those representations and omissions when ~~he~~they submitted cards ~~for PSA grading~~, paid or reimbursed PSA Grading-Related Charges, and treated PSA grades, certifications, and ~~population data~~Population Reports as authoritative~~, and accepted PSA's market-facing~~

certification product as the reliable output outputs of expert, standardized, criteria-based grading. *See supra* ¶¶ 206–222. That reliance included PSA's representation that identifiable physical criteria—including surface, centering, corners, and edges—materially structured the professional condition assessment, as well as the advertised turnaround time associated with the selected service tier.

381.367. As a direct and proximate result of Defendants' fraudulent misrepresentations and half-truths and omissions, Plaintiff sustained actual , Plaintiffs suffered the economic damagesinjuries alleged in ¶¶ 220–222 and 260–266, including payment or reimbursement of PSA Grading-Related Charges for a certification productand overpayment for Graded Card Credentials materially different from the onethose represented, overpayment for grading services marketed as expert and standardized, payment of upcharges, speed premiums, repeat-service fees, shipping, handling, insurance, and related chargestransaction costs, and loss of the benefit of the bargain. Plaintiffs further allege that PSA's excess retention of their independently valuable cards beyond the advertised service-tier periods contributed to the economic overpayment and, where separately proven, additional market-timing or liquidity loss.

382.368. Plaintiffs allege Defendants acted knowingly, intentionally, and with malice because they continued marketing by continuing to market PSA's grading and certification productCredential as expert, standardized, reliable, durable, and market-authoritative while concealing material contrary facts within their possession that made those representations false or materially misleading. Plaintiff is therefore entitled to. Plaintiffs seek punitive damages to the extent permitted by law.

369. WHEREFORE, ~~Plaintiff~~Plaintiffs, individually and on behalf of the putative Class, ~~requests~~request that ~~this~~the Court enter judgment against Defendants on the Fifth Claim for Relief and award:

a. actual damages, including overpayment, benefit-of-the-bargain damages, PSA Grading-Related Charges paid or reimbursed for Graded Card Credentials not delivered as represented, transaction costs, and any diminished value, marketability, liquidity, or certification reliability proven at trial;

b. restitution and disgorgement to the extent permitted by law, including fraudulently obtained grading fees, upcharges, expedited-service premiums, repeat-service fees, shipping, handling, insurance, return-shipment charges, and other PSA Grading-Related Charges;

c. punitive damages based on Defendants' knowing, intentional, malicious, or reckless misconduct, to the extent permitted by law;

d. pre-judgment and post-judgment interest;

e. attorneys' fees and costs to the extent permitted by law; and

f. such other and further relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

## FRAUDULENT CONCEALMENT
**(Against All Defendants)**

370. Plaintiffs incorporate the preceding allegations, including specifically paragraphs 1–40, 73–204, and 206–222, when asserting this cause of action.

371. Defendants' alleged concealment was not silence in a vacuum. After choosing to speak about PSA's expertise, standards, methodology, reliability, certification, Guarantee, Population Reports, timing, pricing, and independence, Defendants allegedly omitted material facts that qualified those statements, including: (a) grader qualifications and whether graders

possessed the represented expertise when performing the work; (b) subjective eye-appeal and market-acceptance judgments; (c) grader-to-grader variability; (d) trainees, internally developed personnel, contractors, and other market participants; (e) production targets, extended shifts, internal research holds, and approval requirements; (f) changing or discretionary grading criteria; (g) prior PSA grade information supplied on at least certain identifiable resubmissions; (h) review, resubmission, crossover, and cracking variability; (i) alteration-screening and numerical-grade eligibility practices; (j) certification correction, deactivation, or downgrade; (k) duplicate, stale, misclassified, nonqualifying, or otherwise distorted Population Report data; (l) employee and executive personal financial conflicts; (m) Collectors' downstream financial interests; (n) post-submission MIV, valuation, and upcharge leverage; (o) Guarantee limitations; and (p) Online Terms not shown to beneficial owners. *See supra* ¶¶ 130–204.

372. Plaintiffs allege Defendants had a duty to disclose those facts because they materially qualified Defendants' affirmative and partial representations concerning the same subjects. *See supra* ¶¶ 206–222.

373. Defendants allegedly concealed those facts through anonymous grading; nondisclosure of grader qualifications, training, calibration, production metrics, prior-grade alerts, internal review and research workflows, conflict controls, and performance data; confidentiality restrictions; separated or collapsed pricing and timing disclosures; hyperlinked Online Terms; limited Guarantee language; nondisclosure of alteration-screening, grade-change, error, certification-correction, and Population Report limitations; and market-facing tools that communicated reliability and independence without the qualifying internal information.

374. Defendants intended Plaintiffs and Class members to rely on the resulting impression through PSA's websites, standards, pricing pages, Guarantee, slabs, labels,

certification tools, Population Reports, dealer and intermediary programs, hobby-media messaging, and marketplace integrations.

375. Plaintiffs and Class members relied on that impression by submitting cards, selecting service tiers, paying or reimbursing PSA Grading-Related Charges and related transaction costs, where applicable accepting post-submission or repeat-service charges, and treating PSA grades, certifications, and Population Reports as reliable market credentials. Had the omitted facts been disclosed, they would not have transacted on the same terms or paid as much.

376. As a direct and proximate result, Plaintiffs and Class members suffered the economic injuries alleged in ¶¶ 220–222 and 260–266, including Grading-Related Charges and overpayment for materially different Graded Card Credentials, related fees and transaction costs, and loss of the benefit of the bargain. The concealed timing facts likewise caused Plaintiffs to purchase service tiers at prices and on possession terms they allege they would not have accepted had PSA accurately disclosed the time reasonably required under its actual operating conditions.

377. Plaintiffs allege Defendants acted knowingly, intentionally, and with malice because they possessed superior knowledge of the concealed facts yet continued marketing PSA grading as expert, objective, standardized, reliable, guaranteed, and market-authoritative. Plaintiffs seek punitive damages to the extent permitted by law.

~~383.~~378. WHEREFORE, Plaintiffs, individually and on behalf of the putative Class, request that this Court enter judgment against Defendants on this cause of action as follows:

~~a.~~a. an award of actual damages, including overpayment, loss-of-benefit-of-the-bargain damages, PSA Grading-Related Charges paid or reimbursed for a certification product or ~~Grading~~Graded Card Credential not delivered as represented, transaction costs, and any

diminished value, reduced marketability, reduced liquidity, or reduced certification reliability proven at trial;

~~b.~~b. an award of restitution and/or disgorgement to the extent permitted by law, including the return of fraudulently obtained grading fees, upcharges, expedited-service premiums, repeat-service fees, shipping, handling, insurance, return-shipment charges, and other PSA Grading-Related Charges;

~~c. an award of punitive damages based on Defendants' knowing, intentional, malicious, and reckless misconduct, to the extent permitted by law;~~

~~d.an award of~~c. ~~pre-judgment and post-judgment interest;~~

~~e.an award of attorneys' fees and costs to the extent permitted by law; and~~

~~f.such other and further relief as the Court deems just and proper.~~

~~**SIXTH CLAIM FOR RELIEF**~~

~~**FRAUDULENT CONCEALMENT**~~
~~**(Against All Defendants)**~~

~~370. Plaintiff reasserts, realleges, and incorporates by reference all preceding allegations when asserting this cause of action.~~

~~371. Defendants' fraudulent concealment was not silence in a vacuum. Defendants chose to speak about PSA's grading expertise, standards, methodology, reliability, certification system, guarantee protection, population reports, turnaround times, and pricing structure. Those statements created the misleading impression that PSA grading and Grading Credential were performed by true experts applying stable, objective, universal standards through a reliable and durable certification process. Defendants then omitted material facts that made those statements misleading, including:~~

a. that PSA grading depended on subjective "eye appeal" judgments and market-acceptance determinations that were not fixed, measurable, or independently verifiable;

b. that different graders could view the same flaw differently, penalize the same card differently, and reach materially different grading outcomes;

c. that PSA's graders were anonymous and of undisclosed qualifications, training, calibration, consistency, and performance history;

d. that PSA did not require prior professional grading experience, specialized training, or certification for card-grader positions and relied on trainees, hobbyists, newly hired personnel, and outside contractors whose role and qualifications were not disclosed;

e. that PSA's grading process operated under high-volume speed pressure, production expectations, and short review windows inconsistent with the careful, expert, individualized review PSA marketed;

f. that PSA's published grading criteria could be changed, reinterpreted, or qualified by undisclosed discretion, including the January 2025 centering-tolerance changes;

g. that PSA's grades could be materially inconsistent on resubmission, review, crossover, or cracking of the same unchanged card;

h. that PSA retained and used the ability to deactivate, modify, downgrade, alter, or effectively erase certification records after issuance;

i. that PSA's population reports could reflect subjective, inconsistent, ratio-influenced, duplicate, stale, cracked-out, crossed-over, or otherwise distorted grade counts;

~~j. that PSA could impose post-submission declared-value, Maximum Insured Value, adjusted grading fee, or upcharge demands after obtaining possession of the card and after its own grade helped create or confirm the card's market value;~~

~~k. that PSA's Guarantee did not provide the protection consumers would reasonably expect, including because the original submitter or payor may be excluded and because PSA controls error determination, valuation, and remedy;~~

~~l. that PSA's online terms, including arbitration provisions, class waivers, liability caps, warranty disclaimers, and subjective-opinion language, were not shown to downstream beneficial owners submitting through Card Grading Intermediaries; and~~

~~m. that Collectors' vertically integrated pricing, custody, offer, resale, lending, marketplace, and submission-channel infrastructure created undisclosed conflicts tied to the very grades and scarcity signals PSA marketed as neutral.~~

~~372. Defendants had a duty to disclose those material facts because they chose to speak about the very subjects the omitted facts qualified. PSA affirmatively represented that grading was expert-driven, standardized, criteria-based, reliable, accountable, and market-authoritative; that trained experts applied recognized and respected universal grading standards; that PSA grades, holders, labels, certification numbers, population reports, and guarantees could be trusted; and that PSA's service tiers, pricing, turnaround times, and upcharge practices accurately described the services being purchased. Once Defendants made those partial representations, they had a duty to disclose the omitted facts necessary to make their statements not misleading.~~

~~373. Defendants concealed those facts through affirmative conduct and controlled omissions, including anonymous grading; nondisclosure of grader identities, qualifications, training, calibration, consistency, and performance metrics; confidentiality restrictions on graders~~

and former graders; separated and collapsed pricing disclaimers; hyperlinked Online Terms; limited Guarantee language; nondisclosure of resubmission grade-change rates; nondisclosure of error, deactivation, downgrade, or certification-alteration rates; nondisclosure of population-report limitations; and market-facing slabs, labels, certification tools, population reports, and pricing tools that communicated reliability without disclosing the internal facts that undermined it.

374. Defendants intended Plaintiff and Class members to rely on the misleading impression created by their half-truths and omissions. PSA engineered that reliance through its websites, grading standards, pricing pages, guarantee language, graded-card slabs, labels, certification numbers, certification-verification tools, population reports, dealer programs, Card Grading Intermediaries, hobby-media messaging, and marketplace integrations.

375. Plaintiff and members of the putative classes and subclasses took action in reliance on Defendants' concealment and the misleading impression Defendants created, including submitting cards for PSA grading and Grading Credential, selecting service tiers, paying or reimbursing PSA Grading-Related Charges, paying shipping, handling, insurance, or return charges, accepting or paying post-submission charges, and treating PSA grades, certification numbers, and population reports as reliable market credentials. Had Defendants disclosed the omitted facts, Plaintiff and reasonable consumers would not have submitted cards on the same terms, paid the same charges, accepted the same upcharges, relied on PSA's certification product in the same way, or paid as much.

376. As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff and members of the putative classes and subclasses sustained actual economic damages that include payment or reimbursement of Grading-Related Charges for a certification product or

Grading Credential materially different from the one PSA marketed, including payment of upcharges, repeat-service fees, speed premiums, shipping, handling, insurance, and related charges; overpayment for services represented as expert, standardized, reliable, and market-authoritative; and loss of the benefit of the bargain.

377. Defendants acted knowingly, intentionally, and with malice because they had superior knowledge of their own graders, grading process, production environment, standards, certification records, fee architecture, population-report limitations, guarantee limitations, and downstream conflicts, yet continued to market PSA grading as expert, objective, standardized, reliable, guaranteed, and market-authoritative while concealing the facts that made those statements misleading. Plaintiff is therefore entitled to recover punitive damages to the extent permitted by law.

378. WHEREFORE, Plaintiff, individually and on behalf of the putative Class, requests that this Court enter judgment against Defendants on this cause of action as follows:

a. an award of actual damages, including overpayment, loss-of-benefit-of-the-bargain damages, PSA Grading-Related Charges paid or reimbursed for a certification product or Grading Credential not delivered as represented, transaction costs, and any diminished value, reduced marketability, reduced liquidity, or reduced certification reliability proven at trial;

b. an award of restitution and/or disgorgement to the extent permitted by law, including the return of fraudulently obtained grading fees, upcharges, expedited-service premiums, repeat-service fees, shipping, handling, insurance, return-shipment charges, and other PSA Grading-Related Charges;

~~c.~~an award of punitive damages based on Defendants' knowing, intentional, malicious, and reckless misconduct, to the extent permitted by law;

~~d.~~d. an award of pre-judgment and post-judgment interest;

~~e.~~e. an award of attorneys' fees and costs to the extent permitted by law; and

~~f.~~f. such other and further relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF

**~~NEGLIGENT MISREPRESENTATION~~**
**~~(PLEADED IN THE ALTERNATIVE)~~**
**~~(Against All Defendants)~~**

~~392. Plaintiff reasserts, realleges, and incorporates herein by reference all preceding allegations when asserting the foregoing cause of action.~~

~~393. This claim is brought under Maryland common law, including principles reflected in Restatement (Second) of Torts § 552 (Am. L. Inst. 1977), as recognized and applied by Maryland courts in negligent-misrepresentation cases involving economic loss, professional information, and privity-equivalent relationships. *See Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645 (2000); *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527 (1986).~~

~~394. Pleaded in the alternative to Plaintiff's intentional-fraud claims, Defendants, in the course of their business, profession, employment, and transactions in which they had a pecuniary interest, supplied false and misleading information for the guidance of Plaintiff, Class members, Card Grading Intermediaries, and the market in business and economic transactions.~~

~~395. The information Defendants supplied was not casual commentary or a mere private opinion. Defendants supplied market-facing information designed to guide economic conduct, including representations and data concerning PSA's expert graders, universal grading standards, grading methodology, grading reliability, service tiers, pricing, Maximum Insured Value, upcharges, turnaround times, certification numbers, certification-verification records,~~

slabs, labels, population reports, guarantees, price guides, Card Ladder valuation data, PSA Vault services, PSA Partner Offers, and marketplace integrations.

396. Defendants knew, or should have known, that Plaintiff, Class members, Card Market Participants, and other market participants would use that information to decide whether to submit cards, pay PSA Grading-Related Charges, select service tiers, pay speed premiums, accept or pay upcharges, resubmit cards, pursue review or crossover, buy, sell, hold, insure, finance, lend against, vault, or otherwise rely on PSA-certified cards.

397. The relationship between Defendants' information and Plaintiff's economic decisions created the required intimate nexus. Defendants did not merely publish information to an indeterminate public for unknown use. PSA designed its certification architecture so that a determinate and foreseeable class of beneficial card owners, submitters, Card Market Participants would rely on PSA's grading, certification, population, pricing, and market-authority information in connection with the PSA Grading . Defendants intended and expected that reliance because the value of PSA's business depends on it.

398. Defendants failed to exercise reasonable care or competence in obtaining, verifying, and communicating the information they supplied. Among other things, Defendants failed to exercise reasonable care in representing that PSA grading was expert-driven, objective, criteria-based, standardized, reliable, guaranteed, durable, and market-authoritative while omitting or miscommunicating material facts about grader qualifications, anonymous graders, trainee-dependent staffing, outside contractors, subjective eye appeal, inconsistent outcomes, production pressure, undisclosed standards changes, certification-record alteration, population-report limitations, Guarantee exclusions, upcharge practices, and Defendants' downstream conflicts.

399. Defendants' information was false, misleading, or materially incomplete. PSA represented that its grading was performed by expert graders applying recognized and respected universal standards through a reliable certification process. In reality, Plaintiff alleges PSA's process depended on undisclosed subjectivity, malleable criteria, inconsistent application, production pressure, anonymous or insufficiently credentialed graders, hidden discretion, revisable certification records, and population data that could be distorted, stale, duplicate, ratio-influenced, or otherwise misleading.

400. Plaintiff and Class members justifiably relied on Defendants' false or misleading information. Plaintiff relied on this information when he submitted his cards for PSA grading, selected service tiers, paid or reimbursed PSA Grading-Related Charges, treated PSA grades and population data as authoritative, and accepted PSA's market-facing certification product as the reliable output of expert and standardized grading. Class members relied on this information in the same or materially similar ways, directly or through Card Grading Intermediaries and the PSA-centered market Defendants built.

401. Plaintiff's reliance was reasonable because Defendants possessed superior and specialized knowledge concerning their own graders, grading process, standards, quality-control systems, production environment, fee architecture, Guarantee limitations, certification records, population-report data, and downstream conflicts. Plaintiff and Class members could not reasonably discover those facts before submission or payment.

402. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff and Class members suffered pecuniary loss, including payment or reimbursement of PSA Grading-Related Charges for a certification product materially different from the one represented; overpayment for grading services marketed as expert, standardized, reliable, and

~~market-authoritative; payment of upcharges, speed premiums, repeat-service fees, shipping, handling, insurance, and related charges; and loss of the benefit of the bargain to the extent recoverable under Maryland law.~~

~~403. This claim does not seek to enforce any PSA Online Terms, submission contract, dealer agreement, or group-submission agreement. Plaintiff pleads this claim in tort and in the alternative, based on Defendants' supply of false or misleading information for the guidance of others in economic transactions.~~

~~404. WHEREFORE, Plaintiff requests actual damages, restitution to the extent permitted by law, prejudgment and post-judgment interest, attorneys' fees and costs where recoverable, and all other relief the Court deems just and proper.~~

## ~~EIGHTH CLAIM FOR RELIEF~~

### ~~NEGLIGENCE IN RENDERING SPECIALIZED TRADE SERVICES~~
### ~~MARYLAND COMMON LAW AND~~
### ~~RESTATEMENT (SECOND) OF TORTS § 299A~~
### ~~(PLEADED IN THE ALTERNATIVE)~~
### ~~(Against All Defendants)~~

~~405. Plaintiff reasserts, realleges, and incorporates by reference all preceding allegations when asserting this cause of action.~~

~~406. This claim is brought under Maryland common law and the principles reflected in Restatement (Second) of Torts § 299A (Am. L. Inst. 1965), titled "Undertaking in Profession or Trade." One who undertakes to render services in the practice of a profession or trade must exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities. *See id.* Maryland law similarly recognizes that professionals and specialized service providers are held to the standard of care applicable to their profession or trade. *See Jacques*, 307 Md. At 527 (1986); *Walpert*, 361 Md. 645.~~

407. PSA undertook to render specialized trade services by offering authentication, grading, encapsulation, certification, certification verification, population reporting, review, crossover, resubmission, reholdering, relabeling, and related trading-card grading services. PSA held itself out as possessing superior skill, specialized knowledge, expert graders, universal grading standards, reliable methodology, and market-authoritative certification infrastructure.

408. PSA's undertaking was not limited to assigning a number. PSA also provided a market-facing certification product and Grading Credential that included authentication, condition evaluation, a numerical grade, encapsulation in a PSA holder, a proprietary label, a certification number, an entry in PSA's certification-verification system, population-report consequences, guarantee messaging, and PSA brand authority.

409. PSA owed Plaintiff and Class members a duty to exercise reasonable care, skill, knowledge, and competence in rendering those specialized trade services. That duty arose from PSA's undertaking, PSA's superior knowledge, PSA's market-facing representations of expertise and reliability, the known economic use of PSA's certification product, and the intimate nexus between PSA's grading work and the pricing, resale, insurance, lending, financing, liquidity, and marketability of PSA-certified cards.

410. Collectors owed the same duty to the extent it directed, controlled, ratified, or participated in PSA's grading operations, grading-capacity expansion, staffing, fee architecture, population-report practices, certification infrastructure, downstream monetization, and market-facing representations. Collectors cannot direct and profit from PSA's specialized grading infrastructure while avoiding responsibility for the negligent operation of the trade services it controlled and monetized.

411. Defendants breached their duty by failing to exercise the skill, knowledge, and care normally required of a specialized trade service holding itself out as expert, standardized, reliable, and market authoritative. Defendants' breaches included, without limitation:

a. failing to use sufficiently qualified, trained, calibrated, and supervised graders;

b. failing to require prior professional grading experience, specialized training, independent certification, or comparable credentials before allowing graders to participate in the grading process;

c. relying on trainees, recently hired personnel, hobbyists, and outside contractors of undisclosed qualifications while marketing grading as expert review;

d. failing to disclose or control the role of subjective "eye appeal" judgments in grading outcomes;

e. failing to maintain stable, transparent, and consistently applied grading criteria;

f. changing, reinterpreting, or qualifying published standards without adequate consumer notice;

g. operating a high-volume production environment with short review windows, production expectations, and speed pressure inconsistent with careful expert review;

h. failing to maintain adequate grader tracking, quality-control, calibration, and error-review systems;

~~i. failing to disclose the frequency of inconsistent grades, resubmission grade changes, clerical errors, certification deactivations, downgrades, and after-the-fact certification alterations;~~

~~j. failing to maintain accurate, reliable, and non-duplicative population-report data;~~

~~k. failing to provide meaningful recourse or quality assurance for the consumer who paid for the grading service; and~~

~~l. failing to render the grading and certification services with the care commensurate with a service Defendants knew would influence pricing, resale, insurance, lending, financing, liquidity, and consumer reliance.~~

~~413. Plaintiff does not allege in this count that PSA was required to achieve perfection or that every grading disagreement constitutes negligence. Plaintiff alleges Defendants failed to use reasonable care in the process, staffing, training, calibration, quality control, standards administration, certification-record management, and disclosure practices behind the market-facing certification product PSA sold.~~

~~414. This claim survives even if Defendants characterize PSA grades as mere opinions. A trade professional may provide an opinion while still having a duty to use reasonable care, skill, knowledge, methodology, and competence in forming, communicating, documenting, and certifying that opinion. PSA did not sell an abstract opinion; it sold specialized grading and certification services represented as expert, standardized, reliable, and market-authoritative.~~

~~415. Defendants' breaches proximately caused Plaintiff and Class members to suffer economic injury. Plaintiff and Class members paid or reimbursed PSA Grading-Related Charges for specialized grading services not rendered with the care, skill, knowledge, and competence~~

PSA represented and the trade required. Those charges included grading fees, service-tier charges, speed premiums, Maximum Insured Value charges, upcharges, review fees, resubmission fees, crossover fees, reholdering or relabeling charges, shipping, handling, insurance, return-shipment charges, and related costs.

416. Had Defendants exercised reasonable care in rendering PSA's specialized trade services—or had Defendants disclosed the true nature of their grading process, staffing, standards, production environment, quality control, certification-record practices, population-report limitations, and fee leverage—Plaintiff and Class members would not have submitted cards on the same terms, selected the same service tiers, paid the same charges, accepted the same upcharges, or paid as much.

417. This claim is pleaded in the alternative as an independent tort duty arising from Defendants' undertaking to render specialized grading and certification services while holding themselves out as expert, standardized, reliable, and market-authoritative.

418. WHEREFORE, Plaintiff requests actual damages, restitution to the extent permitted by law, prejudgment and post-judgment interest, costs, and all other relief the Court deems just and proper.

NINTH CLAIM FOR RELIEF

**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT, MD. CODE ANN., COM. LAW §§ 13-101 ET SEQ.**
**(Against All Defendants)**

419.379. Plaintiff reasserts, realleges Plaintiffs reassert, reallege, and incorporates incorporate herein by reference all preceding factual allegations, including specifically paragraphs 1–40, 73–204, 206–222, and 274–325, when asserting the foregoing this cause of action.

~~420.~~381. ~~Plaintiff is a consumer~~Plaintiffs are consumers within ~~the meaning of~~ Md. Code Ann., Com. Law § 13-101(c)(1).

~~421.~~381. Each Defendant is alleged to be a merchant within ~~the meaning of~~ Md. Code Ann., Com. Law § 13-101(g)(1) ~~in that each~~because it directly or indirectly offers or makes available ~~to~~ consumer goods or ~~consumer~~ services.

~~422.~~382. PSA Grading-Related Services are consumer services~~ within the meaning of the Maryland Consumer Protection Act. Defendants did not merely sell~~. Each service tier also included a consumer-facing turnaround representation that communicated how long PSA expected the consumer's independently valuable property to remain unavailable during grading. Defendants sold more than a numerical opinion~~. They sold~~: a market-facing ~~certification product that included~~ Graded Card Credential comprising authentication, grading, encapsulation, a proprietary label, ~~a~~ certification number~~, access to PSA's certification-~~ and verification system, ~~population-report~~Population Report inclusion, ~~guarantee~~Guarantee messaging, and PSA brand recognition~~. Defendants~~, marketed ~~that certification product~~ as the output of expert graders applying recognized ~~universal~~ standards through a reliable~~ and~~, market-authoritative process.

~~423.~~ Defendants allegedly engaged in unfair, abusive, ~~and~~or deceptive trade practices ~~in violation of~~through the ~~Maryland Consumer Protection Act~~common conduct detailed in ¶¶ 130–204, including~~ the following:~~

~~a.~~ ~~**Expert**~~: (a) expert-grader misrepresentations~~. Defendants represented that PSA grading was performed by expert graders with specialized skill, experience, and judgment sufficient to evaluate valuable cards with precision and consistency. Those representations had the capacity, tendency, and effect of deceiving consumers because PSA allegedly used anonymous graders of undisclosed qualifications, trainee-dependent~~

staffing, hobbyist-based hiring criteria, and outside contractors while concealing grader identities, qualifications, training, consistency data, and performance metrics.

b. **Universal**; (b) objective and universal-standard misrepresentations. Defendants represented that PSA grading was objective, criteria-based, standardized, and governed by recognized and respected universal grading standards. Those representations were misleading because PSA allegedly applied malleable criteria, undisclosed or shifting grading standards, subjective "eye appeal" judgments, market-acceptance reasoning, and inconsistent grading outcomes that made the actual process materially different from the uniform standards PSA advertised.

c. **Reliable-certification misrepresentations.** Defendants represented that a PSA grade, slab, label, certification number, guarantee, certification-verification record, and population-report entry created a; (c) reliable, durable, market-recognized credential. Those representations were misleading because PSA allegedly retained and used the ability to revise, deactivate, downgrade, alter, or effectively erase certification records; limited the practical protection of its Guarantee; and published population data that could be stale, duplicate, distorted, or based on subjective and inconsistent grading outcomes.

d. **Price**-certification and Guarantee misrepresentations; (d) independence and conflict misrepresentations; (e) price-premium and market-value **misrepresentations.** Defendants represented, expressly and by implication, that PSA certification justified grading fees, price premiums, increased liquidity, enhanced marketability, and market reliance because PSA grades were expert, standardized, reliable, and authoritative. Those representations were misleading because the value premium Defendants encouraged consumers to pay depended on the veryrepresentations

dependent on the allegedly absent expertise, standards, reliability, neutrality, and certification integrity Defendants allegedly failed to provide.

e. **Material omissions.** Defendants failed to disclosereliability; (f) material factsomissions concerning grader qualifications, grader anonymity, training limitations, subjective eye-appeal discretion, undisclosed subjectivity, standards changes, grading variability, production pressure, certification-recordprior-grade information, alteration, population-report-screening and numerical-grade eligibility, certification and Population Report limitations, personal and corporate financial conflicts, Guarantee exclusions, upcharge practices, possession-basedrestrictions, pricing leverage, and Defendants' downstream conflicts in pricing, custody, resale, offers, lending, and marketplace channels.

f.383. **Deceptive fee**timing practices. Defendants used misleading; and (g) deceptive pricing and fee practices, including involving the visible price-value-speed package, separated turnaround-time disclaimers, Maximum Insured Value qualifications, MIV and declared-value pricing, adjusted grading fees, upcharges, drip and partitioned pricing, repeat-service charges services, and possession-based payment leverage, to extract PSA Grading-Related Charges from consumers who had already committed their cards to PSA's system.

424.384. Taken together, Defendants'Plaintiffs allege those statements and omissions created the materially misleading impression that PSA-certified cards received Graded Card Credentials derived their market valueauthority from expert graders applying fixed universalstable standards through a reliable certification system. That impression was false or materially incomplete. Consumers were led to believe that PSA grades reflected the card's condition under standardized criteria, when Plaintiff alleges the PSA credential was the Graded

Card Credentials were instead affected by ~~undisclosed subjectivity, grader limitations, shifting standards, production pressure, internal discretion, certification-record control, and financial conflicts~~the undisclosed practices alleged above.

~~425.~~385. ~~Plaintiff~~Plaintiffs and~~/or~~ Maryland Subclass members relied on ~~Defendants' misleading~~those representations and omissions when ~~they submitted cards for PSA grading, paid or reimbursed PSA Grading-Related Charges, selected~~submitting cards, selecting service tiers, ~~paid speed premiums, accepted or paid upcharges, paid shipping, handling, insurance, or return charges, pursued review, resubmission, crossover, reholdering, relabeling, or~~ relying on the associated turnaround representations, paying or reimbursing PSA Grading-Related Charges and related costs, accepting post-submission charges, obtaining repeat services, and ~~treated~~treating PSA ~~grades, certification numbers,~~Credentials and ~~population reports~~Population Reports as reliable~~ market credentials.~~. Had ~~Defendants~~the truth been disclosed~~ the truth~~, reasonable consumers would not have ~~submitted cards~~transacted on the same terms~~, paid the same charges, accepted the same upcharges,~~ or paid as much.

~~426. As a direct and proximate result of~~ Defendants' alleged MCPA violations ~~of the Maryland Consumer Protection Act, Plaintiff~~directly and proximately caused Plaintiffs and Maryland Subclass members ~~sustained injuries.~~

386. ~~Plaintiff and Maryland Subclass members suffered~~ actual economic injury~~, including~~.

~~427.~~387. That injury includes the common economic injuries alleged in ¶¶ 220–222 and 260–266, namely payment or reimbursement of PSA Grading-Related Charges for ~~a certification product not delivered as represented;~~materially different Graded Card Credentials, resulting overpayment ~~for grading services marketed as expert, standardized, reliable, and~~

~~market-authoritative; payment of Grading-Related Charges caused by Defendants' deceptive pricing and fraudulent grading practices;~~ and related charges, and loss of the benefit of the bargain~~ because consumers paid for a reliable PSA certification credential but received a materially different product~~.

~~428.~~388. WHEREFORE, ~~Plaintiff requests~~Plaintiffs request actual damages, restitution and disgorgement to the extent permitted by law, declaratory and injunctive relief, reasonable attorneys' fees, costs, and all other relief authorized by Md. Code Ann., Com. Law § 13-408 and applicable law.

## ~~TENTH CLAIM FOR RELIEF~~

## EIGHTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED (PLEADED IN THE ALTERNATIVE) (Against All Defendants)

~~429.~~389. ~~Plaintiff reasserts, realleges~~Plaintiffs reassert, reallege, and ~~incorporates~~incorporate herein by reference all preceding factual allegations, including specifically paragraphs 1–40, 130–204, 206–222, and 321–325, when asserting ~~the foregoing~~this cause of action.

~~430.~~390. ~~Pleaded in the alternative to Plaintiff's statutory claims, Plaintiff~~Alternatively, Plaintiffs conferred a monetary benefit on Defendants ~~by paying or reimbursing~~through PSA Grading-Related Charges~~. The benefit Plaintiff seeks to recover is the money~~ they paid or reimbursed~~, not the performance of any contract.~~. This Claim is ~~pleaded solely in the alternative~~limited to amounts Defendants actually received or retained, does not seek ~~to~~ the value of any market premium or enforce ~~and does not depend upon~~ any ~~submission~~ contract or Online Terms, and is ~~asserted~~ pleaded solely to prevent ~~Defendants'~~ inequitable retention of those payments~~; it is not, and shall not be construed as, an election to embrace,~~

ratify, or accept the . Payment or reimbursement does not constitute assent, ratification, direct-benefits estoppel, or acceptance of any contract containing an arbitration provision, class action waiver, or other contractual limitation of rights.

431.391. Defendants knew of and appreciated the monetary benefit conferred.

432.392. Plaintiffs allege Defendants accepted and retained thethat benefit under circumstances in which it would bemaking retention inequitable for Defendants to retain the benefit without paying value in return, given in light of the fraudulent, and deceptive conduct alleged herein.

433.393. As a direct and proximate result of Defendants' that alleged unjust enrichment, Plaintiff sustained damagesPlaintiffs suffered economic loss.

434.394. WHEREFORE, Plaintiff requestsPlaintiffs request restitution, disgorgement, and such other and further equitable relief as is just and proper.

## PRAYER FOR RELIEF

WHEREFORE, PlaintiffPlaintiffs, the Class, and the Subclasses DEMANDrequest that the Court:

A. A jury trial on all issues so triable;

B. Such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets where appropriate, and an order preserving the status quo with respect to the announced BGS acquisition;

C. Entry of a permanent injunction prohibiting Defendants from engaging in further fraudulent, deceptive conduct, including, where supported by the evidence, divestiture of the SGC and BGS acquisitions.

A. A declarationCertify the proposed Classes and Subclasses under Federal Rule of Civil Procedure 23, appoint Plaintiffs as Class representatives, and appoint Plaintiffs' counsel as Class counsel;

B. Enter judgment in favor of Plaintiffs and the Classes and Subclasses and against Defendants on the claims asserted herein;

D.C. Declare that Defendants' purported Online Terms, including theany arbitration clause andprovision, class-action waiver, jury-trial waiver, forum-selection provision, choice-of-law provision, limitation-of-liability provision, warranty disclaimer, delegation provision, or similar restriction, do not bind Plaintiff or the Class, and, in the alternative, that Plaintiffs and similarly situated Beneficial Card Owners who did not assent to those terms, or, alternatively, are unconscionable and unenforceable as appliedalleged herein;

E.D. An award of Award Plaintiffs and the Classes and Subclasses all actual, compensatory, statutory, and treble, and punitive damages as authorized by law, including treble damages under 18 U.S.C. § 1964(c););), in amounts to be determined at trial;

F. Restitution, disgorgement, rescission, and reformation as appropriate;

E. An award ofAward punitive damages on the claims and to the extent authorized by applicable law;

F. Award restitution, disgorgement, or other equitable monetary relief to the extent authorized by the claims asserted and applicable law, without enforcing contractual rights or performance obligations under any agreement between PSA and a Card Grading Intermediary;

G. Enter appropriate declaratory and injunctive relief, to the extent authorized by law, requiring Defendants to cease the deceptive practices established at trial and to provide materially accurate and non-deceptive disclosures concerning the Graded Card Credential, grading practices, pricing, upcharges, turnaround times, Guarantee limitations, Population Reports, certification practices, and purported contractual limitations;

H. Award pre-judgment and post-judgment interest as permitted by law;

G.I. Award Plaintiffs reasonable attorneys' fees, expert feesexpenses where recoverable, and costs of suit as, including those authorized by 18 U.S.C. § 1964(c), Md. Code Ann., Com. Law § 13-408, and other applicable law; and

J. SuchGrant a jury trial on all issues so triable; and

H.K. Grant such other and additionalfurther relief as the Court may determine to bedeems just and proper.

On this 27th29th day of JulySeptember, 2026. Respectfully submitted,

*/s/ Thomas R. Bundy III*

Thomas R. Bundy III
Federal Bar No. 15265
ADVOCARE LEGAL GROUP,
A Member of Zealous Advocates
8115 Maple Lawn Boulevard
Suite 275
Fulton, Maryland 20789
Telephone: (240) 500-3595
Facsimile: (240) 657-1109
Thomas.Bundy@Z-Advocates.com

Jeremy Eldridge
Federal Bar No. 29830
Adam Crandell
Federal Bar No. 29463
ELDRIDGE CRANDELL LLC,
A Member of Zealous Advocates
One South Street
Suite 2150

Baltimore, Maryland 21202
Telephone: (443) 559-4384
Facsimile: (443) 288-6633
Jeremy.Eldridge@Z-Advocates.com
Adam.Crandell@Z-Advocates.com

Andrew D. Herman
Admitted Pro Hac Vice
Stanley Brand
Admitted Pro Hac Vice
THE HERMAN LAW FIRM LLC
A Member of Zealous Advocates
1775 Pennsylvania Ave., NW
Suite 650
Washington, D.C. 20006
Telephone: (202) 350-3397
Andrew.Herman@Z-Advocates.com
Stan.Brand@Z-Advocates.com

*Counsel for Plaintiffs*